**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

ORLANDO CORDIA HALL,

*Petitioner*,

v.

T.J. WATSON, in his official
capacity as Complex Warden of U.S.P,
Federal Correctional Complex (FCC) Terre
Haute,

*Respondent*.

**No. 2:20-cv-599**

**<u>DEATH PENALTY CASE</u>**

**EXECUTION DATE:
November 19, 2020**

**PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241**

Pieter Van Tol (*pro hac vice* pending)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

Kaitlyn A. Golden (*pro hac vice* pending)
Kathryn Marshall Ali (*pro hac vice* pending)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
kaitlyn.golden@hoganlovells.com
kathryn.ali@hoganlovells.com

*Counsel for Orlando Cordia Hall*

November 12, 2020

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ......................................................................................................... 4

    A.    Procedural History ........................................................................... 4

    B.    Newly Discovered Evidence ............................................................ 9

        1.    The Prosecution's History of Racial Bias .......................... 9

        2.    Racial Bias in Application of the Federal Death Penalty,
                Particularly in Texas ......................................................... 13

ARGUMENT 14

    I.    MR. HALL IS ENTITLED TO BRING HIS PETITION UNDER §
        2241 .......................................................................................... 14

    II.    THE GOVERNMENT USED ITS PEREMPTORY CHALLENGES
        TO STRIKE BLACK JURORS BASED ON THEIR RACE ................... 19

        A.    Striking Jurors on the Basis of Race Violates the Constitution ..................... 21

        B.    The Prima Facie Case. ................................................................... 23

        C.    AUSA Macaluso's Background as a Serial Batson Violator ......................... 25

        D.    The Prosecution's Proffered Reasons for Striking Qualified
                Black Jurors Amy Evans and Billie Lee Were Pretextual ............................. 28

    III.    AS ADMINISTERED BY THE GOVERNMENT, THE FEDERAL
        DEATH PENALTY VIOLATES THE FIFTH AND EIGHTH
        AMENDMENTS AND THE FDPA BECAUSE OUTCOMES ARE
        IMPERMISSIBLY INFLUENCED BY RACE ...................................... 37

        A.    Data Show that Federal Capital Cases Are Impermissibly
                Influenced By Race ........................................................ 37

        B.    The Constitution And The Federal Death Penalty Act Forbid
                Death Sentences That Are Influenced By Racial Bias ..................................... 44

CONCLUSION ........................................................................................................... 49

i

REQUEST FOR RELIEF

STATEMENT IN COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES:**

*Aldridge v. United States*,
   283 U.S. 308 (1931) .................................................................................................53

*Atkins v. Virginia*,
   536 U.S. 304 (2002) .................................................................................................23

*Batson v. Kentucky*,
   476 U.S. 79 (1986) ......................................................................................... *passim*

*Brown v. Rios*,
   696 F.3d 638 (7th Cir. 2012) ...................................................................................22

*Buck v. Davis*,
   137 S. Ct. 759 (2017) ..................................................................................25, 46, 53

*Chambers v. State*,
   784 S.W.2d 29 (Tex. Crim. App. 1989) ...................................................................34

*In re Davenport*,
   147 F.3d 605 (7th Cir. 1998) .............................................................................21, 25

*Davis v. Ayala*,
   576 U.S. 257 (2015) .................................................................................................52

*Dawson v. Delaware*,
   503 U.S. 159 (1992) .................................................................................................28

*Eddings v. Oklahoma*,
   455 U.S. 104 (1982) .................................................................................................51

*Ex parte Travis*,
   776 So. 2d 874 (Ala. 2000) ......................................................................................44

*Flowers v. Mississippi*,
   139 S. Ct. 2228 (2019) .................................................................................... *passim*

*Foster v. Chatman*,
   136 S. Ct. 1737 (2016) ..................................................................................26, 28, 35

*Furman v. Georgia*,
   408 U.S. 238 (1972) .................................................................................................51

*Garza v. Lappin*,
253 F.3d 918 (7th Cir. 2001) ........................................................22

*Gregg v. Georgia*,
428 U.S. 153 (1976)........................................................51

*Hall v. United States*,
526 U.S. 1117 (1999)........................................................14

*Hall v. United States*,
549 U.S. 1343 (2007)........................................................16

*Hall v. United States*,
No. 4:00-cv-00422-Y, 2004 WL 1908242 (N.D. Tex. Aug. 24, 2004) ...................16

*Hall v. Watson*,
No. 2:17-cv-00176-JPH-DLP (S.D. Ind., pending) ................................16

*Ham v. South Carolina*,
409 U.S. 524 (1973)........................................................53

*Harris v. Hardy*,
680 F.3d 942 (7th Cir. 2012) ........................................................28

*Hernandez v. New York*,
500 U.S. 352 (1991)........................................................29

*Lee v. Warden USP Terre Haute*,
No. 19-cv-00468, 2020 WL 3489355 (S.D. Ind. June 26, 2020)......................23

*McCleskey v. Kemp*,
481 U.S. 279 (1987)........................................................52, 55

*Miller-El v. Cockrell*,
537 U.S. 322 (2003) ("*Miller-El I*") ............................................ *passim*

*Miller-El v. Dretke*,
545 U.S. 231 (2005) (*Miller-El II*)............................................ *passim*

*Pena-Rodriguez v. Colorado*,
137 S. Ct. 855 (2017)........................................................25, 26, 53

*Powers v. Ohio*,
499 U.S. 400 (1991)........................................................25

*Proffitt v. Florida*,
428 U.S. 242 (1976)........................................................51

*Purkey v. United States*,
    964 F.3d 603 (7th Cir. 2020) ........................................................22

*Reed v. Quarterman*,
    555 F.3d 364 (5th Cir. 2009) ............................................... *passim*

*Rose v. Mitchell*,
    443 U.S. 545 (1979)..............................................................25, 52

*Roundtree v. Krueger*,
    910 F.3d 312 (7th Cir. 2018) ........................................................21

*Saldano v. Texas*,
    530 U.S. 1212 (2000).....................................................................46

*Scott v. Hubert*,
    610 F.App'x 433 (5th Cir. 2015) ....................................................28

*Snyder v. Louisiana*,
    552 U.S. 472 (2008)...........................................................35, 37, 38

*Turner v. Murray*,
    476 U.S. 28 (1986)...............................................................52, 53

*United States v. Carter*,
    111 F.3d 509 (7th Cir. 1997) ........................................................29

*United States v. Davis*,
    139 S. Ct. 2319 (2019).................................................................16

*United States v. Hall*,
    152 F.3d 381 (5th Cir. 1998) ........................................................14

*United States v. Hall*,
    455 F.3d 508 (5th Cir. 2006) ...........................................16, 34, 51

*United States v. Hunter*,
    932 F.3d 610 (7th Cir. 2019) ........................................................29

*Vasquez v. Hillery*,
    474 U.S. 254 (1986)......................................................................28

*Webster v. Daniels*,
    784 F.3d 1123 (7th Cir. 2015) (en banc) ............................ *passim*

*Webster v. Daniels.*
    964 F.3d 603 (7th Cir. 2020) ........................................................22

*Webster v. Watson,*
  975 F.3d 667 (7th Cir. 2020) ...........................................................................12

*Winston v. Boatwright,*
  649 F.3d 618 (7th Cir. 2011) ...........................................................................28

*Zant v. Stephens,*
  462 U.S. 862 (1983)...........................................................................................53

**STATUTES:**

18 U.S.C. § 924(c) ..................................................................................................16

18 U.S.C. § 3593(f) .................................................................................................54

18 U.S.C. § 3595 .....................................................................................................54

18 U.S.C. § 3595 (c)(1)...........................................................................................54

28 U.S.C. § 2255 .......................................................................................................9

28 U.S.C. § 2255(e) ...............................................................................10, 22, 23, 24

28 U.S.C. § 2255(h)(1) ...........................................................................................10

28 U.S.C. § 2255(h)(2) ...........................................................................................10

**OTHER AUTHORITIES:**

David C. Baldus et al., *Arbitrariness and Discrimination in the Administration of
  the Death Penalty: A Legal and Empirical Analysis of the Nebraska
  Experience (1973-1999)*, 81 Neb. L. Rev. 486 (2002) ...........................................48

David C. Baldus, George Woodworth & Charles A. Pulaski, *Equal Justice and the
  Death Penalty: A Legal and Empirical Analysis* 258–60 (1990) ...........................47

Katherine Barnes, David Sloss & Stephen Thaman, *Place Matters (Most): An
  Empirical Study of Prosecutorial Decision-Making in Death Eligible Cases*,
  51 Ariz. L. Rev. 305 (2009)..................................................................................47

Stephen B. Bright, *Discrimination, Death, and Denial: The Tolerance of Racial
  Discrimination in Infliction of the Death Penalty*, 35 Santa Clara L. Rev. 433,
  475 (1995)...........................................................................................................52

April Castro, *Race is Key in Death Penalty Appeal*, mrt.com (Feb. 15, 2002),
  https://www.mrt.com/news/article/Race-Is-Key-in-Death-Penalty-Appeal-
  7756301.php...................................................................................................18, 33

*Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities*,
United States Gen. Accounting Office, (Feb. 1990),
http://archive.gao.gov/t2pbat11/140845.pdf ...........................................................47

*Death Row Information*, Tex. Dep't of Crim. J.,
https://www.tdcj.texas.gov/death_row/dr_executed_offenders.html (last
visited Nov. 8, 2020)..................................................................................................45

*Death Row U.S.A.*, NAACP (Fall 2020), https://www.naacpldf.org/wp-
content/uploads/DRUSAFall2020.pdf (last visited Nov. 8, 2020) ........................46

Jack Glaser, Karin D. Martin & Kimberley B. Kahn, *Possibility of Death Sentence
Has Divergent Effects on Verdicts for Black and White Defendants*, 39 Law &
Hum. Behav. 539 (2015)............................................................................................48

*Justice Powell's New Wisdom*, NY Times (June 11, 1994).
http://www.nytimes.com/1994/06/11/opinion/justice-powell-s-new-
wisdom.html...............................................................................................................55

Mona Lynch & Craig Haney, *Looking Across the Empathic Divide: Racialized
Decision Making on the Capital Jury*, 2011 Mich. St. L. Rev. 573, 586 (2011)....................47

*Miller-El v. Dretke*,
No. 03-9659, 2004 WL 2899955 (2004) (joint appendix)......................................18

Raymond Paternoster et al., *Justice by Geography and Race: The Administration
of the Death Penalty in Maryland, 1978-1999*, 4 Margins: U. Md. L. J. of
Race, Religion, Gender & Class 1 (2004)................................................................47

*Report No. 210/20 Case 13.361: Report on Admissibility and Merits
(Publication)*, IACHR (Aug. 12, 2020),
https://www.oas.org/en/iachr/decisions/2020/USad13361EN.pdf .............................21, 47, 49

Michael J. Songer & Isaac Unah, *The Effect of Race, Gender, and Location on
Prosecutorial Decisions to Seek the Death Penalty in South Carolina*, 58 S.C.
L. Rev. 161 (2006) ....................................................................................................48

## JURISDICTIONAL STATEMENT

Orlando Cordia Hall is a death-sentenced federal prisoner incarcerated at the United States Penitentiary, Terre Haute as a result of a Judgment entered by a jury in *United States v. Hall*, Northern District of Texas Fort Worth Division, Case Number 4:94-CR-121-Y.  Mr. Hall is scheduled to be executed on November 19, 2020 at the United States Penitentiary, Terre Haute, Indiana.  Mr. Hall invokes the jurisdiction of this Court pursuant to Title 28, United States Code, Section 2241 and requests a writ of *habeas corpus* issue preventing his execution.  The legal and factual bases for this request are enumerated within this consolidated Petition and Memorandum in Support.

## CITATIONS TO THE RECORD

Petitioner Orlando Cordia Hall shall be referred to throughout this pleading as Petitioner or Mr. Hall.  Respondents shall be referred to as the Government.  Citations to the attached exhibits shall be designated as "Exhibit."

## INTRODUCTION

Petitioner Orlando Cordia Hall ("Mr. Hall") is a death-sentenced federal prisoner incarcerated at the United States Penitentiary, Terre Haute ("USP Terre Haute") who is scheduled to be executed on November 19, 2020.  Mr. Hall is Black.  Every juror that convicted and sentenced him to death was White.  This was no accident.  Rather, it was the product of a multi-pronged, successful campaign by Assistant United States Attorneys ("AUSAs") Paul Macaluso twice adjudicated a *Batson*-violator, once by the United States Supreme Court and Richard Roper, to ensure that Mr. Hall would be tried by an all-White jury.  Indeed, years after Mr. Hall's trial, both the Supreme Court and the Fifth Circuit would later grant habeas relief in two earlier Texas capital cases on the ground that one of his prosecutors, AUSA Macaluso, had intentionally struck Black

jurors in violation of *Batson v. Kentucky*.  In light of the pretextual reasons the prosecution gave in Mr. Hall's case for peremptorily striking qualified Black jurors, it is clear that AUSA Macaluso continued that practice here.

