# EXHIBIT 9



Vol. 25

# RECORD ON APPEAL     96-10178     Vo

Case Number:    96-10178    Type:  dcrim Z
Date Docketed:  02/23/96    Fee:   ifp

LOWER DOCKET INFORMATION

Northern District of Texas, Fort Worth

| Lower Docket Number | Date Filed in DC | Date NOA Filed |
|---|---|---|
| 4:94-CR-121-Y | 11/04/94 | 02/13/96 |

Trial Judge:  Honorable Terry R Means

ASSOCIATED CASES

Related Cases

| Lead | Member | Begin | End |
|---|---|---|---|
| 96-10178 | 96-11178 | 09/19/96 | **/**/** |
| 96-10178 | 96-11177 | 09/19/96 | **/**/** |

UNITED STATES OF AMERICA

  Plaintiff - Appellee

 v.

ORLANDO CORDIA HALL, also known as Lan

  Defendant - Appellant

U.S. COURT OF AP

**FILED**

SEP 3 0 1996

CHARLES R. FULBRUG
CL

**PROPERTY OF
U.S. COURT OF APPEALS
FIFTH CIRCUIT**



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA     .     Criminal No.
                                    .     4:94-121-Y

vs.                                   .

ORLANDO CORDIA HALL          .     Fort Worth, Texas
                                    .     October ....
                                    .     1:30 p.m.

. . . . . . . . . . . . . . . . .

VOLUME 12
TRANSCRIPT OF TRIAL
(Hearing on Peremptory Strike Injury)
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
AUG 16 1996
NANCY DOHERTY, CLERK
BY
Deputy

APPEARANCES:

For the Government:            Mr. Richard Roper,
                                   Mr. Paul Macaluso,
                                   Ms. Delonia Watson and
                                   Mr. Christopher Curtis
                                   Assistant United States Attorneys
                                   1700 Burnett Plaza
                                   801 Cherry Street
                                   Fort Worth, Texas   76102
                                   (817) 334-3291

For the Defendant:            Mr. Michael Logan Ware
                                   Attorney at Law
                                   Law Offices of Michael Logan Ware
                                   The Bryce Building
                                   909 Throckmorton St
                                   Fort Worth, Texas   76102
                                   (817) 338-4100

                                   Mr. Jeff Kearney
                                   Attorney at Law
                                   Jeff Kearney & Associates
                                   Sundance Square
                                   120 W. Third Street, Suite 30...
                                   Fort Worth, Texas   76102
                                   (817) 336-5600

U.S. District Court

Official Court Reporter:     Deborah M. Roberts, CSR
523 United States Courthouse
501 West 10th Street
Fort Worth, Texas  76102-3637
(817) 239-2037


Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

U.S. District Court

Friday, October 20, 1995 - 1:30 p.m.

P R O C E E D I N G S

THE COURT:  Let the record reflect that the parties have been provided with copies of the strike list for each side, and that the Court has compiled the strikes onto one master list and has identified the 12 jurors and the four alternates which result.

Parties having been given that opportunity, the Court now calls for any challenges, if any, to the strikes made by either side.

MR. ROPER:  The government has no objection.

MR. WARE:  Your Honor, I don't have any challenges, but I have just a few things I would like to put on the record about them.

THE COURT:  Go ahead.

MR. WARE:  Your Honor, previously we requested some -- at least one extra peremptory strike in addition to the 20 that we had been allotted by statute and by the Court. We would like to renew that request now and point out for the record that we did use all 20 of our allotted peremptory strikes in the first pool of 52 jurors, potential jurors, and that notwithstanding the use of all 20 of those peremptory strikes, there are some objectionable jurors that are going to be on the -- on the jury itself, some of whom we had moved earlier to strike for cause, our motion having been denied.

Some of whom we did not move to strike for cause but are objectionable for other reasons.

Specifically, I would point out that the very last juror selected from the primary panel, number 52, Stacey Leigh Donaldson, I had moved to strike for cause because, as I recall, she had indicated, among other things, that she could not weigh a dysfunctional family and physically abusive childhood as a mitigating factor. We did not use a peremptory on her because, number one, we didn't have enough peremptories to use; and number two, we thought as the last possible juror, the chances of her being reached were less likely than some of the other objectionable jurors. The only reason she was reached was that -- is because there were no double strikes. Out of the 40 strikes, combined strikes, there were no double strikes. And we used all our strikes and the government used all their strikes, otherwise she would not have been reached.

