# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. |
| | 4:94-121-Y |
| vs. | |
| | Fort Worth, Texas |
| ORLANDO CORDIA HALL | October 17, 1995 |
| | 8:05 a. m. |
| . . . . . . . . . . . . . . . | |

VOLUME 9
TRANSCRIPT OF TRIAL
(Mental Health Examination Hearing)
(Individual Voir Dire Examinations)
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          Mr. Richard Roper,
                            Mr. Paul Macaluso,
                            Ms. Delonia Watson and
                            Mr. Christopher Curtis
                            Assistant United States Attorneys
                            1700 Burnett Plaza
                            801 Cherry Street
                            Fort Worth, Texas   76102
                            (817) 334-3291

For the Defendant:          Mr. Michael Logan Ware
                            Attorney at Law
                            Law Offices of Michael Logan Ware
                            The Bryce Building
                            909 Throckmorton St
                            Fort Worth, Texas   76102
                            (817) 338-4100

                            Mr. Jeff Kearney
                            Attorney at Law
                            Jeff Kearney & Associates
                            Sundance Square
                            120 W. Third Street, Suite 300
                            Fort Worth, Texas   76102
                            (817) 336-5600

ORIGINAL

U.S. District Court

Official Court Reporter:        Deborah M. Roberts, CSR
                                523 United States Courthouse
                                501 West 10th Street
                                Fort Worth, Texas   76102-3637
                                (817) 239-2037


Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

U.S. District Court

INDEX

Mental Health Examination Hearing  . . . . .  4

| Venire Persons: | Voir Dire Examination by: | | |
|---|---|---|---|
| | The Court | The Government | The Defense |
| David Thomas Cheatham | 44 | 45 | 54 |
| Natalie Kay Byers | 62 | -- | -- |
| Charles Emory Compton, Jr. | 63 | -- | -- |
| Larry Brogdon | 69 | 70 | 79 |
| Gary Killion | 89 | 91 | 99 |
| Wanda Mills | 104 | 105 | 117 |
| Goldie Ann Nunley | 121 | 130 | -- |
| Frances Miller | 135 | 139 | 146 |
| Lawrence Barrett | 155 | 161 | 170 |
| George Knoll | 175 | 178 | 189 |

U.S. District Court

really delved and dug, and it's probably been uncomfortable for you and we don't mean it to be, but it's very important. Thank you.

MS. MILLER:  Uh-huh.

THE COURT:  And let us do this:  We'll let you know by the end of the week whether your services will be required, and in the meantime if you'll remember not to listen to any media coverage and not to discuss it with anybody at all, especially not at home.

MS. MILLER:  Okay.

THE COURT:  Thank you very much.

MR. MACALUSO:  Thank you, ma'am.

(Venire person excused at 2:20 p.m.)

THE COURT:  All right.  I presume the government has a challenge?

MR. ROPER:  Yes, sir.  And I -- she said something early on that I think -- when you were asking her questions, she just -- early on she said she just didn't think she could give the death penalty, I just don't know I could do it.  Now, if she had said I just don't know if I could give a life sentence without possibility of release, I think that would pretty well disqualify her.

She did come back around both ways on the case, but one thing that I think is important to consider, Judge, Mr. Kearney asked her all these aggravating factors.  Now, if

every one of those aggravating factors were present, and I think she -- really, going back to that Antwine versus Delo case, conceiving of a hypothetical circumstance where they could give a -- in an extreme circumstance give the death penalty, giving the death penalty could qualify them, that's really what Mr. Kearney was doing with all those questions. I mean, every one of these aggravating factors. We would have the ability to have a fair juror with just one of the aggravating factors. They ought to be able to not rule out the death penalty in any one of those circumstances. I think she's substantially impaired because of that.

And I think if you go back and look at her questionnaire, she was real strong on her questionnaire about it, especially about life without possibility of release. She said on that question 52-A, "If life without parole is an option, couldn't give death penalty because living and enduring the punishment of never being able to be free would be more harsh a punishment." And then she marked it saying she couldn't consider it.

And I think that -- she also said that she agreed that life without the -- life imprisonment is more effective than the death penalty, and the state can't teach the sacredness of human life by destroying it. To me that shows how she feels. I mean, she went both ways, correct, but I think the hesitancy in her answers shows how she really feels. And just because

all aggravating factors are present and she can conceive in her mind of a situation that she could give the death penalty, that doesn't qualify her.  And I think that's the bottom line why she's substantially impaired.

THE COURT:  Mr. Kearney.

MR. KEARNEY:  I don't have anything to say, Judge.

