# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA . Criminal No.
.                    4:94-121-Y

 vs.                  .

.                    Fort Worth, Texas

ORLANDO CORDIA HALL    . October 18, 1995

.                    8:45 a.m.

. . . . . . . . . . . . . . . .

VOLUME 10
TRANSCRIPT OF TRIAL
(Individual Voir Dire Examinations)
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
AUG 16 1996
NANCY DOHERTY, CLERK
BY
Deputy

APPEARANCES:

For the Government:        Mr. Richard Roper,
                          Mr. Paul Macaluso,
                          Ms. Delonia Watson and
                          Mr. Christopher Curtis
                          Assistant United States Attorneys
                          1700 Burnett Plaza
                          801 Cherry Street
                          Fort Worth, Texas   76102
                          (817) 334-3291

For the Defendant:        Mr. Michael Logan Ware
                          Attorney at Law
                          Law Offices of Michael Logan Ware
                          The Bryce Building
                          909 Throckmorton St
                          Fort Worth, Texas   76102
                          (817) 338-4100

                          Mr. Jeff Kearney
                          Attorney at Law
                          Jeff Kearney & Associates
                          Sundance Square
                          120 W. Third Street, Suite 300
                          Fort Worth, Texas   76102
                          (817) 336-5600

ORIGINAL

U.S. District Court

Official Court Reporter:          Deborah M. Roberts, CSR
                                  523 United States Courthouse
                                  501 West 10th Street
                                  Fort Worth, Texas   76102-3637
                                  (817) 239-2037


Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

INDEX

| Venire Persons: | Voir Dire Examination by: The Court | The Government | The Defense |
|---|---|---|---|
| Thomas O'Malley | 26 | 34 | 43 |
| Terri Jackman | 50 | 51 | 61 |
| Billy Dwayne Dean | 73 | 74 | 81 |
| Amy Evans | 87 | 90 | 100 |
| Douglas Riley | 104 | 111 | 116 |
| Billie Lee | 116 | 121 | 131 |
| Stacey Lee Donaldson | 136 | 142 | 152 |
| Erma Felts | 163 | 165 | 174 |
| Patricia Lumb | 183 | 188 | 197 |
|  | 203 | -- | -- |
| Dennis Doka | 206 | 212 | 215 |
| Marcia Graves | 222 | 224 | 233 |
| Richard Graham | 242 | 245 | 254 |

JACKMAN/VOIR DIRE/COURT

BY THE COURT:

Q.   Ms. Jackman, you indicated, I believe, that you had not heard any publicity about this case.

A.   Yes.

Q.   Okay.  I have reviewed your questionnaire here, and I don't see any things that I wanted to cover with you.  Do you have any questions for me that relate to what I covered with the entire group this morning?

A.   No, I don't.

Q.   Do you feel like you had a pretty good grasp and understanding of the --

A.   Yes.

Q.   -- process?

THE COURT:  Okay.  The government will have ten minutes.

MR. MACALUSO:  Thank you, Your Honor.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.   Good morning, Mrs. Jackman.

A.   Good morning.

Q.   Ma'am, my name is Paul Macaluso.  I'm one of the prosecutors assigned to this case.  I'm an assistant United States attorney.  We'll be representing the government in this particular case.  The next table over is Mr. Kearney, Jeff Kearney.  He's an attorney in practice here in the Fort Worth

area.  Next to him, of course, is the defendant, Orlando Hall.  Do you recognize any one of us other than from the introductions almost going on a month ago?

A.    No.

Q.    Almost a month ago, I guess.

A.    Yes, almost a month ago.

Q.    Mrs. Jackman, it's very obvious at this point you're a prospective juror on a capital case.  They call it that because obvious -- for obvious reasons.  One of the possible penalties is the death penalty, and what we want to do here in the time that's allotted is to talk to you briefly about some things that may come into play.

A.    Okay.

Q.    And we want to invite you, of course, to first relax.  There's nothing to be nervous about, no right or wrong answers, and you just tell us how you feel and answer the questions honestly and, of course, you'll be doing your job.

A.    Okay.

Q.    If we don't confuse you, we'll be doing ours for the most part.

A.    Okay.

Q.    If you have a question, ask it.  Okay?

A.    Okay.

Q.    And we'll do our best to answer it.

Let me tell you where we stand, that is the government

stands with regard to this particular case at the outset. Ms. Jackman, we're actively seeking the death penalty in this case for this defendant.  In other words, once the trial begins we would expect to provide you, if you're on this jury, with the type and the quality of evidence that would convince you beyond any reasonable doubt whatsoever that the defendant is guilty exactly as he's been charged in this indictment. And if you so find, then we go into the second phase of the trial, the penalty phase, where once again we would expect to provide you and the other jurors, again, with the type and the quality of evidence that would convince you that a death sentence is proper based on the evidence and provided for by law.  That's a decision, of course, that you have complete control over, or you would if you're on this jury, along with the others.

        Almost a month ago you filled this --

A.    Yes.

Q.    -- weighty questionnaire out here, and you were asked a number of questions about your feelings about everything, and certainly about the death penalty.  How do you feel about the death penalty in your own words?

A.    I have no problem with the death penalty.  I think that depending on the crime, depending on circumstances involved, that there are times that the death penalty should be enforced.

Q.    Okay.  I gather from what you're saying, or at least implicit in what you're saying is there would be incidents where it may not be appropriate.

A.    Yes.

Q.    And what would that depend on to your way of thinking?

A.    Oh, it would have a lot to do with evidence that was -- I can't give any one circumstance because I'm not --

Q.    Okay.  That pretty much squares with what His Honor told you this morning, what you know the law is.

A.    Right.

Q.    You know that before you could be permitted or anyone would be permitted to serve on a jury of this nature, you would be expected to take a sworn oath to God --

A.    Uh-huh.

Q.    -- to render a true verdict according to the law, the judge went over that with you this morning --

A.    Uh-huh.

Q.    -- and the evidence.  That would come only from the sworn testimony of witnesses --

A.    Right.

Q.    -- or exhibits, for example, that had been admitted.

      Do you know of any reason why you could not take that oath?

A.    No.

Q.    Do you know of any reason why you could not listen to a

case -- a serious case of this nature and wait until all of the evidence is in before you make up your mind in either phase of the trial?

A.    No.

Q.    You can see how crucial that is --

A.    Yes.

Q.    -- and how utterly important that is, can't you, ma'am?

A.    Yes.

Q.    Is there any reason why you could not?

A.    No.

Q.    Okay.  Now, let me ask you this:  You understand, of course, again from the remarks of His Honor, that the death penalty is not available in all cases?

A.    Yes.

Q.    Even in cases where the law permits it, of course, it's a factual determination by the jury.  You understand that?

A.    Yes.

Q.    Okay.  Now, Mr. Jackman, do you know how he feels about the death penalty?

A.    I'm not really sure.  I think that he probably agrees with me.  I'm not -- we don't discuss it on a regular basis.

Q.    It probably isn't the most pleasant topic of conversation.

A.    Yes.

Q.    Let me ask you, do you have any question at all about any

of the procedure that Judge Means went over with you this morning?

