# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA         .    Criminal No.
                                 .    4:94-121-Y
  vs.                            .
                                 .    Fort Worth, Texas
ORLANDO CORDIA HALL              .    October 12, 1995
                                 .    9:00 a
. . . . . . . . . . . . . . . . . .

VOLUME 7
TRANSCRIPT OF TRIAL
(Individual Voir Dire Examination)
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        Mr. Richard Roper,
                           Mr. Paul Macaluso,
                           Ms. Delonia Watson and
                           Mr. Christopher Curtis
                           Assistant United States Attorneys
                           1700 Burnett Plaza
                           801 Cherry Street
                           Fort Worth, Texas   76102
                           (817) 334-3291

For the Defendant:         Mr. Michael Logan Ware
                           Attorney at Law
                           Law Offices of Michael Logan Ware
                           The Bryce Building
                           909 Throckmorton St
                           Fort Worth, Texas   76102
                           (817) 338-4100

                           Mr. Jeff Kearney
                           Attorney at Law
                           Jeff Kearney & Associates
                           Sundance Square
                           120 W. Third Street, Suite 300
                           Fort Worth, Texas   76102
                           (817) 336-5600

ORIGINAL

U.S. District Court

Official Court Reporter:        Deborah M. Roberts, CSR
                                523 United States Courthouse
                                501 West 10th Street
                                Fort Worth, Texas   76102-3637
                                (817) 239-2037


Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

U.S. District Court

INDEX

|                        | Voir Dire Examination by: | | |
| Venire Persons:        | The Court | The Government | The Defense |
|------------------------|-----------|----------------|-------------|
| Mary Getting           | 27        | 39             | 48          |
|                        | --        | 51             | --          |
| Jane Blackburn         | 59        | 61             | 70          |
| T. Michael Mearse      | 81        | 85             | 95          |
| Angelika Critchett     | 104       | --             | --          |
| Mary Ann Herring       | 108       | 109            | 119         |
| Jacquelyn Ann Gattis   | 123       | 124            | 133         |
| Mary Lake              | 141       | --             | --          |
| Deborah Holland        | 145       | 146            | --          |
| Linda Berry            | 153       | 156            | 168         |
| Elizabeth Goss         | 178       | 180            | 187         |
|                        | --        | 190            | --          |

could return a verdict which assessed the death penalty in a proper case."

Does that still describe how you feel or your belief?

MS. GETTING:  Without knowing my other options, but I would say it's still fairly true.

THE COURT:  Okay.  All right.  Thank you very much for your presence.

MR. ROPER:  Could we have a couple of extra minutes to talk to her about something?

THE COURT:  Yes, go ahead.

MR. MACALUSO:  Thank you, Your Honor.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.   Ms. Getting, I don't mean to drag this out or belabor it, but there was one thing that I did want to speak to you about, something that I believe also flowed from your having read the article in the Morning News, and that was the reference you made to and the judge referred to earlier about the mitigating factor of equally culpable codefendants.  I believe you said that you attached some significance in the article to what His Honor said.  In fact, my sort of hazy recollection is that you said something to the effect that you would consider that a mitigating factor or you --

A.   Well, it could be a mitigating factor.  I mean, I realize there are five individuals and I know that two are up for the

BY THE COURT:

Q.    Ms. Herring, you've had an opportunity, you probably think too long of an opportunity, to review the matters that I reviewed with you earlier with the group.  Do you have any questions about this process that I explained to you this morning?

A.    No, sir, I don't.

Q.    Do you feel like you have a good grasp of it?

A.    Yes, sir, I do.

Q.    Okay.  I've reviewed your questionnaire, and let me ask you just this.  I don't have it right here on what you've heard or think you've heard.  Tell us what, if anything, you believe you recall about this case from the media or anyone else.

A.    To be perfectly honest, nothing.

Q.    Okay.

A.    Simply because I'm not a big news watcher.

Q.    Okay, all right.  That's good.

        THE COURT:  That being the case, I'm going to ask the government to begin its questioning, and they'll have ten minutes.

        MR. MACALUSO:  Thank you, Your Honor.

            GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.    Good morning, Ms. Herring.

