# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA        .    Criminal No.
                                .    4:94-121-Y
  vs.                           .
                                .    Fort Worth, Texas
ORLANDO CORDIA HALL             .    October 19, 1995
                                .    1:30 p.m.
. . . . . . . . . . . . . . .

VOLUME 11
TRANSCRIPT OF TRIAL
(Individual Voir Dire Examinations)
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        Mr. Richard Roper,
                           Mr. Paul Macaluso,
                           Ms. Delonia Watson and
                           Mr. Christopher Curtis
                           Assistant United States Attorneys
                           1700 Burnett Plaza
                           801 Cherry Street
                           Fort Worth, Texas   76102
                           (817) 334-3291

For the Defendant:         Mr. Michael Logan Ware
                           Attorney at Law
                           Law Offices of Michael Logan Ware
                           The Bryce Building
                           909 Throckmorton St
                           Fort Worth, Texas   76102
                           (817) 338-4100

                           Mr. Jeff Kearney
                           Attorney at Law
                           Jeff Kearney & Associates
                           Sundance Square
                           120 W. Third Street, Suite 3_
                           Fort Worth, Texas   76102
                           (817) 336-5600

U.S. District Court

Official Court Reporter:        Deborah M. Roberts, CSR
                                523 United States Courthouse
                                501 West 10th Street
                                Fort Worth, Texas   76102-3637
                                (817) 239-2037


Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

U.S. District Court

INDEX

| Venire Persons: | Voir Dire Examination by: | | |
| --- | --- | --- | --- |
| | The Court | The Government | The Defense |
| Virginia Harn | 38 | 41 | 52 |
| Peter Pruitt | 60 | 63 | 73 |
| Patricia Cox | 81 | 89 | 94 |
| Nancy Hackney | 102 | 108 | 117 |
| Paula Moore | 123 | -- | -- |
| Josephine Ivy | 127 | 132 | -- |
| Kelvin Johnson | 137 | 138 | 144 |
| Linda Eidd | 154 | 160 | 165 |

testimony in the world and may convince you beyond any doubt, and that you just get down to it, you just couldn't give the death penalty under any circumstances.  Or if that mitigating factor is present, you couldn't weigh the aggravating factors, and you just would go on and make up your mind.  Do you see what I'm saying, or don't you?

A.    No.

Q.    Okay.

A.    I know you're asking me if I could give the death penalty or if I would give imprisonment without parole, and I can probably do both but I don't know.  I can't sit here right this second and say I would do one over the other without knowing --

Q.    I'm not asking you that.

THE COURT:  Well, I think that's where we need to stop.  I've let you run over about five minutes.

MR. ROPER:  I'm sorry, I didn't mean to.

THE COURT:  Mr. Ware.

MR. WARE:  Thank you, Your Honor.

DEFENSE VOIR DIRE EXAMINATION

BY MR. WARE:

Q.    Good afternoon, Ms. Harn.  How are you?

A.    All right.

Q.    Just to -- maybe this will make things a little easier. The Court, I anticipate, when we're talking about proof beyond

seem fair to me.  So it's a question of fairness, and you seem to appreciate that.

Okay.  That's all the questions that I have.  I'm going to allow the government almost ten minutes, and the defendant.

A.   They're timing us up in the jury room.

Q.   They are?  Okay.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. ROPER:

Q.   Ma'am, my name is Richard Roper.  I'm one of the prosecutors on this case.  I have some questions to ask you?  Over at the next table is the defendant in the middle, and Mr. Kearney and Mr. Ware are his attorneys.  You don't know -- Mr. Kearney and Mr. Ware are practicing attorneys in Fort Worth.  Do you know those --

A.   No.

Q.   -- people by reputation?  I think all of us appeared before Judge Moore at one time or another in our career.

I have some questions to ask you about -- I know the judge went into the death penalty with you.  I want to explore the idea of life without the possibility of release as a possible punishment with you.  And I think you've answered this, I just want to explore just a little bit more.

