# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION


UNITED STATES OF AMERICA          .    Criminal No.
                                  .    4:94-121-Y
  vs.                             .
                                  .    Fort Worth, Texas
ORLANDO CORDIA HALL               .    October 11, 1995
                                  .    8:30 a.m.

. . . . . . . . . . . . . . .


VOLUME 6
TRANSCRIPT OF TRIAL
(Individual Voir Dire Examinations)
BEFORE THE HONORABLE TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          Mr. Richard Roper,
                             Mr. Paul Macaluso,
                             Ms. Delonia Watson,
                             Mr. Christopher Curtis
                             Assistant United States Attorneys
                             1700 Burnett Plaza
                             801 Cherry Street
                             Fort Worth, Texas   76102
                             (817) 334-3291

For the Defendant:           Mr. Michael Logan Ware
                             Attorney at Law
                             Law Offices of Michael Logan Ware
                             The Bryce Building
                             909 Throckmorton St
                             Fort Worth, Texas   76102
                             (817) 338-4100

                             Mr. Jeff Kearney
                             Attorney at Law
                             Jeff Kearney & Associates
                             Sundance Square
                             120 W. Third Street, Suite 300
                             Fort Worth, Texas   76102
                             (817) 336-5600

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
AUG 16 1996
NANCY DOHERTY, CLERK
BY _____
Deputy

ORIGINAL

U.S. District Court

Official Court Reporter:          Deborah M. Roberts, CSR
                                  523 United States Courthouse
                                  501 West 10th Street
                                  Fort Worth, Texas   76102-3637
                                  (817) 239-2037


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

U.S. District Court

INDEX

| Venire Persons: | Voir_Dire_Examination_by: | | |
|---|---|---|---|
| | The Court | The Government | The Defense |
| Vicki Lane | 30 | 32 | 40 |
| | 54 | -- | -- |
| Benjamin McGowen | 61 | 64 | 74 |
| Chris Isbell | 85 | -- | -- |
| Melinda Motley | -- | 91 | 99 |
| | -- | 104 | -- |
| Gregory Perry | 106 | 108 | 117 |
| Lydia Miles | 123 | 125 | 134 |
| Lisa Chaffin | -- | 140 | 150 |
| | -- | 155 | -- |
| Tempie Griffin | 157 | 162 | 168 |
| | 174 | -- | -- |
| John Breidenbach | 186 | 187 | 197 |
| Randal Davis | 203 | 204 | 212 |
| | 216 | -- | -- |

mitigating factors found, then you would just weigh the aggravating factors and ask the question whether the aggravating factor or factors alone are sufficient to justify the sentence of death.  So the law does not contemplate -- in other words, the law isn't written in such a way to say the presence of any aggravating factor automatically brings the death penalty because it's got to be weighed, it's got to be looked at, evaluated, and then each juror will make up his own mind about whether that aggravating factor is sufficient or not to justify a sentence of death.

A.    Okay.

Q.    Did that help?

A.    Yes, thank you.

Q.    Anything else you wanted to ask about?

A.    That was the only part I was unclear on.

Q.    Okay.  I think I've asked all the questions that I need to ask earlier and just now.

THE COURT:  And so, Mr. Macaluso, you have ten minutes.

MR. MACALUSO:  Thank you, Your Honor.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.    Good morning, Mr. McGowen.

A.    Good morning.

Q.    I'm Paul Macaluso.  I'm one of the three -- actually four

prosecutors assigned to this particular case.  We're all assistant United States attorneys.  The next table, as you know, is the defendant and his lawyers.

Mr. McGowen, we want to talk to you in the time that's been allotted to us about your feelings about some aspects of this case and your ability to actually serve and render a proper verdict based on the law and based on the facts.  Okay?

A.    Uh-huh.

Q.    Let me start, Mr. McGowen, by telling you that there are no right or wrong answers to the things you'll be talking about.  You tell us how you feel, and you'll be doing your job.  If we don't confuse you, we'll be doing ours.  Okay?

