# EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | . Criminal No. |
| | . 4:94-121-Y |
| vs. | . |
| | . Fort Worth, Texas |
| ORLANDO CORDIA HALL | . October 13, 1995 |
| | . 8:30 a.m. |

. . . . . . . . . . . . . . . . . .

VOLUME 8
TRANSCRIPT OF TRIAL
(Individual Voir Dire Examinations)
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
AUG 16 1995
NANCY DOHERTY
BY _____

APPEARANCES:

For the Government:    Mr. Richard Roper,
                       Mr. Paul Macaluso,
                       Ms. Delonia Watson and
                       Mr. Christopher Curtis
                       Assistant United States Attorneys
                       1700 Burnett Plaza
                       801 Cherry Street
                       Fort Worth, Texas   76102
                       (817) 334-3291

For the Defendant:     Mr. Michael Logan Ware
                       Attorney at Law
                       Law Offices of Michael Logan Ware
                       The Bryce Building
                       909 Throckmorton St
                       Fort Worth, Texas   76102
                       (817) 338-4100

                       Mr. Jeff Kearney
                       Attorney at Law
                       Jeff Kearney & Associates
                       Sundance Square
                       120 W. Third Street, Suite 300
                       Fort Worth, Texas   76102
                       (817) 336-5600

ORIGINAL

U.S. District Court

Official Court Reporter:       Deborah M. Roberts, CSR
                               523 United States Courthouse
                               501 West 10th Street
                               Fort Worth, Texas  76102-3637
                               (817) 239-2037


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

U.S. District Court

INDEX

| Venire Persons: | Voir_Dire_Examination_by: | | |
| | The Court | The Government | The Defense |
| --- | --- | --- | --- |
| Jacqulyn Kay Holmes | 30 | 31 | 42 |
| Linda Harrell | 55 | 56 | 67 |
| Doris Manning | 78 | -- | -- |
| Joyce Browning | 84 | 88 | 92 |
| William Thomas Merrill | 99 | 103 | 112 |
| Patsy Brandon | 121 | 123 | 132 |
| Ricky P. Lynn | 140 | 144 | 154 |
| Deborah L. Baker | 164 | 165 | 172 |
| Susan Norman | 177 | 179 | 191 |
| Ronald Gene Martin | 202 | 202 | 213 |

Q.    Okay.   Well, I appreciate your willingness to do that.

You -- from my perspective we made eye contact a lot while we were discussing this over here.   You seemed to be following what I was saying and grasping it.   Is that a fair assessment?

A.    Yes, sir, I think so.

Q.    Did you have any questions about anything that we covered that relates to the death penalty procedure?

A.    No, sir.

Q.    Okay.   Then that being the case, I think that's all the questions that I have for you, and I'll allow the government to ask you questions for about ten minutes.

A.    Okay.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.    Good morning, ma'am.

A.    Good morning.

Q.    I'm Paul Macaluso.   I'm one of the prosecutors assigned to this case.   I'm an assistant United States attorney, as are my colleagues here, and we're representing the government in this particular case.

A.    Uh-huh.

Q.    As you know the next table over the young man in the middle there is the defendant, Orlando Hall.

A.    Uh-huh.

Q.   And to his left, of course, is Mr. Ware, one of his attorneys practicing --

A.   Good morning.

Q.   -- here in Fort Worth, and I believe the young lady at the end -- I'm not trying to slight her, but I don't know her name.

          MR. WARE:   That's Janna Parker.   She's my legal assistant.

BY MR. MACALUSO:

Q.   So we're just kind of reacquainting you with --

A.   Okay.

Q.   -- who we are and what our roles are in this case.

     We want to talk to you in the time that's been allotted to us about some things that may come into play during a trial of this type of a case, obviously a very serious case, and in fact so serious that the law allows us and the judge has allowed us to talk to you individually as we're doing now in the hopes that you'll relax, feel more -- a little bit more comfortable amidst all these strangers and free about your comments and your ability to express your feelings about these matters.   Okay?

A.   Okay.

Q.   There are no right answers, there are no wrong answers.

A.   Right.

Q.   No one is going to argue with you.

A.    I understand.

Q.    The judge, he wouldn't let us do it if we wanted to.

But if there's a question you have at any time, feel free to ask us.

A.    Okay.

Q.    If there's something you would like to tell us, you know, that may affect your service as a juror, this is the time to do it.  You understand that, of course.

A.    (Nods head.)

Q.    Let me tell you where we stand or what our position is with regard to this case.  Ms. Harrell, we're actively seeking the death penalty in this case for that young man in the middle of the next table.

A.    Uh-huh.

Q.    You know that the law allows for it under the proper circumstances, and we expect to provide this jury once the trial begins with the type and quality of evidence that would convince them in both phases of the trial that that's appropriate.  Okay?

