EXHIBIT 31

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | . Criminal No. |
| | . 4:94-121-Y |
| vs. | . |
| | . Fort Worth, Texas |
| ORLANDO CORDIA HALL | . October 2, 1995 |
| | . 2:10 p.m. |
| . . . . . . . . . . . . . . . . | |

VOLUME 1
TRANSCRIPT OF TRIAL
(Individual Voir Dire Examinations)
BEFORE THE HONORABLE TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
AUG 16 1996
NANCY DOHERTY, CLERK
BY_____
Deputy

APPEARANCES:

For the Government:        Mr. Richard Roper,
                          Mr. Paul Macaluso,
                          Ms. Delonia Watson and
                          Mr. Christopher Curtis
                          Assistant United States Attorneys
                          1700 Burnett Plaza
                          801 Cherry Street
                          Fort Worth, Texas   76102
                          (817) 334-3291

For the Defendant:        Mr. Michael Logan Ware
                          Attorney at Law
                          Law Offices of Michael Logan Ware
                          The Bryce Building
                          909 Throckmorton St
                          Fort Worth, Texas   76102
                          (817) 338-4100

                          Mr. Jeff Kearney
                          Attorney at Law
                          Jeff Kearney & Associates
                          Sundance Square
                          120 W. Third Street, Suite 300
                          Fort Worth, Texas   76102
                          (817) 336-5600

ORIGINAL

Official Court Reporter:    Deborah M. Roberts, CSR
                            523 United States Courthouse
                            501 West 10th Street
                            Fort Worth, Texas   76102-3637
                            (817) 239-2037


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

U.S. District Court

INDEX

| Potential Jurors: | Voir Dire Examination by: | | |
|---|---|---|---|
| | The Court | The Government | The Defense |
| Rita Smith | 77 | 29 | 54 |
| Dana Lynne Crittendon | -- | 90 | 114 |

THE COURT:  All right, go ahead.

MR. MACALUSO:  Thank you very much, Your Honor.

DANA LYNNE CRITTENDON,

having been sworn as a venire person, testified as follows:

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.    Good afternoon, Ms. Crittendon.  Let me begin by reintroducing everybody here briefly.  My name is Paul Macaluso.  I'm an assistant United States attorney.  I'm one of the lawyers representing the government in this particular case, along with Richard Roper to my immediate left, Delonia Watson next to Mr. Roper.  We're all assistant United States attorneys.  We work for the Justice Department, and we're representing the government.  I left Mr. Curtis out.  He's back there, as well, and I didn't mean to slight him.  But the four of us are assigned to this case.  We represent the government.

Sitting at the next table, the gentleman to my immediate right is Mr. Jeff Kearney.  To Mr. Kearney's immediate right is the defendant, Orlando Hall.  To Mr. Hall's immediate right is Mr. Michael Ware, and to Mr. Ware's immediate right is Kevin McNally.  You were introduced to the defendant, in fact you were introduced to all of us, I believe, except Mr. McNally and Mr. Kearney about ten days ago when you were up here.

Do you know or recognize any one of us other than from those introductions at all?

A.    No, I do not.

Q.    Okay.  You know, of course, and have known for ten days that you are a prospective juror on a case in which the death penalty is an option.  It's the most serious level, the most serious type of offense or category of offenses a person can be charged with.

And let me -- you've been on a jury before so you know the ordinary procedures, you come down and you sit out in the gallery there, and the lawyers talk to you perhaps individually and ask you questions, and you respond in front of God and the world and everybody else over there.

A.    Uh-huh.

Q.    The law permits us and the Court has permitted us in this instance, because of the very serious nature of the potential penalties here, to interview you individually, the hope being that you'll be a little bit more relaxed, feel a little bit more comfortable, be able to express yourself without being critiqued by 50, 60 other people.  So let's take advantage of that if we can, Mrs. Crittendon, relax as much as you can.

Bear in mind that the Court told you that there are no right answers, no wrong answers.  No one is going to try to talk you into anything, talk you out of anything.  Just tell us what's in your heart and what's on your mind, and you'll be

doing your job.

Now, if you want to ask questions, this is the time to do it, and don't be bashful about that. We'll try our best to answer whatever question may be raised at any time you wish to ask it, all right.

A.    Yes.

Q.    And if I get going real fast -- we're on time limits here. If I get going real fast and I'm not making myself clear, you don't understand me, throw the anchor out and I'll stop, okay?

A.    (Nods head.)

Q.    Okay. Now, I said, and you know, of course, from your coming up here ten days ago that this obviously is a very serious case, the nature of the penalties being what they are, because there's only -- there are really three penalties that are potential in this case. One would be a sentence of death, the other would be a sentence of life without the possibility of release, and the other one would be basically some other sentence we'll talk about later.

But the defendant is charged with an offense, in fact he's charged in four counts of an indictment of basically alleging in the first count that he kidnapped an individual, he along with some other people kidnapped an individual, a young lady by the name of Lisa Rene. Does that name ring a bell to you?

