**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |
|---|---|
| ORLANDO CORDIA HALL, | ) |
| | ) |
| | ) No. 2:20-cv-599 |
| *Petitioner*, | ) |
| | ) **DEATH PENALTY CASE** |
| v. | ) |
| | ) **EXECUTION SCHEDULED:** |
| T.J. WATSON, in his official capacity as | ) **November 19, 2020** |
| Complex Warden of U.S.P., Federal | ) |
| Correctional Complex (FCC) Terre Haute, | ) **HEARING REQUESTED** |
| | ) |
| *Respondent*. | |

**PETITIONER ORLANDO HALL'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR A STAY OF EXECUTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ......................................................................................................................1

BACKGROUND .......................................................................................................................2

A.    Voir Dire ..................................................................................................................2

B.    Mr. Hall's Trial, Conviction, and Post-Conviction Proceedings .........................5

C.    Mr. Macaluso's Adjudicated History of Racial Bias. ...........................................6

D.    Racial Discrimination in the Application of the Federal Death Penalty, And
      Particularly in Texas.  ............................................................................................9

STANDARD OF REVIEW ......................................................................................................10

ARGUMENT .........................................................................................................................11

I.     MR. HALL IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS. ............11

       A.    Mr. Hall Is Likely To Succeed On The Merits Of His *Batson* Claim. ..................11

       B.    Mr. Hall Is Likely To Succeed On His Claim that the Federal Death
             Penalty, Particularly as Applied in Texas, Discriminates on the Basis of
             Race.................................................................................................................13

       C.    Relief Through Section 2241 is Warranted. ...........................................................15

II.    MR. HALL WILL SUFFER IRREPARABLE HARM IF A STAY IS NOT
       GRANTED. ..........................................................................................................16

III.   THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF GRANTING A
       STAY. .................................................................................................................17

IV.    A STAY IS IN THE PUBLIC INTEREST......................................................................17

CONCLUSION.....................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES:

*Batson v. Kentucky*,
 476 U.S. 79 (1986)............................................................................................ *passim*

*Buck v. Davis*,
 137 S. Ct. 759 (2017).............................................................................................2, 14

*Cooey v. Taft*,
 430 F. Supp. 2d 702 (S.D. Ohio 2006) ....................................................................18

*Curtis v. Thompson*,
 840 F.2d 1291 (7th Cir. 1988) .................................................................................10

*Davis v. Ayala*,
 576 U.S. 257 (2015)...................................................................................................2

*Duvall v. Keating*,
 162 F.3d 1058 (10th Cir. 1998) ...............................................................................16

*Flowers v. Mississippi*,
 139 S. Ct. 2228 (2019).........................................................................................9, 12

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*,
 549 F.3d 1079 (7th Cir. 2008) .................................................................................16

*Gregg v. Georgia*,
 428 U.S. 153 (1976).................................................................................................10

*Hall v. United States*,
 526 U.S. 1117 (1999).................................................................................................6

*Hall v. United States*,
 549 U.S. 1343 (2007).................................................................................................6

*Hall v. United States*,
 No. 4:00-cv-422-Y, 4:94-cr-121-Y, 2004 WL 1908242 (N.D. Tex. Aug. 24,
 2004) ....................................................................................................................6, 15

*Harris v. Johnson*,
 323 F. Supp. 2d 797 (S.D. Tex. 2004) .....................................................................18

*Kyles v. Whitley*,
 514 U.S. 419 (1995).................................................................................................11

*Lee v. Warden USP Terre Haute*,
No. 2:19-cv-00468, 2020 WL 3489355 (S.D. Ind. June 26, 2020) .........................................15

*McCleskey v. Kemp*,
481 U.S. 279 (1987)..........................................................................................................15

*Miller-El v. Cockrell*,
537 U.S. 322 (2003).........................................................................................................7, 8

*Miller-El v. Dretke*,
545 U.S. 231 (2005)..................................................................................................... *passim*

*Minney v. U.S. Office of Pers. Mgmt.*,
130 F. Supp. 3d 225 (D.D.C. 2015) ...................................................................................18

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................................10

*Pena-Rodriguez v. Colorado*,
137 S. Ct. 855 (2017)........................................................................................................14

*Purkey v. United States*,
964 F.3d 603 (7th Cir. 2020) ...................................................................................10, 16, 17

*Reed v. Quarterman*,
555 F.3d 364 (5th Cir. 2009) ...................................................................................3, 8, 9, 12

*Roane v. Gonzales*,
No. 1:05-cv-02337-TSC (D.D.C. June 11, 2007) ................................................................17

*Rose v. Mitchell*,
443 U.S. 545 (1979).............................................................................................................2

*Sofinet v. I.N.S.*,
188 F.3d 703 (7th Cir. 1999) .............................................................................................10

*Strauder v. West Virginia*,
100 U.S. 303 (1879)..........................................................................................................18

*In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*,
No. 1:19-mc-00145-TSC (D.D.C. Sept. 20, 2020) ..............................................................17

