IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

ORLANDO CORDIA HALL,
　　　　　Petitioner,

v.

T.J. WATSON, in his official capacity as
Complex Warden of U.S.P. Federal
Correctional Complex (FCC) Terre Haute
　　　　　Respondent.

No.　　2:20-CV-00599-JPH-DLP

**RESPONSE TO HALL'S 28 U.S.C. § 2241 PETITION AND RESPONSE
IN OPPOSITION TO HALL'S MOTION FOR STAY**

Respectfully submitted,

Josh J. Minkler
United States Attorney

*s/ Leigha Simonton*
Leigha Simonton
Special Assistant United States Attorney
Texas Bar No. 24033193

*s/Brian McKay*
Brian McKay
Special Assistant United States Attorney
Texas Bar No. 24046395

*s/ Jonathan Bradshaw*
Jonathan Bradshaw
Special Assistant United States Attorney
Colorado Bar No. 43838
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
E-mail: jonathan.bradshaw@usdoj.gov

Attorneys for Respondent

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION .............................................................................................1

APPLICABLE LEGAL STANDARDS ...............................................................4

ARGUMENT......................................................................................................6

1.  The facts underlying Hall's claims have existed for years, and Hall's delay in raising them now—on the eve of his scheduled execution—warrants denying his stay motion............................................................................................ 6

2.  Hall has no prospect of success on his Section 2241 petition. .............................. 6

    A.  Hall's successive Section 2241 petition should be dismissed as an abuse of the writ. ............................................................................................... 10

    B.  Even if this were Hall's first Section 2241 petition, he could not bring his claims under the savings clause. ............................................................. 12

        i.  Hall could have raised his *Batson* claim under Section 2255....... 13

        ii.  Hall already litigated—and lost—his remaining claims under Section 2255................................................................................ 17

    C.  Even if Hall could proceed via the savings clause, his claims have no merit. ............................................................................................... 19

        i.  Hall has no chance of success on his newly manufactured, last-minute *Batson* claim. ................................................................. 19

            a.  Hall's claim fails to acknowledge the strength of the voir dire record in his case. ....................................................... 19

            b.  Hall's claim inaccurately states the views of the Black venire members who were struck and the non-Black venire members to whom he compares them.............................. 21

        ii.  Hall's claim that his death sentence violates the Fifth and Eighth Amendments and the FDPA is meritless. ..................................... 35

ii

3.      The remaining stay considerations do not weigh in Hall's favor, especially given Hall's delay and that he cannot succeed on the merits. ........................................ 37

CONCLUSION.................................................................................................................... 39

CERTIFICATE OF SERVICE ............................................................................................ 40

# TABLE OF AUTHORITIES

**Federal Cases**                                                                          **Page(s)**

*Anraout v. Marberry*, 351 F. App'x 143 (7th Cir. 2009) .............................................................. 11

*Atkins v. Virginia*, 536 U.S. 304 (2002) .................................................................................... 16

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ..................................................................................... 6

*Barr v. Lee*, 140 S. Ct. 2590 (2020) ....................................................................................... 6, 7

*Baston v. Kentucky*, 476 U.S. 79 (1986) ...................................................................................... 7

*Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020) ........................................................ 10, 12, 19

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) ...................................................................... passim

*Chazen v. Markse*, 938 F.3d 851 (7th Cir. 2019) .................................................................. 12, 26

*Davis v. Ayala*, 576 U.S. 257 (2015) ................................................................... 23, 28, 29, 30

*Davis v. Greer*, 13 F.3d 1134 (7th Cir. 1994) ........................................................................... 36

*Felker v. Turpin*, 518 U.S. 651 (1996) ..................................................................................... 11

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) ........................................................................ 12

*Gomez v. U.S. Dist. Ct.*, 503 U.S. 653 (1992) ............................................................................ 7

*Hall v. United States*, 527 U.S. 1054 (1999) .............................................................................. 2

*Hall v. United States*, No. 4:00-CV-422-Y, 2004 WL 1908242
    (N.D. Tex. Aug. 24, 2004) .......................................................................................... 2, 17, 18

*Hill v. McDonough*, 547 U.S. 573 (2006) ................................................................................... 7

*In re Davenport*, 147 F.3d 605 (7th Cir. 1998) ........................................................................ 12

*In re Hall*, No. 19-10345, ___ F.3d ___, 2020 WL 6375718 (5th Cir. Sept. 30, 2020) ....... 2, 4, 38

*Lambert v. Buss*, 498 F.3d 446 (7th Cir. 2007) .................................................................. 4, 5, 6

*Lee v. Watson*, ("Lee II"), 964 F.3d 663 (7th Cir. 2020) ................................................ 13, 14, 15

*Lee v. Watson (Lee I)*, No. 19-3399, 2019 WL 6718924 (7th Cir. Dec. 6, 2019) ............. 4, 5, 6, 10

*McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076 (11th Cir. 2017) ............. 13

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ................................................................................ 36

**Federal Cases, continued**                                                           **Page(s)**

*McCleskey v. Zant*, 499 U.S. 467 (1991) ................................................. 11

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ................................................. 15

*Nelson v. Campbell*, 541 U.S. 637 (2004) ................................................... 5

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................... 4

*Parks v. Watson*, No. 2:20-CV-00196, 2020 WL 5407495 (S.D. Ind. Sept. 9, 2020)................. 18

*Prost v. Anderson*, 636 F.3d 578 (10th Cir. 2011)........................................ 13

*Purkey v. United States*, 812 F. App'x 380 (7th Cir. 2020)............................... 5

*Purkey v. United States*, 964 F.3d 603 (7th Cir. 2020).................................. 5, 12, 13, 18

*Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009)....................................... 15

*Roper v. Simmons*, 543 U.S. 551 (2005)................................................... 16

*Roundtree v. Krueger*, 910 F.3d 312 (7th Cir. 2018)................................... 11, 18

*United States v. Hall*, 152 F.3d 381 (5th Cir. 1998) ................................... passim

*United States v. Hall*, 455 F.3d 508 (5th Cir. 2006) .................................... 2

*United States v. Hendrix*, 509 F.3d 362 (7th Cir. 2007) ................................ 32

*United States v. Holland*, 1 F.3d 454 (7th Cir. 1993) .................................... 4

*United States v. Thompson*, 735 F.3d 291 (5th Cir. 2013)............................ 23, 24, 25, 26

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) .............................. 14, 19, 22

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) ................................... passim

*Williams v. Chrans*, 50 F.3d 1358 (7th Cir. 1995)................................... 4, 5, 38

**Federal Statutes and Rules**                                                                                 **Page(s)**

18 U.S.C. § 3593(f) ............................................................................................................ 36

28 U.S.C. § 2255(e) ...................................................................................................... 11, 12

28 U.S.C. § 2255(h) .......................................................................................................... 11

28 U.S.C. § 2255(h)(1) ...................................................................................................... 17

**Other Authorities**

Pet. for Cert., *United States v. Wheeler*, No. 18-420 (Sup. Ct.), 2018 WL 5017116 (denied Mar. 18, 2019) .......................................................................................................... 13

**INTRODUCTION**

Over 25 years ago, Orlando Hall and his coconspirators kidnapped 16-year-old Lisa Rene from her Arlington, Texas apartment, raped her, and then drove her to their hometown of Pine Bluff, Arkansas, where they held her captive in two different motel rooms, continued to rape her, and eventually buried her alive and left her to suffocate and die after beating her with a shovel, stripping her naked, and pouring gasoline on her at the gravesite. *See United States v. Hall*, 152 F.3d 381, 388-427 (5th Cir. 1998). Hall orchestrated the crime in retaliation for a drug deal gone bad when Lisa's brother Neil took $4700 from Hall in exchange for marijuana for Hall's drug-distribution business but failed to provide the marijuana to Hall in return. *See id*. Sixteen-year-old Lisa was not connected in any way with this drug activity and had recently left her parents and home on the Caribbean island of St. Croix to share an apartment in Arlington, Texas with her older sister Pearl, who worked at the front desk of a La Quinta hotel, to pursue a high-school education. (Tr. Vol. 16:150-56 (Govt Appx. at 182-88).)

Hall does not contest his guilt, nor does he contend that he is categorically disqualified from the death sentence imposed. Yet in this proceeding—which he initiated on the eve of his scheduled execution—Hall claims that the jury that convicted him and recommended a death sentence a quarter of a century ago was selected in a racially discriminatory manner and that alleged racial disparity resulted in his death sentence.

Hall did not pursue his current jury-selection claim in his appeal or in the multiple collateral attacks he filed over the past decades. None of Hall's many challenges to his conviction or sentence—which continue to span multiple circuits—has been successful. In his direct appeal—in which he was represented by at least three attorneys, including one of the same attorneys who continues to represent him today, Marcia Widder—Hall raised 11 separate claims

1

of error. *See Hall*, 152 F.3d at 388-427. And even though he had asserted an unsuccessful *Batson* objection in the district court, (CV No. 1-11), he made no *Batson* claim on appeal. The Fifth Circuit affirmed Hall's conviction and sentence, *id.* at 427, and the Supreme Court denied certiorari, *see Hall v. United States*, 527 U.S. 1054 (1999).

