IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

ORLANDO CORDIA HALL,

           Petitioner,

v.

No.    2:20-CV-00599-JPH-DLP

T.J. WATSON, in his official capacity as
Complex Warden of U.S.P. Federal
Correctional Complex (FCC) Terre Haute

           Respondent.

**APPENDIX TO RESPONSE TO HALL'S 28 U.S.C. § 2241 PETITION
AND RESPONSE IN OPPOSITION TO HALL'S MOTION FOR STAY**

Respectfully submitted,

Josh J. Minkler
United States Attorney

*s/ Leigha Simonton*
Leigha Simonton
Special Assistant United States Attorney
Texas Bar No. 24033193

*/s/Brian McKay*
Brian McKay
Assistant United States Attorney
Texas Bar No. 24046395

*s/ Jonathan Bradshaw*
Jonathan Bradshaw
Special Assistant United States Attorney
Colorado Bar No. 43838
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
E-mail: jonathan.bradshaw@usdoj.gov

Attorneys for Respondent

2

## CERTIFICATE OF SERVICE

I certify that on November 16, 2020, this appendix was filed electronically. Notice of this filing will be sent to all ECF-registered counsel of record via email generated by the Court's ECF system.

_s/ Jonathan Bradshaw_
Jonathan Bradshaw
Special Assistant United States Attorney

recommendation to His Honor of the sentence of death.  Okay?

Now, that doesn't mean you're going to do that.  What that means, that's just, again, telling you our position.  The decision is yours, obviously, along with the other 11 jurors that will serve on this case.  But we want you to know exactly where we stand from the beginning.

Now, you filled out this questionnaire which a friend of mine used to say could bring tears to your eyes because of its length.  You were asked about your feelings about the death penalty and checked boxes or circled things or whatever, and you had an opportunity to write a few things.  But why don't you share with us, if you could in your own words, Mrs. Duvall, how you feel about the death penalty just generally.

A.    Well, I've never had to make that decision.

Q.    Sure.

A.    So I'm uncomfortable with it --

Q.    Okay.

A.    -- thinking about it.  It depended on the circumstances.  And the way I feel about it is if it's a first time of killing somebody and it was not premeditated or done intentionally, no.

Q.    Okay.

A.    If it was a serial killer that every time that person gets out he commits a crime like that and is put back in and

001
Webster v. Lockett 013378

DUVALL/VOIR DIRE/MACALUSO

released again, then maybe I could think about putting him to death.

Q.    Okay.    Let me -- let me mention from the outset here that I'm not permitted to go into the specific facts of this case. Neither is Mr. Kearney.  We can speak in some sort of vague generalities, give you some idea of some of the things that may come into play, but I can't pose or give you a trial look at some of the evidence that may come into play in this case. But you -- I gather from what you're saying, you do feel the death penalty is proper in some circumstances or you do not?

A.    In very few circumstances.

Q.    And you said --

A.    I mean --

Q.    Go ahead, I'm sorry.

A.    I'm just not very good at this.

Q.    Just relax, there's nothing to worry about.

A.    I believe a person's life is their life, and God is the only one that can make the choice whether they live or die.

Q.    Okay.

A.    But I do believe there's certain people that have not earned the right to continue their life.

Q.    All right.  Let's explore that just a little bit, ma'am, if we can, the last statement you made you believe that -- you said about a religious belief or feeling about the sanctity of life or sacredness of life; is that correct?

U.S. District Court

DUVALL/VOIR DIRE/MACALUSO

of me whatsoever?  Anything you need explained at all, or anything you'd like to say to me?

A.    The only thing that -- with the death penalty.

Q.    Yes, ma'am.

A.    What I'm trying to, I guess, express is that I know with an open mind that there are circumstances where the death penalty is proper.  I have no problem with that.  Where I have my problem is when you ask me about one murder, you know, whether given the choice of death penalty versus life imprisonment, if my opinion -- what my opinion would be on that is I would probably try to go with life imprisonment. You know, considering the evidence and -- is what I'm trying to explain.

Q.    Yes, ma'am.

A.    Maybe I didn't make myself clear on that.  It's not that I'm against the death penalty.  What it is, is that I'm very serious about it.  It would be a hard decision, and I don't know as a person myself, I've never been brought up to make that choice.  I don't know if I would be the person to make that choice.  I guess that's what I'm trying to say.  I don't know if I could.

        THE COURT:  And you're expressing yourself very well.  Don't worry about it.

A.    I guess I got confused, and that's what I wanted to tell you.  I don't find a problem with the death penalty, because I

003
Webster v. Lockett 013404

know in this world the way it is that there's certain cases that the death penalty is not a nice thing to do, but it is necessary, but it's very few and far between.  That's how I take it, because a person's life is their life, and once you make that choice of -- I mean, the jurors that's making that choice of that person losing their life, just like that person made the choice of somebody else losing a life.  And I take it very seriously, and it would be very difficult for me as a person to take that person's life away, to make that judgment.  It's not that it's -- I don't believe in it, it's just that I'm not sure that I would be the person to do it.

Q.   We appreciate it, Mrs. Duvall.  I am out of time, and Mr. Kearney will have some questions and want to speak with you now.

            MR. MACALUSO:  Thank you very much, Your Honor.

            THE COURT:  Mr. Kearney.

                DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.   Good morning.

A.   Good morning.

Q.   You know, we lawyers probably ought to learn from you.  You expressed yourself very well, and maybe we shouldn't try to ask such leading questions and lead people down certain paths, and we ought to ask them how they feel about certain things.

004

Webster v. Lockett 013405

having been sworn as a venire person, testified as follows:

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.   I'm trying to get my watch moving here.

Good afternoon.  It's Mrs. Tercero; is that correct?

A.   (Nods head.)

Q.   I'm Paul Macaluso.  This is Richard Roper.  That's Delonia Watson.  We're the lawyers for the government here. We're all assistant United States attorneys.  We represent the government.  We're the prosecutors in the case.

The next table to my immediate right here is Mr. Jeff Kearney.  You know the defendant over there.  He's the gentleman sitting next to Mr. Kearney, Orlando Hall, and to Mr. Hall's right is Kevin McNally.  Do you recognize or do you know of any one of us other than from the introductions about ten days ago?

A.   No.

Q.   Okay.  You know you're a prospective juror on this case. It involves as a potential penalty the death penalty.

A.   Yes.

Q.   And so it's very, very serious.  I'm sure you understand that.  That's why, basically, we get to talk to you sort of semi-privately here instead of like when you served -- you served on a jury down at the state one time, didn't you?

A.   County courthouse.

005

Webster v. Lockett 013432

TERCERO/VOIR DIRE/MACALUSO

Q.    County courthouse?  And you were probably interviewed and asked questions by the lawyers in front of everybody else, weren't you?

A.    Yes.

Q.    The procedure here is different so that you hopefully will relax a little bit.  And I'm going to try not to cover or repeat some of things that Judge Means said to you, because he said them, I think, very adequately and very appropriately.

You understand we want you to relax.  Just tell us what's on your mind about some of the things that come into play, and understand that there are no right or wrong answers, and no one is going to try and browbeat you or talk you into a position or talk you out of a position.  You just tell us how you honestly feel about anything that comes up then you'll be doing your job, and we can't ask any more of you than that, okay?

A.    Okay.

Q.    If I don't make myself clear, and I probably won't as we go along here from time to time, let me know, all right?  I'll slow down if you want me to.  The court reporter always wants me to slow down, but I'll slow down, I'll repeat the question, and I'll try and clarify it.  Whatever is necessary so that you understand it, okay?

A.    Uh-huh.

Q.    Now, you know, of course, that a potential penalty for a

006

Webster v. Lockett 013433

person convicted of a case of this type is the death penalty. That's just one of three possible penalties.  The other is a sentence of life without the possibility of release, and the other one is a sentence to be determined by the Court.  Okay? Other than those two.

Let me tell you, Mrs. Tercero, exactly where we stand in this case so you'll understand from the outset what our position is, and what we hope to be able to prove to you beyond a reasonable doubt as the law requires.

First, as the judge said, that the defendant is guilty exactly as he is charged in the indictment.  We have to do that.  That's done in the first part of the trial.  Secondly, let me say this:  We are actively seeking the death penalty in this case for the defendant in the second part of the trial. And again, the law says that can be done, the law says the burden of proof on that aspect, part of the trial, that's on us, as well.  That's what we're seeking based on the evidence once the trial actually begins, the decision that you as a juror will be called upon to make ultimately.  Do you see?

A.    (Nods head.)

Q.    So we want to let you know exactly where we are, how serious this is and what the stakes are.  Any questions about that at all, ma'am?

A.    No.

Q.    All right.  Now, I'm going to stop talking for the most

007

Webster v. Lockett 013434

part and let you do a little bit of talking.

You filled out this questionnaire, and believe me it provides us with a lot of information, but it's just black and white on paper.  Can you share with us for all of us your own feelings about the death penalty?  How do you personally feel about it?

A.   Well, I agree with it because it's the law, but for me to put somebody else in that position to say that -- give them the death penalty, I don't know.

Q.   Okay.

A.   I'm not too sure on that.

Q.   All right.  What sort of problems, what sort of things are you thinking about?  What is the problem in that regard?

A.   Well, it's more of teachings from church, you know, a commandment.  You're not supposed to kill.

Q.   All right.  So you have a religious basis for this; is that correct?

A.   Yes.

Q.   All right.  Now, let me --

A.   I put on there that I was for that, for the death penalty.

Q.   Yes, you did.  I noticed that.

A.   But there was another question on there, could I come down and say give him the death penalty, and I said I wasn't too sure to take someone's life.

TERCERO/VOIR DIRE/MACALUSO

Q.   Okay.   That's -- your recollection is correct as to these answers.   You asked -- or we asked you, basically, some questions about the death penalty, and you gave some reasons for it and your position on it.   But with regard to the four or five choices you have there as to whether or not you could actually serve, and that's really what we're talking about perhaps even more importantly than your position on the death penalty, whether or not you could actually serve and make those decisions, because that's obviously what jurors will be called upon to do.   You indicate that you believe the death penalty is appropriate for some crimes involving murder, but that you could never return a verdict which assessed the death penalty.   I gather that's the way you felt then; is that right?

A.   Yes.

Q.   Does that remain the way you feel?

A.   Yes.

Q.   And I'm going to have to, because the law requires us, Mrs. Tercero, sort of pin you down on some of these things, because we have to know -- that is all the lawyers have to know, and more importantly Judge Means needs to know because he makes the ultimate decision in this sort of situation -- precisely what your position is.   Not what the lawyers think or what our questions are, but exactly how you express yourself, okay?

009
Webster v. Lockett 013436

A.    (Nods head.)

Q.    Are you saying, then, that -- are you saying that you could see the death penalty in certain instances, but it's just something you cannot impose yourself?

A.    Yes.

Q.    All right.  Are you saying that under any circumstance that you can think of, or just under certain circumstances or how?

A.    It's just the way I was raised.  I mean Biblical base, you know, from the commandments, you know.

Q.    Okay.  Would you say that your feelings are strong enough that regardless of the facts of the case, if it involves the imposition of the death penalty, that's at the end of the line, so to speak, that you could not make that decision yourself?

A.    No.

Q.    All right.  Do you feel strongly about that?

A.    Yes.

Q.    All right.  Have you felt that way for a long time, ma'am?

A.    Well, I felt -- like I said, because it's the law, you know, well, so be it, but I don't think I could say, you know, give him the death penalty, no.

Q.    Okay.  Now, I want you to understand, and I think you probably do already but just to be clear on this, the fact

010

Webster v. Lockett 013437

that service on a jury of this type and making a decision of this type would be difficult --

A.    Uh-huh.

Q.    -- wouldn't disqualify you, for example, for being a juror on this type of case.  No one would think for a moment that any juror on a case of this magnitude where the death penalty is a possibility would come in here and serve and just kind of be nonchalant about it or happy-go-lucky.  It's a serious proposition.

A.    Yes.

Q.    The distinction is whether or not you in your heart of hearts simply could not, regardless of the facts that would be presented during the course of a trial, any trial, return a verdict or make a recommendation to the Court that would mean that somebody else would be put to death.  Is that the way you feel?

A.    Yes.

Q.    All right.  Would it -- I'm not going to do this, but would it do me any good or Mr. Kearney any good to try to talk you out of that position?

A.    No.

Q.    Let me just ask you, since you filled this questionnaire out Friday, ten days ago or so, have you given this a lot of thought?

A.    I felt some sort of conviction about it, because after I

011

Webster v. Lockett 013438

wrote down -- it was easier to say, you know, I believe in it, but when it came down to would I be able to do it, no.

Q.   Okay.  Now, by the same token -- and I'm speaking generally and sort of hypothetically here.  Some people might say, well, it would be tough for me to do it, but maybe I could do it in certain cases if the facts were right.

And let me pause for just a second, because I cannot give you and I'm not going to give you examples of this or examples of that, specific examples, and I certainly can't go into the facts of this case, okay?  I can talk in some generalities, but I can't go in and give you a summary of the facts that we expect to present in this case.  But some people say, well, I'm for it, but I can't -- maybe I could do it in some cases but not in others.  Are you saying you couldn't do it in any case regardless of the facts?

A.   No.

Q.   In other words if it was -- I'm not going to make up a situation that says -- like a situation where babies are killed or multiple murders or killing the president.  It doesn't matter to you, I gather.

A.   I --

Q.   What I'm saying is if it means the death penalty, you just simply couldn't make that decision?

A.   No.

Q.   And not just because it would just be hard, you're just

012

Webster v. Lockett 013439

saying for religious or moral reasons you simply could not ever do that. Am I reading you correctly?

A. Yes.

Q. All right. And let me say, also, as I'm sure you already know, that people who could serve on a jury like this, that doesn't make them better citizens than people who for religious or moral reasons can't. It doesn't make them better citizens or worse citizens. It's just that -- and it doesn't mean that you're not qualified, for example, as a juror on a wide variety of other cases. In fact, the judge asked you in some detail about whether or not you could sit in judgment in a criminal case, and I believe you said you could, couldn't you?

A. (Nods head.)

Q. In other words, if this were a burglary case or some sort of a case that did not involve the death penalty, I gather you would have no difficulty serving on the jury?

A. No.

Q. Could you find somebody guilty of murder or kidnapping if it didn't involve the death penalty?

A. Yes.

Q. All right. In fact, I believe you said -- I'll ask it this way: You could find someone guilty of murder or kidnapping. That wouldn't be the problem, would it, at all, the decision as to whether a person is guilty or not guilty?

013

Webster v. Lockett 013440

TERCERO/VOIR DIRE/MACALUSO

A.   (Nods head.)

Q.   The problem is with regard to the death penalty?

A.   Yes.

Q.   All right.  Now, do you know of --

        MR. MACALUSO:  Could I have just one second?

     (Discussion at counsel table.)

BY MR. MACALUSO:

Q.   There is one other question I would like to discuss with you, Mrs. Tercero, and that's the one where you posed a -- I'll read the sentence itself.  It says, "If a sentence of life without the possibility of parole is an option, could you nevertheless recommend a sentence of death."  And you checked the box "yes."  Okay?  That's a little bit different than what I think you're saying here today if I'm reading you right.

     But you go on to say if it were an option, life or death, they can -- life, they can live with theirselves and ask God to forgive them.

A.   Uh-huh.

Q.   What -- could you elaborate on that a little bit and tell us what you were thinking about in that regard?

A.   Well, a lot of people are easy to pass judgment on a person if they were to kill somebody, and they say, well, God can't forgive them, but God can forgive them for their sins if they were to ask him, you know, for forgiveness.

Q.   Okay.  Excuse me, I've got a frog in my throat.

U.S. District Court

014

Webster v. Lockett 013441

Let me ask you another way.  If in a hypothetical case, and based on what you've told us so far, if you were given the choice as you would in the procedure that the judge outlined to you between a sentence of death and a sentence of life without the possibility of parole, are you saying that you would -- you would vote for and recommend a sentence of life without parole over the death sentence?

A.    Uh-huh.

Q.    Is there any -- regardless of the facts of the case?

A.    No.  I mean, I just won't go there.

Q.    Okay.  In other words, let me put it this way so that we're clear on this:  A juror would be -- for a juror to be qualified and to be seated for a case of this type would basically have to be able to say that in a proper case, under the proper facts and circumstances, they could honestly both consider and then vote for or recommend a sentence of death, okay?

A.    Uh-huh.

Q.    Could you do that under any circumstance whatsoever?

A.    No.

Q.    Regardless of the facts?

A.    (Shakes head.)

Q.    You're shaking your head no; is that right?

A.    Yes.

Q.    And I'm not going to belabor this point, which would

015

Webster v. Lockett 013442

please the judge, I'm confident of that, but would it do any -- is there anything that I could say, ma'am, that would change your mind whatsoever?

A.   No.

Q.   Have you given this -- well, I know you've given this serious thought.

I appreciate the answers that you have given to us, and I think Mr. Kearney will have some questions for you at this time.  Thank you very much, ma'am.  I appreciate it.

THE COURT:  Mr. Kearney.

DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.   Good morning.  You know that -- would you agree that citizens have a duty when they're called to jury service to serve on a jury?

A.   Yes.

Q.   Would you agree with that?

A.   (Nods head.)

Q.   Okay.  As a matter of fact, if you wanted to get out of jury service, you could certainly figure out a way to do it; is that right?

A.   Yeah.

Q.   I mean, a lot of people showed up here and had excuses to get out of it and that type of thing, and -- but I can tell that because you're here, you realize that there is a civic

016

Webster v. Lockett 013443

TERCERO/VOIR DIRE/KEARNEY

duty.

A.   Yes.

Q.   Is that fair to say?

A.   Uh-huh.

Q.   Now, before you would ever -- if you were serving on a jury in a case like this -- we can't talk to you about this case, but a case like this where the government is seeking the death penalty, before the issue of whether you could vote for death is even an option to you, the government would have had to convince you and the other jurors beyond any reasonable doubt that the accused was guilty, because you would have to find that he was guilty of a murder.  Do you understand that?

A.   Yes.

Q.   And then before they could even ask you to consider the death penalty, you would have to find, which is I think on the first page of that list there in front of you, you would have to find -- beyond a reasonable doubt they would have to prove to you that he participated in a murder that intentionally caused the death of someone, intentionally participated in something that caused the death of an individual.  So we have that intentional element in every one of those, okay?

A.   Uh-huh.

Q.   And you would have to find that he was intentionally involved before you could even consider the death penalty.  All right?

U.S. District Court

Webster v. Lockett 013444

TERCERO/VOIR DIRE/KEARNEY

A.    (Nods head.)

Q.    Now, if you would turn to the next page, in -- they would have to prove beyond any reasonable doubt the existence of at least one of those options there that you see, A, B, C and D. The first one is it was committed during the -- a murder resulted during the commission of a kidnapping, which is the first one there.  Do you see what I'm talking about?

A.    Yes.

Q.    That you would have to find beyond a reasonable doubt that the accused committed this during a kidnapping, another crime.  Do you see what I'm saying?

A.    Yes.

Q.    Or they would have to prove that it was committed in a heinous, cruel or depraved manner.  Do you see what I'm saying?

A.    (Nods head.)

Q.    The defendant committed the offense in an especially heinous, cruel or depraved manner, in that it involved torture or serious physical abuse to the victim.  Do you see that?

A.    Yes.

Q.    Let me show you something here.  Okay, heinous means extremely wicked or shockingly evil.  Okay?  Can you imagine something that would be extremely wicked or shockingly evil? Where the killing was accompanied by such additional facts as torture or serious physical abuse of the victim as to set it

Webster v. Lockett 013445

apart from other killings.  Do you see how some killings could be so horrible if they tortured someone or something like that to set it apart from another case?  Do you see what I'm talking about?

A.    Yes.

Q.    And cruel means that the defendant intended to inflict a high degree of pain by torturing the victim in addition to killing the victim.  And depraved means that the defendant relished the killing or showed indifference to the suffering of the victim as evidenced by torture or serious physical abuse.  Do you see how bad that is?

A.    Uh-huh.

Q.    And torture means mental as well as physical abuse to the victim.  In either case the victim must have been conscious of the abuse at the time it was inflicted, and the defendant must have specifically intended to inflict severe mental or physical pain and suffering on the victim apart from killing them.  Can you see how some cases could be so aggravated, so horrible that it's not just that you're punishing someone for killing, but there has to be some type of factors there, also?

A.    (Nods head.)

Q.    Okay.  Can you conceive in your mind a situation that's so horrible where there is a heinous, cruel and depraved manner of committing the murder where if you believe that beyond any reasonable doubt and you believe that they were

019

Webster v. Lockett 013446

guilty of it, they participated in it intentionally, and that those other things were -- torture and physical abuse and the defendant relishing it, can you imagine a situation so severe and so aggravated that you could under those facts set aside your personal feelings about the death penalty and follow the law if it was proven to you and vote for the death penalty? Can you imagine a situation that severe where you can do that?

A.    Excuse me?

Q.    Can you imagine a situation so bad like I just read to you to where you can set aside your personal feelings about the death penalty, and if the law provided for it and required you to do it under the evidence, that you could actually vote for a death penalty under those severe facts?

A.    I wouldn't give it.

Q.    You can't imagine a situation that severe?

A.    That's -- that's my opinion.  I wouldn't give it.

Q.    Pardon me?

A.    I wouldn't say the death penalty.

Q.    Can you imagine a situation where it was premeditated or planned and those other -- the torture was there and the physical abuse and those type of things, where the situation would be so severe that you could consider giving the death penalty?

A.    It wouldn't be my place to -- I mean, I'm not God to give judgment to a person.

020

Webster v. Lockett 013447

Q.    Well, you understand that there are some laws that people don't agree with --

A.    Yes, sir.

Q.    -- but we have to follow them anyway?

A.    (Nods head.)

Q.    You know people that have certain laws they don't agree with, but we have to as citizens follow them anyway?

A.    Yes.

Q.    And if you took an oath on this jury to follow the law, okay, and if all of these things were proven to you beyond any doubt in your mind, beyond any reasonable doubt, are you telling us that you couldn't follow the law if the law required you to vote for the death penalty?

A.    I couldn't give it to him.

Q.    Pardon me?

A.    No, I wouldn't.

        MR. KEARNEY:  I don't have any more questions, Judge.

        THE COURT:  Ms. Tercero, we appreciate your being here this morning and the sacrifices you make to do your duty as a citizen.  We appreciate that very much.

        We will let you know by telephone whether you'll be called to serve on this jury or not.  As I -- I'm not sure I mentioned this before, but service on the jury will not actually start until sometime after the middle of the month,

021
Webster v. Lockett 013448

but we will let you know.

MS. MEDINA-TERCERO:  Okay.

THE COURT:  Mr. Jim Bowen will escort you out. Thank you very much.

MR. MACALUSO:  Thank you, ma'am.

MS. MEDINA-TERCERO:  You're welcome.

(Venire person excused at 10:50 a.m.)

MR. MACALUSO:  We would submit for cause Mrs. Tercero on her inability to consider the death penalty.

THE COURT:  Response?

MR. KEARNEY:  No.

THE COURT:  Ms. Tercero is stricken for cause. Could you bring down Ms. George.

(Off-the-record discussion.)

(Venire person seated at 10:55 a.m.)

THE COURT:  You're Ms. George?

MS. GEORGE:  Yes.

THE COURT:  All right.  It's a big drafty, sound-eating courtroom, so speak up and let us be sure and hear your answers.  It's very tempting, we're so used to communicating with body language, that almost all of us go like this, so give audible answers so that our court reporter can take them down.  Sometimes here she's not looking up so she can't see the nod and shake of the head.  We'll ask the same of the attorneys, to speak up and make sure that you

022

Webster v. Lockett 013449

heinous crimes.

