# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF INDIANA

ORLANDO CORDIA HALL

*Petitioner*,

v.

T.J. WATSON, in his official capacity as Complex Warden of U.S.P, Federal Correctional Complex (FCC) Terre Haute,

*Respondent*.

No. **2:20-cv-599**

**Death Penalty Case**

**Execution Date: November 19, 2020**

## DECLARATION OF ROBERT C. OWEN
## PURSUANT TO 28 U.S.C. § 1746

I, Robert C. Owen, declare and state the following:

1. I am an attorney licensed to practice in Texas and Illinois and am a member in good standing of the bars of both states.

2. I hold a bachelor's degree in Comparative Literature (1984) and a master's degree in Speech Communication (1986) from the University of Georgia. I earned my J.D. degree at Harvard Law School (1989).

3. I am a criminal defense attorney and for the most part limit my practice to capital cases. I was first licensed as a lawyer in 1989. From 1995-1998, I served as an Assistant Federal Public Defender in Seattle, Washington, and in that role handled a wide range of non-capital matters in addition to a few capital cases. Other than during that interval, I have devoted almost my entire thirty-year legal career to defending clients facing the death

1

penalty, primarily in appellate and post-conviction litigation. I have done so in a variety of practice settings (in a non-profit law office, in a public defender agency, in a small private practice, in a law school clinic, in a solo practice). My cv (circa 2019) is attached as Exhibit 1.

4. In the current iteration of my practice, I directly represent individual clients in capital cases in state and federal court. By virtue of a contract funded by the Defender Services Division of the Administrative Office of the United States Courts, I also serve as a consultant and advisor to other attorneys handling such cases.

5. I have successfully argued four capital cases at the Supreme Court of the United States (*Tennard v. Dretke* (2004), *Abdul-Kabir v. Quarterman* (2007), *Brewer v. Quarterman* (2007), and *Skinner v. Switzer* (2011)). I am regularly invited to present at national training programs focusing on capital defense. I directed or co-directed death penalty defense clinics at the law schools of the University of Texas at Austin (1998-2012) and Northwestern University (2013-2019). In 2011, I received a medal from the Bar of the City of Paris (France) in recognition of my work in the struggle for human rights.

6. I have represented Orlando Cordia Hall since May 1999. I was initially appointed for Mr. Hall's initial post-conviction proceeding under 28 U.S.C. § 2255, as co-counsel to Marcia A. Widder. In that initial § 2255 proceeding, we filed three iterations of Mr. Hall's motion for relief (an initial motion, a first amended motion, and a second amended motion). Although we raised other complaints about the racially discriminatory character of the federal death penalty, none of those pleadings advanced a claim under *Batson v. Kentucky*, 476 U.S. 79 (1986).

2

7. Paul Macaluso was one of the Assistant United States Attorneys who prosecuted Mr. Hall at trial, and one role he played on the prosecution team was helping select the jury. In *Miller-El v. Dretke*, 545 U.S. 231 (2005), which was decided after Mr. Hall's § 2255 proceedings had concluded, the Supreme Court named Mr. Macaluso as having intentionally struck Black jurors on account of their race when he was a state-court prosecutor in Dallas County, Texas, and as having offered false pretextual reasons in defense of his conduct when required to account for it. This declaration addresses why, after *Miller-El*, Ms. Widder and I did not attempt to litigate a potential *Batson* claim in Mr. Hall's case to take advantage of the Supreme Court's having identified Mr. Macaluso as a *Batson* violator.

8. First, in our judgment there was no route, certainly no obvious one, for getting the *Batson* claim into court. By the time *Miller-El* was announced, Mr. Hall's initial post-conviction proceeding under 28 U.S.C. § 2255 had concluded in district court and was pending before the Fifth Circuit where we were seeking a Certificate of Appealability. It was not possible to inject the issue into the appellate proceedings at that stage.

9. Nor did we believe the *Batson* issue would support a motion in the Court of Appeals to authorize a successive application under § 2255. The relevant statute, 28 U.S.C. § 2255(h), appears to require either a showing of factual innocence or a newly minted and retroactive constitutional rule from the Supreme Court. A *Batson* claim would not have satisfied either of these criteria. First, we did not possess "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found [Mr. Hall] guilty." *See* 28 U.S.C. § 2255(h)(1). And *Miller-El* by definition could not have announced a

3

previously unavailable "new rule of constitutional law," *see* 28 U.S.C. § 2255(h)(2), because it arose on federal habeas review.

