# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| ORLANDO CORDIA HALL<br><br>                    *Petitioner*,<br><br>          v.<br><br>T.J. WATSON, in his official<br>capacity as Complex Warden of U.S.P,<br>Federal Correctional Complex (FCC) Terre<br>Haute,<br><br>                    *Respondent*. | **No. 2:20-cv-599**<br><br>**<u>Death Penalty Case</u>**<br><br>**Execution Date:**<br>**November 19, 2020** |

**DECLARATION OF MARCIA A. WIDDER**
**PURSUANT TO 28 U.S.C. § 1746**

I, Marcia A. Widder, declare and state the following:

1.      My involvement in Mr. Hall's case dates back to early 1997. Six or so months after I completed a two-year judicial clerkship for the Honorable James L. Dennis, my former mentor at the Loyola Death Penalty Resource Center in New Orleans, R. Neal Walker, asked me if I would be interested in working on a federal capital appeal to which he was being appointed. I began reading the record once it was sent to me, with the understanding that I would be focusing on sentencing phase issues, while Mr. Walker focused on issues pertaining to jury selection. Michael Ware, one of the trial attorneys, remained on the case and planned to write up sections of the brief addressing the admissibility of Mr. Hall's confessions and the district court's denial of a motion to continue the trial.

2.      Shortly after I began working on the case, Mr. Walker was struck by a car and almost killed. With the assistance of Federal Resource Counsel attorneys Kevin McNally and, I believe, David Bruck, I filed a motion asking to be appointed under the Criminal Justice Act

and took over as lead counsel on the case, with the understanding that Federal Resource Counsel would oversee my work due to my lack of experience. Mr. Hall received a few extensions of time in which to file his brief, and Mr. Walker recuperated sufficiently to draft portions of the brief addressing cause challenges.

3.      The direct appeal brief that was eventually filed did not contain a claim that the prosecutors' use of peremptory challenges to remove Black jurors on the basis of their race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  While it is my professional belief and opinion that the transcript of Mr. Hall's trial contains strong evidence of racial bias by the government during jury selection, I also am aware that (i) until its post-*Miller-El II* decision in *Reed v. Quarterman* in 2009, the Fifth Circuit  had never granted relief in a case raising a *Batson* challenge (including in the case of Mr. Miller-El himself) and (ii) courts often have required "something more" than a trial record to find a *Batson* violation and/or to make the weighty determination that a prosecutor's proffered justifications for the exercise of peremptory strikes were pretextual.  Until the evidence concerning Paul Macaluso and the Dallas County Prosecutor's Office and its "Sparling Manual" came to light in *Miller-El II*, we did not have that "something more" (and even if we had, would have been barred from introducing such evidence on direct appeal).  Part of appellate counsel's job is "winnowing out weaker claims on appeal and focusing on those more likely to prevail . . . ." *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).

4.      While it is my view that the *Batson* claim in Mr. Hall's case is strong based on the trial record alone, given the Fifth Circuit's jurisprudence on this issue, it is my opinion that had Mr. Hall raised a *Batson* claim on appeal or in a post-conviction petition at that time, however, it almost certainly would have lost, just as his co-defendant Bruce Webster's claim would later lose, in the Fifth Circuit. *See United States v. Webster*, 162 F.3d 308, 348-50 (5th Cir. 1998). It appears that, until 2009, not a single criminal litigant had ever succeeded on the

merits of a *Batson* claim in the Fifth Circuit. *See Chamberlin v. Fisher*, 885 F.3d 832, 846 (5th Cir. 2018) (Costa, J., dissenting) (observing that "only two of the hundreds of *Batson* decisions in our circuit have ever found that a strike was discriminatory (a few others vacated convictions based on procedural error in application of the *Batson* framework") (citing *Hayes v. Thaler*, 361 Fed. Appx. 563 (5th Cir.2010), and *Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009)).

5.      In June 2005, nine or so months after the district court had denied Mr. Hall's § 2255 motion, the United States Supreme Court issued its decision in *Miller-El v. Dretke*, 545 U.S. 231 (2005) (*Miller-El II*). In that case, the Supreme Court reversed the Fifth Circuit's denial of relief on a *Batson* claim, expressly finding that Dallas County prosecutor Paul Macaluso had struck Black jurors because of their race. *See* 545 U.S. at 264; *see also id.* at 248-50, 256 (mentioning Paul Macaluso's name ten times). As the Court explained in that case, the Dallas County District Attorney's Office, during the time Paul Macaluso worked there, used a jury selection training manual that "outlin[ed] the reasoning for excluding minorities from jury service." *Miller-El v. Dretke II*, 545 U.S. at 264 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 334-35 (2003) (*Miller-El I*)). *See also Miller-El I*, 537 U.S. at 335 (explaining that a separate circular distributed to attorneys in the Dallas County prosecutor's office "instructed its prosecutors to exercise peremptory strikes against minorities: 'Do not take Jews, Negroes, Dagos, Mexicans or a member of any minority race on a jury, no matter how rich or how well educated.'").[1]

6.      By the time *Miller-El II* was decided, it was too late to amend Mr. Hall's § 2255 motion to add a *Batson* claim—his case was already pending in the Fifth Circuit. *See, e.g.*, *Gonzalez v. Crosby*, 545 U.S. 524, 531 (2005) ("Using Rule 60(b) to present new claims for

---

[1] Following *Miller-El II*, moreover, the Fifth Circuit found that Paul Macaluso had struck Black jurors on the basis of race in another Texas capital trial, relying heaving on the similarities between that case and *Miller-El II*, including the fact that Paul Macaluso was the prosecutor in both cases. *Reed*, 555 F.3d 364. .

relief from a state court's judgment of conviction—even claims couched in the language of a true Rule 60(b) motion—circumvents AEDPA's requirement that a new claim be dismissed unless it relies on either a new rule of constitutional law or newly discovered facts. § 2244(b)(2).").

7.      The only argument that Mr. Hall's trial lawyers had made at the *Batson* colloquy following jury selection was identifying the six Black prospective jurors who had qualified after voir dire and the four the prosecutors had struck with peremptory challenges. *See* Pet. Exhibit 12, ECF No. 1-11.  At the direct appeal stage, Mr. Walker had not himself conducted any analysis of the *Batson* issue. It was, in other words, a completely undeveloped claim.

8.      I know from experience that working up a *Batson* claim requires a significant investment of time. "[I]n considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (quoting *Miller-El II*, 545 U.S. at 239). *See also, e.g.*, *Foster v. Chatman*, 136 S. Ct. 1737, 1748 (2016) ("As we have said in a related context, '[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial . . . evidence of intent as may be available.'") (citation omitted). In Mr. Hall's case, that included careful review of the 11-volume voir dire and a banker's box of juror questionnaires in order to be able to undertake the comparative juror analysis that is "a centerpiece of the *Batson* analysis." *Boyd v. Newland*, 467 F.3d 1139, 1150 (9th Cir. 2006). *See, e.g.*, *Flowers v. Mississippi*, 139 S. Ct. 2228, 2248-51 (conducting comparative juror analysis of prosecutor's strike of one Black juror); *Foster v. Chatman*, 136 S. Ct. 1737, 1749-54 (conducting comparative juror analysis of prosecutor's strike of two Black jurors); *Snyder*, 552 U.S. at 483-84 (conducting comparative juror analysis of prosecutor's strike of one Black juror); *Miller-El II*, 545 U.S. at 241-52 (engaging in extensive comparative juror analysis of the prosecutor's strikes against two Black jurors); *see*

*also Chamberlain*, 885 F.3d at 849 (Costa, J., dissenting) ("Comparative juror analysis is a tool that helps determine whether this disproportionate exclusion of black jurors was the extraordinary coincident it would take to defy the[] odds" of randomly striking a greatly disproportionate number of Black jurors).

9.      Further, until the Seventh Circuit decided *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc), there did not appear to be any procedural avenue for raising Mr. Hall's *Batson* claim. By that time, however, Mr. Hall was protected from getting an execution date by a preliminary injunction entered in 2007 in lethal injection litigation pending in the District of Columbia District Court. *See* Order, *Roane v. Gonzales*, No. 1:05-cv-02337-TSC (June 11, 2007), ECF No. 68. And also, by that time, I was working full-time at the Georgia Resource Center representing Georgia's condemned in federal habeas proceedings, clemency proceedings, and warrant litigation. At the Resource Center I have a full, really over-full, case load of habeas cases brought under 28 U.S.C. § 2254, which are pending in various federal courts. *See* Curriculum Vitae, attached as Exhibit 1.  I have, additionally, since the time *Webster* was decided, been a key participant in warrant litigation undertaken on behalf of seven Georgia prisoners who received execution dates, all but one of whom was ultimately executed. All of which is to say that, once *Webster* provided a potential path to litigate Mr. Hall's racial discrimination claims, I was not in a position to expend the resources to develop those claims, particularly in light of the fact that Mr. Hall was protected against execution. He remained insulated from execution until September 20, 2020, when the district court denied relief on all claims in the lethal injection litigation and lifted the preliminary injunction.

10.      Since Mr. Hall's § 2241 petition was filed last week, I have obtained copies of the voir dire conducted in the case of Mr. Hall's co-defendant Bruce Webster. Mr. Webster was tried several months after Mr. Hall by the same set of prosecutors, including Paul Macaluso. I did not receive electronic copies of the Webster voir dire until late in the day on

November 13. I have since reviewed the transcripts to identify the jurors who were questioned, the prosecutor who conducted the voir dire, and the ultimate status of each jurors.

11.    According to my review of the transcripts, 86 prospective jurors were questioned during voir dire to seat the jury and five alternates. Paul Macaluso questioned 41, Richard Roper questioned 40, and Delonia Watson questioned one. Four prospective jurors were excused after the court questioned them. Each side exercised 20 peremptory strikes to seat the jury and 3 strikes to seat alternates. At the conclusion of voir dire, the parties appear to have exercised blink strikes. The strike sheets are attached as Exhibit 2.

*12.*    After the jury was struck, but before the alternates were selected, the defense raised a *Batson* challenge, arguing that the prosecution had used peremptory challenges to remove all five qualified Black jurors and one Asian juror. *Webster*, Vol. 15 at 3 (attached as Ex. 3). The defense identified the struck Black jurors as Ernestine Goss (No. 3), Miles Nelson (No. 49), Herman Dean Mallory, (No. 69), Phyllis Williams (No. 89), Larry Charles Reed (No. 103), and the struck Asian juror as Ai-Lien "Duong"[2] (No. 123). *Id.* at 4. According to the defense, the only minority member of the jury was Ms. Gonzales, who was Hispanic. *Id.*

13.    The district court expressed doubt that this established a prima facie case, but ordered the government to provide race neutral reasons for its strikes. *Id.* AUSA Roper indicated he would provide reasons, but asked the Delonia Watson be allowed to supplement them because she had taken notes throughout the voir dire, but was not able to attend court that day. *Id.* at 4-5. Ms. Watson was permitted to supplement the record two days later, on April 4, 1996. *See Webster*, Vol. 15 (attached as Ex. 4).