**Racial Bias in Jury Selection.**  AUSAs Macaluso and Roper used peremptory strikes to strike four of five qualified Black jurors from Mr. Hall's jury (while knowing the defense was sure to strike the fifth Black venire member due to her emphatically pro-death penalty views).  New evidence confirms that these strikes were exercised on the basis of race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  But at the time of Mr. Hall's trial, this critical evidence was unavailable, secreted away in the Dallas County District Attorney's Office.  Only a decade later— significantly, *after* the district court had denied Mr. Hall's motion to vacate his conviction and death sentence pursuant to 28 U.S.C. § 2255—did the Supreme Court shine a spotlight on the history of racially biased jury selection practices in the Dallas County District Attorney's Office and the repeated discriminatory use of peremptory strikes by Paul Macaluso specifically.  In light of the newly discovered evidence of AUSA Macaluso's history of repeated *Batson* violations, inconsistencies between the voir dire record and the prosecution's explanations for its strikes in Mr. Hall's case cannot be explained by anything other than racial animus.

**Racial Bias in Application of the Death Penalty.**  On top of the tainted jury selection process in Mr. Hall's case, the application of the federal death penalty writ large, and as applied to Mr. Hall, is impermissibly influenced by race, in violation of the Fifth and Eighth Amendments, as well as the Federal Death Penalty Act ("FDPA").  It is an objective fact and a matter of public record that while the FDPA sought to minimize racially disparate application of the federal death penalty, racial minorities—and particularly Black defendants, like Mr. Hall—are far more likely to be sentenced to death as compared to White defendants.  Since Mr. Hall's § 2255 petition was

adjudicated, new statistical evidence has emerged that Black defendants, eligible for the federal death penalty, are significantly more likely to have the death penalty requested by prosecutors, authorized by the Department of Justice, and meted out by a jury, and that all of these disparities are even more pronounced in Texas, where Mr. Hall was charged and tried.  This evidence was not known or reasonably available to Mr. Hall during the pendency of his trial, direct appeal, or initial § 2255 petition.  Indeed, it was not until August 2020 that Mr. Hall became aware of a report presented before the Inter-American Commission on Human Rights ("IACHR") providing new, expert evidence of the stark racial disparities in imposing the death penalty in federal prosecutions in Texas.  Mr. Hall brings this suit to challenge the legality of his death sentence based on this new evidence.

These important constitutional claims can only be brought only by a petition for a writ of habeas corpus under 28 U.S.C. § 2241.  While the subject matter of this petition may have been brought pursuant to an initial motion under § 2255(a), it does not meet the specific criteria for a successive motion under § 2255(h), which is reserved for claims attacking "guilt[ ] of the offense" or applying "a new rule of constitutional law."  28 U.S.C. §§ 2255(h)(1)–(2).  Section 2255(e), permitting a prisoner to petition the court for a writ of habeas corpus under § 2241, is available in circumstances such as these, where "the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention."  28 U.S.C. § 2255(e).

The Seventh Circuit has permitted claims to proceed under § 2241 where (i) § 2255 is procedurally unavailable, and (ii) the prisoner proffers new evidence that, if true, would prove a death sentence to be in violation of the Constitution.  *See*, *e.g.*, *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc).  And, the Seventh Circuit so held despite the fact that Webster had twice litigated the merits of that claim without the critical evidence that proved it.  Mr. Hall finds himself

without recourse under § 2255 to present new evidence that reveals his death sentence as unconstitutional.  To rectify the constitutional harm proven by Mr. Hall's new evidence—that his prosecutor used racially based peremptory strikes to empanel an all-White jury to decide his fate— access to the writ of habeas corpus under § 2241 is necessary.

Mr. Hall seeks the following relief to address Defendants' violations of his rights  under the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution: (a) that Mr. Hall be granted a stay of execution pending a final resolution of the claims raised in this petition; (b) that Respondent be ordered to respond to this petition; (c) that Mr. Hall be permitted to file a Reply and/or a Traverse; (d) that leave to conduct discovery be granted to fully develop and prove the facts as alleged in this petition; (e) that an evidentiary hearing be conducted on the merits of Mr. Hall's claims, any procedural issues, and all disputed issues of fact; and (f) that habeas relief from Mr. Hall's sentence of death be granted.

## **BACKGROUND**

### A.      Procedural History.

**Charging decision and trial.**  On October 26, 1994, Mr. Hall—along with his brother Demetrius Hall, Bruce Webster, and Steven Beckley—was charged with kidnapping in violation of 18 U.S.C. § 1201(a)(1).  A little more than a week later, a six-count superseding indictment was returned, charging Mr. Hall and the three other original defendants, plus Marvin Holloway, with: (1) kidnapping in which a death occurred in violation of 18 U.S.C. §§ 1201(a)(1)–(a)(2); (2) conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c); (3) traveling in interstate commerce with intent to promote the possession of marijuana with intent to distribute in violation of 18 U.S.C. § 1952; (4) using a telephone to promote the unlawful activity of extortion in violation of 18 U.S.C. § 1952; (5) traveling in interstate commerce with intent to promote extortion in

violation of 18 U.S.C. § 1952; and (6) using and carrying a firearm during a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)–(c)(2).  Exhibit 1 (Indictment).  Counts 4 and 5 were later dropped.

On February 23, 1995, the government gave notice that it intended to seek the death penalty only against Mr. Hall and co-defendant Bruce Webster.[1]  Thereafter, Mr. Hall's trial was severed from the trial of his co-defendants, with the three co-defendants (other than Mr. Webster) agreeing to testify against Mr. Hall and Webster in exchange for favorable treatment from the government.

Mr. Hall's trial commenced on October 2, 1995, in Fort Worth.  Voir dire lasted from October 2-19.  Hall  was represented at trial by two attorneys, Jeffrey Kearney and Michael Ware, but only Mr. Kearney represented Mr. Hall during most of jury selection, because Mr. Ware was frantically attempting to conduct the penalty phase investigation counsel had failed to undertake prior to trial.  On the government's side, AUSA Macaluso was instrumental in the questioning and selection of Mr. Hall's jurors.  And, as discussed in more detail below, since Mr. Hall's trial, Mr. Macaluso has twice been adjudicated to have violated *Batson* by striking Black jurors based on their race (and then offering false pretextual reasons in defense of his actions).  *See Miller-El v. Dretke*, 545 U.S. 231 (2005) )("*Miller-El II")*  (repeatedly referencing Macaluso by name); *Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009) (also identifying Macaluso by name).

After strikes for cause, five qualified Black venire members remained.  The defense struck one Black juror because of her strongly pro-death-penalty views; the government peremptorily struck the remaining four, ensuring that Mr. Hall's fate would rest in the hands of an all-White

---

[1] The The Seventh Circuit recently affirmed this Court's decision vacating Mr. Webster's death sentence on the basis that he is intellectually disabled. *Webster v. Watson*, 975 F.3d 667 (7th Cir. 2020).  As a result, of the individuals convicted of these crimes, only Mr. Hall remains under a death sentence.

jury.  Mr. Hall's defense counsel, Michael Ware, raised a *Batson* challenge.  In response, the government provided ostensibly "neutral" reasons for its strikes, though the record reveals those reasons as pretextual   The government further represented to the court that it had only exercised its peremptory strikes against these four Black jurors after unsuccessfully challenging each of them for cause.  This was not true; the government had previously leveled cause challenges against only two of these Black jurors.

Mr. Hall's trial proceeded from October 24–31.  The defense presented no evidence and waived closing argument.  On October 31, 1995, the jury convicted Mr. Hall of all counts: (a) kidnapping in which a death occurred; (b) conspiracy to commit kidnapping; (c) traveling in interstate commerce to promote possession of marijuana with intent to distribute; and (d) using and carrying a firearm during a crime of violence.  Exhibit 2 (Verdict, Guilt).

The penalty phase commenced on November 1.  For the next three days, the same all-White jury that had found Mr. Hall guilty heard testimony and argument regarding his sentence.  The government presented evidence concerning several aggravating factors, including Mr. Hall's prior felony drug convictions and bad character testimonial evidence.  As to the character witnesses, the government presented seven witnesses to speak to Mr. Hall's purported bad character, and the defense declined to cross-examine six of them.  The government also presented two witnesses from the prison where Mr. Hall was incarcerated, a prisoner and a former guard, to testify to Mr. Hall's conduct in prison, including an alleged scheme to escape from prison.  Mr. Hall's attorneys presented evidence concerning the conduct of Mr. Hall's co-defendants and offered only Mr. Hall's mother and sister as character witnesses.  The district court denied Mr. Hall permission to

make a statement expressing his remorse in allocution to the jury.[2]  On November 6, 1995, the jury recommended the death penalty.  Exhibit 3 (Verdict, Penalty).

After denying Mr. Hall's motion for a new trial, the district court entered judgment on February 12, 1996, formally sentencing Mr. Hall to death.  The court also imposed a sentence of life imprisonment for the conspiracy conviction and sixty-months' imprisonment for each of the remaining two counts.

Mr. Hall appealed his conviction and sentence on multiple grounds, including that: (a) the district court's refusal to permit him to allocute before the jury violated due process; (b) the admission of nontestimonial victim impact statements during the penalty phase violated his Sixth Amendment right to confrontation and due process and the FDPA's evidentiary standards; and (c) the jury's failure to consider certain mitigating factors at the penalty phase, such as the circumstances of Mr. Hall's childhood,[3] violated the Eighth Amendment and 18 U.S.C. § 3593(c)(1).  The Fifth Circuit affirmed, *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), and denied rehearing on October 1, 1998.  The Supreme Court declined review.  *Hall v. United States*, 526 U.S. 1117 (1999).

**Section 2255 proceedings.**  In May 1999, after Mr. Hall's direct appeal had concluded, the district court appointed Ms. Widder and Robert C. Owen for purposes of representing Mr. Hall in habeas corpus proceedings brought under 28 U.S.C. § 2255.

---

[2] Had he been permitted to, Mr. Hall would have told that jury as follows: "I want to apologize to my family and ask them to forgive me, and I hope somehow they can forgive me. I want to apologize to Lisa Rene's family and ask them to forgive me, even though I know that there is no possible way they can forgive me and I understand that. I want to ask God to forgive me, however, I question in my own mind whether even God can forgive me."  *See United States v. Hall,* 152 F.3d 381, 391 n.1 (5th Cir. 1998).

[3] Marcia A. Widder ("Ms. Widder") was originally appointed under the Criminal Justice Act to represent Mr. Hall in that appeal and continues to represent Mr. Hall to this day.

In May 2000, Mr. Hall moved to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. A month later, the district court entered a scheduling order, pursuant to which Mr. Hall filed motions for discovery in August 2000 and May 2001. The district court denied both motions in April 2002. In June 2002, Mr. Hall filed an amended motion to vacate and, in September 2002, Mr. Hall was permitted to file a second amended motion to vacate. As summarized by the district court, Mr. Hall's second amended motion raised nine issues:

> A. Hall's rights under the Fifth Amendment were violated because the indictment against him did not allege any aggravating factors that rendered Hall eligible for the death penalty (claim one).

> B. Hall was denied his Sixth Amendment right to the effective assistance of counsel (claim two).

> C. A juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated Hall's rights under the Fifth, Sixth, and Eighth Amendments. (claims three through five).

> D. The government violated Hall's rights under the Fifth and Sixth Amendments by failing to disclose exculpatory and mitigating information concerning government witness Larry Nichols (claim six).

> E. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated because of false testimony given by government witnesses Larry Nichols and Steven Beckley (claims seven and twelve).

> F. The government violated Hall's Sixth Amendment rights by using jail inmate Larry Nichols to elicit information from Hall (claim eight).

> G. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated when the government provided a statement to the defense made by Alonso Airy that contained false information for the purpose of dissuading the defense from calling Airy to the stand (claim nine).

> H. The government interfered with Hall's Sixth Amendment right to counsel when it advised his initial defense attorneys about information that Hall intended to kidnap the attorneys in an escape attempt (claim ten).

> I. Hall's rights under the Fifth and Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme (claim eleven).

*Hall v. United States*, No. 4:00-cv-00422-Y, 2004 WL 1908242, at *4 (N.D. Tex. Aug. 24, 2004). The district court denied these claims. *Id.* at 37. Mr. Hall sought permission to appeal from both the district court and the Fifth Circuit. Leave to appeal was denied, *see United States v. Hall*, 455 F.3d 508 (5th Cir. 2006), and the Supreme Court denied certiorari. *Hall v. United States*, 549 U.S. 1343 (2007).

**Section 924(c) challenge.** In March 2019, Mr. Hall sought authorization to bring a habeas challenge to his firearm conviction under 18 U.S.C. § 924(c), arguing that under *United States v. Davis*, 139 S. Ct. 2319 (2019), the predicate offense did not qualify as a crime of violence and so his conviction on that basis could not stand. On October 30, 2020, the Fifth Circuit refused to allow Mr. Hall to pursue that claim. Order, *In re Hall*, No. 19-10345 (5th Cir. Oct. 30, 2020). Mr. Hall is presently litigating the same challenge to his firearms conviction before this Court in a separate habeas action. *Hall v. Watson*, No. 2:17-cv-00176-JPH-DLP (S.D. Ind., pending).

### B.    Newly Discovered Evidence.

Mr. Hall's amended 28 U.S.C. §2255 petition was denied by the Northern District of Texas in August 2004. *Hall*, 2004 WL 1908242, at *4. After denial, new evidence was discovered showing: (1) in 2005 and 2009, a clear history of racial bias by his prosecutors during jury selection; and (2) most recently in August 2020, that the federal death penalty in Texas has been disparately applied to Black defendants in a racially-biased manner.

### 1.    The Prosecution's History of Racial Bias.

Less than one year after Mr. Hall's 28 U.S.C. §2255 proceedings concluded, the United States Supreme Court decided *Miller-El v. Dretke*, 545 U.S. 231 (2005), where it held that the state prosecutors in that case, including Paul Macaluso (who is mentioned by name ten times in the majority's opinion), violated *Batson* by peremptorily striking 91 percent of the eligible Black

prospective jurors—a disparity the Court deemed "unlikely" to have been produced by "happenstance." *Id.* at 241. Macaluso was a key member of Mr. Hall's prosecution team and played a pivotal role in the selection of Mr. Hall's jury.