As another example, I note, number one juror, Dana Lynn Crittendon, we had moved to strike for cause, and I know that motion was denied. And with our 20 strikes we chose to strike some of the other objectionable jurors over her. Those are two examples of individuals who are on the jury who are objectionable to us, and we would request at least one extra peremptory strike at this time to use on the first 52, or renew our request.

THE COURT: Is there a response?

MR. ROPER: Judge, I believe that those jurors were not substantially impaired from considering the full range of punishment and following the Court's instructions, and I don't believe they've established grounds to justify a challenge on those jurors.

THE COURT: Do you have additional points you wish to make?

MR. WARE: Yes, sir.

THE COURT: Go ahead.

MR. WARE: And I'm not -- there are other objectionable jurors that are on the panel, as well. I'm not limiting it to just those two.

In addition, on the alternate pool, we once again renew our motion for one additional strike. We were given two strikes, both of which were used, and notwithstanding that, that there are some objectionable jurors on the -- on the alternate panel.

THE COURT: Anything else?

MR. WARE: That's all, Your Honor.

THE COURT: Okay.

(Sotto voce between Court and law clerk.)

THE COURT: Your motion for additional strikes is conditionally denied. It will probably be denied for all purposes, but I want you to remind me of it one more time on Tuesday outside of -- outside the hearing of the jury, of

course, and before we -- right before we begin to tell them who's on the jury.

(Sotto voce between Court and law clerk.)

MR. ROPER:  That's right.  We'll have all of them there.  You don't have to remind me of it, it's denied.

Okay.  Is there any other matter that we need to bring up before we recess to begin trial on Tuesday morning?

Mr. Ware, have I left you puzzled?  You looked puzzled.

MR. KEARNEY:  You have me, Your Honor.

THE COURT:  Okay.

MR. KEARNEY:  I'm just afraid that maybe the Court was thinking we didn't say the magic words or something.

THE COURT:  Oh, no, no, no, not at all.  Not at all. I can't imagine what you could say that could be more clear than what you said.

(Sotto voce between Court and law clerk.)

THE COURT:  Yes, sir?

MR. WARE:  Yes, Your Honor.  It appears from the list and from my recollection of the jurors that the only person of African-American descent, person of the black race that is a potential juror at this point is number 59, Kelvin Johnson, who is the third alternate juror.  And it also appears that the government has struck -- used peremptory strikes on four black jurors, those being number 43, Frances Miller; number 44, Lawrence Barrett; number 49, Amy Evans; and

number 51, Billy Lee. And the defendant in this case is of the black race, and under Batson and the statutes pursuant to Batson and the cases interpreting Batson, we would ask that the government justify why it used its strikes on those black individuals. And in the alternative, we would ask that -- or ultimately we would ask those individuals be seated on this jury. And finally, if that's denied, we would ask for a mistrial.

THE COURT: Is the only basis for your objection under Batson that the four persons you identified are black?

MR. WARE: There were five -- according to our count five black people in the first 52 potential jurors. The government used peremptory strikes on four of those five. Frankly, the other one, number 14, Ms. Harris, is one that we, the defendant, used a strike on.

THE COURT: I understand that, but so far your only ground that I hear to substantiate a Batson claim is that the four persons you named are black.

MR. WARE: They are black, Your Honor, and we believe that having -- the government having used four of their five -- used peremptory strikes on four of five potential black jurors raises at least a presumption of racially discriminatory use of the peremptory strikes, and so we're raising Batson for that reason.

THE COURT: Okay. I think under the case law that's

insufficient to present a prima facie case, but in case it's not I will call upon the government to offer, if it can, race neutral reasons for its strikes on those enumerated jurors.

MR. ROPER:  Your Honor, I'll present most of this for the government.

There were -- we did strike those jurors as listed. Certainly none of the strikes were based on race.  In fact, we didn't strike Ms. Harris, who was stricken, as Mr. Ware said, by the defense.  That was number 14 on the final jury list, Natalie Harris.

THE COURT:  Are you making a Batson challenge as to that strike?