THE COURT:  Okay.  You know, when you look over here at her answers to the questions where a statement is set out and then the degree of agreement or disagreement is possible, she slightly agrees that the death penalty is wrong but she also agrees we must have the death penalty for some crimes, she agrees with that, and she slightly agrees that the death penalty is necessary.

What I'm inferring there is she thinks it's wrong and wishes we didn't have to have it, but we do have it -- she disagreed, by the way, the death penalty is absolutely never justified, she slightly disagreed with that, and she agreed that the death penalty is necessary.  She disagreed that the death penalty cannot be regarded as the same method for dealing with crime.  She disagreed that the death penalty is wrong and is unnecessary even in our imperfect civilization. She even disagreed that the death penalty has never been effective in preventing crime.  She agreed with we must have the death penalty for some crimes.  Her answers are somewhat ambivalent.  She didn't think the execution of criminals was a

disgrace to civilized society, but as I say, they're somewhat conflicting.

My conclusion here is that she has a battle going on between her emotions and her mind, and I think that presented with the facts of a proper case, I think she can give the death penalty. I think she'll rely on her mind. I think the fact that she leans against the death penalty is no more cause for striking than the fact that a number of our people we have allowed on lean for the death penalty once intent is found. So I deny the motion to strike. I'm sorry it took so long, but I was really kind of thinking out loud there.

Let's hear from Mr. Barrett.

(Venire person seated at 2:25 p.m.)

LAWRENCE BARRETT,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

Q.   Hi, Mr. Barrett. How are you, sir?

A.   Fine.

Q.   Please have a seat.

Let's see, Mr. Barrett, you indicated this morning that you had heard something about the case on the news. Could you tell us what you've heard?

A.   Basically whenever it happened I just read the accounts of the kidnapping and the killing and also the -- where their

you won't know until probably Friday of this week, and so ask if they'd let you off. And if they say no, give me a call and I'll see if I do something.

MR. BARRETT: Okay. Any idea if I am selected how long it --

THE COURT: Yes, sir. We think the trial will take two weeks.

MR. BARRETT: Two weeks? Okay.

THE COURT: Do you work on commission?

MR. BARRETT: I work on a commission and I've also signed up for a class that I'm taking, and it's a real estate training class and it's -- it goes every Monday for 11 weeks.

THE COURT: You're in luck. You don't -- we won't hear anything on Mondays.

MR. BARRETT: Won't hear anything on Mondays, okay.

THE COURT: All right. Thank you very much.

MR. KEARNEY: Thank you.

MR. MACALUSO: Thank you, sir.

(Venire person excused at 2:55 p.m.)

THE COURT: Okay. Who thinks he's substantially impaired?

MR. ROPER: I do. He said I don't -- talk about letting emotions take over, and he said I just don't know. And I think that kind of sums up -- and he said conflicting answers, but obviously he's against the death penalty and I

think he clearly answered that question, "I can't give the death penalty if life without parole is an option.  That person will no longer be a threat to society."

And he went back and forth and back and forth, pausing for a lot of times on his answers.  I just don't think he can give a good faith consideration.  He may say he can in answer to the Court's questions, I just don't think he can do it.  I think his hesitation and his answers shows it.  He also, I believe, is disqualified on the reasonable doubt standard.  You know, Mr. Kearney said we really don't know what that means, and then Mr. Kearney told him what he thought his definition of it was.

I think he's substantially impaired because of his beliefs against the death penalty.  He's got pretty strong beliefs, and I just don't think he can sit.

THE COURT:  I think he's a real good candidate for a peremptory, but I deny the motion to strike.

MR. KEARNEY:  Off the record.

(Off-the-record discussion.)

THE COURT:  Mr. Knoll, we're ready for Mr. Knoll.

(Venire person seated at 3:00 p.m.)

GEORGE KNOLL,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

KNOLL/VOIR DIRE/COURT

question, though, has it?

Q.   Well, what -- I guess you would vote to keep it because you felt that it serves a purpose, would that be fair?

A.   Yes.

Q.   Okay.  Maybe we can go at it this way.  What purpose?

A.   The -- I believe that purpose goes deeper into the area where if it's future dangerous -- dangerous -- the defendant would remain dangerous, or prior criminal history, repeat offenders, I believe in those areas that would become much more important than on the first offense, if that helps explain my position.

Q.   Would it be important to you as to whether or not any prior criminal record was for violent offenses as opposed to nonviolent offenses?

A.   What would be a nonviolent offense where a life was taken?

Q.   No, no, no.

A.   Okay.

Q.   I'm saying prior --

A.   Excuse me.

Q.   -- criminal record, a prior criminal record.  Would it be important to know whether or not there was violence involved in the prior criminal record or whether there was not any violence?

A.   I don't understand the question.