A.    No.

Q.    Did you have any idea that that's actually how it was or that was a procedure that was provided for?

A.    No, I didn't.  No.

Q.    Did it seem to make sense to you?

A.    Yes.

Q.    Do you see how an analysis through this particular process that the judge talked to you about would in your mind distinguish somebody who perhaps deserved the death penalty and somebody who did not --

A.    Yes.

Q.    -- depending on the facts?

A.    Yes.

Q.    Okay.  Now, you had an opportunity, of course, through the judge's discussion to understand that you must first establish a defendant's guilt, obviously --

A.    Right.

Q.    -- in the first phase of the trial.  If we don't, that's all.

A.    Right.

Q.    Okay.  If we do, then there's the penalty phase, a separate and distinct phase --

A.    Yes.

JACKMAN/VOIR DIRE/MACALUSO

Q.    -- where we must again, if we're seeking the death penalty, and we are, we must establish a number of things before a juror could even for a moment consider whether the death penalty is appropriate or not.

A.    Yes.

Q.    Any question about that at all?

A.    No.

Q.    You understand the first one on the first page there, that's with regard to our requirement --

A.    Right.

Q.    -- that we've proven an intentional act.

A.    Uh-huh.

Q.    You understand you would have to find beyond a reasonable doubt one of those four means.

A.    (Nods head.)

Q.    Any reason why you could not do that depending on the facts?

A.    No.

Q.    By the same token, if we don't, that ends it. Understand?

A.    Uh-huh.

Q.    But even then, understand, even you if found somebody guilty of kidnapping which resulted in somebody's death, and even if we establish that it was an intentional killing, you understand you still can't consider the death penalty unless

or until we establish one or more of those aggravating factors.

A.   Yes.

Q.   And you've had a chance to look at those.  And let me ask you just generally speaking, do those impress you as the type of categories of things or considerations that you might consider important in evaluating somebody as to whether or not they might -- the death penalty might be appropriate, depending upon the facts?

A.   Yes, yes.

Q.   Okay.  Maybe, maybe not?

A.   Right.

Q.   And you see how these things can be proven, let's say beyond a reasonable doubt, but obviously some of them may be provable in degrees.

A.   Oh, yes.

Q.   How much planning, how much premeditation, how cruel, how heinous, how vulnerable was the victim.

A.   Uh-huh.

Q.   Okay.  Nothing absolute about them, just like the judge said.

A.   Right.

Q.   Okay.  Now, you understand we have to prove at least one of those.

     The defendant, of course, can, if he desires, prove a

mitigating factor, and those are set out in the fourth one.

A.    Right.

Q.    And you know we have the burden of proof in both phases of the trial.  The defendant never has anything to prove whatsoever, or disprove for that matter.

A.    Right.

Q.    Except one area, and that's what the judge said, also. With regard to a mitigating factor, if he wishes a juror -- the jury to consider a mitigating factor, then he has the burden of proof, but that's by a much lower standard, preponderance of the evidence.

Now, the first mitigating factor that we -- let's take a look at there, is the one about equally culpable defendants. Do you see that under A, under Roman numeral four?

A.    Yes.

Q.    That's a situation that could occur where let's say during the course of the trial you -- you find that the offense was committed by the conduct of more than one person, two or three people, for example, and you might find by a preponderance of the evidence that the defendant on trial was one of those three but the other two are equally blameworthy.

A.    Uh-huh.

Q.    Just as guilty, just as culpable, just as blameworthy. If that is established by a preponderance of the evidence, that would be a mitigating factor that the law would require

that you consider.

A.    Okay.

Q.    Is there any reason why you could not do that?

A.    No.

Q.    Now, again, like the aggravating factors, how much weight you wish to give that mitigating factor is a decision you and the other jurors would make.

A.    Right.

Q.    But you've told us and you can tell the defendant you would actually consider that?

A.    Yes.

Q.    Let me ask you how important you feel that is as a mitigating factor when you consider the evaluation of whether it's a death or life situation, whether somebody else not on trial equally culpable is not getting the death penalty?

A.    Well, actually, I think that you should consider the case as a case.  If the other people are not involved in this case, yes, you need to hear those things, but I think the main objective should be with this case here.

Q.    Okay.  One other matter, you understand there are two -- actually technically three potential penalties for a conviction of this time.  Obviously the death penalty is one.

A.    Right.

Q.    There are two life sentences.  One is life without the possibility of release and the other one is life without

parole.  They're basically the same.

A.    Right.

Q.    Some people might say, well, you know, given that situation where I know if I found that -- a penalty of life without possibility of release, that person is going to be behind bars for the rest of his or her life, and I don't think I could ever give the death penalty under any circumstance knowing that.  Some people might say, well, no, I'd still look at it and if it's appropriate, if I think it called for it, I could do it.  How do you feel about that?

A.    I could do it if it was appropriate.

Q.    I'm about out of time, Mrs. Jackman.  Do you have any questions of me at all?

A.    No.

Q.    Can you think of one single reason why you couldn't be a fair juror in this case?

A.    No, I do not.

Q.    Whether we've touched on it here or not.

A.    No.

Q.    Do you feel that in a proper case, that's where the facts and circumstances warrant it, you could return a sentence of death if you felt it was appropriate?

A.    Yes.

Q.    Same thing, flip it over, in the proper case where you felt the facts and circumstances warranted it and called for

it, is there any reason why you couldn't return a sentence of life?

A.    No.

Q.    I appreciate it, ma'am.

A.    Thank you.

Q.    Thank you very much.

A.    Uh-huh.

          THE COURT:    Mr. Kearney.

          DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.    Good morning.

A.    Good morning.

Q.    Let's assume you're on a jury in a case like this and the first phase of the trial is the guilty/innocence phase, and let's assume for our discussion that you and the other jurors have found the defendant guilty beyond a reasonable doubt of the crime alleged that gets us to the death penalty phase, that is the kidnapping, that the defendant is guilty of participating in a kidnapping that resulted in the death of another person.

A.    Uh-huh.

Q.    And then the next thing you'll have to find as a juror in the punishment phase, you and all the jurors would have to find that the defendant's participation and his conduct was intentional conduct that resulted in the death, which is on

MR. MACALUSO:  Thank you, Your Honor.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.    I was going to say good afternoon.  About this time every day I think it's afternoon.

Good morning, Ms. Evans.  My name is Paul Macaluso.  I'm an assistant United States attorney.  I'm one of the prosecutors in this case.  Ms. Watson is another one, Mr. Roper is the third -- actually he has primary responsibility for the case once the trial actually begins.

Next table over, as you know, is the defendant, Orlando Hall, and one of his attorneys, Mr. Jeff Kearney.  Do you recognize or know any one of us, ma'am?

A.    No.

Q.    As you well know at this point and have known for almost a month, you are a prospective juror on a capital case.

A.    Uh-huh.

Q.    This is the most serious level of offense, I'm sure you know, under the law -- under either the federal or state laws, for that matter.

We want to talk to you about some things that may impact on your service as a potential juror on this case.  I want you to know there are no right or wrong answers.  No one is going to try and talk you into or out of any position you have.  We just want to know how you feel about some aspects that may

come into play.

A.    Sure.

Q.    Mrs. Evans, if you have a question at any time, you won't be interrupting if you ask it.  Okay?  If there's something you need to tell us about yourself that you feel may be of benefit or necessity to us in assessing your suitability for this type of case, by all means let us know.  Okay?