A.    Good morning.

Q.    I'm Paul Macaluso.  To my left is Delonia Watson.  We're two of the prosecutors that are assigned to this case.  We're the prosecutors.  Of course, we're assistant United States attorneys.  At the next table over, of course, is Mr. Kearney.

MR. KEARNEY:  Hello.

BY MR. MACALUSO:

Q.    And the defendant, of course, has been introduced to you before.  His name is Orlando Hall.

We want to talk to you, if we can, at this particular point, Ms. Herring, about some aspects of your potential service on this jury, and we're all, I think, inviting you to relax as much as you possibly can under the circumstances and to bear in mind that there are no right or wrong answers to anything we're going to be talking about.  You just tell us what's on your mind and you'll be doing your job, okay?

A.    That's fine.

Q.    And if I don't talk too fast so the court reporter doesn't throw something at me, maybe I'll be doing mine.

If you have a question at any time, just ask and we'll do our best to answer it for you, all right?

A.    All right.

Q.    We'll do our best to answer it for you.

Ms. Herring, we're actively seeking the death penalty in this case, that is the government is actively seeking the

death penalty in this case.  We've told, I believe, all the other prospective jurors that to let them know exactly what our position is and what we expect to prove under the evidence once the evidence is presented to the jury.  That is our ultimate goal based on the law and based on the evidence.

Now, the ultimate decision, of course, rests with 12 jurors once the trial has concluded.  The judge went over with you that procedure.  Do you have any questions at all about any of the procedures the judge discussed with you?

A.    (Shakes head.)

Q.    Does it seem to make sense to you?

A.    It makes perfectly logical sense.

Q.    The first decision you make is guilt or innocence.

A.    Yes.

Q.    If you find somebody not guilty, it's over.  If you find them guilty, then you decide what the penalty is.  Sounds logical, doesn't it?

A.    Very logical.

Q.    And we call those things aggravating factors and mitigating factors, but at the end, assuming we live up to our burden to establish the intentional aspect of the crime and prove the aggravating factors, then you weigh the good, basically, with any bad we present with regard to the aggravating factors and you make a decision.

A.    Correct.

Q.    Do you know of any reason, ma'am, why you couldn't do that?

A.    None.

Q.    Okay.  Let me say this:  Each juror who will serve on this case will raise their hand and take a sworn oath to render a true verdict according to the law and according to the evidence so help you God.  Do you know of any reason why you could not take such an oath?

A.    No.

Q.    Do you know of any reason whether -- whether anything was raised by the judge when he was talking to you or thus far, anything that's entered your mind that you could share with us that would prevent you from keeping an open mind and waiting, ma'am, just as the law requires, until you have heard every last bit of every piece of evidence before you make up your mind in this case?

A.    None.

Q.    Okay.  Any reason why you can't be fair and impartial to both sides?

A.    No.  In fact, I've been accused of being too fair.

Q.    I don't know if you can be too fair.

A.    Well, children can accuse you of being too fair.

Q.    Let me ask you a couple of questions about your feelings, generally speaking, about the death penalty.  How do you feel in your own words?  How do you feel about the death penalty,

whether it serves a purpose or not or --

A.    I think under certain circumstances it serves a purpose. I don't think -- personal opinion is that I think it's something that's needed, and I think if the circumstances truly warrant it, then it is a hopefully useful tool.

Q.    What do you think it accomplishes?

A.    I'm hoping that it accomplishes the deterrent of other people doing things they shouldn't do.

Q.    What sorts of crimes do you think it ought to be available for?  I know you put down here premeditated murder and an extremely vicious murder, premeditated or not.

A.    That sums it up.

Q.    Okay.  Would you expand it, if you had an opportunity, to include other crimes or leave it the way it --

A.    I believe it depends.

Q.    Okay.

A.    It's kind of like I also put in there you don't judge a book by its cover, but once you open it, then you start judging it.

Q.    That's true.  And let me ask you this:  You understand that -- I think from his initial remarks when the judge talked to you this morning, he told you, and this is a factor, of course, that the death penalty is not available for any or all murders.

A.    Correct.

Q.    You understand that?

A.    Yes, I do.

Q.    Even any or all premeditated murders.

A.    That's correct.

Q.    That we must go beyond that and there must be evidence, you know, according to that method the judge outlined for you this morning that we must strictly adhere to.  Would you make us do that if you were a juror on this case, ma'am?