A.   That's fine.

Q.   Some people feel like in a case where life without the possibility of release is an option, in other words the person

will spend the rest of his life in prison, effectively die in prison, under those circumstances they just couldn't consider the death penalty. How do you feel about that?

A.   I still would probably answer you, I think, in the same way or have a fairly consistent answer in the sense that there is a process to go through that defines that and makes it fairly clear what your choices are, when I can deal in logic and I can deal in facts, then I can make -- I could do that.

Q.   Okay. Some people feel philosophically they could talk about being in favor of the death penalty over a cup of coffee and --

A.   That's right.

Q.   -- getting down to it is another thing.

My question for you is this -- and the reason we're asking you these questions now, you understand, is so that you may get on the jury, you know, and here I've spent two weeks and now I've got another opinion. I wish I had told them earlier, I just can't vote for the death penalty under any circumstances.

A.   I think it is and it should be treated as a burden and a responsibility. So, I mean, in that sense I don't think any human particularly wants to be on a jury and just can't wait to be on a jury that has the death penalty. I mean, I don't -- at least I don't think that way. I mean, I think it's a burden and a responsibility that you have to treat

someone's life with care and concern and responsibility, but doing those things --

Q.    Uh-huh.

A.    -- I could still give the death penalty.

Q.    All right.  That was really my next -- if the facts justified it under the system that we've gone through, and I won't go through all that, could you sign your name to a verdict form knowing that it would result in the execution of another human being?

A.    Yes.

Q.    His Honor went over this article that you read --

A.    Uh-huh.

Q.    -- and I want to explore just briefly.  If you were to serve on the jury, you're going to have to take an oath that you would a true verdict render according to the law and according to the evidence.  There's a couple of parts to that. One is you've got to follow the law His Honor will give you. You may have a feeling, especially you being connected to the legal profession like you are, have been for all your life, you might have a different feeling about the law.  The judge will require you to follow his instructions, just like Judge Moore did when he was a judge require jurors to do the very same thing.  Could you follow the judge's instructions?

A.    Uh-huh.

Q.    Okay.  And the second part of that oath is to consider

only the evidence presented at trial, which doesn't include
newspaper articles.  You understand that?

A.   Right.

Q.   You understand if you were being charged with a crime,
how horrible it would be for somebody to introduce a newspaper
article as evidence.

A.   It would be.

Q.   And I think from -- the concern we would have is
obviously the jury is not going to be sequestered --

A.   Right.

Q.   -- Mrs. Cox.  That's not going to happen in this case.
And because of that, because of that fact, if you were to read
an article, it would just be devastating.

A.   I'd have to adjust my personal habits.  I mean, there's
absolutely no doubt.  I mean, I would have to send my husband
to another room to read the paper.

Q.   Okay.

A.   Literally.

Q.   And I want to ask -- how would that affect you?  I
know -- I know the judge instructed us earlier not to read it.
Do you think you could follow the judge's instructions
about --

A.   Yes, I'll do.  And I'll be real honest, the reason I read
the article in the first place was because it had gone on so
long before I had been summoned for this individual interview

that I thought it was over and the jury was selected and we were moving on. Because originally I remembered a two-week time limit that if we had not been called, probably we would not be. So by the time that article appeared, I was kind of trucking along and thought it was over with.

Q. All right. Do you feel like you could keep an open mind in this case, and if the facts justified it and the law provided for it, you could give a death sentence in this case?

A. Yes, I would like to think I can.

Q. And if the facts justified it and the law provided for it, could you render a sentence of life without the possibility of release?

A. I think I could keep an open mind and render whatever I thought was right.

Q. Oh, one question. You told us your feelings on the death penalty. What does your husband feel about the death penalty?

A. He would be -- there's no doubt in my mind that he's in favor of the death penalty. I can't say it's a topic of discussion that we have very often, but he would be in favor of the death penalty.

Q. That's all. I think Mr. Ware has some questions for you. Thank you, ma'am.

A. Uh-huh.

        THE COURT: Mr. Ware.

        MR. WARE: Thank you, Your Honor.