A.    Okay.

Q.    Now, let me tell you from the outset what our position is, that is the government's position in this case.  We are actively seeking the death penalty in this case for this defendant.  In other words, we intend -- we would expect and the law would require that we provide you in the first part of the trial with evidence that would convince you beyond a reasonable doubt of the defendant's guilt.  Do you understand that?

A.    Uh-huh.

Q.    Just as the law would expect us to provide you with proof, evidence that is, beyond a reasonable doubt that the intentional part of the second phase of the trial should be

proven, and furthermore that we would establish and prove to you any one or more of the aggravating factors that you have to find beyond a reasonable doubt for you to even be able to consider the death penalty. But that's what we're seeking based on the evidence, and we know it's provided for by law under the proper circumstances.

Ultimately though, Mr. McGowen, you know that's your decision if you're selected as a juror in this case, so that's why we're talking to you now.

A.    Okay.

Q.    Okay? You indicated on this questionnaire you apparently are in favor of the death penalty; is that correct, sir?

A.    Yes.

Q.    Could you tell us in your own words how you feel about the death penalty?

A.    In my opinion in certain crimes the death penalty should be warranted. If it was a crime, you know, like -- an instance of like a lapse of mental endurance or something like that it should be looked at differently, maybe a life imprisonment there, but if it was like a premeditated where the person went out and intended to do such a thing such as murder somebody, I believe it should be used.

Q.    Have you ever felt differently about the death penalty, sir?

A.    No.

Q.    How about your folks?  Do you know what their position is?

A.    What?

Q.    Your mom and your dad.

A.    I'm not sure what their position is on it.

Q.    Okay.  Do you think it serves a purpose?

A.    Yes.

Q.    What is that, sir?

A.    It serves a purpose to show the rest of the population that crimes of this nature should not go unpunished with a simple slap on the wrist.

Q.    Okay.  Let me -- let me just talk a little bit about some of the things or one or two things that the judge talked to you about in his initial remarks to you.

A.    Uh-huh.

Q.    Remember what he said about the clean slate at the beginning of the trial?

A.    Uh-huh.

Q.    That a defendant -- and we're not even talking about this defendant.  We'll speak hypothetically, that a defendant, that would mean me, you, any one of us if we were on trial, the law would expect that the jurors enter the jury box over there and that there be a clean slate, there will be no evidence on there, no preconceptions that would interfere with the evaluation by the jurors of the evidence that's actually

presented during the trial.  You sit over there and you listen to the evidence, and you decide what the facts are and the credibility of the witnesses, ultimately the weight you wish to give the testimony in deciding whether or not the government has proven the case to you, that which is in the indictment, beyond a reasonable doubt.  If you do, your job is very simple.  You must find the defendant guilty.  Just as if we fail to do that, if we don't satisfy you beyond a reasonable doubt, you must find the defendant not guilty.  Any problem with that, sir?

A.    None.

Q.    Okay.  You understand it's more or less the same procedure the second part of the trial.  Even though we may come into the jury box with opinions on what the law ought to be, what it should be, what it might be if you were sort of king for a day, so to speak, how you might change things, you understand to be a qualified juror, as the judge told you, you must take a sworn oath to a true verdict render according to the law -- the judge will give you law, he's talked to you about that -- and the evidence.  Can you do that, sir?

A.    Yes.

Q.    In other words, for example you said just a moment ago, you said, well, I believe if it's a premeditated murder, that person should get the death penalty, or words to that effect.

A.    Yes.

U.S. District Court

Q.    Do you understand that?

A.    Uh-huh.

Q.    You did say that, didn't you?

A.    Yes, sir.

Q.    Okay.  You understand -- and are you telling us, Mr. McGowen, that you will keep an open mind?  Do you understand that there are three punishments available to you --

A.    Yes.

Q.    -- in the second phase of the trial?  Keep that slate clean, keep an open mind, and any decision, whether it be a sentence of death, a sentence of life without the possibility of release, or a sentence of life without parole would be made only after and until you've heard all of the evidence in the case, the pros -- in other words, the pros, that which would be mitigating in favor of the defendant, and the cons, that would be the aggravating factors that would make the crime more serious.  Can you do that?