A.    Uh-huh.

Q.    Ultimately, however, you understand that's up to the jury.  That's not our decision.

A.    Right.

Q.    The ultimate decision is based on the jury and based, obviously, on the evidence once it's presented.

A.    (Nods head.)

Q.    Now, you were asked a myriad of questions in this questionnaire.

A.    Yes, sir.

Q.    More than you care to answer, I'm sure.  I know I would feel that way.  And some of it's focused, obviously, on your feelings about the death penalty.  In your own words, ma'am, how do you feel about the death penalty?

A.    I believe in the death penalty.  I believe it's -- I don't know if the word is appropriate.  I believe it's deserving in some cases under the right circumstances.  I just socially and morally just believe that it's okay --

Q.    Okay.

A.    -- to under some circumstances to take the life.

Q.    All right.  You say under some circumstances.  You understand from the comments of His Honor this morning that that's pretty much the way the law looks at it.

A.    Right.

Q.    Not all circumstances, some circumstances --

A.    Right.

Q.    -- as defined by law, and then ultimately as defined by the jury.

A.    Right.

Q.    And that's based on the evidence.  But you understand, Ms. Harrell, that before you and any other individuals will be

impaneled and become a jury in a case of this nature, you would raise your right hand and take a sworn oath to render a true verdict according to the law and according to the evidence.

A.    Uh-huh.

Q.    Do you know of any reason why you couldn't do that knowing the death penalty was a possible option in a case of this nature?

A.    I would be able to do it.

Q.    Okay.  And do you have any questions at all or any comments at all about the procedure as the judge set out this morning?

A.    No.

Q.    Do you think that makes sense the way --

A.    Yes.  The only comment I have to make is that I wasn't sure until he explained this morning about aggravating and mitigating circumstances.  I didn't know whether if the law defined where the death penalty is to be implied or not, and that made a lot more sense to me.

Q.    You didn't understand it before?

A.    I didn't understand it before.  You know, I knew that it was -- it says, you know, that you ask for it and you can get it, but I didn't realize -- I didn't know if you reach this many points of the law then it's automatically that it happens or what until he explained this, and that makes a lot more

sense to me now that he explained that about the aggravating and mitigating circumstances.

Q.    And I agree with the judge when he said that maybe at first it sounds a little complicated, but in the final analysis, after all the evidence is in and you weigh the good and the bad --

A.    Right.

Q.    -- and all of the facts you hear from the trial, and then you make a decision.

A.    Right.

Q.    Is there any reason why you could personally not do that, actually serve on a jury like that and make that ultimate decision?

A.    No, sir.  I should be able to.

Q.    Okay.  Now, back to the death penalty for a second, what sorts of offenses do you think the death penalty would be appropriate for just in your heart of hearts, in your own mind?

A.    A heinous crime of murder, something very violent.

Q.    Okay.

A.    Premeditated.

Q.    All right.  Now, you understand, of course, a prerequisite for anything, of course, is a finding of guilt.

A.    Uh-huh.

Q.    We have the burden of proof.  We have to prove the

defendant's guilt in the first part of the trial, as the judge told you. Then we also have to prove in the second part of the trial the aspect of intentional conduct.

A.   Right.

Q.   That it was intentional conduct. That seems to make sense, too, doesn't it?

A.   Uh-huh.

Q.   All right. And then, as the judge said, even more than that, we have to prove at least one of these aggravating factors. More if the evidence is there, obviously, but we have to prove at least one aggravating factor for the jury to even be able to consider much less vote for the death penalty.

A.   Uh-huh.

Q.   And you have those on your sheet there on page -- Roman numeral two.

A.   Uh-huh.

Q.   There are four aggravating factors that are set out there. Let me ask you this: Do those -- looking at those and then those on the next page where there are three more, let me ask you, do those strike you as things that you might like to know or you feel you may need to know about somebody who you're deciding the death penalty?

A.   I would think so.

Q.   Do you think those are kind of pertinent things?

A.   Yeah.

Q.    Whether it was a heinous crime or whether there was substantial planning or whether the victim was vulnerable, the person's past record, future dangerousness, things of that nature?

A.    Right.

Q.    Okay.  Now, you understand we have to prove at least one of those.

A.    Uh-huh.

Q.    All right.  And we have to prove those by a preponderance-- pardon me, by proof beyond a reasonable doubt.

A.    Right.

Q.    Let's look at the third Roman numeral there.  That's -- those are -- did I say the third one?  I meant the fourth one, I'm sorry.

Those list some mitigating factors, and those are things that a defendant -- and I'm speaking hypothetically now, not about Mr. Hall but just a hypothetical defendant.  Those are things that the law has labeled mitigating factors, and the judge discussed those with you.  And those are things that he may, if he wishes, establish to a juror -- to the jury by proof that's of basically a preponderance of the evidence. That's far less than proof beyond a reasonable doubt.