A.    I had heard that before.

Q.    Something on the radio or TV or something?

A.    Right.

Q.    Well, we'll get to that in just a second.

And that kidnapping resulted in her death.  The second count basically alleges a conspiracy to commit that kidnapping, that's an agreement to basically violate the law. We're going to be talking not about the other counts, but just about those two primarily, and really focusing in on the first count which involves the kidnapping which resulted in death.

And I said there were three possible penalties, Mrs. Crittendon.  Let me tell you from the outset so that we're as clear with our position as we can possibly be in fairness to you and fairness to the defendant, just an overall fairness.  Ma'am, we're actively seeking the death penalty in this case for this defendant.  Ultimately it will be up to the jury to decide, but it's only fair to you to let you know at least what we're seeking based on the evidence that we intend to present to this jury once the trial itself begins, okay?

A.    (Nods head.)

Q.    Like I said, that's our position.  That's not what really counts.  What really counts is how you and 11 other people who would actually be making those decisions, how you feel based on the evidence once the trial begins, okay?

A.    (Nods head.)

Q.   Okay.   Now, you know, you filled out about 120-some page -- or question questionnaire that's probably asked you more questions than you could even imagine anybody could think of.  The ones that are probably central or of particular interest more than any others is the questions on the death penalty and your ability to serve.

Can you share with us just in your own words what your personal feelings are about the death penalty or capital punishment and your ability to actually serve on this type of case if you're called upon to do so?

A.   I think it's unfortunate that we have to have the death penalty, but I think that it's necessary.

Q.   Okay.

A.   I have no -- it's a little hard to articulate that.

Q.   Sure.  Let me --

A.   It's unfortunate, but I do not have -- I would not have difficulty in delivering that as a verdict.

Q.   Okay.  Let me ask you basically, and I think this is going to be kind of a refrain as I talk to you, I gather maybe what you're going to do in a case, in any case you are going to serve on, is going to depend on the facts and the evidence; am I reading you correctly?

A.   Right.

Q.   And no one, of course, at this point, Mrs. Crittendon, is for a moment going to try and pledge you or try to commit you

to any particular course or any particular verdict.  We can't do that.  It wouldn't be proper for us to do that, okay?  So we're going to be speaking hypothetically.  We're not going to speak -- I can't talk to you about the particulars that would be offered in this particular case.  I can speak in some degree and some generalities, but what we're looking for ultimately -- and I'm going a little bit ahead here I know -- are people who have an open mind, who are capable of making tough decisions, mature decisions, but will do so only when and if they have heard all of the evidence on which to base those decisions.  Am I reading you right if I say a juror needs to be that type of individual?

A.    I believe so, yes.

Q.    Okay.  Now, you said you regrettably believe -- you believe the death penalty is kind of unfortunate that we have to have it, but do you believe it serves a particular purpose in society?

A.    Yes.

Q.    Okay.  For example?

A.    Possibly as a deterrent.

Q.    Okay.  And you think it may be a deterrent; is that correct?

A.    Possibly.

Q.    Have you ever felt differently about it?  Some people go through a period of life where they may be for it, against it,

maybe at some point they're against it and they change, situations or factors change in their life where they reevaluate their position.  Have you ever felt differently?

A.    No.

Q.    Do any particular types of offenses come to your mind, the types of offenses where, again, depending upon the facts, come to your mind that you feel that the death penalty might be justified?

A.    Premeditated murder.

Q.    Okay, murder.  The reason I say this, some people say, well, I believe that people who get little kids hooked on dope ought to get the death penalty, some people say I think mass murderers ought to be the ones, only mass murderers, people who kill the presidents -- or the president or public officials or kill police officers or little babies or something like that, or it has to be a mass murderer.  Do you feel that the death penalty, or recommendation of the death penalty as would be the situation potentially in this case, could be considered by you and actually voted for by you for the death of one individual depending upon the facts and circumstances?

A.    Yes.

Q.    You said -- in particular you talked about a premeditated murder; is that correct?

A.    (Nods head.)

Q.    Let me ask you, ma'am, Mr. Crittendon, do y'all more or less agree on the position of the death penalty, or does he have a position that's different than yours?

A.    No.  I believe -- we haven't discussed it recently, but I believe he shares the same feelings that I do.

Q.    Okay.  Now, let me ask you, do you know of any reason -- you've said you were -- you believe for certain purposes the death penalty possibly as a deterrent.  Do you know of any reason, ma'am, why you would be unable to sit on this particular case or in a capital case as a juror and actually render that decision, actually listen to all of the evidence, as I said earlier, make the tough decisions, and if you felt it was proper, recommend a sentence of death in a case depending upon the facts?

A.    If I was convinced, depending on the facts, that the person was guilty of that crime --

Q.    Okay.

A.    -- then I have no problem rendering that decision.

Q.    Okay.  Let's talk a little bit -- let's talk a little bit about the procedure involved in this type of case.  Actually, in a sense it might be said that there were actually two trials in a capital murder trial or in a capital case.  The first part deals solely and exclusively with the guilt or the innocence of the person who's charged.  And again, Mrs. Crittendon, I'm not going to get into the facts of this

particular case.  We'll just speak in a hypothetical case.