*Thompson v. McNeil*,
556 U.S. 1114 (2009)........................................................................................................10

*Turner v. Murray*,
476 U.S. 28 (1986)............................................................................................................14

*United States v. Hall*,
  152 F.3d 381 (5th Cir. 1998) ..............................................................................6

*United States v. Hall*,
  455 F.3d 508 (5th Cir. 2006) ..............................................................................6

*Wainwright v. Booker*,
  473 U.S. 935. (1985) .........................................................................................16

*Webster v. Daniels*,
  784 F.3d 1123 (7th Cir. 2015) (en banc) ...........................................................15

*Whitaker v. Kenosha United Sch. Dist. No. 1*,
  858 F.3d 1034 (7th Cir. 2017) ...........................................................................16

*Zant v. Stephens*,
  462 U.S. 862 (1983) ...........................................................................................14

## STATUTES:

18 U.S.C. § 3593 ...............................................................................................14

18 U.S.C. § 3595 ...............................................................................................14

28 U.S.C. § 2241 ......................................................................................13, 15, 16

28 U.S.C. § 2255 ................................................................................... *passim*

## OTHER AUTHORITIES:

April Castro, *Race Is Key in Death Penalty Appeal*, Midland Reporter-Telegram
  (Feb. 15, 2002 6:00 pm CST) ..............................................................................7

## INTRODUCTION

Petitioner Orlando Cordia Hall ("Mr. Hall") is a death-sentenced federal prisoner incarcerated at the United States Penitentiary, Terre Haute ("USP Terre Haute"), and scheduled to be executed on November 19, 2020.  Mr. Hall is Black.  Every juror that convicted and sentenced him to death was White.  This was no accident.  Rather, it was the product of a multi-pronged, successful campaign by Assistant United States Attorneys ("AUSAs") Richard Roper and Paul Macaluso (twice adjudicated to be a *Batson v. Kentucky* violator, once emphatically by the United States Supreme Court) to ensure that Mr. Hall would be tried by an all-White jury.

AUSAs Macaluso and Roper used peremptory strikes to remove four of five qualified Black jurors from Mr. Hall's jury (while knowing the defense would almost certainly strike the fifth Black venire member due to her strong pro-death penalty views).  New evidence confirms that these strikes were exercised on the basis of race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  But at the time of Mr. Hall's trial, this critical evidence was unavailable because it lay secreted away in the Dallas County District Attorney's Office, where it would remain until 2005—years after Mr. Hall's § 2255 petition had already been adjudicated.

On top of the tainted jury selection process in Mr. Hall's case, the application of the federal death penalty writ large, and as applied to Mr. Hall, is impermissibly influenced by race, in violation of the Fifth and Eighth Amendments, as well as the Federal Death Penalty Act ("FDPA").  It is an objective fact and a matter of public record that while the FDPA was designed to minimize disparate application of the federal death penalty, racial minorities—and particularly Black defendants, like Mr. Hall—are far more likely to be sentenced to death as compared to White defendants.  Since Mr. Hall's § 2255 petition was adjudicated, new statistical evidence has emerged that Black defendants eligible for the federal death penalty are

significantly more likely to have the death penalty requested by prosecutors, authorized by the Department of Justice, and meted out by a jury, and  that all of these disparities are even more pronounced in Texas, where Mr. Hall was charged and tried.   This evidence, too, was unavailable to Mr. Hall during the pendency of his trial, direct appeal, or initial § 2255 petition.

Mr. Hall brings this suit to challenge the legality of his sentence based on this new evidence.  These violations of Mr. Hall's rights under the law must be addressed, and a stay of execution is required in order for these important claims to be fairly litigated.      A brief stay of execution would preserve the status quo while allowing Mr. Hall to pursue his claims, on which he is likely to succeed.   The other stay factors also weigh in favor of a stay of Mr. Hall's execution to allow him to litigate these claims.  The potential injury to Mr. Hall—death—is "categorically irreparable" and cannot be reversed.  Additionally, the balance of the equities tips sharply in Mr. Hall's favor, as the Government faces minimal harm in delaying the execution, while Mr. Hall faces the ultimate harm.  Last, the public interest is served by staying Mr. Hall's execution, as it allows him to pursue claims of exceptional importance—ensuring that the death penalty is not meted out on the basis of race.[1]

## BACKGROUND

### A.      Voir Dire.

After Mr. Hall was indicted on six counts of criminal conduct in the fall of 1994, the government gave notice on February 23, 1995 that it intended to seek the death penalty against

---

[1]  *See, e.g.*, *Buck v. Davis*, 137 S. Ct. 759, 778 (2017) (observing that racial discrimination "'is especially pernicious in the administration of justice,'" and, when it impacts criminal sanctions it "'poisons public confidence' in the judicial process," an injury "not just [to] the defendant, but 'the law as an institution, . . . the community at large, and . . . the democratic ideal reflected in the processes of our courts'") (quoting *Rose v. Mitchell*, 443 U.S. 545, 555–56 (1979) and *Davis v. Ayala*, 576 U.S. 257, 285 (2015)).

him and co-defendant Bruce Webster.  Pet. at 7-8.  Thereafter, Mr. Hall's trial was severed from

the trial of his co-defendants, and the three non-capitally charged co-defendants agreed to testify

against Mr. Hall in exchange for favorable treatment from the government.  *Id.* at 8.