In 2000, represented by separate counsel so he could file ineffective-assistance claims against his former counsel, Hall sought relief under 28 U.S.C. § 2255. He ultimately asserted 12 separate claims after supplementing his Section 2255 motion twice. *Hall v. United States*, No. 4:00-CV-422-Y, 2004 WL 1908242, at *4 (N.D. Tex. Aug. 24, 2004). Again, not one of them related to allegations of racial bias in his jury selection. *See id.* Notably, Hall did raise the other claim he makes here—namely, the contention that "Hall's rights under the Fifth and Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme." *Id.* The district court rejected that claim (along with all the others), and both it and the Fifth Circuit denied a certificate of appealability. *United States v. Hall*, 455 F.3d 508, 510 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

Most recently, Hall filed a different Section 2241 petition in this Court, Case No. 2:17-CV-176; a motion for authorization to file a second or successive Section 2255 motion in the Fifth Circuit; *see In re Hall*, No. 19-10345, ___ F.3d ___, 2020 WL 6375718 (5th Cir. Sept. 30, 2020); and a complaint in the District of Columbia, Case No. 1:20-CV-3184. For several years, he has also been a party to a separate lawsuit in the District of Columbia relating to the execution protocol, which is currently on appeal. *See* D.C. Cir. Case No. 20-5329. But in none of the more recent collateral attacks did Hall raise the claims he alleges here. Rather, he raises them now in this (second) Section 2241 petition—filed just *seven days* before his scheduled execution. The last-minute nature of his claims is astonishing when one considers that Hall: (1) has known for

2

years about the facts underlying his claims and could have known about them even sooner with reasonable diligence; (2) has, of course, been aware of his death sentence for the past 25 years; and (3) received 50 days' notice of his execution date.

As is obvious from this procedural history, this last-minute Section 2241 petition is nothing more than a last-ditch attempt to level barred and baseless allegations against the U.S. Attorney's Office (and, impliedly, the very-capable district judge who ruled on Hall's *Batson* objection and imposed the death sentence) in the hopes that a court in a completely different district and circuit—unconnected to the crimes Hall committed and the trial proceedings, and a quarter century from a fresh record—stays his execution. This Court must reject the invitation, especially in light of Hall's dilatory tactics, which are designed to bolster his case for postponing his execution given the short window of time now left for the government to brief these issues and for this Court to decide them. His delay alone merits denial of his stay motion.

Even if it did not, the Court should reject his claims because they are an abuse of the writ, not cognizable under Section 2241, and meritless. Like Hall's previous Section 2241 petition, this petition raises claims that could and should have been adjudicated in a Section 2255 motion. No precedent supports Hall's efforts to evade the requirements of Section 2255 by filing a successive petition under Section 2241 based on evidence that he knew or could have discovered years ago. As to the merits, Hall's *Batson* claims rely on a mischaracterization of the trial record, which in fact demonstrates that the government—principally represented by AUSA (later U.S. Attorney) Richard Roper—conducted a careful jury-selection process, described at length to the district court its reasons for its peremptory strikes, and easily defeated a *Batson* challenge before the district judge who viewed the proceedings. And Hall's statistical claims are based on tenuous

statistical analysis that, both legally and factually, does not support any inference of racial discrimination in his own case.

More than 25 years have passed since Hall's "heinous, cruel, and depraved" crime. *Hall*, 152 F.3d at 406. Hall has availed himself of a direct appeal and multiple collateral attacks, each one unsuccessful. His new claims are both procedurally improper and meritless. That is why "[i]t is time—indeed, long past time—for these proceedings to end." *In re Hall*, 2020 WL 6375718, at *6. This Court should not reward Hall's delay. His stay motion should be denied.

## APPLICABLE LEGAL STANDARDS

A stay of execution is a form of equitable relief to which the standards for a preliminary injunction generally apply. *See Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995); *see Nken v. Holder*, 556 U.S. 418, 434 (2009) (noting the "substantial overlap" between standards for stays and preliminary injunctions). A capital prisoner seeking a stay of execution pending additional legal proceedings bears the burden of demonstrating: (1) he has a significant likelihood of success on the merits in the pending legal proceedings; (2) he will suffer irreparable harm if a stay is not granted; and (3) the balance of equities (the harms to the prisoner and the government, as well as the interests of the public at large) weigh in favor of a stay. *Lambert v. Buss*, 498 F.3d 446, 447 (7th Cir. 2007); *cf. United States v. Holland*, 1 F.3d 454, 456 (7th Cir. 1993).

The Seventh Circuit has established guidelines for such motions. First, the requirement that the movant "make a '*strong* showing' of probable success on the merits" is a demanding one—a court may not grant a stay even if it is based on a "significant possibility" of success or a finding "that evaluating [the defendant]'s arguments will take more time." *Lee v. Watson* (*Lee I*), No. 19-3399, 2019 WL 6718924, at *1 (7th Cir. Dec. 6, 2019) (quoting *Nken*, 556 U.S. at 434)

4

(emphasis added). Indeed, the Supreme Court recently vacated a stay of execution for a federal prisoner where the Seventh Circuit had found only that his claims were "worthy of further exploration" and that a stay would permit more "time for consideration and deliberation." *Purkey v. United States*, 964 F.3d 603, 618 (7th Cir. 2020), *stay vacated*, ___ S. Ct. ___, 2020 WL 3988688 (July 15, 2020); *see also Purkey v. United States*, 812 F. App'x 380, 382 (7th Cir. 2020) (clarifying that, to issue stay, likelihood of success must be "strong enough to satisfy *Nken*'s first requirement").

Second, "[t]he prospect of irreparable injury" is "not itself enough" to justify a stay of execution, *Lee I*, 2019 WL 6718924, at *1, because irreparable injury is generally taken as a given in capital cases, *Chrans*, 50 F.3d at 1360.

Third, as for the remaining equitable considerations, when a defendant's conviction and sentence have been upheld on direct appeal and collateral review, a court must recognize the government's "strong interest in proceeding with its judgment" and must consider "the extent to which the inmate has delayed unnecessarily in bringing the claim" on which a stay application is based. *Lambert*, 498 F.3d at 452 (quoting *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004)); *see Bucklew v. Precythe*, 139 S. Ct. 1112, 1133-34 (2019) (explaining that "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a [death] sentence" that has been upheld on direct appeal and collateral review, and "[c]ourts should police carefully against attempts to use [further] challenges as tools to interpose unjustified delay") (quotation marks omitted). Because the government has a "significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Lambert*, 498 F.3d at 452 (quoting *Nelson*, 541 U.S. at 650). Thus, while this

5

Court should give "non-frivolous claims of constitutional error the careful attention that they deserve," "the administration of justice ought not to be interfered with on mere pretexts," *Barefoot,* 463 U.S. at 888, and this Court should not countenance attempts "to use [further] challenges as tools to interpose unjustified delay," *Bucklew*, 139 S. Ct. at 1133-34.

Given these standards, the Seventh Circuit has identified "two critical factors in evaluating whether a stay of execution should issue"—"whether the inmate shows a significant probability of success on the merits," and "whether the inmate has delayed unnecessarily in bringing the claim." *Lambert*, 498 F.3d at 451. Absent a strong showing of both likelihood of success and diligence, a capital defendant is not entitled to a stay of execution. *Id.*; *see Barr v. Lee*, 140 S. Ct. 2590, 2591-92 (2020) (per curiam); *Lee I*, 2019 WL 6718924, at *1-2.

**ARGUMENT**

This Court should deny Hall's stay motion for three independent reasons. First, Hall delayed impermissibly before filing this second Section 2241 petition just days before his scheduled execution. Hall could have pressed these claims decades ago rather than manufacturing a sense of urgency by raising them for the first time on November 11, 2020. Hall's inexcusable delay is reason alone to deny his stay motion. Second, Hall has no hope of succeeding on his claims here. This entire proceeding is an abuse of the writ, his claims are not cognizable under the savings clause, and they are fundamentally meritless. Third, the other stay factors weigh overwhelmingly against staying Hall's execution.

1.    **The facts underlying Hall's claims have existed for years, and Hall's delay in raising them now—on the eve of his scheduled execution—warrants denying his stay motion.**

Hall's newest motion stands in blatant disregard of the Supreme Court's admonition that last-minute stays or injunctions of federal executions "should be the *extreme* exception, not the

6

norm." *Barr*, 140 S. Ct. at 2591 (quotation marks omitted; emphasis added). The "'last-minute nature of an application' that 'could have been brought' earlier . . . 'may be grounds for denial of a stay'" or other equitable relief. *Bucklew*, 139 S. Ct. at 1134 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)); *see Gomez v. U.S. Dist. Ct.*, 503 U.S. 653, 654 (1992) (same).

Hall's eleventh-hour petition provides no basis to conclude that the exceptional relief of a stay is warranted here. His claims are based on jury-selection issues and alleged discrimination in the application of the death penalty—events that occurred 25 years ago. Hall could have included these claims along with the 11 others he raised on direct appeal, but he did not. *See Hall*, 152 F.3d at 388-427. He raised only one of his claims in a prior Section 2255 proceeding, and he lost. He raised neither claim in his prior Section 2241 proceeding in this Court. And despite having received notice of his scheduled execution on September 30, 2020, Hall waited until *seven days* before the noticed date to raise these two unmeritorious claims.

First, the facts about jury selection in Hall's case were a matter of record and were known to Hall during his direct appeal more than two decades ago. Indeed, Hall raised a challenge to the government's strikes under *Baston v. Kentucky*, 476 U.S. 79 (1986), during jury selection, which the district court overruled. (CV No. 1-11.) Hall could have sought review on direct appeal, when the record and memories were fresh, but he did not, presumably because his counsel did not consider that challenge to have enough merit to be included with his 11 other claims. It is not as though Hall's counsel did not consider alleging error at the voir dire stage as a means of challenging his conviction because he actually raised a different claim of error at that stage: that "the district court committed reversible error by denying several of his challenges for cause to certain venirepersons, thereby forcing him to utilize peremptory challenges to keep these individuals off the jury." *Hall*, 152 F.3d at 406. Nor did Hall raise his challenge to jury selection

7

in the Section 2255 proceedings or contend that his attorneys were ineffective related to their investigation or assertion of a *Batson* challenge. Hall has had prior opportunities to raise his claim of *Batson* error but availed himself of none of them.