Q.    Okay.

A.    Second, if I had to vote whether there should or should not be a death penalty in our country, I would vote that there should be.

Q.    Okay.  Have you felt that way for a long time?  Sometimes people change their opinions about the death penalty.

A.    No.  I've felt that way a long time.

Q.    Okay.  How about Mr. Goldsmith?  How does he feel about it?

A.    He has -- excuse me.  I'm sorry, I have a sore throat.

Mr. Goldsmith, who is not a potential juror, has -- I'm trying to think of how to phrase this.  Has greater convictions against the death penalty than I do.

Q.    Okay.

A.    He would have a harder time giving a death penalty sentence than I would.

Q.    Okay.  Does that cause any -- I don't imagine this is something that necessarily comes up certainly on a daily basis, but does it cause any conflict as far as your position versus his?

A.    No.

Q.    Okay.  Let me ask you this:  Do you know of any reason, ma'am, as you sit there why -- depending upon the facts and circumstances, where in the proper case, okay, why you could

023

Webster v. Lockett 013537

to question you, and then each side will be allowed 10 minutes more.

I think we're going to just leave those off, Mr. Macaluso. We'll just have to all speak up.

Mr. Hussain, because of the big courtroom and the fact that sound just dies, we'll ask you to speak up. And also when you have an answer instead of nodding your head or shaking your head, go ahead and answer orally so that we can get it in the record here.

MR. HUSSAIN: Okay.

THE COURT: Okay? Do you have any questions before we begin?

MR. HUSSAIN: No, sir.

THE COURT: All right.

You may proceed, Mr. Macaluso.

MR. MACALUSO: Thank you, very much, Your Honor.

TALAT M. HUSSAIN,

having been sworn as a venire person, testified as follows:

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.    Good morning, Mr. Hussain.

A.    Good morning.

Q.    Let me begin briefly by reintroducing everybody here once again. My name is Paul Macaluso. To my immediate left is Mr. Richard Roper, to Richard's immediate left is Delonia

024
Webster v. Lockett 013702

Watson.  We are three assistant United States attorneys.  We work for the Department of Justice for the United States Attorney for the Northern District here in Texas.  We're the prosecutors on this case.  We represent the United States in this prosecution, okay?

A.    Okay.

Q.    The next table over is Mr. Jeff Kearney.  Next to Mr. Kearney, as you know, is the defendant, Orlando Hall.  There's another gentleman, another lawyer who will be representing Mr. Hall.  He's not here in the courtroom this morning.  His name is Michael Ware.  He was introduced to you that Friday y'all came down here before.

A.    Yes.

Q.    Do you know or recognize any one of us, sir, other than from the introductions?

A.    No, sir.

Q.    You know what roles we play and what our responsibilities are.  We're the prosecutors, of course he's the defendant, and Mr. Kearney is one of his lawyers.  Do you understand that?

A.    Yes, sir.

Q.    You know, of course, sir, at this point you're a prospective juror on a capital case.  And by that, of course, that phrase "capital case" means an offense for which one of the possible penalties would be a sentence of death.  All right?

025

Webster v. Lockett 013703

Now, Judge Means has very capably gone over many, many of the things that will come into play during the course of this trial, so I'm not going to insult him by going over that anymore.  Hopefully I won't at any rate.

But I want you to know -- and I believe you have served on a jury before, haven't you?

A.    Yes, I have.

Q.    All right.  You may recall when you were down on that jury service, sir, that you were probably interviewed by the lawyers, but that was done in the presence of all the others jurors, wasn't it?

A.    Yes, sir.

Q.    Well, the procedure here is obviously different.  We talk to you individually so that you may relax as much as you possibly can.  And I'll remind you of what the judge said, there are no right or wrong answers.  No one's going to quarrel with you or quibble with you about anything.  We're not going to try to talk you into anything, talk you out of anything.  What we do want is to know how you honestly feel, okay, about any aspect of your potential service on this case.

A.    Yes, sir.

Q.    So if there's something you need to tell us, now's the time, okay?

A.    There's nothing.

Q.    Okay.  As we go along, if you have a question,

026
Webster v. Lockett 013704

Mr. Hussain, by all means ask it, all right? If you need something explained in more detail, like I say, now is the time.

Now, let me tell you -- let me tell you, sir, exactly where we stand in this particular case. That is where the prosecution or the government stands in this case. We are actively seeking the death penalty for Mr. Hall. We know that the law allows for it under the right circumstances, given the proper evidence, that a jury can return a verdict of death, and we are actively seeking that. Now, that's a decision, of course, that you, if you were on this jury, and 11 others that would accompany you would have the responsibility of determining.

We want you to know from the very outset where we stand and what our objective is. Whether we achieve that, whether we were to convince you and the other jurors remains to be seen, and that's some of the things we would like to talk about. But those are the stakes in this case, and that's what our objective is.

Now, you were asked all these questions here, 120 or 121 questions, and that helps us a whole lot, keeps us from having to ask you all these questions again. But -- and one of the questions or a series of questions, of course, concern the death penalty.

Let me ask you again, in your own words can you share

027

Webster v. Lockett 013705

with us, please, Mr. Hussain, what are your personal feelings about the death penalty?  How do you personally feel about it?

A.  I just feel that if it is proven that the person has committed the crime and that -- that that penalty should be given.

Q.  All right.  For what sort of crimes do you think the death penalty, generally speaking, would be appropriate?  What sorts of crimes?

A.  Death of another person.

Q.  Murder?

A.  Yes.

Q.  Okay.  For an intentional murder of somebody?

A.  Yes, sir.

Q.  All right.  Any other crimes come to your mind?  Some people will say, well, you know, selling dope, narcotics or drugs to children, for example.

A.  No, sir.

Q.  Okay.  A variety of things.  You think it should be limited to murder?

A.  Yes, sir.

Q.  All right.  Have you ever felt differently about this, Mr. Hussain?  Has there ever been a time in your life, perhaps, where you felt the death penalty wasn't appropriate?

A.  No, sir.

Q.  All right.  Let me ask you, sir, furthermore, do you know

028

Webster v. Lockett 013706

of any reason why you would not be able to actually serve on a jury of this type, keep an open mind, listen to the evidence, and if the evidence calls for a sentence of death, return that recommendation to the Court?

A.   No, sir.

Q.   You feel you could actually do that?

A.   Yes, I do.

Q.   Okay.  You understand, though, on the other hand there are actually three possible penalties for a person who is convicted of an offense such as Mr. Hall has been charged, a sentence of death --

A.   Yes, sir.

Q.   -- a sentence of life without the possibility of release or a life sentence?

A.   Yes, sir.

Q.   All right.  Now, you understand we have the burden of proof in both phases of the trial that the judge told you about.

A.   Yes.

Q.   The guilt or innocence phase, we must first, of course, prove all the elements in the indictment to you and the other jurors by proof beyond a reasonable doubt.  And if we do that, your role is very simple, you must find the defendant guilty. If we don't, you understand, it's just as simple, you must find the defendant not guilty.

029

Webster v. Lockett 013707

A.    Okay.

Q.    Is there any reason, sir, why you couldn't do that?

A.    No, sir.

Q.    All right.  Let me just ask you a broader question.  Do you know of any reason, sir, as you sit here why you couldn't keep an open mind, be fair and impartial, listen to all the evidence that would be presented to you during the course of a trial such as this, and basically just render your verdict based on the evidence and based on the law?

A.    Yes, sir.

Q.    Can you do that?

A.    Yes, sir.

Q.    In other words, you don't have any preconceived ideas about this case, do you, sir?

A.    No, sir.

Q.    You're not going to prejudge anything?

A.    No, sir.

Q.    Now, some people might -- you know, we talked about the death sentence, we talked about the other sentences.  Some people might say, well, if there was a sentence of life without the possibility of release, I would never give the death penalty.  How do you feel about that?

A.    Can you repeat the question, sir?

Q.    Okay.  You see -- you know, of course, that one of the possible penalties, depending upon the evidence, is a sentence

030
Webster v. Lockett 013708

of death.

A.   Yes.

Q.   Another sentence, for example, is a sentence of life without the possibility of release.  Somebody might say, a person could say, well, gee, that sounds pretty good, life without release.  If we have that, I don't want to ever give anyone the death penalty.  I don't see a need for the death penalty.  How do you feel about that?  Do you feel a death sentence might still be appropriate depending upon the facts and circumstances?

A.   Yes, sir, I do.

Q.   All right.  Could you keep an open mind to both, then, depending upon the evidence?

A.   Yes, sir.

Q.   Any problem with that at all, sir?

A.   No, sir.

Q.   Now, do you have any questions, Mr. Hussain, about any of the procedures that Judge Means described to you and went into here this morning about the second phase of the trial?

A.   No, sir, I do not.

Q.   All right.  You do understand the trial's in two parts basically.

A.   Yes.

Q.   We already talked about the first part, that's where we have to prove the defendant's guilt beyond a reasonable doubt.

031
Webster v. Lockett 013709

A.    Yes, sir.

Q.    All right.  You understand if you find the defendant guilty, that's the end of the trial, there's no second phase.

A.    Yes, sir.

Q.    Okay.  If he's found guilty -- and let's just speak hypothetically.  We won't speak about Mr. Hall, we'll speak about a hypothetical case.

Let's say you have found an individual guilty because the government has proven to you that he's guilty by proof beyond a reasonable doubt.  Remember the judge went over with you those things that must also be proven to you in the second part, the penalty phase of the trial.  First those aspects about our proving to you beyond a reasonable doubt to all of the juries -- all of the jurors, rather, that it was an intentional killing, these four ways, and you have that sheet there in front of you.

A.    Yes.

Q.    You understand we have to do that first.

A.    Yes, sir.

Q.    That's a prerequisite.  We have to do that first.

Any reason why, having gone over this with the Court, any reason why you couldn't find one of those ways depending upon the evidence that you hear?

A.    No, sir.

Q.    Okay.  You can see how that could be proven, depending

Webster v. Lockett 013710

upon the evidence.

A.    Yes, sir.

Q.    The second page, of course, lists the second requirements that we must establish, again, beyond a reasonable doubt, unanimously.  And those concern the aggravating factors as they're described -- that's a legal term, by the way.  The law actually characterizes these as aggravating factors.  And can you see how we could prove these or maybe not prove these depending upon the evidence?

A.    Yes, sir.

Q.    Let me ask you, sir, do you think these are things that you would be -- you would consider important, for example, during the course of a trial in deciding whether a person should get a life sentence or a death sentence?

A.    Based on these?

Q.    Well, you look at these factors, for example, these aggravating factors: death during the commission of another crime or whether the crime was heinous, cruel or depraved, whether there was substantial planning or premeditation.  You understand -- first off, you know we have to prove at least one of those --

A.    Yes, sir.

Q.    -- for you to even be able to consider the death penalty.

      But even then you may decide that these factors are very important to you in deciding whether someone should get the

033
Webster v. Lockett 013711

death penalty, or you may find that they're not that significant. Can you keep an open mind as to that?

A.    Yes.

Q.    How do you personally feel about these factors? Do you think they're important?

A.    Yes.

Q.    All right. Now, do you understand that there may be other factors, also, aggravating factors that may be presented to you for your consideration?

Now, as the judge said, assume that we have proven the intentional part in the second part of the trial, we've established one or more of the aggravating factors, then and only then could you consider the death penalty, okay?

A.    Okay.

Q.    Do you understand, also, that the defendant may, if he wishes, present evidence to you establishing the existence of a mitigating factor?

A.    Yes, sir.

Q.    You understand, just like the defendant has no obligation to testify in any part of the trial, you understand that?

A.    Yes, sir.

Q.    He is not obligated to present any mitigating factors to you either. If he wishes to, he may. And if he doesn't, then that's the way it goes. You can't hold that against a defendant. You understand that?

034

Webster v. Lockett 013712

A.   Right, yes, sir.

Q.   You wouldn't do that, would you, Mr. Hussain?

A.   Oh, no.

Q.   Okay.  Now, let's assume that we've proven those things, the aggravating factors or a factor, as the case may be, because we may not be able to prove them all to you, and they have established some mitigating factors.  And you know the burden on the defendant for establishing a mitigating factor is less than on us establishing an aggravating factor, just by a preponderance of the evidence.

A.   Yes, sir.

Q.   And basically it comes down to this, and it's kind of a common sense thing, I think.  After all the evidence is in in the second phase of the trial, you and the other jurors weigh the aggravating factors you found, or factor, against any mitigating factors, and basically you call it the way you see it.  If you feel at that point that the death penalty is the proper sentence, then you recommend that to the Court.  Do you see how that happens?

A.   Yes, sir.

Q.   And if you don't, you recommend some other sentence.

A.   Yes, sir.

Q.   Any reason why you couldn't do that, sir?

A.   No, sir.

Q.   Again, you haven't prejudged anything, have you?

035

Webster v. Lockett 013713

A.    No, sir.

Q.    Because, Mr. Hussain, it's very important, and I think you understand this, certainly if you were on trial -- and I don't mean to personalize this, but I guess it's as good a way as any.  I'm sure you would want a juror on your case to come in here without any preconceived notions about someone's guilt, wouldn't you?

A.    Yes, sir.

Q.    All right.  That you have an open mind, that you'd want somebody on the jury that could make a tough decision, make the right decision, but do that only -- and I emphasize that, only after he has heard every last bit of all of the evidence so that he can make an intelligent decision on these important factors.

A.    Yes, sir.

Q.    Is that fair enough?

A.    Yes, sir.

Q.    Are you that type of person, Mr. Hussain?

A.    Yes, sir.

Q.    All right.  Now, you understand if there are no mitigating factors -- and again, he has not -- there's no requirement that he prove mitigating factors, you understand that you then make your decision simply on the aggravating factors.

      And you can see how the aggravating factor or factors,

they may be proved, okay, but then again as you look at them, you take into consideration the entire crime, you may not feel that even with proof of these aggravating factors the death penalty is warranted.  Then again you might.  You see how it could go one way or the other?

A.   Yes, sir.

Q.   Any problem with that at all, sir?

A.   No, sir.

Q.   Let me add, also, one other thing that the judge touched on.  As far as evidence goes, you know, when you hear -- when you decide -- in the first part of the trial you'll hear all about how the offense happened, who did this, who did that, the various aspects of the case.  All right?  All of that evidence that's presented to you in the first part of the trial you can reconsider, you see, you can reconsider in the penalty phase of the trial in establishing these factors.  You see?

A.   Yes.

Q.   All right.  So for example -- and I'm speaking purely hypothetically here, Mr. Hussain.  You could find out if it was a -- this was a spur of the moment offense, something just happened like that, or whether it was planned or premeditated. If it was planned and premeditated, whether a defendant -- what role the defendant had in that, was he a leader, was he a follower.  How much premeditation.  Then during the offense

037

Webster v. Lockett 013715

itself was -- what role did the defendant -- a defendant play in that part of the trial -- or the offense. Was he a leader or was he a follower --

MR. KEARNEY: Your Honor, we're going to object to him suggesting things for the juror to consider.

THE COURT: Sustained.

BY MR. MACALUSO:

Q.   Well, Mr. Hussain, let me just put it this way: Do you understand that you'd be able to consider all of the factors, everything you learn, you see, if you want to in the first part of the trial to consider in answering these questions? Do you see that?

A.   Yes, sir.

Q.   And then you may hear additional testimony in the second phase of the trial. In fact, you may well hear additional testimony that would be designed to aid you, if you decide it does aid you, in answering the questions -- or in deciding the issues, actually. I say answering questions, but decide these issues. Any question about that, sir?

A.   No, sir.

Q.   Okay. Mr. Hussain, let me ask you a few things that are in the questionnaire here that I noticed. One is that you have a trip to Pakistan in November; is that right?

A.   Yes, sir.

Q.   The 19th of November?

A.   Yes, sir.

Q.   Well, you understand that we have little control, if any control, of when this trial will start, much less when it will end, but the Court has indicated and I think the smart money is on that the trial will probably be over by then.

MR. MACALUSO:  The Court might wish to address that.

THE COURT:  Address what?

MR. MACALUSO:  About the trip on the 19th.

THE COURT:  I don't think there's -- I hope there's no chance we'll still be in trial the 19th.  Have you bought your ticket?

MR. HUSSAIN:  Yes.

THE COURT:  Is it nonrefundable?

MR. HUSSAIN:  It can be changed.

THE COURT:  Okay.  Could you change your trip if absolutely necessary for this trial?

MR. HUSSAIN:  Yes, I could.

BY MR. MACALUSO:

Q.   So that shouldn't be a problem then, sir?

THE COURT:  I don't think we're going to go that late.  We're certainly not scheduled to, and it will be a major inconvenience for the Court if we do, too, because we've got other cases set.

BY MR. MACALUSO:

Q.   Other one thing here, Mr. Hussain, with regard to

039

Webster v. Lockett 013717

question 121, actually.  There's actually 124 questions or 123 here, but 121 was do you want to serve as a juror in this case, and you said no, and I don't probably blame you.  But it said, "Please explain," and you wrote down here that you had religious beliefs that could affect any -- may affect any time during the hearing.  Can you expand on that a little bit and tell us about that?

A.   On Fridays I usually --

MR. KEARNEY:  I'm sorry, I just can't hear you.

A.   On Friday is the Sabbath day, and I usually go and attend my mosque, and that was the only reason that I was thinking that that probably --

BY MR. MACALUSO:

Q.   And how much time are we talking about?

A.   It takes only about a couple of hours.

THE COURT:  What time do you usually go?

MR. HUSSAIN:  It's about 1:30 to about 3:50.

THE COURT:  Okay.

A.   Just one day.

BY MR. MACALUSO:

Q.   Okay.  Let me ask you this, Mr. Hussain, do you have any questions about anything that I said?

A.   No, sir.

Q.   Do you understand all of those -- what those things that the judge talked to you about, those things about presumption

040

Webster v. Lockett 013718

of innocence, the burden of proof being on the government at all times, you understand that?

A.   Yes.

Q.   The defendant can testify or not testify.  That's his decision?

A.   Yes.

Q.   If he doesn't, you understand you cannot hold that as any kind of evidence against him whatsoever,

A.   Yes, sir.

Q.   You can abide by that, can't you, sir?

A.   Yes, sir.

Q.   Same thing about judging the witnesses.

A.   Yes, sir.

Q.   All right.  Mr. Kearney is going to have some questions for you now, Mr. Hussain.  Let me just ask you, do you know of any reason, whether I've touched on it, sir, or not, why you couldn't be a completely and totally fair juror in this type of case?

A.   Yes, sir, I would fair.

Q.   Keep your mind open, wait until you've heard all the evidence before you make a decision?

A.   Yes, sir.

Q.   You could do that?

A.   Yes, sir.

Q.   Thanks, Mr. Hussain.

041

Webster v. Lockett 013719

MR. MACALUSO:  That's all the questions I have, Your Honor.

THE COURT:  Sir, are you with the Fort Worth Star Telegram?

A SPECTATOR:  Actually Channel 5.

THE COURT:  Okay.  You can sketch anybody but the jurors.

A SPECTATOR:  Anybody but the jurors?

THE COURT:  Right.  You probably weren't going to do that anyway, were you?

A SPECTATOR:  No.

THE COURT:  Which side do you --

All right, Mr. Kearney, you may proceed.

DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.   Good morning.

A.   Good morning, sir.

Q.   You were born in Pakistan.  How old were you when you left?

A.   I was about 21.

Q.   Pardon me?

A.   About 21 years old.

THE COURT:  I can't hear you, sir.

MR. HUSSAIN:  About 21.

BY MR. KEARNEY:

042
Webster v. Lockett 013720

Q.    21?

THE COURT:  Could you speak up a little?

MR. HUSSAIN:  Yes, sir.

BY MR. KEARNEY:

Q.    Were you -- were you born a United States citizen or were you -- did you later become a citizen?

A.    I became later a citizen.

Q.    Was that here in Texas?

A.    Yes -- in Georgia.

Q.    In Georgia?

A.    Yes, sir.

Q.    Okay.  And when was that?

A.    That was August 1975.  April or August 1975.

Q.    What brought you to the United States?

A.    I came here to go to school.

Q.    Where did you attend school?

A.    I attended school in Miami, Florida, and then some schooling in Texas.  I join the military afterwards.

Q.    Okay.  Did your parents come to the United States, or did you come alone?

A.    I came alone, sir.

Q.    The question about your attending the mosque on Fridays -- is that right?

A.    Yes, sir.

Q.    If you were not able to do that, what kind of problems

043

Webster v. Lockett 013721

would that cause personally to you?

A.    Not much.  I can just pray at home later.

Q.    What's that?

A.    I can pray at home later.

Q.    But you would like to do that if you could?

A.    Yes, sir.

Q.    Do you normally do that on Fridays?

A.    Yes, sir.

Q.    So you have -- your employment allows you to do that?

A.    Yes, sir.

Q.    Obviously the government is seeking the death penalty, the prosecutors are, and we are asking that we have jurors that are open-minded to some other punishments that may be available.  Do you understand that?

A.    Yes, sir.

Q.    When the prosecutor asked you your views on the death penalty, you said that if it is proven that a person has committed a crime, murder --

A.    Yes.

Q.    -- that he should get the death penalty.

A.    Yes.

Q.    Some people feel that way.

A.    Yes, sir.

Q.    The reason we're going through this process is to determine whether or not people can also, even though someone

044
Webster v. Lockett 013722

is proven guilty beyond any reasonable doubt that they were involved in a murder, and even though the prosecution has proved that the person engaged in the intentional conduct that's there on the first page in front of you, that jurors will not think that it's automatic that they should get the death penalty.

A.   Yes.

Q.   That jurors would be open-minded to the other available sentences, which are life without the possibility of release or a life sentence.

A.   Yes, sir.

Q.   I need to kind of figure out how you feel about that.

If you found someone guilty beyond any reasonable doubt, you and the rest of the jurors, of -- the offense in this case is kidnapping that resulted in a death, and then you also find beyond a reasonable doubt that one of these intentional conducts, that the defendant participated and engaged in this intentional conduct in front of you, one of the four ways, beyond any reasonable doubt, would you feel that -- you personally that the death penalty should be the only proper punishment for that?

A.   If that is directly resulted in death.

Q.   If that what?

A.   If that is directly resulted in the death, I would have to wait and see.

045

Webster v. Lockett 013723

THE COURT: I just can't hear you, sir. Can you speak up?

A. I was saying that we don't know the facts. We'll just have to hear the facts, what the facts are.

BY MR. KEARNEY:

Q. Some people because of personal beliefs, opinions or religious beliefs believe that, you know, if it is proven beyond any reasonable doubt that they're guilty in a murder case, and also that if it was -- that the person caused the death through some intentional conduct like the things that are on the first page there in front of you, that the only possible -- just because of their own personal moral or religious beliefs, the only possible punishment that they would consider is the death penalty.

A. Yes, sir.

Q. I'm trying to figure out if you fall into that category, that you would say that's the only possible punishment after I have found somebody guilty beyond any reasonable doubt.

A. Yes, sir.

Q. Is that how you feel?

A. Yes, sir.

Q. Okay. That's what I thought you said when you gave us your first --

The law contemplates before you can serve on a jury like this that you have to be able to say even though you found

somebody guilty beyond any reasonable doubt, and even though you found that the person engaged in the intentional conduct there in front of you, that you would be open-minded before the trial started --

A.    Yes, sir.

Q.    -- to say it's not just automatically the death penalty, but that even though I found all those things beyond any reasonable doubt, that I would certainly be open-minded to one of the life sentences that is an option, okay?

A.    Yes.

Q.    And from what I hear you telling me is that you're not open to that if you have found somebody guilty beyond a reasonable doubt.