10. In the abstract, I can imagine conjuring up some other procedural vehicle in the convicting court by which we might have asserted Mr. Hall's *Batson* claim after *Miller-El*. Fed. R. Civ. P. 60(d)(1), for example, contemplates that a district court has the power to "entertain an independent action to relieve a party from a judgment, order, or proceeding." But even contemplating how we might reopen the proceedings in the Northern District of Texas was unlikely, given our deeply frustrating experiences litigating Mr. Hall's initial § 2255 action in that court.

11. To appreciate why, it is important to understand that from an advocate's point of view, the key to a post-conviction proceeding is investigating and developing facts outside the trial record to support the client's constitutional claims for relief. The ability to introduce such extra-record evidence is essentially what distinguishes such a proceeding from a direct appeal. When I was first contacted about the prospect of joining Mr. Hall's counsel team, I was enthusiastic about the idea. I had just completed three years as an Assistant Federal Public Defender and had a high opinion of the quality of judicial process typically afforded in federal court. I had never previously worked on a federal capital prosecution, although I had represented many death-sentenced state prisoners in Texas and Washington in seeking federal habeas relief. My experience led me to believe that there would be adequate resources available for fact-development in a § 2255 proceeding arising from a death penalty prosecution.

4

12. That expectation was not realized.  From start to finish, the district court in Mr. Hall's case resisted accommodating many of the most basic tasks of post-conviction fact development in a capital case.

13. Start with the fact that whether measured by the financial cost to the court or by the hours of services provided by trial counsel, Mr. Hall's trial was defended on the cheap.  Because his trial counsel spent far fewer hours preparing for trial than defense teams in comparable cases, the total cost of litigating Mr. Hall's case at the trial level fell far below that of comparable federal capital prosecutions.[1]

14. Mr. Hall's trial counsel claimed to have recognized from early in the case that there would be little dispute about Mr. Hall's guilt and thus that their energies should primarily be focused on developing the case for sparing his life.  But they nevertheless neglected basic social history investigation in favor of other tasks which, while essential to the defense (such as reviewing documents provided by the government in discovery), did not help them prepare for sentencing. Indeed, trial counsel did not begin investigating Mr. Hall's life history until jury selection was underway.

---

[1] The authoritative 1998 report of the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services, Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation ("FDPR") compiled data on the costs of defense services in federal capital prosecutions through 1997.  Using that data, one can show that the amount spent for legal services in Mr. Hall's case was only 65% of what was paid for such services in the average federal capital prosecution of the era ($139,800 in Mr. Hall's case, versus an average cost of $216,016).  And the sum authorized by the trial court for non-attorney fees (that is, for investigative and expert services) in Mr. Hall's case was just 47% of the average ($25,000 in Mr. Hall's case, versus an average of $53,143).  *See* FDPR at 22.  The FDPR (Chart C-7, "Average Number of Attorney Hours Billed in Capital and Non-Capital Homicide Cases") also shows that through 1997, the average amount of time billed by defense counsel in federal capital cases that went to trial was 1,889 hours, representing 409 hours of in-court time and 1,480 hours of out-of-court time. Mr. Hall's trial counsel, by contrast, billed a total of approximately 1,106 hours (59% of the average), representing approximately 229 hours of in-court time (56% of the average) and 877 hours of out-of-court time (59% of the average).

15. Thus, for me and Ms. Widder to provide Mr. Hall adequate representation in his § 2255 proceeding, we had to attempt to conduct the penalty-phase investigation trial counsel had never pursued, in order to develop a detailed account of Mr. Hall's background. Given that we could demonstrate objectively through the time and payment records of Mr. Hall's trial counsel that they had failed to perform this necessary foundational work, we anticipated that the trial court would be willing to support our efforts in that regard.

16. That is not how things turned out. At the outset of the case, the district court did authorize payment of up to $7500 for a fact investigator (not a mitigation specialist). That investigator's assistance in locating and interviewing certain witnesses related to the government's case in aggravation was essential to our work, but it could not substitute for assistance in developing the case in mitigation that should have been presented at trial. Moreover, the court required that the approved $7500 cover both fees and expenses (*i.e.*, the substantial costs associated with our fact investigator's travel from his residence in Texas to and around Arkansas, where many of the relevant witnesses were located).