14.    I do not currently have the material necessary to conduct a thorough and complete analysis of the *Batson* claim raised in Mr. Webster's case. For instance, I do not have

---

[2] Based on the transcript of her voir dire, it appears the juror's last name was "Dunong." Vol. 12 at 133.

the jury questionnaires, so do not know the racial makeup of the pool of prospective jurors who

were examined and cannot conduct a meaningful comparative-juror analysis. However, AUSA

Roper (the other AUSA who, along with Paul Macaluso, picked the jury in Mr. Hall's case)

gave reasons for striking two minority jurors that are in fact racist on their face. He explained

that he had that he struck juror Ai-Lien Dunong, because she might not be able to understand

"Black" English:

> I think though she could under and communicate, I think she wouldn't
> understand southern black – we're going to have co-defendants testify that have
> a definite accent, I think, kind of a southern dialect, and I think it would just
> make it almost impossible for her to hear, and I'm afraid she would miss that
> crucial testimony and she wouldn't be able to render a decision. Otherwise, I
> thought she was qualified.

15:6.

15.    On its face, the prosecutor's response that Ms. Dunong would not understand

"southern black" is race-based and reveals a discriminatory viewpoint that colors all the

prosecutor's explanations. *See, e.g.*, *State v. Tomlin*, 384 S.E.2d 707, 710 (S.C. 1989)

(prosecutor's explanation that he struck juror who "'shucked and jived' to the microphone"

relied on a "racial stereotype [that] evidence[d] the prosecutor's subjective intent to

discriminate" in violation of *Batson*); *United States v. Wilson*, 884 F.2d 1121, 1124 (8th Cir.

1989) ("Where as here the testimony of the prosecutor indicates a stereotypical racial reason

for striking the potential black juror Brooks, the district court's finding that "race was not in

any way a factor" in the Government's exercise of its challenge receives no support from the

record. The prima facie case of discrimination has not been overcome.").

16.    Moreover, when one reviews Ms. Dunong's voir dire, it seems dubious at best

that she would have appreciably more trouble understanding witnesses than anyone else. She

testified that she was born in Vietnam, came to this country when she was 21, and was

naturalized in 1985. Vol. 12 at 136.[3]  In Vietnam, she had worked as a language teacher for an American minister. *Id.* She had studied engineering at two American universities located in the South – the University of Arkansas and the University of Alabama, and had worked for a tech company performing oil and fuel analysis for a variety of companies in the United States, including Union Pacific Railroad. *Id.* at 145-46, 147-49. Her work involved both oral and written communication with other people at various stations in the United States. *Id.* at 149-59. Ms. Dunong recalled the case from hearing about it once on the radio (presumably in English), but testified that would not influence her decision as a juror. *Id.* at 137-39. Although the transcript of her testimony corroborates that she was a non-native speaker, it also shows that she appropriately answered the questions posed to her by the court, the prosecutor, and defense counsel, and asked appropriate questions of her own. *See id.* at 133-51.

17.    AUSA Roper also relied on racial stereotyping to explain his strike of prospective juror Phyllis Williams, who he claimed the government struck, in part, because she "had two children, apparently out of wedlock," aged 17 and 22, but "didn't mention she was divorced" and "[i]t's apparent from the questionnaire that they were born out of wedlock." Vol. 15 at 17-18. In addition, Roper went on, "she's still living with someone." *Id.* at 18. Roper claimed that he was "not trying to be a moralist," and instead just felt that she was "not consistent" and "there's a good chance that she's not walking the walk. She's talking the talk," because Ms. Williams also reported that "she listens and donates money to Cleflo Dollar, an evangelist" and "her lifestyle is not consistent" with Cleflo Dollar's "real conservative minist[ry]." *Id.*

---

[3]  The transcripts of the *Webster* voir dire are voluminouis. I reviewed them quickly to determine what happened to each of the jurors and which prosecutor questioned each juror, and then took a closer look at some of the jurors subject to *Batson* challenges. In order to avoid overwhelming the Court with additional transcripts, the voir dire transcripts (other than the *Batson* colloquy and the Watson supplement) are not attached here. They are, however, in the government's possession and can be made available to the Court upon request.

18.     The image of Ms. Williams as an unwed mother, living in sin, is a racial stereotype. *See, e.g.*, *Kesser v. Cambra*, 465 F.3d 351, 369 n.6 (9th Cir.2006) (prosecutor's explanation that he struck Asian woman because "'she was somewhat insecure and she impressed me as a woman who would walk two steps to the left and one to the rear'" and "'put up with a great deal from her husband,'" about whom she did not testify, "smacks of racial and ethnic stereotypes of the subservient Asian woman"); *Tomlin*, 384 at 710 (prosecutor's claim to strike 43-year-old Black woman "because she walked slow, talked low, and might not be able to withstand the trial" and trial court's "suggest[ion] that [she] had a lack of education, was extremely sluggish and . . . would be a 'filler' if seated on the jury" were "racial stereotypes" violating *Batson*). It thus cannot serve as a legitimate basis for the strike and its patently racist nature should carry significant weight in addressing the rest of the prosecutor's proffered reasons. Indeed, the prosecutor's additional reasons for striking Ms. Williams appear pretextual in light of her voir dire testimony based on the record I have been able to review.

*19.*     AUSA Roper claimed that he struck Ms. Williams because (1) she had relatives in Pine Bluff and El Dorado, Arkansas, where the case was "real big news" and he worried that her relatives "are going to end up calling her and talking to her about it, and she's going to have a lot of pressure put on her"; (2) that "[s]he did put down a couple of real answers to the questions in her [questionnaire] chart that caused me a bunch of concern, and I asked her about those and her answers to me were kind of meek" and "not very strong" and "I got the impression she's kind of meek, and I just feel like the pressure sitting on the jury, when it got right down to it, all of us . . felt like she would have a problem in this case, especially if it turns out there was some kind of outside influence"; and (3) her cousin murdered his girlfriend and got five years, although she did testify that she thought he should still be in jail." Vol. 15 at 15-17. After detailing her presumed out-of-wedlock motherhood, Roper noted that she had listed Reverend Jesse Jackson as someone she respected and that "Mr. Macaluso said that he thought that her

answers were very weak and meek, and . . . don't evidence somebody that could come back and really make a strong decision on the death penalty in a case such as this." *Id.* at 18. The district court accepted these as race neutral reasons "sufficient to overcome any prima facie case, if it has been made, to suggest it was based on race," and overruled the objection. *Id.*

20.    Notably, Ms. Williams testified that she supported the death penalty and felt it served a purpose because "it would give other people – they will think more before they do that" and "no one has the right to take any else's life." Vol. 9 at 121. She testified that she could sign her name to a verdict "knowing that it would result in the death some day of another human being" and that she had no hesitation about her ability to do that in an appropriate case: "Yes, I could do that." *Id.* at 121-22. She also testified that the availability of life without the possibility of release would not change that—"If they took a person's life or whatever, if that is the case, if they get the death penalty, I think they deserve it."—and agreed she meant she could still consider the death penalty even if life was an option. *Id.* at 122-23.

21.    When AUSA Roper asked her about her cousin's murder conviction, she explained:

> It's been at least 22, 23 years maybe. * * * He [was prosecuted and] went to prison and he's out. * * * I feel that he still should be in there. He admitted to doing it. He really should be there. I don't think he should have been let out. I mean, he wasn't really in there that long, maybe five years, and I really don't think he should be out, period.

*Id.* at 123. She testified that her cousin's prosecution would not impact her ability to be fair. *Id.* The prosecutor asked Ms. Williams *zero* questions about her marital status or motherhood, or how it related to listening to Cleflo Dollar (if she in fact so stated in her questionnaire). When defense counsel questioned her about her connections to Pine Bluff, where Bruce Webster was from, she testified it had been 19 years since she had last been there. *Id.* at 126.

22.    Nothing in Ms. Williams actual testimony indicates that she was "meek" or "weak." Rather, she provided thoughtful responses to questions and was not afraid to ask defense counsel to clarify one of his questions. *See id.* at 130. Moreover, the prosecutor's suggestion that Ms. Williams would somehow cave in to pressure from Pine Bluff relatives about the case is predicated on the wholly unsubstantiated inference that she would violate her oath as a juror by advertising her status on the jury and then talking about the case with others. There was no reason to suspect that she would do so and such suspicions would have been grounds for challenging her for cause.

23.    Based on my 20+ years of experience doing capital appellate and habeas work, it is my opinion that the Fifth Circuit Court of Appeals would have conducted a very different analysis of the voir dire had they known of Paul Macaluso's shameful track record at the time of Mr. Webster's direct appeal. *See United States v. Webster*, 162 F.3d 308, 350 (5th Cir. 1998) (concluding that the district court did not clearly err in overruling the *Batson* objections and noting that "Webster offers no direct evidence of purposeful discrimination" and that his comparative juror analysis was unavailable because the jurors "had different combinations of qualities, and some had more government-desired qualities than did the jurors the government preempted"); *cf. Reed v. Quarterman*, 555 F.3d 364, 382 (5th Cir. 2009) ("One of the same lawyers that conducted the voir dire in *Miller-El*'s case, Paul Macaluso, also questioned prospective jurors for Reed's trial."); *id.* (considering "the historical evidence of racial bias among the[] prosecutors," including Macaluso, the "we view this exact same evidence as persuasive here.")

I declare under the penalty of perjury of perjury under the laws of Georgia that the foregoing is true and correct and was executed this 17th day of November in Atlanta, Georgia.

Marcia A. Widder

Marcia A. Widder

# EXHIBIT 1

**MARCIA A. WIDDER**
Georgia Resource Center
104 Marietta Street NW, Suite 260
Atlanta, GA 30303
(404) 222-9202

# LEGAL EXPERIENCE

**Senior Litigator, Georgia Resource Center, Atlanta, GA.**  10/12 – present.

> Duties include representation of death-sentenced clients in state post-conviction, federal habeas corpus, and clemency proceedings, and overseeing work performed by junior attorneys.

**Solo practitioner**, New Orleans, LA.  4/10 – 10/12.

> Private practice representing clients in capital and non-capital cases in federal court (on direct appeal and in habeas proceedings) through court appointments.  Co-presented (with Rob Owen) *Litigating Claims in the Inter-American Commission on Human Rights*, at the 2011 National CHU Conference, Austin, TX, April 2011.

**Staff Attorney, Capital Defense Project of Southeast Louisiana**, New Orleans, LA.  9/10 – 5/11 (temporary part-time position).

> Duties included motion and pretrial writ practice, and strategizing the presentation and preservation of legal issues for capital trial office representing clients in Louisiana state courts.

**Litigation Director/Staff Attorney, Capital Appeals Project**, New Orleans, LA.  7/01 - 3/10.

> Duties included representing indigent death-sentenced clients, primarily on direct appeal in state court through certiorari petitions in the United States Supreme Court; overseeing cases being handled by junior attorneys and supervising law student interns; advising trial counsel on outside matters; and presenting trainings at various local CLE seminars.

> State court practice included serving primarily as lead counsel on numerous capital direct appeals (responsible for drafting appellate briefs, presenting oral argument or helping prepare other counsel for argument, and pursuing review in the United States Supreme Court), as well as serving as counsel in state post-conviction and at the trial level in other Louisiana capital cases.

> Federal court practice included representing death-sentenced clients on direct appeal and in 2255 proceedings, and representing one non-capital client in 2254 proceedings.

**Solo practitioner**, New Orleans, LA.  9/98 - 7/01.

> Criminal defense practice primarily focused on representing death-sentenced clients in Louisiana on direct appeal, but including one federal capital case both on direct appeal and in 2255 proceedings.

**Associate, Michael R. Needle, P.C.**, Philadelphia, PA.  9/96 - 9/98.

> Small general firm with focus on commercial litigation.