In *Miller-El II*, in addition to examining the strike record at trial, the Supreme Court credited evidence that the Dallas County District Attorney's Office—where Macaluso trained and practiced for 15 years—"had adopted a formal policy to exclude minorities from jury service. . . . A manual entitled 'Jury Selection in a Criminal Case' [sometimes known as the Sparling Manual] was distributed to prosecutors. It contained an article authored by a former prosecutor (and later a judge) under the direction of his superiors in the District Attorney's Office, outlining the reasoning for excluding minorities from jury service. *Miller-El II*, 545 U.S. at 264 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003) ("*Miller-El I*"))

The Sparling manual's discriminatory policy is unequivocal. Attached as Exhibit 4, it recommended the following:

    a. "You are not looking for any member of a minority group which may subject him to oppression – they almost always empathize with the accused."

    b. "Look at the panel out in the hall before they are seated. You can often spot the show-offs and the liberals by how and to whom they are talking."

    c. "I don't like women jurors because I can't trust them. . . . Young women too often sympathize with the Defendant; old women wearing too much make-up are usually unstable, and therefore are bad State's jurors. It is impossible to keep women off your jury, but try to keep the ratio at least seven to five in favor of men."

    d. "Race. Minority races almost always empathize with the Defendant."

e. "Jewish veniremen generally make poor State's jurors.  Jews have a history of oppression and generally empathize with the accused."

Exhibit 4 (Sparling Manual Excerpt *available at Miller-El v. Dretke*, No. 03-9659, 2004 WL 2899955, *99-114 (2004) (joint appendix)).

Macaluso trained and practiced in the Dallas County District Attorney's Office between 1973 to 1988.  April Castro, *Race is Key in Death Penalty Appeal*, mrt.com (Feb. 15, 2002), https://www.mrt.com/news/article/Race-Is-Key-in-Death-Penalty-Appeal-7756301.php.      The Sparling manual was in distribution at the District Attorney's Office during this time.  As explained herein, the Supreme Court and Fifth Circuit have both found that Macaluso's connection to the Sparling manual is persuasive history to consider when analyzing whether his actions constituted a *Batson* violation.

In addition to the Sparling manual, the *Miller-El II* Court also noted that "[t]he prosecutors used their peremptory strikes to exclude 91% of the eligible African–American venire members  . . . . Happenstance is unlikely to produce this disparity."  545 U.S. at 241.  As part of its analysis, the Court found that a "side-by-side comparison[] of some black venire panelists who were struck [with] white panelists allowed to serve" is "more powerful than . . . bare statistics." *Id.*  Thus, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."  *Id.*

After conducting side-by-side comparisons of comparable Black and White jurors, the Court found in no uncertain terms that the discrimination was purposeful, finding that the the prosecutor's claim that inconsistent testimony was the reason for a peremptory strike was "severely undercut by the prosecution's failure to object to other panel members who expressed views much

11

like Warren's." *Id.* at 248.  The Court further pointed out "[t]he fact that Macaluso's [proffered] reason also applied to these other [four] panel members, most of them white, none of them struck, is evidence of pretext." *Id.* at 248.

Ultimately, the *Miller-El II* Court held that the "chosen race-neutral reasons for the [peremptory] strikes do not hold up and are so far at odds with the evidence that pretext is the fair conclusion, indicating the very discrimination the explanations were meant to deny."  545 U.S. at 265.

Four years later, the same evidence that led the Supreme Court to find that Macaluso and others had violated *Batson* in *Miller-El II* was sufficient to convince the Fifth Circuit that—once again—Macaluso and his cohorts had discriminated on the basis of race in jury selection.  *See*, *Reed*, 555 F.3d at 382 ("One of the same lawyers that conducted the voir dire in Miller–El's case, Paul Macaluso, also questioned prospective jurors for Reed's trial").

The *Reed* Court specifically noted that given "the historical evidence of racial bias among the[] prosecutors," including Macaluso, "we view this exact same evidence as persuasive here." *Id.  See also Flowers v. Mississippi*, 139 S. Ct. 2228, 2246, (2019) ("The State's actions in [prior] trials necessarily inform our assessment of the State's intent going into [the trial on review.]  We cannot ignore that history. We cannot take that history out of the case.").

The same evidence that constituted clear *Batson* violations in *Miller-El* and *Reed* is present in Mr. Hall's case.  As in the prior cases, Macaluso utilized the theories from the Sparling manual during Mr. Hall's voir dire.  He struck qualified Black potential jurors and, as discussed below, proffered pretextual reasons despite those same reasons not being applied with regard to non-Black jurors.

Neither *Miller-El II* nor *Reed* had been decided when Mr. Hall's 28 U.S.C. § 2255 petition was resolved. *Miller-El II* was the first case to mention the Sparling manual and to tie it to Macaluso's actions. Consequently, evidence of Macaluso's racial bias was not reasonably known to Mr. Hall during the pendency of his trial, direct appeal, or initial § 2255 proceeding.

### 2. Racial Bias in Application of the Federal Death Penalty, Particularly in Texas.

In August 2020, new evidence emerged of a statistical analysis conducted by a professor of sociology of all criminal defendants eligible for the federal death penalty in Texas between 1988 and 2010. Mr. Hall was charged, tried, convicted, and sentenced during this period, in 1995. The study shows that the federal death penalty in Texas is disproportionately meted-out based on race. *See generally* Exhibit 5 (Declaration of Scott Phillips) ("Phillips Decl.").

For example, federal prosecutors in Texas were nearly **six times** more likely to request authorization to seek the death penalty against a Black defendant than a non-Black defendant. *Id.* ¶ 7. Authorization was nearly **eight times** more likely to be granted in cases with a Black defendant than a non-Black defendant. *Id.* And a death verdict was nearly **sixteen times** more likely to be rendered in a case with a Black defendant than a non-Black defendant. *Id.* In the Northern District of Texas, where Mr. Hall was sentenced, the racial disparity was consistent with that seen across all four Texas federal districts and even "slightly greater.". *Id.* ¶ 8. As Dr. Phillips explains, this disparity is almost certainly too extreme to have a benign explanation, and it is highly unlikely that a race-neutral factor could explain why Black defendants were sixteen times more likely to be sentenced to death than non-Black defendants. *Id.* ¶ 11. However, the statistical analysis described herein was not conducted until 2011—more than six years after Mr. Hall's § 2255 petition was denied. Moreover, Dr. Phillips's analysis was not public and only came to light in August 2020 when the IACHR published the Robinson decision and cited Dr. Phillips

13

report.  *See Report No. 210/20 Case 13.361: Report on Admissibility and Merits (Publication)*, IACHR, 7 n.7 (Aug. 12, 2020), https://www.oas.org/en/iachr/decisions/2020/USad13361EN.pdf ("Report No. 210/20").  This statistical analysis was therefore unavailable to Mr. Hall during the pendency of his direct appeal and § 2255 proceedings and, indeed, unavailable to him until two and a half months ago.

## ARGUMENT

## I.    MR. HALL IS ENTITLED TO BRING HIS PETITION UNDER § 2241.

This Court has jurisdiction to hear Mr. Hall's petition under § 2241.  New evidence that has come to light since Mr. Hall's initial § 2255 motion indicates that racial bias infected the jury selection process, which constitutes grounds to apply to this Court for a writ of habeas corpus.

Venue is proper under 28 U.S.C. §§ 2242 and 2243 because Mr. Hall's custodian is T.J. Watson, the warden of the United States Penitentiary in Terre Haute, Indiana, located within the Southern District of Indiana.  The present petition under § 2241 is properly filed in such district. *See Webster*, 784 F.3d at 1144–45.

"[T]he essential function of habeas corpus . . . is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998).  "Section 2241 authorizes federal courts to issue writs of habeas corpus, but § 2255(e) makes § 2241 unavailable to a federal prisoner unless it 'appears that the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of [the] detention.'"  *Roundtree v. Krueger*, 910 F.3d 312, 313 (7th Cir. 2018) (quoting § 2255(e)).  The question of whether a prisoner may petition a federal court for relief under § 2241 is governed by § 2255(e), often referred to as the "savings clause" or "safety valve," which states that:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

In *Purkey v. United States*, 964 F.3d 603 (7th Cir. 2020), the Seventh Circuit recognized three "central" cases "conside[ring] the safety valve:" *In re Davenport*; *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); and *Webster v. Daniels*. 964 F.3d 603, 611–12 (7th Cir.) (July 2, 2020). However, the *Purkey* court cautioned against thinking that "those cases rigidly describe the outer limits of what might prove that section 2255 is 'inadequate or ineffective to test the legality' of a person's detention." *Id*. at 611. That the relief sought under § 2241 is based on grounds that "could not have [been] invoked . . . by means of a second or successive § 2255 motion" and seeks to remedy "an error [that] was indeed a miscarriage of justice" are key to the Seventh Circuit's interpretation of the savings clause. *Brown v. Rios*, 696 F.3d 638, 640 (7th Cir. 2012) (citation omitted). While "[t]he mere fact that [a] petition would be barred as a successive petition under § 2255 . . . is not enough to bring the petition under § 2255's savings clause," *Garza*, 253 F.3d at 921, the court in *Webster* read "section 2255(e) as encompassing challenges to both convictions and sentences that as a structural matter cannot be entertained by use of the 2255 motion," 784 F.3d at 1139.

*In re Davenport* and much of its progeny focus on a § 2241 petition that is based on new Supreme Court precedent relating to statutory interpretation (and thus excluded from review under § 2255, since the new law does not address constitutional issues). But it is clear that § 2241 cases are not so limited. Neither *Webster* nor *Garza* relied on cases of statutory interpretation for their petitions under § 2241. In *Webster*, the Court construed the various Seventh Circuit cases interpreting *In re Davenport* and the savings clause of § 2255 to require in general that "something

more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." 784 F.3d at 1136.  Specifically, it found that "something more" in the character of the new evidence proffered and the petitioner's attempt to prevent a violation of his constitutional protections; the court did not also require that he invoke a change in statutory interpretation.

Webster's challenge to his sentence was based on newly discovered evidence and Supreme Court precedent addressing the constitutional landscape surrounding the execution of persons with an intellectual disability.  *See*, 784 F.3d at 1138–40.  Later courts have agreed that "[t]o satisfy the § 2255(e) savings clause using the path outlined in *Webster*, a petitioner must proffer newly discovered evidence."  *Lee v. Warden USP Terre Haute*, No. 19-cv-00468, 2020 WL 3489355, at *1 (S.D. Ind. June 26, 2020).  In addition to such newly discovered evidence, the *Webster* court also permitted Webster's § 2241 petition to proceed given that *Atkins v. Virginia*, 536 U.S. 304 (2002) would, if the evidence proffered were true, make him categorically ineligible for the death penalty and created precedent that the Seventh Circuit noted "must guide our understanding of the law."  784 F.3d at 1139.

It is appropriate for this Court to hear this case under § 2241 through the path outlined in *Webste*r.  Years after the filing of Mr. Hall's first motion under § 2255 in May 2000, it was discovered that one of Mr. Hall's prosecutors, Paul Macaluso, was trained in jury selection procedures at the Dallas District Attorney's Office, which in a 1963 circular to its prosecutors expressly encouraged using peremptory strikes to rid juries of "Jews, Negroes, Dagos, Mexicans or a member of any minority race …, no matter how rich or how well educated." *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003) ("*Miller-El I*").  The Supreme Court in 2005 found that Macaluso used peremptory strikes to eliminate Black jurors from the venire panel in the trial that lead to *Miller-El I*, and that his purported rationale for the strikes was just a pretext for

16

discrimination.  *See Miller-El II*, 545 U.S. at 264, 248.   Mr. Hall's counsel were unable to investigate claims of race bias thoroughly given limitations on funding in the [appellate and] post-conviction process.

Section 2255 does not provide Mr. Hall with an avenue to test the "legality of his detention."  28 U.S.C. § 2255(e).  Had the relevant evidence of racism been available to Mr. Hall earlier, he could have presented it in a motion pursuant to § 2255(a), alleging that his "sentence was imposed in violation of the Constitution."  28 U.S.C. § 2255.  However, at this point in time, the language of § 2255(h) prevents Mr. Hall from bringing forward this important evidence that racial discrimination destroyed the fairness of the process that led to his death sentence.  Section 2255(h)(1) only permits a successive motion if new evidence would suggest that "no reasonable factfinder would have found the movant guilty of the offense."  While the new evidence available to Mr. Hall provides him grounds to attack his conviction, this evidence is not of the exculpatory type contemplated in § 2255(h)(1), but instead evidence of a failure to safeguard his fundamental constitutional due process and equal protection rights.  Similarly, § 2255(h)(2) only permits a successive motion based on "a new rule of constitutional law . . . that was previously unavailable."  The rule of constitutional law that prohibits racially motivated peremptory strikes, *Batson v. Kentucky*, was decided prior to Mr. Hall's initial § 2255 motion, and so a successive motion on this basis would not be permitted under § 2255(h)(2).