MR. ROPER:  No, Your Honor.  But the alternative juror list, Kelvin Johnson did make the jury and we didn't exercise peremptory.  The only peremptories we exercised were on Mrs. Miller, Mrs. Evans, Mrs. Lee and Mr. Barrett that were black, and we didn't do that for anything other than the fact that we thought that, in fact, they were all, we thought, in our opinion, disqualified, but the Court refused to grant our challenges to those jurors, and we feel like they were unable to give substantial consideration for the death penalty according to -- let's talk about Ms. Miller first.  Ms. Miller in her questionnaire said she was against the death penalty.

THE COURT:  And what was her number on our strike list?

MR. ROPER: On the strike list she's --

THE COURT: Number 43?

MR. ROPER: Yes, sir, 43.

In her questionnaire she said she was against the death penalty but could assess it in the proper circumstances, though she felt like she couldn't give the death penalty if life without the possibility of release was an option. Then she said their living and enduring the punishment of never being able to be free would be more harsh punishment. She said, "I feel at the time death is an easy escape and no one has the right to kill another person." She -- and in her testimony she said that she was tending to lean for life without release. She also said, "I don't know. I don't think I could do it. I just don't know that I could do it." And I noticed that there were long pauses in those responses when we asked her about that. She said she was basically opposed to the death penalty, and she believed that living in prison was a worse punishment.

So the reason we struck Ms. Miller was because her views on the death penalty we believed substantially impaired her consideration for the death penalty.

THE COURT: I overrule the challenge as to Ms. Miller.

MR. ROPER: Lawrence Barrett was -- he was number 77 in the original jury pool, and he's number 44 on the list. He

was challenged for cause because of his views on the death penalty. Also, I noticed when he came in in the general pool, that he was the only juror that made eye contact and smiled and looked at the defendant for several moments smiling, which sometimes doesn't mean anything and sometimes it does, but I do feel like it was significant.

He, again, in his questionnaire said he was basically against the death penalty but could assess it in some circumstances. He said in his questionnaire he couldn't give the death penalty if life without parole was an option, and he stated on the questionnaire, that's question 52-A, that the person will no longer be a threat to society. And he testified that he just didn't know if he could do it, meaning giving the death penalty. He thought it was a tough decision, he'd most likely lean toward life without parole, he didn't see it served a purpose, and he didn't think he could sign his name to a verdict form that resulted in someone being put to death, though he did -- he was rehabilitated on -- when the defense got hold of him, but all in all I felt like he was substantially impaired from giving the death penalty, and that's why we struck him.

THE COURT:  The challenge to Mr. Barrett, number 44, is overruled.

MR. ROPER:  The next juror, number 83, which is -- on the original list, which is 49, Amy Evans.

I noticed that she had two brothers-in-law in prison, as stated in her questionnaire. I ran out of time and didn't have a chance to ask her about that and it concerned me. She -- in her testimony she was very, very hesitant on her views on the death penalty, and she said that she was leaning toward life without the possibility of parole. And she -- during the questions asking her about whether she could give the death penalty or not, she had very long pauses in her answers and was very hesitant in what she said.

I really don't think -- based on my experience, I just don't think she would be a juror that could give a death penalty in a case because of her hesitant answers and her views toward the death penalty.

Just a second.

(Discussion at counsel table)

MR. ROPER: I couldn't read some of my writing.

She said -- she was the one that said she would pass the referendum. She didn't want to vote for it. Also, if the death penalty was a -- I just don't feel like all in all, considering her, that she could actually give the death penalty if it got down to it, and I think she would give a sentence of life without the possibility of release because of her feelings about her statements. She was leaning toward life without parole.

One other -- one time I asked her a question, and I

recall the response as being -- she was very hesitant. She said, well, I possibly could render the death penalty on some circumstances. But I thought that was such a weak answer, I thought that she was -- I really think she is substantially impaired from giving the death penalty if she made it on the jury.

Anyway, I didn't strike her for anything to do with race, but rather her views on the death penalty and her background with two brothers-in-law in prison.

THE COURT: The defense challenge is overruled.

MR. ROPER: The next juror would be 86 on the original jury list, and it's number 51 on the last list, Billy Lee.

In her questionnaire she said that she didn't believe in the death penalty but could assess it, could follow the law --

THE REPORTER: Could follow the law what?

THE COURT: You're kind of mumbling, Mr. Roper.