A.    Sure.

Q.    Now, let me tell you where we stand on this case, okay?  We're actively seeking the death penalty in this case for this defendant.  In other words, once the trial begins we expect to provide you and the other jurors, if you're on this case, with the type and the quality of evidence that would convince you beyond any doubt based on any reason whatsoever that the defendant is guilty just like he's charged.  That's done in the first trial as the judge told you this morning.  Then in the second part, the penalty phase, we would again expect to provide you with that kind of evidence that would convince you beyond a reasonable doubt that the proper sentence on that evidence is a sentence of death.

Now, that's our position.  You and the other jurors make the final call, but we want you to know where we stand in this case from the outset.  Okay?

A.    Uh-huh.

Q.    You've filled out this questionnaire, and you filled it

EVANS/VOIR DIRE/MACALUSO

out about a month ago, and it asked you everything but your IQ and your hat size, I guess.

A.     Pretty much.

Q.     But we were trying to home in there on your feelings about the death penalty and the criminal justice system.  How do you feel about the death penalty yourself, Mrs. Evans?

A.     I'm really not that sure.  I -- I believe as a last resort or in a case to where a crime was committed intentionally without, you know, any -- any regards for life or, you know, something like that, I just -- I think it would probably be appropriate.

Q.     Okay.  What sorts of crimes come to your mind?

A.     Basically just -- just someone just going out shooting somebody without really having a reason, you know, just doing it just to -- you know.

Q.     Do you feel that the death penalty serves a particular purpose, some benefit to society?

A.     I think it does to a certain extent when you have, you know, a horrendous crime committed or in some cases habitual, you know.

Q.     Okay.  Let me ask you this -- or let me put it this way: If they put the death penalty to a vote just on a ballot come election day some November, and they said yes or no we're going to keep it or we're going to get rid of it, how would Mrs. Evans vote on that?

A.    I probably would skip it.

Q.    Well, if you had to -- that's not fair.  That's probably what I would do.

A.    I'm not sure.  I guess I would probably vote to keep it, but, you know, like I say, I still would have reservations as when it would be applied.

Q.    Okay.  I gather what you're saying is you feel it's appropriate under certain circumstances.

A.    Under certain.

Q.    Obviously not all --

A.    Right, uh-huh.  Right.

Q.    You can see, I gather, certain circumstances where you feel it is appropriate?

A.    Uh-huh.

Q.    Now, I notice you indicated here, there was a question with regard to Mr. Evans' position on it, and you indicated here, "I'm sure that he disagrees with the death penalty in any case because of religion."  He's studied theology, has he not?

A.    Yes.

Q.    All right.  Let me ask you how -- would that impact your decision if you were on the jury, your husband's position on it?

A.    Not necessarily, because I think, you know, if I'm chosen as a juror, that's an individual --

Q.    Yes, ma'am.

A.    -- you know, decision, and it doesn't have any, you know, regard to what my spouse feels about it.

Q.    Uh-huh.

A.    Also I really don't know what his beliefs are.

Q.    Okay.

A.    It's just not a subject that we talk about.

Q.    Right.

A.    But he is a minister and so that's why I just assume, but we have not discussed it.

Q.    You haven't discussed it, for example, since you've been down here to fill out this questionnaire?

A.    Now, I did ask him how he felt about it, and he didn't know.

Q.    He didn't know?

A.    Huh-uh.

Q.    Okay.  You hit the nail -- the proverbial nail on the head when you said it's important that we select you as a juror in this case, if you are, and you vote your conscience based on the evidence and based on the law.  Of course, it would obviously be inappropriate for us to --

A.    Right.

Q.    Mr. Evans is not down here, of course.

A.    Right.

Q.    And we have not had an opportunity to hear or to speak

with him.  Do you feel you can do that, vote your own conscience if you were a juror in this case?

A.    I believe I could.

Q.    Mrs. Evans, the bottom line here, I guess, as far as I'm concerned, at least, as a practical matter is this:  Do you know of any reason why you, Mrs. Evans, could not serve on this type of a case and you, if the facts and circumstances called for it, actually vote for the death penalty and if you had to actually sign your name on the verdict form for the death penalty?  Any reason why you could not do that?

A.    No, not at this time.

Q.    By the same token, if you felt after you've heard all the evidence in the case that the right thing to do based on the evidence, all of it, every last shred of it once it's in, would be for a sentence of life without the possibility of release, could you vote for that, as well?

A.    Yes, I could.

Q.    Do you feel you have that open mind or you're starting off with the clean slate that the judge referred to this morning?

A.    I think so.

Q.    Okay.  Let's talk a little bit about one other question here, and we'll go on to some other matters here in the time that remains.

Some people -- you know, there is at least two possible

penalties in this case upon conviction.

A.    Uh-huh.

Q.    One is obvious, that's a sentence of death.  The other is a sentence of life without the possibility of release.

A.    Uh-huh.

Q.    Some people might say those are both pretty -- pretty stout, in fact a sentence of life without the possibility of release, you know, that makes sure, I guess, that the person is not ever going to be out into free society and that satisfies me, and I don't think I could ever realistically vote for the death penalty knowing that I could put someone behind bars for the rest of his or her life, so they could never really give fair consideration to the death penalty. How do you feel about that?

A.    I don't know.  I kind of read over this while I was up there a little bit, and I think that if the intent, as the judge was discussing, if the intent was there, you know, to intentionally --

Q.    Yes, ma'am.

A.    -- you know, kill the victim, then I think I possibly could, you know, if it's proved.

Q.    You possibly could --

A.    Render the death penalty.

Q.    Okay.  The reason I asked that, also, is you indicated in your response to that question, you said, "Dependent upon the

nature of the crime" --

A.    Uh-huh.

Q.    "-- would probably lean more toward the life sentence."

A.    (Nods head.)

Q.    Do you feel right now as you sit there you would lean, would be more likely to vote for a life sentence?

A.    It just depends on the evidence.

Q.    Okay.

A.    You know, if I'm, you know, assured beyond a reasonable doubt that the intent was there.

Q.    All right.  Let's talk a little bit about that.  You understand, of course, that we have the burden -- I'm really running out of time here -- that we have to prove, of course, the defendant's guilt.  Then you'll be called upon -- if you find the defendant guilty beyond a reasonable doubt, be called upon to address these other issues.

A.    Right.

Q.    One is the issue of the matter of intent, and there's four ways of proving that or establishing that.  We have to do that.  Do you understand that?

A.    Uh-huh.

Q.    Do you think you could make that finding depending upon the evidence?

A.    Depending upon the evidence.

Q.    Right.  Assuming that we were to do that, just

hypothetically, then you would be called upon to consider whether or not we, the government, has proven to you beyond a reasonable doubt at least one, possibly more, of those aggravating factors.  You have those on your second and third sheets there.

A.    Uh-huh.

Q.    Just scanning those and your recollection of the discussion with the judge this morning, do those impress you as the type of factors that you would consider important in deciding whether or not the person you've convicted gets a sentence of death or a sentence of life?

A.    Yes, I think these are important factors.

Q.    Does any one in particular stick out or stand out in your mind?

A.    Not in particular.

Q.    Whether it was a heinous, cruel or depraved manner of committing the offense?

A.    Yeah.

Q.    Premeditated and planned?

A.    Right.

Q.    The victim was vulnerable, young or old or infirmed?  The next page about criminal history, things of that nature?

A.    Uh-huh.

            THE COURT:  Your time is up.  Go ahead and finish your question.

MR. MACALUSO:  Okay.