A.    Definitely.

Q.    Okay.  You understand what the burden of proof is in each phase of the trial?

A.    Yes, I do.

Q.    It's always on the government, you understand that?

A.    That's correct.

Q.    It never shifts over here.  In fact, even when we get -- if we're in a hypothetical case, Ms. Herring, and get to the penalty phase of the trial.  Let's assume for a moment hypothetically that we have provided the type of quality of evidence that convinces you of a person's guilt beyond a reasonable doubt.  That's done in the first part of the trial. We would go on to that second part, the penalty phase, and you understand that burden still rests with us to provide evidence to you that proves to you beyond a reasonable doubt that the act was an intentional act, that the murder was an intentional murder.

A.    Yes.

Q.    Any reason why you couldn't make such a finding if the evidence were there?

A.    If the evidence were there, you can prove it to me.

Q.    Okay.  If we do, of course, even then you cannot consider the death penalty, even though at that particular point you would have found the defendant guilty and you would have found beyond a reasonable doubt that the act of murder was an intentional act by one of the standards set out on those sheets.

A.    Right.

Q.    We must go forward and establish at least one of those aggravating factors.  Would you take a look at those?  Those begin under page -- under Roman numeral two, some of the aggravating factors.  And just scanning those, do those impress you, Ms. Herring, as the type of thing that you might find valuable in deciding whether or not the death penalty, depending upon the facts, is an appropriate sentence or whether a life sentence is appropriate?

A.    Certainly.

Q.    Okay.  There's two more -- pardon me, three more on the next page over there, the impact on the victim, future dangerousness and prior criminal history.  Do those impress you as things you might well want to take into consideration in weighing whether or not --

A.    Certainly.

Q.    Okay.  Now, you understand, again, we have the burden of proof on that.

A.    That's correct.

Q.    You understand that, as the judge told you, that the defendant has the opportunity, although he has absolutely no requirement to, establish mitigating factors.

A.    Uh-huh.

Q.    If he wants to, he can, and if he doesn't, then that's fine.  It's kind of like -- well, he's just not required to.  Do you understand that?

A.    Sure.

Q.    And if he does, he must need only establish a mitigating factor by a...preponderance of the evidence.  I just drew a blank.

A.    You'll be all right.

Q.    Like the judge said the other day, all he saw was the caboose.

      You understand that's a much lower standard?

A.    Yes, I do.

Q.    Now, look under the fourth Roman numeral there.

A.    Mitigating?

Q.    Yes.  And the first one is entitled or in bold there, "equally culpable defendants."

A.    Correct.

Q.    Do you remember the judge talked to you about that?

A.    Yes, I do.

Q.    Let's speak hypothetically here again.  You found somebody guilty and in the course of the trial there is evidence and you believe this either by a presumption or more -- preponderance of the evidence, rather, or more -- there I go again -- that that's true, that another defendant or defendants not on trial who you believe is equally culpable, just as blameworthy as the person who is on trial who you've convicted of this offense, do you see?  Can you see how you might find that?

A.    Certainly.

Q.    Okay.  And then you will be called upon to decide whether or not -- well, if you found by a preponderance of the evidence that to be a fact, that an equally culpable defendant did not receive the death penalty, then the law requires -- and I'm really emphasizing, that's underlined, the law then requires that you consider that or give consideration of that mitigating factor in deciding whether or not the death penalty or a life sentence is appropriate.

A.    Isn't that only fair?

Q.    No, I was asking you.  I think it is.  It sounds fair to me.

A.    I understand.

Q.    In other words, is there any reason why you could not

follow that aspect of the law?

A.    No.

Q.    Okay.  Now, the fact that you're required to consider it doesn't mean you have to give it any particular consideration, you just have to give it honest, adult consideration.  You might find that that's an enormously important factor, you might find it's less than enormous or not much of a factor at all.  It just depends, doesn't it?

A.    That's true, it depends.

Q.    Same thing for the other factors there like the defendant's background and other things or any other mitigating factor.  You understand if a mitigating factor has been found by a preponderance of the evidence, the law requires you consider it, and you said you would?