MS. HACKNEY:  Okay.

THE COURT:  Thank you very much.

MS. HACKNEY:  Thank you.

(Venire person excused at 4:50 p.m.)

THE COURT:  Do I hear a challenge?

MR. MACALUSO:  No.

MR. KEARNEY:  No.

(Brief pause in proceedings.)

(Venire person seated at 4:55 p.m.)

PAULA MOORE,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

Q.    Hi.  How are you, Ms. Moore?

A.    Fine, thank you.

Q.    Please have a seat.

Ms. Moore, I've been looking at your questionnaire, and I want to start with the question of capital punishment.  You indicate here that you have moral, religious or personal beliefs that would prevent you from sitting in judgment of another human being and that you are opposed to the death penalty, and there was a question there where you had five different choices about -- there were statements about the death penalty, and you could circled the one that's most closely related to your belief, and you circled this one, "I

could never, regardless of the facts and circumstances, return a verdict which assessed the death penalty."

Does that still -- it's been a couple of weeks, and people have time to think about things. Does that still reflect your attitude toward the death penalty?

A.   Basically that's how I feel. That's just how I feel.

Q.   That's fine. We're not here to try to make anyone change his opinion or challenge their conscience. Lord knows that's the last thing we want to do.

That has a practical application to a case like this where the death penalty is a possibility, and that's where you would be called upon, if you were selected to serve on this jury, to sign off on a piece of paper that would say I have found the defendant not -- pardon me. I have found the defendant guilty, and also that you find that the death penalty is the appropriate sentence in the case, and you recommend that sentence to the judge. And, of course, as I told you before it's called a recommendation, but it's binding on the Court.

Assume with me that the case got that far and you were on the jury. Would you be able to sign that slip of paper giving the --

A.   I don't think so. I don't believe so.

Q.   I think I can see why, but let me hear it in your own words. I see here on the questionnaire why, let me hear it,

though, in your own words.

A.    I don't believe in the death penalty simply because -- I mean, I can't stand -- I believe in justice, but I believe in another form of justice. I just can't say -- what if God forgives this person if they did do this, and who am I to say I don't forgive you, you must die.  I can't give back a life, why should I take one?

Q.    I understand.  What I'm hearing you say sounds like a very strong opinion on your part.

A.    Well, it is.  But I can't say if it was my sister or something happened to my sister, I can't say I want this person dead.  I have to admit that would be a natural reaction from my hurt --

Q.    But you would never serve on that jury, would you?

A.    I'm sure they wouldn't put me on that jury.  But after I got over the initial shock of it, I believe I would be -- because whatever happens, I can't get her back, so -- but this is what I believe.  But if it's a family member, I -- you know, a family member, that's somebody that you love and care about very deeply, so you're going to want revenge as a matter of speaking.

Q.    I'm going to excuse you from this jury, but that doesn't mean that I don't appreciate your patience with us and your coming down here today, because I do, and I'm going to ask you in exchange for my letting you go here, that you'll agree to

serve sometime in the future on a case that you can serve on.

A.    Sure.

Q.    Because we need good people who are dedicated to the justice system, and you said you're for justice.

A.    Yes, I am.

Q.    And our system won't work without people who are for justice.  So if you will agree to do that, I'll let you go and you won't have to face that problem in this case.

A.    I agree.

Q.    All right.  Thank you very much.

A.    Thank you.

        MR. MACALUSO:  Thank you, ma'am.

        MS. MOORE:  Thank you.

    (Venire person excused at 5:00 p.m.)

        THE COURT:  Do I hear any objection to the decision of the Court in Ms. Moore's situation?

        MR. WARE:  Your Honor, I think that under the current state of the law, as I understand it, that the Court's decision was proper.  Nevertheless, I'm going to lodge an objection.  Since the 8th Amendment is an evolving process and is an evolving concept, I believe that it is entirely possible that at some point it may become the law that a juror such as herself, notwithstanding her extreme reservations about the death penalty or her opinions about the death penalty, that even jurors like that would be qualified to serve on a jury