A.    Yes.

Q.    In other words, can you tell us -- can you tell the defendant and can you tell us that you have no preconceptions along those lines that would interfere --

A.    No --

Q.    -- that would interfere with your service as a juror?

A.    No, I don't have any preconceptions.

Q.   Can you tell us you would wait until every last stick of evidence is in, until the flag drops --

A.   Yes.

Q.   -- until you make up your mind?  And then like the judge told you, after you -- if you find, for example, on the second part, the part that's required you show that the crime was intentional, and if we establish one or more of the aggravating factors, that you would weigh those aggravating factors, whatever they may be, against any mitigating factors that may be raised in deciding what the proper punishment should be?

A.   Yes.

Q.   Can you do that?

A.   Uh-huh.

Q.   If it calls for a -- if it calls for a recommendation of a sentence of death, could you do that, sir?

A.   Yes.

Q.   By the same token, if it calls for, to your way of thinking along with your discussions with the other jurors, a sentence of life without the possibility of release or life without parole, could you do that just as well?

A.   Yes.

Q.   Sir, have you closed your mind in any respect to any aspect of the case that's been discussed with you by His Honor or by me at this point?

A.    No, sir.  I still have a very open mind about it because --

Q.    I think everyone here is looking for somebody like that. There's no reason why you can't follow the law and no reason why you couldn't keep an open mind to all of the aspects of the case in fairness to both sides.

A.    Uh-huh.

Q.    Am I reading you right, sir?

A.    Yes.

Q.    Okay.  For example, you asked about the mitigating and you asked about the aggravating facts.  And I think the judge very adequately explained to you that the aggravating facts would take a crime that you found a person guilty of, and we're speaking hypothetically but let's say this type of crime, kidnapping resulting in the death of somebody, you would -- of course defined also in that second part that we prove that it was an intentional killing.  You see?

A.    Uh-huh.

Q.    And then we'd have to establish one or more of those aggravating factors, things that are listed on that --

A.    The first page?

Q.    -- sheet you have or series of sheets under the heading of Roman numeral two.  Do you see that?

A.    Uh-huh.

Q.    We may or we may not be able to prove those to you.  We

may be able to prove all of those to you, we may not be able to prove any of them to you, but we must prove at least one for you even -- for you to be able to even consider the death penalty as a possibility, we have to prove at least one of those.

A.    (Nods head.)

Q.    Take a look at those, if you would, and let me ask you, would those strike you as things that you might want to take into consideration, I mean some factors that you may wish to take into consideration in deciding whether the death penalty is appropriate?

A.    Yes.  They seem -- I mean, they seem like reasonable, within the limits --

Q.    Same thing --

          THE REPORTER:  Seem like reasonable within the what?

          MR. McGOWEN:  Within the limits of social standards.

BY MR. MACALUSO:

Q.    Okay.  Same thing for the ones under Roman numeral three. Those are additional aggravating factors that we may provide evidence on.  Do those strike you as things that you would like to take into consideration when you evaluate what the punishment ought to be?

A.    Yes.

Q.    By the same token, you understand a defendant -- I mean, just in old-fashioned, fundamental fairness to both sides, a

defendant can raise things in mitigation, like the judge said, in some way that you would consider that might lessen the severity of the punishment.  Do you see?

A.    (Nods head.)

Q.    And all the law says that he has to raise those by a preponderance of the evidence, more evidence that's believable than not, you see, and the law says if those are raised, for example he has two set out there under Roman numeral four, that you shall consider that.  It doesn't mean that that's binding on you in the sense that that means you have to not give the death penalty, any more than proof of the aggravating factors says you have to give the death penalty.

          THE COURT:  One minute.

          MR. MACALUSO:  Thank you, Your Honor.

BY MR. MACALUSO:

Q.    It just says when all, every last stick of the evidence, aggravating and mitigating, you've got that open mind, you've got that all before you, you weigh the aggravating against the mitigating, and then you decide what the proper penalty should be.  Can you do that?

A.    Yes.

Q.    I mean, you may decide that the mitigating factors have been established, but you may decide I don't think that that's significant in my decision, you and the other jurors may feel that way.  Do you see what I'm saying?

A.    Yes.

Q.    But you will give them due consideration, will you not, sir?

A.    Yes, sir.

Q.    Any reason why we couldn't rely on that?

A.    No.

Q.    Is there any reason -- first off, do you have any questions of me at all?

A.    No.

Q.    Do you think you can give Mr. Hall a fair trial?

A.    Yes.

Q.    Do you think you can give the government a fair trial, Mr. McGowen?

A.    Yes.

Q.    I appreciate it, sir.    Thank you very much.

        MR. MACALUSO:    Your Honor, thank you.

        THE COURT:    Mr. Kearney.

                DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.    Hello, Mr. McGowen, how are you?

A.    Hello.

Q.    Do you have friends from different races?

A.    Yes.

Q.    Do you?

A.    Uh-huh.

can go beyond just an exchange of ideas or opinions to where somebody tries to impress or impose their views on somebody else, can get beyond what's just expected of exchanging ideas and opinions?

A.    I can see that happening.

Q.    That's what we want to try to avoid.

A.    Uh-huh.

Q.    And if you saw that happening where it was overbearing or -- would you speak up against that and say, hey, we're all supposed to vote the way we really feel?

A.    Yes.

Q.    Thank you.

        MR. KEARNEY:  That's all I have, Judge.

        MR. ROPER:  Could I have one question, Judge?

        THE COURT:  Yes, sir.

              GOVERNMENT VOIR DIRE EXAMINATION

BY MR. ROPER:

Q.    Ma'am, I was looking at your questionnaire, and I didn't see this.  But one of the questions, 52-A, you said, "If a sentence of life without the possibility of parole is an option, could you nevertheless recommend a sentence of death?" And you answered no to that question.  Do you remember that?

A.    No.  And that may have been one that I really didn't understand --

Q.    All right.

all I heard was jury selection was starting --

Q.   Okay.

A.   -- and they mentioned the name, and as soon as they mentioned the name, I changed it.

Q.   Okay, good.

THE COURT:  Well, I don't think I have any additional questions, so I'll allow the government to begin. Ten minutes.

MR. MACALUSO:  Thank you, Your Honor.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.   Good morning, Mr. Perry.  I was going to say good afternoon here.  I think I'm losing my voice.

My name is -- excuse me.  I'm Paul Macaluso.  I'm one of the prosecutors assigned to this particular case, Mr. Perry. The next table over, of course, is the defendant and his attorneys, Mr. Ware and Mr. Kearney.  Do you know or recognize any one of us, sir, other than from the introductions?

A.   No.

Q.   Okay.  We want to talk to you in the brief time that we have to just to get to know how you think about some matters that may be crucial in this case if you're selected as a juror.  We'd ask you, of course, to relax, speak your mind, no right and no wrong answers as the judge may have mentioned to you, just tell us how you feel, okay?

A.    Okay.

Q.    I'll tell you where we stand in this particular case at the outset, Mr. Perry. We're actively seeking the death penalty in this case for this defendant. You know that's one -- the death penalty is one of the three punishments available upon conviction at the conclusion of the second phase of the trial, but we are actively seeking the death penalty in this particular case, and we feel it only fair to apprise you of that at the outset, okay?

A.    Okay.

Q.    Now, in your questionnaire that you filled out almost -- well, over two weeks ago, you were asked a number of questions about your personal feelings about the death penalty. Let me just ask you: Could you in your own words here for us share with us your feelings just generally about the death penalty?

A.    I believe it is justified in some cases. One of the drawbacks I see to it is the long delay between sentencing and the execution of that punishment, but I have no moral objections to it.

Q.    Let me ask you this: Do you have any -- can you share with us any reason why knowing yourself as you do, sir, why you could not actually serve on a jury of this type and actually make the decision, knowing that could possibly be, based on the evidence and based on the law, a sentence of death for a person, fully expecting that that sentence will be

carried out, that somebody would at some date and some time be executed?  Do you have any reason why you could not actually make that judgment yourself based on the evidence?

A.    No.

Q.    Because, you know, some people say I'm for it, but I draw the line, I don't know that I could do it myself.  Do you see?

A.    (Nods head.)

Q.    You believe in it and you said you could do it, as well, if the facts were present?

A.    If the facts justified it, yes.

Q.    Okay.  And that's going to be a theme, I think, hopefully as we speak here, that we would expect and the law would demand, in fact, that you do nothing, you would be able to do nothing with regard to this or any other case until you've heard all of the evidence.  Are you that type of person, Mr. Perry?

A.    Yes.

Q.    Okay.  Whatever call you make at the end of the trial if you were to serve would be based, I gather, on the Court's instructions, because he will give you the law, you're not expected to be knowledgeable of that, he'll instruct you as to the law, and you are the judges of the facts.  You and the other jurors decide what they are, how much weight to be given to them.  Can you do that, sir?

A.    Yes.

Q.    What sorts of crimes do you think the death penalty ought to be available for?  If you were in the legislature yourself and you were in a position to designate penalties for offenses, what would you do?  What offenses come to your mind, sir?

A.    I refer back to this, what's laid out in these pages as far as aggravating conditions, and all seem pretty reasonable.  The -- especially the aggravating condition of prior criminal history.

Q.    Okay.

A.    The criminal history that shows that they've had chances to reform and there's a repetition set up, a pattern set up where there's no indication that the person wants to be rehabilitated or reformed --

Q.    Okay.  I notice --

A.    -- and they're still committing -- and, of course, only in cases of murder.  I don't think any other crimes other than murder would justify a death penalty.

Q.    Okay.  The crucial case or the focal point would be on a murder type offense, I gather?

A.    Yes.

Q.    Okay.  You said -- you did say in response to one of the questions, you did refer to is your feelings about the death penalty as just punishment, and I'm quoting from your response here, "As just punishment for particularly cruel crimes where

there appears to be no chance of rehabilitation."  Do you think some people can be rehabilitated?

A.    Yes.

Q.    Do you think there are some people that simply won't or cannot be rehabilitated, as well?

A.    Won't be rehabilitated.

Q.    Okay.  Now, you also said about crimes that come to your mind is murder when a perpetrator has shown a pattern of crime in total disregard for human life.  By "pattern of crime," would that mean, to your way of thinking, another murder or some other types of crime, or what's your thinking on that?

A.    Basically a life of crime.  Not necessarily other murders, but other crimes showing disregard for life where they --

Q.    Okay.  You mentioned -- referred, of course, to the aggravating factors that the law has set out, four of which we would expect to provide -- well, actually four are statutory and then the others on the other page, seven all together, that we would anticipate providing you proof or evidence on. Do those strike you as the types of factors, whether you call them aggravating factors or just factors, that you would consider important in your decision as to whether or not a person should receive a sentence of death?

A.    Yes.

Q.    Do any of -- you said prior criminal history; is that

correct?

A.   That's --

Q.   That's one that struck you in particular; is that right?

A.   Yes.

Q.   And the others, as well?

A.   Uh-huh.

Q.   Excuse me.  I'm not going to go through the entire procedure that the judge went through because he did a great job in covering that with you, I think, but do you understand that ultimately -- and I guess it gets down to the proverbial bottom line as your service as a juror is concerned, at least, that we would expect and the law would demand, of course, that you keep an open mind, as you said you would, not prejudge anything, not jump to any conclusions whatsoever, but listen attentatively to all of the evidence.  If we prove a defendant's guilt, it's very simple, you must -- beyond a reasonable doubt, of course, you must find the defendant guilty.  Just as surely and just as clearly as if we fail to do that, Mr. Perry, that you must find the defendant not guilty.  Any problem with that?

A.   No.

Q.   The law would require we prove these other things, the intentional nature of the crime, one or more of the aggravating factors, and then, of course, if the defendant wishes to, as you know, he can provide proof on mitigating

factors, things that might tend to lessen the seriousness of the crime or your evaluation of him as a person. That's fair enough, isn't it, sir?

A.   Yes.

Q.   Let's look at those briefly on Roman numeral four. You may hear, for example, testimony -- and this only needs to be proven to you to establish a mitigating factor by a preponderance of the evidence, not by proof beyond a reasonable doubt, that equally culpable defendants -- do you know what that means?

A.   Uh-huh.

Q.   Okay. Somebody that's equally blameworthy, another defendant -- for example, you may hear evidence that this individual or individuals may not be receiving the death penalty, and you will have explained to you, for example, or you may have explained to you why that is so. Okay?

A.   (Nods head.)

Q.   Do you understand if that is proven to you or established by a preponderance of the evidence, the law would expect you to consider that --

A.   Uh-huh.

Q.   -- as a mitigating factor?

Now, just like the aggravating factors, how much consideration or how little consideration is a judgment call that really you're paid to do, really, as a juror.

A.   Okay.

Q.   Can you do that?

A.   Yes.

Q.   How do you feel personally about equally culpable defendants?  Let's say another defendant not -- first off, if you decide that yes by a preponderance of the evidence he's equally culpable, how do you feel?  How does that strike you?

A.   A little bit of a bad taste in that it's independent of this person's guilt and all the factors, something totally independent to that defendant could affect his outcome or his punishment, but on the other hand the gut feel says you can't let one guy off, not impose death on one guy and impose death on another person.  That doesn't seem fair either.  So I see the logic.  I guess it depends on why -- the aggravating part is why one person got off, because they turned over other evidence or the loophole gets the first person off is what would bother me, but once one person got off --

Q.   Any reason, sir, why you can't wait and listen to all the facts, once you've heard them all, and decide that particular issue or weigh that issue against any of the other aggravating factors and make your decision?

A.   No.

Q.   Do you think you can do that?

A.   I think I can.

Q.   Okay.  Some people would say, also, one other matter here

that I don't think I touched on, that if you have -- and you do in this sort of a case have an option of a sentence of life without the possibility of release as well as the death penalty, they say, well, if I have the option of sentencing somebody to the penitentiary for the rest of his or her life, I would never vote for the death penalty.  Some people might say that.  How do you feel about that?  There would never be a death penalty as long as there is an option of life without the possibility of release.  What's your impression of that?

A.    I think I would have to weigh the factors, the mitigating and aggravating factors.  If there's enough aggravating factors or serious enough aggravating factors, then I don't think I would try to hedge my bet by saying I would never impose the death penalty.

Q.    Okay.  Keep an open mind, as you said before?

A.    (Nods head.)

Q.    I'm out of time, Mr. Perry.  Do you have any questions of me at all at this time?

A.    No, I don't believe so.

Q.    Do you know of absolutely any reason, whether we touched on it here this morning or not, why you couldn't be a fair and impartial juror in this case?

A.    No, I do not.

Q.    Do you think you could, like you said before, keep an open mind until every last stick of evidence is in before you

decide?

A.   Yes.

Q.   Can you promise us that, sir?

A.   Yes.

Q.   I appreciate it, sir.  Thank you very much.

THE COURT:  Mr. Kearney.

DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.   Mr. Perry, if you were serving on a jury in a case like this and you had found someone guilty beyond a reasonable doubt of the allegation of kidnapping and as a result of that kidnapping causing the death of someone, all right?

A.   Uh-huh.

Q.   And then you would go in the second phase of the trial, and then the jurors would decide what the appropriate punishment should be.

A.   Uh-huh.

Q.   Basically we're talking about death or life without the possibility of release.

A.   Okay.

Q.   The first thing the jury would determine is whether or not the defendant on trial engaged in some intentional conduct that caused the death that's there on the first page.

A.   Uh-huh.

Q.   And then if the jury found one of those intentional acts