A.    Right.

Q.    Let's look at that first one, A, equally culpable defendants.  And again speaking hypothetically, let's suppose

you are on a jury and you hear all of the evidence, and the evidence establishes for you by a preponderance of the evidence that there's more than one person involved in a particular offense, in a killing for example, maybe two or three. And you decide in your mind and the other jurors -- or any one juror decides that, yes, any one of those other defendants was equally blameworthy, just as guilty, basically, in this particular crime as the man who's on trial. Okay?

A.    Uh-huh.

Q.    If that's so, in other words if that mitigating factor is established, the law requires that you and the other jurors consider that, do you see --

A.    Uh-huh.

Q.    -- in deciding whether or not a death penalty is appropriate or not.

A.    Uh-huh.

Q.    In which case whether a life sentence without the possibility of release is appropriate. Is there any reason why you couldn't consider that?

A.    No.  I should be able to.

Q.    Okay.  It's not binding on you, you understand that?

A.    Right, right.

Q.    That's one of those things that ultimately -- like in that fourth page where you weigh the aggravating factors --

A.    Right.

Q.     -- to the mitigating factors, and you decide whether or not the aggravating factors substantially outweigh the mitigating factors.

A.     Uh-huh.

Q.     In which case you see where a death penalty would be appropriate, I gather.

A.     (Nods head.)

Q.     And if not, then a sentence of life without the possibility of release.

A.     Right.

Q.     Now, you understand with regard to the aggravating factors just as well as the mitigating factors, there are degrees of -- with regard to those things, in other words an aggravating factor, for example let's say premeditation, and the evidence may show there's a lot of premeditation, maybe less premeditation.  You see how those things are variable just as the mitigating factors might be variable?

A.     Right.

Q.     One thing I want to discuss with you in the time remaining, sometimes people say, well, you know, if there was such a thing as a sentence of life without any possibility of release ever, in other words where a person would spend the rest of his or her life behind bars, realistically I don't believe I could ever vote for the death penalty because life without the possibility of release is good enough.  And others

say, well, no, I could still consider it.  How do you feel in that regard?

A.   I could still consider the death penalty.

Q.   You have not -- in other words, you have not closed your mind to either one?

A.   No, no.

Q.   In fact, is there anything about -- or any aspect of the case that we've talked about that you've got a closed mind as to?

A.   Not that I'm aware of.

Q.   Then I guess the ultimate question, Ms. Harrell, is this: In the proper case where the law allows for it and the facts call for it, is there any reason why you could not assess a sentence of death?

A.   No.

Q.   Just the same as in the proper case where the facts called for it and the law allows for it, is there any reason why you could not assess a sentence of life imprisonment without the possibility of --

A.   No.

Q.   And I think the judge has in the past, and I can't recall this morning whether you've heard the clean slate.

A.   Uh-huh.

Q.   But do you feel like you do have a clean slate and a clear mind as you sit here today?

A.    Yes, sir.

Q.    Is there any reason why you couldn't give Mr. Hall a fair trial?

A.    Not that I'm aware of.

Q.    Or the government?

A.    Not that I'm aware of.

Q.    Do you have any questions of me at all?

A.    No, sir.

Q.    I appreciate it, Ms. Harrell.  Thank you very much.

MR. MACALUSO:  That's all the questions I have.

THE COURT:  Mr. Ware.

MR. WARE:  Thank you, Your Honor.

DEFENSE VOIR DIRE EXAMINATION

BY MR. WARE:

Q.    Good morning, Ms. Harrell.

A.    Good morning.

Q.    My name is Mike Ware.  I know we've been introduced about three times now.

I want to talk to you a little bit about this statutory -- or what we call a statutory, which means passed by Congress, mitigating factor of equally culpable codefendants.  Now, I know it's been explained that before that even becomes a factor or an issue in a case where the government is seeking the death penalty, the 12 folks who are on a jury such as that would have to have found the individual

A.    Right, yes.

Q.    Do you have any questions of me?

A.    No.

Q.    Can you look at Mr. Hall and tell him that you can give him a fair trial?

A.    I feel I could if I had enough presented.

Q.    Thank you, ma'am.

        MR. ROPER:  Your Honor, could I have a question on another matter?

        THE COURT:  All right, briefly.

                GOVERNMENT VOIR DIRE EXAMINATION

BY MR. ROPER:

Q.    I don't know if you said what type of surgery you were going to have.  I've been on juries before where jurors have surgery, and it's difficult for them to sit all day long.

A.    It's outpatient surgery.  It's just a scope surgery.

Q.    All right.  It wouldn't cause you any problems sitting.

        THE COURT:  All right.  Thank you very much.  You've been very kind to sit and wait on us and be patient with us and answer the questions forthrightly.  We'll let you know in about ten days, and in the meantime please don't discuss the case with anyone or what you did here today, including those at home, and please avoid all media coverage.

        MS. BARKER:  Okay.

        THE COURT:  Thank you.