Let's assume, for example, you're a juror.  You've taken one of those chairs over there behind you.  And by the way, you've been on a jury before, haven't you?

A.    (Nods head.)

Q.    So you're familiar with the procedure, are you not?

A.    Yes.

Q.    All right.  In many respects the procedure in this case as to guilt or innocence would be very similar to the procedure you were involved with in the state trial.  You understand we've done the accusing in this indictment.  We've charged the defendant with certain offenses, very, very serious offenses, and the law permits that.  At the same time the law demands, expects and requires that we do all of the proving if we expect you to find the defendant guilty.  Do you have any problem with that?

A.    No.

Q.    Would you hold us to our burden of proof?  We have the exclusive burden of proof.  We have to prove all the elements and all the allegations contained in this indictment if we expect you to convict the defendant.

A.    Yes.

Q.    It's very simple, you see.  If we do, then you must find the defendant guilty.  If we don't, you must find the defendant not guilty.

A.    I understand.

Q.    It's just that simple.

Obviously if the defendant is found not guilty in a hypothetical case, it's over, no punishment, of course.  If, on the other hand, you and the other jurors unanimously agree that he has been proven guilty beyond a reasonable doubt, then we go on and have basically what we call -- we have a second trial, basically, or a second phase.  The first one dealt with guilt or innocence only.  This deals with the penalty only, what is the proper penalty based on the totality of the evidence that's presented to you, okay?

A.    (Nods head.)

Q.    Okay.  Now, the distinction here -- and there are some new aspects of the law that we are going to discuss here that come into play in this type of a case.  Basically you're going to be called upon at the end of all of the -- whatever evidence you may hear in the second phase of the trial to decide whether or not certain things have been proven to you.  By statute the laws have put certain types of labels or designated certain facets or aspects of the case.

For example -- and by the way, these are things that we, the government again, have the exclusive burden of proving to you beyond a reasonable doubt and unanimously, in other words all the jurors, of course, if expect you to be even able to consider, you see, a sentence of death.

Let me give you an example:  These things are called aggravating factors.  And I don't want to minimize the lawmakers and the phrase they use, and I'm certainly not being critical, but basically what they are, that's a descriptive term to things that I think you would agree, most people would agree, would be the bad part of a person's background or conduct, okay?  Things that are aggravating, things that would make a case or circumstance worse.

By the same token, we'll be talking a little bit about some things that are called mitigating factors that may minimize a person's conduct, make it not so bad, okay?

A.    (Nods head.)

Q.    Now, let me tell you this:  The law requires, Mrs. Crittendon, just as we must prove the defendant guilty beyond a reasonable doubt in the first part of the trial, the law requires that we must prove to you at least two aggravating factors in the second part of the trial, again beyond a reasonable doubt and unanimously, before you could even consider the death penalty as a possible penalty.  Am I making myself clear?

A.    Uh-huh.

Q.    The first one has to do, ma'am, with basically whether this was a -- whether the death of the individual, in this instance Lisa Rene, was done in any one or more of the following ways, okay?

MR. KEARNEY:  Your Honor, we're going to object to his characterization of those as aggravating factors.  They're not aggravating factors under the statute.

THE COURT:  What were they?

MR. MACALUSO:  The culpable mental state, basically, the four culpable mental states, whether he acted intentionally and the others that are set out by statute.

THE COURT:  I sustain the objection.

BY MR. MACALUSO:

Q.    Let me back up for just a second.

We must -- we would have to prove to you that the murder of the victim was carried out in at least one of the following ways, okay:  Either, A, that she was intentionally killed, or he, the defendant, intentionally killed the victim; or B, intentionally inflicted serious bodily injury that resulted in the death of the victim, okay?

A.    (Nods head.)

Q.    Or C, intentionally participated in an act contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person other than one of the participants, in other words other than one of the other persons involved in the crime, and that the victim died as a result of that act, okay?  And lastly, that he intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a

person, again other than one of the participants in the crime, in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a result of that act.

Now, we are charged, required to prove to you that the murder occurred in any one or more of those ways, do you see? And we must prove that to you beyond a reasonable doubt unanimously. Can you see how those -- that -- you know, there could be proof to establish that depending upon the type of evidence that you hear during the course of the trial?

A.    (Nods head.)

Q.    Any problem with that at all?

A.    No.

Q.    Okay. Do those seem relevant to you, that you have some idea of whether the person acted intentionally, for example, that a defendant -- in deciding life or death, do those seem relevant to you?

A.    Yes, they do.

Q.    Those considerations?

Now, let me mention, also, that you may consider in bringing to bear whether the government has proven these to you beyond a reasonable doubt all of the evidence that you heard in the first part of the trial where you learned about the offense itself, and any additional that may be offered to aid you in answering these questions. Do you see what I'm

getting at?

A.    Yes.

Q.    Can you see how they could be answered yes or no depending upon the evidence?

A.    Yes.

Q.    Well, actually not answered yes or no, whether or not the proof measures up depending upon the evidence.

All right.  Next -- that's the first step.  The next thing we have to do is prove to you at least one aggravating factor, and in this particular instance in this case we've alleged four aggravating factors, actually four what they call statutory -- they're set out actually by statute, and these are four different categories.

A)  That the death occurred during the commission of another crime, the death or injury resulting in death occurred during the commission or attempted commission of or during the immediate flight from the commission of an offense.  In this case we've alleged a kidnapping, okay?

A.    (Nods head.)

Q.    Or B), there's another aggravating factor.  We must prove to you at least one of these, okay?  That it was a heinous, cruel or depraved manner of committing the offense, that the defendant committed the offense in an especially heinous, cruel or depraved manner in that it involved torture or serious physical abuse to the victim.  You see, here's another

aggravating factor that we've alleged.

C)   That there was substantial planning and premeditation, that the defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism; and

D)   That we have a vulnerable victim, that is the victim was particularly vulnerable because of age, youth or infirmity.

Okay.  Let me ask you, do you think those particular aggravating factors, to the limited extent, Mrs. Crittendon, that I've gone over them with you here, do those appear to be serious considerations to you, at least, in deciding whether or not somebody should be recommended for a sentence of death or a sentence of life without possibility of parole?

A.   They do seem relevant.

Q.   I'm sorry, ma'am?

A.   Yes, they should be considered.

Q.   Okay.  You understand that the only way you'll even be able to consider it is if we prove those other factors, initial factors, by how it was done and those other things. We can also prove, the law --

THE REPORTER:  You're going to have to slow down. I'm wearing out.

MR. MACALUSO:  Okay.

BY MR. MACALUSO:

105

CRITTENDON/VOIR DIRE/MACALUSO

Q.    That we can also prove other nonstatutory aggravating factors.  For example, the impact on the victim and her family, okay?  Future dangerousness, the person represented danger to society or wherever this person or individual may be in the future, and then a person's prior criminal history, if any.  In other words, does he have a record, does he have prior convictions for certain types of offenses.  Can you see how all these may come into play?

A.    Possibly.

Q.    Okay.  You have some hesitation there.  Tell me about it.

A.    These are other factors that can be considered in what portion of this process?

Q.    These are factors that would be considered or could be considered by the jury in the punishment phase of the trial.

A.    Okay.

Q.    Okay?  Now I've referred to these things as aggravating factors.  The defense can allege, if they wish to offer proof. of what they call mitigating factors, things that may -- that you could consider in deciding whether or not, well, yeah, the government's proved these aggravating factors hypothetically, well, we have some good things to tell you and we want you to consider those things.  Do you see?

What ultimately happens here is that at the end after all the evidence is in, ma'am, you and the other jurors will be expected, assuming one -- of course, we have to prove at least

U.S. District Court

the portion with regard to whether it was done intentionally or a culpable mental state, as we call it, and at least one aggravating factor, at least one for you to even consider this. You basically would go back, you would look at the aggravating factors that have been proven, look at any mitigating factors -- and by the way, they only have to be established by proof of by a preponderance of the evidence, what's more believable. And it can be done by only one juror, as far as that goes.

But you weigh the aggravating factors against the mitigating factors, and you make a decision. And if the aggravating factors outweigh any mitigating factors that you believe have been found by the evidence, then you can recommend a sentence of death. Any problem with that at all?

A.    No.

Q.    At least the procedure?

A.    No.

Q.    Now, if there are no mitigating factors, then you decide and the other jurors decide whether the aggravating factors alone, to your way of thinking, are sufficient to warrant a sentence of death.

A.    (Nods head.)

Q.    Any problem with that?

A.    No.

Q.    Do you know of any reason, Mrs. Crittendon, why you

couldn't do that?

A.    No.

Q.    Depending, again, on the evidence.

A.    No.

Q.    All right.  Now, let me ask you, we've talked about the death sentence and our position about the death sentence.  Let me ask you with regard to a sentence of imprisonment without the possibility of release, what sorts of things do you feel would be persuasive or influential or what you would like to know about an individual if you were making this decision as to whether or not maybe a person should receive a sentence of life without parole?  I said parole.  It's actually life without the possibility of release.

A.    The previous offenses.

        MR. KEARNEY:  I'm sorry, I didn't hear.

        MS. CRITTENDON:  I'm sorry, previous offenses, convictions.

BY MR. MACALUSO:

Q.    Okay.  Previous -- whether this individual has been convicted of other things before?

A.    Yes.

Q.    Like offenses or other offenses, just serious offenses, or what comes to your mind?

A.    Serious offenses.

Q.    Okay.  And let me ask you, knowing that a -- knowing that

a sentence of life without the possibility of release is one of the options that you have before you, let me ask you, do you feel that you would be inclined or more inclined to vote for that over a death sentence knowing that other sentence exists, life without the possibility of release, or could you give fair consideration to both of them, depending upon the facts?

A.    I believe fair consideration to both of them.

Q.    In other words, the possibility of life without parole would not rule out, I gather, your serious consideration of the death penalty, again, depending upon the facts?

A.    That's correct.

Q.    Okay.  Now, do you have any questions at all of anything I've said to this particular point, ma'am?

A.    No, I do not.

Q.    All right.  Do you think you know anything about this case other than what you've heard on the radio --

A.    No.

Q.    -- or TV?

A.    No.

Q.    That's not going to influence you if you're selected?

A.    I'm sorry?

Q.    That's not going to influence you if you're selected as a juror on this case, anything you may have heard?

A.    I don't know of anything that would influence me.

Q.    In other words, the judge will instruct you and you obviously know that you will render a verdict in this case solely and exclusively from the testimony you hear during the course of the trial, and you can do that?

A.    Yes.

Q.    All right.  Now, let me run through a couple of things here.

Do you understand that our burden of proof or the burden of proof in any criminal case, including one of this magnitude, is proof beyond a reasonable doubt, not beyond any and all doubt but beyond any doubt you would have as a juror based on reason?

A.    Yes.

Q.    Would you have any problem holding us to that burden?

A.    No.

Q.    No more and no less, you would have to be convinced beyond a reasonable doubt.  That goes to the proof in the first part of the trial as well as our proof on any of the statutory or aggravating factors in the second part of the trial.  You understand that?

A.    Yes.

Q.    You understand, as the judge told you, the defendant is presumed to be innocent.

A.    I understand.

Q.    The indictment is no evidence.  We have the exclusive

burden of proof.  Any problem with that?

A.   No.

Q.   You understand if the defendant wishes to testify, he may.  If he wishes not to, that's his privilege, that's his exclusive privilege.  And if a defendant in a hypothetical sense chooses not to, you cannot consider that as any evidence whatsoever against him.  Would you have any problem with that at all?

A.   No.

Q.   You were on a jury before.  It was a murder case, I believe; is that correct?

A.   Yes.

Q.   Was there anything about your service on that jury that you feel would interfere in any way, anything that happened with the lawyers or the case itself, the deliberations, that you feel would interfere with your service in this case at all?

A.   No.

Q.   I noticed, also, looking over your questionnaire that you indicate that you knew another one of the prospective jurors on this case.

A.   Yes.  I thought that we worked together, but she was called up at the same time I was this time around, and she no longer works for --

Q.   Oh, was that Patsy --

A.    Duvall.

Q.    -- Duvall?

A.    Uh-huh.

Q.    Okay.  Mrs. Crittendon, let me just ask you at this particular point, do you know of any reason whatsoever, whether I've brought it up or not, anything about your background or your personality, your family commitments or anything like that that you feel would prevent you from being a fair and impartial juror in this case?

A.    I will tell you of my concern, and that is caring for my son.  I am married, but I do have primary responsibility for caring for him, and that entails picking him up at school after day care.

Q.    Okay.

A.    And if the jury were sequestered, it would cause us a large problem.

Q.    What time do you -- what time would you ordinarily be responsible for picking your son up?

A.    I usually pick him up by 5:30.

Q.    By 5:30?

A.    I made a special arrangement for him today.

Q.    This is kind of -- not kind of, this is a matter pretty much within the bailiwick of the Court, and he might --

THE COURT:  Let me pick up there from there.

We would expect to start testimony usually around 9:00

a.m., sometimes as early as 8:30, and go till 5:00, 5:30. Could you handle that?  Could you make arrangements for that?

MS. CRITTENDON:  For that I could, yeah.

THE COURT:  Pardon?

MS. CRITTENDON:  Yes, I could.

THE COURT:  Okay.

Mr. Macaluso, you have about three minutes remaining.

MR. MACALUSO:  Okay.

BY MR. MACALUSO:

Q.    Let me just say one other thing here with regard to what I said earlier about the type of evidence in a hypothetical case you could consider, and these are things that, for example, in the first part of the trial you may learn about what happened before this particular offense, what happened during and what happened after.  These are considerations that you could bring to bear, of course, depending on what they are, in answering the questions.

For example, you may in a hypothetical case learn about whether or not this is a planned or premeditated crime, or whether it's one that was done on the spur of the moment, you see?  What role did the defendant have in the planning or the premeditation, if any.  Was he a leader?  Was he a follower? Can you see how that might influence you in answering -- or making a decision on the penalty phase of the trial?

During the crime itself was he a leader or follower,

calling the shots, giving the shots, or was he some subordinate or in some subservient or subordinate role, how brutal was the crime, how necessary was the brutality, how senseless was it.  Do you see what I'm getting at?

A.    Yes.

Q.    And then afterwards is this the type of person that showed some legitimate remorse or grief about what happened, or was he nonchalant, blaze` about it, business as usual.  You see, there are so many variables that you can take into consideration that are brought to you perhaps in the first part of the trial, then any additional evidence, including any evidence the defendant wishes to bring to you, for example, on the mitigating factors.

In the final analysis, the law expects of you two things, actually:  One, that you follow the law that the judge gives you.  Do you know of any reason you couldn't follow the instructions of the Court with regard to what the law is?

A.    No.

Q.    He gives the law, you understand that?

A.    Yes.

Q.    Any reason why you couldn't just wait, keep an open mind, listen to all of the facts before you make up your mind, and then basically, as the old saying goes, what, make the punishment fit the crime as you perceive it?

A.    I have no problem with that.

Q.    Can you do that?

A.    Yes.

Q.    I appreciate it, Mrs. Crittendon.

The other lawyers are going to have an opportunity to talk to you.  I appreciate you listening to me talk here, and that's all the questions I have for you at this time.  Thank you.

MR. MACALUSO:  Pass the venire person, Your Honor.

THE COURT:  Mr. Kearney.

DEFENSE VOIR DIRECT EXAMINATION

BY MR. KEARNEY:

Q.    Good afternoon.  As you've been told, my name is Jeff Kearney.

And I want to ask you a little bit about anything that you may have heard or seen or read about this case, and the incident occurred about a year ago, September of '94.

A.    Okay.

Q.    A little over a year ago, a few days past a year, and it involved a young lady, girl, in Arlington named Lisa Rene. Have you heard anything about that case?

A.    It was awhile ago.  I didn't know exactly when I had heard it, but I did remember hearing something about it.  And I don't know if I really remembered her name or not, but that someone had been abducted, and I remember that Arkansas was involved.  That's all that I really remember from that case.

U.S. District Court

Q.   Have you read anything or heard anything recently, let's say within the last two or three weeks about this?

A.   No, nothing

Q.   Do you read the newspaper on a regular basis?

A.   Yes.  That's a fair question.

Q.   What newspaper do you read?

A.   Well, I tend to -- I read the Star Telegram, I read the business section, and then I scan the rest.

Q.   Okay.  There was an article in Saturday's paper, a couple days ago.  Did you happen to read that article?

A.   No.  We get the paper at work, so I tend not to read it on the weekends.  Well, I don't read it on the weekends.

Q.   Did anyone -- have you had anyone discuss this case or anything about this case with you, or overhear anybody discuss it or anything like that?

A.   (Shakes head.)

Q.   Prior jury service, you served on a jury back four or five years ago?

A.   It's been awhile, yes.

Q.   And tell me what kind of case that was.  What were the allegations?

A.   I believe that it was murder.  I have to be honest with you, I don't really know if it was -- I believe that was the charge, murder, and it was a man who was charged with stabbing another man.  They had been at a party, and this other man

U.S. District Court

ended up dead somehow, and the man on trial was accused of that.

Q.   Okay.   And do you remember the accused's name?

A.   No.

Q.   And you reached a verdict, a unanimous verdict, the jury did?

A.   Yes.

Q.   And that was not guilty?

A.   That's correct.

Q.   How long did the trial last?

A.   It wasn't very long.   I want to say it was probably less than two weeks.

Q.   Do you remember any of the lawyers' names who participated in it?

A.   No.

Q.   After the trial was over, did you have occasion to talk to either the prosecuting attorneys or the defense lawyer about the case or about your verdict?   A lot of times they'll go back into the jury room or meet you in the hall and talk about it.

A.   I remember someone did mention that the decision was the correct decision, and that was it.   That was the end of it.

Q.   Did you learn any information after the trial that you didn't know while the trial was going on?   Anybody come in and say if we had told you this or we had told you that, anything

like that?

A.    No.

Q.    Okay.   The thing that we're interested in is just like the government, the prosecutors here told you.   They're seeking the death penalty.   We certainly want to find jurors who are open to the full range of punishment, okay?

A.    Uh-huh.

Q.    And if you're on this jury and we get to the punishment phase of this trial, the penalty phase, the juror will be faced with deciding whether or not the death penalty is the appropriate punishment, or an alternative would be life in the federal penitentiary without any possibility of release, okay?

A.    (Nods head.)

Q.    In other words, you go to the penitentiary for life, there's no parole, there's nothing.   You don't get out until you die.   Another option would be any other sentence, lesser sentence that the jury -- that the judge would assess.   So the jury would have three options.   The government is going to ask the jury to assess the death penalty.   We're going to ask the jury to consider the other options, all right?

A.    (Nods head.)

Q.    How do you feel about a sentence of life in the penitentiary without the possibility of parole for someone that you have convicted of an intentional murder?   How do you feel about that as a possible punishment?

A.    It could fit.

Q.    It could fit?

A.    It could.

Q.    If the murder is committed during the course of a kidnapping, how do you feel about life in the penitentiary without the possibility of parole if it was committed during the course of a kidnapping?

A.    I feel the same.

Q.    I can't hear you, I'm sorry.

A.    I feel the same way.

Q.    Your mind is open to that?

A.    Yes.

Q.    If -- what type of factors would you consider, what type of factors would be important to you in leaning towards life, a life sentence as opposed to the death penalty?

A.    I would want to know more about the individual.

Q.    The individual?

A.    (Nods head.)

Q.    That would be the most important factor, learning more about the individual?

A.    I believe so.

Q.    Can you think of any other factors that would be important to you?

A.    Other things that were going on at the time.

Q.    Let me add another consideration.  Let's say that -- see,

before you can even consider the punishment phase, you would have been part of a jury that unanimously found someone guilty beyond a reasonable doubt of murder.

A.    Uh-huh.

Q.    And then you would have had to find beyond a reasonable doubt unanimously, the jury would, that it was done in one of the four ways, like intentionally or something like that.

A.    (Nods head.)

Q.    And then you would have to find that one of these aggravating factors.  One of the ones the government has alleged is premeditation.

A.    (Nods head.)

Q.    If you have found beyond a reasonable doubt that someone is guilty of murder, that it was done intentionally and done with premeditation, then you would be asked to determine -- to consider all of the evidence that you've heard and decide which sentence would be appropriate.  After you found those things, guilty of murder, premeditation, intentionally done, could you still be open-minded to considering a sentence of life as opposed to the death penalty under certain circumstances in the proper case?

A.    Yes.

Q.    Okay.  You wouldn't automatically say because it was done intentionally or with premeditation that it should automatically be the death penalty?

A.    (Shakes head.)

Q.    Have you ever had -- heard of plea bargaining?

A.    (Nods head.)

Q.    Have you ever heard of witnesses that were, in other words, given something for their testimony?  For example, someone who is given a lesser sentence or someone the government says we'll give you reduced charges if you will testify and cooperate with us.  Do you know what I'm talking about?

A.    Yes.

Q.    Have you ever heard of that principle?

A.    Yes.

Q.    If there are witnesses like that in the case, the judge will tell you that those witnesses, their testimony, what they say, their credibility, should be judged with great caution and great care and that they're in a different category than the other witnesses in the case.  Does that make sense to you?

A.    Yes.

Q.    Okay.  Can you see why that a juror should judge a witness' testimony who falls into that category, somebody that is being paid for their testimony with freedom or reduced charges or something like that, should be judged specially? Can you see why that --

A.    I'm sorry, I'm not sure that I --

Q.    Okay.  Can you see why a witness who is being given

special consideration, something for their testimony, why that witness should be -- their testimony, their credibility should be judged with great caution and great care?  Do you see why that is?

A.    Give less credibility to this person because --

Q.    Well, I think what the judge will tell you is that witnesses who are testifying for personal advantage or gain --

A.    All right.

Q.    -- they're getting something for that, that those people should be judged differently than just the ordinary witness who's just up there and is not receiving anything for their testimony.

A.    Okay.

Q.    Okay.  Can you see the difference in the two witnesses?

A.    Yes.

Q.    And if you're on the jury, the judge is the judge of the law.  He'll tell us all what the law is.  But the jurors are the judges of the facts of the case and the credibility of the witnesses.  So as a juror, you're the one that has to decide the credibility of the witnesses, who you believe and who you don't, whether you believe all of what a witness says or part of what a witness says or none of what a witness says, okay? And in judging that in a witness, the credibility of a witness, the believability of a witness, would you give consideration to the fact that they're being paid something

for their testimony?  Is that something you would consider in determining whether you believe them or not?

A.    I believe so, yes.

Q.    Pardon?

A.    I believe so.

Q.    Would you think that would be an important consideration or not?

A.    No.

Q.    It's not an important consideration?

A.    I don't believe so.

Q.    Okay.  Can you tell me why that is?  Why do you think it's not important?

A.    I think it's just because I want to believe that people are going to tell you the truth.

Q.    Well, you know, if everybody that got up on the witness stand told absolutely 100 percent the truth, we wouldn't even need jurors, because we could just take what they said at face value and go on.  Are you open to the possibility that maybe someone would get up there and not tell the truth in order to -- for personal advantage or gain?

A.    Yes, I believe that could happen.

Q.    Okay. Are you open to the proposition that maybe a witness could get up on the witness stand and blame someone else for something, because by doing that they get a lesser sentence or reduced time or they don't get faced with the

death penalty?  Can you see what I'm saying?

A.    I would think if circumstances or if the facts supported that, then, yes, then I would consider that.

Q.    Okay.  When you were growing up, did you ever know anyone who would blame something on someone else so that they wouldn't get in trouble?

A.    Uh-huh.

Q.    Okay.  You've seen that in school or --

A.    Family.

Q.    -- on the playground or family?

A.    Uh-huh.

Q.    People that do that, sometimes they do it when they're adults, also.  It's not just that they're going to be sent to their room.  If they're facing the death penalty, people can say some things that aren't true ·in order to shift the blame from themselves to someone else.  Do you see how they might do that?

A.    Yes.

Q.    And can you see why those type of people, the judge will tell you that you have to judge their testimony and their credibility with greater caution and greater care than you do other witnesses?

A.    Yes, I understand.

Q.    In the punishment phase in deciding whether or not death is the appropriate sentence or whether some life sentence is

appropriate, there are some mitigating factors that the jury can consider, one of them being that if an equally culpable, responsible -- guilty, culpable, codefendant, somebody that was acting with the defendant did not receive the death penalty, was not going to receive the death penalty, that the jury can consider that in determining whether or not the defendant on trial should get the death penalty.  Okay?

A.    Okay.

Q.    Can you see what I'm talking about?

A.    Uh-huh.

Q.    There might be two or three or more people involved in something, and if the government has decided that someone else, let's say for example if they're going to testify for government, they're not going to get the death penalty.

A.    Uh-huh.

Q.    And then the person on trial, the government is seeking the death penalty, all right?  And they're equally culpable in what happened, all right?  The jury can consider that in -- when they determine whether or not there should the death penalty in this case or whether there should a life sentence. Okay?

A.    Uh-huh.

Q.    Do you think that is something that you would think is important in deciding whether or not you want to vote for the death penalty on someone that -- when someone equally culpable

is not getting the death penalty?

A.    No.

Q.    That is not something that you would think would be important?

A.    No.

Q.    Okay.  If you found that the government has proven beyond a reasonable doubt the required culpable mental state of the defendant, the four things we read, intentionally and those things, and they also proved that it was done with premeditation or one of the other aggravating factors beyond a reasonable doubt, if the defendant proved to you by a preponderance of the evidence that an equally culpable codefendant and/or codefendants will not be punished by death, they're going to receive something else, would you give fair consideration to that mitigating factor as something that would mitigate towards a life sentence as opposed to the death penalty?

A.    As mitigating, yes.

Q.    Would you consider that as a reason why you would vote for life as opposed to death, the fact that somebody else is not getting the death penalty?

A.    No.

Q.    You would not?

A.    (Shakes head.)

Q.    Have you ever had any experience with polygraph tests?

A.    Yes.

Q.    Have you ever taken a polygraph test?

A.    (Nods head.)

Q.    Do you feel like they're reliable?

A.    I believe so, yes.

Q.    When you took it, was it reliable as far as you were concerned?

A.    I got the job, so yeah.

Q.    Have you ever worked in any area that you had to rely on polygraph tests for any --

A.    No.

Q.    Have you ever had any experience on how they work or --

A.    No, not really.

Q.    No really special training or understanding?

A.    Oh, no.

Q.    What about -- let me ask you about psychiatrists or psychologists.  Do you think they serve a function in society?

A.    Yes.

Q.    Do you have any -- any special training or education in the field of psychiatry or psychology?

A.    Just entry level college courses.

Q.    Other than that?

A.    No.

Q.    Do you feel like that they can serve a place in the criminal justice system?

U.S. District Court

A.   Yes.

Q.   And if a psychiatrist or a psychologist testified about the examination of a defendant in a criminal case, could you give fair consideration to what they say if you felt they were qualified --

A.   Yes.

Q.   -- and had a basis for their opinion?

A.   (Nods head.)

Q.   Do you have any preconceived feelings towards psychiatric or psychological testimony or evaluations?

A.   No.

Q.   You don't feel one way or the other about them?

A.   No.

Q.   You have a son?

A.   (Nods head.)

Q.   Eight years old?

A.   Yes.

Q.   Does he go to a public or private school?

A.   Public.

Q.   Do you live in a neighborhood where there are people of other races that live in the neighborhood where you live?

A.   Yes.

Q.   Do you work in a situation where you work with people of different races?

A.   Yes.

Q.    Do you supervise people of different races?

A.    No.

Q.    What is a communications manager?

A.    I'm responsible for the data network and the voice network for my company.

Q.    I'm sorry?

A.    The data network and the voice network for my company.

Q.    And do you have someone of a different race that supervises you?

A.    No.

Q.    Do you have friends of different races?

A.    Yes.

Q.    Do you ever entertain them in your home?

A.    No.

Q.    Have you ever been to their home?

A.    No.

Q.    If -- have you ever had a bad experience with someone of a different race?

A.    No.

Q.    Can you think of any positive, good experience you've had with someone of a different race?

A.    They've all been positive.  I don't know of any negatives.

Q.    Pardon me?

A.    I said they've all been positive.  I haven't had any

CRITTENDON/VOIR DIRE/KEARNEY

negatives.

Q.   Okay.  Ms. Crittendon, can you look at Orlando Hall and say to him, "Orlando, I can give you a fair trial"?

A.   Yes, I can.

Q.   Can you?  Okay.

MR. KEARNEY:  We have a matter to take up, Judge.  Other than that I'm through.

THE COURT:  All right.

(Discussion at counsel table.)

THE COURT:  After your conference there, did you have additional questions?

MR. KEARNEY:  No.

THE COURT:  I would propose that we let this lady go on.  Is that suitable?

MR. KEARNEY:  Yes.

THE COURT:  Okay.  It's not as though you want to talk with me and then decide to ask more questions?

MR. KEARNEY:  No, no.  I'm through.  I'm finished.

THE COURT:  All right.

Thank you so much.  We will let you know by telephone whether you have been chosen to serve on this jury.  We're still going to shoot for the 17th as our first day, but I have to tell you we're already behind on, as you can see, on juror selection.  But that's still our goal.  We will let you know.  Thank you very much.  We appreciate it.

U.S. District Court