The government chose to prosecute Mr. Hall in the Northern District of Texas, Fort

Worth Division (10.41% Black in 1990) instead of the Pine Bluff Division of the Eastern District

of Arkansas (35.85% Black in 1990).  *Id.* at 26.  As a result, of the 100 prospective jurors

questioned during voir dire, only seven were Black.  *Id.*  After challenges for cause, only six

Black prospective jurors remained.  *Id.*

Mr. Hall's trial commenced on October 2, 1995, in Fort Worth.  Voir dire lasted from

October 2–19.   Assistant United States Attorney Paul Macaluso was instrumental in the

questioning and selection of Mr. Hall's jurors.  As discussed in more detail below, years after

Mr. Hall's trial, Mr. Macaluso was twice adjudicated—by two different courts, including the

Supreme Court of the United States—to have violated *Batson* by striking Black jurors based on

their race.  *See Miller-El v. Dretke*, 545 U.S. 231 (2005) ("*Miller-El II*") (repeatedly referencing

Macaluso by name); *Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009) (also identifying

Macaluso by name).

In Mr. Hall's case, the government struck four of the five qualified Black venire members

(while knowing the defense was sure to strike the fifth on account of her strong pro-death penalty

views).  The result?  Mr. Hall, who is Black, was convicted and sentenced to death by an all-

White jury.

Mr. Hall's defense counsel raised a *Batson* challenge at trial, in response to which the

government provided ostensibly "neutral" reasons for its strikes (though, as discussed below, the

trial record casts serious doubt on these justifications).  The government also misstated the facts

when it came to their purported bases for striking several Black prospective jurors.  Specifically, while the government represented that it had only exercised its peremptory strikes after unsuccessfully challenging each of these four jurors for cause, this was not true.  In fact, the government had challenged only two of these jurors.

With respect to the two jurors not previously challenged, a side-by-side comparison of the government's proffered bases for its strikes provides useful context:

**Amy Evans**.  Amy Evans wrote in her jury questionnaire that she was in favor of the death penalty "depend[ing] on the nature of the crime," that it was appropriate for "brutal senseless murders," and that it served "as a means of deterrent from committing the crime."  She testified that even if the option of a life sentence without parole was available, she could vote for the death penalty.  Despite this, the government used a peremptory strike on Ms. Evans, claiming that she "was very, very hesitant on her views on the death penalty."  But the government seated other jurors who gave similar testimony.

The government also stated that Ms. Evans "had very long pauses in her answers and was very hesitant in what she said," which the record does not support.  And the prosecutor claimed that he was "concerned" that Ms. Evans had two brothers-in-law in prison, even though he asked her no questions about this topic, and seated multiple non-Black jurors with family members either currently in or released from prison.

**Billie Lee**.  Potential juror Billie Lee stated in her jury questionnaire that she favored the death penalty for "extremely brutal" crimes and it should be available for "child molesters who kill their victims."  She further testified  that she believed the death penalty was warranted for "[a]nything that involves children, murder of children, [and] cruelty to children" (Mr. Hall was tried for the killing of a minor).    She also testified that, though she may initially lean toward a

life sentence over the death sentence, she could impose a death sentence "depend[ing] on evidence, the cruelty of the act, all of that would have to be considered." The government nevertheless claimed that it struck Ms. Lee because she had stated in her juror questionnaire that she did not believe in the death penalty but could assess it. Yet again, a side-by-side comparison of jurors the government accepted for service belies this explanation; indeed, the prosecution seated multiple White jurors who expressed misgivings about capital punishment.

The government also proffered as a reason to exclude Ms. Lee that she was "on a prior jury trial for robbery and found the defendant not guilty." Not only is this false, but the government actually *accepted* a White juror who served on a prior jury and acquitted a defendant on a charge of murder. Upon noticing this mistake, the prosecutor changed his story, claiming that Ms. Lee was struck because she "had a brother-in-law who was a criminal defense attorney, which caused me some concern." But the prosecution asked Ms. Lee no questions about this topic, which belies a claim that it actually caused the government any concerns. *See Miller-El II*, 545 U.S. at 246 ("[F]ailure to engage in any meaningful voir dire examination on a subject the [government] alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." (internal quotation marks omitted)). And, once again, the government seated a White juror whose brother was a public defender.

**B.    Mr. Hall's Trial, Conviction, and Post-Conviction Proceedings**

Mr. Hall's trial proceeded from October 24–31. The defense presented no evidence and waived closing argument. On October 31, 1995, the jury convicted Mr. Hall of all available counts. The penalty phase commenced the following morning. From November 1–3, the same all-White jury that had found Mr. Hall guilty heard testimony and argument regarding his sentence. On November 6, 1995, the jury recommended the death penalty.

5

After denying Mr. Hall's motion for a new trial, the District Court entered judgment on February 12, 1996, formally sentencing Mr. Hall to death. The court imposed a sentence of life imprisonment for the conspiracy conviction, and sixty-months' imprisonment for each of the remaining two counts. The Fifth Circuit affirmed his conviction and sentence on appeal, *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), and the Supreme Court subsequently denied certiorari, *Hall v. United States*, 526 U.S. 1117 (1999). In May 2000, Mr. Hall moved to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. Pet. at 11. The district court ultimately denied his claims. *Hall v. United States*, No. 4:00-cv-422-Y, 4:94-cr-121-Y, 2004 WL 1908242, at *37 (N.D. Tex. Aug. 24, 2004). Mr. Hall sought permission to appeal from both the district court and the Fifth Circuit. Leave to appeal was denied, *see United States v. Hall*, 455 F.3d 508 (5th Cir. 2006), and the Supreme Court denied certiorari, *Hall v. United States*, 549 U.S. 1343 (2007).

### C.     Mr. Macaluso's Adjudicated History of Racial Bias.

Less than one year after Mr. Hall's 28 U.S.C. § 2255 petition was resolved, the United States Supreme Court decided *Miller-El II*, where it held that the Texas prosecutors involved, including Paul Macaluso—who was a key member of Mr. Hall's prosecution team and played a pivotal role in the selection of Mr. Hall's jury—had struck Black jurors. The Court specifically rejected the justifications that Macaluso and others had proffered for their exercise of peremptory strikes in that case, holding unequivocally that they were pretextual. Pet. at 29.

Of particular importance, the Supreme Court credited evidence that the Dallas County District Attorney's Office—where Macaluso trained and practiced for 15 years—"had adopted a formal policy to exclude minorities from jury service. . . . A manual entitled 'Jury Selection in a Criminal Case' [sometimes known as the Sparling Manual] was distributed to prosecutors. It

contained an article authored by a former prosecutor (and later a judge) under the direction of his superiors in the District Attorney's Office, outlining the reasoning for excluding minorities from jury service." *Miller-El*, 545 U.S. at 264 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 334–35 (2003)) ("*Miller-El I*").

The Sparling manual's discriminatory policy is unequivocal. It recommended the following:

a. "You are not looking for any member of a minority group which may subject him to oppression – they almost always empathize with the accused."

b. "Look at the panel out in the hall before they are seated.  You can often spot the show-offs and the liberals by how and to whom they are talking."

c. "I don't like women jurors because I can't trust them. . . . Young women too often sympathize with the Defendant; old women wearing too much make-up are usually unstable, and therefore are bad State's jurors.  It is impossible to keep women off your jury, but try to keep the ratio at least seven to five in favor of men."

d. "Race.  Minority races almost always empathize with the Defendant."

e. "Jewish veniremen generally make poor State's jurors.  Jews have a history of oppression and generally empathize with the accused."

Macaluso trained and practiced in the Dallas County District Attorney's Office between 1973 and 1988.  April Castro, *Race Is Key in Death Penalty Appeal*, Midland Reporter-Telegram (Feb. 15, 2002 6:00 pm CST), https://www.mrt.com/news/article/Race-Is-Key-in-Death-Penalty-Appeal-7756301.php.  The Sparling manual was in distribution at the District Attorney's Office during this time.  As explained herein, the Supreme Court and Fifth Circuit have both found that

7

Macaluso's connection to the Sparling manual is persuasive history to consider when analyzing whether his actions constituted a *Batson* violation, and it must be considered here too.

In addition to the Sparling manual, the *Miller-El II* Court also noted that "[t]he prosecutors used their peremptory strikes to exclude 91% of the eligible African–American venire members . . . . Happenstance is unlikely to produce this disparity."  545 U.S. at 241 (quoting *Miller-El I*, 537 U.S. at 342).

The Court also instructed that a "side-by-side comparison[] of some black venire panelists who were struck [with] white panelists allowed to serve" is "[m]ore powerful than . . . bare statistics."  Thus, "[i]f a prosecutor's proffered reason for striking a Black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."  *Miller-El II*, 545 U.S. at 241.   And the side-by-side comparisons showed the state had struck Black panel members but accepted White panel members offering similar testimony.  *Id.* at 244-45.

Ultimately, the *Miller-El II* Court held that the "chosen race-neutral reasons for the [peremptory] strikes do not hold up and are so far at odds with the evidence that pretext is the fair conclusion, indicating the very discrimination the explanations were meant to deny."  *Miller-El II*, 545 U.S. at 265.

Four years later, the same evidence that led the *Miller-El* Court to find that Macaluso and his prosecutorial team had committed a *Batson* violation also convinced the Fifth Circuit that— once again—Macaluso and his cohorts had engaged in racial bias in jury selection.  *See Reed*, 555 F.3d at 382  ("One of the same lawyers that conducted the voir dire in Miller–El's case, Paul Macaluso, also questioned prospective jurors for Reed's trial").  The *Reed* Court specifically noted that given "the historical evidence of racial bias among the[] prosecutors," including

Macaluso, "we view this exact same evidence as persuasive here." *Id.  See also Flowers v. Mississippi*, 139 S. Ct. 2228, 2246 (2019) ("The State's actions in [prior] trials necessarily inform our assessment of the State's intent going into [the trial on review.] We cannot ignore that history. We cannot take that history out of the case.").

Both *Miller-El II* and *Reed* were decided after Mr. Hall's 28 U.S.C. § 2255 petition was resolved.   Consequently, evidence of Macaluso's racial bias was not reasonably available to Mr. Hall during the pendency of his trial, direct appeal, or initial § 2255 proceeding.

### D.    Racial Discrimination in the Application of the Federal Death Penalty, And Particularly in Texas.

A statistical analysis of all criminal defendants eligible for the federal death penalty in Texas between 1988 (when the federal death penalty was reinstated) and 2010, conducted by an expert sociologist whose research focuses on how the death penalty is applied, shows that the federal death penalty in Texas is disproportionately meted out based on race.  *See* Exhibit 5 to Pet. for Writ of Habeas Corpus (Declaration of Scott Phillips) ("Phillips Decl.").

For example, federal prosecutors in Texas were nearly **six times** more likely to request authorization to seek the death penalty against a Black defendant than a non-Black defendant. *Id.* ¶ 7.  Authorization was nearly **eight times** more likely to be granted in cases with a Black defendant than a non-Black defendant.  *Id.*  And a death verdict was nearly **sixteen times** more likely to be rendered in a case with a Black defendant than a non-Black defendant.  *Id.*  In the Northern District of Texas, where Mr. Hall was sentenced, the racial disparity was consistent with that seen across all four Texas federal districts and even "slightly greater.".  *Id.* ¶ 8.  As Dr. Phillips explains, this disparity is almost certainly too extreme to have a benign explanation, and it is highly unlikely that a race-neutral factor could explain why Black defendants were sixteen times more likely to be sentenced to death than non-Black defendants.  *Id.* ¶ 11.  This expert

analysis, however, was not available at the time of Mr. Hall's trial, appeal and § 2255 proceedings. The expert statistical analysis itself was not conducted until 2011—more than six years after Mr. Hall's § 2255 petition was denied.  And it did not become publicly available until August 2020.  This statistical analysis was therefore unavailable to Mr. Hall during the pendency of those proceedings and did not become available until very recently.

## STANDARD OF REVIEW

The purpose of a stay is "simply [to] suspend[] judicial alteration of the status quo." *Nken v. Holder*, 556 U.S. 418, 429 (2009).  A motion for stay of execution requires consideration of the following factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Purkey v. United States*, 964 F.3d 603, 618 (7th Cir. 2020) (quoting *Nken*, 556 U.S. at 434), *reconsideration denied*, 812 F. App'x 380 (7th Cir. 2020), *and cert. denied*, No. (20A12), 2020 WL 4006838 (July 16, 2020).  In assessing a motion for a stay, the Seventh Circuit "employs a 'sliding scale' approach . . . so that even though a plaintiff has less than a 50 percent chance of prevailing on the merits, he may nonetheless be entitled to the injunction if he can demonstrate that the balance of harms would weigh heavily against him if the relief were not granted."  *Curtis v. Thompson*, 840 F.2d 1291, 1296 (7th Cir. 1988); *see also Sofinet v. I.N.S.*, 188 F.3d 703, 707 (7th Cir. 1999) (applying the sliding scale approach in the context of a motion for a stay of deportation).

In capital cases, courts are 'dutybound to 'insure that every safeguard is observed' when 'a defendant's life is at stake.'"  *Thompson v. McNeil*, 556 U.S. 1114, 1116 (2009) (quoting *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)).

The "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (internal quotation marks omitted).

<u>**ARGUMENT**</u>

**I.     MR. HALL IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.**

  **A.     Mr. Hall Is Likely To Succeed On The Merits Of His *Batson* Claim.**

Mr. Hall is likely to prevail on the merits of his *Batson* claim. Race-based peremptory strikes infected Mr. Hall's trial at every stage: the government chose to prosecute Mr. Hall in a forum with a paltry non-Block jury pool; employed a serial *Batson* violator to pick the jury and prosecute the case; and gave pretextual reasons for striking the few qualified Black jurors who made it to voir dire.

The first step in the government's strategy to dilute the presence of Black jurors was its decision to prosecute Mr. Hall in the Northern District of Texas, Fort Worth Division. This gambit paid off. Of the 100 prospective jurors questioned during voir dire, only seven were Black. Exhibit 7 to Pet. for Writ of Habeas Corpus (Prospective Juror Questionnaire Cover Pages). Though the district court excused one of these potential jurors for cause (without attorney questioning) and the defense peremptorily struck another, the prosecution struck four of the five remaining death-qualified jurors and the only surviving Black juror, selected as the third alternate, never served on the jury. Counsel for Mr. Hall raised a *Batson* challenge at trial, which the trial court denied without giving Mr. Hall's counsel any opportunity to challenge the prosecution's stated reasons for the strikes. Even a cursory review of the trial record, however, reveals that the government's proffered reasons were pretextual.

That the government so ruthlessly struck Black jurors in Mr. Hall's trial is not surprising when its conduct is set against the background and practices of prosecutor Paul Macaluso.

Macaluso was an integral figure in jury selection in Mr. Hall's case, and cut his legal teeth in the Dallas County District Attorney's Office, which "for decades . . . had followed a specific policy of systematically excluding blacks from juries." *Miller-El II*, 537 U.S. at 263. As the Supreme Court explained, "[a] 1963 circular by the District Attorney's Office instructed its prosecutors to exercise peremptory strikes against minorities: 'Do not take Jews, Negroes, Dagos, Mexicans or a member of any minority race on a jury, no matter how rich or how well educated.'" *Miller-El I*, 537 U.S. at 334–35 (citation omitted). The office's discriminatory pattern and practice was further fleshed out in a "manual entitled 'Jury Selection in a Criminal Case' [sometimes known as the Sparling Manual]" the office distributed to its prosecutors. *Id.*; *see also Miller-El II*, 545 U.S. at 264. When the Supreme Court found clear and convincing evidence to reject as "incredible" Macaluso's proffered reasons for striking Black jurors, *Miller-El II*, 545 U.S. at 265, it mentioned Macaluso by name no less than ten times. *Id.* at 236, 248–50, 256. The Fifth Circuit followed suit four years later, specifically mentioning Macaluso three times in finding that he and his prosecution team had again struck Black jurors on the basis of their race. *See Reed*, 555 F.3d at 371, 371 n.3, 382. That evidence is highly relevant here, in another of Macaluso's cases. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2246 (2019) ("The State's actions in [prior] trials necessarily inform our assessment of the State's intent going into [the trial on review.] We cannot ignore that history. We cannot take that history out of the case."). Macaluso's proclivity for striking Black jurors on the basis of race provides critical context for assessing the credibility of the reasons the prosecution provided in Mr. Hall's trial for striking four of the five qualified Black jurors.

Lastly, the prosecution's proffered reasons for striking qualified Black jurors were pretexts for the government's intentional discrimination on the basis of racial bias. And the

prosecution's behavior with respect to White jurors is instructive: the very grounds prosecutors used to justify striking Black jurors Amy Evans and Billie Lee applied equally to White jurors the prosecution accepted.  Pet. at 31-40.  The government's systematic striking of Black jurors in Mr. Hall's trial means that he is likely to succeed on the merits of his *Batson* claims.

> **B.      Mr. Hall Is Likely To Succeed On His Claim that the Federal Death Penalty, Particularly as Applied in Texas, Discriminates on the Basis of Race.**

Mr. Hall has demonstrated that he is likely to succeed on the merits of his claims that, as administered by the government, the federal death penalty violates the Fifth and Eighth Amendments and the FDPA because sentencing outcomes are impermissibly influenced by race. Data show that, in violation of the law, race discrimination pervades federal capital cases.  The Constitution and the FDPA squarely forbid death sentences that are influenced by racial bias. For that reason, Mr. Hall is entitled to relief under Section 2241.

Nationwide statistics create a strong inference that government decisions regarding who will face the death penalty are impermissibly influenced by the race of the defendant.  *See* Exhibit 32 to Pet. for Writ of Habeas Corpus (Declaration of Kevin McNally) at ¶¶ 7, 9 ("McNally Decl.").  Yet the federal death penalty is administered in Texas in an even more racially discriminatory manner.  To date, federal prosecutors in Texas have sought the death penalty at trial against 23 defendants and obtained 16 death verdicts.  *See id.* McNally Decl. at ¶ 19.  Ten of those 16 men who received death sentences in federal prosecutions in Texas have been Black; only four have been White.  McNally Decl., Exhibit A.

Newly available evidence demonstrates the statistical improbability of this result without the influence of racial bias in the federal system.  In August 2020, the Inter-American Commission on Human Rights ("IACHR") issued a report in the case of another federal death row inmate, Julius Robinson.  That report included expert sociologist Scott Phillips' analysis of

the federal death penalty in Texas, which concluded that "[i]t is highly unlikely that a race-neutral factor or factors could explain why Black defendants were 16 times more likely to be sentenced to death. The racial disparities are almost surely too extreme to have a benign explanation."  Phillips Decl. ¶ 11 (emphases added).  Dr. Phillips' study was not available to Mr. Hall until he learned of its existence from the August 2020 Report in Julius Robinson's IACHR case.

In a capital case, the right not to be discriminated against on the basis of race has roots in both the Eighth Amendment prohibition on arbitrary death sentences and the right to equal protection of the laws.  *See, e.g.*, *Turner v. Murray*, 476 U.S. 28, 35 (1986) (because "[t]he risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence," the defendant's right to question prospective jurors regarding possible racial prejudice is a matter of constitutional dimension in cases involving interracial crimes); *Buck*, 137 S. Ct. at 775 (race is among the factors that are "constitutionally impermissible or totally irrelevant to the sentencing process") (citing *Zant v. Stephens*, 462 U.S. 862, 885 (1983)); *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867–68 (2017) (discussing the Supreme Court's continuing commitment to eliminating racism in legal proceedings).  When race influences a capital sentencing outcome, as it did in Mr. Hall's case, the Eighth Amendment and the Constitution's equal protection guarantee are violated.

The Federal Death Penalty Act evinces a commitment to preventing racial bias from influencing sentencing verdicts, and Mr. Hall's death sentence violates the statute.  First, 18 U.S.C. § 3593 ("Special precaution to ensure against discrimination") erects an elaborate formal process for confirming that jurors' deliberations were unaffected by (inter alia) race.  *See id.* § 3593(f).  Second, 18 U.S.C. § 3595 ("Review of a sentence of death") provides that on

reviewing a death verdict, a court of appeals must "address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor . . .". *Id.* § 3595 (c)(1).  Mr. Hall is likely to succeed on the merits of his claim that his death sentence violates the FDPA.  He sets out a racially disproportionate pattern of capital charging, which, by itself, might not be enough to demonstrate purposeful racial discrimination.  *See McCleskey v. Kemp*, 481 U.S. 279 (1987).  Critically, however, Mr. Hall pairs this pattern with compelling case-specific evidence of personal racial animus by the prosecution in his case, as exhibited by their race-based use of peremptory challenges to block four of five eligible Black jurors from service.

Mr. Hall is likely to succeed on the merits of his claims under *Batson*, the Fifth and Eighth Amendments, and the FDPA.  At a minimum, the evidence Mr. Hall raises warrants discovery concerning the government's authorization process and other relevant decision-making in Mr. Hall's case.

## C.     Relief Through Section 2241 is Warranted.

These important constitutional claims can only be raised in a petition for a writ of habeas corpus under 28 U.S.C. § 2241.  Mr. Hall's amended 28 U.S.C. § 2255 petition was denied by the Northern District of Texas in August 2004.  *Hall v. United States*, No. 4:00-cv-00422-Y, 2004 WL 1908242, at *4, 37 (N.D. Tex. Aug. 24, 2004).  New evidence that has come to light since Mr. Hall's initial Section 2255 motion indicates that racial bias infected the jury selection process, which constitutes grounds to apply to this Court for a writ of habeas corpus.  Under Fifth Circuit law, he cannot raise these claims now, despite the new evidence that precluded their meaningful presentation before.  Pet. at 20.  It is appropriate for this Court to hear this case under § 2241 through the savings clause avenue set out in *Webster v. Daniels*, 784 F.3d 1123, 1136–39,

1144–45 (7th Cir. 2015) (en banc).  "To satisfy the § 2255(e) savings clause using the path outlined in *Webster*, a petitioner must proffer newly discovered evidence."  *Lee v. Warden USP Terre Haute*, No. 2:19-cv-00468,  2020 WL 3489355, at *1 (S.D. Ind. June 26, 2020).  Mr. Hall has proffered just that—after his Section 2255 remedies were exhausted, Mr. Hall obtained new evidence showing: (1) a clear history of racial bias by his prosecutors during jury selection; and (2) that the federal death penalty in Texas has been disparately applied to Black defendants in a racially biased manner in violation of the Constitution and federal law.  This Court thus has jurisdiction under Section 2241 to consider Mr. Hall's petition.

### III.   MR. HALL WILL SUFFER IRREPARABLE HARM IF A STAY IS NOT GRANTED.

Mr. Hall faces manifestly irreparable harm without a stay.  "[H]arm is considered irreparable if it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Whitaker v. Kenosha United Sch. Dist. No. 1*, 858 F.3d 1034, 1045 (7th Cir. 2017) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)).  Here, the harm is certain:  Mr. Hall's execution has been scheduled for November 19, 2020.  This most grievous injury has been described by the Seventh Circuit to be "the ultimate irrevocable action" and "categorically irreparable injury."  *Purkey*, 964 F.3d at 616, 618.  When a petitioner faces execution, there can be no doubt that the impending execution presents irreparable harm.  *See, e.g.*, *Duvall v. Keating*, 162 F.3d 1058, 1062 (10th Cir. 1998) (granting immediate review of denial of temporary restraining order to death row inmate because his impending execution guaranteed he would "suffer irreparable harm absent immediate review").  In capital cases, irreparable harm is "necessarily present," *Wainwright v. Booker*, 473 U.S. 935, 935 n.1. (1985) (Powell, J., concurring), and the urgency of that harm is even more so present where such an execution would result in the deprivation of enumerated constitutional rights.

16

Without injunctive relief, Mr. Hall will be unable to pursue his constitutional and statutory claims, and would be executed without the opportunity to fully litigate them.  Such a denial of Mr. Hall's rights is plainly foreclosed by the Constitution such that Mr. Hall's execution cannot proceed under the current circumstances.

## IV.   THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF GRANTING A STAY.

The balance of equities also tips in favor of granting injunctive relief.  Without a stay, Mr. Hall will be unable to vindicate his constitutional rights, and his important claims that his trial was infected by racial animus will go unaddressed.  Moreover, the harm Mr. Hall will suffer without a stay—loss of his life—is indisputably irreparable.

While Defendants have an interest in the finality of Mr. Hall's case, the delay that will come from staying his execution to allow him to litigate these claims will not cause substantial harm to Defendants.  That is particularly true given that Mr. Hall was protected by a stay of execution for 13 years, Order, *Roane v. Gonzales*, No. 1:05-cv-02337-TSC (D.D.C. June 11, 2007), ECF No. 68; a reprieve to which the government had consented and which was not lifted until September 20, 2020—ten days before the government decided to suddenly notice Mr. Hall's execution in the midst of a global pandemic, *In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C. Sept. 20, 2020), ECF Nos. 265 & 266.  The government has provided no reason why it suddenly must be permitted to execute Mr. Hall right now, and in light of this history,  "[a] brief stay to permit the orderly conclusion of the proceedings in this court will not substantially harm the government . . . ."  *Purkey,* 964 F.3d at 618.  Mr. Hall has raised claims that his fundamental, constitutional rights have been infringed.  Granting a stay so as to allow him to fully and fairly litigate those claims greatly outweighs the Government's sole interest in finality.

## V.      A STAY IS IN THE PUBLIC INTEREST.

Finally, a stay of execution is in the public interest.  It does not serve the public to execute individuals before they are able to fully litigate their constitutional rights.  *See id.* (observing "the public interest is surely served by treating this case with the same time for consideration and deliberation that we would give any case.  Just because the death penalty is involved is no reason to take shortcuts—indeed, it is a reason not to do so."); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) ("The public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights."); *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004) ("Confidence in the humane application of the governing laws . . . must be in the public's interest.").  Indeed, "[a]pplying the law in a way that violates the Constitution is *never* in the public's interest." *Minney v. U.S. Office of Pers. Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015).

A fundamental right such as that presented here, the right to a fair trial, must be safeguarded even more so.  *See Batson*, 476 U.S. at 86 n.8 (describing "the right to trial by jury in criminal cases" as a "fundamental feature of the American system of justice").  As the Supreme Court made clear in *Batson*, "[d]iscrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others.'"  *Id.* at 87–88 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879)).  Such an alleged harm cannot go unaddressed, for failure to do so infects the entire system.

There is a strong public interest in ensuring Mr. Hall is not put to death on the basis of a sentencing verdict contaminated by racial bias.  His constitutional claims must be fully considered prior to his execution.

18

## **CONCLUSION**

For the foregoing reasons, this Court should grant a brief stay of execution to permit Mr.

Hall to pursue his constitutional claims regarding the imposition of his death sentence.


Dated:  November 12, 2020                    Respectfully submitted,

                                        By:    */s/  Kaitlyn A. Golden*
                                               Kathryn M. Ali (*pro hac vice* pending)
                                               Kaitlyn A. Golden (*pro hac vice* pending)
                                               HOGAN LOVELLS US LLP
                                               555 Thirteenth Street, N.W.
                                               Washington, D.C. 20004
                                               Telephone: (202) 637-5600
                                               Facsimile: (202) 637-5910
                                               kathryn.ali@hoganlovells.com
                                               kaitlyn.golden@hoganlovells.com

                                               Pieter Van Tol (*pro hac vice* pending)
                                               HOGAN LOVELLS US LLP
                                               390 Madison Avenue
                                               New York, NY 10017
                                               (212) 918-3000
                                               (212) 918-3100 (fax)
                                               pieter.vantol@hoganlovells.com


                                               *Counsel for Petitioner Orlando Hall*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2020, I electronically transmitted the attached document to the Clerk of the Court using the CM/ECF System.  I further certify that service was made via Federal Express on the following:


    T.J. Watson, Warden
    UNITED STATES PENITENTIARY TERRE HAUTE
    4700 Bureau Road South
    Terre Haute, Indiana 47802

    Jonathan Bradshaw
    DEPARTMENT OF JUSTICE
    1100 Commerce Street
    Suite 300
    Dallas, TX 75242


*/s/  Kaitlyn A. Golden*

Kaitlyn A. Golden