Hall suggests that his last-minute *Batson* claim is justified because subsequent decisions by the Supreme Court and Fifth Circuit lend support to his claim. That argument is unpersuasive for several reasons, including that those other cases do not suggest, much less make a strong showing, that *his* jury was selected in a racially discriminatory manner. *See infra* at § 2(C). But even accepting Hall's suggestion that he could not have alleged a *Batson* claim before 2009—when the Fifth Circuit issued the later decision—he does not explain why he never brought it to any court's attention until now, 11 years later. Indeed, even on Hall's telling, the facts underlying his *Batson* claim were available to him well before 2017, when he initiated his first Section 2241 proceeding in this Court. And, the very day that Hall received notice of his execution date, his attorneys released a prepared statement alleging that Hall's jury was selected in a racially discriminatory manner.[1]  Yet Hall sat on his *Batson* claim for 43 more days—until just seven days before his scheduled execution—before raising it, and he provides no explanation for that additional delay. His delay is unfair to the government, the district court in which he was tried, and this Court; it undermines the adjudication of his claims that he purports to seek; and it belies any suggestion that he intends for this proceeding to be something other than a tactic to force postponement of his execution.

---

[1] Marcia C. Widder & Robert C. Owen, *Orlando Hall Attorney Statement Regarding Execution Date Announcement* (Sept. 30, 2020), https://www.fd.org/news/orlando-hall-attorney-statement-regarding-execution-date-announcement).

Second, Hall has been dilatory in raising a claim that racial discrimination—rather than the heinous nature of his crimes—animated the decision to seek and secure the death penalty for his offense. Like the facts underlying his *Batson* claim, statistics concerning the application of the federal death penalty existed during Hall's criminal proceedings, and the particular figures he points to were available by 2011. But he did not raise this claim during his trial, on direct appeal, or in any of his collateral challenges until now.

Hall cites the subsequent *report* of those figures as "new evidence" that justifies raising this claim now. But his argument fails. The underlying data that Hall relies on have existed for nearly a decade, and his counsel could have secured this analysis (or an equivalent) long ago through reasonable diligence. Indeed, the 2011 declaration he points to makes it clear that the analysis was performed at the request of another inmate, and Hall easily could have sought it himself. (*See* CV No. 1-7 at 2 ¶ 2.) Moreover, if the mere *analysis* of historical data that has long been available constitutes new evidence, as Hall contends, an inmate could wait until a scheduled execution looms before performing new analyses (or, at least, obtaining analyses not yet known to him) and then claim to have found "new evidence" warranting postponement of his execution. That would make late stays routine, not the extreme exception the Supreme Court says they are.

Moreover, even accepting Hall's assessment of when he became aware of the statistical analysis he relies on, he has not explained why he delayed over two months—until the eve of the scheduled execution—before presenting his claim. Hall admittedly was aware of the analysis by August 2020. (CV No. 1 at 22.)[2] And since then, he has engaged in extensive litigation in

---

[2] "CV No." refers to the docket numbers of this Section 2241 proceeding.

different proceedings in this Court, in the Fifth Circuit, in the District Court for the District of Columbia, and in the D.C. Circuit. But he waited until now to raise this claim.

In sum, that Hall chose not to avail himself of these multiple opportunities to seek relief until now—on the eve of his execution date—exposes his petition as the delay tactic that he intends it to be. The Seventh Circuit's observations about dilatory tactics in *Lee I*, 2019 WL 6718924, at *1, demand that Hall's stay motion be denied. Like Hall, Lee delayed filing a Section 2241 petition. *Id*. But unlike Hall, Lee's petition was filed at least two months before the scheduled execution date—not *seven days* prior. *Id.* In vacating a stay of execution, the Seventh Circuit pointed out that Lee waited to seek relief under Section 2241 until four years after learning of evidence "he characterize[d] as newly discovered" and two months after receiving notice of his execution date. *Id.* at *2. Recognizing that a district court would want more than the *months* that Lee's belated motion permitted to adjudicate his claims, the Seventh Circuit explained that the effects of his delay could not be used to justify postponement of his execution. *Id.* ("[S]omeone who waits years before seeking a writ of habeas corpus cannot, by the very act of delay, justify postponement of the execution."). Hall's delay, which allows a mere *seven days* for the defendants to prepare briefing and for this Court to render a decision, is even more extreme and justifies denying his stay motion. *See Bucklew*, 139 S. Ct. at 1134 (recognizing that the last-minute nature of claims that could have been asserted earlier may justify denying a stay).

**2.      Hall has no prospect of success on his Section 2241 petition.**

       **A.      Hall's successive Section 2241 petition should be dismissed as an abuse of the writ.**

In most cases, a federal prisoner may collaterally attack his judgment only by motion under Section 2255. *Bourgeois v. Watson*, 977 F.3d 620, 632 (7th Cir. 2020). In 1996, Congress restricted the grounds on which federal prisoners may file second or successive Section 2255

10

motions through the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 105, 110 Stat. 1214, 1220. AEDPA limited the availability of successive Section 2255 motions to cases involving either (1) persuasive new evidence that the prisoner was factually not guilty of the offense, or (2) a new rule of constitutional law made retroactive by the Supreme Court to cases on collateral review. 28 U.S.C. § 2255(h).

Even before AEDPA, however, federal courts imposed restrictions on a prisoner's ability to file multiple Section 2255 motions or Section 2241 petitions. *See Felker v. Turpin*, 518 U.S. 651, 664 (1996) (describing the abuse-of-the-writ doctrine). A prisoner abuses the federal writ of habeas corpus by "raising a claim in a subsequent petition that he could have raised in his first, regardless of whether the failure to raise it earlier stemmed from a deliberate choice." *McCleskey v. Zant*, 499 U.S. 467, 489 (1991). The Seventh Circuit has applied this doctrine to uphold the dismissal of second or successive Section 2241 petitions seeking to raise claims that could have been raised earlier. *E.g.*, *Roundtree v. Krueger*, 910 F.3d 312, 314 (7th Cir. 2018).

This is Hall's second Section 2241 petition. Hall filed his first Section 2241 petition in 2017, *see Hall v. Daniels*, 2:17-CV-176-JPH-DLP, Dkt. 1 (S.D. Ind. Apr. 19, 2017), and this Court dismissed it because Hall could not satisfy the savings clause (requiring him to demonstrate that Section 2255 was "inadequate or ineffective," 28 U.S.C. § 2255(e), *see infra*), *id.* at Dkt. 48 (S.D. Ind. Nov. 14, 2020). In that 2017 petition, Hall could have raised both claims he raises now. He did not. Because every fact on which Hall now relies could have been discovered no later than 2011, this "second petition is an abuse of the writ," and this Court should dismiss it with prejudice. *Anraout v. Marberry*, 351 F. App'x 143, 144-45 (7th Cir. 2009).

11

**B.    Even if this were Hall's first Section 2241 petition, he could not bring his claims under the savings clause.**

Setting aside Hall's abuse of the writ, his claims are not cognizable under Section 2241. Although Section 2255 generally limits prisoners to "one shot at relief," two exceptions exist. *Bourgeois*, 977 F.3d at 632. First, a prisoner can move to file a second or successive Section 2255 motion if it contains newly discovered evidence proving actual innocence or identifies "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court." 28 U.S.C. § 2255(h). Second, a prisoner can seek relief under 28 U.S.C. § 2255(e)—the "savings clause." That clause may be invoked only if Section 2255 is "inadequate or ineffective to test the legality of [the prisoner's] detention." *Chazen*, 938 F.3d at 856.

The Seventh Circuit has decided three "central" cases applying the savings clause. *Purkey*, 964 F.3d at 611. First, in *In re Davenport*, 147 F.3d 605 (7th Cir. 1998), the Seventh Circuit concluded that the savings clause permits a habeas petition that raises a claim of fundamental statutory error in a federal defendant's conviction or sentence (such as a conviction for conduct that is not criminal) that could not have been asserted in the defendant's first Section 2255 proceeding but is later made viable by an intervening decision of statutory interpretation. Second, in *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001), the Seventh Circuit concluded that the savings clause permitted a habeas petition asserting that the United States was bound by treaty to follow an international tribunal's decision that the defendant's death sentence was illegal, a claim that the Court deemed "literally impossible" for the defendant to have raised on direct appeal or in his Section 2255 motion because the tribunal's decision was not available at that time. Third, in *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc), the defendant (and Hall's coconspirator) obtained new evidence in support of his intellectual-disability claim—evidence that existed at the time of his trial but had been purportedly unavailable to him. *Id.* at 1132-34.

12

Because Webster could not satisfy Section 2255(h)'s gatekeeping requirements for a successive motion, he filed a Section 2241 petition claiming that he was categorically ineligible for the death penalty based on that new evidence. *Id.* at 1134-35. In that "rare case," the en-banc court held that there was a "structural problem" in Section 2255, so Webster could invoke the savings clause. *Webster*, 784 F.3d at 1135-44.[3]

While these cases do not create "rigid categories delineating when the [savings clause] is available," *Purkey*, 964 F.3d at 614, Seventh Circuit precedent "holds unambiguously" that a Section 2241 petition may not proceed under the savings clause "absent 'a compelling showing' that it was 'impossible' to use § 2255 to cure the defect identified in the § 2241 petition." *Lee v. Watson* ("*Lee II*"), 964 F.3d 663, 666 (7th Cir. 2020), *cert. denied*, No. 20-5032, 2020 WL 3964235 (July 14, 2020). At a minimum, "there must be something 'structurally inadequate or ineffective about section 2255 as a vehicle' for the arguments raised in the § 2241 petition." *Id.* That is, "the words 'inadequate or ineffective,' taken in context, must mean something more than unsuccessful." *Purkey*, 964 F.3d at 615.

### i.    Hall could have raised his *Batson* claim under Section 2255.

Hall could have, but chose not to, raise his *Batson* claim on direct appeal or in his first Section 2255 motion. Hall acknowledges that *Batson* was announced *before* he was found guilty, filed a direct appeal, or first collaterally attacked his criminal judgment. Indeed, Hall's lawyers

---

[3] The government respectfully disagrees with the Seventh Circuit's conclusions in *Davenport*, *Garza*, and *Webster* and agrees with the Tenth Circuit's decision in *Prost v. Anderson*, 636 F.3d 578 (10th Cir. 2011) (Gorsuch, J.), the Eleventh Circuit's en banc decision in *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076 (11th Cir. 2017) (en banc), and the dissent in *Webster*, 784 F.3d at 1146-54 (Easterbrook, J., dissenting), which concluded that the savings clause does not permit a defendant to challenge his conviction or sentence in a Section 2241 habeas petition. *See* Pet. for Cert., *United States v. Wheeler*, No. 18-420 (Sup. Ct.), 2018 WL 5017116 (denied Mar. 18, 2019). The government recognizes that the Seventh Circuit's binding precedent forecloses this argument here but notes its position to preserve the issue for further appellate review if warranted.

raised a *Batson* challenge at trial, (CV No. 1 at 14.), and his codefendant Webster (tried separately) raised a *Batson* claim in his appeal, *United States v. Webster*, 162 F.3d 308, 350 (5th Cir. 1998). But Hall did not appeal any *Batson* ruling or mention *Batson* in his first collateral attack.

In addition to the *Batson* decision itself, all of the facts on which his claim relies likewise existed before Hall's direct appeal or first Section 2255 motion. That includes the "manual," which Hall claims was created before his victim was even born, (*see* CV No. 1 at 33), and AUSA Macaluso's conduct in two trials conducted *before* he joined the U.S. Attorney's Office and became a part of the team that prosecuted Hall. Therefore, Hall could have included a *Batson* claim at least by the time of his first Section 2255 motion, among the 12 claims he raised therein. *See Hall v. United States*, 4:00-CV-422-Y, Dkt. 1068 (N.D. Tex, Sept. 25, 2002) (permitting Hall to file an amended Section 2255 motion "[b]ecause [it] is [Hall's] sole opportunity to raise all constitutional challenges to his conviction and sentence"). There "was nothing structurally inadequate about § 2255 as a vehicle" for Hall's *Batson* claim, so "[t]he savings clause does not apply." *Lee II*, 964 F.3d at 667.

Hall tries to avoid that conclusion by painting his petition in the image of *Webster*. But Hall's situation is nothing like the one that allowed his coconspirator to proceed via the savings clause. The *Webster* Court made clear that not all (or even most) types of new-evidence claims would be cognizable under Section 2241. *Webster*, 784 F.3d at 1140. Rather, Webster's "rare" circumstances depended on two essential facts: (1) the evidence must be genuinely new, in the sense that it was previously unavailable "despite diligent efforts to obtain it"; and (2) "most importantly, the evidence must show that the petitioner is constitutionally ineligible for the

14

penalty he received." *Id.* n.9. Because Hall's circumstances differ on each fact, he cannot proceed on the path laid out in *Webster*.

First, had Hall been diligent, he could have obtained all of the evidence on which he currently relies even before his trial. Hall claims that he could not have known about the "Sparling manual" or Macaluso's earlier trials until the Supreme Court or the Fifth Circuit published cases describing them after Hall filed his first Section 2255 motion. (*See* CV No. 1 at 35.) Not so. With diligence, Hall could have discovered the manual in the same way that Miller-El's counsel did. *See Miller-El v. Cockrell*, 537 U.S. 322, 334-35 (2003) (explaining that the petitioner used subpoenas to support his claim). Indeed, that Miller-El's counsel did so belies Hall's allegation that the evidence was not reasonably available. Likewise, Hall does not suggest that he faced any impediment in obtaining the records from Macaluso's two earlier trials. The voir dire in Reed's trial took place in 1983; Miller-El's was in 1986. Although the appellate courts did not agree with Reed's or Miller-El's claims until 2009 and 2005, respectively, both defendants had pressed *Batson* claims for years before Hall filed his first Section 2255 motion. *See Miller-El*, 537 U.S. at 328-29 (noting that, in 1988, the Texas Court of Criminal Appeals acknowledged that the petitioner had established an inference of purposeful discrimination); *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009) (noting that, after *Batson* was decided in 1986, the Texas Court of Criminal Appeals remanded Reed's case to the trial court to conduct a *Batson* hearing). Thus unlike *Webster*, in which the Seventh Circuit found "there [was] evidence indicating that . . . missteps by the Social Security Administration" had impeded Webster's access to the relevant information, 784 F.3d at 1140, Hall faced no impediment to obtaining the facts on which he now relies. *See Lee II*, 964 F.3d at 667 (explaining that evidence cannot be "newly discovered" under *Webster* when it was in a publicly available court record). As Hall

15

seemingly admits, he cannot credibly argue that his lawyers even tried to obtain that evidence before filing his first collateral attack. (*See* CV No. 1 at 25.)

It is true that Hall could not have obtained the *decisions* in *Miller-El* or *Reed* until 2005 and 2009. But even if those judicial decisions in other cases did support his *Batson* claim here, Hall cannot satisfy *Webster*'s requirement of diligence. *See* 784 F.3d at 1146 (explaining that the lower court may proceed to the merits of Webster's claim only if it concludes that the relevant records were previously "unavailable and all due diligence was exercised"). *Miller-El* and *Reed* have been on the books for 15 and 11 years, respectively, and Hall offers no explanation for why he failed to pursue his *Batson* claim until now. This Court should reject Hall's attempt to fit it within *Webster*'s "fact pattern[]." *Hall v. Daniels*, 2:17-CV-00176-JPH-DLP, Dkt. 48 at 4 (S.D. Ind. Nov. 14, 2020).

Hall's attempt to rely on *Webster* breaks down further at the "most important[]" step in the analysis. 784 F.3d at 1140 n.9. As the Seventh Circuit emphasized, Webster's new evidence ultimately proved that he was, as a *categorical* matter, *constitutionally ineligible* for the death penalty. *See id* at 1125. For Hall, even a successful *Batson* claim does nothing of the sort. At very most, it would have entitled Hall to a new trial, at which he could been found guilty and sentenced to death.

And there is another critical defect in Hall's *Webster*-based argument. The *Webster* majority emphasized that Webster relied on constitutional cases that the Supreme Court had decided *after* AEDPA's enactment, and after the conclusion of Webster's direct appeal. As the majority explained, "the fact that the Supreme Court had not yet decided *Atkins*[ *v. Virginia*, 536 U.S. 304 (2002),] and *Roper*[ *v. Simmons*, 543 U.S. 551 (2005),] at the time AEDPA was passed supports the conclusion that the narrow set of cases presenting issues of constitutional

16

ineligibility for execution is another lacuna in [Section 2255]." *Id.* at 1138. The claim that Hall raises here, by contrast, is based on *Batson*, which predated AEDPA's enactment and Hall's trial, appeal, and first full round of collateral attacks.

If Congress had intended to allow defendants to raise *Batson* claims in second or successive Section 2255 motions, it could have said so in AEDPA. Instead, AEDPA permits second or successive motions based on newly discovered evidence only when that evidence, if credited, would establish the defendant's innocence by "clear and convincing evidence." 28 U.S.C. § 2255(h)(1). And AEDPA requires petitioners to raise such claims within one year of "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* § 2255(f)(4). Allowing Hall to proceed with a *Batson* claim—raised more than two decades after trial, almost as long after his first Section 2255 motion, and three years after his first Section 2241 petition—would nullify Section 2255's congressionally-mandated limitations. Hall has not (and cannot) point to any Seventh Circuit precedent supporting that result.

### ii. Hall already litigated—and lost—his remaining claims under Section 2255.

Days before his lawful sentence is set to be enforced, Hall claims that the "application of the federal death penalty, and as applied to [him], is impermissibly influenced by race, in violation of the Fifth and Eighth Amendments, as well as the Federal Death Penalty Act." (CV No. 1 at 10.) But Hall raised—and the court of conviction rejected—those claims already. *See Hall v. United States*, No. 4:00-CV-422-Y, 2004 WL 1908242, at *36 (N.D. Tex. Aug. 24, 2004). "Specifically, Hall contend[ed] that the government violated his constitutional rights under the Fifth and Eighth Amendments because it has used ethnicity as a basis for seeking the

17

death penalty against African–Americans like himself." *Id.* Hall is barred from relitigating claims he lost under Section 2255 now. *See Roundtree*, 910 F.3d at 314.

Hall's reliance on *Webster* to salvage these claims fails for the same reason *Webster* cannot save his *Batson* claim. As Hall admits, his "new" evidence—statistics contained in a declaration prepared in 2011—is, in fact, almost a decade old. Again, Hall does not point to any impediment to his having obtained this evidence before now. Indeed, the statistics on which Hall now relies were compiled at the request of *another* death row inmate in 2010—demonstrating their availability to defendants like Hall. (CV No. 1 at 40.) And even if those statistics were truly "new" evidence, nothing about them suggests that Hall would be constitutionally ineligible for the death penalty. Because Hall has not (1) offered evidence that is genuinely new, in the sense that he could not have previously discovered it, and (2) showed that he is categorically ineligible for the death penalty, he cannot rely on *Webster*.

Finally, Hall cannot show a broader, structural flaw in Section 2255 that barred him from raising his claims that the federal capital sentencing scheme is biased. To the contrary, Hall raised that very claim during his first round of collateral review. *See, e.g.*, *Parks v. Watson*, No. 2:20-CV-00196-JPH-DLP, 2020 WL 5407495, at *3 (S.D. Ind. Sept. 9, 2020) (explaining that the petitioner could not resort to the savings clause where he raised many of his Section 2241 claims in a previous Section 2255 motion and so "cannot show that § 2255 was inadequate or ineffective."). If Hall could simply return to this Court every few years and file a new Section 2241 petition claiming that further statistics support his already-rejected argument, "what would stop a never-ending series of reviews and re-reviews (particularly since there is no numerical limit for section 2241)?" *Purkey*, 964 F.3d at 615. Hall seeks to return to the days of endless rounds of successive collateral attacks on his criminal judgment. AEDPA prohibits that

18

approach, and the Seventh Circuit has squarely rejected "end-runs" around Section 2255(h).

*Bourgeois*, 977 F.3d at 637.

### C. Even if Hall could proceed via the savings clause, his claims have no merit.

#### i. Hall has no chance of success on his newly manufactured, last-minute *Batson* claim.

Hall has not shown a likelihood of success on the merits of his last-minute *Batson* claim. That is not surprising, because if Hall's attorneys had believed his *Batson* claim was at all viable, they would have raised it on direct appeal—as did Hall's codefendant, Bruce Webster. But in rejecting Webster's claim, the Fifth Circuit reasoned: "The government offered distinguishing characteristics for each of the jurors Webster claims were similarly situated. They had different combinations of qualities, and some had more government-desired qualities than did the jurors the government preempted . . . and the reasons resemble ones we have accepted in the past." *United States v. Webster*, 162 F.3d 308, 350 (5th Cir. 1998), *cert. denied*, 528 U.S. 829 (1999). The same is true here.

##### a. Hall's claim fails to acknowledge the strength of the voir dire record in his case.

The record flatly contradicts Hall's argument that the government struck Black jury venire members based on race rather than on legitimate factors relating primarily to their beliefs about the death penalty. Lead trial AUSA (later U.S. Attorney) Richard Roper explained these race-neutral factors to the district court in painstaking detail based on notes he made of each juror's written questionnaire and of each juror's individual voir dire examination.

The comprehensive jury-selection record created in this case explains why none of Hall's army of counsel ever raised—much less prevailed on—a *Batson* claim in any appeal or collateral-review motion in the last 25 years. It also explains why, rather than basing his claim

19

primarily on the actual voir dire record in his case, Hall's argument rests primarily on innuendo he draws from *Miller-El* and *Reed* relating to pre-*Batson* jury-selection practices in the Dallas District Attorney's Office and Macaluso's role in jury selection in those cases before he later joined the U.S. Attorney's Office.

The Department of Justice, including the U.S. Attorney's Office for the Northern District of Texas, unequivocally condemns any racially discriminatory jury-selection process, including the Dallas District Attorney's Office's pre-*Batson* voir dire practices as described in *Miller-El*. The Department emphasizes its commitment to fairness in jury selection, including its commitment to following the requirements of *Batson* and its progeny. But Hall's argument based on *Miller-El* and *Reed* does not come close to establishing any *Batson* violation and is meant to divert this Court's attention from the actual trial record, which—as Hall's counsel has known ever since declining to raise a *Batson* challenge on direct appeal—demonstrates unequivocally that no *Batson* violation occurred.

A four-member federal prosecution team tried Hall, and AUSA (later U.S. Attorney) Richard Roper led that team. The team also included long-time appellate AUSA Delonia Watson, AUSA Chris Curtis, and AUSA Macaluso. As lead counsel, AUSA Roper handled a substantial amount of the voir dire questioning of potential jurors; completed the prosecution's peremptory strike list; presented all of the argument on the *Batson* challenges and did so from his own notes; and provided voluminous, legitimate, and credible reasons for the strikes at issue. (*See, e.g.*, CV No. 1-15 (prosecution strike list); CV No. 1-11 (*Batson* hearing).) Longtime Fort Worth district judge Terry Means presided over the case, watched the voir dire, heard the *Batson* challenges and AUSA Roper's explanations for the strikes at issue, and found Roper's explanation for his strikes credible and valid under governing caselaw. (CV No. 1-11.)

20

Hall's counsel have implicitly admitted over and over again that no valid *Batson* claim exists, as they did not pursue a *Batson* argument on direct appeal or in his many collateral motions and related litigation, including his initial Section 2255 motion, his applications to file second or successive Section 2255 motions, and his earlier Section 2241 petition filed in this Court—even though he filed the last two attacks several years after both *Miller-El* and *Reed* were decided. Rather, he waited until 25 years after trial, 11 years after the last of these opinions issued, and 43 days after receiving notice of his execution date to raise this claim.

This sequence of events belies the existence of any meritorious *Batson* argument. The following review of the voir dire record further confirms that his *Batson* claim is baseless.

> **b.      Hall's claim inaccurately states the views of the Black venire members who were struck and the non-Black venire members to whom he compares them.**

Aside from relying on *Miller-El* and *Reed*, Hall's argument either minimizes, omits, or mischaracterizes the statements and views of the potential jurors at issue as well as the reasons AUSA Roper provided to explain his use of peremptory strikes.

Out of the four Black venire members AUSA Roper struck, Hall does not contend that AUSA Roper violated *Batson* in striking two—Frances Miller and Lawrence Barrett—because of their strong opposition to the death penalty. (*See* CV No.1 at 36 n.12.) Rather, he takes issue only with AUSA Roper's decision to strike two other Black venire members, Amy Evans and Billie Lee. But it is important to review the statements of all four potential jurors and AUSA Roper's explanations for striking them because doing so demonstrates that all four were justified.

***Frances Miller.*** Ms. Miller checked the box on the questionnaire indicating, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it I could assess it under the proper set of circumstances"; she further stated that she was "basically

21

opposed to the death penalty." (Tr. Vol. 9:142, 144 (Gov't Appx. at 132, 134).) She also said in the questionnaire that "no one has the right to kill another person" and admitted that she did not know if she could ever vote to impose the death penalty. (*See id.*)

The district court noted these questionnaire answers during voir dire and followed up with her on them, and she responded, "my tendency would be to go to life without parole, and the circumstances would have to be very crucial before I could consider the death penalty, because I just don't believe in the death penalty." (Tr. Vol. 9:151 (Gov't Appx. at 141).) Based on her beliefs, the court "presume[d] the government" would challenge her for cause, and the government did, explaining that Ms. Miller's voir dire answers indicated she was not sure she could ever vote to impose the death penalty and that, if she were ever to do so, she would need to have found several aggravating factors, which is more than the law requires. (Tr. Vol. 9:152-54 (Gov't Appx. at 142-44).) After lengthy discussion in which the court was "thinking out loud" about the question, the court—which was conservative in its decision to strike any potential jurors for cause, likely because the parties had 20 peremptory strikes each—denied the motion. (Tr. Vol. 9:152-55 (Gov't Appx. at 142-45).)

In response to the *Batson* challenge as to Ms. Miller after he exercised a peremptory strike on her, AUSA Roper provided detailed reasons based on his own notes and focused on her opposition to the death penalty and the strong possibility she could never vote to impose it:

> In her questionnaire she said she was against the death penalty but could assess it in the proper circumstances, though she felt like she couldn't give the death penalty if life without the possibility of release was an option. Then she said their living and enduring the punishment of never being able to be free would be more harsh punishment. She said, "I feel at the time death is an easy escape and no one has the right to kill another person." She—and in her testimony she said that she was tending to lean for life without release. She also said, "I don't know. I don't think I could do it. I just don't know that I could do it." And I noticed that there were long pauses in those responses when we asked her about that. She said she

22

was basically opposed to the death penalty, and she believed that living in prison was a worse punishment.

So the reason we struck Ms. Miller was because her views on the death penalty we believed substantially impaired her consideration for the death penalty.

(CV No. 1-11 at 10-11.)

Hall does not argue that these reasons were not race-neutral or were impermissible under existing caselaw. *See Davis v. Ayala*, 576 U.S. 257, 273-74, 279 (2015) (recognizing that a juror's hesitancy to impose the death penalty and demeanor are race-neutral justifications); *see also United States v. Thompson*, 735 F.3d 291, 297 (5th Cir. 2013), *as modified* (Nov. 18, 2013) ("This court has routinely found demeanor to be a race-neutral justification.").

Based on AUSA Roper's explanation, the district court rejected the *Batson* challenge as to Ms. Miller. (*Id.*)

***Lawrence Barrett.*** The record demonstrates that AUSA Roper struck potential juror Lawrence Barrett for the same reasons. In questioning Mr. Barrett during voir dire, AUSA Roper noted that Barrett's questionnaire indicated "that [Mr. Barrett] said that [he] couldn't give the death penalty if life without parole is an option, and [he] said that a person [serving a life sentence] will no longer be a threat to society." (Tr. Vol. 9:162 (Gov't Appx. at 146).) Roper later asked, "if the fact that life without the possibility of release is an option, would it really take you out of being able to fairly consider the death penalty?" Mr. Barrett responded, "Yes, it would." (Tr. Vol. 9:165 (Gov't Appx. at 149).) Mr. Barrett further explained that he would only vote to impose the death penalty if the government proved its case beyond all shadow of a doubt." (Tr. Vol. 9:170 (Gov't Appx. at 154).) The government moved to strike for cause because Mr. Barrett was "obviously against the death penalty." (Tr. Vol. 9:174 (Gov't Appx. at

23

158).) The court denied the motion but said, "I think he's a real good candidate for a peremptory." (Tr. Vol. 9:175 (Gov't Appx. at 159).)

AUSA Roper took the court's suggestion and exercised a peremptory strike on Mr. Barrett. (CV No. 1-15.) In responding to Hall's challenge, he again offered a comprehensive explanation for the decision:

> He was challenged for cause because of his views on the death penalty. Also, I noticed when he came in in the general pool, that he was the only juror that made eye contact and smiled and looked at the defendant for several moments smiling, which sometimes doesn't mean anything and sometimes it does, but I do feel like it was significant. He, again, in his questionnaire said he was basically against the death penalty but could assess it in some circumstances. He said in his questionnaire he couldn't give the death penalty if life without parole was an option, and he stated on the questionnaire, that's question 52-A, that the person will no longer be a threat to society. And he testified that he just didn't know if he could do it, meaning giving the death penalty. He thought it was a tough decision, he'd most likely lean toward life without parole, he didn't see it served a purpose, and he didn't think he could sign his name to a verdict form that resulted in someone being put to death, though he did—he was rehabilitated on—when the defense got hold of him, but all in all I felt like he was substantially impaired from giving the death penalty, and that's why we struck him.

(CV 1-11 at 12.) Based on this explanation, the court rejected the *Batson* challenge as to Mr. Barrett. (*Id.*)

**Amy Evans.** AUSA Roper provided similar—and similarly comprehensive—reasons for striking Amy Evans. When asked if she could impose the death penalty when life without parole was also an option, Ms. Evans explained in her questionnaire that it would "depend on the nature of the crime" but added that she "would probably lean more toward the life sentence." (CV No. 1-14 at 10.) She also said that her husband was a minister and would likely be more opposed to the death penalty than she was. (CV No. 1-14 at 10; Tr. Vol. 10:93-94 (Gov't Appx. at 161-62).) She further noted in her questionnaire that her brother-in-law went to prison for murder and another brother-in-law went to prison as a habitual offender. (CV No. 1-14 at 13.)

24

During voir dire, the prosecution questioned her about her questionnaire answer indicating that she leaned toward a life sentence instead of the death penalty, indicating the government's concern with that questionnaire answer. (Tr. Vol. 10:93-94 (Gov't Appx. at 161-62).) Ms. Evans was equivocal on whether she would vote to impose the death penalty. (*Id.*) The prosecution did not move to strike Ms. Evans for cause, likely because the court had consistently denied its request to strike other potential jurors with similar views, including Ms. Miller, Mr. Barrett, and others.

AUSA Roper exercised a peremptory strike on Ms. Evans, yet again offering a voluminous, detailed explanation for the decision:

> I noticed that she had two brothers-in-law in prison, as stated in her questionnaire. I ran out of time and didn't have a chance to ask her about that and it concerned me. She—in her testimony she was very, very hesitant on her views on the death penalty, and she said that she was leaning toward life without the possibility of parole. And she during the questions asking her about whether she could give the death penalty or not, she had very long pauses in her answers and was very hesitant in what she said.
>
> I really don't think—based on my experience, I just don't think she would be a juror that could give a death penalty in a case because of her hesitant answers and her views toward the death penalty. . . .
>
> . . . . She said . . . she would pass the referendum [to have the death penalty but s]he didn't want to vote for it. Also, if the death penalty was a—I just don't feel like all in all, considering her, that she could actually give the death penalty if it got down to it, and I think she would give a sentence of life without the possibility of release because of her feelings about her statements. She was leaning toward life without parole. One other—one time I asked her a question, and I recall the response as being—she was very hesitant. She said, well, I possibly could render the death penalty on some circumstances. But I thought that was such a weak answer, I thought that she was—I really think she is substantially impaired from giving the death penalty if she made it on the jury. Anyway, I didn't strike her for anything to do with race, but rather her views on the death penalty and her background with two brothers-in-law in prison.

25

(CV 1-11 at 13-14.) As with the other explanations, the district court credited this one and overruled the *Batson* objection. (*Id.*)

Hall attacks this ruling on several bases, all of which fail. First, he argues that Ms. Evans did not take long pauses because the record does not reflect that she did. (*See* CV No. 1 at 30-31.) This is despite the fact that a court reporter rarely, if ever, notes a witness's hesitation or pause in a transcript, and also despite the fact that Judge Terry Means and Hall's trial counsel were present during Ms. Evans's voir dire examination and did not contradict or disagree with AUSA Roper's recollection. Although Hall further suggests that the district court was required to "validate" this part of Mr. Roper's explanation, (CV No. 1 at 30), the Fifth Circuit has held otherwise. *Thompson*, 735 F.3d at 300; *see Chazen*, 938 F.3d at 865 (Barrett, J., concurring) (collecting cases and explaining why there is "force" behind district court decisions applying the law of the circuit of conviction in Section 2241 proceedings). And, regardless, common sense dictates that if this observation were counter to Judge Means's and Hall's trial counsel's memories, they would have pointed it out on the record. And yet they did not, indicating they agreed with AUSA Roper's assessment of Ms. Evans's demeanor.

Second, Hall compares Amy Evans to white juror Mary Ann Herring, whom AUSA Roper did not strike, (CV No. 1 at 32; *see* CV Nos. 1-14, 1-23), but the two were not the same in terms of their beliefs about the death penalty. For example, in their questionnaires, Ms. Evans said her support of the death penalty was dependent on the nature of the crime, while Ms. Herring did not place a qualification on her answer that she was in favor of it. (CV No. 1-14 at 9; CV No. 1-23 at 9-10.) And, during voir dire, Ms. Herring said the death penalty was "something that's needed" and should be available for crimes like premeditated or vicious murders. (Tr. Vol. 7:112 (Gov't Appx. at 123).) The two also gave different answers to the question about whether

26

they could impose the death penalty if life without parole also were an option. Ms. Evans said it would "depend on the nature of the crime" but added, she "would probably lean more toward the life sentence." (CV No. 1-14 at 10.) But Ms. Herring said simply that "it would depend on the crime" without expressing a general preference toward a life sentence. (CV No.1-23 at 11.)

Additionally, while Ms. Evans explained that her husband was a minister and likely opposed (or at least was not in favor of) the death penalty for religious reasons, (CV No.1-14 at 10; Tr. Vol. 10:93-94 (Gov't Appx. at 161-62)), Ms. Herring's husband was not religious clergy and did not hold a different view from Ms. Herring on the death penalty. (CV No.1-23 at 4, 11.) Likewise, Ms. Evans had two brothers-in-law who were in prison—one for murder and the other a habitual offender—while Ms. Herring reported one family member, a son-in-law, who had been arrested, charged, or convicted of something but she had no details about it. (CV No. 1-14 at 14; CV No. 1-23 at 11, 13.)

Hall likewise unfairly compares Ms. Evans to juror Linda Harrell. (CV No. 1 at 40.) During voir dire, Ms. Harrell expressed greater comfort with the death penalty than Ms. Evans:

> Voir Dire of Ms. Evans
>
> Q.  How do you feel about the death penalty yourself, Mrs. Evans?
>
> A. I'm really not that sure. I—I believe as a last resort or in a case to where a crime was committed intentionally without, you know, any—any regards for life or, you know, something like that, I just—I think it would probably be appropriate. (Tr. Vol. 10:92 (Gov't Appx. at 160).)
>
> Voir Dire of Ms. Harrell
>
> Q. In your own words, ma'am, how do you feel about the death penalty?
>
> A. I believe in the death penalty. I believe it's—I don't know if the word is appropriate. I believe it's deserving in some cases under the right circumstances. I just socially and morally just believe that it's okay. (Tr. Vol. 8:59 (Gov't Appx. at 124).)

As these excepts demonstrate, Ms. Evans's and Ms. Harrell's views "were by no means 'indistinguishable.'" *Davis*, 576 U.S. at 273.

Additionally, like Ms. Herring and unlike Ms. Evans, Ms. Harrell's spouse did not oppose the death penalty. (CV No. 1-24 at 12.) Also like Ms. Herring and unlike Ms. Evans, Ms. Harrell did not have a family member in prison for murder—contrary to Hall's suggestion, Ms. Harrell's husband's arrest for indecent exposure is not comparable to a murder prosecution. (CV No. 1 at 41; *see* CV No. 1-24 at 14.) Also contrary to Hall's claim, (CV No. 1 at 40), Ms. Harrell's questionnaire answer of "I don't know" to the question about whether she would impose the death penalty if life without parole were available was not equivalent to Ms. Evans's answer that it would depend on the nature of the crime but that she would lean toward a life sentence. Ms. Harrell's answer indicated that she had not formed an opinion; Ms. Evans's answer indicates she had formed at least some opinion and was leaning toward life without parole over the death penalty.

Taken together, it is clear why the differences between Ms. Evans's answers and those of Ms. Herring and Ms. Harrell led AUSA Roper to strike Ms. Evans but not Ms. Herring or Ms. Harrell. And Supreme Court precedent supports such distinctions; as the Court has explained when addressing the need to distinguish between varying degrees of opposition to or support for the death penalty in capital jury selection:

> In a capital case, it is not surprising for prospective jurors to express varying degrees of hesitancy about voting for a death verdict. Few are likely to have experienced a need to make a comparable decision at any prior time in their lives. As a result, both the prosecution and the defense may be required to make fine judgment calls about which jurors are more or less willing to vote for the ultimate punishment. These judgment calls may involve a comparison of responses that differ in only nuanced respects, as well as a sensitive assessment of jurors' demeanor. . . . A trial court is best situated to evaluate both the words and the

28

demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes.

*Ayala*, 576 U.S. at 273-74 (internal quotation marks and citations omitted).

Finally, Hall also suggests that, given AUSA Roper's mention of Ms. Evans's family members who were in prison, the prosecution also should have struck others who had family involved with the criminal justice system, (CV No. 1 at 41)—but he fails to acknowledge obvious distinctions between Ms. Evans and those potential jurors. For example, juror Stacy Donaldson's husband received probation for a DWI charge, and juror Randall Davis was acquitted on a DWI charge. (CV No. 1-26 at 13; CV No. 1-27 at 12.) Particularly in the context of a prosecution for intentionally killing someone, neither are equivalent to having a family member in prison for murder, as Ms. Evans did.

Hall further points out that Ms. Donaldson reported that her husband's father and uncle had at some point been in jail or in prison but did not share any details on those matters, arguing that the prosecution did not seem concerned about that fact the way it seemed concerned in its *Batson* explanation about Ms. Evans's relatives in prison. (CV No. 1 at 49; *see* CV No. 1-27 at 14.) But Hall ignores that, unlike Ms. Evans, Ms. Donaldson's other statements made her a strong potential juror for the government. At voir dire, she said she never opposed the death penalty and believed "in some cases it is justified and that it should be used," such as in murder cases. She also said that her husband was in favor of the death penalty. (Tr. Vol. 10:144-45 (Gov't Appx. at 172-73).) Hall's attorneys found her to be favorable to the government and moved to strike for cause, which the court denied. (Tr. Vol. 10:162 (Gov't Appx. at 175).) Thus, it is understandable why AUSA Roper did not view Ms. Donaldson's family members'

29

interaction with the criminal justice system as disqualifying and wanted to seat her on the jury. In sum, Hall's challenges to Ms. Evans fail.

**Billie Lee.** Hall's claim with regard to the last potential juror, Billie Lee, fares no better. Ms. Lee, a teacher, said in her questionnaire in response to the question about whether she was in favor of the death penalty: "If the crime is 'extremely' brutal and heinous, the death penalty may be an option. Life without parole would also be another option." (CV No. 1-29 at 8-9.) In the next question, Ms. Lee said that she believed the death penalty served a legitimate purpose when it was used against criminals "who repeatedly commit heinous crimes (without a conscience)." (CV No. 1-11 at 9.) Later on, she reinforced this view that the death penalty should be reserved for people who repeatedly kill others. She was asked, "For what crimes do you think the death penalty should be available?" (CV No. 1-29 at 9.) She responded that it should be available for "serial killers; people who kill for the sake of killing; habitual child molesters who kill their victims." (*Id.*)

On the same page of her questionnaire, which listed several views of the death penalty ranging from (a) "I believe the death penalty is appropriate for all crimes involving murder" to "(e) I could never, regardless of the facts and circumstances, return a verdict which assessed the death penalty," Ms. Lee chose (d), the next to most extreme anti-death-penalty option. That option stated, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it, under the proper set of circumstances." (CV No. 1-29 at 9.) This was the same option that Ms. Miller chose that also served as one basis for Ms. Miller's strike, which Hall does not contest. (Tr. Vol. 9:136 (Gov't Appx. at 126); CV No. 1-11 at 9.)

30

Relatedly, on another questionnaire page that asked Ms. Lee to rate her response to a list of statements relating to the death penalty, some of her answers reinforced her hesitance to impose capital punishment. In response to the statement, "The death penalty is wrong," she checked "slightly agree." (CV No. 1-29 at 27.) She checked the same answer in response to the statement, "The State cannot teach the sacredness of human life by destroying it." (CV No. 1-29 at 28.)

Due to the nature of her questionnaire answers, during voir dire the district court specifically questioned Ms. Lee about them before allowing the parties to ask their own questions. The court noted her response to the first multipart question in which she chose the option indicating that she did not believe "the death penalty ever ought to be invoked" but that she could "assess it under the proper set of circumstances," and it asked: "Does that still represent your belief about the death penalty?" She responded, "Yes, it does." (Tr. Vol. 10:118-19 (Gov't Appx. at 163-64).) She later explained, "I'm ambivalent about the death penalty. . . . On one hand I think that it should not be used at all, and then there are certain cases or circumstances when I think maybe yes"; "basically I feel [the death penalty] should not be applied." (Tr. Vol. 10:123 (Gov't Appx. at 168).) She continued by explaining that she would be willing to consider the death penalty for crimes against children but specified that she meant "smaller children," and re-expressed her general preference for life in prison: "[I]t would depend on evidence, but, of course, I think life without ever being released would be a better option." (Tr. Vol. 10:126 (Gov't Appx. at 171).)

Mr. Roper explained that he had exercised a peremptory strike on Ms. Lee because of these views:

In her questionnaire she said that she didn't believe in the death penalty but could assess it. . . .

She said, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper circumstances."

She said in her questionnaire that it would have to be repeatedly commit [sic] heinous crimes without conscience, and we don't have repeated murders in this case. She also said she would—thought it was appropriate for serial killers. Of course, we don't have serial killers. She said also habitual child molesters, that would be a possible crime she could give the death penalty. We don't have habitual child molesters. [Hall] hasn't been convicted of child molestation in the past. She said she would lean toward life without the possibility of release.

I thought she was impaired just because of her questionnaire. She said on her questionnaire she thought that the death penalty was wrong. She slightly agreed that the death penalty was wrong. . . .

Oh, she also was on a prior jury trial for robbery and found the defendant not guilty . . . .

. . . . I'm sorry, I was mistaken about her. She didn't—I got that mixed up. She wasn't on the jury on a robbery. I'm sorry, my notes were jumbled up. I apologize. She had a brother-in-law who was a criminal defense attorney, which caused me some concern. And she's—I got the impression from her that she was really just ambivalent toward even considering the death penalty . . . .

(CV No. 1-11 at 14-16.)

In light of this justification and Ms. Lee's views, Hall's claim in his Section 2241 petition that, "Had Ms. Lee been White, it is hard to imagine the government would have struck her," is simply ridiculous. In fact, AUSA Roper exercised peremptory strikes on several non-Black jurors who expressed views similar to the views expressed by the jurors discussed here. *Cf. United States v. Hendrix*, 509 F.3d 362, 370-71 (7th Cir. 2007) ("Strock—a Caucasian—was also struck for the same reason as Jurors Woodland and Hairston, which further illuminates the non-discriminatory nature of the prosecution's strikes and erodes notions of pretext in the prosecution's motive for the strikes.").

32

For instance, AUSA Roper struck Patsy Duvall, who said she did not "find a problem with the death penalty" but believed it was appropriate in "very few circumstances" such as a serial-killer situation, (Tr. Vol. 2:28-29, 54-55 (Gov't Appx. at 1-4); CV No. 1-15), and Carla Cannon, who expressed similar reticence and also identified serial or mass murders as an appropriate use of it. (Tr. Vol. 5:101-02 (Gov't Appx. at 84-85); CV No. 1-15.) These answers were similar to those given by Ms. Lee. (CV No. 1-29 at 9.) He also struck Corrina Goldsmith, who supported the death penalty but said that her husband "would have a harder time giving a death penalty sentence than I would," (Tr. Vol. 2:187 (Gov't Appx. at 23); CV No. 1-15)—a circumstance similar to Ms. Evans and her minister husband. AUSA Roper struck Paul Long, who, like Mr. Bennett, expressed severe hesitance to ever recommend the death penalty and said he could only impose it if he believed without a doubt that it was necessary. (Tr. Vol. 5:144-69 (Gov't Appx. at 86-111); Tr. Vol. 9:162, 165, 170 (Gov't Appx. at 145, 149, 154).) And he struck Temple Griffin, whose son and sister were police officers and who initially seemed supportive of the death penalty but later said she would favor life without parole over a death sentence, (Tr. Vol. 6:157-67 (Gov't Appx. at 112-22))—similar to Ms. Evans's answer on her questionnaire, (CV No. 1-14 at 10). As this exhaustive summary demonstrates, Hall's last-ditch attempt to raise *Batson* for the first time in 25 years falls flat.

Knowing he cannot effectively assail AUSA Roper's thorough, detailed responses on substance, Hall also tries to attack Mr. Roper's few accidental misstatements, such as when he said he had questioned Ms. Evans and when he thought Ms. Lee had acquitted someone of a crime. To put these misstatements into context, jury selection occurred over 11 days and involved roughly 100 potential jurors. In was thus inevitable that both parties would, at times, confuse certain facts about each juror. But in terms of the only error AUSA Roper made on a

33

material fact—his statement that Ms. Lee had previously acquitted a defendant in another case—he immediately corrected himself, apologized, and continued providing reasons specific to Ms. Lee that both explained and supported his decision to exercise a peremptory strike on her. Put simply, AUSA Roper was right on all the facts that mattered. And the trial court, which observed the jury selection proceedings and assessed AUSA Roper's credibility, found no *Batson* violation.

Finally, Hall overreaches in making the inflammatory claim that (1) he was convicted by an "all-white" jury, and (2) suggesting that such circumstance was the intended result of the prosecution's strikes or the decision to prosecute in the Northern District of Texas. In fact, in terms of the jury's racial or ethnic composition, the race or ethnicity of some of the jurors who were selected is unclear. For example, juror Cindy Boggess declined to state her race on her jury questionnaire. (Tr. Vol. 13:14-15 (juror list) (Gov't Appx. at 180-81); CV No. 1-9 at 35.) And the questionnaire asked only about "race," not also ethnicity, and thus Hall's jury might have included Latinx or Hispanic jurors who identified as white on the questionnaires.[4] Further, Hall's jury did include a self-identified Black individual—Kelvin Johnson, who was an alternate.

Imprecise at best and inaccurate at worst, Hall's repeated emphasis that he was convicted by a jury composed of no persons of color also ignores that the court excused some non-white or self-identified Hispanic/Latinx potential jurors for cause—sometimes on Hall's counsel's own motion—because of objectively unacceptable views about the death penalty or the beyond-a-reasonable-doubt standard. During voir dire, the Court excused a Black potential juror, Paula

---

[4] For instance, some jurors identified as both "white" and "Hispanic." (CV No. 1-9 at 15, 30, 94.) Other jurors might have also been Latinx or Hispanic but might not have been so specific and identified themselves only as white. *See generally* https://www.census.gov/topics/population/race/about.html.

34

Moore, and a potential juror who identified as Hispanic, Sylvia Medina-Tercero, because both said they could never vote to impose the death penalty. (Tr. Vol. 2:82-99 & 11:123-25 (Gov't Appx. at 3-22, 176-78); CV No. 1-9 at 7, 99.) Conversely, the Court also struck for cause Talat Hussein, a juror who identified as non-white on his questionnaire and was from Pakistan, because of his strongly pro-death-penalty views, and Rosana Galdos-Bridgewater, a Hispanic immigrant from Peru, because she did not agree with the concept that a jury would have to acquit a defendant who might be guilty if the guilt was not shown beyond a reasonable doubt. (Tr. Vol. 3:35-66 & 4:163-69 (Gov't Appx. at 24-55, 77-83); CV No. 1-9 at 14, 30.) Finally, as Hall's counsel acknowledged in voir dire, the jury would have included another Black juror if not for Hall's counsel's strike of Natalie Harris, potential juror number 14, because of her strongly pro-death-penalty views. (Tr. Vol. 4:135-55 (Gov't Appx. at 56-76); CV No. 1-11 at 9.)

Relatedly, it is baseless (and absurd) to suggest, as Hall does, (*see* CV No. 3-1 at 8), that the Department of Justice's decision to charge this case in the Northern District of Texas was influenced in any way by the relative percentage of minority populations in north Texas versus central Arkansas. The U.S. Attorney's Office for the Northern District of Texas prosecuted Hall because he kidnapped and raped his 16-year-old victim there and because the girl he brutalized and buried alive was part of that community, as were the family members who survived her. This desperate claim holds no merit.

### ii.      Hall's claim that his death sentence violates the Fifth and Eighth Amendments and the FDPA is meritless.

Hall's claim that his death sentence is infected by racial discrimination in violation of the Fifth and Eighth Amendments and the Federal Death Penalty Act (FDPA) likewise has no merit. He contends that his claim of racial discrimination is borne out by statistical reviews of federal death penalty cases in Texas jurisdictions. But he acknowledges—as he must—that it is

35

impossible to sustain such a claim using these kinds of figures. (CV No. 3-1 at 20.) Indeed, the Supreme Court has rejected such claims predicated on these types of statistics and has instead explained that a defendant who tries to demonstrate this kind of constitutional violation "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).

Hall avers he has proof that the Department of Justice sought the death penalty based on a discriminatory purpose, but the only thing he points to is his claim of *Batson* error—a claim the district court rejected at trial and that his attorneys never previously considered to have enough merit to even raise on appeal or in his collateral attacks. (CV No. 1 at 23.) And for the reasons explained above, Hall's *Batson* claim has no merit that it can lend to his claim of a discriminatory prosecution. As such, Hall is left trying to do what the Supreme Court specifically disallowed in *McCleskey*, and his statistics do not create even a veneer of merit, much less the strong showing necessary to support his stay motion. *See Davis v. Greer*, 13 F.3d 1134, 1143-44 (7th Cir. 1994) (following *McCleskey* in rejecting the use of statistical studies to challenge the Illinois death penalty; noting of cited studies, "nothing in them . . . establishes any constitutional violation and certainly does not provide the exceptionally clear proof of discrimination required by *McCleskey*").

Hall's invocation of the FDPA fares no better. Indeed, as Hall himself emphasizes, the FDPA imposes numerous procedures to "prevent[] racial bias from influencing sentencing procedures." (CV No. 1 at 47.) Those procedures were followed here,[5] helping to ensure that

---

[5] For example, the court instructed the jury that, in considering whether a death sentence was justified, it shall not consider the race of the defendant or victim and further instructed that it could not recommend a death sentence unless it concluded that it would recommend a death sentence for the crime in question regardless the race of the defendant or victim. *See* 18 U.S.C. § 3593(f). (Tr. Vol. 20A:27 (Gov't Appx. at

Hall's penalty proceeding was fair and untainted by considerations of race. Hall does not even suggest otherwise, and therefore cannot prevail on his claim of an FDPA violation.

Lacking evidence of a discriminatory purpose in his case, Hall focuses on the four Texas federal districts merely in order to advance before this Court a gossamer allegation that his prosecution in another district far from this one was animated by racial disparity rather than the brutality of his crimes. Statistics of that type can be misleading.[6] But even aside from that, they cannot support Hall's claim here. It bears repeating that Hall kidnapped 16-year-old Lisa Rene, holding her over days during which she was repeatedly and viciously raped, and buried her alive. His crimes evince a level of depravity rivaled by few others and stand as a horrible testament to the brutality and callousness one human can show toward any other, much less a child. Hall's contention that his death sentence was the result of discrimination rather than his own conduct impugns, based on no evidence, the U.S. Attorney's Office for the Northern District of Texas, the Honorable Janet Reno (the Attorney General who approved the decision to seek the death penalty), the jury that recommended that sentence, and the district judge who imposed it.

3.     **The remaining stay considerations do not weigh in Hall's favor, especially given Hall's delay and that he cannot succeed on the merits.**

As described above, Hall's extraordinary delay in bringing his claims reveals this proceeding to be nothing more than an eleventh-hour attempt to force postponement of his execution. Hall has known about the facts and the law underlying these claims for years. His

---

189); First 2241 Gov't Appx. at 52).) Each of the jurors certified their compliance. (First 2241 Gov't Appx. at 52).)

[6] In a study far more comprehensive than the statistics Hall provides, researchers found support for the fact that decisions to seek the death penalty in federal court "were driven by heinousness of crimes rather than race." Stephen P. Klein, et al., *Race and the Decision to Seek the Death Penalty*, xix-xx (RAND 2006), *available at* https://www.rand.org/content/dam/rand/pubs/technical_reports/2006/RAND_TR389.pdf.

*Batson* challenge was preserved at trial for appellate review, yet his defense team did nothing with it in the more than two decades since. Hall previously challenged the manner in which the death penalty is sought and administered, and that challenge lacked merit too. By his own admission, he has waited months to bring to the Court additional statistics, which he readily could have obtained himself. By sitting on his claims until the eve of his scheduled execution, Hall's conduct is not consistent with someone who truly wishes to allow a Court to adjudicate his claims.

The other stay factors similarly do not support relief here, for many of the same reasons that were true of Hall's previous Section 2241 petition. That Hall faces irreparable harm from his execution is not dispositive; if it were otherwise, then no death sentence would ever be enforced. *See Chrans*, 50 F.3d at 1360. However, there can be no dispute that the public interest favors finality in judgments and the government being able to enforce the sentences imposed on criminal defendants. The public and the victim's family have an overwhelming interest in implementing the capital sentence recommended by the jury a quarter-century ago. *See, e.g.*, *Bucklew*, 139 S. Ct. at 1133-34. Hall's victim, 16-year-old Lisa Rene, was an innocent bystander to a dispute over a drug transaction. *See Hall*, 152 F.3d at 406. Because Hall believed that he was out a few thousand dollars over a marijuana dispute, he and his coconspirators subjected Lisa Rene to a horrific death, including being kidnapped, repeatedly raped over several days, and ultimately beaten with a shovel, stripped naked, soaked in gasoline, and buried alive. *See id.* at 389-90. Her family has waited decades for the sentence to be carried out. Hall's current claim— in addition to being barred and meritless—has no potential to undermine that sentence. As the Fifth Circuit rightly noted: "It is time—indeed, long past time—for these proceedings to end." *In re Hall*, 2020 WL 6375718, at *7.

## CONCLUSION

This Court should deny Hall's Section 2241 petition and deny his motion for a stay of execution.

Respectfully submitted,

Josh J. Minkler
United States Attorney

*s/ Leigha Simonton*
Leigha Simonton
Special Assistant United States Attorney
Texas Bar No. 24033193

*s/Brian McKay*
Brian McKay
Assistant United States Attorney
Texas Bar No. 24046395

*s/ Jonathan Bradshaw*
Jonathan Bradshaw
Special Assistant United States Attorney
Colorado Bar No. 43838
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
E-mail: jonathan.bradshaw@usdoj.gov

Attorneys for Respondent

## CERTIFICATE OF SERVICE

I certify that on November 16, 2020, this reply/response was filed electronically. Notice of this filing will be sent to all ECF-registered counsel of record via email generated by the Court's ECF system.

*s/ Jonathan Bradshaw*
Jonathan Bradshaw
Special Assistant United States Attorney