MR. MACALUSO:  Excuse me, Your Honor.  I'm going to ask that the question be phrased more precisely.  First he says kidnapping, if he's found guilty of kidnapping, then he's talking about murder, then he's talking about finding somebody guilty.  I think it's confusing.

THE COURT:  Well, I don't think it was, but just in case, you want to try to rephrase it.

MR. KEARNEY:  I think I ought to be able to ask him however I want to ask the question, you know, without him standing up and objecting right there when I've got -- I don't see any purpose in that objection other than interrupting me, Your Honor.

MR. MACALUSO:  Well --

THE COURT:  Mr. Kearney, I don't think that's called for.  Would you please ask that question again, or do you want me to ask it?

MR. KEARNEY:  I'll try to ask it again.

BY MR. KEARNEY:

Q.   What we're trying to get to is this:  This is a case that involves -- the allegation is kidnapping that resulted in a murder, okay?  And in the first phase of the trial, if you're on the jury, you and the other jurors would have to unanimously -- that's means all of you, including you -- find that the person is guilty beyond any reasonable doubt, okay?  Then the government would have to prove beyond any reasonable doubt to you and the other jurors unanimously that the accused, who you have already found guilty of the crime, engaged in some of this intentional conduct there that's in front of you, the four things the judge has explained to you on the first page, and then you have to find that intentional conduct was committed beyond any reasonable doubt, okay, that resulted in the death.

A.   (Nods head.)

Q.   What I'm trying to find out is once you found both of those things beyond any reasonable doubt and you're convinced of that, do you think the only appropriate punishment is the death penalty?

048

Webster v. Lockett 013726

A.   Yes.

Q.   Okay.  And you would not be open to -- no matter what the facts and circumstances were, after you found those things beyond any reasonable doubt, to the punishments of the life sentences that are the option?

A.   Yes, sir.

Q.   Is that right?

A.   Yes, sir.

Q.   Do you feel pretty strongly about that?

A.   Yes, sir.

Q.   Do you feel like that I'm not going to sit here and talk you out of that?

A.   That's the way I feel, sir.

Q.   Okay.  And you're not going to let Mr. Macaluso try to talk you out of that, are you?

A.   No, sir.

Q.   We just want to know how you feel, your true beliefs.  And if that's the case, maybe some other case besides this would be the best case for you to sit on, one that doesn't involve the death penalty, whenever you get summoned again next year or whenever it is.  Okay?

A.   Yes.

THE COURT:  Do you pass the witness?

MR. KEARNEY:  Yes.  I yield right now for that purpose.

Webster v. Lockett 013727

THE COURT:  Yield, all right.

Mr. Macaluso, do you need some more coffee?

MR. MACALUSO:  No.

THE COURT:  Do you wish to question?

MR. MACALUSO:  Yes, I would.

THE COURT:  Five minutes.

MR. MACALUSO:  Yes, Your Honor.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.   Mr. Hussain, let me assure you of one thing right off. I'm not going to try and talk you into or out of anything.  I told you that before.  What I do wish to do is try to explain a little bit more carefully if I can a little bit more about the procedure.  Okay?

Remember, the first part of the trial the only decision you're going to make is whether or not the defendant has either been proven guilty beyond a reasonable doubt or not guilty.  Okay?  If we prove the defendant's guilt beyond a reasonable doubt, you will have found that he committed the offense of kidnapping that resulted in somebody's death. There's no decision as to any kind of death penalty at that point.  You understand that, don't you, sir?

A.   Yes.

Q.   All right.  And remember you said -- and this is what's so important, Mr. Hussain, is that you not prejudge anything.

050

Webster v. Lockett 013728

A.    Yes, sir.

Q.    You haven't heard a word of testimony, have you?

A.    No, sir.

Q.    You have not heard one fact in this case, have you?

A.    Huh-uh.

Q.    You can't make a decision without the facts, can you?

A.    That's true.

Q.    How many times, sir -- we're both old enough to know that we sometimes, even though we tend to prejudge things or tend to think one way, when the facts actually come out, things are a whole lot different sometimes, aren't they, sir?

A.    Yes.

Q.    That's why it's so important, we all know that, don't we --

A.    Yes.

Q.    -- to keep an open mind?

And you may be thinking at various times in your life you're going to act this way, you're going to do it this way. You may have felt very strongly about doing something this way.  But when it came down to it, when you got all of the facts -- not just all of the facts, the facts, not conjecture, not speculation, you see, but the facts --

A.    Yes.

Q.    -- that you act maybe the same way, maybe differently.

A.    Yes, sir.

051

Webster v. Lockett 013729

Q.    You see?  That's all that's going to be asked of you in this situation here, wait until all of the evidence has been presented to you.  Can you do that?

A.    Yes, sir.

Q.    Okay.  Now, let's suppose in a case you found the defendant guilty of that kidnapping where a death occurred.  Then, of course, you know, we have to then present more facts to you.  We may or we may not be able to, but certainly you cannot at that point right after you've found someone guilty, the death penalty is not a factor at that time.

A.    That's true.

Q.    Do you understand that?

A.    Yes.

Q.    Okay.  You understand as the judge told you and I mentioned earlier, we have to then prove that it was an intentional killing.

A.    Yes, sir.

Q.    We may or we may not be able to do that.  But you know something, Mr. Hussain, even if we do, you can't consider the death penalty.  Do you know why?  Do you know why, Mr. Hussain?

A.    No, sir.

Q.    Because the law that you would be taking a sworn oath to follow says you can't.  It just can't.  That's the rules.  Can you follow the law, Mr. Hussain?

052

Webster v. Lockett 013730

A.    Yes.

Q.    Will you follow the law?

A.    Yes, sir.

Q.    Is there any question about that whatsoever?

A.    No, sir.

Q.    Okay.  Now, you understand then, even then, even if we prove that at that point that it was an intentional act, we then have to prove at least one of those aggravating factors. Do you see that?

A.    Yes, sir.

Q.    Even if we do that, Mr. Hussain, the law does not say that the death penalty is automatic.  Even if you were to in your mind favor the death penalty, you understand that it's not automatic.

A.    Yes, sir.

Q.    Do you understand that?

A.    Yes.

Q.    Your mind has to remain open, and the law would expect your mind to remain open to whether it be the death sentence or, depending upon when you hear all of those facts, when it's all in and it's all said and done, whether or not you should assess a sentence of life without the possibility of release. Do you see?

A.    Yes, sir.

Q.    Now, the fact that when it's all over you may decide that

053

Webster v. Lockett 013731

a death sentence is what is proper, that may be the way it should be, but you make that decision -- or the law expects you to make that decision only until you've heard all of the evidence. And I thought that's what you told us or told me in the beginning.

A.   Yes, sir.

Q.   Have you changed your mind in any way, or can you keep your mind open to a life sentence if you feel based on the facts, once all the evidence is in, that that's the right thing to do?

A.   Yes.

Q.   Can you see how under certain facts a life sentence may be the right thing to do?

A.   Yes, sir.

Q.   Maybe a death sentence.

A.   Yes.

Q.   Now, do you have an open mind, Mr. Hussain?

A.   Yes, I do.

Q.   Well, the reason I ask you that again in that way is because when Mr. Kearney talked to you, you said you had your mind made up or it sounded like you said you had your mind made up on a death sentence. Do you or don't you, sir?

A.   No, sir.

Q.   All right. Can you tell the judge, can you tell the defendant, can you tell all of us that you'll wait, you'll

054
Webster v. Lockett 013732

follow the law, you will listen to all the evidence, and just call it the way you see it after you hear all of the evidence and not before?

A.    Yes, sir.

Q.    You haven't closed your mind to a life sentence, you haven't closed your mind to a death sentence.

A.    No, sir.

Q.    Thank you, Mr. Hussain.

THE COURT:    You do want some more coffee, don't you?

MR. KEARNEY:    Huh?

THE COURT:    I believe you do want some more coffee. Are you making a motion?

MR. KEARNEY:    Yes.

THE COURT:    Mr. Hussain, I'm going to excuse you from this jury. That means you will not have any further responsibility here. We appreciate your being here, your kind patience, especially since you had to come back a second day. And we appreciate the candor with which you've answered our questions. Do you have any final questions of us?

MR. HUSSAIN:    No.

THE COURT:    Thank you very much.

MR. MACALUSO:    Thanks, Mr. Hussain.

MR. KEARNEY:    Thank you.

MR. ROPER:    Thanks.

(Venire person excused at 9:45 a.m.)

055
Webster v. Lockett 013733

because you would want a cross section.

MR. DICKERSON:  Well, I might be mad at myself.

MR. KEARNEY:  Is he saying something different than he said up there?

THE COURT:  No.  I think it's the same answer.

MR. DICKERSON:  I don't mean to.  Yeah, I would want someone that I feel is -- I would want people that are fair that would consider both sides, and I feel like that's the kind of person I am.

THE COURT:  Okay.  Thank you.

Please remember your instructions to not discuss the case with anyone, including what you've done here today, to avoid all media coverage scrupulously so that we can be sure that when the final decision is made, it's based totally on what is heard here in the courtroom.  Okay?  Thank you, sir.

MR. MACALUSO:  Thank you, sir.

(Venire person excused at 2:50 p.m.)

(Off-the-record discussion.)

(Recess from 2:50 p.m. to 3:10 p.m.)

NATALIE HARRIS,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

Q.  Ms. Harris, thank you for coming back here, ready to talk with us.  I have some questions for you first of all.

056
Webster v. Lockett 014118

You had indicated to me when you were talking -- we were talking to the four of you that you thought maybe you wouldn't want someone like yourself on a jury if you were on trial. Did I understand you correctly?

A.   That's true.

Q.   Tell me why you think that.

A.   Well, because based on people I know and my live experiences, I would say that what you talked about about reasonable doubt is kind of like the gray area between your decision-making process of yes or no and the gray area of not guilty.  I tend to have a fairly narrow band there, and it's improved over time as I've gotten older and made some of my own mistakes and realized that we all have to be more forgiving sometimes or more aware of situations or circumstances, but I still would say that I tend to have a smaller band in there in terms of making the decision-making going from reasonable doubt to being sure.  I would say I have a fairly narrow band.

Q.   Okay.  For me to be sure that I understand what you're saying, I'm going to have to ask you some additional questions if my voice will hold out.  Excuse me.

A narrow band --

A.   Well, I tend to go ahead and make my decisions -- I mean, I listen to the information or I try and gather information, not just here but just in life, but I find that I tend to go

057

Webster v. Lockett 014119

ahead and make my decisions fairly rapidly after I have information, where some people seem to give more benefit of the doubt, perhaps, in certain situations.

Q.   Okay.  Do you make those rapid decisions -- or when you make them, do you make them with all the facts, or do you tend to make them before all the facts are in?

A.   I make them with all the facts.

Q.   Do you think that your consideration is thorough when you do that?

A.   Yes, I do.

Q.   I'm going to explore a little bit more on the narrow band.

When you're -- if you're on the jury or in any jury in a criminal case, the ultimate question will be whether you can look at the evidence and decide whether or not you have a reasonable doubt.  Is there anything about your reasoning process that makes you concerned about your ability to decide whether there is a reasonable doubt or whether you have a reasonable doubt?

A.   No.  I think I could decide if I had a reasonable doubt.

Q.   Any impairment on being able to identify that reasonable doubt?

A.   No.

Q.   Okay.  Are you telling me that you're likely to find guilt beyond a reasonable doubt too easily or too quickly?

058

Webster v. Lockett 014120

A.    I don't think it would be easily -- easy or quick, but I tend not to have a lot of doubt in general.

Q.    No doubt in general.  Now, that could mean that you just -- once you make up your mind, you're satisfied with your process and you go on.

A.    That's true.

Q.    Or it could mean that you rush to judgment.

A.    No, I don't think I rush.

Q.    I hear you telling me you're concerned about the narrow band, and yet when I probe, I don't understand what you mean by the "narrow band."  So far nothing you've told me would show me a narrow band, so what is it you mean there?

A.    Maybe it's fine.  I don't know.

Q.    Don't -- I don't mean to put you on the defensive because you're the one who knows your mind, not me, but I'm having trouble understanding what you mean by it.

A.    Let me think of an example.

Q.    Okay.

A.    In terms of reprimanding or -- my children.

Q.    Uh-huh.

A.    There are times when my husband will come back later to me and say there was some circumstances, mitigating circumstances you didn't consider, and sometimes that's because the situation is such that that information isn't given to me by the child or other people in the situation, and

there have been times when I've had to rethink that.  But when I heard all the facts that I had at that point in time, I didn't think that I rushed to judgment or that I even necessarily made the wrong decision.  I'm just saying that I tend to get all the facts, make the decision and go on.  And I don't know -- my perception is that a lot of other people don't do that.  They appear to muddle around in the middle for a long time without being able to decide what they're doing.

Q.    I think I'm guilty of that.

I don't hear anything so far that makes me think you're not a qualified juror.

A.    That's fine.

Q.    But I'm still concerned about your telling us that you would not necessarily want someone like yourself on the jury, because what you've described so far is someone who hears all the facts, considers all the evidence, and while the judgment might be unmuddled and uncluttered, is rational and reasonable and is arrived at with fair consideration.

A.    I can do that, so if that's acceptable, I guess I'm in the -- I'm in the group from that standpoint.

Q.    Do you think that the way you decide things makes you what we would call a pro-prosecution juror?

A.    I don't know.

Q.    Do you know what I mean by a "pro-prosecution juror"?

A.    I think I understand the concept.

Webster v. Lockett 014122

Q.    Yeah.

A.    No, not necessarily.  I don't think it would.

Q.    Okay.  Does it make you think you might be -- well, the reason I asked that because I asked you if you were a defendant would you want somebody like yourself, so that suggested to me that maybe you thought of yourself as a pro-prosecution juror, but I guess I just heard you say you don't think you're a pro-prosecution juror.

A.    I don't know.  Maybe I would be a better juror than I think.

Q.    Could be.  Let's go on then.

A.    Okay.

Q.    I've been reading your questionnaire, and it looks to me like you feel pretty strongly about -- in favor of the death penalty.  Is that a fair statement?

A.    That's a fair statement.

Q.    Would those strong feelings in favor of the imposition of the death penalty prevent you in even the slightest way from following the law as I related it to you earlier today?

A.    No.  I think I understand the steps, that you want people to consider each aspect --

Q.    Right?

A.    -- make the decision, and then decide either to go forward or not.

Q.    There's a difference between being strongly in favor of

the concept of the death penalty and being strongly in favor of using it if you're a juror based on the facts.  Would you agree with that?

A.  I would agree with that.

Q.  So that's what I need to probe and see if there's a bleedover from one to the other.  Because if you're propensity -- not propensity, that's the wrong word.  If your belief that the death penalty can be an appropriate penalty would make you more likely to give the death penalty and to in some way look at the facts less carefully, less conscientiously, less morally, then we would need to know that.

A.  Well, I think it's probably one of the most serious decisions that you would have to make in judgment of somebody else, and from that aspect I don't think it would be something I would rush towards, but I would not avoid it either.

Q.  I think where this might come up, where I would be concerned most for you, is in the -- if it came down to this: Let's say that in the trial the defendant were found guilty beyond a reasonable doubt of the crime of kidnapping in which a death resulted, and suppose in addition to that the jury found beyond a reasonable doubt and unanimously that the killing of the victim was done in one way or another intentionally, and then that the jury found unanimously and beyond a reasonable doubt that there was one or more

aggravating factors. Would you be able to look at those aggravating factors and consider -- and let's say there were no mitigating factors that you found yourself, so all you have is one or more aggravating factors. Would you be able to weigh and look at those, or would you feel at that moment compelled to give the death penalty because there was an aggravating factor?

A.    I think I would have to weigh and look at those.

Q.    How do you think that would work? How would that weighing process take place? I know that's a vague question, but maybe you can grasp it.

A.    I guess you could, I assume, take notes and make -- you know, write down what -- on a scale about how serious the mitigating factors were and whether --

Q.    You mean aggravating factors?

A.    Aggravating factors, and I would --

Q.    So I --

A.    It would be strange to me that there were no mitigating factors, but maybe there aren't.

Q.    Well, there may very well be. I just gave you a hypothetical where there weren't, because that seems to me to be -- to use a trite phrase -- where the rubber meets the road as far as your attitude towards the death penalty, because the law would contemplate that a juror would look at those aggravating factors and weigh them rather than say there's an

aggravating factor, I'm going to -- I've got to give the death penalty.

A.   I think it would depend on the aggravating factor and the number of them and severity.

Q.   I had a real good thought just a minute ago, and all I see right now on that train is the caboose.

Well, I think you have answered most of my concerns about that.  There may be and probably will be others that one of the counsel will want to bring up with you.

(Sotto voce between Court and law clerk.)

BY THE COURT:

Q.   My law clerk has brought up an interesting question, and I think it arises out of your real good example you gave of your children and disciplining your children.  And it hits home with me, I know exactly what you're talking about.

If you were deliberating and you made your decision, had your mind made up, but you began to question it after listening to the points that the other jurors would make, do you think you would be able to reevaluate your opinion or decision?

A.   I would be able to do that.

Q.   You would be able to?

A.   Because there have been times when I've had to go apologize to a child, so if I can change in that situation where they basically don't have any power, then I think I can

change with my peers.

Q.    So you could reevaluate your position, even possibly change it, in the light of a cogent, meaningful argument from another juror who would point out other things to you?

A.    I could do that.

Q.    I know what it was.  The train just came back in.

If the aggravating factors are there and you find an aggravating factor beyond a reasonable doubt, what we were talking about earlier, it implies that there might be some aggravating factors that might not justify the death penalty.

A.    Uh-huh.

Q.    And some that might, or that some are present in an insufficient degree to justify that.  Can you agree with that concept?

A.    I can agree with that concept.

Q.    Okay.  You tell us in your questionnaire that your husband was stopped because he had a headlight out and ended up getting arrested, and he had a stick in his car.  Was it a stick of dynamite?

A.    No.  It was about this long, about that wide (indicating).

Q.    A broom handle?

A.    About that size, yeah.

Q.    Gosh.  Is that illegal?

A.    They took it as potentially a weapon.

Q.    Okay.

A.    He had just driven down from New York and had used it to push the gas down when his leg got tired because he didn't have cruise control.

Q.    I'm glad that they didn't know that.

Is there anything about that experience that would make you in any way a less than fair juror in this case?

A.    I don't think so.  I mean, at the time I didn't think that it was a valid situation, but in working through the legal system, everything worked out well, and so I don't think that would cause me a problem.

Q.    Okay.  Has it made you anti-government or anti-law enforcement?

A.    No.

Q.    Did your mom recover okay?

A.    She's still in the hospital.

Q.    Is she?

A.    Uh-huh.

Q.    Do you have daily responsibilities for her?

A.    Well, she's in the hospital in Fontana, California.

Q.    Oh, okay.

A.    But she's expecting to see either myself or my brother on the weekend when she gets out.

Q.    You told me -- you came up, didn't you?

A.    Uh-huh.

Q.    And you told me, I remember that now --

A.    Uh-huh.

Q.    -- that you were going to go out.  Did you go?

A.    Yes.  We flip.  My brother is in northern California and comes down --

Q.    Do you think he could give you a couple weeks in a row if you needed it?

A.    Probably.

Q.    You would have to make it up, wouldn't you?

A.    Yes, I would.

Q.    Okay.  But you're willing to do that?

A.    I'm willing to do that.

Q.    Okay.

A.    I did have a question about how long court runs during the day --

Q.    Okay.

A.    -- because of day care responsibilities and pickup.

Q.    I think you need to be there by 6:00 or you get a minute over -- a dollar a minute?

A.    Uh-huh.

Q.    We'll almost certainly quit by 5:00 to 5:30.  I can't imagine going beyond 5:30 except -- let's say if we had a witness from somewhere way out of state and had a plane to catch, we might need to hurry and put that witness on, but I think we would be able to give you notice.  It wouldn't be

HARRIS/VOIR DIRE/COURT

much --

A.    The reason I ask is one child is in Dallas in school, and the other one is in South Lake.

Q.    Okay.

A.    And while my husband can cover both of them some days, there are other times when he can't get to both of them because of the distances involved.

Q.    Do you have others who can help out in a pinch?

A.    Not really.

Q.    Okay.  So what is the latest you could be here and still meet your duties to your children?

A.    I would say if I picked up the closest one, probably 5:15.

Q.    How long does it take you to get here from where the closest one is?

A.    Well, she's in South Lake.  I haven't really driven straight from South Lake, I keep coming here from work, so I haven't timed it.  So I would suspect -- it's on the north side of the freeway out past Grapevine.  I would suspect with the traffic -- I don't know how the traffic flows around here because I don't drive in Fort Worth a lot, but that could be difficult.

Q.    So you would need to leave by 4:30 or 4:45.

A.    5:15 I could make it.

Q.    Oh, okay.  I thought you had to pick the child up at

068

Webster v. Lockett 014130

5:15.

A.    No.    I have to be there by 6:00.

Q.    Okay.    Let me say this:    If you're picked for this jury, we will work with you on it.

A.    Okay.

THE COURT:    Okay.    I think I'm through.    Let's hear from the government, 15 minutes.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. ROPER:

Q.    Good afternoon, Mrs. Harris.    My name is Richard Roper. I'm an assistant U.S. attorney.    To my left is Delonia Watson, and to my right is Paul Macaluso.    They're also assistant U.S. attorneys, and we represent the United States in this case.

To Mr. Macaluso's right is Mr. Jeff Kearney, who is an attorney who practices here in Fort Worth, and to his right is the defendant, Orlando Hall.

I want to ask you some questions -- of course, you've been questioned extensively either by the judge or through this questionnaire, and I just have a few questions for you and -- touching on some areas maybe the judge didn't go over with you.

First, I don't know if you know this, if you are called to sit as a juror, you will be asked to take an oath, and that oath is something to the effect that I true -- I will a true verdict render according to the law and evidence.    That's

really the verdict you'll be given -- or the oath you'll be given as a potential juror if you are -- actually sit on this. And that really means, as it states, that you are to base your decision on what you hear up there on the witness stand and any exhibits that are introduced.  Do you understand that?

A.     Uh-huh.

Q.     And if you might have heard anything outside the courtroom about this case, you are to base your decision solely on what you hear in the courtroom.  Do you understand that?

A.     I understand.

Q.     Do you think you could follow that oath?

A.     I could follow that.

Q.     I wanted to ask you certain -- go over certain concepts, certain precepts of law that we have here in our criminal justice system, and one, of course, is the presumption of innocence.  We, as the government, we're obligated to prove the guilt of Mr. Hall beyond a reasonable doubt, and we're also -- if we prove him guilty and we go to the punishment phase of the trial, we're obligated to prove the aggravating factors to justify a sentence of death and also the fact that -- before that fact, the fact that he intentionally participated in the murder of someone.  We also have to prove that beyond a reasonable doubt.

Do you feel like you could hold us to that burden and

070

Webster v. Lockett 014132

make that determination based on the evidence you hear at the trial?

A.   I believe I could do that.

Q.   And do you feel like -- and essentially what I'm asking you is can you call a ball a ball, a strike a strike?

A.   I think I could do that.

Q.   Okay.  I want to go over with you these aggravating and mitigating factors.  I know His Honor went over those with you.  And if you turn to that handout -- do you have it?

A.   No, it's upstairs.  Sorry.

Q.   We have one.  And if we could turn to the first page of that.

And I want you to know that we can't go into the facts of this case with you, and there's a pretty good reason for that.  I may have an idea of what the facts are, and Mr. Kearney may have an idea, and for that matter even Judge Means may have an idea, I don't know that, but even if he did, we didn't -- the fact -- we couldn't go into those facts because they haven't been established from the witness stand.  Do you understand that?

A.   Uh-huh.

Q.   And what we're dealing with is we're trying to talk to you about the law in general, do you understand that?  And if for some reason I misspeak and you think I'm talking about specific facts, there are not any specific facts, do you

071

Webster v. Lockett 014133

understand that, at this time?

A.    They're not facts till they come from over there.

Q.    Exactly.

A.    Okay.

Q.    And, really, when we're dealing with these, you can see A, B, C and D really involve -- potentially they could apply to a wide range of circumstances because they're written fairly broad, would you agree?

A.    Uh-huh.

Q.    Intentionally kill the victim could involve many different circumstances.

If we are successful in proving Mr. Hall guilty of kidnapping and that a death resulted, then we would move to this phase, the punishment phase, and our first issue the jury would deal with is whether we've proven that Mr. Hall participated in a -- intentionally participated in a murder is essentially what it is.  At that point the decision wouldn't end for the jury.  That would only, as His Honor said, open the gate for consideration of other factors.  All right?

A.    All right.

Q.    Do you understand at that point you would still have to keep an open mind as to whether you would feel the death penalty is justified.  Do you understand that?

A.    Uh-huh, yes, I do.

Q.    And could you do that?

072
Webster v. Lockett 014134

A.    Yes, I could.

Q.    Okay.  Let's move to the aggravating factors on the next page, and the page after that are both aggravating factors. That would involve -- they're all set out here, and you can see from looking at these that those would involve a wide range of circumstances, as well.  Premeditation could involve, oh, several minutes of premeditation all the way to several days.  Do you realize that?

A.    Yes.

Q.    And, of course, we can't go into the facts -- the victim could be vulnerable, could be 100 years of age, could be 7 years of age, I don't know, could be 1 year of age, could be 12 years of age.  Do you understand that these encompass varying circumstances, and if we are successful in proving those aggravating factors, the decision -- your decision would still not be over at that point.  In other words, you couldn't automatically want to vote for the death penalty if you found intentional murder and you found these aggravating factors. You would still have to weigh them.  Could you do that?

A.    I could do that.

Q.    And let's move -- and in the event that there are mitigating factors presented, do you know the defendant -- that's the only thing in this case, the very only thing that the defendant would have to prove, these mitigating factors, and that would be by a preponderance of the evidence or the

073

Webster v. Lockett 014135

greater weight of the evidence.  Do you understand that?

A.    Yes, I do.

Q.    And let me just deal with those mitigating factors.  I think it's on the next to the last page.  Equally culpable defendants is one.  In other words, in a matter of fairness if somebody else doesn't get the death penalty but he's just as equally culpable by the way he committed the crime and his background, then that would be a factor for you to consider.  Do you understand that?

Now, you may consider it and feel like the death penalty is justified.  You may consider it and feel like the death penalty is not justified.  Could you make that determination one way or the other?

A.    I could do that.

Q.    And also defendant's background and character, we don't know what that is, of course, and if there is that, could you consider that, whatever it is?  And I say consider.  We can shake our heads and, I mean, say something, but could you give it a good faith adult consideration?

A.    I could give it a good faith consideration.

Q.    And finally at the end, in the event that there are no mitigating factors and there are only aggravating factors, could you weigh those aggravating factors at that time, and one way or the other decide whether the death penalty is justified in this case?

074

Webster v. Lockett 014136

A.    I could do that.

Q.    All right.  You mention on your questionnaire that you thought that as to pre -- I was trying to get your exact words.  You thought that the death penalty should be available for premeded [sic] murder, extended crimes --

A.    Premeded murder?

Q.    Premeditated, I'm sorry.  Premeditated murder, extended crimes during which a person could reassess their actions.  Do you remember writing that?

A.    Uh-huh.

Q.    Now, do you feel like that though you have these feelings about this as far as premeditated murder, could you still follow the protocol set out in the statute and make that decision only after you've heard the evidence and after you've gone through that protocol?  Do you understand that?

A.    I understand that.  This is like programming steps.  It's pretty logical.  You just don't go to the next step until you -- you don't leap to the end until you build your way through.

Q.    And probably Judge Means ought to develop a flow chart for the jury to use, I don't know, but that's a good point.  And the purpose is could you follow that flow chart and make a decision.  For instance, you mentioned this thing about premeditated murder.  Well, some people would say, well, you know, there's premeditated murder, that ends the question, I'm

075

Webster v. Lockett 014137

not going to consider anything else, my mind is closed to anything else, and this is the death penalty or it's just life imprisonment.   Could you keep an open mind and wait until all the evidence is in and consider the factors as the judge will instruct you to consider and do that?

A.   I think I could follow the rules, which means I would keep an open mind.

Q.   Exactly.  I think you stated it better.

Do you have any questions for me?

A.   No.

Q.   All right.  Do you feel uncertain about any of the answers you've made?  You sure don't seem like a person that's indecisive.  Do you feel like that?

A.   I don't think I'm uncertain.

Q.   Okay.

MR. ROPER:  No further questions.

THE COURT:  Mr. Kearney.

DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Help me with something, if you're willing to do it.  You said, when the judge asked you at the outset of his questioning here individually to you, in response to the question about whether you are the type of juror you would

076

Webster v. Lockett 014138

We'll let you know in the next couple of weeks.  In the meantime, please remember all of your instructions not to discuss the case.

MS. HARRIS:  Radio, talking --

THE COURT:  Exactly, all those instructions.  Thank you.

MS. HARRIS:  Thank you.

THE COURT:  I've got another break.  We'll come back at 4:00.

(Recess from 3:50 p.m. to 4:05 p.m.)

ROSANA BRIDGEWATER,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

Q.   Okay.  Ms. Bridgewater, let me think now.  You were concerned about something when we were asking questions of you.  I think one of them was your ability to apply guilt beyond a reasonable doubt.

A.   Uh-huh.

Q.   A concept you were not as familiar with.

A.   Well, I'm familiar with it, I just don't agree with it.

Q.   Okay.

A.   That's all.

Q.   Okay.  More precisely you don't agree with it.

A.   Now, what I have to decide is whether your disagreement

BRIDGEWATER/VOIR DIRE/COURT

with it would in one way or another prohibit you or keep you from being a fair and impartial juror, and so I'm going to ask your help in analyzing that.

What I think I heard you say was you don't agree with it, and I take it by that that you mean you think it's too high of a standard in order to convict someone.

A.   Uh-huh.

Q.   Okay.  And while you don't agree with it, do you recognize that it is the law?

A.   Oh, it is the law, and if I was the person being on trial, I would like to be treated fair.

Q.   And if you were the person on trial, you would likewise want the juror to apply the legal standard of the country.

A.   Uh-huh, yes.  That's what I'm saying.  It's just like you have to abide by certain things, and even if you don't like them, you have to do them.  That's the way I see it.

Q.   Do you think that your ability to consider that, your ability, more precisely, to consider guilt beyond a reasonable doubt as the only standard for conviction would be impaired in any way, however slight, by your attitude toward that standard?

A.   It's more than just disagreeing.  I work with my husband who is a psychologist, and I've seen and I've dealt with criminals who have gotten out, and psychologically we know they have been guilty and because of the reasonable doubt they

078

Webster v. Lockett 014147

are out, and they are going back to commit crimes.  So for me that's a fallacy, but I cannot help it.  So it probably would.

Q.    Probably would affect your judgment?

A.    Because I've seen the results of it, I've talked to the individuals, I've been next to them, either translated into Spanish or doing psychological assessments, and it's just -- it's angering to see that the system just slides.

Q.    Okay.  You said in response to one of my questions that -- and the question specifically was would you want someone like yourself on this jury.

A.    Uh-huh.

Q.    And you said I don't think so.

A.    Because of that reason.

Q.    And that's the same reason?

A.    Uh-huh.

Q.    Okay.  Any other reason?

A.    If this selection was happening four years from now, I would probably be more open-minded.  The other reason is my four-year-old child and the fact that I'm very needed, although my husband is a very capable parent.  That's the only other reason.

But it's just -- I feel really strange, because when I have gotten a chance to work so closely with people that have really committed crimes, and I do believe in psychology and what that puts out, and then all of sudden you know those

079

Webster v. Lockett 014148

people are out and -- because of technicalities and because of reasonable doubt they got out.  That's why I said it angers me, and that's just my way of thinking.

Q.    That raises a question.

THE COURT:  Is this hers?

BY THE COURT:

Q.    How did you answer that question in your --

A.    I don't remember.  I don't remember the answer.

Q.    I haven't said which one yet.  The one about -- just a minute, I'll find it.

A.    I don't remember having a question about that.  That's what bothers me.

Q.    It's something you said that made me think about this question.  It wasn't the exact question that you mentioned.

A.    Uh-huh.

Q.    Just a minute.

Oh, I know, about -- the one about whether it would be worse to let someone go who's guilty --

A.    Oh, yes, I remember.  I think both are bad.

Q.    Both are wrong you said.

A.    I go back to what I know, what is my tool, that I can comprehend why the system doesn't rely on psychological testing.  I don't know what the legalities of that is, but I've seen a lot of things done that way.  That's why I couldn't say.  I mean, for me both are evil.

080

Webster v. Lockett 014149

Q.   Okay.  You said a minute ago that you thought that your attitude towards the concept of guilty beyond a reasonable doubt might affect your decision on -- in the jury -- serving on the jury of whether reasonable doubt has been proven or not.  Have I changed it, or is that still a fair paraphrase of what you said?

A.   I probably could do it.  I mean, I would just have to force myself to see things differently.  I can't guarantee it because I know my convictions and I know what they are based on.

Q.   See if you can be a little bit more specific about how that mental process might work, how that mental process of being strongly skeptical if not -- well, not just skeptical, you're opposed to that concept of proof beyond a reasonable doubt before conviction, how that concept might bleed over and affect your decision --

A.   If all the -- all the facts point to a guilty verdict, and somebody feels there is reason to believe that that didn't happen yet it's there concretely -- the Simpson case, I just couldn't believe what the decision was, and that's another reason for me to believe, hey, you know, the system is not working.  I'm sorry, I just see it that way.  If I see that everything indicates the person is guilty and still the person -- or the jury decides that there's reasonable doubt, it doesn't -- I just don't agree with it.  I'm sorry, I just

can't comprehend that. And as I say, I'll have to learn and probably I could do it. I could just force myself to see things differently, and if the law says I'll have to do it, I'll do it. And it will be hard, but I'll do it. I'll try. I'm an open-minded person and I could see it, but those are just my convictions.

Q.   You are saying things that are a little bit conflicting, because one time you say I can do it and the next time you say I'll try.

A.   That's what I'm saying. I'll do it if I have to, but it's not going to be easy, and I don't know how fair to the person being tried that will be.

Q.   I understand that. This is a bit of an unusual situation, and I think what I'd like to do at this point is have you remain, to just sit there, and let me visit with the lawyers in private a minute. Would you permit that?

A.   That's fine.

     (Off-the-record discussion at bench.)

          THE COURT:  Mr. Kearney, I presume there's a challenge?

          MR. KEARNEY:  Yes.

          THE COURT:  Ms. Bridgewater?

          MS. BRIDGEWATER:  Uh-huh.

          THE COURT:  I think that you have been extraordinarily forthright about this, and I appreciate it. I

082

Webster v. Lockett 014151

think that given your concerns about your ability to serve and to apply that standard, that it would be best that you didn't serve, and so I'm going to excuse you from the jury and just ask you that in the future you offer your services again.

MS. BRIDGEWATER:  Oh, yeah.  This is only the -- I think the fourth time I've been called in the past four years.

THE COURT:  Right.

MS. BRIDGEWATER:  So --

THE COURT:  Okay, good.  We appreciate your patience with us, you had to wait a good while, but I hope you'll feel like it's worthwhile.  We certainly do, and we appreciate your being here and the attention and care you've given to your answers.

MS. BRIDGEWATER:  Thank you.

THE COURT:  Thank you.

MR. MACALUSO:  Thank you, ma'am.

(Venire person excused at 4:15 p.m.)

THE COURT:  Could you bring down Ms. Palmer.

(Venire person seated at 4:20 p.m.)

LINDA FAYE PALMER,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

Q.    Ms. Palmer, did you have a chance to review those pages that we gave you?

083
Webster v. Lockett 014152

Now, this questionnaire the judge referred to and you may still have emblazed in your mind here, 120 some questions that asked you a number of things about the death penalty.  Can you share with us in your own words, how do you feel about the death penalty?  You've had a couple more weeks to think about it even.

A.    How do I feel about the death penalty?

Q.    Yeah.  What are your feelings about it?

A.    I guess it's pretty harsh but, you know, I realize that there are circumstances that probably warrant a death penalty, and I think in the questionnaire, I don't remember what exactly were the questions, but, you know, I'm sure that --

Q.    Okay.  So you feel there is a place or it does serve a purpose?

A.    Yes.

Q.    What sort of purpose?

A.    I guess I probably think that, you know, there is a purpose for the death penalty in that, you know, certain crimes or -- are committed that, you know, if the person that has committed the crime could do it again.

Q.    Okay.  Would you reserve it for certain types of crimes, or do you think there's certain types of crimes that come to your mind generally -- I mean generally speaking, depending upon the individual facts and individual circumstances, but any particular types of crimes?

084
Webster v. Lockett 014285

THE COURT:  And while you're thinking of your answer, I'm going to let the court reporter get her tape machine going again.

A.    I believe I said in the questionnaire, also, was a serial killer or something like that, you know.

BY MR. MACALUSO:

Q.    Okay.  That would be a repeat murderer?

A.    Yes.

Q.    Also you said mass murderers --

A.    Yes.

Q.    -- where somebody kills obviously more than one individual.

Let me ask you, do you believe it should be reserved exclusively for multiple or repeat offenders?

A.    No.  I guess that just came to mind --

Q.    Okay.

A.    -- when I was answering the question.

Q.    You understand, of course, why that would concern us in this particular case, because this indictment alleges the death of one individual.

A.    Yes.

Q.    And were you to say, well, you know, I know what the law is but -- you know, that it would allow for it under the proper circumstances, but my personal feelings would not allow it.  Are you saying that's the situation with you, or are you

085

Webster v. Lockett 014286



THE COURT:   Any other questions?

All right.  What I would suggest you do is -- we're going to start with Mr. Long.  And, ladies, if you'll go back to the jury room and take these with you, and you can review them, and if you have any more questions, I will allow you to ask them when you're here at the table.

Mr. Long, if you'll come on down and have a seat at the table.

(Venire panel excused at 1:55 p.m.)

PAUL ERNEST LONG,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

Q.   Mr. Long, in your questionnaire you indicated that you could never, regardless of the facts and circumstances, return a verdict which assessed the death penalty.

A.   (Nods head.)

Q.   And it was -- it was my thought that we ought to nevertheless talk to you about that because you said that not knowing the procedures that we go through, and it occurred to me that perhaps you could assess it if the process seemed thorough and fair and that sort of thing.  I don't know, only you can answer that, but that would be my question to you.  Is that still your belief?

A.   I would say that you are right in your assumption,

086
Webster v. Lockett 014328



because, A, I've had time to think about it; and B, I did not realize that all of these things had to be met, that there were these gatekeepers.  I thought it was like, you know, that's it.  It was an either/or situation.

Q.    No, sir.

A.    So --

Q.    This -- let me be totally frank with you.  This is a totally new statute, this is the first case to be tried in the country under the statute, and so if at times we seem to be uncertain of how we're phrasing things or struggling for words, it's because we have no guide to go by except the statute itself.

A.    Uh-huh.

Q.    But just to comment briefly, Congress has set up a system that seems to be quite careful.  There are more safeguards, for instance, as to racial bias that I haven't even told you about where each juror will have to sign a statement that certifies that in his own mind race played no part in the sentence if the sentence is death.

So given all that, what I think I hear you saying is that now your answer might be this one.  Let me see.  This is choice B, "I believe the death penalty is appropriate for some crimes involving murder, and I could return a verdict which assessed the death penalty in a proper case."  Is that fair or --

Webster v. Lockett 014329

LONG/VOIR DIRE/COURT



A.   Yes.   Because I was -- I've talked to myself long and hard about this, and I said to myself, first of all, these guys are really going to have to convince me really a lot for me to return a death penalty, but if -- if I can be convinced, really convinced; and B, if I felt the crime was so horrible, just so absolutely horrible that death was the only thing that would repay society, I think I could do it.

Q.   Okay.   Now, when you say really convinced, that raises in a mind -- a question in the mind of any criminal lawyer or government attorney, I'm sure, as to whether you would require proof that goes beyond the standard of beyond a reasonable doubt.

A.   You mean in the death -- I mean in the guilty or not guilty phase?

Q.   And in the other, as well.

A.   No, huh-uh.

Q.   So you would -- in other words, you're saying that the standard of beyond a reasonable doubt is sufficient?

A.   Yes.

Q.   Okay.   It wouldn't be beyond a shadow of a doubt --

A.   No.

Q.   -- or any possible doubt?

A.   Right.

Q.   Beyond a reasonable doubt is sufficient?

A.   (Nods head.)

U.S. District Court

Q.    And is that true also for these standards that I gave you for intent and aggravation?

A.    Those standards gave me -- made me feel more comfortable about the whole thing.

Q.    Okay.  I think that concludes my questions.  I'm going to allow the government to ask you questions for about ten minutes, and then the defendant, as well.

MR. MACALUSO:  Thank you, Your Honor.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.    Good afternoon, Mr. Long.  You've been introduced to all of us.  As you know, we're the prosecutors over here.  We represent the United States Attorney's Office in this case.  And, of course, the defendant and his attorneys are seated to my right, to your left.

Mr. Long, I want to get to the heart of this matter -- I want to get to the heart of this matter, if I can, because we're on very stringent time limits here, and we have some very, very important things to talk about.

A.    Sure.

Q.    I just want to be clear, if I can, as I'm sure the other lawyers do as well as the Court, precisely where you stand with regard to your ability to serve on this particular type of case.  Because, Mr. Long, to be honest with you, I'm very concerned about some of the answers that you gave with regard

089

Webster v. Lockett 014331



to your position, which appear to be a very, very, very strong position in opposition to the death penalty, and of course your position today.

A.    Uh-huh.

Q.    I think you can see from my standpoint why we would naturally be concerned about that, and so we need to talk and let you talk.

A.    Okay.

Q.    I gather from -- well, first off, you understand also underlying all of this, no one is trying to shoehorn you into an impossible situation or a situation where you might well be called upon to violate strong conscientious beliefs you may have.  Without a doubt I would have to say you are qualified to sit on this type of case -- pardon me, on a criminal case, rather, of burglary, robbery, another murder case, any other type of a case possibly where the death penalty was not a potential penalty.  The difference is many jurors may not be suited to actually serve on this type of a case even though they may be qualified in the larger sense.  Am I making myself clear?

A.    Uh-huh.

Q.    That's because of the death penalty.

A.    Uh-huh.

Q.    Now, when you were asked these questions a little bit over two weeks ago, do you remember signing the last page of

090

Webster v. Lockett 014332

LONG/VOIR DIRE/MACALUSO

the questionnaire?

A.    Uh-huh.

Q.    And actually it's dated and signed there, and that was apparently your particular feelings then.  And you went on -- and I can't in my time go into all of the responses you gave, but you made it rather clear you were opposed to the death penalty.

A.    Uh-huh.

Q.    In fact, you said with regard to what your position was, you said, "I don't believe the state has the right to kill someone."

A.    Uh-huh.

Q.    "I'm horrified at the possibility we may excute an innocent person.  If they committed a heinous crime, lock them away for life."

A.    Uh-huh.

Q.    Okay.  Was that your feeling then?

A.    Uh-huh.

Q.    What has changed about that since then?

A.    I've just had a lot of time to think about it.  I mean, it's something that I've wrestled with for a long time and -- I'll give you some -- this is the way I react.

Q.    Okay.

A.    There have been crimes that have been committed, and it always involved children, and I found myself, my first

091

Webster v. Lockett 014333

reaction -- and this was long before this came up. In the past if a crime was involved -- a crime involving a child who was killed and murdered in a horrible way, my first reaction was that the only suitable penalty for that was death. But then -- and that would be more of an emotional type reaction. But then I find myself questioning what I just said based on my moral beliefs. So I guess what I would say is I have some -- some ambivalence sometimes.

Q.    Like I said earlier, you understand our concern about this --

A.    Sure.

Q.    -- change in positions here.

A.    Sure.

Q.    Because we're obviously concerned -- and the Court and the law would expect, everyone here would expect a juror to be qualified as well as suited on this type of case to be able to follow the law.

A.    Uh-huh.

Q.    And were you, for example, to be put on a position -- put on this jury, you understand this is not -- obviously you've been in the newspaper business. This is not something that you're reading about or seeing on television, but this is something you would be in the thick of. This would be a situation where you would be called upon -- based on the evidence and if the law was adhered to, where you could be

092

Webster v. Lockett 014334

called upon to determine whether or not a person would actually have his or -- well, in this case his life ended, executed.

A.    Uh-huh.

Q.    Legally killed.

A.    Uh-huh.

Q.    And if you get on there, we're obviously entitled to 12 fair and impartial jurors who could honestly consider and vote for that in the proper case, and that's where the facts and the circumstances warrant it.

A.    Uh-huh.

Q.    And see what horrible situation that would be for you --

A.    Uh-huh.

Q.    -- obviously, the conflict it would cause for you, obviously, if you were put in that position where you say -- well, let's say your mind changes between now and a week or two from now when the trial begins --

A.    Uh-huh, I understand.

Q.    -- where you reexamine your position.  Do you see?

A.    I understand that.

Q.    Okay.  That's why -- that's why we're concerned.  Just like some of the broader questions that were asked of you about your position about the death penalty on the preferential chart on the back here where it seems as though you made it very clear that you strongly believe that the

093
Webster v. Lockett 014335

death penalty is wrong and this should -- as far as it should

be used more or as it's been, you said not at all.  And --

well, you know what I'm saying.

A.    I understand.

Q.    It goes on there.  I guess it comes down to that again.

Are you saying that your position with regard to the death

penalty has changed to such a degree that you feel you

actually could serve on a jury of this type in all honesty,

sir?

A.    Yes.  When I -- when I -- understand when I filled that

thing out I did not realize that -- as far as I'm concerned

these questions right here leave me a great deal of leeway

to -- it's not a black or white thing.  In other words, I

don't have to give the death penalty, but I can if I feel like

the crime is so heinous that's the only punishment that

warrants it.

Q.    Okay.  Well, one question was asked, "Do you have any

moral, religious or personal beliefs that would prevent you

from returning a verdict which would ultimately result in the

execution of another human being?"  And you indicated, "Yes,

see above."  You said, "Basically I think it's

unconstitutional."  And then with regard to whether or not you

could consider the death penalty --

A.    Uh-huh.

Q.    -- in light of a -- as you know the judge laid out the

U.S. District Court

Webster v. Lockett 014336

procedure to you thus far, the death penalty is an option to a -- or one of the possible penalties to a sentence of life without the possibility of release or parole. You said, "I could definitely recommend life without parole, but the death penalty, can't do it."

A.    Uh-huh.

Q.    Now, the thing that I want to be clear in my mind, if I can, these just seem to like to go to the core --

A.    I understand.  I understand what you're saying.

Q.    Sure.  I mean not like, well, in the case of a child or something like that.  I don't recall seeing anywhere in here there was any qualification whatsoever on anything where you were given an opportunity to respond. And to be honest with you, people have indicated under certain rare circumstances, people said for mass murderers, for this type of murder or a peculiar circumstance, none of which you seemed to indicate.

Are you telling us, sir, that you could honestly consider and vote for the death penalty knowing that a -- an alternative to that under the facts in the case would be a sentence of life without any chance of release ever?

A.    If those -- what do you call them -- aggravating factors existed, and if I didn't think the mitigating factors outweighed it.

Q.    So you could -- you're telling us you could honestly consider the death penalty?  And you understand, sir -- and I

Webster v. Lockett 014337

don't mean to belabor this, but that's what we're all here about.  When we talk about a recommendation of a sentence of death, that means, I think, reasonably that the jurors obviously would take seriously that it's more than just a recommendation, that you should by your verdict, by that recommendation, fully expect that at some date and at some appointed time that the defendant who is the subject of that decision would be put to death, would be executed.  Are you saying you feel you're up to that?

A.    Yes, I am.

Q.    All right.  And with regard to the -- and with regard to the matter that the judge discussed with you with regard to the burden of proof, are you saying you would or you would not hold us to a standard because of your feelings about wanting to be certain, naturally, as I think everyone would be in a decision of this type, would you hold us to a higher burden of proof than the law holds us to to be sure you don't make any mistakes or the wrong person isn't executed, either on the guilt or innocence phase or in the penalty phase?  Just being honest, Mr. Long.

A.    Let me see if I understood this correctly.

Q.    Yes, sir.

A.    Guilty or not guilty is beyond a reasonable doubt.

Q.    Yes, sir, that's correct.

A.    Death or -- and the death -- I mean the penalty phase

U.S. District Court

Webster v. Lockett 014338

is -- the standard is?

Q.    Well, there's two standards, actually, that may come into play.  The first standard is the same as in the guilt or innocence phase, and that is beyond a reasonable doubt as to proof of the intentional aspect of the murder --

A.    Okay.

Q.    -- you know, that's associated with the kidnapping.  Beyond a reasonable doubt also applies to the government's burden of proof with regard to any one or more of the aggravating factors that we present.  That's all by proof beyond a reasonable doubt.

A.    Okay.

Q.    The preponderance of the evidence standard comes in if the defendant desires, he has no obligation to, but if he desires to raise for your consideration a mitigating factor or factors, then that can be established by proof by simply preponderance of the evidence, more believable than not.  The greater weight of believable evidence, basically, and then the law would expect you --

A.    Okay.

Q.    -- to consider that.  But again, the burden of proving those factors that we are asserting would be in support of our contention that he is deserved or worthy of a recommendation of death are by a proof beyond a reasonable doubt in both phases, not any more.  But again, that's why we're talking

097
Webster v. Lockett 014339

with you.  If in all honesty and in your heart of hearts you would require more because of the obvious serious nature, then you would need to let us know that, sir.

A.   I would have to be convinced beyond a doubt, period, that it's the right person.

Q.   Okay.

THE COURT:  I didn't hear the last part, "beyond a doubt, period"?

MR. LONG:  That it's the right person who did it.

BY MR. MACALUSO:

Q.   Okay.

A.   And secondly, that the crime was so horrible that death is the only appropriate penalty.

Q.   Okay.

A.   But, I mean --

Q.   Yes, sir.

A.   -- the standard -- I can't -- I mean, your standard -- the standard that you would have to meet in my mind would have to be very high.  I don't know how to say that.

Q.   Okay.  Well, I don't know how to say it either other than to go with what the judge said and what the law allows, and that is the proof of these aggravating factors, for you to consider aggravating factors is by proof beyond a reasonable doubt, beyond a doubt based on reason.  Okay?  And I'm just asking you if you would require proof greater than that.

098

Webster v. Lockett 014340

That's a standard the law has set up.  That may not be enough for you, that may not be enough for the next juror, but the law says that's what the standard is for those particular aspects of this type of a crime -- or a trial I should say.

Like I say, if because of the strong feelings you have or had that you would require more than proof beyond a reasonable doubt to establish those aggravating factors.  You could see how somebody could say, well, the -- you know, I'll set the standard so high that they'll just never prove it to me.

A.    Uh-huh.

Q.    You see how that can done?

A.    I understand that.

Q.    We're both adults, and you can see how somebody could say that and really be saying in their minds I don't believe it, I really don't believe and I'm not going to do it.  I'll just set the standard so high I can intellectually justify not doing it.

A.    Uh-huh.

Q.    That wouldn't be fair to either side, would it?

A.    No.

Q.    And so it comes back full circle to this, I guess, Mr. Long, are your feelings about the death penalty and this type of crime such that you would require proof greater than that which the law holds us to, and that's proof greater than -- or beyond a shadow of a doubt, beyond any and all

Webster v. Lockett 014341

doubt, not proof simply beyond a reasonable doubt?

A.    It's a tough one.

Q.    That's simply why we're asking you these questions now.

A.    I understand, I understand.  I don't want to get into semantics --

Q.    Sure.

A.    -- but in my mind to assess the death penalty, it would have to be beyond a doubt.

THE COURT:  Whether reasonable or not?

MR. LONG:  I guess what I'm saying is when I reach this conclusion, I can have no doubts, period.  I mean, it has to be ironclad.  I can't -- you know, I can't be saying, well, what if or what if, you know.

THE COURT:  And it's hard right now to imagine a situation where you can describe the difference between a reasonable doubt and an unreasonable doubt.

MR. LONG:  I understand.

THE COURT:  I imagine it's hard for you to think of one, too.  But I guess that might provide me the way of asking the question of would you require proof beyond an unreasonable doubt?

MR. LONG:  Perhaps.

A.    I know that I'm confusing you because of my answers on that thing, and like I said, I've had time to think about it.

BY MR. MACALUSO:

U.S. District Court

100

Webster v. Lockett 014342

Q.    Yes, sir.

A.    And that may be my problem.  And then when I saw these, I felt that these were enough safeguards where I could convince myself I'm doing the right thing.  Because when I filled that out, I didn't realize there were all these gatekeepers and circumstances that I could take into consideration.

Q.    You see what I was saying earlier about -- and again, kind of going to another full circle about the difference between being qualified for general jury duty and being suited to this type of case.

A.    I understand.

Q.    You may just simply not be -- you might be a perfect juror for a burglary case or another case where the death penalty in these considerations don't come into play, but not suited for this type of case.

A.    Uh-huh.

Q.    We know that that doesn't make you a good citizen or a bad citizen or whatever.  It just eliminates putting you in a possible -- potentially impossible situation, and obviously making sure that both sides in this case get a fair trial.  Do you see what I'm driving at, sir?

A.    Sure, sure.

Q.    Do you see yourself falling -- you know, having second thoughts about it?

A.    About what?

Webster v. Lockett 014343

LONG/VOIR DIRE/MACALUSO

Q.    About being suited for this type of a jury.

A.    Sure.

Q.    And I've run out of time pretty much, and Mr. Kearney may have some questions for you or His Honor may have some more questions for you, but I gather, at least towards the end of what we talked about here, that you would or possibly could set the standard so high that you said it would be beyond a reasonable doubt; is that correct, sir?

A.    (Nods head.)

Q.    That's all I have.  Mr. Long, I appreciate your listening to me, thinking through these questions.  Do you have any questions of me at this time at all?

A.    No.

Q.    Is there any reason why your opinion with regard to this particular matter of proof beyond a reasonable doubt would change from what you've told His Honor and what you've told me?

A.    All I'm saying is that, just to make it clear --

Q.    Yes, sir?

A.    -- obviously imposing the death penalty would be very difficult for me.

Q.    Yes, sir.

A.    Very difficult, but if I believed in -- you know, and I don't know how you quantify this, but if I believed in my heart that the person did it and that the only suitable

U.S. District Court

Webster v. Lockett 014344

punishment is death, I could impose the death penalty.

THE COURT:  I think that's about a good as summation as you could give.  I appreciate it.

MR. LONG:  Okay.

THE COURT:  Mr. Kearney.

DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.   You know, in this process the government has to prove certain things beyond a reasonable doubt, and do you know what that definition is?

A.   Not the legal definition, no.

Q.   Well, the judge will give you a legal definition, and he would tell you that a reasonable doubt is a doubt based upon reason and common sense after a careful consideration of all the evidence.  Now, that's what a reasonable doubt is.  But they have a stronger burden than that, because they have to take each juror to the point where it's proof beyond a reasonable doubt.  Okay?

A.   Okay.

Q.   Now, proof beyond a reasonable doubt is something that each and every juror will decide on their own what proof beyond a reasonable doubt is, and the Court will tell you that proof beyond a reasonable doubt is proof of such a convincing character, it's so convincing that you would not hesitate to rely on that type of proof and take action on that type of

U.S. District Court

103

Webster v. Lockett 014345

LONG/VOIR DIRE/KEARNEY

proof without hesitation.  In other words, it's the kind of thing that you'll know that you can rely on it and you can act on it without even hesitating, you know, that sure, in the most important of your own personal affairs.  So it's the kind of thing that it's so convincing that you not only would rely on that proof, but you would take some action and do it without even hesitating in the most important of your own personal affairs, affairs that affect your life or your family's life or your loved ones or elderly parents or something like that.  Do you see what I'm saying?

A.    Uh-huh.

Q.    So that's what proof beyond a reasonable doubt is.  And I guess we can get into semantics about what an unreasonable doubt is.  I don't know what that is.

THE COURT:  It's any doubt that's not reasonable.

MR. KEARNEY:  Any doubt that's not reasonable.

BY MR. KEARNEY:

Q.    But the jurors can decide in their own minds whether it's reasonable or not.  So if you feel like you have a doubt that is reasonable, based on reason and common sense, then that's a reasonable doubt to you.  Mr. Smith who sits next to you on the jury might say that's not a reasonable doubt to me.  Okay?  And the law can't tell you what it has to be to you and what it has to be to Mr. Smith sitting next to you on the jury.  You get to decide by yourself.

U.S. District Court

104

Webster v. Lockett 014346

So the bottom line is if the Court instructed you that that is the definition of reasonable doubt, is that something you can follow and then apply to your own personal feeling of what is a reasonable doubt to you as opposed to somebody else?

A.   Yes, sir.

Q.   You wouldn't have any trouble doing that?

A.   No.

Q.   Now, when we get to this weighing of mitigating and aggravating factors, the question there after -- let's assume that you found aggravating factors, a factor or more factors to exist beyond a reasonable doubt, you and the rest of the jurors, and you found -- already found him guilty, already found it was done intentionally, and found the aggravating factor or factors beyond a reasonable doubt, then this issue of reasonable doubt doesn't necessarily come into the weighing process because you've already taken these steps that are on this paper like the judge said, step by step by step.

A.   Okay.

Q.   Then the law says what you do individually, each juror, is weigh the aggravating factors against the mitigating factors, if there are any --

A.   Uh-huh.

Q.   -- and the jurors decide individually, not beyond a reasonable doubt anymore, but they decide individually now is whether the aggravating factors sufficiently outweigh any

Webster v. Lockett 014347

mitigating factors to justify the death penalty.  Then it becomes 12 individual decisions about whether these facts in this case are sufficient to justify the death penalty.  You make that decision, each of the other 11 jurors make that decision.  Do you see what I'm saying?

A.    Yes.

Q.    And the reasonable doubt doesn't float into that.

A.    Okay.  We've already gotten past --

Q.    You've already found that.  Do you see what I'm saying?

A.    Yes.

Q.    If there are no mitigating factors, the jurors individually, each one decides whether this case, the facts of this case, the factors that have been proven and everything you've heard, whether they are sufficient to justify a death penalty or not.

A.    Right.

Q.    That's what it boils down to.

A.    Yes.

Q.    And that's what everybody has to decide in their own heart individually, and so that's really what it boils down to.  Can you do that, look at the facts of the case and make an individual decision?

A.    Yes.

Q.    Okay.

        MR. KEARNEY:  I don't have anything further.

U.S. District Court

Webster v. Lockett 014348

THE COURT: Okay. Mr. Long, we appreciate not only your presence here today but also the obvious soul searching that you've gone through over the last several weeks and even here today. We will let you know in the next couple of weeks whether you'll be called to serve or not, and in the meantime, please remember your duty to avoid all media coverage and to not discuss the case with anyone, including those at home.

MR. LONG: Okay. When am I officially discharged?

THE COURT: You will --

MR. LONG: When the trial begins?

THE COURT: No. You'll be discharged -- if you're not chosen, we'll let you know in the next couple of weeks.

MR. LONG: Okay. One way or the other I'll be told --

THE COURT: One way or the other -- I'm sorry. You'll be notified one way or the other --

MR. LONG: Okay.

THE COURT: -- within the next couple of weeks. Of course if we say yes, then you'll come in and you'll be here for a couple more weeks. If we say no, you haven't been selected, then you're discharged.

MR. LONG: Okay.

THE COURT: Thank you very much.

MR. LONG: Thank you.

MR. MACALUSO: Thank you, sir.

U.S. District Court

107

Webster v. Lockett 014349

(Venire person excused at 2:20 p.m.)

THE COURT:  Is there a motion on Mr. Long?

MR. ROPER:  The government moves to challenge.  I believe his opinions on the death penalty substantially impair his ability to serve in this case.  I think we've had -- I think -- if I'm not right, I think there's been four or so people that have come in here and they have answered questions the other way, that would be strong for the death penalty, and then they've -- have opinions about the case, and then they come in and almost -- I would say all of them just about have come around and said, yeah, I can be fair and, yes, I would hold the government to its burden of proof, but when it got down to it, the Court decided -- and I know this is individual for each juror, found that they just weren't suited to serve on this jury and granted the defendant's challenge for cause.

I have read through a 100 of these questionnaires, 101 so far.  I don't think I've seen one questionnaire that's so strong against the death penalty as this guy was.  I mean, you've read through the questionnaire.  He says I believe -- I don't believe the state has the right to kill someone.  I'm horrified at the possibility we may execute an innocent person.  If they committed -- if they committed a heinous crime, lock them away for life.  And I think that dovetails into his problem, and at the end he really equivocated on answers to Mr. Macaluso's questions about holding the

U.S. District Court

Webster v. Lockett 014350

government to a proof beyond a reasonable doubt.  And I think that shows exactly where he is, beyond any possible doubt, which is a standard higher than beyond a reasonable doubt.

Now, Mr. Kearney, I submit, talked him into holding it to beyond a reasonable doubt, and I think that just goes to show you his equivocation, and that equivocation flows from his beliefs regarding the death penalty.  I think he -- I don't think from the questions he's given today in considering the whole situation, I don't think he's shown that he's not substantially impaired.  I think that clearly he is substantially impaired.  And, of course, this is a credibility decision the Court's got to make.

THE COURT:  Let me hear from Mr. Kearney.

MR. KEARNEY:  We object to the challenge.  You know, maybe his opinions two weeks ago would have disqualified him, but he clearly came in here and said he thought about, had no idea what the law was, and after the Court explained the law to him, that he certainly could follow it.  Because he had some misconception of how it worked and what the law is, and now that he understands that there are procedures that must be followed and findings through this process step by step, he clearly has qualified in every answer he gave here.

Mr. Roper misstated what he told Mr. Macaluso.  He never said beyond any possible doubt.  He never said that.  He said beyond a doubt that he determines to be reasonable or

U.S. District Court

Webster v. Lockett 014351

whatever.  But anyway -- but when Mr. Macaluso was asking him the questions, he wasn't told what the definition was.  After he was told the definition of proof beyond a reasonable doubt, then he clearly said, yes, that he could follow that definition.

So based upon his answers here before the Court, as he sits here today he's qualified to serve on this jury.  And the test is not, you know, what his answers were ten days ago or two weeks ago when he had no idea what the law was.

MR. ROPER:  May I respond?

THE COURT:  (Nods head.)

MR. ROPER:  Well, regardless of what the law is, he -- if you look through all these questions, from 45 on through 52-A, there's no equivocation about it, not at all. Now, regardless of what the law is, if you feel like the death penalty should never be imposed, how can you come up with a law that would change your belief in it, that the government doesn't have the right to take somebody's life?  And the life without parole is a good example, 52-A.  I could definitely recommend life without parole, but the death penalty, there's a question mark, can't do it.  Now, it doesn't matter what kind of feelings about the law is.  I mean, he's obviously trying the best that he can do to fulfill his duty to serve as a juror.  I saw he was a petty officer in the Navy.  I think he's trying -- bending over backwards trying to serve as a

U.S. District Court

Webster v. Lockett 014352

juror.  But when he gets right down to it these beliefs are so strong, and he did equivocate in Mr. Macaluso's questions to him, I just think he's still substantially impaired.

MR. KEARNEY:  He seemed particularly, you know, sincere to me, Judge, and an intelligent person.

THE COURT:  I'm going to let him serve.  I tell you the difference I see, Mr. Roper, because I'm sensitive to the point you make about others I've let off that were stricken. The ones -- I think the biggest difference is that on the ones that I've stricken that the government wanted was they could never quite come to the point of saying, yes, I can finally do it.  I can finally say, yes, I would look at it.  Instead I could -- they would say it would be hard, it would be -- I find it hard to not give the death penalty, you know, but this guy said I can do it.  And I take -- there's some pretty wide differences between what he said here and what he said in writing, but he explained that, and I thought he explained it to my satisfaction.  I agree with Mr. Kearney.  I thought he was sincere and he was clearly struggling with it, but what he was saying was that in the proper case he could do that.

I might point out to you, based on the facts you allege in this case, he's basically said he could do what you wanted him to do if you prove those facts.  Of course, you know you're going to use a peremptory on him anyway.

So anyway, I'm going to deny the motion to strike for

Webster v. Lockett 014353

coverage.  Okay?

MS. CHAFFIN:  Okay.

THE COURT:  We'll let you know in about ten days.

MR. MACALUSO:  Thank you.

(Venire person excused at 1:50 p.m.)

THE COURT:  Be seated.

Do I hear any challenges on Ms. Chaffin?  Then she's number 26.

MR. KEARNEY:  Off the record.

(Off-the-record discussion.)

(Venire person seated at 2:00 p.m.)

TEMPIE GRIFFIN,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

Q.   Hi, Ms. Griffin.

A.   Hi.

Q.   Have a seat, please.

I have had a brief opportunity to review your juror information sheet that you gave us a few weeks ago with all that effort, and I noticed here some reference to -- question 47, actually, where we had six different statements that might describe your belief about the death penalty, and you had to circle the one that's most near your belief.  And you circled A which says, "I believe that the death penalty is appropriate

for all crimes involving murder."

Now, what I have told you about the process that we follow here in this court and under the new statute is that once the -- once a defendant is found guilty of a crime that -- like here, a kidnapping involving death, then the jury has to turn to the question of intent, and once they find intent, then they move on to aggravation and mitigation.

Now, that answer there could be read to say once I find intent, in other words if the killing was intentional, then I would automatically give the death penalty without waiting to hear about aggravating and mitigating factors.  That's how that could be read.

So my question to you is does that accurately describe how you feel about it, or would you be able to weigh it and in good faith fairly evaluate and review the aggravating and mitigating factors and go forward from that point on?

A.    I feel I would be able to go forward from that point on.  That was the most correctly for the instance of that question but not for the instance of an actual happening.

Q.    I understand that.  And we throughout this questioning have the situation where we ask you what you think about the death penalty in abstract terms, and what they think about it doesn't necessarily jive with how the statute is set up, and so we understand that.

Now -- so when you answered that you didn't know, and as

you said, that was just one of the choices you had.  It didn't give this choice really.

A.    Huh-uh.

Q.    But you know now that you have that choice.  Do you think you would be able -- this is similar to the question I just asked but I hope it's not exactly the same one, would you be able to follow this procedure?

A.    Yes, I feel I would.

Q.    Okay.  Do you feel like you understand the procedure?

A.    Yes, I feel I do.

Q.    Do you have any questions about how it works?

A.    No, not really.

Q.    Okay.  Now, you indicated in your questionnaire that you had heard some things or read some things that you think may relate to this case, and you heard that either -- well, somewhere in the media, I guess.  Could you tell us to the best of your recollection what it is you believe you know about the case?

A.    Okay.  I'm not sure exactly when it happened as far as time period, but I remember it being linked to a 911 call, and I remember it being in the Arlington area, and basically that's all I put together with it.  I remember them not knowing if she was alive or not for a period of time.

Q.    Anything else that you recall?

A.    No, not really.

Webster v. Lockett 014583

Q.    Okay.  Now, you heard me give a rather long review this morning about how important it is that that kind of recollection of what you believe to be the facts not play any role in the decision-making process here in the courtroom.  Do you agree with that idea?

A.    Yes, I do.

Q.    Do you believe that you would be able to move outside the arena, move off of the blank slate any thought of what you may have heard outside the courtroom?

A.    Yes, I do.

Q.    Okay.  Do you have any doubt about that, your ability to do that?

A.    No, not -- no, I don't.

Q.    Okay.  You notice here in your questionnaire that your son is a police officer and so is your sister.

A.    Yes.

Q.    Okay.  Would there -- your relationship with them put any strain on you in making an independent decision in this case?

A.    I don't believe so.

Q.    Would they expect you to find a verdict for the government?

A.    No.

Q.    Would they understand if you found the defendant not guilty?

A.    That's a separate entity.  I just look at their positions

GRIFFIN/VOIR DIRE/COURT

as it's their employment.  They both have been there a very short term, they're just beginning, but still that's their profession but it doesn't really enter into this.

Q.   So their relationship -- or your relationship with them would not have any role whatsoever in your decision-making in this case?

A.   No.

THE COURT:  I think that's all I have tabbed to ask you, so I'm going to ask the government to begin its questioning.  They have ten minutes.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. ROPER:

Q.   Ma'am, my name is Richard Roper.  I'm an assistant U.S. attorney, and I represent the United States along with these two other lawyers.  At the next table is Mr. Kearney and on the end is Mr. Ware, and in the middle is their client, Orlando Hall.  I just have a few questions to ask you.

You understand that representing the government in this case, we're actively seeking the death penalty, and I want to ask you some questions about that and see how you -- you feel, your opinions.  What's your opinion about the death penalty? Could you tell us?

A.   I had never really thought a lot about it until I filled out this questionnaire, and I haven't given it a lot of thought since I filled out the questionnaire.  But I really

U.S. District Court

116

Webster v. Lockett 014585

GRIFFIN/VOIR DIRE/COURT

don't feel that the death penalty is a deterrent as far as an example for other people.  I do feel that there has to be something that we have as a guideline or that we have as a finality in order to stop some of the things that go on, and the death penalty is just like our -- the entire system is what we have come up with, and I feel like that's what we have to deal with.

Q.    You said you don't believe it's a deterrent but may be a final type sentence.  Do you believe it serves any other purpose?

A.    No, I really don't.

Q.    If you were a legislator and the issue of whether to keep the death penalty or do away with the death penalty was a question, how would you vote on it?

A.    I would vote to do away with it.

Q.    I'm going to ask you some questions about that, and I know I have the benefit of your answers.  And I think you mentioned one thing, consider it maybe abstractly and then applying it in this case, you know if you're called as a juror in this case there wouldn't be any abstract if we get to that point in the trial.  It could possibly involve a situation where you have to sign your name on a verdict form that would result in somebody else being executed someday.  Do you understand that?

A.    I understand that.

Webster v. Lockett 014586

GRIFFIN/VOIR DIRE/COURT

Q.    You had mentioned in -- and you may be more familiar with the Texas judicial system since you have some relatives who are police officers.  In Texas a jury has the possibility in some situations -- well, it ends up practically speaking that a sentence could be assessed of a term of years or life which would possibly involve parole or actually the death penalty, you know, and that's an option, the death penalty.  In the federal system, unlike the state system, there's really, in effect, as Judge Means instructed you, two sentences, either life without the possibility of release or the death penalty? Okay?  Considering your views on the death penalty -- and I'll just say this, some people believe that if life without the possibility of release is an option, in other words the person won't get out of jail for the rest of their life, then some people feel like the death penalty is just not an appropriate sentence because the person's going to be locked up and society, in effect, would be protected.  How do you feel about that?  Do you feel that way?

A.    I feel that -- as an abstract answer to that question that, yes, that being locked up for the rest of their life without parole which -- over the death penalty.  However, on an individual basis looking at individual and concrete evidence, I don't know how I would feel until I do that.

Q.    Well, let me explore that with you.  You had answered -- and the reason I asked you that question, you had answered --

118

Webster v. Lockett 014587

the question was if a sentence of life without the possibility of parole is an option, could you nevertheless recommend a sentence of death. And you answered no, and then you said, "If the sentence was life and the possibility of never getting out was absolute" -- which it is in this case -- "I would pick the life sentence given that choice."

A.    Uh-huh.

Q.    Do you feel that way now?

A.    As far as that questionnaire went I feel that way. As far as actual -- I don't know how I would feel until it's presented. I really can't sit here and tell you honestly.

Q.    And I appreciate that.

You know, the reason we're having this kind of discussion in a little bit more informal setting is so you will feel a little bit more comfortable in talking to us about your feelings or beliefs, and I'm not here to disagree or agree with them, and certainly there are no right or wrong answers. Do you understand that?

A.    Right.

Q.    But, really, this informality is so you would feel more comfortable, because if you would get on the jury, and say you get through the whole trial, you get back there in that jury room and you start thinking about it and you go, you know, when I get it all over, I just -- regardless of the facts and circumstances, when it gets right down to it, right down to

GRIFFIN/VOIR DIRE/COURT

the lick log, come right down to it, I just can't give the death penalty when life without the possibility of release is an option.  Do you see that?  Do you feel like you would be in that position or could be?

A.   No, I really don't.  I feel that it would be dishonest to say regardless of whatever was presented that my conviction to the life imprisonment versus the death penalty, there's not a conviction there that is so strong that I would choose that above the evidence.

Q.   Do you feel like there -- what type of crimes do you think the death penalty would be appropriate for?

A.   Again, I have never really thought about it that much.  I do feel like that murder is definitely something that that has been established for, but as far as the degrees of it and the integral workings of it, I really don't know.

Q.   You said -- you answered no, and I probably should have come back and asked you this about your feelings, that you would vote against the death penalty, if you had a chance, as a law.

When you say in all honesty that opinion you have, how you would vote, and considering that you don't feel like the death penalty serves a real strong purpose, when it got right down to it, do you feel like that would affect your ability to sit in this case?

A.   No, I really don't.

Q.    Do you understand you might be a great juror in a burglary case or an automobile theft case, maybe even a murder case that doesn't involve the death penalty, but do you feel like in this particular case that it would affect your ability to sit considering your feelings about the death penalty?

A.    I don't think so.  I don't think I have that strong of a conviction about the death penalty, but never having done that before, never having even been on a jury before, I don't know.

Q.    Well, let me put it this way:  If the facts justify it and the law provided for it, could you sign your name on a verdict form that --

A.    Yes, I could.  I wish I could sit here and honestly tell you that, no, I could not, that I feel that strongly, but, yes, I feel I could.

Q.    Do you have any hesitation in your mind?

A.    No.

Q.    What police department does your son work for?

A.    Flower Mound.

Q.    Flower Mound?

A.    Uh-huh.

Q.    And how long has he been there?

A.    He just finished his training five weeks ago.  He's been out five weeks on his own.

Q.    All right.  Is he on patrol, I take it?

A.    Yes, he is.

Webster v. Lockett 014590

GRIFFIN/VOIR DIRE/COURT

Q.    What about your -- is it your sister?

A.    Uh-huh.

Q.    For whom does she work?

A.    She works down close to Austin, Cedar Park, and she has been with the force like six months.

Q.    And what does she do?

A.    She is also a patrolman.

Q.    Patrol, also?

A.    Uh-huh.

Q.    Has she ever worked in narcotics?

A.    No.

THE COURT:  Your time is up.

MR. ROPER:  All right.

THE COURT:  Mr. Kearney.

DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.    Good afternoon.

A.    Hi.

Q.    I want to talk to you a little bit about the punishment phase of a case like this.  All right?

You understand that there will be two phases of the trial.  The first phase the jury determines whether or not the prosecution has proved the defendant guilty beyond a reasonable doubt.  Do you understand that?

A.    Yes, I do.

U.S. District Court

122

Webster v. Lockett 014591

whether it serves a purpose or not or --

A.    I think under certain circumstances it serves a purpose. I don't think -- personal opinion is that I think it's something that's needed, and I think if the circumstances truly warrant it, then it is a hopefully useful tool.

Q.    What do you think it accomplishes?

A.    I'm hoping that it accomplishes the deterrent of other people doing things they shouldn't do.

Q.    What sorts of crimes do you think it ought to be available for?  I know you put down here premeditated murder and an extremely vicious murder, premeditated or not.

A.    That sums it up.

Q.    Okay.  Would you expand it, if you had an opportunity, to include other crimes or leave it the way it --

A.    I believe it depends.

Q.    Okay.

A.    It's kind of like I also put in there you don't judge a book by its cover, but once you open it, then you start judging it.

Q.    That's true.  And let me ask you this:  You understand that -- I think from his initial remarks when the judge talked to you this morning, he told you, and this is a factor, of course, that the death penalty is not available for any or all murders.

A.    Correct.

123
Webster v. Lockett 014759

HARRELL/VOIR DIRE/MACALUSO

A.    (Nods head.)

Q.    Now, you were asked a myriad of questions in this questionnaire.

A.    Yes, sir.

Q.    More than you care to answer, I'm sure.  I know I would feel that way.  And some of it's focused, obviously, on your feelings about the death penalty.  In your own words, ma'am, how do you feel about the death penalty?

A.    I believe in the death penalty.  I believe it's -- I don't know if the word is appropriate.  I believe it's deserving in some cases under the right circumstances.  I just socially and morally just believe that it's okay --

Q.    Okay.

A.    -- to under some circumstances to take the life.

Q.    All right.  You say under some circumstances.  You understand from the comments of His Honor this morning that that's pretty much the way the law looks at it.

A.    Right.

Q.    Not all circumstances, some circumstances --

A.    Right.

Q.    -- as defined by law, and then ultimately as defined by the jury.

A.    Right.

Q.    And that's based on the evidence.  But you understand, Ms. Harrell, that before you and any other individuals will be

124
Webster v. Lockett 014899

BY THE COURT:

Q.    Hi, Ms. Miller.

A.    Hello.

Q.    How are you?

A.    Okay.

Q.    Have a seat, please.

You had indicated on your -- in the questioning this morning that you had heard something about this case. Could you tell me what that is?

A.    I heard about it on TV just, you know, what had happened.

Q.    And tell me specifically what you recall about that.

A.    That the -- the teenaged daughter had been abducted and something like ransom or something like that to do with the drugs, that they were like holding her because they didn't get money or something to do with drugs.

Q.    Did you hear anything in the news about what happened to her or anything that related to that?

A.    I think later that they had found her dead.

Q.    Okay. And you don't remember any details about that?

A.    (Shakes head.)

Q.    Okay. I spoke with you this morning at some length about how important it is to keep all of that out of the case, keep that out of your mind, at least for the purposes of consideration of the facts in the case, how unreliable all that is, and so my question to you now is do you think you

would be able to do that, keep all of that out of your mind and to focus --

A.    Oh, yes.

Q.    -- on the facts in the case?

A.    Yes.

Q.    Okay.  You said in response to a question on your questionnaire that this statement that I'm going to read to you now most closely represented your belief, and that statement is, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it I could assess it under the proper set of circumstances."  Is that still an accurate statement of your belief?

A.    (Nods head.)

Q.    Okay.

A.    Yes.

Q.    Do you feel like you are basically opposed to the death penalty?

A.    Yes.

Q.    Okay.  Now, we will go through quite a careful procedure here before the death penalty would even be brought to your -- brought to you.  The defendant first would have to be found guilty beyond a reasonable doubt of the crime with which he's charged.  Then we would go into a consideration of intent, and assuming that the jury found beyond a reasonable doubt that

Webster v. Lockett 015195

the defendant did intend to -- the death occurred in one of the four ways I've mentioned to you this morning, then you would proceed to the aggravation, look at the aggravating factors and the mitigating factors, and I explained that to you this morning.

After you went through all that, do you believe that if the aggravating factors actually did outweigh the mitigating factors, you could assess the death penalty?

A.    I'm not sure.

Q.    Okay.  Tell me why you think you're not sure.  What things come to mind as you say that?

A.    Well, if it were definitely proven beyond a reasonable doubt, if I had no doubt that it -- you know, that it could -- that it happened, then I might be able to then -- I've never been put in this position, and, you know, like I said, I don't believe in the death penalty, and I can't say.  But I know that some crimes are so hideous that they definitely deserve being the death penalty.

Q.    What if you were a juror in one of those and you decided that it definitely deserved it, could you vote to assess it?

A.    I believe I could.

Q.    Is there any doubt about whether you could or not in that situation you just described, that it's so hideous that the death penalty seemed appropriate to you, is there any doubt in your mind as to whether you could vote for the death penalty?

Webster v. Lockett 015196

A.    I think I could.  I believe I could.

Q.    Are you saying by that that you don't have any doubts that you could?

A.    Yes.

Q.    Okay.  Now, to make the question a little tougher still, in that hideous situation where you think that the death penalty seems appropriate, and not only seems appropriate but you could give it, if the -- if life without release were an option, could you still give it?  If life without the release were an option, one of the two options you had, death or life without release, in the hideous situation where you think death is appropriate, could you still give the death penalty?

A.    I think I could give the death sentence to -- because I feel that some criminals cannot -- you know, they don't -- I don't think they can be rehabilitated.  Some people -- that's the kind of circumstances I'm thinking, because I believe that if there is any -- if there's a reason that a person could be rehabilitated, that we should look at that.  And sometimes I think that -- well, most of the times I feel like living is more of a punishment than death.

Q.    Okay.  I think that's all of the questions I have for you right now.  I'm going to allow the government to question you for about ten minutes.

THE COURT:  Mr. Macaluso.

MR. MACALUSO:  Thank you, Your Honor.

U.S. District Court

128

Webster v. Lockett 015197

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.    Good afternoon, Mrs. Miller.

A.    Good afternoon.

Q.    My name is Paul Macaluso.  I'm one of the prosecutors assigned to this case, and I've got about ten minutes to chat with you here.

I want to first invite you to relax as much as you can. There's nothing to be nervous about.  Like the judge, I believe, said this morning, there are no right or wrong answers to any of the things we'll be discussing, but we want to know how you in your heart of hearts feel about some matters that we think are of incredible importance in a case of this nature, because we are literally dealing in life and in death matters in this type of a case.  I think you understand that.  In fact, you've had about -- almost, well, three weeks, over three weeks since you learned that you might be a juror in this type of case and you might be called upon to make these enormous types of decisions.  So we want to talk about that, and I'm not going to try to talk you into or out of anything, but I do -- I mean this, we do need to talk about some things very, very seriously about your potential service as a juror on this case.

If you have any questions at any time, you won't be interrupting me by asking.  Just let me know what it might be.

129
Webster v. Lockett 015198

A.    Okay.

Q.    The reason I mention that is sometimes -- we're about two months apart in age.  You've weathered better than I have?  But, you know, we read about things, we discuss things with family members and loved ones, and sometimes we say things never having really come to grips with the reality of the situation.  Sometimes in life we encounter those.  This may be one of those situations where we talk about doing this or doing that, but we never have really seriously thought of the gravity of it all and actually whether or not we could do what we give lip service to sometimes.

A.    Right.

Q.    Sometimes we can, beyond our expectations, I'm sure.  But the reality of this, of course, is that this is nothing you're reading about or talking about or intellectualizing or philosophizing about.  You actually could be a juror on this case, and if you were you would take a sworn oath, if you could that is, to a true verdict render according to the law and to the evidence.  And that means simply that if we were to prove to you in a case of this nature that the defendant is guilty, you would have to find him guilty.  And I gather from your questionnaire you would have no difficulty with the guilt or innocence phase of the trial at all.

A.    Right.

Q.    If you are satisfied beyond a reasonable doubt, you could

make that determination in this type of case, just as you could if it were a burglary or a rape case or a robbery or theft or embezzlement or something like that. The difficulty, if any, that we need to address, I think, is where it comes to the second part, and that's where it's the death or the life.

A.    (Nods head.)

Q.    And I think you might see clearly that you would be qualified as many, many -- perhaps everybody that's come down here thus far has been qualified in a larger sense as a juror to make a determination of guilt or innocence. The sticky wicket part is whether or not jurors -- and you may be one of the individuals -- are suited to this type of a case, and suited because of their strong personal feelings about the death penalty. And by the way, we've had it both ways. We've had people -- and I'm not saying people come down and say I'm crazy about the death penalty, but there's all sorts of extremes of emotion when it comes to that. We all know that.

A.    Yes.

Q.    Now, you -- obviously if someone is suited to this type of a jury, that doesn't make them a better citizen than some that may not because of their personal convictions about the death penalty. It doesn't work that way. It's just that some people can serve on a case like this, and some simply are not suited. And that's what we need to talk about here.

A.    (Nods head.)

131

Webster v. Lockett 015200

MILLER/VOIR DIRE/MACALUSO

Q.    And I don't -- I don't want to be putting any words in your mouth, so if I repeat something when I let you start talking here in a minute, if I repeat something and it's not accurate, will you stop me and correct me if I say something that doesn't accurately reflect the way you feel?  Okay?

A.    Okay.

Q.    You indicated here that you -- with regard to the question about the death penalty, "I feel that at times death is an easy escape and also" -- and this is what I want to dwell on here if we can or examine -- "no one has the right to kill another person."  Can you just share with us, tell us a little bit more about your feelings in that regard?

A.    Well, I just don't believe that anyone should have the authority over anyone to take a life away.  That's a personal belief --

Q.    Right.

A.    -- for me.  And sometimes I -- like I said, I feel that there might be a justification in hideous crimes but -- and then I know if something happened to someone in my family, I might -- you know, I guess it could be different, but I don't think so.

Q.    Uh-huh.

A.    I think that if a person has to live with what they had -- with what they've done is greater punishment than death sometimes, because death is a quick -- it's a quick escape.

Webster v. Lockett 015201

Q.    You think that the death penalty under certain circumstances may be worse than -- pardon me, a life sentence without the possibility of parole could be worse than a sentence of death?

A.    Yes.

Q.    Okay.  Let me tell you -- and I neglected to mention this earlier and I should have, but let me tell you where we stand in this case, okay, so you kind of get an idea -- not kind of, hopefully get a real clear picture of where we stand.

Ma'am, we are actively seeking the death penalty in this case.  We're -- that's our aim at the end of this trial, is a verdict will be returned that will result in some day that -- well, this judge will sentence this defendant to be executed, die, put to death.  Under these circumstances, that would be by a lethal injection.

And, now, the decision, of course, is ultimately up to 12 jurors, and the law actually talks in terms of a recommendation, but I think reasonably anyone who would serve in this case should take as serious as a heartbeat the reality of the situation and the finality of the situation, and that is if you return, along with the other jurors based on the evidence, a sentence of death, the judge will act upon that, and at some point in time the person upon whom the sentence is pronounced will, in fact, be put to death.

Now, like I said, we want to know how you feel about it,

Webster v. Lockett 015202

MILLER/VOIR DIRE/MACALUSO

because it would be horrible to put you into a position, put you on this jury -- and this has happened to people. They say, well, I guess I -- yeah, I guess under certain circumstances I could do it, when they know in their heart of hearts or they're really not 100 percent sure when it came really down to it, taking pen in hand, signing a -- their name basically on the verdict form itself that they know is going to end the life of an individual, that they just really can't do it.

And that's why -- you know, you could see how horrible it would be for everybody if you were in that position, and you get back in the jury room and you say I should have told them, I should have been -- I can't do it. I think it has a place. You know, it's like some other aspects of the law. I think it has arguably some merit under certain circumstances, but I, Mrs. Miller, I personally, I just can't do it. How do you feel about that?

A.   Personally I don't know if I could do it. I'm not sure that I could do it.

Q.   And why is that?

A.   If I felt like I ended somebody's life, I don't know if I could live with it personally.

Q.   Okay. Can you see why -- and I don't want to belabor this thing, but can you see why we're asking you all these questions and talking to you individually like this, why

Webster v. Lockett 015203

that's so incredibly important to both sides of this case?

A.    (Nods head.)

Q.    And, Mrs. Miller, I want you to understand if you serve or don't serve -- divorce your thinking or your involvement in this case for just a second.  I don't want you to think, for example, if you don't serve on this case or someone who thinks like you doesn't serve on this case, that this young man over here is going to be judged by a bunch of people that are crazy about the death penalty.  This jury will --

MR. KEARNEY:  Your Honor, I object to what other people may think.

THE COURT:  I sustain the objection.

MR. KEARNEY:  And ask you to instruct Ms. Miller to disregard the comment.

THE COURT:  I don't want you to think about what others might do on the jury.  Just focus on what you would do.

Mr. Macaluso, you've got about 30 seconds.

MR. MACALUSO:  Okay.

BY MR. MACALUSO:

Q.    Like I said in the beginning, we're not trying to talk you into or out of anything.  Are you saying that thinking about it or in your heart of hearts you feel you simply could not, yourself, return a verdict of death yourself?

A.    I don't think I -- like I said, I'd have to look at -- I don't know if I could or not.

Webster v. Lockett 015204

MILLER/VOIR DIRE/MACALUSO

Q.    Okay.

A.    I do, I question myself.  I don't know.

Q.    That's because of your feelings about the death penalty?

A.    Yes.

Q.    All right.  Ma'am, I'm out of time.  You've been real polite to me.  I thank you very much.

MR. MACALUSO:  That's all I have, Your Honor.  Thank you.

THE COURT:  Mr. Kearney.

DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.    Ms. Miller, I'm Jeff Kearney.

A.    Yes.

Q.    And I'm Orlando's lawyer.

Let me -- I thought that when you and the judge had this talk just a few minutes before the prosecutor started talking to you, that you had told the judge that in a proper case, that means a case that's so bad that the facts justified the death penalty and where the law provided for it, that you could in that situation vote for the death penalty if the facts were there so bad that they justified it.  Is that what you told the judge?

A.    Yes.

Q.    You know, before you would ever even be faced with voting for the death penalty, the jury would have to find a number of

Webster v. Lockett 015205

things beyond a reasonable doubt.  First of all, the jury unanimously, all 12 of the jurors would have to find the defendant guilty of a crime like this.  Do you understand that?

A.    (Nods head.)

Q.    And then the jury would hear additional evidence in what's called the punishment phase of the trial or in the sentencing phase of the trial to decide whether or not the death penalty would be appropriate or life without release would be appropriate.  All right?

A.    (Nods head.)

Q.    Now, before the death penalty would ever be appropriate, you would have to find that the person also committed an intentional act that caused somebody's death like that's on the first page there.

A.    Yes.

Q.    Okay.  Then you would have to find that beyond a reasonable doubt, and all the jurors, all 12, would have to agree on that.  Okay?

A.    (Nods head.)

Q.    But you still wouldn't be authorized under the law even to consider the death penalty unless some other things occurred, all right?  If you would look at the second page there, the jury would have to find that one of these aggravating factors existed, that the death was -- resulted

Webster v. Lockett 015206

MILLER/VOIR DIRE/KEARNEY

during the commission of another crime; or B on your page there, that the defendant committed the crime in an especially heinous, cruel or depraved manner, in that it involved torture or serious abuse to the victim.  Okay?

A.    (Nods head.)

Q.    Now, can you imagine in your mind how horrible something would be that involved torturing somebody or serious physical abuse?

A.    Yes.

Q.    Or there would have to be substantial planning or premeditation, okay, to cause the death.  In other words, somebody would have to think about it beforehand or plan it and then carry out the death.  All right?

A.    (Nods head.)

Q.    Or that the victim was either an elderly person or a very young person or somebody that was infirmed, disabled or something like that.  Do you understand that?

A.    Yes.

Q.    And can you imagine -- and then you, the jury, would have to unanimously, all of you, find that beyond a reasonable doubt.  Okay?

A.    Okay.

Q.    And then weigh that against any mitigating factors to decide which -- whether a death sentence or a life sentence was appropriate.  All right?

Webster v. Lockett 015207

A.    (Nods head.)

Q.    In a case where you had found someone guilty beyond a reasonable doubt and then found that it was an intentional act beyond a reasonable doubt and then found one of these horrible aggravating factors beyond a reasonable doubt, can you imagine a fact situation so bad where you could, if the law provided for it, could say this is so bad I think I have to vote for the death penalty?  Could you do that in a case like that?

A.    Yes, I believe I could.  Yes.

MR. KEARNEY:  That's all I have.

THE COURT:  My only concern, Ms. Miller, is this: When the government puts it to you like would you really want to be put in this position, you are -- you feel pushed one way and you give an answer that way, and when Mr. Kearney asks you a question you feel pushed this way.  And I understand that completely.  I do, too, when I listen to them.

Here's my ultimate question that I have to decide:  Will Frances Miller sit on this jury and hear a defendant possibly convicted of a -- beyond a reasonable doubt in her own mind of a crime of kidnapping, convinced in her own mind that the defendant is guilty of intent in causing the death of the victim, convinced in her own mind beyond a reasonable doubt that one of the aggravating factors is present such as cruelty, heinousness, convinced in her own mind that the aggravating factors outweigh the mitigating factors, will

Webster v. Lockett 015208

Frances Miller, convinced of all that, when the moment comes to vote still vote against the death penalty even though she's convinced of all that because suddenly her emotions take over, or will she at that moment be able to say to herself I found the defendant guilty beyond a reasonable doubt, I found the defendant has committed the murder in some way intentionally, I found that beyond a reasonable doubt, I found aggravating factors beyond a reasonable doubt, I found that aggravating outweighs mitigating, and now I believe that the death penalty is the appropriate sentence and I can sign off on it. Which Frances Miller are we going to get?

MS. MILLER: Like I said, it would have to be -- a lot would have to do with the information that I was given. The type -- you know, like you said --

THE COURT: Assume -- assume that that information is you are convinced of guilt, you are convinced the intent is there, you're convinced that the aggravating factors are there and that they're severe aggravating factors, and you're convinced that those aggravating factors are strong enough to justify a sentence of death, you know in your mind that it's sufficient to justify a sentence of death. Could you do it?

MS. MILLER: I would truly have to be convinced.

THE COURT: Well, I'm saying you're convinced. You're convinced that all those are true. Could you, then, go ahead and sign off in favor of the death penalty, or would at

Webster v. Lockett 015209

that moment your emotions prevent you from doing that?  Would you suddenly say, oh, I just can't do it, I don't care what the facts are, I just can't do it?

MS. MILLER:  If I were really convinced -- here I go back to this, because it would have to be certain extenuating circumstances that I would have to truly believe before I would think that a person -- my tendency would be to go to life without parole, and the circumstances would have to be very crucial before I could consider the death penalty, because I just don't believe in the death penalty.

THE COURT:  Okay.  But is it fair to say that there is a set of facts out there where you could give the death penalty?

MS. MILLER:  (Nods head.)

THE COURT:  That is fair to say?

MS. MILLER:  That's fair to say.

THE COURT:  And you believe you would not be overcome by emotion and balk at the last minute before you signed off?

MS. MILLER:  Yes, right.  If the circumstances were there, I think I could give the -- I could agree with the sentencing.

THE COURT:  Of death?

THE WITNESS:  Of death.

THE COURT:  You've been very kind.  I know we've

really delved and dug, and it's probably been uncomfortable for you and we don't mean it to be, but it's very important. Thank you.

MS. MILLER:  Uh-huh.

THE COURT:  And let us do this:  We'll let you know by the end of the week whether your services will be required, and in the meantime if you'll remember not to listen to any media coverage and not to discuss it with anybody at all, especially not at home.

MS. MILLER:  Okay.

THE COURT:  Thank you very much.

MR. MACALUSO:  Thank you, ma'am.

(Venire person excused at 2:20 p.m.)

THE COURT:  All right.  I presume the government has a challenge?

MR. ROPER:  Yes, sir.  And I -- she said something early on that I think -- when you were asking her questions, she just -- early on she said she just didn't think she could give the death penalty, I just don't know I could do it.  Now, if she had said I just don't know if I could give a life sentence without possibility of release, I think that would pretty well disqualify her.

She did come back around both ways on the case, but one thing that I think is important to consider, Judge, Mr. Kearney asked her all these aggravating factors.  Now, if

every one of those aggravating factors were present, and I think she -- really, going back to that Antwine versus Delo case, conceiving of a hypothetical circumstance where they could give a -- in an extreme circumstance give the death penalty, giving the death penalty could qualify them, that's really what Mr. Kearney was doing with all those questions. I mean, every one of these aggravating factors. We would have the ability to have a fair juror with just one of the aggravating factors. They ought to be able to not rule out the death penalty in any one of those circumstances. I think she's substantially impaired because of that.

And I think if you go back and look at her questionnaire, she was real strong on her questionnaire about it, especially about life without possibility of release. She said on that question 52-A, "If life without parole is an option, couldn't give death penalty because living and enduring the punishment of never being able to be free would be more harsh a punishment." And then she marked it saying she couldn't consider it.

And I think that -- she also said that she agreed that life without the -- life imprisonment is more effective than the death penalty, and the state can't teach the sacredness of human life by destroying it. To me that shows how she feels. I mean, she went both ways, correct, but I think the hesitancy in her answers shows how she really feels. And just because

all aggravating factors are present and she can conceive in her mind of a situation that she could give the death penalty, that doesn't qualify her.  And I think that's the bottom line why she's substantially impaired.

THE COURT:  Mr. Kearney.

MR. KEARNEY:  I don't have anything to say, Judge.

THE COURT:  Okay.  You know, when you look over here at her answers to the questions where a statement is set out and then the degree of agreement or disagreement is possible, she slightly agrees that the death penalty is wrong but she also agrees we must have the death penalty for some crimes, she agrees with that, and she slightly agrees that the death penalty is necessary.

What I'm inferring there is she thinks it's wrong and wishes we didn't have to have it, but we do have it -- she disagreed, by the way, the death penalty is absolutely never justified, she slightly disagreed with that, and she agreed that the death penalty is necessary.  She disagreed that the death penalty cannot be regarded as the same method for dealing with crime.  She disagreed that the death penalty is wrong and is unnecessary even in our imperfect civilization.  She even disagreed that the death penalty has never been effective in preventing crime.  She agreed with we must have the death penalty for some crimes.  Her answers are somewhat ambivalent.  She didn't think the execution of criminals was a

disgrace to civilized society, but as I say, they're somewhat conflicting.

My conclusion here is that she has a battle going on between her emotions and her mind, and I think that presented with the facts of a proper case, I think she can give the death penalty. I think she'll rely on her mind. I think the fact that she leans against the death penalty is no more cause for striking than the fact that a number of our people we have allowed on lean for the death penalty once intent is found. So I deny the motion to strike. I'm sorry it took so long, but I was really kind of thinking out loud there.

Let's hear from Mr. Barrett.

(Venire person seated at 2:25 p.m.)

LAWRENCE BARRETT,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

Q. Hi, Mr. Barrett. How are you, sir?

A. Fine.

Q. Please have a seat.

Let's see, Mr. Barrett, you indicated this morning that you had heard something about the case on the news. Could you tell us what you've heard?

A. Basically whenever it happened I just read the accounts of the kidnapping and the killing and also the -- where their

Now, the life in Texas traditionally has not been without release. Parole is involved. But in the federal system a life sentence means that. In other words, the defendant would die in prison. Okay?

A.    (Nods head.)

Q.    Under those circumstances some people have some fairly strong feelings about imposing the death penalty in those circumstances. They feel like under those circumstances when somebody can be locked up and effectively die in prison, that the death penalty is not an appropriate punishment.

I understand from looking at your questionnaire that you said that you couldn't give the death penalty if life without parole is an option, and you said that a person will no longer be a threat to society. Tell me how you feel about that.

A.    If -- basically if there were two options, life imprisonment -- I would most likely go with the life imprisonment rather than the death penalty.

Q.    Why would that be?

A.    Basically because I just have a feeling about the death penalty. You know, like in certain situations I think I could do it, but most situations, no, I would prefer life in prison as a choice.

Q.    Do you feel like the death penalty serves any particular purpose?

A.    I don't -- I don't know. It doesn't -- it doesn't seem

Webster v. Lockett 015221

to be serving the way things are continually going.

Q.    Can you think of any good purpose for it?

A.    A good purpose for the death penalty?

Q.    In all honesty.

A.    I really couldn't think of any good purpose --

Q.    If you were -- I'm sorry, I didn't mean to cut you off.

A.    If the death penalty -- if there's a choice between life in prison and the death penalty, I most likely would go with the life in prison unless death is the last option.

Q.    Okay.  I'm not -- honestly I'm not trying to argue with you about it, but I want to explore that a little bit more. And, again, we're talking more in the realm of philosophical discussion.  You understand if you are called to sit on this jury --

A.    Uh-huh.

Q.    -- and it got down to it under the proper facts and circumstances, my question to you is considering the fact that life without the possibly of ever being released is an option, in that circumstance could you under any circumstances sign your name to a verdict form knowing that that's going to result in the execution of another human being, in all honesty?

A.    I don't think I could.

Q.    Why is that?

A.    It's just a feeling that I have.  I just don't think I

147

Webster v. Lockett 015222

could do it.

Q.   How long have you had these feelings about the death penalty?   I mean, you used to be for it, or tell me how you feel about it.

A.   How long have I had the feeling about it?

Q.   Uh-huh.

A.   I don't know how long I've had this feeling about it.

Q.   Well, I mean, you can see why we're asking you this question.   It would be a horrible -- it would be placing you in a horrible position to get on this jury and then get back in the back and you just couldn't do it --

A.   Right, uh-huh.

Q.   -- even though those factors and all that's been found. I mean, we can go through these factors with you, but when you get down to the bottom line that could be a possibility, and if you feel like life without the possibility of release is more -- is a punishment you would go with, maybe you even feel like it's more harsher punishment than the death penalty, I don't know, but are you saying you just couldn't under any circumstances actually sign a verdict form for death when life without parole -- without the possibility of ever being released is an option?

A.   Repeat that again?

Q.   Okay.

A.   I got lost.

Webster v. Lockett 015223

Q.    I think you've already answered it.

A.    Okay.

Q.    And I understand, I can see where you put down you thought that life imprisonment is more effective than the death penalty anyway.

A.    Right, and that's probably the way I would go most likely, unless something would say yes go with the death penalty, but my belief is that life imprisonment.

Q.    What it really -- what I'm saying, if the fact that life without the possibility of release is an option, would it really take you out of being able to fairly consider the death penalty?

A.    Yes, it would.

Q.    And I say, "consider."  You know, when we say -- we can give lip service to consideration, tell your kids, oh, yeah, I'll consider that knowing good and well when it gets right down to it you're not going to consider it.

A.    Uh-huh.

Q.    Do you feel that way about it, about the death penalty when life without the possibility of release is an option?

A.    I would consider it, but my most likely choice is going to be life imprisonment.

THE COURT:  When you say that you would consider it, would that consideration be good faith consideration, or do you think it would be kind of going through the motions?

149

Webster v. Lockett 015224

MR. BARRETT:  It would be good faith consideration. It would be a lot of prayer, it would be a thought -- it's not nothing that I would just jump up and do.  It would be a big decision on my part with my personal beliefs.

THE COURT:  What I was driving at there was, as Mr. Roper said, sometimes a consideration, you know, oh, yeah, I'll consider it, but the consideration turns out to be -- because we feel so strongly against the death penalty, that the consideration turns out to be kind of a going through the motions because you know you really just can't -- can't do it, whereas a good faith consideration is one where you know you can do it and you're weighing all the factors and trying to decide whether those factors add up to being able do it.

MR. BARRETT:  I think basically it would be a good faith consideration.

BY MR. ROPER:

Q.    And I'm not trying to argue with you, but you said a couple of different things.

Are you saying that when life without the possibility of release is an option, when that's an option -- you know, Texas it's not an option.  In that circumstance do you feel like considering your opinions about the death penalty and the consideration of life without the possibility of release is as severe as you said, do you feel like you could still give good faith consideration when you got back to that jury room to a

Webster v. Lockett 015225

death sentence in all honesty?

A.    Yes.

Q.    Okay.  You said a couple different things.  Tell me why you feel different now?

A.    What did I say?

Q.    Earlier you said that you didn't think you could.  Now you're saying you could.  I mean, I'm not trying to argue with you, but it's important --

A.    Judge Means explained to me that -- you know, about the good faith.  I wouldn't tell you now that I couldn't do it and get back there knowing that I couldn't do it.  It would be considered.  What I was telling you was that my most favorable -- I mean, the conclusion most favorable to me would be the life imprisonment.

Q.    Okay.  I understand.  Let me put this way:  It really wouldn't be fair to the government and to the -- you know, the situation here and the people in this community if you just can't get back there and even consider the death penalty once you get down to it since life without parole is an option.  Do you see what I'm saying?  It just wouldn't be fair.  And if you feel that way I'm not here to disagree with you --

A.    Uh-huh.

Q.    -- or argue or try to change your position because you're entitled to your opinions.  We live in the United States, and we have that right.  And I don't want to put you in a horrible

position, nobody does, of sitting on a jury when you really got these strong feelings against the death penalty and feel like you do about life without the possibility of release. See where I'm coming from?  And maybe I'm not articulating it very well, but do you think you could give full and good faith consideration to the death penalty when life without the possibility of release is an option?

MR. KEARNEY:  Judge, this is so repetitious.  I think he's answered this question two or three times.

THE COURT:  I'm going to ask him to give an answer one more time and then we'll move on.

A.    What am I answering now, the question?

BY MR. ROPER:

Q.    I'm sorry.

THE COURT:  In 25 words or less.

BY MR. ROPER:

Q.    It wouldn't be fair to give -- to get on that jury and really not be able to give good faith consideration to the death penalty when life without the possibility of release is an option, and I'm not asking -- try to talk you out of your feelings or not, but you feel like it would place you in a horrible circumstance where you couldn't consider the death penalty when life without the possibility of release is an option?

A.    Now, you're saying where I couldn't consider, and I said

Webster v. Lockett 015227

BARRETT/VOIR DIRE/ROPER

I could consider but my most likely would be the life penalty.

Q.    Would you rule out the death penalty?

A.    I wouldn't rule out the death penalty.  It's a decision I have to make at that time based on --

Q.    And how certain do you feel like you would have to be?

A.    I can't answer how certain.

Q.    Okay.  Do you know in all criminal cases the burden of proof is -- the government has to prove its case beyond a reasonable doubt?

A.    Uh-huh.

Q.    That's all in criminal cases.  The judge will instruct you that while the government's burden of proof is a strict or heavy burden, it's not necessary that the defendant's guilt be proven beyond all possible doubt.  Do you see that?  Do you feel like because this is a death penalty case and considering your feelings against the death penalty and your feelings toward life without the possibility of release, would you want to hold the government to proving its case beyond all possible doubt?

A.    Would I want to hold the government to prove its case beyond all possible doubt?  Yes.

Q.    Do you understand that would be higher than beyond a reasonable doubt?

A.    Yeah, I would have to.

Q.    And that's based on what you feel about the death

153
Webster v. Lockett 015228

penalty?

A.    Uh-huh.

Q.    Am I making myself clear?  Do you understand my question?

A.    Yes, you are.  It would have to be beyond all shadow of a doubt.

Q.    Why is that?

A.    That's just the way I feel about it.

          THE COURT:  Your time is up.

     Mr. Kearney.

               DEFENSE VOIR DIRE EXAMINATION

BY MR. KEARNEY:

Q.    You know, these terms we throw at you, "beyond a reasonable doubt" and "shadow of a doubt," nobody really knows what those mean.  You know, a shadow of a doubt would be not a real doubt but just a shadow.  A shadow of a person is not a real person, it's just a shadow.

     The judge will tell you what proof beyond a reasonable doubt is, and that is proof of such a convincing character that a reasonable person would rely and act on it without hesitation in the most important of his own personal affairs. That's what the judge will tell you.  And everybody gets to decide on their own what reasonable doubt is.  What might be reasonable doubt to you might not be reasonable doubt to the juror sitting next to you.  You know what I'm saying.  So everybody gets to decide that on their own.  But the

definition is it's got to be so strong and so convincing that you would rely on it, that kind of proof, and then take some action on it in your own personal life without even hesitating, it would be that strong, in an importance of your own personal decisions, discussions such as making a decision for the -- you know, a life or death decision as to your child or to make a decision as to an elderly parent, an important decision. Do you see what I'm saying?

A. (Nods head.)

Q. So that's what the standard is, proof beyond a reasonable doubt. If the judge told you that the standard you shall use is proof beyond a reasonable doubt, that that's the law, could you follow the law?

A. Yeah, I could follow that.

Q. And use that standard, proof beyond a reasonable doubt?

A. (Nods head.)

Q. You could?

A. Uh-huh.

Q. Okay. She's going to write this down. Yes -- are you saying, yes, you could?

A. Follow the law?

Q. Follow the law.

A. Yes.

Q. If the judge told you that's what the law is?

A. Yes.

U.S. District Court

Webster v. Lockett 015230

Q.   Okay.  How long -- you've been in the real estate business almost two years now?

A.   Uh-huh.

Q.   Is that a realtor's pin that you have there?

A.   Uh-huh, yes.

Q.   Okay.  Do you have a broker's license?

A.   No.

Q.   Is it residential or commercial real estate?

A.   Residential.

Q.   Residential.  How long have you and Mrs. Morehouse been married?

A.   15 years, I believe.

Q.   And let me ask you about Millie.  Where does Millie go to school?

A.   Everman.

THE REPORTER:  Where?

MR. BARRETT:  Everman.

BY MR. KEARNEY:

Q.   Do you have any questions of us?  Have you got any questions about this whole procedure?

A.   (Shakes head.)

Q.   You've been asked so many questions, I don't want to keep asking you questions.

MR. KEARNEY:  So that's all I have, Judge.

THE COURT:  All right, thank you.

U.S. District Court

Webster v. Lockett 015231

Mr. Barrett, you've been very kind to let us probe so deeply. I know it's not easy to have a bunch of strangers asking you such soul-searching questions, and so we appreciate your being here and we appreciate your effort, as well.

Please remember that you cannot discuss the case with anyone, including anyone at home, and you should avoid all media coverage until we let you know whether you'll serve or not, and we'll know that by the end of this week.

MR. BARRETT: By the end of this week?

THE COURT: Yes, sir.

MR. BARRETT: Okay. I've got summons for another court tomorrow.

THE COURT: Do you?

MR. BARRETT: Yeah.

THE COURT: Is that for jury duty?

MR. BARRETT: Yeah, jury duty.

THE COURT: Well, you tell them that I've got first dibs on you and that you'll know by the end of the week whether you're going to have to serve here or not.

MR. BARRETT: Okay.

THE COURT: I think they'll let you off. Is that a state court jury?

MR. BARRETT: Yeah, state court for tomorrow.

THE COURT: I can't imagine that. That's the first time I've seen that. Just tell them you're on call for us and

Webster v. Lockett 015232

you won't know until probably Friday of this week, and so ask if they'd let you off.  And if they say no, give me a call and I'll see if I do something.

MR. BARRETT:  Okay.  Any idea if I am selected how long it --

THE COURT:  Yes, sir.  We think the trial will take two weeks.

MR. BARRETT:  Two weeks?  Okay.

THE COURT:  Do you work on commission?

MR. BARRETT:  I work on a commission and I've also signed up for a class that I'm taking, and it's a real estate training class and it's -- it goes every Monday for 11 weeks.

THE COURT:  You're in luck.  You don't -- we won't hear anything on Mondays.

MR. BARRETT:  Won't hear anything on Mondays, okay.

THE COURT:  All right.  Thank you very much.

MR. KEARNEY:  Thank you.

MR. MACALUSO:  Thank you, sir.

(Venire person excused at 2:55 p.m.)

THE COURT:  Okay.  Who thinks he's substantially impaired?

MR. ROPER:  I do.  He said I don't -- talk about letting emotions take over, and he said I just don't know. And I think that kind of sums up -- and he said conflicting answers, but obviously he's against the death penalty and I

158

Webster v. Lockett 015233

think he clearly answered that question, "I can't give the death penalty if life without parole is an option.  That person will no longer be a threat to society."

And he went back and forth and back and forth, pausing for a lot of times on his answers.  I just don't think he can give a good faith consideration.  He may say he can in answer to the Court's questions, I just don't think he can do it.  I think his hesitation and his answers shows it.  He also, I believe, is disqualified on the reasonable doubt standard. You know, Mr. Kearney said we really don't know what that means, and then Mr. Kearney told him what he thought his definition of it was.

I think he's substantially impaired because of his beliefs against the death penalty.  He's got pretty strong beliefs, and I just don't think he can sit.

THE COURT:  I think he's a real good candidate for a peremptory, but I deny the motion to strike.

MR. KEARNEY:  Off the record.

(Off-the-record discussion.)

THE COURT:  Mr. Knoll, we're ready for Mr. Knoll.

(Venire person seated at 3:00 p.m.)

GEORGE KNOLL,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

159

Webster v. Lockett 015234

EVANS/VOIR DIRE/MACALUSO

out about a month ago, and it asked you everything but your IQ and your hat size, I guess.

A.    Pretty much.

Q.    But we were trying to home in there on your feelings about the death penalty and the criminal justice system.  How do you feel about the death penalty yourself, Mrs. Evans?

A.    I'm really not that sure.  I -- I believe as a last resort or in a case to where a crime was committed intentionally without, you know, any -- any regards for life or, you know, something like that, I just -- I think it would probably be appropriate.

Q.    Okay.  What sorts of crimes come to your mind?

A.    Basically just -- just someone just going out shooting somebody without really having a reason, you know, just doing it just to -- you know.

Q.    Do you feel that the death penalty serves a particular purpose, some benefit to society?

A.    I think it does to a certain extent when you have, you know, a horrendous crime committed or in some cases habitual, you know.

Q.    Okay.  Let me ask you this -- or let me put it this way: If they put the death penalty to a vote just on a ballot come election day some November, and they said yes or no we're going to keep it or we're going to get rid of it, how would Mrs. Evans vote on that?

Webster v. Lockett 015349

A.    I probably would skip it.

Q.    Well, if you had to -- that's not fair.  That's probably what I would do.

A.    I'm not sure.  I guess I would probably vote to keep it, but, you know, like I say, I still would have reservations as when it would be applied.

Q.    Okay.  I gather what you're saying is you feel it's appropriate under certain circumstances.

A.    Under certain.

Q.    Obviously not all --

A.    Right, uh-huh.  Right.

Q.    You can see, I gather, certain circumstances where you feel it is appropriate?

A.    Uh-huh.

Q.    Now, I notice you indicated here, there was a question with regard to Mr. Evans' position on it, and you indicated here, "I'm sure that he disagrees with the death penalty in any case because of religion."  He's studied theology, has he not?

A.    Yes.

Q.    All right.  Let me ask you how -- would that impact your decision if you were on the jury, your husband's position on it?

A.    Not necessarily, because I think, you know, if I'm chosen as a juror, that's an individual --

Webster v. Lockett 015350

Q.    Yes, ma'am.

A.    -- you know, decision, and it doesn't have any, you know, regard to what my spouse feels about it.

Q.    Uh-huh.

A.    Also I really don't know what his beliefs are.

Q.    Okay.

A.    It's just not a subject that we talk about.

Q.    Right.

A.    But he is a minister and so that's why I just assume, but we have not discussed it.

Q.    You haven't discussed it, for example, since you've been down here to fill out this questionnaire?

A.    Now, I did ask him how he felt about it, and he didn't know.

Q.    He didn't know?

A.    Huh-uh.

Q.    Okay.  You hit the nail -- the proverbial nail on the head when you said it's important that we select you as a juror in this case, if you are, and you vote your conscience based on the evidence and based on the law.  Of course, it would obviously be inappropriate for us to --

A.    Right.

Q.    Mr. Evans is not down here, of course.

A.    Right.

Q.    And we have not had an opportunity to hear or to speak

decision is reached, it will be reached based upon what has been seen and heard in the courtroom without any influence from what was seen or heard or read outside the courtroom.

The ultimate question to you, of course, has to be whether you can do that.

A.    I feel that I can do it, yes.

Q.    You feel that you can?

A.    I feel that I can do that, yes.

Q.    Okay.  Do you have any doubts about your ability to do that?

A.    No.

Q.    Okay.  What -- just to review, what we'll actually be asking you to do is to look at the evidence and the facts in the case heard in the courtroom, seen in the courtroom, and to resist every impulse that you have to remember or to consider or to think about anything you heard outside the courtroom that you just related to us a few moments ago.  And what I believe I hear you saying is you can do that.

A.    I can do that.

Q.    Okay.  Thank you.

You said in response to question 47 on the questionnaire, which really isn't a question, they gave you six statements and your job there was to find the one of the six that best represented your belief about the death penalty.

A.    Uh-huh.

U.S. District Court

Q.    And you circled D, which says, and I quote, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances."

Does that still represent your belief about the death penalty?

A.    Yes, it does.

Q.    Is it fairly accurate?  I mean, we only had six to choose from.  Yours might have been in between some of the choices. Does that fairly accurately reflect your opinion about the death penalty?

A.    It does.

Q.    So what I would conclude from that, trying to make it a little more specific for this case, is that while you are not in favor of the death penalty, that since the law does provide for it, if the facts of this case seem to justify it in the manner that I reviewed with you earlier --

A.    Right.

Q.    -- that you could vote for a death penalty?

A.    I could.

Q.    Okay.  The -- that reminds me of something I didn't ask you earlier.  I made eye contact with you a number of times as we were going over these things, and you seemed to be understanding them just fine.  Was there anything about that review that you didn't understand or you have a question about

now?

A.    I think I understood everything.

Q.    Okay.  Did it seem to have a certain sense to it?

A.    It did.

Q.    Okay.  Sometimes we criticize Congress for some incomprehensible legislation, but this one, I take it, seemed to have --

A.    With your explanation it made sense.

Q.    Okay.  You have a brother-in-law that's a lawyer?

A.    Yes, I do.

Q.    And you're willing to admit that?

A.    Yes.

Q.    What kind of law does he practice?

A.    Criminal law.

Q.    Okay.  Have you ever discussed some of his cases with him?

A.    No, I haven't.  My husband has.

Q.    Okay.  Is there anything about that relationship that would prevent you from being a fair and impartial juror in this case?

A.    Nothing.

Q.    Okay.  All right.  I think that's all of the questions I have for you.  The government will question you for about ten minutes, and that will be followed by the defendant.

A.    Okay.

Webster v. Lockett 015377

LEE/VOIR DIRE/MACALUSO

THE COURT:  Mr. Macaluso.

MR. MACALUSO:  Thank you very much, Your Honor.

GOVERNMENT VOIR DIRE EXAMINATION

BY MR. MACALUSO:

Q.    Good morning, Mrs. Lee.

A.    Good morning.

Q.    I'm Paul Macaluso.  Along with Delonia Watson and Richard Roper, we're three of the four prosecutors assigned to this case.  We're all assistant United States attorneys.  We represent the government in this case.

Next -- over at the next table, as you know, is the defendant, Orlando Hall, and one of his attorneys, Mr. Jeff Kearney.  Do you recognize or know any one of us other than from the introductions --

A.    No, I don't know anyone.

Q.    Okay.  Well, you do know this, you're a prospective juror on this case, of course, and it's a capital case, the most serious level of offense a person can be charged with under federal and state law, obviously, because of the nature of the penalties that are possible at least.

We want to let you know that there are no right or wrong answers to any of the things we're going to be talking about here today.  We would like to ask you some questions, let you speak your mind and your heart about some things so we get to know a little bit more about you.  And if you have a question

LEE/VOIR DIRE/MACALUSO

at any time, now is the time to ask it.  If you get on the jury it's too late for all practical purposes.

And if there's something you need to tell us that we haven't touched on as we talk, by all means this is the time, also, to let us know about anything that you feel may be important to us in making a decision as to whether or not you're suited to this type of a case.  Okay?

A.    Okay.

Q.    Let me tell you where we stand from the outset on this, that is the government's position.  We're actively seeking the death penalty in this case, Mrs. Lee.  In other words when the trial begins, we would intend, as the law requires, to provide you and 11 others, if you're on this jury, with the type and the quality of evidence that would convince you beyond any doubt whatsoever based on reason that the defendant's guilty just exactly as charged in the indictment.  If that's done, a finding of guilt is returned, then we would expect also in the penalty phase of the trial which would follow to provide you and 11 jurors with that type and that quality of evidence that would convince you beyond any reasonable doubt that the proper sentence would be a sentence of death.

Now, that's our position.  Ultimately you as a juror and the others would be called upon to make the final decision, the most important and the most crucial decision.

Now, you were asked 120 intrusive questions here,

LEE/VOIR DIRE/MACALUSO

basically, about -- almost a month ago, and a number of them dealt obviously with what we're here about today for the most part, the criminal justice system, and more specifically the death penalty.

A.   Uh-huh.

Q.   Can you share with us just in your own words and your own feelings how you personally feel about the death penalty?

A.   Yes.  Well, I'm ambivalent about the death penalty.

Q.   Okay.

A.   On one hand I think that it should not be used at all, and then there are certain cases or circumstances when I think maybe yes.

Q.   Okay.

A.   Also, at times I think if it were more standardized, nationally standardized, sometimes I could support it more than, I guess, the discretion based on where you are, who you are.

Q.   Okay.  Let me make sure -- let me see if I can probe a little bit deeper on this.  Do you have like -- I'm not a very deep person myself, but do you have a philosophical aversion to the death penalty, or do you just feel it shouldn't be applied in certain circumstances where it has been?

A.   Well, basically I feel it should not be applied; however, I think there are circumstances -- and since it is used in America where it sometimes becomes necessary, but, now, if --

Webster v. Lockett 015380

LEE/VOIR DIRE/MACALUSO

if it were not an option, let's say --

Q.    Uh-huh.

A.    -- then I could support that.  If the death penalty was -- just did not exist, I could support that.  However, since it is in existence in America and obviously some crimes are pretty heinous and cruel, then there are certain times when I would say yeah, maybe.

Q.    Okay.  Let's explore that a little bit deeper, too, if we can.

Sometimes people will say, well, I believe in the death penalty -- or really I don't necessarily believe in it, whatever that means, but it's there and I guess it's the law, and so -- so -- but knowing myself and knowing my feelings and being an adult I know this or I'm not sure about this, I don't know that I could actually serve on a jury of this nature myself.  If it really came down to it in my heart of hearts, honestly, return a verdict, regardless of the facts, I mean when it really came down to it, return a verdict that would result in me signing my name or making a decision and signing my name to a document that would result in the execution of another human being.  How do you feel about that?

A.    I've never done that before.  I mean, I can't say that I definitely would not do that or just could not do that.  I would have to hear everything involved, all of the -- all of the witnesses, everything, you know.

U.S. District Court

LEE/VOIR DIRE/MACALUSO

Q.    Okay.

A.    I would just have to be aware of everything before I could just say yes I can say that or no I cannot say that.  I think it would be based individually on a case by case decision.

Q.    So there's nothing about knowing yourself that would say -- that would tell us that you are foreclosed from consideration of the death penalty if the facts and circumstances warranted it?

A.    No, I wouldn't say that.

Q.    The same thing for a life sentence, I gather?

A.    No, I wouldn't say that.

Q.    All right.  Let me ask you this:  If you -- what sorts of crimes do you think the death penalty ought to be reserved for just generally --

A.    I thought about that.  Anything that involves children, murder of children, cruelty to children, incorrigible kinds of acts perpetrated by someone repeatedly, to me that's the worse thing that you could do.

Q.    I notice, of course, that you're with the school district here in Fort Worth, have been for a number of years.

A.    (Nods head.)

Q.    When you talk about children, of course you work with children on a daily basis, but what age range are you talking about when you speak about crimes against children?

170

Webster v. Lockett 015382

LEE/VOIR DIRE/MACALUSO

A.    Well, especially smaller children.

Q.    Okay.

A.    I would have to say smaller children especially.

Q.    Smaller children, all right.

A.    It depends.  Some teens.

Q.    Okay.

A.    Smaller.

Q.    One question you were asked on this -- on the questionnaire referred to, I guess, a balancing or at least a consideration of two of the possible penalties that exist for a person that's convicted of this type of an offense.  And the judge touched on this, I believe, again this morning.

Some people might say, Mrs. Lee, you know, if I had the option between a death sentence and a sentence of life without the possibility of that person ever being released, one versus the other, both of which we will all admit are pretty stout.

A.    Uh-huh.

Q.    In all honesty with that one, life without the possibility of release ever, period, to be honest with you I could never ever give fair consideration to the death sentence under those circumstances.  How do you feel about that?

A.    Again it would depend on evidence, but, of course, I think life without ever being released would be a better option --

Q.    Okay.

171
Webster v. Lockett 015383

reasonable doubt the proper sentence is a sentence of death.

Now, that's our position.  That doesn't control.  What controls ultimately, I'm sure you understand at this point, is a decision made by the jury based on the law and based on the facts.

Now, let me just ask you, you were asked -- you know, the judge referred to this earlier -- lots of questions about this and that and everything else, including, believe it or not, the death penalty.  And you did express your views on it, and you're kind of confined in some of these things.  So let me just ask you, would you share with us how you personally feel about the death penalty in your own words.

A.    I believe in some cases it is justified and that it should be used.

Q.    Okay.

A.    And other cases, you know, there are extenuating circumstances to where I don't believe it is necessary.

Q.    On a case by case basis?

A.    Yes, uh-huh, you would have to.

Q.    That pretty much -- as you can tell, that's pretty much the way the law looks at it, isn't it?

A.    Right, uh-huh.

Q.    Have you ever been opposed to the death penalty?

A.    No.

Q.    Mr. Donaldson, how does he feel about it?

Webster v. Lockett 015401

A.    He's for it.

Q.    He's for it?

A.    Uh-huh.

Q.    Does he feel more or less the same way you do?

A.    Basically, yes, uh-huh.

Q.    Okay.  On a case by case basis?

A.    Uh-huh.

Q.    You're young enough to let me ask you this, how about your folks?  Do you know what your mom or dad's position is?

A.    I haven't really ever discussed it with them.  I'm not that close to my dad, but it's never really been, you know, a topic of conversation.

Q.    Do you think it serves a purpose?

A.    I do.

Q.    What is that?

A.    Well, if there are people that can't conform to society in the way that they should, if they're someone that's going to be, you know, repeatedly violent to other people, then it's --

Q.    Okay.

A.    -- unfortunately doing away with those that can't live, you know, in harmony with us.

Q.    What types of offenses come to your mind just as categories?

A.    Well, murder would be one.  But like I said it's a case

173

Webster v. Lockett 015402

by case basis because it just depends on the circumstances.

Q.    Sure.

A.    You know, something to a child would be -- I'm a mother, and anything that someone would, you know, harm a child would be another reason.

Q.    Okay.  You know, some people will say, well, I believe in the death penalty or I can see it as a niche, you know, in the criminal justice system that is needed, but to be honest with you, I don't know that I'm the type of person that could actually serve on a jury and actually make that big decision.  Do you see what I'm getting at?

A.    Uh-huh.

Q.    And what we're trying to do, part of the process here is to make sure we don't put somebody who feels that way in a position that untenable.

A.    That can't make the decision.

Q.    Do you know of any reason why you could not serve on a jury of this type, listen to all the evidence and make a decision even to the point, when it came down to it, of actually making a decision as to death or life, if it came down to actually signing your signature on a verdict form which would result in the execution of the defendant?

A.    I think if you had proved in my mind beyond a reasonable doubt that he did do it, I don't think I would have a problem with that at all.  But if there's the slightest bit of doubt,

Webster v. Lockett 015403

(Venire person excused at 1:45 p.m.)

MR. WARE:  Judge, could we just put something on the record real quickly?

Now comes the defendant and would move to strike -- would move to strike juror number 87, Stacey Leigh Donaldson, for cause on the grounds that she could not give fair consideration to a defendant growing up in a dysfunctional and physically abusive family as a -- as a mitigating factor in a case such as this.  I think she stated first it had to be proven to her beyond a reasonable doubt or beyond all doubt, and then only in addition to proving the factor of growing up in a physically abusive dysfunctional family, if it was proven to her beyond a reasonable doubt that there was a causal connection between that and the offense committed.  We would move that she be struck for cause on that basis.

THE COURT:  I deny the strike.  First of all, what she said that she would have to hear without a doubt was the connection not the existence of it.  And she's free to not -- as I read the law, to not find that that is a mitigating factor, and so I think a strike is inappropriate.

She's number 52, and I think we're ready for Ms. Felts.

(Venire person seated at 1:45 p.m.)

ERMA FELTS,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

Webster v. Lockett 015419

MS. HACKNEY:  Okay.

THE COURT:  Thank you very much.

MS. HACKNEY:  Thank you.

(Venire person excused at 4:50 p.m.)

THE COURT:  Do I hear a challenge?

MR. MACALUSO:  No.

MR. KEARNEY:  No.

(Brief pause in proceedings.)

(Venire person seated at 4:55 p.m.)

PAULA MOORE,

having been sworn as a venire person, testified as follows:

COURT VOIR DIRE EXAMINATION

BY THE COURT:

Q.    Hi.  How are you, Ms. Moore?

A.    Fine, thank you.

Q.    Please have a seat.

Ms. Moore, I've been looking at your questionnaire, and I want to start with the question of capital punishment.  You indicate here that you have moral, religious or personal beliefs that would prevent you from sitting in judgment of another human being and that you are opposed to the death penalty, and there was a question there where you had five different choices about -- there were statements about the death penalty, and you could circled the one that's most closely related to your belief, and you circled this one, "I

could never, regardless of the facts and circumstances, return a verdict which assessed the death penalty."

Does that still -- it's been a couple of weeks, and people have time to think about things.  Does that still reflect your attitude toward the death penalty?

A.   Basically that's how I feel.  That's just how I feel.

Q.   That's fine.  We're not here to try to make anyone change his opinion or challenge their conscience.  Lord knows that's the last thing we want to do.

That has a practical application to a case like this where the death penalty is a possibility, and that's where you would be called upon, if you were selected to serve on this jury, to sign off on a piece of paper that would say I have found the defendant not -- pardon me.  I have found the defendant guilty, and also that you find that the death penalty is the appropriate sentence in the case, and you recommend that sentence to the judge.  And, of course, as I told you before it's called a recommendation, but it's binding on the Court.

Assume with me that the case got that far and you were on the jury.  Would you be able to sign that slip of paper giving the --

A.   I don't think so.  I don't believe so.

Q.   I think I can see why, but let me hear it in your own words.  I see here on the questionnaire why, let me hear it,

Webster v. Lockett 015642

though, in your own words.

A.    I don't believe in the death penalty simply because -- I mean, I can't stand -- I believe in justice, but I believe in another form of justice. I just can't say -- what if God forgives this person if they did do this, and who am I to say I don't forgive you, you must die.  I can't give back a life, why should I take one?

Q.    I understand.  What I'm hearing you say sounds like a very strong opinion on your part.

A.    Well, it is.  But I can't say if it was my sister or something happened to my sister, I can't say I want this person dead.  I have to admit that would be a natural reaction from my hurt --

Q.    But you would never serve on that jury, would you?

A.    I'm sure they wouldn't put me on that jury.  But after I got over the initial shock of it, I believe I would be -- because whatever happens, I can't get her back, so -- but this is what I believe.  But if it's a family member, I -- you know, a family member, that's somebody that you love and care about very deeply, so you're going to want revenge as a matter of speaking.

Q.    I'm going to excuse you from this jury, but that doesn't mean that I don't appreciate your patience with us and your coming down here today, because I do, and I'm going to ask you in exchange for my letting you go here, that you'll agree to

THE COURT:  I understand.  Overruled.

And the first alternate is whom?

MS. RAPER:  Marsha Graves.

THE COURT:  Marsha Graves will be juror number one.

MR. KEARNEY:  Judge, different issue.  I'm a little concerned that the jurors in the far right-hand side of the jury box could be able to see his shackles, and that's what I'm a little concerned about.

THE COURT:  Well, we want him on the end of the table for that reason.  Can you bring him around?

(Off-the-record discussion.)

(End of bench conference.)

(Ms. Crittendon entered the courtroom.)

THE COURT:  Ms. Crittendon, thank you very much.  We're going to let you go.  You have our best wishes.

MS. CRITTENDON:  Thank you.  I appreciate that.

(Ms. Crittendon left the courtroom.)

THE COURT:  On your opening statements, the original scheduling order granted 30 minutes.  You're certainly not required to take the entire 30 minutes, I hope you don't, but that's what I gave you, so that's what you'll have.

(Jury seated at 9:10 a.m.)

THE COURT:  To make sure that we have the right jurors in the jury box, I'll call out the names again, and each juror should say "here" as his or her name is called.

Marsha Graves.

MS. GRAVES:  Here.

THE COURT:  Timothy Nesbit.

MR. NESBIT:  Here.

THE COURT:  Donald McCormick.

MR. McCORMICK:  Here.

THE COURT:  Cynthia Boggess.

MS. BOGGESS:  Here.

THE COURT:  Benjamin McGowan.

MR. McGOWAN:  Here.

THE COURT:  Mary Ann Herring.

MS. HERRING:  Here.

THE COURT:  Nancy Hackney.

MS. HACKNEY:  Here.

THE COURT:  Jacqueline Holmes.

MS. HOLMES:  Here.

THE COURT:  Linda Harrell.

MS. HARRELL:  Here.

THE COURT:  Patsy Brandon.

MS. BRANDON:  Here.

THE COURT:  Gary Killion.

MR. KILLION:  Here.

THE COURT:  Billy Dean.

MR. DEAN:  Here.

THE COURT:  Stacey Donaldson.

Webster v. Lockett 021470

MS. DONALDSON:  Here.

THE COURT:  Kelvin Johnson.

MR. JOHNSON:  Here.

THE COURT:  And Linda Eidd.

MS. EIDD:  Here.

THE COURT:  That's correct?  Is it Eidd?

MS. EIDD:  (Nods head.)

THE COURT:  Are the parties satisfied that the correct jurors are in the box?

MR. ROPER:  The government is, Your Honor.

MR. KEARNEY:  The defense is, Your Honor.

THE COURT:  Then the Court so certifies.

As I told you at the beginning of this process, there are three oaths to be taken.  You've taken two, and it's now time for you to take the third oath, this one covering your service as actual jurors in the case.  So at this time each of you will stand and raise your right hand.

(Jury sworn by the Court.)

THE COURT:  You may be seated.

Was there anyone among you who was unable to answer "I do"?  And there was no one.

Please remember that when you leave the jury box and then return, to sit in the same chair you're in now so I can make sure who's here and who's not.

We're going to be here about two weeks, we think.  In the

Webster v. Lockett 021471

P. RENE/DIRECT/ROPER

THE COURT:  I'm sorry.

Would you please raise your right hand and be sworn.

(Witness sworn by the Court.)

THE COURT:  You may be seated in the witness chair.

MR. ROPER:  May it please the Court.

PEARL RENE,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ROPER:

Q.    Would you state your name for the judge and jury.

A.    Pearl Rene.

Q.    Okay.  You might want to pull that microphone back a little bit.

A.    (Witness complies.)

Q.    Ms. Rene, how old are you?

A.    23.

Q.    I want to take you back to September of 1994.  Where were you living?

A.    At 1526 Chukka Drive.

Q.    And is that a location of apartments known as the Polo Run Apartments?

A.    Yes, it is.

Q.    What was your particular apartment number?

A.    507.

Q.    Who did you live there with?

Webster v. Lockett 022285

P. RENE/DIRECT/ROPER

A.    My fiance and my little sister.

Q.    And what was the name of your little sister?

A.    Lisa Rene.

Q.    How old was she?

A.    She was 16.

Q.    How many other brothers and sisters do you have, Ms. Rene?

A.    Three.

Q.    Who would those be?

A.    Emily, Julie and Neil Rene.

Q.    Do you have a half-brother, also?

A.    Yes, I do.

Q.    What's his name?

A.    Stanfield Vitalis.

Q.    How long -- well, where did you grow up, ma'am, your family?

A.    I'm sorry?

Q.    Where did your family grow up?

A.    In the Virgin Islands.

Q.    In which particular islands?

A.    Saint Croix.

Q.    When did you come here to the United States to live?

A.    When?

Q.    To the mainland United States to live.

A.    In 1990.

Webster v. Lockett 022286

P. RENE/DIRECT/ROPER

Q.   And in September of 1994 where were you working?

A.   At a hotel, La Quinta Inn.

Q.   Okay.  What was your position there?

A.   I was a front desk supervisor.

Q.   And you said your sister was living there with you, Lisa. When did she come up to live with you there at the Polo Run Apartments?

A.   She came in early July of '94.

Q.   Prior to that had she lived in Saint Croix?

A.   Yes, she did.

Q.   And what was the purpose of coming up here that summer?

A.   She came on vacation.

Q.   When it came time at the end of the year -- the summer, did she stay or go back?

A.   She stayed.

Q.   Why did she stay?

          MR. KEARNEY:  Your Honor, object to relevance.

          THE COURT:  Overruled.

A.   She enjoyed it here.

BY MR. ROPER:

Q.   Did she enroll in school at that time?

A.   Yes, she did.

Q.   Now, I want to take you to Friday, September the 23rd, that day.  And on that date did your brother and stepbrother have occasion to leave and go anywhere?

Webster v. Lockett 022287

A.    Yes, they did.

Q.    And do you know where they went?

A.    No, I do not.

Q.    Did you go -- did you go with them?

A.    No, I didn't.

Q.    Was there any particular event happening in Houston that weekend?

A.    There was a Caribbean festival.

Q.    Okay.  And were there any plans about going to Houston that weekend?

A.    Yes, there were.

Q.    And what plans were made?  Could you tell the jury what those plans were?

A.    Stan and Neil and my fiance, Henry, drove to Houston.  I could not go because I had to go to work, and Lisa and I were to fly out the following day.

Q.    And that would be Saturday?

A.    That would be Saturday.

Q.    So they left on Friday?

A.    Right, Friday night.

Q.    Okay.  Let's move to Saturday, during the day Saturday. What time did you go to work?

A.    At 3:00.

Q.    Now, during the day Saturday were you at home?

A.    No, I wasn't.

Webster v. Lockett 022288

P. RENE/DIRECT/ROPER

Q.   Where was Lisa during the day Saturday?

A.   She was with me.

Q.   And where did you go that day?

A.   We went to the mall, and we just did little things, and we came back home about a quarter till 3:00.

Q.   And after that, what were the plans, your plans that day?

A.   Well, I had to go to work, and Lisa stayed home.

Q.   What was Lisa's plan?

A.   Nothing, she just stayed at home.  She had some homework to do.

Q.   After you got to work, did you talk to Lisa after that by phone?

A.   Yes, I did.

Q.   And when did she call you, or when did you talk to her by phone?

A.   It was around -- around 8:00 I called her to see how she was -- what she was doing, and she said she had just woken up from a nap and she was about to do her homework.

Q.   All right.  After you talked to her at that point, did you talk to her again by telephone?

A.   Yes, I did.

Q.   Tell the members of the jury what happened in that conversation.

A.   Well, Lisa called back after I had spoken to her a few minutes --

Webster v. Lockett 022289

P. RENE/DIRECT/ROPER

MR. KEARNEY:  Hearsay, Your Honor.

THE COURT:  Pardon?

MR. KEARNEY:  Hearsay.

THE COURT:  Overruled.

A.    Lisa called back after I had spoken to her a few minutes, and she was very frantic, and she told me to come home because someone was breaking into the house.

BY MR. ROPER:

Q.    You say she was frantic.  Describe for the members of the jury how you could tell her voice was -- describe it for the jury.

A.    She said, "Pearl, Pearl, come home, come home, someone's breaking in the door."

Q.    And what did you say?

A.    I said, "Hang up and dial 911."

Q.    And what did you do then?

A.    At that point I dropped the phone and I went straight home.

Q.    How long did it take you -- the La Quinta you worked at, can you tell the members of the jury where that's located?

A.    It's right off of 360 and Six Flags Drive.

Q.    And your -- the apartment, Polo Run, is off Cooper?

A.    Right.

Q.    So how long did it take you to get to the apartment?

A.    It took me approximately five minutes.  It's right off of

Webster v. Lockett 022290

P. RENE/DIRECT/ROPER

the freeway off of I-30.

Q.   Tell the members of the jury what you saw when you got there.

A.   When I got there, there were police officers outside the apartment.  And at that point I got out of my car and I ran towards them, and I asked them where was my sister, and they told me to stand back.  At that point I asked one of officers if he wanted my key, my key to the front door, and he said yes, and I gave it to him.  I ran back to the car and got it, and I gave it to him.

Q.   Did you ever see your sister, Lisa, when you came back?

A.   Excuse me?

Q.   Did you ever see your sister, Lisa, when you came back?

A.   No, I did not.

          MR. ROPER:  May I approach the witness?

          THE COURT:  You may.

BY MR. ROPER:

Q.   Ma'am, did your sister, Lisa, wear glasses?

A.   Yes, she did.

Q.   I want to show you what's been marked as Government's Exhibit Number 15, and ask if you can identify it?

A.   Yes.  Those are her glasses.

Q.   Did she have those on on September 24th, the last time you saw her?

A.   Yes, she did.

Webster v. Lockett 022291

factor or factors are themselves sufficient," et cetera. Anyone who doesn't follow that?

Then there follows a signature line for the presiding juror and a date line.

Decision Form D.  We, the jury, recommend by unanimous verdict a sentence of life imprisonment without the possibility of release and the usual lines.

Decision Form E.  We, the jury, recommend a sentence of life imprisonment without parole and signature lines.

Certification.  By signing below, each juror certifies that in considering whether a sentence of death is justified, consideration of the race, color, religious beliefs, national origin or sex of the defendant or the victim was not involved in reaching his or her individual decisions, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin or sex of the defendant or the victim were.  And then the signature line for each juror, including the presiding juror, and a date line.

Was there anyone among you who had a page left out? Sometimes the Xerox machine will miss a page.

I have allotted a considerable amount of time for the government and the defendants to -- defendant to argue because of the importance of the decision that you're about to make.

Webster v. Lockett 022845