17. In June 2000, after filing Mr. Hall's initial § 2255 motion and with permission to amend that motion at a later date, we sought funds to obtain appropriate expert assistance in completing the mitigation investigation. Specifically, we sought appointment and authorization for payment of Jill Miller, M.S.W., a forensic social worker with expertise in traumatic stress disorders and the investigation, development and presentation of mitigating evidence. Ms. Miller had sterling qualifications, including having been appointed to assist defense teams in at least eighteen federal capital cases in the preceding twelve years. Two months later, after we pleaded with the court to pay our fact investigator's travel expenses in full, the court closed the books altogether on money for

6

fact development: it ordered our fact investigator paid a grand total of $8,603.42, refused to appoint or pay Ms. Miller, and ruled that it would entertain no further requests for authorization to pay for investigation or experts.

18. With the court unwilling to support our fact-development efforts, we had to expend our own resources. Ms. Widder and I eventually paid a total of about $10,000 out of our own pockets to hire Ms. Miller (a figure significantly below the cost of the time she invested in the case, but all we could afford at the time). Ms. Miller in turn found a neuropsychologist who was willing to work for free as a favor to her, and who conducted an evaluation of Mr. Hall that produced useful results. I asked a colleague who was a criminal defense lawyer with a national reputation – Michael E. Tigar, who had headed the defense of Terry Nichols, co-defendant of Oklahoma City bomber Timothy McVeigh – to review the record and assess trial counsel's performance in light of prevailing national standards for capital defense practice. Professor Tigar likewise spent many hours on the case for which he was never compensated.

19. In addition to refusing to fund investigation and experts, the district court imposed unusual limitations on paying me and Ms. Widder for our legal work on Mr. Hall's case. For example, for any tasks we performed jointly (such as meeting with a witness together, or conferring by phone to discuss the case), we were required to bill at only half the applicable CJA rate, effectively meaning that anytime Ms. Widder and I worked together on the case, the court was paying only as much as it would have paid for a single lawyer. And in April 2002, the district court declared that from that point forward, it would not compensate me or Ms. Widder for any investigative work we performed to further develop Mr. Hall's claim

7

of ineffective assistance of counsel at sentencing. We sought mandamus relief from the district court's order in the Fifth Circuit but were unsuccessful.

20. The financial constraints imposed on our fact-development efforts would not have been as burdensome had the district court given us access to any of the traditional tools of discovery, which in habeas cases are available only if the court authorizes them. We made numerous and detailed requests but were granted no discovery whatsoever. We were never allowed to interview the trial jurors despite making repeated requests to do so, and despite the fact that information in trial counsel's files strongly suggested that a juror may have been exposed to extraneous information or influence during sentencing deliberations. Other information relevant to that allegation may have been contained in video footage of post-verdict juror interviews by local news media; our requests that the district court allow us to subpoena the footage were rejected. Nor were we permitted any discovery on any potential prosecutorial misconduct (FBI 302s suggested that federal agents may have had a previous relationship with a jail inmate who testified against Mr. Hall at sentencing), nor any information related to racial discrimination in the administration of the federal death penalty.

21. We fought tirelessly for a fair process in the district court, but our efforts were mostly futile. We sought a protective order when we anticipated that Mr. Hall's trial counsel would engage in ex parte communications with the government regarding the allegations in our ineffective assistance of counsel (IAC) claim. It was denied, and trial counsel predictably huddled with the government to prepare and file lengthy affidavits disputing our IAC claim. We were refused an evidentiary hearing on every claim in our petition but one: a juror misconduct issue, as to which the district court barred us from interviewing the

8

potentially implicated juror before she took the witness stand, and refused to let us speak with any other members of the jury or call them as witnesses. Unsurprisingly, the hearing produced no revelations. We were specifically denied an evidentiary hearing on our penalty-phase IAC claim despite the fact that telephone records we submitted to the court in seeking a hearing proved that a key claim in the affidavit submitted by one of Mr. Hall's trial attorneys was false.

22. We were discouraged when the district court denied relief on Mr. Hall's § 2255 motion in the late summer of 2004, but hoped we might persuade the Court of Appeals that the process had been inadequate to reliably resolve Mr. Hall's substantial allegations. Unfortunately, because the district court denied a Certificate of Appealability as to any of Mr. Hall's claims for relief, we were not entitled to a merits appeal and instead had to apply to the Fifth Circuit for a COA. Our first request to the Court of Appeals, to allow us to file an over-length COA application, was rejected. We cut down our application to a point at which the Fifth Circuit would accept it, but that was effectively the end of the process. There was no oral argument, and in the summer of 2006 the Fifth Circuit issued an opinion denying COA. Our cert petition challenging the Fifth Circuit's COA decision was denied on April 16, 2007.[2]

---

[2] My fee vouchers were cut for the work I performed on both the COA appeal in the Fifth Circuit and Mr. Hall's petition for writ of certiorari. The Fifth Circuit cut my payment for the appeal by 22% (I was paid a little over $19,000). The voucher I submitted for legal services performed with respect to Mr. Hall's cert petition fared worse. I initially sought payment for $6,797.10, and the Fifth Circuit balked, offering to pay me $5,639.80. I invested the time and effort to appeal, explaining why I felt the reduction was unwarranted. The Court responded to my appeal with a further reduction in payment. I surrendered and was paid a total of $4,133.50 for my work on Mr. Hall's cert petition – a cut of about 40%.

23. Many things about our experience litigating Mr. Hall's § 2255 motion in the trial court and the Fifth Circuit, thus, made it unlikely that we would try to devise some procedurally innovative way to get the *Batson* claim into one of those courts after *Miller-El*.

24. There were two other significant development in Mr. Hall's case around the same time as our initial 2255 proceeding came to an end. One was that in October 2007, we initiated a proceeding before the Inter-American Commission on Human Rights ("IACHR"), alleging violations of Mr. Hall's rights under Articles I, II, XVIII, XXV and XXVI of the American Declaration on the Rights and Duties of Man. The petition we filed drew on the work we had done in the 2255 proceedings and did not entail additional costs or investigation.

25. The other and ultimately much more significant development was that Mr. Hall became one of the plaintiffs in a civil suit filed in federal district court in the District of Columbia challenging the federal government's lethal injection protocol. That suit was filed in December 2005 as *Roane v. Gonzales*, No. 05-2337 (D.D.C). Mr. Hall moved to intervene as a plaintiff in In April 2007 (the same month cert was denied on our initial § 2255 proceeding). He also moved to enjoin the government from setting an execution date or carrying out his execution until the court had completed its review of the legality and constitutionality of the federal government's lethal injection protocol. The government did not oppose either request, and an injunction was entered. Two months later, the government moved to stay discovery pending litigation of dispositive motions, for judgment on the pleadings, and to lift the Plaintiffs' injunctions. The court nevertheless enjoined the government from setting an execution date for Mr. Hall, and the government did not appeal. As discussed below, that injunction remained in place for more than thirteen years, until September 20 of this year.

26. The law firm of Steptoe & Johnson, LLP, was recruited to represent Mr. Hall in the lethal injection litigation. Because Steptoe attorney Owen Bonheimer had interest and experience in international law, he offered to represent Mr. Hall on his petition to the IACHR. The firm's representation of Mr. Hall, however, was limited to those two matters.[3]

27. From those developments in the *Roane* litigation, Ms. Widder and I drew hope that for the foreseeable future, Mr. Hall would not be threatened by an execution date. That inference was strengthened, even if only slightly, when in July 2008 the IACHR granted precautionary measures on behalf of Mr. Hall. That is, the Commission officially requested that the United States refrain from executing Mr. Hall while it considered his claims of human rights violations. While that request did not carry the force of law, it did implicate the United States' relationship with and goodwill toward the other nations in the Organization of American States and thus had diplomatic significance, especially heading into the Administration of President Obama, who had promised to promote human rights. In our view, the IACHR's request to the U.S. government represented at least some pressure that might help discourage the government from attempting to proceed with Mr. Hall's execution, if other legal barriers fell away.

28. Later that year, however, another event occurred that raised questions about how long Mr. Hall would remain out of danger. In December 2008, the judge who had presided at Mr.

---

[3] In much the same fashion, a few years later the law firm of Sidley Austin LLP agreed to help us bring a successive habeas challenge to Mr. Hall's conviction for violating 18 U.S.C. § 924(c) based on then-recently-decided cases from the U.S. Supreme Court. Although Sidley attorneys also assisted us in making a request that then-President Obama grant clemency to Mr. Hall, the firm never agreed to take on Mr. Hall as a client for any other or subsequent matters, and indeed today continues to limit its work on Mr. Hall's behalf to the ongoing § 924(c) litigation.

Hall's trial abruptly issued an order giving the government thirty days to show cause why "the death sentence imposed by this Court has not been carried out." Order to Show Cause, *United States v. Hall*, No. 4:94-CR-121-Y(2), Doc. 1190 (Dec. 10, 2008). The government filed a response describing the lethal injection litigation underway in the District of Columbia and explaining that the court there had enjoined Mr. Hall's execution while that case was being litigated. Government's Response to Order to Show Cause, *United States v. Hall*, No. 4:94-CR-121-Y(2), Doc. 1191 (Jan. 8, 2009).

29. The combination of the pressure from the trial judge and ongoing developments in the Roane lethal injection litigation in D.C. raised concerns that we should begin preparing for possible clemency proceedings in Mr. Hall's case. Accordingly, in November 2009 we moved the trial court to authorize funds to enable us to prepare a clemency application on Mr. Hall's behalf. *See* Defendant's Motion for Authorization for Funds to Prepare Clemency Application to the President of the United States and Brief In Support, *United States v. Hall*, No. 4:94-CR-121-Y(2), Doc. 1192 (Nov. 2, 2009). Perhaps unsurprisingly, given our experience with funding applications to the trial court, that motion was denied outright in short order. *See* Order Denying Defendant's Motion for Authorization for Funds to Prepare Clemency Application to the President of the United States, *Hall v. United States*, No. 4:00-CV-422-Y, Doc. 4 (Dec. 10, 2009).

30. For more than a decade after that denial of funds, Mr. Hall remained protected from the setting of an execution date by the longstanding injunction in the *Roane* lethal injection case. Because of that fact, Ms. Widder and I never felt an overriding urgency to try to find a vehicle by which we could bring Mr. Hall's *Batson* claim to court, nor did we have any

12

expectation that we would be compensated for doing so, or receive authorization for funding.

31. Moreover, during the decade that preceded the lifting of that injunction in September 2020, I continued to be heavily involved in litigating both Texas state-court death penalty cases, including numerous cases with imminent execution dates, and federal death penalty matters, even as I worked full-time as a clinical professor of law (first at the University of Texas at Austin and then from 2013-2019 at Northwestern Law in Chicago). Between teaching, academic service, and litigating active cases (and supervising law students working under my direction), my professional life was very full. If a death penalty case in which I was counsel was dormant for any period of time, I did not look that gift horse in the mouth but instead tended to the other capital cases on my docket that needed urgent attention.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 17, 2020

_____
Robert C. Owen

13

# EXHIBIT 1

*Curriculum vitae* of Robert C. Owen, Esq. (2019)

*Curriculum Vitae*
**Robert C. Owen**

---

Law Office of Robert C. Owen, LLC
53 W. Jackson Blvd., Ste. 1056
Chicago, Illinois 60604
(512) 577-8329
robowenlaw@gmail.com

## Education

Harvard Law School                                        J.D. *magna cum laude*, 1989
Cambridge, Massachusetts

University of Georgia                                                M.A., 1986
Athens, Georgia                                        (Speech Communication)

University of Georgia                                A.B. *summa cum laude*, 1984
Athens, Georgia                                        (Comparative Literature)

## Selected Capital Litigation Activities

In the United States Supreme Court, argued and won four death penalty cases (*Tennard v. Dretke* (2004); *Abdul-Kabir v. Quarterman* (2007); *Brewer v. Quarterman* (2007); *Skinner v. Switzer* (2010)).  Participated in litigating five other death penalty cases; wrote four amicus briefs; filed over 50 petitions for *certiorari*.

Represented over 50 prisoners facing the death penalty in Texas, Washington, Arkansas, and the federal system.

Represented Ernest Willis, exonerated from Texas' Death Row.

Have represented five prisoners on the federal Death Row.

Presented more than a dozen oral arguments in the United States Courts of Appeals for the Fifth and Ninth Circuits, the Court of Criminal Appeals of Texas, and the Arkansas Supreme Court.

Presented argument at the Inter-American Commission on Human Rights.

Prepared more than 20 petitions for clemency.

Owen CV - 1

## Legal Experience

### Law Office of Robert C. Owen, LLC

(Chicago, Illinois)                                                    10/19 - present

Solo practitioner engaged primarily in appellate and post-conviction defense of criminal cases in state and federal court. Serve as contractor with Administrative Office of the U.S. Courts, consulting with appointed and *pro bono* counsel representing death-sentenced Texas prisoners in federal habeas corpus proceedings.

### Owen & Rountree, L.L.P.

(Austin, Texas)                                                        10/98 - 9/13

Partner in small firm engaged primarily in appellate and post-conviction defense of criminal cases in state and federal court.

### Assistant Federal Public Defender for the Western District of Washington

(Seattle, Washington)                                                  10/95 - 10/98

Represented indigent citizens accused of federal crimes at all phases of trial from initial appearance through appeal. Litigated federal habeas corpus matters (capital and non- capital) in federal district court and on appeal.

### Litigation Director, Texas Resource Center

(Austin and Houston, Texas)                                            5/95 - 9/95

Supervised and directed all state and federal post-conviction death penalty litigation conducted by Resource Center attorneys. Determined budgets for litigation-related expenses.

### Senior Staff Attorney, Texas Resource Center

(Austin, Texas)                                                        1/93 - 5/95

Represented indigent Death Row prisoners in all phases of state and federal post-conviction proceedings; trained and supervised less experienced staff attorneys; supervised TRC's Trial and Appeal Project.

### Assistant Public Advocate, Kentucky Dept. of Public Advocacy

(Frankfort, Kentucky)                                                  8/92 - 1/93

Member of Capital Trial Unit, three-lawyer team responsible for statewide defense of capital cases at trial.

### Staff Attorney, Texas Resource Center

(Austin, Texas)                                                        6/89 - 8/92

Represented indigent Death Row prisoners in state and federal post-conviction proceedings. Wrote pleadings and briefs, conducted evidentiary hearings, and did factual investigation.

Owen CV - 2

## Teaching Experience

**Clinical Professor, Northwestern Pritzker School of Law**                    9/13 - 8/19

Directed the Center on Capital Defense in the Bluhm Legal Clinic.  Taught clinical courses and supervised law students who assisted in work on pending capital cases.

**Clinical Professor, University of Texas School of Law**          9/06-8/11 and 8/12-8/13

Co-directed Capital Punishment Center.   Taught numerous classroom courses on the law governing capital punishment (*e.g.*, *Capital Punishment*, *Advanced Topics in Capital Punishment Law*, *The Right to Counsel and the Death Penalty*). Taught clinical courses and supervised law students who assisted in work on pending capital cases.

Taught freshman seminar in the (undergraduate) Plan II Honors Program on the cultural life of capital punishment.

**Visiting Clinical Professor, Northwestern University School of Law**          **9/11 to 8/12**

Taught clinical course and supervised law students who assisted in work on pending capital cases.

Taught *The Modern Death Penalty in America: Doctrine and Reality* (seminar on capital punishment law open to second- and third-year students).

**Adjunct Professor, University of Texas School of Law**                    **9/98-9/06**
**(half-time appointment)**

Co-taught clinical course and supervised law students who assisted in work on pending capital cases. Taught lecture course on the law of capital punishment. From 2002, developed and taught Plan II honors seminar on the cultural life of capital punishment.  In 2005, taught three Plan II seniors in a year-long "conference course" (seminar) on racial discrimination and capital punishment.

## Publications

Owen, Robert C., and Meredith Martin Rountree. "Overlooked Guidelines: Using the Guidelines to Address the Defense Need for Time and Money," 41 HOFSTRA LAW REVIEW 623-634 (Spring 2013)

Owen, Robert C.  "Absolute Power, Absolute Corruption," in Paul Wright and Tara Herivel, eds., PRISON NATION: THE WAREHOUSING OF AMERICA'S POOR (2003).

Owen, Robert C., and Melissa Mather.  "Thawing Out the 'Cold Record': Some Thoughts On How Videotaped Records May Affect Traditional Standards Of Deference On Direct And Collateral Review," 2 J. APP. PRAC. & PROCESS No. 2 (Summer 2000).

Owen CV - 3

## Honors and Recognitions (2010 - present)

Received medal from the Bar of the City of Paris, France, for work in defending human rights, 2011.

Recognized as "Appellate Lawyer of the Week" by the National Law Journal, 2010.

## Selected Invited Presentations (2012-present)

### *Legal Audiences (2012 – present)*

*Presentations on Supreme Court Litigation*

"Litigating in the Supreme Court of the United States," presentation at new attorney training for the State of Texas's Office of Capital and Forensic Writs (state capital post-conviction public defender agency), September 2018

Faculty, Anthony G. Amsterdam Supreme Court Advocacy Institute (sponsored by the Administrative Office of the U.S. Courts), 2014, 2015, 2016, 2017.

"The Basics of Supreme Court Practice," Annual Western All-Star Conference (sponsored by the Idaho State Public Defense Commission), 2016

"Top Ten Supreme Court Death Penalty Opinions You Need To Know." Capital defense training sponsored by the Washington Death Penalty Assistance Counsel, 2013

*Presentations on Habeas Procedure and Appellate Practice*

"*Martinez* Developments," National Federal Habeas Corpus Seminar, sponsored by the Administrative Office of the U.S. Courts, 2019

"Brainstorming Beyond Cert: Post-§ 2255 Litigation," Annual Conference of the Federal Capital Habeas Project, 2019

"Litigating Claims of Ineffective Assistance of Counsel" and "Improving Your Persuasive Writing," presentations at new attorney training for the State of Texas's Office of Capital and Forensic Writs (state capital post-conviction public defender agency), September 2018

"Post-§2255 Litigation and Advocacy," training sponsored by the Administrative Office of the U.S. Courts, 2015, 2017.

"Recent Developments in Federal Habeas Corpus Law and Practice," at "After the Appeal: Personal Restraint Petitions and Federal Habeas Corpus Relief," training sponsored by the Federal Public Defender for the Western District of Washington and the Washington Defender Association, 2015.

"Overcoming Barriers to Claim Consideration," National Federal Habeas Corpus Seminar,

Owen CV - 4

sponsored by the Administrative Office of the U.S. Courts, 2014.

"Litigating State Misconduct," National Federal Habeas Corpus Seminar, sponsored by the Administrative Office of the U.S. Courts, 2014.

*Presentations on Trial Practice*

Faculty, Annual Capital Case Seminar, Los Angeles County Public Defender's Office, 2012.

Faculty, "Bring-Your-Own-Case" capital trial defense training, sponsored by the National Consortium for Capital Defense Training and the National Association of Criminal Defense Lawyers, 2012.

*Academic Audiences (2012-present)*

Panelist, "A Retrospective on the Modern Era of the Texas Death Penalty," at "The Death Penalty in Texas: Past, Present, and Future," held at the School of Law of the University of Texas at Austin, 2019

Panelist, "The Significance of Mitigation to American Death Penalty Practice," at "Mitigation Advocacy," held at the School of Law of the University of Texas at Austin, 2018

Panelist, "Transformation of Capital Systems: Appellate and Post-Conviction Litigation," at "Forty Years After *Gregg v. Georgia*: A National Conference on the Death Penalty," held at the School of Law of the University of Texas at Austin, 2016

Served as faculty for three-day training in Addis Ababa, Ethiopia, for clinical law professors from Ethiopian law schools (presented by Addis Ababa University and supported by funding from the Royal Danish Embassy), 2015

Discussant, "Same Effects, Same Causes: Comparing/Contrasting Punitiveness in the Capital and Non-Capital Realms," at "Mass Incarceration and the Death Penalty," symposium sponsored by the Capital Punishment Center, School of Law, University of Texas at Austin, 2013.

Panelist, "Lynching's Legacy and Contemporary Capital Practice," at "Lynching and the Death Penalty," a symposium sponsored by the Capital Punishment Center, School of Law, University of Texas at Austin, 2012.

## Professional Service, Activities, and Memberships

National Association of Criminal Defense Lawyers

Washington State Committee To Examine Death Penalty Representation (Member of blue ribbon committee, headed by Washington Supreme Court Justice Richard Guy, which drafted new

Owen CV - 5

appellate and trial rules to govern death penalty cases), 1996-1998.

Washington State Death Penalty Representation Panel (Member of five-person body with statewide jurisdiction appointed by Washington Supreme Court to assess qualifications of attorney applicants seeking appointment in death penalty cases), 1998.

**Bar admissions**

Illinois (all state courts); Texas (all state courts); United States District Courts (Northern, Southern, and Western Districts of Texas); United States District Court for the Northern District of Illinois; United States Courts of Appeals (Fifth and Ninth Circuits); Supreme Court of the United States.

Owen CV - 6