> Served by court appointment as lead counsel in a federal capital direct appeal.

**Law clerk to Hon. James L. Dennis**, Circuit Judge, United States Court of Appeals for the Fifth Circuit, New Orleans, LA.  10/95 - 8/96.

**Law clerk to Hon. James L. Dennis**, Associate Justice, Louisiana Supreme Court, New Orleans, LA.  8/94 - 10/95.

**Law Clerk, Loyola Death Penalty Resource Center**, New Orleans, LA.  1/94 - 7/94.

> Engaged primarily in research and writing legal briefs and memoranda in death penalty cases at all stages of litigation.  Researched *Brady v. Maryland* issues for petitioner's briefs in *Kyles v. Whitley*, 514 U.S. 419 (1995).

**Summer intern, Defender Association of Philadelphia**, Philadelphia, PA.  5/93 - 8/93.

**Law clerk, Loyola Death Penalty Resource Center**, New Orleans, LA.  8/92 - 12/92.

**Law clerk, Needle & Feldman**, Philadelphia, PA.  5/92 - 8/92.

# EDUCATION

**TULANE LAW SCHOOL**, New Orleans, LA.

> J.D. *summa cum laude*, May 1994.
>
> *Honors*: Law Review (Senior Articles Editor, 1993-1994, Junior Member, 1992-1993); Order of the Coif; American Jurisprudence Award: 14th Amendment; Senior Fellow, Legal Research & Writing Program, 1993-94.
>
> Publications:  Comment, *Hanging Life in the Balance: The Supreme Court and the Metaphor of Weighing in the Penalty Phase of the Capital Trial*, 68 Tul. L. Rev. 1341 (1994) (Finalist, 1994 SCRIBES Notes & Comments Writing Competition); Student Commentary, *Neutralizing the Poison of Juror Racism: The Need for a Sixth Amendment Approach to Jury Selection*, 67 Tul. L. Rev. 2311 (1993).

**NEW SCHOOL FOR SOCIAL RESEARCH**, New York, NY.

> Non-degree program in Film Production, 9/88 - 5/90.

**UNIVERSITY OF PENNSYLVANIA**, Philadelphia, PA.

> B.A. (English), August 1988.

# BAR MEMBERSHIPS

Admitted to practice in the United States Supreme Court, the United States Courts of Appeals for the Fifth and Eleventh Circuits, the United States District Courts for the Southern and Middle Districts of Georgia, the Northern District of Texas, and the Eastern (currently on inactive status inactive), Middle and Western Districts of Louisiana, and all state courts in Georgia, Louisiana (currently on inactive status inactive) and Pennsylvania (currently on inactive status inactive).

# REPRESENTATIVE CASES[1 & 2]

### United States Supreme Court

*Wilson v. Sellers*, 138 S. Ct. 1188 (2018) (reversing Eleventh Circuit's *en banc* decision and remanding) (served as co-counsel to counsel of record Brian S. Kammer; case argued by Mark E. Olive)

*Tharpe v. Sellers*, 138 S. Ct. 545 (2018) (*per curiam*) (remanding case to Eleventh Circuit Court of Appeals for additional proceedings on racist juror claim) (served as co-counsel to counsel of record Brian S. Kammer)

*Tharpe v. Sellers*, 138 S. Ct. 53 (2017) (granting stay of execution) (served as co-counsel to counsel of record Brian S. Kammer)

*Snyder v. Louisiana*, 552 U.S. 472 (2008) (vacating conviction and death sentence on basis of racism in jury selection) (counsel of record prior to cert. grant; second chair to Steven Bright before the Supreme Court)

*Snyder v. Louisiana*, 545 U.S. 1137 (2005) (*per curiam*) (remanding to Louisiana Supreme Court for further consideration in light of intervening Supreme Court decision)

### United States Court of Appeals for the Fifth Circuit

*Tabler v. Stephens*, 591 Fed. Appx. 281 (5th Cir. 2015) (capital 2254 case; vacating district court's judgment denying habeas relief and remanding for further proceedings)

*United States v. Davis*, 609 F.3d 663 (5th Cir. 2010) (direct appeal from capital resentencing; argument shared with co-counsel), *cert. denied* 131 S. Ct. 1676 (2011)

*United States v. Orlando Hall*, 455 F.3d 308 (5th Cir. 2006) (2255 case; co-counsel) (COA denied without argument)

*United States v. Orlando Hall*, 152 F.3d 381 (5th Cir. 1998) (direct appeal)

*Kirt Hall v. Cain*, 201 Fed. Appx. 993 (5th Cir. 2006) (non-capital 2254 case) (reversing denial of habeas petition and remanding)

### United States Court of Appeals for the Eleventh Circuit

*Jones v. Warden*, *GDCP*, No. 20-12587 (lead counsel) (COA Application due in December 2020)

*Heidler v. Warden, GDCP*, No. 20-13752 (lead counsel) (COA Application due in December 2020)

*King v. Warden*, *GDCP*, No. 20-12804 (lead counsel) (COA expansion motion pending)

---

[1] Unless noted, these are capital cases in which I served by court appointment as lead counsel and argued the case before the identified court, and also served as counsel of record before the Supreme Court in the cert. petitions that followed every affirmance.

[2] In addition to listed cases, I served as lead or associate counsel in successive litigation in state and federal court, and state clemency proceedings on behalf of numerous additional Georgia capital defendants.

*Lee v. Warden, Georgia Diagnostic Prison*, No. 19-11466-P (case currently pending post-oral argument)

*Esposito v. Warden, Georgia Diagnostic Prison*, No. 15-11384-P (rehearing denied September 15, 2020; cert petition due in Supreme Court in February, 2021) (co-counsel prior to Brian Kammer's departure from GRC; lead counsel thereafter)

*Wilson v. Warden, Georgia Diagnostic Prison*, No. 14-10681-P (co-counsel prior to Brian Kammer's departure from GRC; lead counsel thereafter, through execution)

### Southern District of Georgia

*Heidler v. Warden, GDCP*, No. 6:11-cv-00109 (co-counsel prior to Brian Kammer's departure from GRC; lead counsel thereafter)

*Jones v. Warden, Georgia Diagnostic Prison*, No. 5:02-cv-00116 (co-counsel prior to Brian Kammer's departure from GRC; lead counsel thereafter)

*Lee v. Warden, Georgia Diagnostic Prison*, No. 5:10-cv-00017 (co-counsel prior to Brian Kammer's departure from GRC; lead counsel thereafter)

*Williams v. Warden, GDCP*, No. 4:12-cv-106 (co-counsel prior to Brian Kammer's departure from GRC; lead counsel thereafter)

*King v. Warden, GDCP*, No. 2:12-cv-119 (co-counsel prior to Brian Kammer's departure from GRC: lead counsel thereafter).

### Middle District of Georgia

*Tharpe v. Warden, Georgia Diagnostic Prison*, No. 5:10-cv-433 (co-counsel)

*Esposito v. GDCP Warden*, No. 5:12-cv-163 (co-counsel)

### Eastern District of Louisiana

*United States v. Louis Gilmore, et al*, No. 03-274 (2nd chair counsel in potentially capital case favorably resolved with plea to term of years)

### Middle District of Louisiana

*Kirt Hall v. Cain*, M.D.La. No. 99-0541-C (non-capital 2254 case)

### Northern District of Texas

*United States v. Orlando Hall*, 2004 U.S. Dist. LEXIS 17089 (2255 case; co-counsel)

### Louisiana Supreme Court

*State v. Bell*, 53 So. 3d 437 (La. 2010) (lead counsel through filing of opening brief)

*State v. Lee*, 976 So. 2d 109 (La. 2008)

*State v. Snyder*, 942 So. 2d 484 (La. 2006), *rev'd Snyder v. Louisiana*, 552 U.S. 472 (2008) (co-counsel in state court proceedings following Supreme Court remand; argued by lead counsel)

*State v. Leger*, 936 So. 2d 108 (La. 2007) (argued by co-counsel)

*State v. Weary*, 931 So. 2d 297 (La. 2006)

*State v. Juniors*, 915 So. 2d 291 (La. 2005)

*State v. Manning*, 885 So. 2d 1044 (La. 2004)

*State v. Cisco*, 861 So. 2d 118 (La. 2003) (reversing conviction and death sentence)

*State v. Legrand*, 864 So. 2d 89 (La. 2003)

*State v. Lam*, La. Sup. Ct. No. 01-2729 (remanded to trial court for determination of whether poor quality of Vietnamese interpretation at trial violated due process; pending in trial court)

*State v. Wright*, 834 So. 2d 974 (La. 2003)

*State v. Ball*, 824 So. 2d 1089 (La. 2002)

*State v. Jacobs*, 803 So. 2d 933 (La. 2001)

*State v. Deruise*, 802 So. 2d 1224 (La. 2001)

*State v. Hoffman*, 768 So. 2d 542 (La. 2000)


### Louisiana District Courts

*State v. Roy*, 9th Judicial District Court No. 235,372 (state post-conviction case; 2nd chair)

*State v. Johnson*, Orleans Parish Criminal District Court No. 402-510(E) (2nd chair; resolved through plea to life sentence)

*State v. Henson*, Orleans Parish Criminal District Court No. 444-275(E) (2nd chair; resolved through plea to life sentence)

*State v. Cisco*, 14th Judicial District Court No. 17646-98 (3rd chair, following reversal of conviction and death sentence on direct appeal, resolved through plea to term of years)


### Inter-American Commission on Human Rights

*Orlando Hall v. United States*, Petition No. 1309-07 (co-counsel) (raising claims of human rights violations arising from racism in the application of the federal death penalty, ineffective assistance of counsel and various due process violations)

# EXHIBIT 2



NORTHERN DISTRICT OF TEXAS

FILED

APR - 2 1996

NANCY DOHERTY, CLERK

By_____
        Deputy

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

### FORT WORTH DIVISION

**JUDGE:**                           HONORABLE TERRY R. MEANS, U.S. DISTRICT JUDGE

**CASE NUMBER:**                     4:94-CR-121-Y (1)

**TITLE OF CASE:**                   UNITED STATES OF AMERICA v. Bruce Carneil Webster

**DATE EMPANELED:**                  April 1, 1996

**COURTROOM DEPUTY CLERK:**          JUDY H. SMALLING

**COURT REPORTER:**                  ANA WARREN

### JURY ROLL

#### JURY PANEL

1. Pat Gary Jones
2. Clara Gonzalez
3. Dorothy Marie Johnston
4. Thomas R. Rhodes
5. Mary Jane Higginbotham
6. Danny Frank Collard
7. Christi Chesser Davey
8. Joyce A. Owen
9. Cynthia Gay Ferris
10. Alice Kay Barger
11. Rita Kay Kelton
12. Charles Alfred Fox

#### ALTERNATES

1. Christopher Ray Rawlinson
2. Mary Gladys Arledge
3. Janis Kay Bowden
4. Michael Gabriel Adams
5. Cathryn Ann Kaufman

ORIGINAL

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

UNITED STATES OF AMERICA                4:94-CR-121-Y (1)

    VS

Bruce Carneil Webster (1)

STRIKE LIST

| JUROR | ~~PLAINTIFF~~ GOVERNMENT | DEFENDANT |
|---|---|---|
| #3 Ernestine Hin Goss | 1 | |
| #8 Karen Sue Mathews | 2 | |
| #9 Pat Gary Jones | ① | |
| #10 Deanna Day Hailey | | 1 |
| #11 Clara Gonzalez | ② | |
| #12 Dorothy Marie Johnston | ③ | |
| #14 Thomas Russell Rhodes | ④ | |
| #15 Frances Wallie Miller | 3 | 2 |
| #17 William Edwin Blind | | 3 |
| #28 Randolph Step Stout | 4 | |
| #33 Mary Jane Higginbotham | ⑤ | |

| JUROR | PLAINTIFF | DEFENDANT |
|---|---|---|
| #35 Betty Crawford Sherwood | | 4 |
| #39 Melva Clark | 5 | 5 |
| #40 Jimmie Clyde Perkins | 6 | 6 |
| #43 Louis Glenn Hardin | 7 | |
| #46 Lloyd Wayne Williams | | 7 |
| #47 Mikell Pruitt Robinson | | 8 |
| #48 Danny Frank Collard | (6) | |
| #49 Miles Nelson | 8 | |
| #51 Lou Ann Winn | | 9 |
| #53 Christie Sue Davey | (7) | |
| #60 Kenneth E. Kiester | 9 | |
| #61 Donna Gourley Hampton | 10 | |
| #62 Joyce Mulnix Owen | (8) | |
| #69 Herman Mallory | 11 | |
| #70 Hector Diaz | | 10 |
| #73 Jimmy Blankenship | | 11 |
| #74 Mary Gaines | | 12 |
| #77 Kimberly Darnell | 12 | |

| JUROR | PLAINTIFF | DEFENDANT |
|---|---|---|
| #78 David Hoffman | | 13 |
| #79 Tracey Lineberger | 13 | |
| #81 Cynthia Ferris | (9) | |
| #82 Alice Kay Barger | (10) | |
| #86 Wm Walter McCulley | | 14 |
| #87 Joe Henry Goetz | | 15 |
| #89 Phyllis Ann Williams | 14 | |
| #90 Rita Kay Kelton | (11) | |
| #92 Dorothy Lighfoot | 15 | |
| #95 Kay Carolyn Coffett | | 16 |
| #100 Charles Fox | (12) | |
| #102 Mary Ann Schroeder | 16 | |
| #103 Larry Reed | 17 | |
| #108 Christopher Rawlinson | (ALT. 1) | |
| #109 Gail Sarap | | 17 |
| #110 Ann Beam | 18 | |
| #121 Karen Lewis | 19 | |
| #122 Carolyn Black | ALT. 1 | |

| JUROR | PLAINTIFF | DEFENDANT |
|---|---|---|
| #123 Ai-Lien Thi Dunong | *20* | |
| #124 Patty Ballard | | *18* |
| #125 W. J. Blassingame | | ALT 1 |
| #126 Cheryl White | | *19* |
| #130 Kristi Magouirk | | *20* |
| #132 James Wood | | ALT. 2 |
| #133 Mary Arledge | ALT. 2 | |
| #136 Kay Tindell | ALT. 2 | |
| #137 Janis Bowden | ALT. 3 | |
| #138 Patrick Mitchell | ALT. 3 | |
| #139 Jimmy Chambless | | ALT 3 |
| #141 Michael Adams | ALT. 4 | |
| #143 Cathryn Kaufman | ALT.5 | |

**Total released from jury duty:**

**Postponed, excused, exempted, dismissed**

| | | | |
|---|---|---|---|
| #1 Carl Crumpley | #42 Bonnie Mason | #91 Gary Bryce | #140 Mary Power |
| #2 Warren Herron | #44 Roy Abshier | #93 Emily Hurston | #142 D. Jones |
| #4 Dorothy Cates | #45 Joy Heilger | #94 Grace Elliott | |
| #5 Jerry Ash | #50 Phyllis Hermane | #97 Patricia Akers | |
| #6 Nancy Manweiler | #52 Michael Guzman | #96 James Vrba | |
| #7 Jacquelyn Gattis | #54 Stephen Rogers | #98 Ellen Meyer | |
| #13 Karen Bohmfalk | #55 Jeri Wilhit | #99 Lisa Platt | |
| #16 Bobby Amason | #56 Linda Vicari | #101 Robert Taylor | |
| #18 Gary Kromer | #57 Debra McConnell | #104 Yucandice King | |
| #19 Thomas Keyes | #58 John Almy | #105 Betty Penny | |
| #20 Wm Butler | #59 Dawn Stapleton | #106 Eunice Walls | |
| #21 Cynthia Ruelas | #63 Mark Knittle | #107 Ann Cole | |
| #22 Evelyn Van | #64 Rick Ewing | #112 Lonnie Smith | |
| #24 Charles E Ross | #65 J M Shaw | #113 Sherry Osicka | |
| #25 Martha Braudaway | #66 Michael Saenz | #114 Karen Hobson | |
| #26 Monica Ward | #67 C Caruthers | #115 Robert Sessions | |
| #27 B Rodriquez | #68 Judy Reger | #116 Kenneth Foster | |
| #29 William Cowan | #71 U. Gomez | #117 Annie Vannaraj | |
| #30 T C Turner | #72 Charles Denton | #118 Ruby Roberts | |
| #31 Robert Smith | #75 Lochie Opitz | #119 Walter Rainey | |
| #32 Carolyn Burk | #76 S Williams | #120 Angela Alfred | |
| #34 Terry Ellis | #80 D Tucker | #127 E. Forester | |
| #36 Linda Pempsell | #83 Y Woodard | #128 D. Kozey | |
| #37 Gloria Dunaway | #84 Hazel Williams | #129 W. Crowley | |
| #38 Jason Lee | #85 Lariece Brown | #131 Deb Matheny | |
| #41 Mike Warnick | #88 Linda Phifer | #134 Daven Robinson | |
| #23 Gladys Barnes | #111 Emma Clark | #135 Elma Carr | |

ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA                    4:94-CR-121-Y (1)

    VS

Bruce Carneil Webster (1)


### GOVERNMT'S STRIKE LIST

| JUROR | PLAINTIFF | DEFENDANT |
|-------|-----------|-----------|
| #3 Ernestine Hin Goss | ✓ 1 | |
| #8 Karen Sue Mathews | ✓ 2 | |
| #9 Pat Gary Jones | | |
| #10 Deanna Day Hailey | | |
| #11 Clara Gonzalez | | |
| #12 Dorothy Marie Johnston | | |
| #14 Thomas Russell Rhodes | | |
| #15 Frances Wallie Miller | ✓ 3 | |
| #17 William Edwin Blind | | |
| #28 Randolph Step Stout | ✓ 4 | |
| #33 Mary Jane Higginbotham | | |

| JUROR | PLAINTIFF | DEFENDANT |
|---|---|---|
| #35 Betty Crawford Sherwood | | |
| #39 Melva Clark | ✓ 5 | |
| #40 Jimmie Clyde Perkins | ✓ c | |
| #43 Louis Glenn Hardin | ✓ 7 | |
| #46 Lloyd Wayne Williams | | |
| #47 Mikell Pruitt Robinson | | |
| #48 Danny Frank Collard | | |
| #49 Miles Nelson | ✓ 8 | |
| #51 Lou Ann Winn | | |
| #53 Christie Sue Davey | | |
| #60 Kenneth E. Kiester | ✓ 9 | |
| #61 Donna Gourley Hampton | ✓ 10 | |
| #62 Joyce Mulnix Owen | | |
| #69 Herman Mallory | ✓ 11 | |
| #70 Hector Diaz | | |
| #73 Jimmy Blankenship | | |
| #74 Mary Gaines | | |
| #77 Kimberly Darnell | ✓ 12 | |

| JUROR | PLAINTIFF | DEFENDANT |
|---|---|---|
| #78<br>David Hoffman | | |
| #79<br>Tracey Lineberger | ✓ 13 | |
| #81<br>Cynthia Ferris | | |
| #82<br>Alice Kay Barger | | |
| #86<br>Wm Walter McCulley | | |
| #87<br>Joe Henry Goetz | | |
| #89<br>Phyllis Ann Williams | ✓ 14 | |
| #90<br>Rita Kay Kelton | | |
| #92<br>Dorothy Lighfoot | ✓ 15 | |
| #95<br>Kay Carolyn Coffett | | |
| #100<br>Charles Fox | | |
| #102<br>Mary Ann Schroeder | ✓ 16 | |
| #103<br>Larry Reed | ✓ 17 | |
| #108<br>Christopher Rawlinson | | |
| #109<br>Gail Sarap | | |
| #110<br>Ann Beam | ✓ 18 | |
| #121<br>Karen Lewis | ✓ 19 | |
| #122<br>Carolyn Black | ✓ | |

A-1

| JUROR | PLAINTIFF | DEFENDANT |
|---|---|---|
| #123 Ai-Lien Thi Dunong | ✓ 20 | |
| #124 Patty Ballard | | |
| #125 W. J. Blassingame | | |
| #126 Cheryl White | | |
| #130 Kristi Magouirk | | |
| #132 James Wood | | |
| #133 Mary Arledge | | |
| #136 Kay Tindell | ✓ (A2) | |
| #137 Janis Bowden | | |
| #138 Patrick Mitchell | ✓ (A3) | |
| #139 Jimmy Chambless | | |
| #141 Michael Adams | | |
| #143 Cathryn Kaufman | | |

**Total released from jury duty:**

**Postponed, excused, exempted, dismissed**

#1 Carl Crumpley
#2 Warren Herron
#4 Dorothy Cates
#5 Jerry Ash
#6 Nancy Manweiler
#7 Jacquelyn Gattis
#13 Karen Bohmfalk
#16 Bobby Amason
#18 Gary Kromer
#19 Thomas Keyes
#20 Wm Butler
#21 Cynthia Ruelas
#22 Evelyn Van
#24 Charles E Ross
#25 Martha Braudaway
#26 Monica Ward
#27 B Rodriquez
#29 William Cowan
#30 T C Turner
#31 Robert Smith
#32 Carolyn Burk
#34 Terry Ellis
#36 Linda Pempsell
#37 Gloria Dunaway
#38 Jason Lee
#41 Mike Warnick
#23 Gladys Barnes

#42 Bonnie Mason
#44 Roy Abshier
#45 Joy Heilger
#50 Phyllis Hermane
#52 Michael Guzman
#54 Stephen Rogers
#55 Jeri Wilhit
#56 Linda Vicari
#57 Debra McConnell
#58 John Almy
#59 Dawn Stapleton
#63 Mark Knittle
#64 Rick Ewing
#65 J M Shaw
#66 Michael Saenz
#67 C Caruthers
#68 Judy Reger
#71 U. Gomez
#72 Charles Denton
#75 Lochie Opitz
#76 S Williams
#80 D Tucker
#83 Y Woodard
#84 Hazel Williams
#85 Lariece Brown
#88 Linda Phifer
#111 Emma Clark

#91 Gary Bryce
#93 Emily Hurston
#94 Grace Elliott
#97 Patricia Akers
#96 James Vrba
#98 Ellen Meyer
#99 Lisa Platt
#101 Robert Taylor
#104 Yucandice King
#105 Betty Penny
#106 Eunice Walls
#107 Ann Cole
#112 Lonnie Smith
#113 Sherry Osicka
#114 Karen Hobson
#115 Robert Sessions
#116 Kenneth Foster
#117 Annie Vannaraj
#118 Ruby Roberts
#119 Walter Rainey
#120 Angela Alfred
#127 E. Forester
#128 D. Kozey
#129 W. Crowley
#131 Deb Matheny
#134 Daven Robinson
#135 Elma Carr

#140 Mary Power
#142 D. Jones

April 2, 1996

ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

4:94-CR-121-Y (1)

VS

Bruce Carneil Webster (1)

DEFENSE
STRIKE LIST

| JUROR | PLAINTIFF | DEFENDANT |
|---|---|---|
| #3<br>Ernestine Hin Goss | | |
| #8<br>Karen Sue Mathews | | |
| #9<br>Pat Gary Jones | | |
| #10<br>Deanna Day Hailey | | STRIKE① |
| #11<br>Clara Gonzalez | | |
| #12<br>Dorothy Marie Johnston | | |
| #14<br>Thomas Russell Rhodes | | |
| #15<br>Frances Wallie Miller | | STRIKE② |
| #17<br>William Edwin Blind | | STRIKE③ |
| #28<br>Randolph Step Stout | | |
| #33<br>Mary Jane Higginbotham | | |

| JUROR | PLAINTIFF | DEFENDANT |
|---|---|---|
| #35 Betty Crawford Sherwood | | STRIKE④ |
| #39 Melva Clark | | STRIKE⑤ |
| #40 Jimmie Clyde Perkins | | STRIKE⑥ |
| #43 Louis Glenn Hardin | | |
| #46 Lloyd Wayne Williams | | STRIKE⑦ |
| #47 Mikell Pruitt Robinson | | STRIKE⑧ |
| #48 Danny Frank Collard | | |
| #49 Miles Nelson | | |
| #51 Lou Ann Winn | | STRIKE⑨ |
| #53 Christie Sue Davey | | |
| #60 Kenneth E. Kiester | | |
| #61 Donna Gourley Hampton | | |
| #62 Joyce Mulnix Owen | | |
| #69 Herman Mallory | | |
| #70 Hector Diaz | | STRIKE⑩ |
| #73 Jimmy Blankenship | | STRIKE⑪ |
| #74 Mary Gaines | | STRIKE⑫ |
| #77 Kimberly Darnell | | |

| JUROR | PLAINTIFF | DEFENDANT |
|---|---|---|
| #78<br>David Hoffman | | STRIKE (13) |
| #79<br>Tracey Lineberger | | |
| #81<br>Cynthia Ferris | | |
| #82<br>Alice Kay Barger | | |
| #86<br>Wm Walter McCulley | | STRIKE (14) |
| #87<br>Joe Henry Goetz | | STRIKE (15) |
| #89<br>Phyllis Ann Williams | | |
| #90<br>Rita Kay Kelton | | |
| #92<br>Dorothy Lighfoot | | |
| #95<br>Kay Carolyn Coffett | | STRIKE (16) |
| #100<br>Charles Fox | | |
| #102<br>Mary Ann Schroeder | | |
| #103<br>Larry Reed | | |
| #108<br>Christopher Rawlinson | | |
| #109<br>Gail Sarap | | STRIKE (17) |
| #110<br>Ann Beam | | |
| #121<br>Karen Lewis | | |
| #122<br>Carolyn Black | | |

| JUROR | PLAINTIFF | DEFENDANT |
|---|---|---|
| #123 Ai-Lien Thi Dunong | | |
| #124 Patty Ballard | | STRIKE (18) |
| #125 W. J. Blassingame | | ALT. STRIKE (1) |
| #126 Cheryl White | | STRIKE (19) |
| #130 Kristi Magouirk | | STRIKE (20) |
| #132 James Wood | | ALT. STRIKE (2) |
| #133 Mary Arledge | | |
| #136 Kay Tindell | | |
| #137 Janis Bowden | | |
| #138 Patrick Mitchell | | |
| #139 Jimmy Chambless | | ALT. STRIKE (3) |
| #141 Michael Adams | | |
| #143 Cathryn Kaufman | | |

Larry M. Moore

April 2, 1996

**Total released from jury duty:**

**Postponed, excused, exempted, dismissed**

#1 Carl Crumpley
#2 Warren Herron
#4 Dorothy Cates
#5 Jerry Ash
#6 Nancy Manweiler
#7 Jacquelyn Gattis
#13 Karen Bohmfalk
#16 Bobby Amason
#18 Gary Kromer
#19 Thomas Keyes
#20 Wm Butler
#21 Cynthia Ruelas
#22 Evelyn Van
#24 Charles E Ross
#25 Martha Braudaway
# 26 Monica Ward
#27 B Rodriquez
#29 William Cowan
#30 T C Turner
#31 Robert Smith
#32 Carolyn Burk
#34 Terry Ellis
#36 Linda Pempsell
#37 Gloria Dunaway
#38 Jason Lee
#41 Mike Warnick
#23 Gladys Barnes

#42 Bonnie Mason
#44 Roy Abshier
#45 Joy Heilger
#50 Phyllis Hermane
#52 Michael Guzman
#54 Stephen Rogers
#55 Jeri Wilhit
#56 Linda Vicari
#57 Debra McConnell
#58 John Almy
#59 Dawn Stapleton
#63 Mark Knittle
#64 Rick Ewing
#65 J M Shaw
#66 Michael Saenz
#67 C Caruthers
#68 Judy Reger
#71 U. Gomez
#72 Charles Denton
#75 Lochie Opitz
#76 S Williams
#80 D Tucker
#83 Y Woodard
#84 Hazel Williams
#85 Lariece Brown
#88 Linda Phifer
#111 Emma Clark

#91 Gary Bryce
#93 Emily Hurston
#94 Grace Elliott
#97 Patricia Akers
#96 James Vrba
#98 Ellen Meyer
#99 Lisa Platt
#101 Robert Taylor
#104 Yucandice King
#105 Betty Penny
#106 Eunice Walls
#107 Ann Cole
#112 Lonnie Smith
#113 Sherry Osicka
#114 Karen Hobson
#115 Robert Sessions
#116 Kenneth Foster
#117 Annie Vannaraj
#118 Ruby Roberts
#119 Walter Rainey
#120 Angela Alfred
#127 E. Forester
#128 D. Kozey
#129 W. Crowley
#131 Deb Matheny
#134 Daven Robinson
#135 Elma Carr

#140 Mary Power
#142 D. Jones

# EXHIBIT 3

Vol. 15: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA    .  CRIMINAL ACTION NO.
    .    4:94-CR-121-Y
V.     .
    .  Fort Worth, Texas
BRUCE CARNEIL WEBSTER    .  April 2, 1996
. . . . . . . . . . . . . . .

VOLUME 15
TRANSCRIPT OF THE TRIAL
(Voir Dire Examination)
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:    MR. RICHARD B. ROPER
    MR. PAUL D. MACALUSO
    MR. CHRISTOPHER CURTIS
    MS. DELONIA WATSON
    Assistant United States Attorney
    801 Cherry Street, Suite 1700
    Fort Worth, Texas  76102-6897
    (817) 978-3291

For the Defendant:    MR. LARRY M. MOORE
    Attorney at Law
    1112-A East First Street
    Fort Worth, Texas  76102
    (817) 338-4800

    MR. ALLAN K. BUTCHER
    Hill, Beatty, Butcher
      & Gallagher
    201 Main Street, Suite 1300
    Fort Worth, Texas  76102
    (817) 336-3600

Court Reporter:    Ana P. Warren
    U.S. District Court Reporter
    501 W. 10th Street, Room 204B
    Fort Worth, Texas  76102-3637
    (817) 335-3050

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COURT

COPY

Vol. 15: 2

PROCEEDINGS

(Commencing, 9:00 a.m.)

THE COURT: I have the motion for defendant for six additional strikes, and that's overruled.

MR. MOORE: Judge, Judy had indicated yesterday that there would be a new strike list, and I have not received that.

MR. ROPER: She said she was going to come down --

THE COURT: She's not here this morning. I have two marked originals, so these must be they. So if you will step up here?

(Brief pause in proceedings)

THE COURT: Let me know if the strike list that I just handed you is not correct in any way?

MR. MOORE: If we could have just one minute, Judge.

THE COURT: Sure.

By the way, what I'm going to do is wait until we see the 20 challenges -- make your 20 challenges, and I'll see what's left over, and if we have enough, we may have enough for some additional alternates which might help us cover the period between now and June.

(Brief pause in proceedings)

THE COURT: She didn't put a place for you to sign these. So go ahead and sign at the bottom of the fourth page and indicate your party.

(Brief pause in proceedings)

Vol. 15: 3

THE COURT:  You have been handed copies of strike lists that I have compiled for both government and defense, and I would like to hear from the parties any objections they have to strikes from the other side before we proceed on to exercising peremptories against alternate jurors.

MR. MOORE:  Judge, we are going to object to the government's exercise of their peremptory challenge.  They have used -- there were five black veniremen that were eligible to be seated as jurors on the first 12 in this case.  They have used their peremptory challenges in order to excuse all of those five veniremen from service.  And there was one oriental venireman.  They have also used their peremptory challenge to excuse that venireman from service, and we believe that the manner in which the government has exercised its challenges is improper in that it's racially discriminatory and in violation of Batson.

THE COURT:  Do you have anything further to present a prima facia case that the government has used a racial test or racial criteria to make its challenges?

MR. MOORE:  Judge, we would, in that regard, ask the Court, first of all, to note the voir dire examination of each venireman.  They have struck five out of five.  There are no black jurors that will serve on this jury.  If the Court allows those strikes to remain in place, then they have literally struck 100 percent of the black jurors.

U.S. DISTRICT COURT

Vol. 15: 4

They have also struck the oriental that was in place that could be reached.  The only minority juror that I can see is going to possibly serve is the Hispanic juror, Ms. Gonzales.  So it's our belief that by striking 100 percent of the black jurors, and our defendant is black, that we have established a prima facia showing of racial discrimination.

THE COURT:  I'm not sure that it does, but let us assume a prima facia case has been made by the government -- by the defendant and hear from the government its rationale for striking.  Can you give us the numbers of those jurors?

MR. MOORE:  Judge, the jurors that have been struck by the government, which we feel was done in a racial discriminatory manner, are Juror Number 3, Ernestine Goss, Juror Number 49, Miles Nelson, Juror Number 69, Herman Dean Mallory, Juror Number 89, Phyllis Williams, Juror Number 103, Larry Charles Reed, and Juror Number 123, Ai-Lien Duong, who is oriental.

THE COURT:  I call upon the government for a statement of its rationale for striking Jurors 3, 49, 69, 89, 103 and 123.

MR. ROPER:  Judge, I would like to make some statements.  Delonia Watson, who has been working the case with me, was an integral part towards the jury selection.  She couldn't be here today because her uncle's will was being probated, and she couldn't put it off.  So she had to go do

that.  What I would like to do is -- she will be back tonight. I thought maybe give my rationales and allow Ms. Watson -- she took more notes in jury selection.  I didn't know until last night -- I had forgotten that she wasn't going to be here today, and I didn't get to talk to her.  She had taken down some notes on what some of these jurors said that we all found objectionable, and I can't remember all of them because I didn't write them down.  So what I would ask to do is give a response and then supplement it Thursday morning before you actually bring the jurors in, if that's okay?

THE COURT:  Well, I'm trying to have as much -- as many people as possible remaining for the alternate strikes, and that will affect -- this will affect that.

Go ahead and give me your rationale for your strikes, and then I'll decide on that request.

MR. MOORE:  Judge, in all fairness, I had told Mr. Roper that I didn't object to that procedure.  When he informed me that Delonia couldn't be present because of a family matter, I told him I didn't object.

THE COURT:  All right.  Thank you.

MR. ROPER:  Just a second.

(Brief pause in proceedings)

MR. ROPER:  All right.  The first one is -- let's just start with the oriental juror, Ai-Lien Duong.  I thought she had trouble understanding the English language.

Vol. 15: 6

THE COURT:  You're not the only one.

MR. ROPER:  And I think though she could understand and communicate, I think she wouldn't understand southern black -- we're going to have co-defendants testify that have a definite accent, I think, kind of a southern dialect, and I think it would just make it almost impossible for her to hear, and I'm afraid she would miss that crucial testimony and wouldn't be able to render a decision.  Otherwise, I thought she was qualified.  I didn't strike her because of any racial reasons at all.

THE COURT:  She was hard to understand, and she was having difficulty understanding me and others.  And I agree with you.  She would have great difficulty understanding black dialect because I have trouble understanding it sometimes.  A lot of people do.  She would have a double translation there to make.

So I overrule the defense's objection to Juror Number 123 -- I overrule the defense's objection to your striking 123.

MR. ROPER:  Juror Number 3 is Ernestine Goss, and we struck her.  She has a brother who went to prison in the '70s and she knows Wayne Hines and a Clayton Wooten, who have also been to the penitentiary.  She mentioned that rehabilitation was her first priority, I have written down here.

She put down that she slightly disagreed that life imprisonment was more effective.  I thought she might be a

little light on that.  She agreed the death penalty was not effective as -- she agreed the death penalty has never been effective in preventing crime.  She left blank the response that the law should concern itself more with victims of crime than with those accused and convicted of crimes.

She had mentioned during jury selection that her sister and brother were in prison, and I have written down here that she found it to be very difficult to give the death penalty in a case.  I noted that as a reason that I thought in her mind and the way I looked at her, I got the idea and wrote down that I thought that she would -- it would -- she just couldn't do it when it got down to it.  I thought she was very extremely nervous, and I think when it got back down to going into the jury room, I just don't think she would be able to give the death penalty to the defendant, and Mr. Macaluso and Ms. Watson shared my beliefs.

There were some additional matters that were written by Ms. Watson that I don't have with me, but it was our consensus that she couldn't give the death penalty because of her beliefs and hesitancy in the fact that she had relatives in the penitentiary.  And I felt she just wouldn't be able to give the death penalty.  That's why we struck her, and it didn't have anything to do with her race.

THE COURT:  I overrule the defense's objection to your striking Juror Number 3 finding that your reasons offered are

Vol. 15: 8

sufficiently race neutral to overcome any prima facia case, if there is one, of exercise of peremptory challenges based on race.

Let me ask you a question before you go on.  I want to make sure that Ms. Watson's reasons, if she offers them on the record later, will not be mere pretext.  Was she actively involved in the process of exercising these strikes?

MR. ROPER:  Yes, she was.  We argued a lot about a lot of them.

THE COURT:  So her reasons that she may offer at a later time, are you telling me that those reasons will be legitimate and real reasons on the part of the government and not just additional reasons that you can go through and think of?

MR. ROPER:  No.  During jury selection, she didn't examine very many jurors, and she took most of our notes on the jurors while myself or Mr. Macaluso were examining jurors, and I have a hard time taking notes when I'm thinking of questions to ask.  So she took a lot of notes.

And after we finished -- after the jury selection procedure was finished, actually, each day, we would go back to the office and rank the jurors, and she kept that master log, and it's in her handwriting, and I can't read it.  She had notes on it on each juror.  Then after we finished the jury selection process, we went through and went down that master log as our

Vol. 15: 9

guide, and then I had my own notes and each little juror information sheet that we filled out on the questionnaires, and we went through and made our strikes.

THE COURT: So this strike list that you have offered is a product of her input as well?

MR. ROPER: Oh, absolutely. The reason Ms. Watson is on the case is because she's an appellate lawyer, and the Department of Justice regulations urged us to have an appellate lawyer. I want her on there because I think she's a real good lawyer and she helps us mainly doing research, but she has done a lot of work substantively on the case. Mainly, she's real familiar with the facts.

So it wasn't a pretext that she was on there. She was the one who was actually keeping the master list, and when we were going through the jury selection process, we would put her input in on these jurors, and she would bring up stuff I had forgotten about in the jury selection. I wish she were here.

THE COURT: So do I. Number 49?

MR. ROPER: Miles Nelson had originally put down in his questionnaire that he was against the death penalty, but he thought he could. I guess I ought to read that response.

Although I do not believe the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances.

I don't know if that question alone would give me a reason

to challenge him because I think some of the jurors, quite frankly, changed their mind later on after they saw it. But the way I view this is, you have got to look at the whole thing in totality and an not just individual questions, but some of them, when you add it up, it's just somebody that I don't think can give the death penalty, and I think Mr. Nelson falls in that category.

He also says, in addition to Question 47, in my mind, I find it difficult to believe some people that don't believe in the death penalty could actually do it.

In 52, he answered that one, yes, do you have any moral, religious, or personal beliefs that would prevent you from returning a verdict which would ultimately result in the execution of another human being? And he checked that yes.

Then, also, 52A, he checked if a sentence of life without the possibility of parole was an option, could you nevertheless recommend a sentence of death? And he checked that no.

Also, his answers on the chart caused me a lot of concern. He didn't even --

THE COURT: Let me just ask you this, Mr. Roper. Did all of those answers that you have listed so far play a role in your decision to strike?

MR. ROPER: Yes, sir.

THE COURT: Then I think you have made a proper response to the objection. So I overrule the defendant's

Vol. 15: 11

objection to your striking Juror Number 49.

MR. ROPER:  There were also some chart answers that he gave that really caused me concern, and I won't go into those. I guess all the questionnaires are in the record.

The next juror is Juror Number 69.

THE COURT:  Herman Mallory?

MR. ROPER:  Yes, sir.

All right.  He -- in his chart answers, he answered -- 52A, he answered, again, the question dealing with life in prison without the possibility of parole, could you still assess the death penalty and recommend a sentence of death?  And he said, no, that he also had a cousin convicted of assault and drugs.

And then he also -- during the selection process is what really -- more than just the chart, the answer to 52A really caused a lot of concern about him.  He said -- he made a comment in response to, I believe, Mr. Moore's question that really caused me concern.  I know the theory of the defense is, of course, to find one juror that could really hang up the whole jury, which is obviously not a bad theory for the defense, but I think that Mr. Mallory would play right into their hands.

His response was very vocal and took me aback.  He said, well, I'm known for being different.  He said -- and I think because of that real strong response -- and I got the impression he really had a good rapport with Mr. Moore, and

Vol. 15: 12

because of that, I just thought he would never -- because of that answer on 52A and also on that, I got the impression that he would never be able -- that he wouldn't return a death penalty verdict, and I thought -- though I thought there was a possibility he could, I thought it was more likely that if he did go against us, he would never be in a position to allow the other jurors to convince him at all.  He's just known for being different.  That's not all he said, but that's what I wrote down.

THE COURT:  I guess you should be glad that different is not yet a protected class.

MR. ROPER:  Some day I may be proved wrong.  He used to be against the death penalty, too.  Sometimes I worry about people that had a different view about the death penalty, and I feel like that when it got right down to it, they wouldn't be able to assess the death penalty.

I understand from a case down at the state, some people had changed their minds that they could vote for the death penalty. They were put on the death penalty jury, and then they were the persons that hung up the jury and wouldn't return a death --

THE COURT:  You say sometimes you were worry about that.  Were you worried about that --

MR. ROPER:  Yes, sir.

THE COURT:  -- and is that a basis for your strike in this case?

MR. ROPER:  Yes, sir.

THE COURT:  I think you have stated enough race neutral reasons to show that your strike was not based on racial considerations, and, therefore, I overrule the defendant's objection to your striking peremptorily Number 69.

MR. ROPER:  Let me skip over to Mr. Reed, Number 103. He really caused me concern.  I don't think he could ever give the death penalty in a case.  He answered 52A, no, he couldn't give the death penalty, couldn't recommend the sentence of death if life without the possibility of release were an option.

On the chart answer, he said that he disagreed that he thought the death penalty was necessary, which caused me a bunch of concern.  And he was really causing me concern in the case.  He mentioned during the actual questioning process, he said -- well, first off, he had family in Pine Bluff.  Pine Bluff is a pretty small town.  I have been up there about three times working on the case, and I think it's a small town.

I'm afraid -- and I have seen it happen before with relatives on cases.  They end up putting pressure on jurors, and I just don't feel like taking -- I think it could really backfire on me, especially when you have a small town. Now, it could help me, but I just don't want to take a chance. I think it would hurt me more.  That was a concern of mine.

Also, he said that he thought he could give the death

penalty to somebody like Jeffrey Dalmer or Ted Bundy, and I questioned him about that. And I said, well, you know, could you give the death penalty to just one person, and he said he could. But I think his answer -- I think anybody, or you could line up almost 12 people off the street, and they'll give the death penalty to Jeffrey Dalmer or Ted Bundy or Adolph Hitler or somebody like that. These guys were serial killers that killed I don't how many. Dalmer killed at least ten. Bundy killed at least ten, too. That's a far cry from a situation where you have one victim.

And it reminds me of a case down at the state that was not a case that's very unlike this case, a case where a little girl was kidnapped from Arlington. And I understand the juror that hung the case up was somebody that said, yeah, on jury selection -- Mike Parrish, who was the prosecutor, asked the question, could you give the death penalty? And he said, yes, to somebody like Adolph Hitler I could.

And then they went through and put him on the jury, and he's the one that hung it up. And I think anybody -- if they look for that to be a mean of who to give the death penalty to, well, there are very few cases ever in the history of the world that are going to fall into that category of an Adolph Hitler or a Ted Bundy or a Jeffrey Dalmer, and I just don't want to take a chance on him. I just don't think he would do it in this case.

Vol. 15: 15

He had a shoplifting conviction, too, a theft conviction, a misdemeanor theft conviction, and that caused me some concern as well.

THE COURT:  All right.  I find your proffered reasons for striking Number 103 to be sufficiently race neutral, and find that they were not made or based on a racial criteria. Accordingly, I overrule the defense's objection to your striking Number 103.

MR. ROPER:  The most difficult decision -- I almost took Juror Number 89, Phyllis Williams.  I'm pretty familiar with her response to all the questions.  I decided to strike Ms. Williams for several reasons.

One is, she has relatives in Pine Bluff and in El Dorado. El Dorado is also a small town.  I asked her about that, and she said that she didn't have much contact with them, but she did have relatives there, and I'm afraid because Pine Bluff is so small -- and this is real big news up in Pine Bluff -- and I think there is a possibility if her relatives or cousins find her on the jury, they are going to end up calling her and talking to her about it, and she's going to have a lot of pressure put on her.

Now, I think probably most everybody in town probably doesn't have much good to say about the defendant, but there could be some people that could, and because of that fact, I think that I have a problem with her being on the jury.  And

when it gets down to it, if they bring pressure to bear on her, it's going to -- it could cause me to have a hung jury on this case, and that was one of the main factors in deciding to strike her.

She did put down a couple of real answers to the questions in her chart that caused me a bunch of concern, and I asked her about those and her answers to me were kind of meek.  She said, yeah, I could.  Her responses weren't very strong, and I was really concerned.  I thought, all in all, her whole questions on the questionnaire were good questions --

THE COURT:  You mean good answers?

MR. ROPER:  I mean good answers.  I don't know how good the questions were.

But she said she slightly agreed the death penalty was wrong.  And I thought, well, maybe she made a mistake on it.  But she said -- also, down later on, on "H" on the chart, she also again said she slightly agreed the death penalty is wrong, and it is unnecessary, even in our imperfect civilization.

That shows me a couple of consistent answers that she has a feeling about the death penalty that causes me some concern about taking her as a juror on the case, and I thought some of her responses -- she's kind of -- to me I got the impression she's kind of meek, and I just feel like the pressure sitting on the jury, when it got right down to it, all of us, Ms. Watson, myself, Mr. Macaluso, felt like she would have a

Vol. 15: 17

problem in this case, especially if it turns out there was some kind of outside influence.

Now, she's the one that had the cousin who murdered his girlfriend and buried her in the woods under two dead dogs, and he got five years, I think. Now, she did say that she thought he still should be in jail. Well, there is a difference between somebody being in jail and somebody getting the death penalty for a case, and that caused me a concern. I don't think she would have a problem at all in, A, finding Webster guilty, and I think she probably could, in some cases, give him the death penalty, but I think -- I'm afraid she might use that as a standard of saying, well, you have got to get life in prison like I thought my cousin should get. It's kind of similar here, and I think that that could take her and make her become more of an individual.

Now, she said that she listens to Cleflo Dollar, an evangelist, and I think gives him money or something like that. He's real conservative. I have heard Reverend Dollar, and I thought that was a plus in keeping her on the jury, but then I wonder that her answers -- her lifestyle is not consistent. Cleflo Dollar is a real conservative minister. Certainly, I'm not trying to be a moralist, but Ms. Williams had two children, apparently out of wedlock. She didn't mention she was divorced, and one of them is a 17-year-old that goes to Sam Houston High School, and the other one is a 22-year-old hair

Vol. 15: 18

stylist now.

It's apparent from the questionnaire that they were born out of wedlock. Now, that's not a problem -- and, again, I'm not trying to be a moralist -- but she's still living with someone. So we felt like that there's a good chance that she's not walking the walk. She's talking the talk, and I'm afraid that she wouldn't, when it got down to it, give the death penalty on the case.

She mentioned one of the persons she respected was the Reverend Jesse Jackson. I have a lot of respect for him, too. He has been vocal in his opposition, I understand, to the death penalty, and I wonder -- at least he has spoken against the death penalty in some cases very vocally, and I'm wondering -- of course, that, in and of itself, wouldn't be a reason for me to strike anybody, but I wonder if, when it got down to it, she would have a harder time voting for the death penalty in a case because of that fact.

Also, I would mention the fact that Mr. Macaluso said that he thought that her answers were very weak and meek, and I don't evidence somebody that could come back and really make a a strong decision on the death penalty in a case such as this.

THE COURT: All right. I find that your proffered reasons for striking Juror Number 89 are sufficient to overcome any prima facia case, if it has been made, to suggest it was based on race. So I overrule the objection to your striking

Number 89.

I will hear, next time we're together on the record, any additional reasons that Ms. Watson can recall. I would appreciate your giving her your reasons so that I don't get a lot of redundancy.

MR. ROPER: Yeah. We wrote it down.

THE COURT: Okay. That means that we have 11 persons left on the list as I count it -- see if you agree -- who are potential alternate jurors. I believe them to be Juror Number 108, 122, 125, and 132 through 143. 142 is out of the list.

If we have 11, under Rule 24(c), as I read it, that would allow us to have five alternates, each side exercising three peremptories, and that way we would have five alternates to start. We could decide on -- bring that down probably to two or three when the trial starts after -- we're going to need to talk to everybody when they come back and make sure they haven't been tainted after two months of opportunities for media coverage or other influence. And then if we still have 12 and five after that, we can pair it down to 12 and two or 12 and three.

MR. ROPER: Judge, would you call out those alternates again for us?

THE COURT: Yes, sir. It looks to me like the first person who has not been stricken by one side or the other, and who is not already one of the jurors, is Number 108, continuing

Vol. 15: 20

Numbers 122, 125, and then Numbers 132 through 143. Numbers 134, 135 and 142 are off already. I believe that's 11 people.

Let me give back to you, then, your originals of the strikes and have you make your three strikes.

(Brief pause in proceedings)

THE COURT: Mr. Roper, I inadvertently gave you my strike list.

MR. CURTIS: I thought it looked way too neat for us.

THE COURT: I doubt that.

(Brief pause in proceedings)

THE COURT: All right. The government has exercised strikes in the alternate zone on Carolyn Black, Number 122; Kay Tindell, Number 136; and Patrick Mitchell, Number 138.

Does the defendant have any objections?

MR. MOORE: No, Your Honor.

THE COURT: The defendant has exercised peremptory challenges on potential alternates, Number 125, Blassingame; 132, James Wood; and 139, Jimmy Chambless.

Does the government have any objections?

MR. ROPER: No, Your Honor.

THE COURT: All right. The alternates would then be Number 108, Christopher Rawlinson; Number 133, Mary Arledge; Number 127, Janice Bowden; Number 141, Michael Adams; and Number 143, Cathryn Kaufman.

Does that conclude our business here today, gentlemen?

U.S. DISTRICT COURT

Vol. 15: 21

MR. MOORE:  Yes, Your Honor.

THE COURT:  Thank you.

MR. MOORE:  Judge, at some point we need to visit with you very briefly about getting somebody to get up to speed for Dr. Finn.  You had limited us to $2500.  We're having some difficulty finding somebody to be able to do that for that amount of money.  I have got some information that I would like to give to the Court for you to look at and consider in that regard.

THE COURT:  Well, that number is elastic as far as I'm concerned.  That was a target.  If you can't do it for that, get me a brief motion, ex parte, under seal, if need be, and I'll raise it.  I'm sure your motion will show the reason.

MR. MOORE:  We'll do that, Your Honor.

THE COURT:  Thank you.

(End of proceedings, 10:20 a.m.)

-oOo-


CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, and that the transcript was prepared by me and under my supervision.

_Ana P. Warren_

Ana P. Warren, CSR #2302
U.S. District Court Reporter

4-8-97
Date

-oOo-

U.S. DISTRICT COURT

# EXHIBIT 4



Vol. 16: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA      .    CRIMINAL ACTION NO.
                                .      4:94-CR-121-Y

V.                                  .
                                 .    Fort Worth, Texas

BRUCE CARNEIL WEBSTER       .    April 4, 1996

. . . . . . . . . . . . . . .

VOLUME 16
TRANSCRIPT OF THE TRIAL
(Voir Dire Examination)
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:         MR. RICHARD B. ROPER
                                MR. PAUL D. MACALUSO
                                MR. CHRISTOPHER CURTIS
                                MS. DELONIA WATSON
                                Assistant United States Attorney
                                801 Cherry Street, Suite 1700
                                Fort Worth, Texas  76102-6897
                                (817) 978-3291

For the Defendant:          MR. LARRY M. MOORE
                                Attorney at Law
                                1112-A East First Street
                                Fort Worth, Texas  76102
                                (817) 338-4800

                                MR. ALLAN K. BUTCHER
                                Hill, Beatty, Butcher
                                  & Gallagher
                                201 Main Street, Suite 1300
                                Fort Worth, Texas  76102
                                (817) 336-3600

Court Reporter:             Ana P. Warren
                                U.S. District Court Reporter
                                501 W. 10th Street, Room 204B
                                Fort Worth, Texas  76102-3637
                                (817) 335-3050

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.



Vol. 16: 2

P R O C E E D I N G S

(Commencing, 9:40 a.m.  Jury present)

THE COURT:  Ladies and gentlemen, this is United States of America versus Bruce Carneil Webster, Cause Number 4:94-CR-121-Y.

You have been chosen to serve on this jury either as a juror or an alternate.  The jurors who have been chosen are Pat Jones, Clara Gonzales, Dorothy Johnston, Thomas Rhodes -- in fact, let me start over.  And while I list the names, let me have you just answer "here" as I call your name.

Pat Jones?

MR. JONES:  Here.

THE COURT:  Do you go by Pat or Gary?

MR. JONES:  Yes, sir, Pat.

THE COURT:  Clara Gonzalez?

MS. GONZALEZ:  Here.

THE COURT:  Dorothy Johnston?

MS. JOHNSTON:  Here.

THE COURT:  Thomas Rhodes?

MR. RHODES:  Here.

THE COURT:  Mary Jane Higginbotham?

MR. HIGGINBOTHAM:  Here.

THE COURT:  Danny Collard?

MR. COLLARD:  Here.

THE COURT:  Christopher -- let me call the regular

Vol. 16: 3

jurors, and then I'll get to the alternates.

Christy Davey?

MS. DAVEY:  Here.

THE COURT:  Joyce Owen?

MS. OWEN:  Here.

THE COURT:  Cynthia Ferris?

MS. FERRIS:  Here.

THE COURT:  Alice Barger?

MS. BARGER:  Here.

THE COURT:  Rita Kelton?

MS. KELTON:  Here.

THE COURT:  And Charles Fox?

MR. FOX:  Here.

THE COURT:  Alternates, Christopher Rawlinson?

MR. RAWLINSON:  Here.

THE COURT:  Mary Arledge?

MS. ARLEDGE:  Here.

THE COURT:  Janis Bowden?

MS. BOWDEN:  Here.

THE COURT:  Michael Adams?

MR. ADAMS:  Here.

THE COURT:  And Cathryn Kaufman?

MS. KAUFMAN:  Here.

THE COURT:  Are the parties satisfied that the correct jurors have been seated?

Vol. 16: 4

MR. ROPER:  The United States is, Your Honor.

MR. MOORE:  To the degree we have not already raised to the Court, yes, sir.

THE COURT:  All right.  The reason that I brought you in here this morning is not only to notify you that you have been chosen as a juror to sit in this case, but also to give you some brief preliminary instructions, and as well to ask you some questions.

Let me start by telling you that the 12 primary jurors will serve on the case, but should some primary juror fall ill, suffer an accident, or have some kind of a family emergency, the alternate jurors would be called to sit in the place of such a juror.  The alternates will not be treated any differently than any of the other jurors during the trial of the case, but once -- pardon me, once the deliberations begin, we will dismiss any alternate who has not been seated as a primary juror.

I gave each of you, as carefully as I could at the time of your primary voir dire, instructions not to discuss the case with anyone and to avoid media coverage.  As strongly as I could say that, I also know that sometimes it's not humanly possible to follow that instruction, that sometimes you can get involved in reading something or hearing something before you realize what it is you're hearing or reading.

So I need to know if there is anyone among you who found

Vol. 16: 5

him or herself unable to follow that instruction in toto, completely?  Anyone?

And there is no affirmative response.

I take it by your silence, then, that all of you were able to refrain from discussing it at home?  All of you were able to avoid media coverage?  No one has discussed the case with anyone whatsoever since you left here several weeks ago?

All right.  Thank you.

Let me renew that instruction.  In fact, at this time I am required by law to order you to not discuss the case with anyone.  That includes anyone at home.  It includes anyone. Just don't discuss it with anyone, not even with each other. As I said before, you can get to know each other, but don't discuss the case.

You're ordered, as well, to avoid media coverage.  I don't think there will be any media coverage until a few days before the trial is to begin.  That's the usual pattern, but I can't be sure of it, so what I'm going to instruct you to do is to avoid media coverage of all criminal cases.  That way we can be sure that you don't inadvertently receive some coverage of this criminal case.

So I don't care if you watch the news, but when matters concerning criminal defense or criminal cases come up, please leave the room, turn the dial, whatever you need to do to avoid that coverage.  Same with the newspaper.

Vol. 16: 6

If you want to follow it, have someone at your house save the newspapers, and you can read them when the case is over. Of course, you can read a newspaper between now and then, but I'm talking about avoiding the articles on criminal matters.

We will ask you to return here at 2:00 p.m. on June 3, and what we will do at 2:00 p.m. on June 3 is review with you, very similarly to what I have done this morning, whether you have been able to follow the orders of the Court regarding avoiding media coverage and regarding not discussing the case with anyone. If all of you have been successful at that, we will then send you on home and start the case at 9:00 a.m. the next morning, which will be Tuesday, June 4.

The jury room where you came this morning will be your home away from home for the two-to-three weeks that the case will take to try. You may bring food. Sometimes jurors bake cookies or bring cake, and sometimes they bring sack lunches and that sort of thing. There is a little refrigerator up there if you want to refrigerate anything. I think we have cleaned up the coffee pot, right, lately? So we will try to keep up with the coffee, and if you want to bring other things, you may.

Now, if you will notice, right up there above you is a vent, and it's going to blow some kind of air on you mostly all the time. Some days it will be hot air and some days it will be cold air, and we couldn't have a lot of advance notice as to

Vol. 16: 7

what it will be.  So you're probably a little chilly right now, but I would advise you to adopt the layered look for your attire during the trial so that you can add on a jacket as you need to or take it off if it gets too warm.  I really don't know what kind of air is going to be coming out of there from day-to-day.  They try.  It's an old system, and they try to make it comfortable, but sometimes they miss the mark.

Now, do any of you have any questions?  Please feel free to ask them.  If it relates to something about the case, I would just want you to raise your hand, and we would talk to you privately so the other jurors wouldn't hear what you have to say, but if you have any other kinds of questions, I think you can ask them right here in front of everyone, or if it's something too private, we will be glad to talk to you privately.

Yes, sir?

PROSPECTIVE JUROR:  I need some kind of notice for my work to tell them what time the trial starts and that I was here today and stuff.

THE COURT:  Okay.  My clerk's name is Judy Smalling. She's on the third floor, very near -- you will see a marking up there that says, clerk and law clerk to Judge Means.  That's me.  And it's just near the door up there on the third floor. Jim can help you find her.

PROSPECTIVE JUROR:  We have got certificates.

Vol. 16: 8

THE COURT:  You have got certificates.

(To the clerk)  Will you be able to give it to him today?

If you're afraid this certificate won't be enough, check with Mrs. Smalling, and we'll get you what you need.

PROSPECTIVE JUROR:  Thank you, sir.

THE COURT:  Whatever it is you need.  If you need a letter from me, I can do that, but work with her on that.  And, Jim, once you show him the certificate, if he's afraid that's not enough, if you will introduce him to Ms. Smalling?

COURT SECURITY OFFICER:  Yes, sir.

THE COURT:  Anything else?

Let me visit with the parties, counsel, at the bench briefly.

(Off-the-record discussion at the bench at this time)

THE COURT:  Yes, ma'am.

PROSPECTIVE JUROR:  Judge Means, what kind of apparel would you like women to wear?  Can we wear slacks?

THE COURT:  If you want to wear slacks that look nice, that's fine.  I would want you to be comfortable.  Please, no shorts or T-shirts.

Gentlemen, you don't have to wear a tie.  If you're used to wearing a tie, and you want to wear a tie, and you feel comfortable wearing a tie, you may wear a tie, but you don't have to.  I have gotten so used to it now, I would wear a tie to the swimming pool, I think.

Vol. 16: 9

We want you to look nice.  Reflect the fact that it's an important case, and I think you can see how attire reflects on our attitudes about things.  So just keep that in mind.

Any other questions?

MS. FERRIS:  I have a question about parking.  Once the trial starts, is there a certain place, or do we still have to fend for ourselves, basically?

THE COURT:  Assume that you have to fend for yourself.  We tried to work with the lot just over here and get arranged parking, and they would say they would be ready for us and then they wouldn't be.  So we finally got out of the business of trying to arrange it.  But I'll check into that between now and the next time.  Certainly, the first day you come, you will have to fend for yourselves.  I know it would be a convenience for you, though, if you had a certain place to park and you knew it would be there every day.  So since you will be here two-to-three weeks, I'll check into that and see if we can arrange it.  It was a big mess before, over six months.  So it may not be possible, but I will check into it.

Any other questions?

All right.  We'll see you at 2:00 p.m. on Monday, June the 3rd.

(Jury not present)

THE COURT:  Is there any matter we need to take up?

U.S. DISTRICT COURT

MR. ROPER:  There was a matter, Your Honor, of the -- any additional reasons we had struck the minority jurors or some of the minority jurors, and I think we would like to take that up.

THE COURT:  All right.  Ms. Watson?

MR. ROPER:  We just received this motion when we came in here, and I would like to look at it.  Ms. Watson is going -- I think she has the reasons.

THE COURT:  Well, it was my understanding that Mr. Moore did not have any objection to Ms. Watson stating for the record any additional reasons that the government had for striking -- using its peremptory challenges on certain veniremen.

Also, I think I stated my concern that those reasons be reasons that actually played a role in the decision by the government, and that Ms. Watson had been actively involved with that, and Mr. Roper assured me that she was.  So on that bias I'll receive that at this time.

MR. MOORE:  Judge, one thing, just for purposes of the record, I would like the record to reflect that prior to the jurors being brought in and impaneled this morning and instructed by the Court, we did, in fact, file our motion disputing the explanations that have heretofore been given regarding these peremptory challenges, and request that they be disallowed.  And that was delivered to the Court and provided

to counsel for the government prior to the jury being brought in.

THE COURT:  I haven't seen it.  It was brought in just a few minutes before we were to be here.  I don't know what the resolution of that will be, and I would assume that the government will have a response.

Ms. Watson, would you step to the lectern --

MR. ROPER:  I'm ready to give my response orally.  I can give it in writing if you want me to.

THE COURT:  I would prefer it in writing since I haven't even read the motion.

MS. WATSON:  Your Honor, there were, I believe, three of the five jurors that I had additional reasons for that were not listed in that information that was given to me by Mr. Roper.

In particular, on Prospective Juror Number 49, Mr. Nelson, one of the problems we had with that juror serving, although qualified, was the fact that he went back and forth about whether or not he could or couldn't, and one of the things in particular --

THE COURT:  Could or couldn't?

MS. WATSON:  Assess the death penalty if life without the possibility of release was an option.  In particular, he said on several occasions, I could change my mind.  So we were concerned that, although he was saying at this point that he

thought he could, we weren't certain that over the long haul, especially given the two-and-a-half months between the qualification of the juror and the actual commencement of the trial, that he would still retain that same position -- maintain that same position.

And he also talked about the fact that this arose from his religious beliefs, and that since he couldn't make that kind of sacrifice, that he was concerned about being able to -- that sacrifice being giving up his life for someone, he had real concerns about being able to assess the death penalty.

With regard to Mr. Mallory, our major concern with him was that he told us that he had changed his mind the last two or three years about assessing the death penalty, that before that, he used to think that there wasn't any real need for the death penalty.

Our concern was that Mr. Mallory said that he couldn't give us a reason to explain his change of heart, and considering that that change of heart came over just the last two or three years, it struck us odd that he couldn't justify or explain why he had changed his mind. So that left a question in our mind whether or not he might, in fact, change his mind again. We were also concerned that he made a point of saying that he was known for being different, for standing on his own. So we had a concern of his being a bit of a Maverick.

With respect to Mr. Reed, we also had a few concerns about

Vol. 16: 13

the Court's inability to locate him during that time period when we kept looking for him, looking for him, and we couldn't find him, and that sort of plays into the health concerns that he talked about.  And although he said he was fine now, we also had some concerns about his ability to actually sit in two-and-a-half months, not knowing exactly what the problem was with that medical condition.

Those are all the reasons -- those are all of the additional reasons that were not covered in the initial discussion.  Thank you.

THE COURT:  Thank you.

MR. ROPER:  I just want to make an additional response as to my reasons.

THE COURT:  Go ahead.

MR. ROPER:  You know, it's hard not to take it personal when somebody calls you a bigot, and I think that's what Mr. Moore and Mr. Butcher have done in this case.  I have been a prosecutor since 1982, and I don't think I have ever had maybe one or two challenges for Batson, and I must have tried 200 jury trials.  And if you go back and look at my record as a prosecutor, I have left blacks on juries on most of my cases. One of my best friends is a black man.

In fact, I think in the Orlando Hall case, I left on -- I didn't strike all the black jurors in the Orlando Hall case, and I don't do that.  You know, they called me a bigot on the

way we selected the prosecution in this case because we're trying this case as a death penalty, even though we have a black victim.

THE COURT:  Is there anything further?

MR. MOORE:  Not at this time, Your Honor.

THE COURT:  We're in recess until further -- pardon.

Mr. Roper, there was a matter that I thought we ought to get on the record.  It's my understanding that Dr. Coons, who had examined the defendant, had inadvertently mailed to the government his report.  Can you fill in the Court for the record on that?

MR. ROPER:  Yeah.  Mary Schrieffer knows more about it than I do.  She's my assistant, legal assistant.  I came back from lunch last week, I think it was, and she said -- I started walking towards my office, and she yelled at me on the way back there and said, Richard, you have got something that came in the mail for Judge Means.  So I walked back there, and it was sitting in my chair, and it was a letter and it was addressed to you, and it had been opened.

So I stopped and went back over there.  She had met me there, and she said, it's from a doctor.  So I knew what it had to be.  So I just gave it to her and told her to call your law clerk and give it to her.  So that's it.  I never did look inside.

THE COURT:  Can you certify to the Court that no one

in your office, other than your secretary, saw it, and that no one, including her, actually read it.

MR. ROPER:  Yeah.  She told me that.  She said she didn't read it.  She hadn't related anything that was in there except it was from Dr. Coons.

THE COURT:  Does the defense have any question about that?

MR. MOORE:  No, Your Honor.

THE COURT:  The matters being reviewed -- we're looking at it -- we asked that that be turned in to us, we're looking at it for potential Brady material.  That decision has not yet been made.  If we determine there is Brady material present, it will be turned over to the defendant, and at that time, of course, we'll need to let the government see it as well.

I believe that our instruction -- help me on this, but I believe our instruction was that this be delivered to the Court, and it would be delivered to the government for its use after the conclusion of the guilt or innocence phase.  Is that your recollection as well, gentlemen?

MR. MOORE:  It is, Your Honor.

THE COURT:  Anything further -- oh, Dr. Parker's report, where is that?  We don't have it.

MR. CURTIS:  I talked to him on the phone, and he said he had sent it to your office before Dr. Coons.  So I'll follow

Vol. 16: 16

up on that.  We don't have it.

THE COURT:  I don't think we have it.

MR. CURTIS:  Okay.   I'll follow up on that.

THE COURT:  Thank you.

Anything else?

We'll be in recess until June 3 or until further call.

(End of proceedings, 10:05 a.m.)

-oOo-

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, and that the transcript was prepared by me and under my supervision.

_Ana P. Warren_

4-8-97
Date

Ana P. Warren, CSR #2302
U.S. District Court Reporter

-oOo-

U.S. DISTRICT COURT