The procedural limitations of § 2255 preventing Mr. Hall from presenting new evidence that racism infected his death sentence amount to a "structural problem with section 2255" that opens the safety valve to § 2241.  *Webster*, 784 F.3d at 1136.  The new evidence that Mr. Hall seeks to present, like the evidence proffered by Webster, suggests that carrying out Mr. Hall's sentence of death would violate the Constitution.  The evidence before the Court strongly shows

that Mr. Hall's prosecution, conviction, sentence, and impending execution are all tainted by racial bias. That fact provides the "something more" beyond mere unavailability of a successive § 2255 motion that should allow him to bring a petition under § 2241. *Webster*, 784 F.3d at 1136. To permit such a constitutional challenge to the "fundamental legality of his . . . sentence" is at the heart of § 2241, and the evidence that Mr. Hall's constitutional rights were violated justifies the present petition. *In re Davenport*, 147 F.3d at 609.

Mr. Hall was convicted and sentenced to death by an all-White jury, crafted by a prosecutor trained to exclude minority jurors. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Buck v. Davis*, 137 S. Ct. 759 (2017) (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)). The Supreme Court has specifically found that "[p]ermitting racial prejudice in the jury system damages 'both the fact and the perception' of the jury's role as 'a vital check against the wrongful exercise of power by the State.'" *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

Indeed, the Court continues to move closer to recognizing that where a procedural rule would otherwise block consideration of a substantial claim of racial bias, that technical requirement must yield to "the *imperative* to purge racial prejudice from the administration of justice." *Pena-Rodriguez*, 137 S. Ct. at 867 (emphasis added). That overriding commitment to enforcing equal justice was the clear message of *Pena-Rodriguez*, where the Court held that the longstanding "no-impeachment rule" prohibiting jurors from testifying about their deliberations must yield where such testimony might show that the proceedings were affected by racial bias. Only thus, the Court explained, can our "maturing legal system" demonstrate that it seeks "to understand and to implement the lessons of history," a matter of increasing and urgent nationwide

concern in the present historical moment.  *See Pena-Rodriguez*, 137 S. Ct. at 871.  Allowing Mr.

Hall to be put to death when his sentence was the product of racial bias is an "intolerable result,"

*Webster*, 784 F.3d at 1139, in violation of the Constitution and "indeed a miscarriage of justice."

This is the only forum in which Mr. Hall can raise these claims, and his petition for a writ of habeas

corpus should be permitted to proceed under § 2241.

## II.   THE GOVERNMENT USED ITS PEREMPTORY CHALLENGES TO STRIKE BLACK JURORS BASED ON THEIR RACE.

The government struck four out of five qualified Black venire members at Mr. Hall's trial.

The justifications the government proffered for these strikes were pretextual.  The trial record is

replete with evidence supporting this conclusion—perhaps most notably, via a side-by-side

comparison of some Black venire members who were struck with White prospective jurors allowed

to serve (just as in *Miller-El II*).  But because jury selection is "discretionary by nature," there is

often "practical difficulty of ferreting out discrimination."  *Miller-El II*, 545 U.S. at 238; *see also*

*id.* at 267 (Breyer, J., concurring) (lamenting the "practical problems of proof" in discerning

*Batson* violations).  As discussed below, however, in light of the new evidence of AUSA

Macaluso's history of using peremptory challenges to discriminate on the basis of race, the Court

confronts no such difficulty here.

Historically, courts have been hesitant to conclude that a prosecutor intentionally

discriminated on the basis of race during jury selection without something more than a cold trial

record.  In *Foster v. Chatman*, for example, this "something more" was a set of prosecution notes

that came to light many years after Foster's trial showing that the prosecution had flagged all of

the Black jurors on their strike sheets, written "No Black Church," and made a recommendation

for who to pick if they "had to pick a black juror," 136 S. Ct. 1737, 1744 (2016).  That these notes

ever saw the light of day was in fact a happy accident for Foster—the prosecution had previously

suppressed them during post-conviction discovery, and it was only in response to an Open Records request that an unwitting clerk happened to turn them over. But for this accident, Foster likely would still be facing execution. In the Supreme Court's most recent *Batson* decision, *Flowers v. Mississippi*, the "something more" was evidence that across its history of six trials prosecuting Flowers, prosecutor Doug Evans struck 41 of 42 prospective Black jurors. 139 S. Ct. 2228. And in *Miller-El II*, the "something more" was new evidence that the prosecution office at issue had adopted a formal policy to exclude racial minorities from jury service and that the specific prosecutors who tried Miller-El had been trained to strike Black jurors via the "Sparling Manual". 545 U.S. at 264.

Here, the Court need not search for "something more" because one of the very same prosecutors that the Supreme Court (and later the Fifth Circuit, in a different case) concluded had violated *Batson* on the basis of the office policy and Sparling Manual in *Miller-El II* helped pick the jury that convicted and sentenced Mr. Hall. And just as in *Miller-El II* and *Reed*, this evidence bears directly on the Court's inquiry into the genuineness of the prosecution's stated reasons for its strikes of 80% of the qualified Black venire members at Mr. Hall's trial. *Batson*, 476 U.S. at 96–97 ("all relevant circumstances" must be considered in determining whether a violation has occurred). As the Supreme Court noted in *Miller-El II*, "[i]f anything more is needed for an undeniable explanation of what was going on, history supplies it." 545 U.S. at 266. That is doubly so given that the "history" here is the very same piece of history on which the Supreme Court relied in *Miller-El II* to find that Paul Macaluso violated the Equal Protection Clause in that case. *See also Reed*, 555 F.3d at 382 ("One of the same lawyers that conducted the voir dire in Miller–El's case, Paul Macaluso, also questioned prospective jurors for Reed's trial"); *id.* (given "the historical evidence of racial bias among the[] prosecutors," including Macaluso, "we view this

20

exact same evidence as persuasive here.").  And it dispatches any notion that the jury selection process at Mr. Hall's trial was race neutral, as the Constitution requires.

    **A.**    **Striking Jurors on the Basis of Race Violates the Constitution.**

Race-based peremptory strikes violate the Equal Protection Clause of the Fourteenth Amendment. *Batson*, 476 U.S. at 89.  "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers*, 139 S. Ct. at 2244 (citing *Foster*, 136 S. Ct. at 1747). Thus, where a single juror is struck on the basis of race, structural constitutional error has occurred and the conviction must be reversed.  *Batson*, 476 U.S. at 100; *see also Dawson v. Delaware,* 503 U.S. 159 (1992) (Blackmun, J., concurring) (*Batson* violations are not subject to harmless-error analysis); *Winston v. Boatwright*, 649 F.3d 618, 628 (7th Cir. 2011) ("The hallmark of a structural error is that the error persists throughout the proceeding and relates to the framework in which a trial proceeds. *Batson* error meets that description."); *Scott v. Huber*t, 610 F.App'x 433, 434 (5th Cir. 2015) (discrimination on the basis of race in *voir dire* is a structural error that voids a conviction) (citing *Vasquez v. Hillery,* 474 U.S. 254, 261–64 (1986)).

To demonstrate a *Batson* claim, therefore, Mr. Hall must show only that at least one of the prosecution's four peremptory strikes against Black jurors "was motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2248 (quoting *Foster*, 136 S. Ct. at 1737).  In assessing the prosecutor's motive, "courts must consider 'such circumstantial and direct evidence of intent as may be available.'" *Harris v. Hardy*, 680 F.3d 942, 952 (7th Cir. 2012) (quoting *Batson*, 476 U.S. at 93).  "A defendant may rely on 'all relevant circumstances,'" including

"historical evidence of the State's discriminatory peremptory strikes from past trials."  *Flowers*,

139 S. Ct. at 2245 (quoting *Batson*, 476 U.S. at 96-97)).[4]

*Batson*'s three-part test for determining whether the prosecution has improperly used its

peremptory challenges based on race (or gender) is well established:

> First, a defendant must make a prima facie showing that a peremptory challenge
> has been exercised on the basis of race. . . . Second, if that showing has been made,
> the prosecution must offer a race-neutral basis for striking the juror in question.
> Third, in light of the parties' submissions, the trial court must determine whether
> the defendant has shown purposeful discrimination.

*Miller-El I*, 537 U.S. at 328–29 (quoting *Batson*, 476 U.S., at 96-98).  At *Batson*'s third step, the

critical question for a trial court is "whether [it] finds the prosecutor's race-neutral explanations to

be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by

how reasonable, or how improbable, the explanations are; and by whether the proffered rationale

has some basis in accepted trial strategy."  *Miller-El I*, 537 U.S. at 338-39.  "[T]he rule in *Batson*

provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires

the judge to assess the plausibility of that reason in light of all evidence with a bearing on it."

*Miller-El II,* 545 U.S. at 251–52 (citing *Batson*, 476 U.S. at 96-97; *Miller-El I*, 537 U.S. at 339).[5]

---

[4] In *Flowers*, the Supreme Court concluded that "the history of the prosecutor's peremptory strikes in Flowers' first four trials strongly supports the conclusion that his use of peremptory strikes in Flowers' sixth trial was motivated in substantial part by discriminatory intent."  *Flowers*, 139 S. Ct. at 2245.

[5] Although the district court expressed doubt that the defense had presented a prima facie case of discrimination, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991). *See, e.g.*, *United States v. Hunter*, 932 F.3d 610, 617 (7th Cir. 2019) ("Where the prosecution has 'offered a race-neutral explanation for the peremptory challenge, the test is compressed down to the ultimate question of intentional discrimination; the preliminary question of a *prima facie* case becomes moot.'") (quoting *United States v. Carter*, 111 F.3d 509, 512 n.1 (7th Cir. 1997)).

### B.   The Prima Facie Case.

The first step in the government's strategy to dilute the presence of Black jurors was its decision to prosecute Mr. Hall in the Northern District of Texas, Fort Worth Division.   The government could alternatively have tried Mr. Hall in the Pine Bluff Division of the Eastern District of Arkansas, which was 35.85% Black in 1990.   Exhibit 6 at 1 (Census Statistic for Additional Observations on the Merits (submitted in support of Mr. Hall's claim before the IACHR)).   The Fort Worth Division, by contrast, was 10.41% Black at that time.   *Id.*

This proved successful.   Of the 100 prospective jurors questioned during voir dire, only seven were Black.[6]   *See generally* Exhibit 7 (Prospective Juror Questionnaire Cover Pages).   The district court excused one of these Black jurors (without attorney questioning) for cause based on her opposition to the death penalty.   *See* Exhibit 19 at 123:14–126:13.   Of the remaining six Black jurors, prosecutors Roper and Macaluso[7] peremptorily struck four and the defense struck one, leaving Mr. Hall to be tried by an all-White jury, with one Black man serving as the 3rd alternate.[8]

At trial, Mr. Hall's defense counsel raised a challenge under *Batson*, 476 U.S. 79, stating:

> It appears from the list and from my recollection of the jurors that the only person of African-American descent, person of the black race that is a potential juror at this point is number 59, Kelvin Johnson, who is the third alternate juror. And it also

---

[6] According to the self-reporting on the jury questionnaires, 87 percent of jurors self-identified as White, three identified as Hispanic, one identified as White and Hispanic, one identified as Asian, and one (who was excused on hardship grounds) did not reveal his race.   *See generally* Exhibit 7. Of the remaining six, four were excused for cause, and the government peremptorily struck one Hispanic woman and the woman who identified as Hispanic and White.   *See* Exhibit 13 (Government's Strike List for Preemptory Challenges).

[7] AUSAs Macaluso and Roper respectively questioned 43 and 42 prospective jurors. Another 15 jurors were excused without any questioning by counsel.

[8] On the morning that trial began, Juror No. 1, Dana Crittendon, was excused for health reasons over defense objection. Exhibit 8 (Trial Tr. Vol. 13) at 12:14–25.   She was replaced by the first alternate, Marcia Graves, a White woman.   *Id.* at 13:1–4; *see also* Exhibit 7 at 91.   The jury thus constituted served through completion of the trial.

> appears that the government has struck – used peremptory strikes on four black jurors, those being number 43, Frances Miller; number 44, Lawrence Barrett; number 49, Amy Evans; and number 51, Billy [sic] Lee. And the defendant in this case if of the black race, and under Batson and the statutes pursuant to Batson and the cases interpreting Batson, we would ask that the government justify why it used its strikes on those black individuals. . . . There were five – according to our count five black people in the first 52 potential jurors. The government used peremptory strikes on four of those five. Frankly, the other one, number 14, Ms. Harris, is one that we, the defendant, used a strike on.

Exhibit 9 (Trial Tr. Vol. 12 (*Batson* Hearing Transcript)) at 6:18–7:15.  Although the district court expressed doubt that the defense had raised a colorable *Batson* claim based solely on the number of strikes the prosecution had used against Black jurors, it nonetheless ordered the government to provide reasons for its strikes.  *Id.* at 7:9–8:3

AUSA Roper responded that "none of the strikes were based on race," *id.* at 8:7, but instead were based on "the fact that we thought that, in fact, they were all, we thought, in our opinion, disqualified, but the Court refused to grant our challenges to those jurors, and we feel like they were unable to give substantial consideration for the death penalty . . . ." *Id.* at 8:17–21.  In fact, Roper's assertion that the government had initially challenged all four of the Black jurors it peremptorily struck for cause was false. The government had challenged only two of these Black venire members, Frances Miller and Lawrence Barrett, for cause.  *See* Exhibit 10 (Trial Tr. Vol. 9) at 152:14–155:10 (unsuccessful challenge to Ms. Miller); *id.* at 174:20–175:17 (unsuccessful cause challenge to Mr. Barrett); Exhibit 11 (Trial Tr. Vol. 10) at 104:4–6 (Ms. Evans accepted as qualified juror no. 50 without challenge); *id.* at 135:14–17 (Ms. Lee accepted as qualified juror no. 51 without challenge).[9]  AUSA Roper's misrepresentation was just the first of many the government made to explain why it struck all but the one Black juror who would predictably be struck by the defense, given her strong pro-death-penalty views from the first 52 qualified jurors

---

[9] Prospective jurors Amy Evans and Billie Lee were qualified without any challenge.

from which the jury was selected.  The district court denied the *Batson* challenge, without giving

Mr. Hall's counsel any opportunity to challenge the stated reasons for the strikes. *See* Exhibit 9 at

9:22–23, 10:22–23, 12:10, 14:16–17.  Even a cursory review of the trial record reveals that the

government's proffered reasons were pretextual.[10]

### C.      AUSA Macaluso's Background as a Serial *Batson* Violator.

The prosecution's discriminatory intent in striking qualified Black jurors in Mr. Hall's trial

cannot be adequately appreciated without an understanding of the background and practices of

prosecutor Paul Macaluso, who was an integral part of jury selection in Mr. Hall's case.  AUSA

Macaluso cut his legal teeth in the Dallas County District Attorney's Office which, "for

decades . . . had followed a specific policy of systematically excluding blacks from juries." *Miller-*

*El II*, 545 U.S. at 263-64 (quoting *Miller-El I*, 537 U.S. at 334-35).  As the Supreme Court

explained, "[a] 1963 circular by the District Attorney's Office instructed its prosecutors to exercise

peremptory strikes against minorities: 'Do not take Jews, Negroes, Dagos, Mexicans or a member

of any minority race on a jury, no matter how rich or how well educated.'" *Miller-El I*, 537 U.S.

at 334-35.  The office's discriminatory pattern and practice was further fleshed out in a "manual

entitled 'Jury Selection in a Criminal Case' [sometimes known as the Sparling Manual]" the office

distributed to its prosecutors. *Id.* (quoted in *Miller-El II*, 545 U.S. at 264).  The manual, which

"outlin[ed] the reasoning for excluding minorities from jury service[] . . . remained in circulation

until 1976, if not later, and was available at least to one of the prosecutors in Miller-El's trial." *Id.*

---

[10] After the district court overruled all of the *Batson* challenges, defense counsel noted for the
record that "my recitations of the individuals and the facts that they are of the black race is accurate
so that we don't need to take further evidence and testimony to establish that numbers 43, 44, 49
and 51 are of the black race." Exhibit 9 at 14:21–25. The court noted that the questionnaires were
also part of the record. *Id.* at 15:1–2. This was the last mention of the prosecution's use of
peremptory challenges to cull the jury of qualified Black jurors.

Although the Court did not identify any of the prosecutors by name in its *Miller-El I* opinion, Paul Macaluso's name figured prominently in the analysis the Court conducted in *Miller-El II*, where it found clear and convincing evidence to reject as incredible his proffered race neutral reasons for striking 10 of 11 qualified Black jurors.  *See Miller-El II*, 545 U.S. at 236, 248–50, 256 (majority opinion mentioning Macaluso's name ten times).[11]

The documented policy of the office, the *Miller-El II* majority found, buttressed the conclusion that Macaluso's proffered reasons for striking Black jurors were "incredible" and followed upon "a selection process replete with evidence that the prosecutors were selecting and rejecting potential jurors because of race."  *Id.* at 265.  "If anything more is needed for a undeniable explanation of what was going on, history supplies it.  The prosecutors took their cues from a 20-year-old manual of tips on jury selection, as shown by their notes of the race of each potential juror."  *Id.* at 266.  After *Miller-El II*, the Fifth Circuit also found that Macaluso had violated *Batson* in another Texas capital trial.  *Reed*, 555 F.3d 364 at 382 (holding that state courts had unreasonably rejected *Batson* claim and noting the striking similarities with *Miller-El II*, as the prosecutors' proffered race-neutral reasons were shown to be pretexts for discrimination because they accepted White jurors with the same characteristics and "[i]n both cases, which . . . involved one of the same prosecutors [Macaluso] a policy of excluding African-Americans from juries pervaded the Dallas County District Attorney's Office").

---

[11] Paul Macaluso was admitted to the Texas bar in September 1970.  *See Find a Lawyer*, State Bar of                                                                                                          Texas https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=223418 (last visited Nov. 12, 2020).  He was employed by the Dallas County District Attorney's Office between 1973 to 1988. *See* Castro, *supra*.

Evidence of AUSA Macaluso's racist jury-selection practices is highly relevant to assessing the prosecution's strikes here. *See, e.g.*, *Flowers*, 139 S. Ct. at 2245 ("[O]ur review of the history of the prosecutor's [use of] peremptory strikes . . . strongly supports the conclusion that his use of peremptory strikes in Flowers' sixth trial was motivated in substantial part by discriminatory intent."). The Fifth Circuit has expressly held as much. *See Reed*, 555 F.3d at 371 n.3, 373 (finding a *Batson* violation in part based on the Sparling manual and other evidence adduced in *Miller-El* and noting that because Paul Macaluso was the prosecutor in both cases, and that it was thus "the exact same evidence" at issue in both cases).

This evidence, however, was not reasonably available at the time of Mr. Hall's trial, direct appeal, or initial § 2255 proceedings, which concluded for purposes of raising new claims and presenting new evidence on September 13, 2004, when the district court denied Mr. Hall's motion to alter or amend its August 24, 2004 judgment. *See Hall*, 455 F.3d at 512-13 (noting that Mr. Hall's direct appeal had concluded with the denial of certiorari on May 17, 1999, that the district court had denied Mr. Hall's § 2255 motion on August 24, 2004, and that Mr. Hall noticed his appeal from that ruling on November 9, 2004). *Miller-El II*, decided on June 13, 2005, was the first court opinion ever to mention the Sparling Manual, the first published decision to find that Mr. Macaluso had provided pretextual reasons for striking Black jurors in an effort to evade *Batson*'s proscription of race-based strikes, and the first decision that linked Mr. Macaluso to the Sparling Manual. *Reed*, in which the Fifth Circuit panel took its cue from *Miller-El*, was not decided until four and a half years later, in 2009.[12]

---

[12] In 1989, the Texas Court of Criminal Appeals found *Batson* error in a capital case Macaluso had prosecuted, but this was because the defendant's *prima facie* case of discrimination was left unrebutted when Macaluso testified, at a retrospective *Batson* hearing, that he could not recall why he made the challenged strikes. *See Chambers v. State*, 784 S.W.2d 29, 31 (Tex. Crim. App. 1989)

Evidence of AUSA Macaluso's proclivity for striking Black jurors on the basis of race provides critical context for assessing the credibility of the reasons the prosecution provided in Mr. Hall's trial for striking four of the five qualified Black jurors. As discussed below, the proffered reasons for striking at least two of these jurors are undermined by the record and deserve no credit. As in *Miller-El*, "it blinks reality to deny that the [Government] struck [them] because they were black." *Miller-El II*, 545 U.S. at 266.[13]

### D. The Prosecution's Proffered Reasons for Striking Qualified Black Jurors Amy Evans and Billie Lee Were Pretextual.

The prosecution's proffered reasons for its strikes of Black jurors were pretextual. This is clear from the trial record. And were there any lingering doubt, AUSA Macaluso's track record should put it swiftly to rest.

As noted above, AUSA Roper was simply wrong in asserting that each of the Black jurors the prosecution struck had been the subject of unsuccessful cause challenges by the government. *See* Exhibit 9 at 8:17–20 (claiming that the prosecutors "didn't [strike the four Black jurors] for anything other than the fact that we thought that, in fact, they were all, we thought, in our opinion, disqualified, but the Court refused to grant our challenges to those jurors"). To the contrary, the

---

("Mr. Macaluso expressly stated that due to the passage of time since the trial of this cause, he could not remember these jurors, and more specifically, he could not recall why he exercised peremptory strikes to eliminate these black jurors from the Appellant's jury."). That decision, in isolation, did not suggest that AUSA Macaluso routinely engaged in a practice of striking Black jurors on the basis of their race.

[13] Mr. Hall does not suggest that the remaining two strikes were nondiscriminatory, but his focus on two of the four challenged strikes is an acceptable approach to focusing the Court's attention on the strongest evidence. In *Miller-El II*, the Supreme Court addressed the merits of only two out of eleven peremptory challenges to Black jurors. *Miller-El II*, 545 U.S. at 265-66. In *Snyder*, the Court addressed only one of two challenged strikes. *Snyder*, 552 U.S. at 477-78. In *Foster v. Chatman*, the petitioner and the Court focused on two of four challenged strikes. *Foster*, 136 S. Ct. at 1743, 1748. In *Flowers v. Mississippi*, the prosecutor struck five of six Black jurors and the Court focused on its removal of only one. *Flowers*, 139 S. Ct. at 2235, 2249.

prosecution challenged only Frances Miller and Lawrence Barrett for cause, unsuccessfully, and accepted Amy Evans and Billie Lee as qualified. *See* Exhibit 10 at 152:14–155:10 (unsuccessful challenge to Ms. Miller); *id.* at 174:20–175:17 (unsuccessful cause challenge to Mr. Barrett); Exhibit 11 at 104:4–6 (Ms. Evans accepted as qualified juror no. 50 without challenge); *id.* at 135:14–17 (Ms. Lee accepted as qualified juror no. 51 without challenge). This was only the beginning of the government's misrepresentations about why they struck Ms. Evans and Ms. Lee.

Amy Evans: Ms. Evans wrote in her questionnaire that she was in favor of the death penalty, "[d]epend[ing] upon the nature of the crime," believed it served "as a means of deterrent from committing the crime," and was appropriate for "brutal senseless murders." Exhibit 12 (Juror Questionnaire of Evans) at Q.45–48. Although she indicated that the option of life without the possibility of parole "would probably" make her lean toward a life sentence, she noted that this "depend[ed] upon the nature of the crime."[14] Exhibit 12 at Q.52a. During voir dire, she told AUSA Macaluso that she believed the death penalty was appropriate "where a crime was committed intentionally without . . . any regards for life," such as when "someone just [went] out shooting somebody without really having a reason" or when "you have . . . a horrendous crime committed or in some cases [a] habitual [offender]." Exhibit 11 at 92:8–20.

Ms. Evans further testified that if a referendum on getting rid of the death penalty were on the ballot, she "would probably vote to keep it" though she "would have reservations as [to] when it would be applied." *Id.* at 93:4–6. She observed that her husband might possibly have opposite views in light of his religious beliefs, but she did not really know what he thought and it wouldn't

---

[14] During AUSA Macaluso's questioning, Ms. Evans testified that even with the option of life without the possibility of parole, she could vote for the death penalty if it was proven that "the intent was there . . . [to] kill the victim." Exhibit 11 at 96:16–20. Whether she leaned in favor of a life sentence "just depends on the evidence[,] . . . if I'm, you know, assured beyond a reasonable doubt that the intent was there." *Id.* at 97:7–10..

bear on her decision.  *Id.* at 93:15–94:16.  She indicated that she would be able to vote for the death penalty and could sign her name to the verdict form imposing it.  *Id.* at 95:4–11.  She felt that the aggravating factors the government had to prove "are important factors" that she would consider in deciding punishment.  *Id.* at 98:7–12.  Ms. Evans's views, in other words, were fully consistent with the mind-set required by the law for capital sentencing jurors.

In explaining why the government struck her, however, AUSA Roper suggested that Ms. Evans did not have the views she had freely shared.  He first noted that that Ms. Evans' questionnaire indicated she had two brothers-in-law in prison, but "I ran out of time and didn't have a chance to ask her about that and it concerned me."  Exhibit 9 at 11:1–3.  He also claimed that Ms. Evans "was very, very hesitant on her views on the death penalty, and she said that she was leaning towards life without the possibility of parole." *Id.* at 11:4–6.  During questioning about the death penalty, "she had very long pauses in her answers and was very hesitant in what she said."  *Id.* at 11:8–9.  The district court overruled the objection without comment.

There is no support for this in the record. Not only did the district court *not* validate this explanation, *see, e.g.*, *Snyder v. Louisiana*, 552 U.S. 472, 479 (2008),[15] but the record itself refutes

---

[15] In *Snyder*, the prosecutor claimed to have struck one juror because "he looked very nervous to me" and because he was a student teacher and might want to finish up quickly with a lesser verdict to avoid a penalty phase.  *Id.* at 478.  The Supreme Court rejected the argument that it must defer to trial court's acceptance of the demeanor-based reason where, as here, the trial court overruled the *Batson* challenge without specifically crediting either of the prosecutor's proffered reasons. Rather, the Court explained, the trial court may not have remembered the juror's demeanor days after his voir dire, when the *Batson* challenge was raised, or the trial judge "may have found it unnecessary to consider [the juror's] demeanor, instead basing his ruling completely on the second proffered justification for the strike."  *Id.* at 479.  The Supreme Court found that the prosecutor's second reason for striking the juror was inconsistent with his treatment of White jurors with more pressing time constraints and the brevity of the trial.  *Id.* at 479–84.  Given the divergence between the prosecutor's explanation and the actuality of the trial record, the Court had no trouble concluding that "[t]he prosecution's proffer of this pretextual explanation naturally [gave] rise to

it.  AUSA Macaluso's questioning of Ms. Evans takes up exactly ten pages of the trial transcript.  *See* Exhibit 11 at 90:4–99:24.  This is consistent with the page lengths of voir dire examinations Macaluso conducted of qualified jurors the government accepted at this point in the voir dire process—and even longer than some.[16]  *See, e.g.*, Exhibit 20 (Trial Tr. Vol. 6) at 64:23–74:15 (seated juror Benjamin McGowen); *id.* at 108:12–117:5 (Gregory Perry, removed with defense peremptory); Exhibit 11 at 50:19–61:7 (Terri Jackman, removed with defense peremptory); *id.* at 142:12–152:8 (seated juror Stacey Donaldson); *id.* at 225:1–233:12 (first alternate/seated juror Marcia Graves).  Given the time limitations placed on *voir dire*, had Ms. Evans answers been full of drawn-out pauses, it would seem likely that the transcript length of her questioning would be correspondingly shorter.

---

an inference of discriminatory intent" and granting relief, irrespective of the prosecutor's demeanor-based reason.  *Id.* at 485.

[16] Over the course of voir dire, the district court increasingly restricted the time allotted to counsel for individual questioning.  At the beginning, the court allowed each side 20 minutes per juror for initial questioning and ten minutes for follow-up questions.  *See, e.g.*, Exhibit 14 (Trial Tr. Vol. 2) at 141:20–24; Exhibit 15 (Trial Tr. Vol. 3) 34:23–35:2.  Later, the court cut the time to 15 minutes.  *See, e.g.*, *id.* at 248:5–7.  By the fourth day of voir dire, the court provisionally cut this time again:

> "I'm going to give you ten minutes [to question jurors], and if during those ten minutes you're asking questions that have not been asked, I'll let you go on.  I'll give you ten minutes to ask the same questions again . . . but if during that ten minutes you use it to ask the same questions, that's all you're going to get.  And if you're asking new questions and getting into new territory, I'll be liberal about that, then you can go on and have your full 15 or 20.

Exhibit 16 (Trial Tr. Vol. 4) at 197:21–198:4.  Thereafter, the record suggests the court was committed to limiting questioning to ten minutes, but would at times allow counsel to run over the 10-minute limit.  *See, e.g.*, Exhibit 17 (Trial Tr. Vol. 5) at 40:22–23; Exhibit 18 (Trial Tr. Vol. 7) at 51:8–10; Exhibit 19 (Trial Tr. Vol. 11) at 52:15–18.

Moreover, the specific grounds that Roper claimed justified striking Ms. Evans were shared by White jurors the prosecution did not strike.[17]  For instance, while Roper emphasized that Ms. Evans's questionnaire indicated she leaned towards a life sentence, she repeatedly stated in both her questionnaire and her testimony established that her sentencing decision would depend on the evidence and the crime, irrespective of the availability of a life-without-release sentence.  *Compare* Exhibit 9 at 11:4–6 *with* Exhibit 12 at Q.45–46, 52a.  Her answer was not appreciably different from seated White juror Mary Ann Herring, whose questionnaire response to Q. 52a clicked off both "yes" and "no" to the question and indicated that "it would depend on the crime."  Exhibit 21 (Juror Questionnaire of Herring) at Q.52a.  Ms. Herring repeated this in her testimony, telling AUSA Macaluso that she:

> would go back to [her] original thoughts and statements.  It depends on the circumstances. . . . I can't tell you till I'm there, what I've heard and what I've listened and judged.  I don't know . . . because it depends on the crime and what the state or the government has proven to me, and then at that point then I would make that decision if I had the option between the two, if that's given to me.

Exhibit 18 at 118:23–19.  Linda Harrell, also White and also selected as a juror, wrote that she did not know if she could sentence someone to death if a sentence of life without the possibility of release were available.  Ex. 22 (Juror Questionnaire of Harrell) at Q.52a.  Like Ms. Evans, in answering the prosecutor's questions about whether she could nonetheless impose a death sentence, she testified that she could still consider it.  Exhibit 23 (Trial Tr. Vol. 8) at 66:3–6.

---

[17] As the Supreme Court observed in *Miller-El II*, "[m]ore powerful than the[] bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and White panelists allowed to serve.  If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."  *Miller-El II*, 545 U.S. at 241.

Moreover, AUSA Roper's claim that "he" was concerned about Ms. Evans' relationship-by-marriage to two people in prison, but that he had no time to question her about it is far-fetched. To begin with, it was AUSA Macaluso who was actually questioning her, and he did not ask for additional time to address this topic—a request he certainly could have made. *See, e.g.*, Exhibit 20 at 104:14–15; Exhibit 18 at 166:18–20, 189:22–23; Exhibit 23 at 176:8–10 (prosecutors requesting and receiving leave to ask additional questions). Moreover, the prosecutor did not appear concerned with the prison sentence of seated White juror Mary Ann Herring's son-in-law, whom she had visited in prison; rather, he asked her no questions about it. *Compare* Exhibit 21 at Q.73, 80 *with* Exhibit 18 at 108:24–119:18. Nor did prosecutors question seated White juror Stacey Donaldson about her husband's DUI conviction or the prison sentences of her husband's biological father and uncle. *Compare* Exhibit 24 (Juror Questionnaire of Donaldson) at Q.73, 80 *with* Exhibit 11 at 142:12–152:8. Nor did prosecutors appear concerned about seated White juror Linda Harrell husband's arrest and prosecution for indecent exposure, *compare* Exhibit 22 at Q.73, 83 *with* Exhibit 23 at 56:16–67:10; or the "unpleasant" experience of White prospective juror Randall Davis, removed with a defense peremptory, when he was prosecuted and acquitted on a DUI charge, Ex. 25 (Juror Questionnaire of Davis) at Q.73, 80, 92. White prospective juror Patricia Cox's brother-in-law had been convicted of robbery, Exhibit 26 (Juror Questionnaire of Cox) at Q.73, 80, but the prosecutor never questioned her about this. *See* Exhibit 19 at 89:9–93:23. She was removed with a defense peremptory challenge.

AUSA Roper misstated that the government had moved to strike Ms. Evans for cause and that he, rather than AUSA Macaluso had actually questioned her. He then offered a demeanor-based rationale for her removal that was at odds with both her actual questionnaire responses and testimony, and with the transcript of her voir dire. Moreover, he claimed that the government

struck Ms. Evans based on characteristics the government did not ask her about and which prosecutors had no trouble accepting in White jurors.  Even without the compelling evidence of Macaluso's serial *Batson* violations, the prosecution's proffered race-neutral reasons hold no water.

**Billie Lee:** Had Ms. Lee been White, it is hard to imagine the government would have struck her. She stated in her questionnaire responses that she favored the death penalty and believed it should be an option "[i]f the crime is 'extremely' brutal and heinous" and that "[w]hen . . . used equitably to rid society of criminal who repeatedly commit heinous crimes (without a conscience), then it benefits society— not just to send a message."  Exhibit 27 (Juror Questionnaire of Lee) at Q.45, 46.  She specified that it should be available for "serial killers; people who kill for the sake of killing; [and] child molesters who kill their victims."  *Id.* at Q.48.  The word "habitual" was handwritten in the margin of her answer, *id.*, but Ms. Lee was not questioned during voir dire about whether the word modified "child molesters who kill their victims" or was a separate category. Exhibit 11 at 121:5–130:24.  Ms. Lee also indicated that the death penalty should apply "in extreme circumstances," but should be applied consistently "to punish 'all' for the same kinds of crimes," and wrote that she could impose the death penalty, even if life-without were an option, as "[i]t would depend on the circumstances."  Exhibit 27 at Q.49, 52a.  Her brother had been killed by a hit-and-run driver.  *Id.* at Q.82.  Although she stated during voir dire that she was "ambivalent" about the death penalty, she also stated that, since it was an available punishment in the United States, she believed there were circumstances where it was necessary and that she could apply it for crimes that are pretty heinous and cruel.  Exhibit 11 at 123:6–124:7.  She would have to hear everything and believed that it should "be based individually on a case by case decision."  *Id.* at 125:4–5.  The death penalty was appropriate, she explained, for "[a]nything that involves children,

murder of children, cruelty to children, incorrigible kinds of acts perpetrated by someone repeatedly"—things, she said "were the wors[t] thing that you could do." *Id.* at 125:16–19. Although she admitted that she more than likely would lean towards a life sentence, she made clear she could give honest consideration to both sentences and the outcome would "depend[] on evidence, the cruelty of the act, all of that would have to be considered." *Id.* at 127:19–21.

AUSA Roper first claimed that the government struck Ms. Lee because her questionnaire responses indicated she did not believe in the death penalty, and that she could only impose the death penalty for people who repeatedly commit heinous crimes and serial killers, but that this case did not present such a situation. Exhibit 9 at 12:11–13:25. But AUSA Roper was not even present while Ms. Lee was being questioned. *See id.* at 13:13–15. Roper nonetheless further stated that "she was also on a prior jury trial for robbery and found the defendant not guilty," although shortly thereafter Roper stated that he had mixed her up with another juror and that in fact she had not been on a jury that acquitted someone charged with robbery. *Id.* at 13:18–14:7. Roper then offered instead that "[s]he had a brother-in-law who was a criminal defense attorney, which caused me some concern." *Id.* at 14:7–9. The court summarily overruled the objection. *Id.* at 14:16–17.

Ms. Lee was not the only prospective juror who selected (d) on Question 47 to indicate that despite misgivings about capital punishment, "as long as the law provides for it, I could assess it, under the proper set of circumstances." Seated White juror Stacey Donaldson also circled that same answer. Exhibit 24 at Q.47. Moreover, several White jurors who were accepted by the prosecution voiced misgivings about capital punishment. Seated juror Cindy Boggess, for instance, testified that she had always connected the death penalty to "the murder of a child or really coldblooded, calculated . . . sort of a murder," and observed that "it would have to be one

that was literally there was no doubt whatsoever, otherwise . . . I could not do it."  Exhibit 17 at 172:13–18.

Nor was Ms. Lee unusual in her assertion that the death penalty should apply to repeat offenders.  Numerous others White prospective jurors said the same, including seated juror Cindy Boggess, who wrote on her questionnaire that the death penalty was appropriate for premeditated child murder and multiple murders.  Exhibit 28 (Juror Questionnaire of Boggess) at Q.48.  *See, e.g.*, seated juror Stacey Donaldson, Exhibit 11 at 145:18 (death penalty appropriate for people who are "repeatedly violent to other people"); George Knoll, removed with a defense peremptory, Exhibit 10 at 190:6–11 (the death penalty would be much more important for repeat offenders than for a first offender); Gregory Perry, removed with a defense peremptory, Exhibit 29 (Juror Questionnaire of Perry) at Q.48 ("when the perpetrator has shown a pattern of crime and a total disregard for human life").

Moreover, Roper's mistaken "reason"—that Ms. Lee had sat on a jury that acquitted someone of robbery charges—would have been incredible had it not in fact been wrong.  Selected juror Dana Crittendon actually had served on a criminal jury that voted to acquit the defendant on the charge of murder or manslaughter—a fact that went unexplored by the prosecution, whose only question about her prior jury service was to clarify that she was already familiar with the voir dire and trial process.  *See* Exhibit 30 (Juror Questionnaire of Crittendon) at Q.87; Exhibit 31 (Trial Tr. Vol. 1) at 91:9–14, 98:2–7.

The prosecutor's final reason was likewise patently bogus as an explanation for Ms. Lee's removal.  While Ms. Lee did indicate that her brother-in-law was a criminal defense attorney in Texarkana, Arkansas, only the district court and defense counsel asked her any questions about this.  *See* Exhibit 11 at 120:9–17, 131:14–17.  AUSA Macaluso, however, did not appear to care,

as he asked Mr. Lee zero questions about her brother-in-law. "It would be difficult to credit the [prosecution's] new explanation, which reeks of afterthought." *Miller-El II*, 545 U.S. at 246. Had Roper's "substitute reason" been an actual concern to the government, one would reasonably expect the prosecutor to have questioned Ms. Lee about her brother-in-law's profession and its bearing, if any, on her views. *Id.* The prosecution's "failure to engage in any voir dire on a subject the [government] alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Id.* (quoting *Ex parte* Travis, 776 So. 2d 874, 881 (Ala. 2000)). That Ms. Lee's brother-in-law's job was of no consequence to the prosecutors, moreover, is demonstrated by their similar disinterest in the fact that seated juror Dana Crittendon's brother-in-law was a public defender in Atlanta. *See* Exhibit 30 at Q.75 ("brother- in law is an assistant in the public defense office—Atlanta, Ga."). She was not asked a single question about this by anyone. *See* Exhibit 31 at 90:7–129:19 (Crittendon voir dire, in which brother-in-law was not mentioned).

## III.   AS ADMINISTERED BY THE GOVERNMENT, THE FEDERAL DEATH PENALTY VIOLATES THE FIFTH AND EIGHTH AMENDMENTS AND THE FDPA BECAUSE OUTCOMES ARE IMPERMISSIBLY INFLUENCED BY RACE.

### A.   Data Show that Federal Capital Cases Are Impermissibly Influenced By Race.

Statistics maintained by the Federal Death Penalty Resource Counsel Project (FDPRCP) as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects which defendants will face the death penalty, and subsequent government decision-making that shapes the ultimate pool of those condemned to die, are impermissibly influenced by race, in violation of equal protection, the Eighth Amendment, and the Federal Death Penalty Act. The statistics maintained by FDPRCP indicate the following:

- Of 4,148 potential capital defendants between 1988 and 2020, a total of 537 defendants (13%) have actually been authorized for capital prosecution.

- Of the 537 individuals against whom the DOJ has authorized or directed local authorities to seek the death penalty, only 147 are White.  Three hundred and ninety (73%) are non-White and 263 (50%) are Black.

- The death penalty is authorized by DOJ more than 2.7 times as often against non-White defendants as against White defendants, and almost twice as often (1.8x) against Black defendants as against White defendants.

- The 55-person federal death row is 60% non-White (33 defendants).  Twenty-five of the condemned (45.5% of the total) are Black.

*See* Exhibit 32 (Declaration of Kevin McNally) at ¶¶ 7, 9 ("McNally Decl.").  All of this is the case despite the fact that Black people currently make up approximately 13.4% of the population, as compared to the 76% of the population who is White (during the earlier years for which these data apply, the demographic disparity was always greater than the current numbers).

These national statistics create a disturbingly strong inference that Government decisions regarding who will face the death penalty are impermissibly influenced by the race of the defendant.  But concerns about racial bias are even more grave with respect to how the federal death penalty is administered in Texas.

Mr. Hall is a Black man who was sentenced to death in federal court in Texas, a state with a long and shameful history of racially discriminatory use of the death penalty.  Of the U.S. jurisdictions that have continued to use the death penalty since 1976, Texas has executed the most people: 570 human beings put to death, *see Death Row* Information, Tex. Dep't of Crim. J., https://www.tdcj.texas.gov/death_row/dr_executed_offenders.html (last visited Nov. 8, 2020).

206 of them Black.  *See Death Row U.S.A.*, NAACP (Fall 2020), https://www.naacpldf.org/wp-content/uploads/DRUSAFall2020.pdf (last visited Nov. 8, 2020).  Thus, while Black people constitute only about 13% percent of the population of Texas, they account for 36.14% of its executions.[18]

The U.S. government also has engaged in the racially discriminatory use of the federal death penalty in cases prosecuted in Texas. To date, federal prosecutors in Texas have sought the death penalty at trial against 23 defendants and obtained 16 death verdicts. *See* McNally Decl. ¶ 19.  Ten of those 16 men who received death sentences in federal prosecutions in Texas have been Black. Only four have been White.[19] Thus, while Black people make up about 13% of the population of Texas, they constitute 62.5% of all the federal death verdicts in the State of Texas.

---

[18] Texas also has an infamous history of racist practices associated with capital prosecutions.  For example, the State long trained its prosecutors to use peremptory strikes specifically to remove Black potential jurors in criminal cases, whether capital or non-capital.  *See Miller-El v. Dretke*, 545 U.S. 231, 264 (2005) (describing the training given to, and the techniques used by, state-court prosecutors in Dallas County to ensure that Black potential jurors would not serve).  For years, Texas also allowed capital sentencing jurors to hear and consider purported expert testimony tying a capital defendant's race to an increased likelihood of future criminal violence, an essential finding in a Texas capital prosecution to support a death sentence.  *See Saldano v. Texas*, 530 U.S. 1212 (2000) (vacating decision for further consideration by lower court after confession of error by Solicitor General of Texas, where such testimony had been presented at sentencing).  The Supreme Court observed in *Buck v. Davis* that such opinion testimony "coincide[s] precisely with a particularly noxious strain of racial prejudice."  137 S. Ct. at 776 (granting habeas relief for ineffective assistance of defense counsel where defense presented expert who testified that defendant's race (he was Black) increased his probable future dangerousness).

[19] Two of those ten Black men have been executed: Louis Jones (2003) and Christopher Vialva (2020).  One was re-sentenced to life imprisonment (David Jackson).  The seven Black men from Texas who remain on the federal death row are Mr. Hall, Joseph Ebron, Bruce Webster, Julius Robinson, Alfred Bourgeois, Brandon Bernard and Sherman Fields.  The other five death-sentenced federal defendants from Texas are four White men (Shannon Agofsky, Mark Snarr, Ricky Fackrell, and Christopher Cramer) and one Latino man (Edgar Garcia).  A second Latino man, Juan Garza, was executed in 2001.

Newly available evidence demonstrates the statistical improbability of this result without the influence of racial bias in the federal system.  In August 2020, the IAHCR issued a report in the case of another federal death row inmate, Julius Robinson, which concluded that the federal death penalty operates in a racially biased manner.  *See* Report No. 210/20 at 7 n.7.  Like Mr. Hall, Black federal death row inmate Julius Robinson was tried and death-sentenced in Fort Worth, in the Northern District of Texas.  His submission to the IAHCR was supported by a study that his lawyers had commissioned in approximately 2010 from sociologist Scott Phillips, Ph.D.

Dr. Phillips has conducted extensive research on the administration of the death penalty and published his findings in peer-reviewed scholarly journals.  He was engaged by Mr. Robinson's lawyers to "conduct a statistical analysis regarding the possible effect of race on the federal death penalty in Texas."  Phillips Decl. ¶ 2.  Dr. Phillips examined "all potential death penalty cases filed in the four federal judicial districts in Texas" from 1988 to 2010.  *Id.* ¶ 4. Noting that "[f]or decades, scholars have demonstrated that race influences the administration of the death penalty in the United States," Dr. Phillips concluded that the data from federal capital prosecutions in Texas "reveals the same troubling patterns."  *Id.*[20]

---

[20] Dr. Phillips' observation that decades of scholarship have documented the role race plays in the American death penalty is accurate.  Studies have repeatedly shown that capital cases that involve Black defendants are prone to racially biased outcomes, an effect that is more pronounced when the victim is White but present in any event.  *See, e.g.,* Mona Lynch & Craig Haney, *Looking Across the Empathic Divide: Racialized Decision Making on the Capital Jury*, 2011 Mich. St. L. Rev. 573, 586 (2011); *see also*, *e.g.*, David C. Baldus, George Woodworth & Charles A. Pulaski, *Equal Justice and the Death Penalty: A Legal and Empirical Analysis* 258–60 (1990); *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities*, United States Gen. Accounting Office, 5 (Feb. 1990), http://archive.gao.gov/t2pbat11/140845.pdf.  More recent studies of capital punishment in Pennsylvania, Maryland, Missouri, Nebraska, and South Carolina have documented a similar pattern of racial disparities.  Raymond Paternoster et al., *Justice by Geography and Race: The Administration of the Death Penalty in Maryland, 1978-1999*, 4 Margins: U. Md. L. J. of Race, Religion, Gender & Class 1 (2004); Katherine Barnes, David Sloss & Stephen Thaman, *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making*

Specifically, Dr. Phillips found that during the interval under study, federal prosecutors in Texas were almost *six times* more likely to request authorization to seek the death penalty against Black defendants (prosecutors requested authorization in 56% of the cases with a Black defendant, compared to 10% of the cases with a non-Black defendant).  Phillips Decl. ¶ 7.  Moreover, federal authorities were almost *eight times* likelier to authorize pursuing a death sentence in cases with Black defendants (authorization was granted in 53% of all the cases with a Black defendant, compared to 7% of all the cases with a non-Black defendant).  *Id*.  Finally, a death verdict was about *sixteen times* more likely to be returned for a Black defendant (a death verdict was rendered in 32% of all the cases with a Black defendant, compared to 2% of all the cases with a non-Black defendant).  *Id*.  Dr. Phillips observed that "[t]he relationships in question are statistically significant."  *Id*.

Dr. Phillips also examined the data from the Northern District of Texas separately to determine whether "the same patterns [held] true" for that specific jurisdiction.  *Id.* ¶ 8.  Here, too, Dr. Phillips found "racial disparities"—indeed, the disparities revealed by his analysis were

---

*in Death Eligible Cases*, 51 Ariz. L. Rev. 305 (2009); David C. Baldus et al., *Arbitrariness and Discrimination in the Administration of the Death Penalty: A Legal and Empirical Analysis of the Nebraska Experience (1973-1999)*, 81 Neb. L. Rev. 486 (2002); Michael J. Songer & Isaac Unah, *The Effect of Race, Gender, and Location on Prosecutorial Decisions to Seek the Death Penalty in South Carolina*, 58 S.C. L. Rev. 161 (2006).  And most recently, researchers presented subjects with a triple murder trial scenario while varying the maximum penalty (death vs. life without parole) and the race of the defendant, and the results once again bore out the conclusions reached in the numerous studies cited above.  *See* Jack Glaser, Karin D. Martin & Kimberley B. Kahn, *Possibility of Death Sentence Has Divergent Effects on Verdicts for Black and White Defendants*, 39 Law & Hum. Behav. 539 (2015).  "Respondents who were told life-without-parole was the maximum sentence were not significantly more likely to convict Black (67.7%) than White (66.7%) defendants.  However, when death was the maximum sentence, respondents presented with Black defendants were significantly more likely to convict (80.0%) than were those with White defendants (55.1%)."  *Id*. at 1.  The conclusion to be drawn from this immense body of research is undeniable: the defendant's race and the victim's race have a material and substantial impact on capital charging and sentencing.

"technically speaking, slightly greater" than those in other federal districts in Texas.  *Id*.  These disparities were likewise "statistically significant."  *Id*.

Dr. Phillips' examination of the data ended at this juncture.  He noted that "[t]ypically, the next step in the analysis would be to control for potential confounders in a multivariate logistic regression model," to test whether race-neutral factors might "account for" or "explain" the observed disparities.  *Id*. ¶ 9.  However, because the government "declined to share the data necessary to conduct such an analysis," Dr. Phillips was unable to go further.  *Id*.

> As Dr. Phillips summed up the conclusions of his study,
>
> Despite my willingness to expand the statistical analysis if the DOJ provides the necessary information, I am confident that the findings would remain the same. Because the magnitude of the racial disparities is *so substantial*, controlling for race-neutral explanations in a multivariate logistic regression model would almost certainly not change the overall pattern. It is highly unlikely that a race-neutral factor or factors could explain why black defendants were 16 times more likely to be sentenced to death. The racial disparities are *almost surely too extreme to have a benign explanation*. Indeed, the racial disparities are *the most acute I have seen in my years of research* on the subject.

*Id.* ¶ 11 (emphases added). Dr. Phillips' study was not available to Mr. Hall until he learned of its existence from the August 12, 2020 Report in Julius Robinson's IACHR case.  Report No. 210/20 at 7 n.7.

Mr. Hall, however, has sought to prove that the federal death penalty is racially discriminatory in practice.  Prior to trial, he filed a "Motion to Dismiss the Government's Request for the Death Penalty Because of Racial Discrimination in Capital Charging by the Government and Request for Discovery of Information Pertaining to the Government's Capital Charging for Purposes of an Evidentiary Hearing."  Exhibit 33 (Hall's Motion to Dismiss, in Case No. 4:94-121-Y).  The Government opposed the motion, arguing in part that "no one ha[d] actually been prosecuted under the newly enacted Federal Death Penalty Act," and that the number of existing

federal capital prosecutions, "including the drug-related death penalty cases," was "so small as to make any such argument speculative."  Exhibit 34 (Gov't's Resp. to Hall's Motion to Dismiss, in Case No. 4:94-121-Y).  The district court denied the motion on September 7, 1995, "for the reasons urged in the government's response."  Exhibit 35 (Order Denying Motion to Dismiss, in Case No. 4:94-121-Y).

A few years later, the available data was not so limited and Mr. Hall sought again to raise a claim of racially discriminatory practice in the administration of the federal death penalty.  In his initial collateral review proceeding under 28 U.S.C. § 2255, he alleged that the processes by which the Department of Justice (DOJ) selects which defendants will face the death penalty were impermissibly influenced by the defendant's race, in violation of the Fifth and Eighth Amendments.  *See* Second Am. Mot. to Vacate Under 28 U.S.C. § 2255, *Hall v. United States*, No. 4:00-cv-00422-Y (N.D. Tex. Sept. 26, 2002), ECF. No 1069.  The collateral review court initially denied discovery on this claim, even as it acknowledged that Mr. Hall had presented evidence arguably tending to prove that "similarly situated white federal defendants have not been subject to the death penalty while black defendants have."  Mem. Op. and Order Den. Pet'r's Objections to the Denial of Additional Investigative Funds and Den. Pet'r's Mot. for Disc., at 34, *Hall v. United States*, No. 4:00-cv-00422-Y (N.D. Tex. Apr. 17, 2002), ECF. No 1048.  However, the court further found that Mr. Hall had presented "no evidence, direct or circumstantial," of the other element of his equal protection claim, *i.e.*, that prosecutors acted with "discriminatory intent" in Mr. Hall's own case or elsewhere.  *Id*.  Mr. Hall proffered additional statistical evidence to the collateral review court in a renewed motion for discovery, but without success.  *See* Second Mot. for Disc. and App., *Hall v. United States*, No. 4:00-cv-00422-Y (N.D. Tex. Apr. 18, 2002), ECF. Nos. 1104; 1105; 1109.  After the district court denied relief, Mr. Hall sought a Certificate of

Appealability from the Fifth Circuit based on, *inter alia*, the district court's refusal to grant discovery of the information necessary to fully develop his claim challenging the federal death penalty as racially discriminatory. *See* Application for Certificate of Appealability at 52, *United States v. Hall*, No. 04-70050 (5th Cir.) (filed July 18, 2005). The Fifth Circuit held that the district court had not abused its discretion because Mr. Hall "ha[d] not raised any contested fact issues that might entitle him to relief." *United States v. Hall*, 455 F.3d 508, 523 (5th Cir. 2006).

**B.    The Constitution And The Federal Death Penalty Act Forbid Death Sentences That Are Influenced By Racial Bias.**

The Constitution will not tolerate death sentences that are imposed in a manner that is arbitrary or capricious. *Furman v. Georgia*, 408 U.S. 238 (1972); *see also Proffitt v. Florida*, 428 U.S. 242, 258–59 (1976) (barring arbitrary death sentences contributes to the rational and consistent administration of justice in capital cases.). The ultimate penalty must be "imposed fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982).

One of the signal ways in which the death penalty may be imposed unfairly is when its imposition is shaped by race, whether the defendant's or the victim's. Put differently, racial discrimination is the quintessential arbitrary and unfair factor. When then-existing death penalty schemes were struck down in Furman, one of the Supreme Court's salient observations was that the death sentences under review were "cruel and unusual in the same way that being struck by lightning is cruel and unusual" and that "if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race." *Furman*, 408 U.S. at 309–10 (Stewart, J., concurring in the judgment) (emphasis added). When the Supreme Court approved the resumption of executions in *Gregg v. Georgia*, 428 U.S. 153 (1976), it did so on the assumption that improved sentencing procedures would eliminate race-based decision

making.

The Supreme Court's jurisprudence generally reflects a fierce commitment to eradicating racial bias and its pernicious effects in the criminal justice system, especially where the death penalty is concerned. "Because of the risk that the factor of race may enter the criminal justice process, we have engaged in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system." *McCleskey v. Kemp*, 481 U.S. 279, 309 (1987) (quoting *Batson v. Kentucky*, 476 U.S. 79, 85 (1986)). The effort is critically important not just to the fairness of individual litigation outcomes, but to the integrity of the legal system as a whole and indeed democratic legitimacy writ large. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979). Relying on race to impose a criminal sanction "poisons public confidence" in the judicial process, *Davis v. Ayala*, 576 U.S. 257, 285 (2015), injuring not just the defendant but "the law as an institution, . . . the community at large, and . . . the democratic ideal reflected in the processes of our courts." *Rose*, 443 U.S. at 556 (internal quotation marks omitted); *see also, e.g.*, Stephen B. Bright, *Discrimination, Death, and Denial: The Tolerance of Racial Discrimination in Infliction of the Death Penalty*, 35 Santa Clara L. Rev. 433, 475 (1995) ("The willingness of the courts to tolerate racial discrimination in order to carry out the death penalty has a corrupting effect not just on capital cases, but throughout the criminal justice system").

In a capital case, the right not to be discriminated against on the basis of race has roots in both the Eighth Amendment prohibition on arbitrary death sentences and the right to equal protection of the laws. *See, e.g.*, *Turner v. Murray*, 476 U.S. 28, 35 (1986) (because "[t]he risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence," the defendant's right to question prospective jurors

regarding possible racial prejudice is a matter of constitutional dimension in cases involving interracial crimes); *Buck v. Davis*, 137 S. Ct. 759, 775 (2017) (race is among the factors that are "constitutionally impermissible or totally irrelevant to the sentencing process") (citing *Zant v. Stephens*, 462 U.S. 862, 885 (1983)); *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867–68 (2017) (discussing the Supreme Court's continuing commitment to eliminating racism in legal proceedings).  This same underlying concern that a defendant's race should play no role in the determination of his guilt or sentence also animates the Supreme Court's decisions insisting on jury selection procedures sufficient to flush out any bigoted juror who might lurk in the venire. *See, e.g.*, *Turner*, 476 U.S. at 35 (holding that a capital defendant accused of an interracial crime must be permitted to voir dire on the subject of racial bias, noting that "the range of discretion entrusted to a jury in a capital sentencing hearing" creates "a unique opportunity for racial prejudice to operate but remain undetected," allowing a "juror who believes that blacks are violence prone or morally inferior" to "be influenced by that belief" in deciding on the sentence); *Ham v. South Carolina*, 409 U.S. 524, 526–27 (1973) ("[S]ince a principal purpose of the adoption of the Fourteenth Amendment was to prohibit the States from invidiously discriminating on the basis of race," principles of equal protection required the trial judge to question prospective jurors about their possible racial prejudice); *Aldridge v. United States*, 283 U.S. 308, 314 (1931) ("No surer way could be devised to bring the processes of justice into disrepute" than allowing racially prejudiced jurors to evade questioning about their possible biases).

The foregoing authorities, taken together, establish the overriding constitutional principle that race is an impermissible factor in capital sentencing outcomes, both as a matter of Eighth Amendment reliability and as a matter of equal protection.

At the same time, the Federal Death Penalty Act also evinces, in its structure and operation,

a commitment to preventing racial bias from influencing sentencing verdicts.  At least two separate provisions of the FDPA instantiate this core value.  First, 18 U.S.C. § 3593 ("Special precaution to ensure against discrimination") erects an elaborate formal process for confirming that jurors' deliberations were unaffected by (inter alia) race.  *See* 18 U.S.C. § 3593(f).  The provision requires both that jurors in a federal capital sentencing hearing must be expressly instructed to "not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim" in "considering whether a sentence of death is justified," and that they should not recommend a death sentence unless they would do so "for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be."  *Id.*  Once the jury makes its sentencing determination, it must certify to the court in a writing, signed by each juror, that these instructions were followed in reaching the sentencing verdict.  *Id.*  Second, 18 U.S.C. § 3595 ("Review of a sentence of death") provides that on reviewing a death verdict, a court of appeals must "address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor . . . ."  18 U.S.C. § 3595 (c)(1) (emphasis added).  Thus, in addition to the issues raised on appeal by the death-sentenced appellant, the court must consider whether the death sentence reflects the taint of "passion, prejudice, or any other arbitrary factor," a description which necessarily comprehends the possible influence of race on the sentencing outcome.  *See supra.*

The current statistics regarding the application of the federal death penalty and Dr. Phillips' careful scholarly analysis of the data from federal capital prosecutions in Texas (undertaken in 2010 but unavailable to Mr. Hall until this year) constitute urgently important new evidence that warrants revisiting this claim, which has never been adjudicated on the merits on a fully developed

47

factual record.  To be sure, a racially disproportionate pattern of capital charging, standing alone, is insufficient to demonstrate purposeful racial discrimination.  *See McCleskey, supra*.[21]  But here, this extensive statistical evidence stands alongside compelling case-specific evidence of personal racial animus on the part of the prosecution team, as exhibited by their race-based use of peremptory challenges to block four of five eligible Black jurors from service.

Moreover, at least with respect to the process for selecting which cases will be pursued as capital, Mr. Hall's case is materially distinguishable from *McCleskey*.  There, the analysis of prosecutorial decisions to seek the death penalty surveyed the decisions not of a single governmental body, as here, but of the multiple prosecuting authorities across the State of Georgia. This distinction alone renders the numbers revealed by the attached statistics and Dr. Phillips' analysis all the more probative of discrimination.  The Court should grant relief from Mr. Hall's death sentence because the death verdicts resulting from federal capital prosecutions in Texas are influenced by race, in violation of the Fifth and Eighth Amendments and the Federal Death Penalty Act.  At a minimum, the evidence presented here warrants discovery concerning the Government's authorization process and other relevant decisions (*e.g.*, plea-bargaining practices in death-authorized cases).

---

[21] Moreover, *McCleskey* was wrong the day it was decided, and it is long past time for the Supreme Court to revisit and repudiate it.  *McCleskey*, a narrow 5-4 decision, is widely and rightly regarded as a stain on the Supreme Court's jurisprudence—the modern-day equivalent of *Dred Scott* or *Plessy v. Ferguson*.  Justice Powell, who wrote for the *McCleskey* majority, admitted just four years later that he wished he had voted the other way.  *See Justice Powell's New Wisdom*, NY Times (June 11, 1994).  http://www.nytimes.com/1994/06/11/opinion/justice-powell-s-new-wisdom.html.  And more than thirty years after *McCleskey*, everywhere in the United States, in state and federal courts alike, race persists as a significant factor in determining whether a criminal defendant will be sentenced to die.  If non-arbitrariness and equal protection are to mean anything, surely they should preclude a capital punishment system that treats defendants differently based on race.

## **CONCLUSION**

The trial that led to Petitioner Orlando Hall's conviction and sentence was impermissibly tainted with racial bias. The claims he has raised in this petition go to the core of § 2241, as they call into question the legality of his death sentence, and implicate the overriding constitutional principle that race is an impermissible factor in capital sentencing outcomes, both under the Eighth Amendment and the Equal Protection Clause. The evidence raised in this petition was not available to Mr. Hall during his trial, appeal, or § 2255 proceedings. Some of this evidence did not come to light until just a few months ago. And it leaves no doubt that Mr. Hall's death sentence was influenced by his race.

For Mr. Hall to be executed under these circumstances would constitute a grave injustice and, therefore, Mr. Hall asks the Court to exercise its jurisdiction pursuant to § 2241 and grant him habeas relief from his death sentence.

## **REQUEST FOR RELIEF**

WHEREFORE, in order to prevent the violations of Mr. Hall's rights under the Sixth and Fourteenth Amendment to the U.S. Constitution alleged above, Mr. Hall's respectfully request that the Court enter the following relief:

a. that Mr. Hall be granted a stay of execution pending a final resolution of the claims raised in this petition;

b. that Respondent be ordered to respond to this petition;

c. that Mr. Hall be permitted to file a Reply and/or a Traverse;

d. that leave to conduct discovery be granted if necessary to prove the facts as alleged in this petition

e.  that an evidentiary hearing be conducted on the merits of Mr. Hall's claims, any procedural issues, and all dispute issues of fact;

f.  that habeas relief from Mr. Hall's sentence of death be granted.

## STATEMENT IN COMPLIANCE WITH LOCAL CRIMINAL RULE 38-2(c)

In conformity with Local Criminal Rule 38-2(c), Petitioner identifies all other legal actions challenging the conviction or sentence challenged in the current petition, followed by citation to every relevant judicial opinion, memorandum decision, order, and/or transcript.

### I.      Trial

*United States v. Orlando Cordia Hall, et al*, No. 4:94-CR-121-Y (N.D. Tex. Ft. Worth Div.)
Relevant Opinion:      None

### II.     Direct Appeal

*United States v. Orlando Cordia Hall*, No. 96-10178 (5th Cir.)
Relevant Opinion:      152 F.3d 381 (5th Cir. 1998), *cert. denied* 526 U.S. 1117 (1999)

### III.    Motion to Vacate Pursuant to 28 U.S.C. § 2255

#### A.  Northern District of Texas, Fort Worth Division

*Orlando Cordia Hall v. United States*, Nos. 4:94-CR-121-Y, Doc. 958 (May 16, 2000)
Relevant Opinion:      Docs. 1139 (Aug. 24, 2004), 1144 (Sept. 13, 2004)

*Orlando Cordia Hall v. United States*, No. 4:00-CV-422-Y
Relevant Opinion:      Doc. 3 (Aug. 24, 2004)

#### B.  United States Court of Appeals

*United States v. Orlando Cordia Hall*, No. 04-70050
Relevant Opinion:      455 F.3d 508 (5th Cir. 2006), *cert. denied* 549 U.S. 1343 (2007)

### IV.    Subsequent Requests for Leave to File Successive § 2255 Motions

#### A.  Northern District of Texas, Fort Worth Division

*United States v. Orlando Cordia Hall*, No. 4:94-CR-121-Y, Doc. 1195 (May 24, 2016)
Relevant Opinions:    Docs. 1197 (May 27, 2016), 1199 (June 21, 2016)

*United States v. Hall*, No. 4:94-CR-121-Y, Doc. 1201 (Mar. 28, 2019)

Relevant Opinion:      None

**B.  United States Court of Appeals**

*In re Orlando Hall*, No. 16-10670 (5th Cir.)
Relevant Opinion:      Doc. 00513555153 (June 21, 2016)

*In re Orlando Hall*, No. 19-10345 (5th Cir.).
Relevant Opinion:      Doc. 00515621458 (Oct. 30, 2020)

**V.     Section 2241 Challenge to § 924(c) conviction and sentences.**

*Hall v. Watson*, No. 2:17-cv-00176-JPH-DLP (S.D. Ind.)
Relevant Opinion:      None


The foregoing contains the entirety of Mr. Hall's legal actions challenging the conviction or sentence challenged in the current petition, and all relevant judicial opinion, memorandum decision, order, and/or transcript is cited herein.


Dated:  November 11, 2020                              Respectfully submitted,

                              By:     */s/  Kaitlyn A. Golden*
                                        Kaitlyn A. Golden (*pro hac vice* pending)
                                        Kathryn M. Ali (*pro hac vice* pending)
                                        HOGAN LOVELLS US LLP
                                        555 Thirteenth Street, N.W.
                                        Washington, D.C. 20004
                                        Telephone: (202) 637-5600
                                        Facsimile: (202) 637-5910
                                        kaitlyn.golden@hoganlovells.com
                                        kathryn.ali@hoganlovells.com

                                        Pieter Van Tol (*pro hac vice* pending)
                                        HOGAN LOVELLS US LLP
                                        390 Madison Avenue
                                        New York, NY 10017
                                        (212) 918-3000
                                        (212) 918-3100 (fax)
                                        pieter.vantol@hoganlovells.com

*Counsel for Petitioner Orlando Hall*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2020, I electronically transmitted the attached document to the Clerk of the Court using the CM/ECF System.  I further certify that service was made via Federal Express on the following:

    T.J. Watson, Warden
    UNITED STATES PENITENTIARY TERRE HAUTE
    4700 Bureau Road South
    Terre Haute, Indiana 47802

    Jonathan Bradshaw
    DEPARTMENT OF JUSTICE
    1100 Commerce Street
    Suite 300
    Dallas, TX 75242

                            */s/  Kaitlyn A. Golden*
                            Kaitlyn A. Golden