MR. ROPER: I'm sorry.

She said she -- in her questionnaire she said that she could -- she was against the death penalty -- well, let me just read it.

She said, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper circumstances."

She said in her questionnaire that it would have to be

repeatedly commit heinous crimes without conscience, and we don't have repeated murders in this case. She also said she would -- thought it was appropriate for serial killers. Of course, we don't have serial killers. She said also habitual child molesters, that would be a possible crime she could give the death penalty. We don't have habitual child molesters. He hasn't been convicted of child molestation in the past. She said she would lean toward life without the possibility of release.

I thought she was impaired just because of her questionnaire. She said on her questionnaire she thought that the death penalty was wrong. She slightly agreed that the death penalty was wrong. And then at that point in the jury selection, in all honesty, I walked out because I had to leave and Mr. Macaluso was examining her and -- is there anything you want to add?

(Discussion at counsel table.)

MR. ROPER: Oh, she also was on a prior jury trial for robbery and found the defendant not guilty, which that alone may not justify -- I mean, in my mind might not have justified a peremptory challenge, but when you consider that with her views on the death penalty, I felt like she couldn't -- she would be substantially impaired from giving the death penalty, and I just don't feel like she would be a fair juror.

Again, the reason she was stricken didn't have anything to do with her race, but rather with her views on the death penalty and her overall background, considering it all together.

I'm sorry, I was mistaken about her. She didn't -- I got that mixed up. She wasn't on the jury on a robbery. I'm sorry, my notes were jumbled up. I apologize. She had a brother-in-law who was a criminal defense attorney, which caused me some concern. And she's -- I got the impression from her that she was really just ambivalent toward even considering the death penalty, from what I could see during the time I was there when she was being questioned by Mr. Macaluso.

Again, we didn't do it for race but for -- for other reasons other than race.

THE COURT: The defense challenge to number 51, Billy Lee, is overruled.

Is there anything further that we need to take up before we recess in anticipation of trial on Tuesday at 9:00?

MR. WARE: Yes, sir. I guess initially I would like to establish for the record that at least my recitations of the individuals and the fact that they are of the black race is accurate so that we don't need to take further evidence and testimony to establish that numbers 43, 44, 49 and 51 are of the black race.

THE COURT:  And their questionnaires are in the record.

MR. WARE:  That's true.

In addition, my recollection -- I could be wrong, but my records show that the Court has not yet made a ruling on our motion to declare the death penalty unconstitutional, and we would like a ruling on that, I guess, before the trial begins.

And although I know the Court has ruled from the bench, or at least informed us of the ruling on the motion to suppress statements, I don't believe we've got a written order on that, and we would like to request at some point before -- well, at some appropriate time, it doesn't have to be before trial begins, but at some appropriate time that the Court either issue a memorandum opinion explaining its decision or to file findings of fact and conclusions of law, or both.

THE COURT:  That will be done.

MR. ROPER:  A couple of points, Your Honor.  One, we're trying to arrange for Dr. Coons to make it up here Monday to interview.  He had some kind of scheduling conflict. It might be necessary -- I don't think we'll reach -- certainly I don't think we'll get through the guilt or innocence portion by the end of next week, but it may be difficult to get him in to see him on Monday, and we may need to file a motion to ask the Court to extend time.  I just wanted everybody to be aware of that, we were having problems

because he was scheduled to go somewhere.

THE COURT: I think if that's the case, you'll need to find out some available times from him and put that in your motion.

MR. ROPER: We are. That's what we're doing right now.

The second thing is, and I thought we would have it over here, we prepared a trial brief that we think covers many of the issues in the case. The trial brief goes into purported facts that I don't think should be in the public record, because we've already had a problem with pretrial publicity, and we're certainly not preparing to file it for the press to get ahold of it. So I don't know how the Court would want to handle it. We could present it to the Court and serve it on the parties without it being filed, or file it under seal.

THE COURT: Why don't you file a request that you be allowed to submit your trial brief under seal.

MR. ROPER: All right.

(Discussion at counsel table.)

MR. KEARNEY: This is what we're trying to do, Your Honor. We don't want the government to have to bring Dr. Coons up, because Mr. Hall is not going to talk to him for all the reasons set out in our response to their request. And so we want to get -- we need to do something to get that on the record. It's my understanding of the Court's ruling that

if he doesn't talk to him, then we can't offer our expert testimony, and we're going to want to at some point in time make a proffer of what the expert would testify to during the punishment phase of the trial to get that on the record.  But rather than bringing Dr. Coons up and going out there and having to refuse to talk to him and going back, we'll stipulate on the record that he's not going to talk to him for all of the reasons set out in --

        (Discussion at counsel table.)

        THE COURT:  Then the record should reflect that the defendant is asserting his Fifth Amendment right and will not subject himself to the examination of Dr. Coons and will present at a later time its proffer of what the expert -- their own expert would have been had they been allowed to present that expert, which they would not be allowed to do because of the defendant's assertion of Fifth Amendment right and claim that he's not attend to and will not be subjected to that examination by Dr. Coons.

        MR. WARE:  Just for the record, Your Honor, Fifth and Sixth Amendment rights.

        THE COURT:  And Sixth Amendment.

        MR. KEARNEY:  And all the reasons set out in our response to their motion for that examination.

        THE COURT:  And all other things uttered and unuttered.

MR. ROPER: Well, not unuttered. I don't like unuttered.

THE COURT: Mr. Roper, the Court now grants you permission to file your trial brief under seal without further motion.

MR. ROPER: Thank you.

THE COURT: And if the defense wants to file a trial brief and have it filed under seal, it may, as well.

(Sotto voce between Court and law clerk.)

THE COURT: The defense filed a request for certain documentation from probation records. The Court has reviewed those in camera and has identified certain pages out of that record that are, the Court believes, proper to be given to the defendant under Brady, and those will be given to the defendant.

Have they yet been, Cheryl?

MS. RAPER: No. I have them right here.

THE COURT: They're ready to be presented.

Have copies been made?

MS. RAPER: Of the matters to be distributed, yes.

THE COURT: Copies have been made for the government so that the government can see what has been given to the defendant, and a copy has been made of the same thing for the record and will be Court's Exhibit Number 4.

MR. KEARNEY: In connection with that, Your Honor,

can we have the entire -- all the documents the Court reviewed pursuant to that motion also made a part of the record as part of the Court's exhibit, copies of that, so if there's something in there that we may have been entitled to that the Court did not give, that the record reflect that?

THE COURT:  I was hoping that wouldn't be necessary because it's just so voluminous and copying is --

MR. ROPER:  I don't think there's a requirement.

MR. KEARNEY:  I think it's a requirement that I request the Court to do that, so I am asking the Court to do that.

THE COURT:  Hold on just a moment.

(Sotto voce between Court and law clerk.)

THE COURT:  Your request is granted.  That will be Court's Exhibit 5.  The materials not turned over will be Court's Exhibit 5, the entire file.

Mr. Ware?

MR. WARE:  Yes, sir.  There are two documents -- at least two documents that are already in the clerk's file -- and I guess they've been there for some time -- the government has filed.  The first being their 404(b) notice of extraneous bad acts of which they intend to offer evidence; and the second being their written summary of punishment evidence that they intend to offer.  And I can reduce this to a written motion later this afternoon or Monday, but I would ask at

least those two documents be sealed for the reason that I -- I assume that the newspaper article two days ago was based, at least in part, on the contents of those two documents.

THE COURT:  Does the government have objection?

MR. ROPER:  No, Your Honor.

THE COURT:  So ordered.

MR. WARE:  Thank you.

THE COURT:  Is there any other matter we need to take up prior to the commencement of trial on Tuesday at 9:00 a.m.?

Do you want to give notice now of the witnesses you expect to call, Mr. Roper?

MR. ROPER:  I -- we were trying to work on that a little bit, and we ran out of time because we've been trying to do that trial brief.

THE COURT:  Okay.  Would you --

MR. ROPER:  I'll call them and tell them.

THE COURT:  Send them written notice and the Court written notice Monday.

MR. ROPER:  I will, Your Honor.

THE COURT:  All right.  That seems to exhaust our matters for this afternoon.  We will then reconvene at 9:00 a.m. on Tuesday morning for trial on the merits.

(Proceedings concluded at 2:00 p.m.)

-oOo-

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

Deborah M. Roberts,
Official Court Reporter
Texas CSR #3770

Date  8/15/96