BY MR. MACALUSO:

Q.   You understand you would be called upon, if we proved one or more of those, to then weigh those aggravating factors against any mitigating factors that may be present, and those are on the fourth --

A.    Right.

Q.   Would you have any problem under the law considering -- considering proof on the mitigating factors, weighing any mitigating factors that might be proven to you against any aggravating factors you found to decide whether or not the death penalty is appropriate?  Could you do that?

A.    I don't think I would have a problem weighing it, you know, weighing the issues, but it might -- the mitigating factors might persuade me whether the death penalty or --

Q.    Sure.

A.    -- life in prison.

Q.    Did one of those mitigating factors in particular catch your attention?  Like the equally culpable defendants, is that --

A.    Not -- not any -- not one in particular.

THE COURT:  We need to move on.

Mr. Kearney.

Thank you, Mr. Macaluso.

MR. MACALUSO:  Thank you, ma'am.

either anything regarding your children or when you were in school, have you ever seen people who when they got caught doing something, they'll try to blame part of what they did on somebody else?

A.    (Nods head.)

Q.    And why do they usually do that?

A.    Well, I tell my children, misery loves company.

Q.    Maybe sometimes they did it so they wouldn't get in as much trial, they wouldn't get as much punishment.  They said I didn't do all of it, somebody else did.  Do you see what I'm saying?

A.    Uh-huh.

Q.    That happens in school, it happens in court.

A.    Uh-huh.

Q.    And the reason is some people are motivated to say it wasn't me, it was somebody else because they can -- won't get punished as much.  Can you see how that would happen?

A.    Yes.

Q.    I believe that's all, thank you.

            THE COURT:  Thank you, Ms. Evans.  We appreciate you being here this morning.  We'll let you know probably on Friday whether your services will be needed.

            MS. EVANS:  Okay.

            THE COURT:  Please remember in the meantime to avoid all media coverage and to not discuss the case with anyone at

home or anywhere else.  Thank you.

MS. EVANS:  Thank you.

MR. MACALUSO:  Thank you, ma'am.

(Venire person excused at 11:20 a.m.)

THE COURT:  Is Ms. Evans number 50?

MR. MACALUSO:  Yes, sir.

THE COURT:  We're ready for Mr. Riley.

MR. MACALUSO:  Dr. Riley.

THE COURT:  Yes, Dr. Riley.

(Venire person seated at 11:20 a.m.)

DOUGLAS RILEY,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

Q.   Mr. Riley, please have seat, sir.

Were you able to postpone your surgery that was scheduled for this morning?

A.   I guess so.  I had to.

Q.   You indicated in your questionnaire that you have a hearing deficiency.  Have you been able to hear everything --

A.   Yes, I have.

Q.   -- that's transpired here so far today?

A.   Yes.

Q.   So that's not going to prevent you from serving?

A.   No.

now?

A.    I think I understood everything.

Q.    Okay.  Did it seem to have a certain sense to it?

A.    It did.

Q.    Okay.  Sometimes we criticize Congress for some incomprehensible legislation, but this one, I take it, seemed to have --

A.    With your explanation it made sense.

Q.    Okay.  You have a brother-in-law that's a lawyer?

A.    Yes, I do.

Q.    And you're willing to admit that?

A.    Yes.

Q.    What kind of law does he practice?

A.    Criminal law.

Q.    Okay.  Have you ever discussed some of his cases with him?

A.    No, I haven't.  My husband has.

Q.    Okay.  Is there anything about that relationship that would prevent you from being a fair and impartial juror in this case?

A.    Nothing.

Q.    Okay.  All right.  I think that's all of the questions I have for you.  The government will question you for about ten minutes, and that will be followed by the defendant.

A.    Okay.

THE COURT:  Mr. Macaluso.

MR. MACALUSO:  Thank you very much, Your Honor.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.    Good morning, Mrs. Lee.

A.    Good morning.

Q.    I'm Paul Macaluso.  Along with Delonia Watson and Richard Roper, we're three of the four prosecutors assigned to this case.  We're all assistant United States attorneys.  We represent the government in this case.

Next -- over at the next table, as you know, is the defendant, Orlando Hall, and one of his attorneys, Mr. Jeff Kearney.  Do you recognize or know any one of us other than from the introductions --

A.    No, I don't know anyone.

Q.    Okay.  Well, you do know this, you're a prospective juror on this case, of course, and it's a capital case, the most serious level of offense a person can be charged with under federal and state law, obviously, because of the nature of the penalties that are possible at least.

We want to let you know that there are no right or wrong answers to any of the things we're going to be talking about here today.  We would like to ask you some questions, let you speak your mind and your heart about some things so we get to know a little bit more about you.  And if you have a question

at any time, now is the time to ask it.  If you get on the jury it's too late for all practical purposes.

And if there's something you need to tell us that we haven't touched on as we talk, by all means this is the time, also, to let us know about anything that you feel may be important to us in making a decision as to whether or not you're suited to this type of a case.  Okay?

A.    Okay.

Q.    Let me tell you where we stand from the outset on this, that is the government's position.  We're actively seeking the death penalty in this case, Mrs. Lee.  In other words when the trial begins, we would intend, as the law requires, to provide you and 11 others, if you're on this jury, with the type and the quality of evidence that would convince you beyond any doubt whatsoever based on reason that the defendant's guilty just exactly as charged in the indictment.  If that's done, a finding of guilt is returned, then we would expect also in the penalty phase of the trial which would follow to provide you and 11 jurors with that type and that quality of evidence that would convince you beyond any reasonable doubt that the proper sentence would be a sentence of death.

Now, that's our position.  Ultimately you as a juror and the others would be called upon to make the final decision, the most important and the most crucial decision.

Now, you were asked 120 intrusive questions here,

basically, about -- almost a month ago, and a number of them

dealt obviously with what we're here about today for the most

part, the criminal justice system, and more specifically the

death penalty.

A.    Uh-huh.

Q.    Can you share with us just in your own words and your own

feelings how you personally feel about the death penalty?

A.    Yes.  Well, I'm ambivalent about the death penalty.

Q.    Okay.

A.    On one hand I think that it should not be used at all,

and then there are certain cases or circumstances when I think

maybe yes.

Q.    Okay.

A.    Also, at times I think if it were more standardized,

nationally standardized, sometimes I could support it more

than, I guess, the discretion based on where you are, who you

are.

Q.    Okay.  Let me make sure -- let me see if I can probe a

little bit deeper on this.  Do you have like -- I'm not a very

deep person myself, but do you have a philosophical aversion

to the death penalty, or do you just feel it shouldn't be

applied in certain circumstances where it has been?

A.    Well, basically I feel it should not be applied; however,

I think there are circumstances -- and since it is used in

America where it sometimes becomes necessary, but, now, if --

if it were not an option, let's say --

Q.    Uh-huh.

A.    -- then I could support that.  If the death penalty was -- just did not exist, I could support that.  However, since it is in existence in America and obviously some crimes are pretty heinous and cruel, then there are certain times when I would say yeah, maybe.

Q.    Okay.  Let's explore that a little bit deeper, too, if we can.

     Sometimes people will say, well, I believe in the death penalty -- or really I don't necessarily believe in it, whatever that means, but it's there and I guess it's the law, and so -- so -- but knowing myself and knowing my feelings and being an adult I know this or I'm not sure about this, I don't know that I could actually serve on a jury of this nature myself.  If it really came down to it in my heart of hearts, honestly, return a verdict, regardless of the facts, I mean when it really came down to it, return a verdict that would result in me signing my name or making a decision and signing my name to a document that would result in the execution of another human being.  How do you feel about that?

A.    I've never done that before.  I mean, I can't say that I definitely would not do that or just could not do that.  I would have to hear everything involved, all of the -- all of the witnesses, everything, you know.

Q.    Okay.

A.    I would just have to be aware of everything before I could just say yes I can say that or no I cannot say that.  I think it would be based individually on a case by case decision.

Q.    So there's nothing about knowing yourself that would say -- that would tell us that you are foreclosed from consideration of the death penalty if the facts and circumstances warranted it?

A.    No, I wouldn't say that.

Q.    The same thing for a life sentence, I gather?

A.    No, I wouldn't say that.

Q.    All right.  Let me ask you this:  If you -- what sorts of crimes do you think the death penalty ought to be reserved for just generally --

A.    I thought about that.  Anything that involves children, murder of children, cruelty to children, incorrigible kinds of acts perpetrated by someone repeatedly, to me that's the worse thing that you could do.

Q.    I notice, of course, that you're with the school district here in Fort Worth, have been for a number of years.

A.    (Nods head.)

Q.    When you talk about children, of course you work with children on a daily basis, but what age range are you talking about when you speak about crimes against children?

A.    Well, especially smaller children.

Q.    Okay.

A.    I would have to say smaller children especially.

Q.    Smaller children, all right.

A.    It depends.  Some teens.

Q.    Okay.

A.    Smaller.

Q.    One question you were asked on this -- on the questionnaire referred to, I guess, a balancing or at least a consideration of two of the possible penalties that exist for a person that's convicted of this type of an offense.  And the judge touched on this, I believe, again this morning.

        Some people might say, Mrs. Lee, you know, if I had the option between a death sentence and a sentence of life without the possibility of that person ever being released, one versus the other, both of which we will all admit are pretty stout.

A.    Uh-huh.

Q.    In all honesty with that one, life without the possibility of release ever, period, to be honest with you I could never ever give fair consideration to the death sentence under those circumstances.  How do you feel about that?

A.    Again it would depend on evidence, but, of course, I think life without ever being released would be a better option --

Q.    Okay.

LEE/VOIR DIRE/MACALUSO

A.    -- for me.

Q.    Would you tend to lean in that sort of direction?

A.    More than likely.

Q.    Okay.  All right.  You understand my concern about that?

A.    Right.

Q.    Or our concern about that?

A.    Right.

Q.    Because obviously we're looking for a juror -- I think everyone here is entitled to jurors who will give fair consideration to either one of those possible penalties depending upon the evidence.

A.    Right.

Q.    Do you feel you could give honest and fair consideration, I mean really -- like some people say I'll consider it, but the level of consideration, given their background or their personal feelings about the death penalty one way or the other, might influence them.  How do you feel about that?  Do you think you could give honest consideration --

A.    I could give honest consideration to both; however, depending on evidence, the cruelty of the act, all of that would have to be considered.

Q.    Okay.

A.    This person -- I would have to consider this person's life, I would have to -- past, future.  I would have to consider all of that.

Q.   Okay.  One other matter -- I'm about out of time.  There's one other matter, if the Court would permit, I would like to discuss with you briefly, if I might.  That's on that handout you have there before you --

A.   Uh-huh.

Q.   -- under Roman numeral four, and I'll cut to -- towards the end of what the judge discussed with you about the presentation or proof of mitigating evidence.  You know, we have the responsibility of providing aggravating factors if we expect a death sentence to be considered.

A.   Uh-huh.

Q.   The defendant may raise mitigating factors, a couple of which are set out there and I believe the judge discussed this morning.  One I would like you to look at is A where it talks about equally culpable --

A.   D?

Q.   Is it D on yours?

A.   Yes.

Q.   We've got an A version and a D version, but it remains the same, equally culpable defendants.

A.   Uh-huh.

Q.   That's a situation that could arise out of this hypothetical situation.  Two or three people might be involved in the commission of a crime.  The three of us could have been involved in it.  You might decide on the basis of the evidence

that all three of us are equally blameworthy, equally culpable, equally guilty, but you may find out during the course of the trial that the other two are not going to get the death penalty, there's only one that would possibly, using me as an example.  Okay?

A.    Uh-huh.

Q.    Okay.  If that's raised and you find that by a preponderance of the evidence, that's a mitigating factor, and the law says you must consider that in deciding, weighing that against any aggravating factors.

A.    Uh-huh.

Q.    How does that factor knowing, as you might know hypothetically, that one person equally culpable with, let's say, another or two others is going to possibly going to get the death penalty when two others are not?  How do you feel about that?  Well, the reason I ask is you said in one of your questions, "Do you believe the death penalty should be used more frequently or less frequently," and your answer was, "Only in extreme circumstances and only when used to punish all for the same kinds of crimes."  How do you feel about that?  Is that an influential factor with you, a mitigating factor, when one person may get the death penalty and others are not?

A.    Well, it would depend on that person's involvement.

Q.    Equally culpable.

A.    Equally culpable?

Q.    Yes, ma'am.

A.    But -- and I'll just give this as an example.

Q.    Sure.

A.    One person might have pulled the trigger, if it were involved with a gun, and the others, even though they were there, they might not have actually pulled the trigger.

Q.    Okay.

A.    So with that in mind I would have to say that that person should not -- the others should not be as culpable as that one.

Q.    Assuming in a hypothetical that you find all three --

A.    All three, okay.

Q.    One or two aren't going to get the death penalty, the other one --

A.    That would probably make a difference to me.

Q.    Okay.  Do you feel you could ever realistically consider the death penalty under a circumstance where you found somebody was -- some other equally culpable defendants were not going to be considered and were not going to get the death penalty?

A.    Probably -- I would probably have difficulty with it.

        MR. MACALUSO:  I believe that's all.  I appreciate the extra time, Your Honor.  Thank you.

BY MR. MACALUSO:

Q.    That's all the questions I have, ma'am.    Thank you very much.

A.    Uh-huh.

THE COURT:    Mr. Kearney.

DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.    I saw here that if you changed professions, you would want to be a lawyer.

A.    Yes, I said that.

Q.    I won't ask you why.

THE COURT:    Have you changed your mind?

MS. LEE:    I think so.

BY MR. KEARNEY:

Q.    Who's your brother-in-law?    Does he practice here?

A.    No, he practices in Arkansas.

Q.    Where in Arkansas?

A.    Texarkana.

Q.    When it comes down -- I'm going to talk to you about the last page of those pages you have in front of you.

When it comes down to voting, you understand that you're -- as a juror you're supposed to weigh the aggravating factors against the mitigating factors and decide whether or not the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death.    If they don't, then you can't personally vote for the death penalty.

how it fits in with all the other factors to decide whether or not the factors are sufficient to justify death or not.  Okay?

A.    (Nods head.)

Q.    Some people can say, well, the factor that's -- the fact that someone equally to blame is not going to get the death penalty is of significant consideration to me and I would give that great weight and I would put that in with all the other things that weigh it.  Okay?  Some people would say that's not very significant to me.  I won't give it much weight, but I'll put it in there and weigh all the things.  All right?  What I heard you say, it's one of those factors you would give great weight to or considerable weight in considering it.

A.    I would weigh it, yes.

Q.    But just because you found that factor to exist, you wouldn't ignore all the other factors and automatically vote one way or the other; is that right?

A.    No, I wouldn't ignore anything.

Q.    You have to weigh it in conjunction with the other facts and in the end vote with whether you thought the aggravating factors were sufficient for death or not; is that right?

A.    Yes, that's correct.

Q.    Okay.

        MR. KEARNEY:  That's all I have, Your Honor.

        THE COURT:  Ms. Lee, thank you very much.  You are the -- you had to wait the longest today, and we know that.

I'm sorry you drew that straw.  We just appreciate your patience with us.

MS. LEE:  Thank you.

THE COURT:  We will let you know on Friday whether you'll be called to serve, or at least by Friday, and in the meantime please avoid all media coverage as you have been doing, and don't discuss the case with anyone, including what we've talked about here today, with anyone at home or otherwise.  All right?

MS. LEE:  Okay.

THE COURT:  Thanks very much.

MR. MACALUSO:  Thank you, ma'am.

(Venire person excused at 12:10 p.m.)

THE COURT:  Do I hear any challenges to Ms. Lee?

MR. MACALUSO:  None from the government, Your Honor.

MR. KEARNEY:  None.

THE COURT:  She's number 51.

(Off-the-record discussion.)

(Recess from 12:15 p.m. to 1:00 p.m.)

THE COURT:  Okay.  I guess we need to see Stacey Leigh Donaldson.

(Venire person seated at 1:05 p.m.)

STACEY LEIGH DONALDSON,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

DONALDSON/VOIR DIRE/COURT

that I would assess.  If they weren't there, then I would have to go with the life imprisonment.

Q.   Well, you've said it all in a nutshell.  That's exactly the way the system is designed to work.

I think that's all the questions that I have.  The government will have ten minutes to ask you questions, and then the defendant will, also.

THE COURT:  Mr. Macaluso.

MR. MACALUSO:  Thank you, Your Honor.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.   Good afternoon, Mrs. Donaldson.

A.   Hi.

Q.   I'm Paul Macaluso.  This is Delonia Watson.  We're two of the assistant United States attorneys that are serving as prosecutors and are assigned to this particular case.  Next table over to my right, as you know, is the defendant seated in the middle.  To his left is Mr. Michael Ware, he's one of the attorneys for Mr. Hall, and to Mr. Hall's right is Janna Parker.  She's a legal assistant.

Do you know or recognize any one of us other than from the introductions almost a month ago?

A.   No, just from the other day when we filled out the questionnaire.

Q.   Okay.  It's been almost a month ago.  It's kind of gotten

away from us.  It's hard to believe.

As you know, you're a prospective juror on this very serious type of case.  We would like to talk to you to see what your impressions are, how you feel and think about things.  As I'm sure you know, there's nothing to be nervous about, really.

A.    You can say that.

Q.    Well, there isn't.  We haven't jumped on anybody yet.  I think we're nearing the end of this process.  But there are no right or wrong answers.  You tell us what's on your mind, and you'll be doing your job.  If you have a question to ask, of course, now is the time to do it, and probably equally important if there's something on your mind you feel you need to share with us with regard -- excuse me -- to your service on this jury, by all means let us know.

Let me tell you where we stand in this case, that is the government and the prosecutors.  Ms. Donaldson, we are actively seeking the death penalty in this case.  Once the trial begins we would expect, and the law does -- in fact, the law requires that we would provide you with the type and quality of evidence that would convince you first that the defendant is guilty precisely as he's charged in the indictment.  If we do that, we would expect in the second phase of the trial to provide you once again with the type and quality of evidence that would convince you beyond any

reasonable doubt the proper sentence is a sentence of death.

Now, that's our position. That doesn't control. What controls ultimately, I'm sure you understand at this point, is a decision made by the jury based on the law and based on the facts.

Now, let me just ask you, you were asked -- you know, the judge referred to this earlier -- lots of questions about this and that and everything else, including, believe it or not, the death penalty. And you did express your views on it, and you're kind of confined in some of these things. So let me just ask you, would you share with us how you personally feel about the death penalty in your own words.

A.    I believe in some cases it is justified and that it should be used.

Q.    Okay.

A.    And other cases, you know, there are extenuating circumstances to where I don't believe it is necessary.

Q.    On a case by case basis?

A.    Yes, uh-huh, you would have to.

Q.    That pretty much -- as you can tell, that's pretty much the way the law looks at it, isn't it?

A.    Right, uh-huh.

Q.    Have you ever been opposed to the death penalty?

A.    No.

Q.    Mr. Donaldson, how does he feel about it?

A.    He's for it.

Q.    He's for it?

A.    Uh-huh.

Q.    Does he feel more or less the same way you do?

A.    Basically, yes, uh-huh.

Q.    Okay.  On a case by case basis?

A.    Uh-huh.

Q.    You're young enough to let me ask you this, how about your folks?  Do you know what your mom or dad's position is?

A.    I haven't really ever discussed it with them.  I'm not that close to my dad, but it's never really been, you know, a topic of conversation.

Q.    Do you think it serves a purpose?

A.    I do.

Q.    What is that?

A.    Well, if there are people that can't conform to society in the way that they should, if they're someone that's going to be, you know, repeatedly violent to other people, then it's --

Q.    Okay.

A.    -- unfortunately doing away with those that can't live, you know, in harmony with us.

Q.    What types of offenses come to your mind just as categories?

A.    Well, murder would be one.  But like I said it's a case

by case basis because it just depends on the circumstances.

Q.   Sure.

A.   You know, something to a child would be -- I'm a mother, and anything that someone would, you know, harm a child would be another reason.

Q.   Okay.  You know, some people will say, well, I believe in the death penalty or I can see it as a niche, you know, in the criminal justice system that is needed, but to be honest with you, I don't know that I'm the type of person that could actually serve on a jury and actually make that big decision. Do you see what I'm getting at?

A.   Uh-huh.

Q.   And what we're trying to do, part of the process here is to make sure we don't put somebody who feels that way in a position that untenable.

A.   That can't make the decision.

Q.   Do you know of any reason why you could not serve on a jury of this type, listen to all the evidence and make a decision even to the point, when it came down to it, of actually making a decision as to death or life, if it came down to actually signing your signature on a verdict form which would result in the execution of the defendant?

A.   I think if you had proved in my mind beyond a reasonable doubt that he did do it, I don't think I would have a problem with that at all.  But if there's the slightest bit of doubt,

I wouldn't convict him.  I could not do that.

Q.   Okay.  Well, that's -- you, of course, are in harmony with what the law expects.  The law would not expect you to find anybody guilty of anything unless you were satisfied beyond any doubt based on reason of that person's guilt as he's charged in the particular -- well, in an indictment, for example, in this case.  And you would have no difficulty, I gather, doing that if you're satisfied --

A.   If I'm -- yeah.  If the case has been proven to me with the facts that he, you know, is guilty, I wouldn't have a problem with doing that.

Q.   And it's clear to you, I'm sure, at this point, obviously, from the explanation of the judge that not all murder cases, as you know, will result or expect to result in the execution of the --

A.   Correct, uh-huh.

Q.   We must go way beyond that, you understand.

A.   Uh-huh.

Q.   The first one, of course, is on page one there where we have to establish that not only was he involved -- or guilty beyond a reasonable doubt of a kidnapping which resulted in somebody's death, but furthermore that it was intentional, and there are four -- I believe there are four different ways set out there that we can prove that.

A.   Right.

Q.    We must prove that, you understand that?

A.    Before it's even an issue, uh-huh.

Q.    Any reason why you couldn't so find based on the evidence that it was an intentional act if the proof were there?

A.    If the proof was there, uh-huh.

Q.    And, of course, you understand even if we prove that, you still can't consider the death penalty.

A.    Right.

Q.    Okay.  You've got to go --

A.    The other factors have to be there before that's -- uh-huh.

Q.    Those are on pages -- Roman numerals two and three on the next pages there.  There's an array of what they refer to as aggravating factors.  You've had a chance to look at those and think about those, I think, to an extent.  Do those impress you as -- any of those in particular impress you as the types of things categorically that you consider important in making a decision on a case by case basis, as you said, as to whether this is the type of person who deserves a sentence of death or not?

A.    Sure.  If it was premeditated, if someone sat there and thought about it and planned it out, to me that's even more of a cruel person than someone who just did it on the spur of the moment.  If mean, someone who can sit there and think about it and construct what they're going to do is --

Q.    That's a factor, isn't it?

A.    Yes, uh-huh.

Q.    You understand that would be one factor, if we were to prove that, that you would be expected to weigh against any others and weigh against any mitigating factors.

A.    Right.

Q.    The judge made that real clear, didn't he?

A.    Uh-huh.

Q.    Is there any reason why you couldn't do that?

A.    No.  If that was proven to me that it was premeditated, that would be an aggravating factor brought into the arena for --

Q.    Somebody might say, well, if I find somebody guilty of kidnapping in which a death resulted, and then it were proven to me that it was an intentional act, I might be leaning towards the death penalty or something beyond a neutral position.  Do you understand that would basically be not what the law would expect you of?

A.    Right.

Q.    The law expects you to be open-minded, basically, wait until all of the evidence --

A.    Is in, uh-huh.

Q.    -- is in, wait till the end, and weigh one of the aggravating factors against any mitigating factors and make a decision.

A.    Uh-huh.

Q.    And I gather clearly you can do that, can't you?

A.    I believe I can, yes, sir.

Q.    Likewise if the defendant established no mitigating factors, then you just simply decide whether the aggravating factors alone are sufficient --

A.    Are enough to -- uh-huh.

Q.    Can you see those aggravating factors, while they sound bad -- you know, who can argue about that.  But the point is those can be proven in degrees.  There may be more or less premeditation, the way the offense was carried out may be more or less violent.  Can you see how those can be proven in varying degrees?

A.    Yes, sir, uh-huh.

Q.    Now, let's look at the -- let's look at the mitigating --

            THE COURT:  You've got one minute.

            MR. MACALUSO:  Thank you, Your Honor.

BY MR. MACALUSO:

Q.    And then I'll mosey on.

    The first one I think should be A on there, it may be D, equally culpable.  Do you see that under Roman numeral four?

A.    Uh-huh.

Q.    That situation could possibly occur, at least in a hypothetical sense, like this:  Two people -- you may find from the facts of the offense that two or three people

actually committed the crime together.  You may decide on the basis of that or from the evidence presented during the course of the trial that those three people are equally culpable, equally blameworthy, equally responsible, but you may find out that -- for a variety of reasons that only the defendant on trial is subject to the death penalty, that the other two may not be receiving the death penalty, may be receiving a lesser sentence.  The law says if that were to be established by a preponderance of the evidence, that's a mitigating factor that you must consider.

A.    Consider that, and I would.

Q.    Okay.

A.    If there were more in and he was receiving a -- you know, a harsher penalty other than them, I would definitely consider it if they were equally blameworthy.  You know, if one was more so than the other, that would be different, but if they were, you know, presented to be equal.

Q.    Do you consider that a significant factor in deciding whether or not this defendant on trial should receive a death penalty or not?

A.    I do, uh-huh.

Q.    Is it something -- well, let me ask you, would you still be able to consider the death penalty?

A.    I would be able to consider it, but that would definitely be a heavy factor weighing in there.

Q.    Along with the other factors?

A.    Uh-huh, on choosing that.

Q.    I'm out of time.  Do you know of any reason why you couldn't be fair and impartial to both sides, Mrs. Donaldson?

A.    I believe I could be very fair and impartial.

Q.    I appreciate it, ma'am.  Thank you very much.

        MR. MACALUSO:  That's all we have, Your Honor, thank you.

                DEFENSE VOIR DIRE EXAMINATION

BY MR. WARE:

Q.    Good afternoon, Ms. Donaldson.  How are you?

A.    Hi.

Q.    Do you have any questions, comments about what's occurred thus far?

A.    Not so far, no, sir.

Q.    I want to take up a little bit where the prosecutor left off with this statutory mitigating factor of equally culpable codefendants.

    I take it from what we've discussed thus far that you can conceive or you can picture in your mind a situation where there might be two, three, four, five, maybe more individuals who are actually responsible for someone's death.

A.    (Nods head.)

Q.    Does that -- that doesn't present any problem for you, I assume.

THE COURT:  As soon as he returns we'll ask him.

BY THE COURT:

Q.  Mr. Roper had to leave for a few minutes, he will be back.

There's also a James Scott that you identified as an MD at Harris Hospital.

THE COURT:  Do you happen to know about him, Mr. Macaluso?

MR. MACALUSO:  No, I don't, Your Honor.

THE COURT:  All right.

BY THE COURT:

Q.  Mr. Macaluso isn't lead counsel in this case, so it's understandable why he wouldn't know every witness out of 240.

I reviewed with you this morning these procedures that we go through in determining the sentence in this criminal case. Is there anything about all that that you were left with some confusion or questions?

A.  Not at all.

Q.  Okay.

THE COURT:  All right, then, that concludes my questioning.  I'll allow Mr. Macaluso to question on behalf of the government for about ten minutes.

MR. MACALUSO:  Thank you, Your Honor.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.    Good afternoon, ma'am.

A.    Hi.

Q.    I am not the lead prosecutor in this case, but I am one of the prosecutors.  Mr. Roper who is seated to my left is actually the lawyer for the government.  He's an assistant United States attorney who will actually be taking the lead on the case and presenting most of the evidence once the trial begins.

      Next table over -- I didn't say my name.  My name is Paul Macaluso, I'm sorry.

      Next table over is Mr. Mike Ware, he's to my immediate right, and then the defendant, Orlando Hall, and then the young lady at the far right is Janna Parker.  She's a legal assistant to Mr. Ware and I believe to another lawyer of Mr. Hall's, his name is Jeff Kearney.  Do you know or recognize any one of us other than from the introductions before?

A.    Not at all.

Q.    Mrs. Graves, as you well know at this time you are a prospective juror on a capital case.

A.    Uh-huh.

Q.    Aptly titled, of course, because of the nature of the penalties or at least a possible penalty for someone who is convicted of either a sentence of death or a sentence of life.

      We want to talk to you a little bit about some of the things that may come into play if you are a juror on this type

of a case, very serious things, of course.

A.    Uh-huh.

Q.    There are, however, no right or wrong answers, and no one will quibble or quarrel with you, I'll guarantee you that, about any conscientious feelings.

A.    Okay.

Q.    About anything at all.  We haven't thus far, and we're nearing the end of this and I don't see any reason to start arguing at this point.

A.    Okay.

Q.    This is deadly serious, of course, and we're more interested in how you feel about some aspects of this case and whether you could actually participate, because we're actively seeking the death penalty in this case for the defendant.  That's the bottom line.  When this trial is over we would hope, based on the evidence, based on the facts that are presented in the trial itself that this jury would conclude that the only proper verdict is a verdict of guilty and a sentence of death.

Now, that's for you as a juror to decide.  We don't make that decision.  We just present the evidence and present our position.  But we feel it only fair to let you know at the very outset what the stakes are as far as we're concerned in this case.  Okay?

A.    Okay.

Q.    Now, how do you feel about the death penalty, in your own words?

A.    I think probably in certain situations that the death penalty is acceptable.

Q.    Okay.  Do you think it serves a particular purpose or accomplishes anything in particular to your way of thinking?

A.    Yes.

Q.    Like?

A.    Well, it depends on the offense, and it's something -- my subjective opinion that there are situations that it would solve something.  Someone who would be a menace to society, in situations like that.

Q.    Okay.  What sorts of crimes come to your mind?  Some people would say like murder, some people say dealing drugs or killing children, molesting children.

A.    It would also depend upon the severity of each one of those situations.  I mean, there's certain levels to each, you know, alleged crime.

Q.    Do you know -- I think we'll all agree here that that position -- that last statement you made is consistent with what you know now the law to be, that even though the death penalty is a possible penalty for a crime such as this, or at least that is charged here, kidnapping which results in the death of an individual, not all kidnappings which result in death call for the death penalty according to the law.  Do you

GRAVES/VOIR DIRE/MACALUSO

understand that?

A.   That's true.

Q.   It depends upon the facts, obviously, and it depends upon the individual circumstance.  Would you more or less agree?

A.   I agree.

Q.   Okay.  And let me ask you, what do you think you would want to know about something in making that decision?  Let's say for a moment -- let's speak hypothetically here, and suppose you have convicted somebody of an offense such as this, a kidnapping in which a death results.  You found out, because it's been proven to you, that this was an intentional act, and it has to be proven, as you know, in the second part of the trial according to what the judge told you.  What sorts of things do you think would be influential or persuasive with you, things that you think would be important in your consideration of whether or not this is the type of person who should receive a sentence of death or a sentence of life?

A.   I haven't actually sat down and thought about it before. Possibly the prior legal accusations towards this person.

Q.   Okay.

A.   Possibly the age.

Q.   Okay.  Age?

A.   The relationship with the person that the crime was committed to.

Q.   Okay.  Do you think you could learn a lot about a person,

for example a lot of those things that you might consider important when you learn about the crime itself, how it was conducted, what his role was in it, for example?

A.    It would depend on how it was presented.

Q.    Okay.  Those pages there, the handout that the Court gave you, contain, of course, the first part of the second -- the first question to be determined in the second part of the trial, if I said that right.  Factors we must prove, of course, that it was intentional, and there are four ways of doing that.  We would have to prove that beyond a reasonable doubt, you understand, before you could even consider the death penalty.

A.    Oh, sure.

Q.    That's a prerequisite.  There's no consideration of the death penalty unless we prove that, and then not even then, okay?  Because we'd have to go ahead and prove at least one of those aggravating factors that you've got right in front of you right now.

How do those strike you, those categories of aggravating factors?  How do those strike you as things you may consider and you may have proven to you, for example, as things that may persuade you or perhaps deter you from returning a verdict of death?

A.    I think -- I mean, they're well explained and that's probably what you need to know.

GRAVES/VOIR DIRE/MACALUSO

Q.    Do you think those are important factors?

A.    Uh-huh.

Q.    On the next page, too, there are some of those things you were referring to, prior criminal record --

A.    Oh, certainly.

Q.    Okay.  Now, you understand we'd have to prove one of those beyond -- at least one of those, we can prove more if we can, by proof beyond a reasonable doubt.  Then it comes down to your weighing those factors against any mitigating factors that the defendant may wish to establish by a preponderance of the evidence.  Any problem with that scenario at all?

A.    No problem.

Q.    Do you think you could keep an open mind and weigh the aggravating factors against mitigating factors --

A.    I --

Q.    -- before you make your decision?

A.    Uh-huh.

Q.    Some people might say -- you know.  I'm kind of in a way a little bit digressing here, but some people might say that in a situation where the penalty or penalties are structured the way they are in this type of case, in other words the sentence of death is one option and the sentence of life without the possibility of anybody ever being released again is another, they might say, you know, well, knowing that and knowing that I could actually assess a penalty where somebody

would be incarcerated for the rest of his or her life so that they would never, ever be released into free society again, that would pretty much rule out the death penalty for me.  As long as I've got that in the arsenal, so to speak, I don't need a death penalty.  Other people may say, no, I still feel the death penalty, depending upon the facts, depending upon the circumstances, the crime, the individual, I could still consider it.  How do you feel?

A.    Once again, it would depend on what was presented.

Q.    Okay.

A.    I could certainly consider it.

Q.    The other thing is probably a hands-on sort of question. Some people would say, well, I believe in the death penalty, I can see that it serves a purpose, I can see the types of crimes that I might feel it appropriate for, lend all sorts of weight to it, but say, on the other hand, they might draw the line at actually serving on a jury of this type themselves and say I don't know, on the other hand, if I could actually be the one to render the decision.  Do you know what I'm talking about?

A.    Uh-huh.

Q.    I can't think of a real good example, but do you see what I'm driving at?  You say I believe in that, but I don't know if I can do that myself when it really came down to it.  How do you feel about that?

A.    Well, luckily I would have 11 of my peers to support me in whichever decision that we as a group came to.

Q.    Okay.  That's -- in a larger sense that's true, but you understand, also, that your vote as a juror would be an individual vote.

A.    Certainly.

Q.    Yes, of course you would expect to be able to draw from the experiences and the views of other jurors.  The law I think expects that, contemplates that, but it could come down to, you know, your independent -- and would in the final analysis come down to whether or not you could actually make that final determination yourself.

A.    (Nods head.)

Q.    Do you think you could?

A.    Yes, I could.

Q.    All right.

        THE COURT:  Your time is up.

        MR. MACALUSO:  It is?

        THE COURT:  Yes, sir.  I started at 3:20.  Was that in error?

        MR. MACALUSO:  I'll defer to the Court.  I thought I had 30 seconds yet.

        THE COURT:  One more question.

        MR. MACALUSO:  Thank you.

BY MR. MACALUSO:

Q.    My watch -- anyway.

Do you know of any reason, ma'am, why you just couldn't keep an open mind and wait until every last stick of evidence is in, weigh the aggravating factors against the aggravating factors before you make up your mind?

A.    I can't think of anything.

Q.    Any questions of me at all?

A.    No.

Q.    Any reason why you couldn't be fair and impartial?

A.    No.

Q.    I appreciate it, ma'am.  Thank you very much.

A.    Uh-huh.

MR. MACALUSO:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Macaluso.

Mr. Ware.

MR. WARE:  Thank you, Your Honor.

DEFENSE VOIR DIRE EXAMINATION

BY MR. WARE:

Q.    Good afternoon, Mrs. Graves.  How are you?

A.    Oh, I'm peachy.

Q.    Good.  Do you have any questions that you would like to ask us or ask me, anything you would -- that would assist you in getting clarified at this point?  I know you've had a lot of information dumped on you.

A.    Not that I can think of.