A.    Yes.

Q.    Now, you understand you weigh the aggravating against the mitigating and decide what weight to give, you know, either the aggravating factors and/or the mitigating factors, if any, and then decide the appropriateness of a sentence of death or a sentence of life.  You can do that, can't you?

A.    Yes, I can.

Q.    You understand the defendant has no requirement whatsoever to provide any mitigating factors.  If you don't receive any evidence of mitigating factors, then you just analyze and make your decision based on whether or not the

aggravating factors alone are serious enough.  Could you do that?

A.    Yes.

Q.    Would you require the defendant to prove any mitigating factors?

A.    No.

Q.    You personally?

A.    Not unless they choose to.

Q.    Okay.  That's how the law sets it out.

A.    That's right.

Q.    Okay.  Now, there's one other question here that I'll -- I just want to ask you one last question.  It actually was asked on the questionnaire.

Some people might say if a sentence of life without the possibility of release were an option, and you know that it is an option in this type of case to the death penalty, some people might say if that were an option where somebody is going to spend the rest of his or her life behind bars, I would never vote for the death penalty regardless of the circumstances.  Some say that they would consider it, and if it's appropriate they would do that.  How do you feel about that?

A.    I think I would go back to my original thoughts and statements.  It depends on the circumstances.  There's -- I can't tell you till I'm there, what I've heard and what I've

listened and judged.  I don't know.  I mean, I'm not going to say that I would rather do that than this, because it depends on the crime and what the state or the government has proven to me, and then at that point then I would make that decision if I had the option between the two, if that's given to me.

Q.    So you haven't closed your mind to either one in that regard?

A.    No.

Q.    Okay.  Is your mind then open -- have you closed your mind to any aspect that's been discussed with you?

A.    I don't have a closed mind.

Q.    That's good.  Do you know of any reason, Ms. Herring -- I'm out of time -- any reason why you can't be fair and impartial to both sides in this case?

A.    None whatsoever.

Q.    I appreciate it, Ms. Herring.  That's all the questions I have for you.  I know Mr. Kearney will have some for you.

            MR. MACALUSO:  Thank you, Your Honor.

            THE COURT:  Mr. Kearney.

                 DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.    Good morning.

A.    Good morning.

Q.    There was a question on here that I think is an interesting question.  I didn't prepare this questionnaire.

behind bars for the rest of his or her life, I would never give the death penalty.  That's good enough, life without the possibility of release.  Others would say the law says that I have to keep an open mind as to both, and I could do that.  If it calls for death, I could give death.  If it calls for life without parole after I evaluate all of the evidence, I could do that.  How do you see yourself in that regard?

A.    I -- well, I would -- here again, I would have to weigh all the evidence to see, because like I said, the death penalty or the actual saying you're going to die by injection or the chair or whatever, it doesn't always -- it shouldn't always be given.  I do think maybe there's times that they could go to prison for the rest of their life and made to think about what they did.

Q.    Would it depend on the facts?

A.    It would depend on the facts.

Q.    Okay.

       MR. MACALUSO:  Could I just ask one other question, Your Honor?

       THE COURT:  Yes, sir.

BY MR. MACALUSO:

Q.    One other thing I noted in your response to questions about the appropriateness, I believe -- or at least your feelings generally speaking about the death penalty.  You made a reference to your tax dollars supporting somebody.  Do you

their parts and one gets off -- not gets off but gets a lesser sentence because he testifies against the other, I don't think so.

Q.    So that is a mitigating factor that you would --

A.    Yes, sir.

Q.    -- consider?

A.    Yes, sir.

Q.    And if you thought that mitigating factor outweighed the aggravating factors, then you could vote for life rather than death?

A.    Yes, sir.

Q.    Then again, if you thought the aggravating factor was so bad that they outweighed that mitigating factor --

A.    Yes, sir.

Q.    -- you could then also vote for death?

A.    Yes, sir.

Q.    What the law requires is you weigh it and give it consideration and compare it to the aggravating factor.

A.    (Nods head.)

Q.    All right, thank you.

        MR. KEARNEY:  That's all I have, Judge.

        MR. ROPER:  Could I have one follow-up question?

        THE COURT:  All right.

            GOVERNMENT VOIR DIRE EXAMINATION

BY MR. ROPER: