**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

| | |
|---|---|
| ORLANDO CORDIA HALL, <br><br> *Petitioner*, <br><br> v. <br><br> T.J. WATSON, in his official capacity as Complex Warden of U.S.P, Federal Correctional Complex (FCC) Terre Haute, <br> *Respondent*. | ) <br> ) <br> ) Civil Action No. 2:20-cv-599-JPH-DLP <br> ) <br> ) **DEATH PENALTY CASE** <br> ) <br> ) **EXECUTION SCHEDULED:** <br> ) **November 19, 2020** <br> ) <br> ) **EXPEDITED HEARING REQUESTED** <br> ) |

**PETITIONER ORLANDO HALL'S CORRECTED REPLY MEMORANDUM IN
SUPPORT OF PETITION AND MOTION FOR A STAY OF EXECUTION**

**INTRODUCTION**

Orlando Cordia Hall ("Mr. Hall") is scheduled to be executed in two days.  Mr. Hall,  who is Black, was convicted and sentenced by an all-White jury.  That was no accident.   Indeed, one of the prosecutors who helped pick  that jury is an adjudicated serial *Batson* violator.  But no court has ever heard the merits of Mr. Hall's challenge to the use of race-based peremptory strikes to produce the all-White panel that condemned him to death.

The government's lead—really, its only—argument against injunctive relief is that Mr. Hall unduly delayed in bringing suit.  This is wrong.  As a threshold matter, no time limit applies to a Section 2241 petition.  And the government neatly ignores the fact that the available evidence and procedural path for Mr. Hall's claims did not exist until 2015 for Mr. Hall's *Batson* claims and August 2020 for Mr. Hall's discriminatory prosecution claims.  And, by the time these claims became available, Mr. Hall had for years been protected against execution by a preliminary injunction to which the government had consented in 2007 and which it was thereafter content to leave in place until just several weeks ago.

Only after 20 pages of handwringing about supposed delay does the government turn to the merits of Mr. Hall's petition.  These arguments all fail.  The government largely sidesteps evidence of prosecutor Paul Macaluso's long history of using peremptory strikes to remove Black jurors and then offering pretextual explanations for doing so—conduct both the Supreme Court and the Fifth Circuit found to be compelling enough evidence of racial bias to warrant relief on *Batson* grounds in two separate cases.  And with this powerful history as context, it is clear from the trial record that the prosecution waged a successful campaign targeted at striking Black jurors from Mr. Hall's jury panel.  Rather than meaningfully rebut this evidence (which, of course, it

cannot do), the government spends most of its brief trying to convince the Court that it lacks the power to do anything about it. That is not the case.

The government can articulate no meaningful reason why Mr. Hall's execution must go forward now, before he is able to litigate his constitutional claims. A stay to allow Mr. Hall to fully litigate his claims is in the interest of justice and should be granted.

## ARGUMENT

### I.   MR. HALL'S PETITION IS TIMELY, AND NO PROCEDURAL BAR PREVENTS THE COURT FROM GRANTING RELIEF.

#### A. No Procedural Bar Applies.

Though the government spends much of its opposition brief complaining about supposed delay, Dkt. 12 at 6-19, it does not identify any procedural bar that actually prevents the Court from adjudicating Mr. Hall's claims or granting a stay of execution. Nor could it under the law. Because no statute of limitations applies to Section 2241 petitions, Mr. Hall's petition is timely. *See Day v. Watson*, 798 F. App'x 27, 29 (7th Cir. 2020); *see also Morales v. Bezy*, 499 F.3d 668, 672 (7th Cir. 2007).[1] The government does not argue otherwise. Rather, the government urges the Court nevertheless to deny Mr. Hall's petition and stay motion because Mr. Hall could have raised claims of racial discrimination long ago. Dkt. 12 at 6-10.

The government claims that a stay of execution and habeas relief are unavailable because "the facts underlying Hall's claims have existed for years." *Id.* at 6. This is wrong on the law and the facts. As a matter of law, while the Court may consider undue delay in determining whether to grant a stay, *Lambert v. Buss*, 498 F.3d 446, 452-53 (7th Cir. 2007), even genuine delay is not,

---

[1] *See also Hayes v. United States*, Nos. 17-CV-923-PP, 19-CV-211-PP, 95-CR-135-PP, 2020 WL 4201814, at *8 (E.D. Wis. July 22, 2020); *Roberts v. Watson*, No. 16-CV-541-BBC, 2017 WL 1483584, at *1 (W.D. Wis. Apr. 25, 2017).

standing alone, a basis for denial and certainly does not mandate that result.  The government does not cite any case to the contrary.  Invoking *Lee I*, where the petitioner delayed two months after learning of his execution date before bringing a habeas petition under § 2241, Dkt. 12 at 10, the government ignores how differently situated Mr. Hall was two months before his currently scheduled execution date.  Two months ago, and in fact until September 20, Mr. Hall was protected from execution by an injunction that had been in place for 13 years.  Moreover, Mr. Lee received significantly more notice of his execution date than Mr. Hall, who only received 50 days of notice.

### B.  Mr. Hall Did Not Unduly Delay In Raising His Claims Of Racial Bias.

The nearly twenty pages the government spends complaining about purported delay by Mr. Hall ignores the facts and the history of this case.  These facts include that: (i) powerful evidence of racial bias by one of the prosecutors who helped pick Mr. Hall's jury (indeed, evidence that both the Supreme Court and Fifth Circuit found dispositive of his racial animus) did not emerge until after Mr. Hall's § 2255 proceedings ended; (ii) until two months ago, Mr. Hall was protected from execution by an injunction that had been in effect for thirteen years; and (iii) Mr. Hall's counsel lacked sufficient resources—despite substantial efforts to obtain them—to mount an adequate *Batson* challenge, particularly when, due to the long-running stay, no execution date was imminent.

**Previously unavailable evidence.**  Critical evidence showing that the prosecution in Mr. Hall's case exercised peremptory strikes on the basis of race to exclude four of five qualified Black jurors and seat an all-White jury did not emerge until after Mr. Hall's direct appeal and § 2255 proceedings concluded. This puts to rest the government's arguments that Mr. Hall is foreclosed from litigating these claims because he should have raised them in those proceedings.  Dkt. 12 at 13-17.  As discussed below, *infra* at 11-15, in *Miller-El v. Dretke*, 545 U.S. 231 (2005) ("*Miller-*

*El II*"), decided the year after Mr. Hall's § 2255 petition was denied, the Supreme Court held that prosecutor Paul Macaluso violated *Batson* when he peremptorily struck 91 percent of eligible Black jurors and gave reasons for striking Black jurors that were "evidence of pretext." To support that finding, the Court credited evidence that Macaluso's 15-year tenure at the Dallas County District Attorney's Office was marred by that office's creation and use of a manual, "Jury Selection in a Criminal Case" (sometimes known as the Sparling Manual), which reflected "a formal policy to exclude minorities from jury service." *Miller-El II*, 545 U.S. at 264 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 334 (2003) ("*Miller-El I*")). Four years after *Miller-El II* was decided, the Fifth Circuit concluded—based on evidence similar to that presented in *Miller-El*, that Macaluso had violated *Batson* in another case. *See Reed v. Quarterman*, 555 F.3d 364, 382 (5th Cir. 2009) ("One of the same lawyers that conducted the voir dire in *Miller-El*'s case, Paul Macaluso, also questioned prospective jurors for Reed's trial."); *id.* (considering "the historical evidence of racial bias among the[] prosecutors," including Macaluso, "we view this exact same evidence as persuasive here"). This was the first time the Fifth Circuit had ever found a *Batson* violation (and is today one of just two such decisions in that Circuit).[2] *Reed*, 555 F.3d at 382.

Accordingly, litigating a *Batson* claim on direct appeal or in Mr. Hall's § 2255 petition based on the trial record alone, before *Miller-El* and *Reed* were decided, would have been hopeless. *See* Exhibit 1 ¶¶ 8-9 (November 17, 2020 Declaration of Robert C. Owen) ("Nov. 17 Owen Decl."); Exhibit 2 ¶¶ 3, 5 (November 17, 2020 Declaration or Marcy Widder) ("Nov. 17 Widder Decl."). And there are good reasons why Mr. Hall did not bring these claims until now. Absent from the government's repeated complaints about supposed delay is any discussion of the fact that

---

[2] Indeed, the Fifth Circuit *denied* relief to Mr. Miller-El on his *Batson* challenge, a denial the Supreme Court subsequently reversed.

Mr. Hall was protected from execution by an injunction that began in 2007 and was not lifted until just weeks ago, and just ten days before the government rushed to set his execution (on the fastest timetable in the history of the modern federal death penalty) in the midst of a global pandemic. Order, *Roane v. Gonzales*, No. 1:05-cv-02337-TSC (D.D.C. June 11, 2007), Dkt. 68; *In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C. Sept. 20, 2020), Dkts. 265 & 266.  The government also conveniently ignores that it consented to that reprieve, further undercutting any legitimate complaint about delay by Mr. Hall.

Though no court-ordered stay is infinite, neither are attorney resources.  Mr. Owen and Ms. Widder have diligently represented Mr. Hall over the course of many years while maintaining an active caseload, serving clients in other capital cases, and waging a persistent but ultimately unsuccessful campaign to secure funding to develop facts and conduct investigation in Mr. Hall's case.  *See* Nov. 17 Owen Decl. ¶¶ 6, 28, 30; Nov. 17 Widder Decl. ¶ 8.  They repeatedly asked the court for more resources in Mr. Hall's case—including for the express purpose of investigating new evidence of race bias that would support a potential *Batson* claim—and these requests were repeatedly refused.  *See* Nov. 17 Owen Decl. ¶¶ 17; 19-21.  Mr. Hall's counsel encountered similar obstacles when they sought additional resources to investigate these potential claims during the appellate process.  *See* Nov. 17 Owen Decl. ¶ 22.  And their efforts to persuade the appellate court that more resources would be necessary resulted not in additional funding, but a *reduction* to the already meager budget in Mr. Hall's case.  *See* Nov. 17 Owen Decl. ¶ 22 n.2.  Receiving no relief from the courts, Ms. Widder and Mr. Owen had no choice but to marshal their limited resources in service of Mr. Hall's existing legal claims.

Additionally, compelling new evidence of racially discriminatory practices in the federal death penalty relevant to Mr. Hall's case did not emerge until August 2020.  The Inter-American

Commission on Human Rights ("IACHR") issued a new report in the case of federal death row inmate Julius Robinson, who was also tried and convicted in the Northern District of Texas' Forth Worth division. *See Report No. 210/20 Case 13.361: Report on Admissibility and Merits (Publication)*, IACHR, 7 n.7 (Aug. 12, 2020), https://www.oas.org/en/iachr/decisions/2020/USad13361EN.pdf. That report concluded the federal death penalty operates in a racially biased manner. Accompanying Julius Robinson's submission was a 2010 study that his lawyers had retained sociologist Scott Phillips, Ph.D. to perform. *See* Exhibit 5 to Pet., Dkt. 1-7. Phillips "conduct[ed] a statistical analysis regarding the possible effect of race on the federal death penalty in Texas[,]" *id.* ¶ 2, and made several findings. He concluded that over a 22-year period, federal prosecutors in Texas were eight times more likely to seek a death sentence in cases with Black defendants and that a death verdict was sixteen times more likely to be returned for a Black Defendant compared to cases with non-Black defendants. *Id.* ¶ 7. Evidence from the Northern District of Texas told the same story: Dr. Phillips concluded "the same patterns [held] true" in that jurisdiction, where Mr. Hall was tried and convicted. *Id.* ¶ 8. This evidence was unavailable to Mr. Hall until the IACHR published its report on August 12, 2020. And while the government insists that Mr. Hall, too, *could* have retained a statistical expert to conduct such an analysis, Dkt. 12 at 9, the repeated denials by the trial court belie such an argument.

### C. Mr. Hall's Petition Is Properly Brought Under The Savings Clause.

Section 2241 is an appropriate vehicle for Mr. Hall's claims, and in fact is the only vehicle for those claims. In attempting to block access to the savings clause, the government— incorrectly—characterizes § 2241 as available only to bring arguments that are entirely new, in both law and fact. Dkt. 12 at 13-14. No such limitation is present in the text of the AEDPA or

borne out in the case law.  Instead, all that is required to satisfy the path set forward in *Webster* is newly discovered evidence.  *Lee v. Warden USP Terre Haute*, No. 19-cv-00468, 2020 WL 3489355, at*1 (S.D. Ind. June 26, 2020) ("To satisfy the § 2255(e) savings clause using the path outlined in *Webster*, a petitioner must proffer newly discovered evidence."); *Webster v. Daniels*, 784 F.3d 1123, 1134-35, 1139-40 (7th Cir. 2015) (permitting Webster to raise an *Atkins* claim via § 2241 based on previously unavailable evidence even though "*Atkins* had already been decided at the time of Mr. Webster's initial section 2255 motion").  Unde*r Webster*, § 2255 may be shown to be inadequate where its procedural limitations would bar the introduction of new evidence to support a claim, even if the underlying legal argument could previously have been made under § 2255.

That is precisely the situation here.  None of the evidence Mr. Hall cites to support his claims was available when he filed his § 2255 motion.[3]  *Supra* at 3-6.  Nor could it have been introduced in a successive § 2255 petition because it neither undercuts "the movant['s] guilt[ ]" nor relies on a "new rule of constitutional law."  Dkt. 1 at 17 (quoting 28 U.S.C. §§ 2255(h)(1)-(2). ).  The only avenue for Mr. Hall to litigate these important constitutional claims is, therefore, through § 2241.

The government nevertheless suggests that *Webster* is inapplicable because Mr. Webster relied on constitutional cases decided after the enactment of AEDPA.  Dkt. 12 at 16-17.  This, too, is wrong.  The concerns that animate *Webster* are protecting the rule of law and adhering to the

---

[3] The government repeatedly argues that because *Batson* claims are in large part based on the record at trial, all the evidence Mr. Hall needed to support his *Batson* claim was available to him from direct appeal onward.  But this ignores that Mr. Hall's *Batson* claim would have been a non-starter without the evidence that first became available in *Miller-El II*—i.e., after Mr. Hall's direct appeal and § 2255 proceedings had concluded.  The government's position is tantamount to arguing that because Mr. Webster was intellectually disabled at the time he litigated his § 2255 motion, he had all the evidence he needed to bring and succeed on such a claim in that proceeding.

Supreme Court's interpretation of constitutional rights, and privileging those important values over the mechanical application of procedural limitations that would otherwise hinder the enforcement of a petitioner's rights. 784 F.3d at 1139 (finding "a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence" and "there is no reason to assume that our procedural system is powerless to act in such a case"). While Mr. Hall, unlike Mr. Webster, could theoretically be found eligible for the death penalty in a fairly conducted trial, *this* death sentence— the one the government is grimly determined to carry out in less than three days—is marred by racism. It is intolerable that such an unconstitutional defect based on an "immutable characteristic" of Mr. Hall and the jurors struck from the venire, should influence Mr. Hall's fate. *Buck v. Davis*, 137 S. Ct. 759, 765 (2017). In seeking to vindicate his rights under *Batson* and the Fifth and Eighth Amendments, Mr. Hall brings meritorious claims every bit as legitimate and strong as those presented in *Webster*. Given the powerful evidence before the Court that racial bias infected Mr. Hall's trial, access to § 2241 is necessary to guarantee meaningful enforcement of such protections and ensure the integrity and vitality of our legal system.

### D. Good Cause Exists To Excuse Any Delay.

Even if the Court were to find that Mr. Hall should have brought these claims sooner, it nevertheless should grant a stay and permit him to litigate them because declining to do so would "result in a 'fundamental miscarriage of justice.'" *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991) (internal quotation omitted).[4] Racial bias in a criminal trial is so antithetical to constitutional values that the Supreme Court has gone to great lengths to repeatedly condemn it. *See, e.g.*, *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017) ("The unmistakable principle

---

[4] Mr. Hall does not need to meet *Coleman*'s cause-and-prejudice standard because he has not committed procedural default. Should this Court require such a showing, however, Mr. Hall can demonstrate both cause and prejudice, for the reasons explained herein.

8

underlying these precedents is that discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'") (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)). Because the execution of a death sentence imposed on the basis of racial discrimination works a fundamental "miscarriage of justice" upon that defendant, *see Wainwright v. Sykes*, 433 U.S. 72, 91 (1977), a habeas petitioner may prevail if he puts forth evidence tending to show that his case satisfies the "miscarriage-of-justice exception." *See House* v. *Bell*, 547 U.S. 518, 536 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). On a full record, Mr. Hall will demonstrate that his case falls within that equitable exception.

The racial animus that infected Mr. Hall's capital trial is a "fundamental miscarriage of justice" that can be corrected on habeas review despite any claimed procedural bar. *Coleman*, 501 U.S. at 750. Though the government downplays Mr. Hall's *Batson* arguments generally and Macaluso's role in the case specifically, Dkt. 12 at 3, 19-21, 32-34, no degree of race-based discrimination is permissible when it comes to capital proceedings. In this most solemn class of cases, "[s]ome toxins can be deadly in small doses." *Buck*, 137 S. Ct. at 777 (finding prejudice where testimony appealing to racial stereotypes was introduced during the penalty phase); *see also Turner v. Murray*, 476 U.S. 28, 35 (1986) (because of "the complete finality of the death sentence," the "risk of racial prejudice infecting a capital sentencing proceeding" is "especially serious"). This is precisely why equitable exceptions exist for correcting fundamentally unjust results where racial bias has distorted the outcome: because the government "lack[s] an interest in enforcing a capital sentence obtained on so flawed a basis." *Buck*, 137 S. Ct. at 779.

Mr. Hall presents compelling evidence that he was "sentenced to death in part because of his race." *Id.* at 778. That evidence of racial animus outweighs other interests, like finality and efficiency, that might justify foregoing review of a claim that lies farther from the constitutional

9

heartland.  In a federal death penalty case like this one, the comity interests that animate federalism concerns in state-prisoner cases are absent.  And on occasion, even a strong presumption in favor of finality can be overcome: "In appropriate cases those principles must yield to the imperative of correcting a fundamentally unjust incarceration."  *Engle v. Isaac*, 456 U.S. 107, 135 (1982) (observing that "victims of a fundamental miscarriage of justice will meet the cause-and-prejudice standard"); *Buck*, 137 S. Ct. at 779 (noting that "the State's interest in finality deserves little weight" in a case of fundamental injustice).  Mr. Hall brings this Court such a case.

Mr. Hall will undeniably be prejudiced in the most serious and irreversible way if the Court declines to consider these claims given the stakes of this action.  That is doubly so given that there is no actual procedural bar to hearing Mr. Hall's claims, and the government's invocation of delay is merely one consideration informing the Court's decision about whether to permit Mr. Hall to proceed.  The path the government advises would conscript the Court's equitable powers in the service of denying relief to a man who can show that racial bias distorted the mechanism of his trial and sentencing and is now, suddenly, facing imminent execution.  Mr. Hall's extraordinary case deserves consideration on the merits.

### E.  The Petition Is Not An Abuse Of The Habeas Writ.

The government's reliance on the abuse-of-the-writ doctrine underscores the weakness of its procedural objections to Mr. Hall's petition.  The cases the government cites all involve a successive  § 2241 petition advancing previously litigated and rejected claims.  *See* Dkt. 12 at 10-11.[5]  As the government recognizes, that is not what Mr. Hall seeks to do here; instead, his race-

---

[5] *See Arnaout v. Marberry*, 351 F. App'x 143, 144-45 (7th Cir. 2009) (dismissing successive § 2241 petition raising claims identical to those brought in an earlier § 2241 petition that had beenwas dismissed just ten months prior); *Roundtree v. Krueger*, 910 F.3d 312, 314 (7th Cir. 2018) (rejecting "[a]n attempt to relitigate a theory" that a habeas petitioner had already unsuccessfully brought in an earlier section 2255 petition).

based discrimination claims in this action are "new claims" based on previously unavailable evidence. Dkt. 12 at 4.

The abuse-of-the-writ doctrine erects no barrier to the claims for relief presented here, which rest on colorable new evidence of equal protection violations in Mr. Hall's trial. Ultimately, as a matter of law, nothing bars this Court from considering the claims Mr. Hall has raised. And given the gravity of those claims, there are compelling reasons to do so.

## II.    MR. HALL IS LIKELY TO SUCCED ON THE MERITS OF HIS CLAIMS.

### A.    Mr. Hall is Likely To Succeed On His *Batson* Claim.

Given how little of substance the government has to say about the merits of Mr. Hall's *Batson* claim, it comes as no surprise that these arguments make their first appearance on page 19 of the government's brief. They fail for at least three reasons: First, the government completely ignores the significance of Paul Macaluso's shameful history of race-based peremptory challenges.[6] Second, having ignored the weight of that history on Mr. Hall's claim, it conflates Mr. Hall's theoretical ability to raise a *Batson* claim on appeal—a claim that would have lost without the critical evidence *Miller-El* brought to light—with the claim Mr. Hall now raises and accordingly seeks to distract this Court from considering Mr. Hall's compelling claim of racial discrimination by the government with a meritless attack on Mr. Hall's purported delay tactics.

---

[6] As the Supreme Court found in *Miller-El II*, the office in which AUSA Macaluso was groomed "for decades[,] . . . followed a specific policy of systemically excluding blacks from juries." 545 U.S. at 263-64 (2005). Indeed, the *Miller-El II* opinion identifies Macaluso by name *ten times*, *id.* at 236, 248-50, 256, and finds the reasons he gave for striking Black jurors "incredible," *id.* at 265. Four years later, the Fifth Circuit repeatedly mentioned Macaluso by name in another case, finding that he had again violated *Batson* by striking Black jurors on the basis of their race, and again given pretextual justifications for those strikes that were disproven by the record. *See Reed v.,* 555 F.3d at 371, 371 n.3, 382.

And, finally, the government's attempts to validate the strikes of prospective jurors Evans and Lee are unavailing because they are wholly belied by the record.[7]

The government attacks Mr. Hall for relying "on innuendo he draws from *Miller-El* and *Reed* relating to pre-*Batson* jury-selection practices in the Dallas District Attorney's Office and Macaluso's role in jury selection in those cases before he joined the U.S. Attorney's Office." Doc. 12 at 26. It further asserts that the Department of Justice abhors "any racially discriminatory jury-selection process, including the Dallas District Attorney's Office's pre-*Batson* voir dire practices as described in *Miller-El*."[8] Sanctimony aside, the government's argument suggests that however many Black citizens Macaluso assiduously blocked from jury service during his years at the Dallas

---

[7] The government also recites a string of irrelevant—and misleading—considerations that risk distracting the Court from the clear racial bias displayed by the prosecution at Mr. Hall's trial. *See* Dkt. 12 at 35-36. To put these to rest: (1) the fact that one potential juror did not identify her race in no way undermines Mr. Hall's claims. At the *Batson* colloquy at trial, the prosecution agreed with the defense's characterization that prosecutors had exercised peremptory strikes against "four out of five potential black jurors," Ex. 9 to Pet. at 7:21-22, 8:6, Dkt. 1-11. The government also did not contest the defense's statement that "the only person . . . of the black race that is a potential juror . . . is . . . Kelvin Johnson, who is the third alternate juror. *Id.* at 6:19-2, 8:13-15; (2) the government's arguments that Latinx or Hispanic jurors may have served or that the trial court excused "some non-white or self-identified Hispanic/Latinx potential jurors for cause," Dkt. 12 at 34, are wholly irrelevant to the government's conduct in striking Black jurors, as is the defense's predictable use of a peremptory strike on Natalie Harris, *id.* at 35; and (3) it is preposterous to say that Mr. Hall's "jury did include a self-identified Black individual—Kelvin Johnson," where the government itself admits Mr. Johnson "was an alternate" and therefore did not actually serve on the jury, *id.* at 34.

[8] Nor does the federal government have an unimpeachable track record in this regard. *See, e.g.*, *United States v. Atkins*, 843 F.3d 625, 637 (6th Cir. 2016) ("[T]he government's reasons for striking [juror] were pretexts for racial discrimination."); *United States v. Odeneal*, 517 F.3d 406, 420 (6th Cir. 2008) (*Batson* violated where the totality of the circumstances established "that the prosecutor's purported explanations smacked of pretext, thus proving the discriminatory use of the peremptory strike"); *United States v. Wilson*, 884 F.2d 1121 (8th Cir. 1989) (*Batson* violated where prosecutor's reliance on racial stereotype did not rebut prima facie case of discrimination).

District Attorney's Office, his slate was wiped clean once *Batson* demonstrated the error of his ways.[9]

That is absurd. "For more than a century," *i.e.* long before *Batson*, the Supreme Court has held "consistently and repeatedly . . . that racial discrimination by the State in jury selection offends the Equal Protection Clause." *Miller-El*, 545 U.S. at 238 (citing cases). Dallas County prosecutors surely knew that their race-based jury selection practices were improper. Perhaps that accounts for the fact that Paul Macaluso, when accused of striking Black jurors because of they were Black, *lied* about what he did. *See Miller-El*, 545 U.S.at 265; *Reed*, 555 F.3d at 380. Macaluso's history as both a repeat *Batson* violator *and* as a repeat *Batson* prevaricator has obvious bearing here, despite the government's efforts to wipe it away as an inconsequential relic of a bygone era. This history is unquestionably relevant. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2246 (2019). And it bears directly on the strength of Mr. Hall's *Batson* claim here. Dkt. 3-1 at 6-9.

As for the argument that Mr. Hall should have brought his *Batson* claim on appeal or in his original § 2255 petition, Dkt. 12 at 21, this contention ignores entirely that the Supreme Court did not decide *Miller-El* until after those proceedings had concluded, and that the Fifth Circuit's decision in *Reed v. Quarterman* was not issued for nearly five years after that. As detailed in the attached Declarations of Robert C. Owen ("Owen Decl.") and Marcia A. Widder ("Widder Decl."), without the evidence that first emerged through the *Miller-El II* decision, any *Batson* claim was a sure loser. That is underscored by the fact the district court that presided over Mr. Hall's § 2255 proceedings repeatedly denied all requests for funding, including for any investigation or work by

---

[9] The government also insinuates that Macaluso had a limited role in voir dire, given Roper's role as lead counsel and the presence of two other AUSAs on the prosecution team. *See* Dkt. 12 at 26. In fact, Roper and Macaluso divided up the voir dire pretty evenly, with Macaluso questioning 43 jurors to Roper's 42 (while 15 jurors were excused before the lawyers questioned them).

13

counsel that could have supported a *Batson* claim. Nov. 17 Owen Decl. ¶ 29. And then there is

the practical reality that Mr. Hall was protected from execution by a long-running injunction that

lasted from 2007 until just weeks ago. In light of that injunction—to which the government

consented (undercutting their protests about delay by Mr. Hall)—and the significant constraints

caused by the lack of funding that has marked Mr. Hall's case from its early stages, Mr. Hall's

counsel had no meaningful opportunity or avenue to pursue this *Batson* claim until now.[10]

The government's attempts to justify the prosecution's exercise of peremptory strikes at

trial fare no better. "Accepting new, unrelated reasons extending well beyond the prosecutor's

original justifications for striking Watson amounts to clear error under the teaching of *Miller-El

II*." *United States v. Taylor*, 636 F.3d 901, 906 (7th Cir. 2011); *see also Miller-El*, 545 U.S. at 252

("[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons

as best he can and stand or fall on the plausibility of the reasons he gives.")). In fact, the Seventh

Circuit has instructed that the government's invocation of such post-hoc rationales *itself* "raises

the specter of pretext." *Taylor*, 636 F.3d at 906. That is the case here.[11] For example, the

government now claims that one of the reasons prospective Black juror Amy Evans was struck

was because "her husband was a minister and likely opposed . . . the death penalty," Dkt. 12 at

27—and that White jurors accepted by the prosecution purportedly lacked that characteristic. But

---

[10] Mr. Hall's counsel were required to seek funding for any/all work they performed in the § 2255 proceeding. This required them to spend thousands of dollars out of their own pockets, *see, e.g.*, Nov. 17 Owen Decl. ¶ 18, and severely curtailed what work could practicably be done on the case. All other counsel were limited in their representation to specific matters. Nov. 17 Owen Decl. ¶ 26. Undersigned counsel at Hogan Lovells were not retained until October 29, 2020.

[11] The government makes much of the AUSA Roper's purported reliance on "painstaking[ly] detailed . . . notes he made of each juror's written questionnaire and of each juror's individual voir dire examination." Dkt. 12 at 25. Those notes are not in the record. They should be disclosed to Mr. Hall and the Court so that their significance may be fairly assessed.

the prosecution never articulated this justification when defending its strike of Ms. Evans.[12]  Under *Taylor*, the Court can and should consider the fact that the government felt the need to search outside of the prosecution's stated justifications for its strikes as evidence of pretext.  636 F.3d at 906.  At the very least, the Court must disregard any post-hoc explanations and "consider only the reasons initially given to support the challenged strike" by the prosecution at trial.  *Id.*  And, "[m]uch like in *Miller-El II*, '[c]omparing [these strikes] with the treatment of panel members who expressed similar views supports a view that race was significant in determining who was challenged and who was not.'"  *Reed*, 555 F.3d at  380-81 (citing *Miller-El II*, 545 U.S. at 252); *see also id.* ("the comparative analysis demonstrates what was really going on: the prosecution used its peremptory challenges to ensure that African-Americans would not serve on Reed's jury"). *See also* Dkt. 1 at 31-40.[13]  This applies with equal force to the government's efforts to reshape the prosecution's lies about challenging jurors for cause as "accidental misstatements."  Dkt. 12 at 33-34.

**Amy Evans.**  The government claims it struck Ms. Evans because she: (1) "had two brothers-in-law in prison," Ex. 9 to Pet. at 11:1, Dkt. 1-11; and (2) expressed equivocal views about the death penalty, *id.* at 11:4-5; *id.* at 11:8-9.  On the first of these proffered reasons, the prosecution did not ask Ms. Evans a single question on this topic, which "is evidence suggesting

---

[12] Not only is this a post-hoc justification that the Court should set aside as a matter of law, it is contradicted by the record.  When Ms. Evans was questioned during voir  dire about her husband's beliefs, she stated that it would not impact her ability to serve fairly because being on the jury was an individual issue, that she didn't really know what his beliefs were on the subject and had just assumed it, and that she asked him about his beliefs after filling out the questionnaire and he said he didn't know.  Ex. 11 to Pet. at 93-94, Dkt. 1-13.

[13] The government repeatedly argues that Mr. Hall has conceded that the strikes of Frances Miller and Lawrence Barrett were legitimate.  Mr. Hall said no such thing, *see* Dkt. 1 at 36 n.13, and reserves the right to raise such challenges.  He nonetheless has focused here on the strikes against prospective jurors Evans and Lee given the starkly apparent evidence discrediting the government's proffered reasons for striking them.

that the explanation is a sham and a pretext for discrimination." *Miller-El II*, 545 U.S. at 246. And, the government accepted multiple non-Black jurors with family members in prison or who had recently been in prison, Dkt. 1 at 33, which also demonstrates pretext. 545 U.S. at 241.

As for Ms. Evans' views about the death penalty, the government clings to purported differences between Ms. Evans and seated White juror Mary Ann Herring, stating that "the two were not the same in terms of their beliefs about the death penalty," because "Ms. Evans said her support of the death penalty was dependent on the nature of the crime." Dkt. 12 at 26. But so did Ms. Herring. Like Ms. Evans, Ms. Herring provided both "yes" and "no" answers in her questionnaire, Ex. 21 to Pet at Q.52a, Dkt. 1-23, writing that the application of the death penalty "would depend on the crime," *id.*; and she testified during voir dire that the death penalty should "depend on the circumstances" and "on the crime," Ex. 18 to Pet. at 118:24, 119:2–3, Dkt. 1-20. Another seated White juror, Linda Harrell, also said that the death penalty was "deserving in some cases under the right circumstances." Tr. Vol. 8:59 (Gov't App'x at 124).

**Billie Lee.** The government attempted to justify its peremptory strike against Ms. Lee by claiming that: (1)"[s]he had a brother-in-law who was a criminal defense attorney," *id.* at 14:7–8, and (2) she was "impaired just because of her questionnaire," Ex. 9 at 13:10–11, Dkt. 1-11.[14] Neither reason is convincing. She was never even questioned about her brother-in-law's employment during voir dire, which, once again, undercuts any suggestion that the government had concerns about this fact. *See Miller-El II*, 545 U.S. at 246. And the government seated a White

---

[14] The government ignores that prosecutors originally proffered as a reason to exclude Ms. Lee that she was "on a prior jury trial for robbery and found the defendant not guilty," which was simply not true. And the government actually *accepted* a White juror who served on a prior jury and acquitted a defendant on a charge of murder. It was only upon noticing this misrepresentation that the prosecutor pivoted to claiming that Ms. Lee was struck because her "brother-in-law . . . was a criminal defense attorney." Dkt. 1 at 36.

juror whose brother was a public defender, Dkt. 1 at 37, which also is evidence of pretext. *Id.* at 241.

As to her questionnaire, the prosecution tried to construe Ms. Lee's answers as stating that she supported the death penalty only in a very limited set of circumstances, which did not apply to Mr. Hall's case. As an initial matter, this explanation omitted the fact that she gave as examples of crimes deserving the death penalty not only "serial killers" and "child molesters who kill their victims," but also "people who kill for the sake of killing." Ex. 27 to Pet. at Q 48, Dkt. 1-29. Moreover, her testimony during voir dire made clear that her views about what types of offenses warranted the death penalty were far more expansive than AUSA Roper claimed. In response to a question as to "what sorts of crimes [she thought] the death penalty ought to be reserved for," she stated: "I thought about that. Anything that involves children, murder of children, cruelty to children, incorrigible kinds of acts perpetrated by someone repeatedly, to me that's the worse thing that you could do." Ex. 11 to Pet. at 125:16–19, Dkt. 9. Given the government's characterization of Mr. Hall as a "child murderer," the prosecutor's claim that Ms. Evans' views about the death penalty caused them concern is flatly incredible—even without considering that the prosecution accepted White jurors who expressed similar views.

In light of the Supreme Court's decision in *Miller-El II*—both the legal principles it articulated and its specific finding that one of the very same prosecutors responsible for seating the all-White jury that convicted and sentenced Mr. Hall had discriminated on the basis of race and then tried to conceal that discrimination by offering pretextual justifications—Mr. Hall has established a likelihood of success of establishing, at a minimum, that Ms. Lee and/or Ms. Evans were impermissibly struck on account of their race, in violation of *Batson*.

**B.      Mr. Hall is Likely to Succeed on His Claim that the Death Penalty as Applied in Federal Prosecutions in Texas is Impermissibly Tainted with Racial Bias.**

The government does not meaningfully dispute that the data presented in Mr. Hall's petition demonstrate the racially biased application of the federal death penalty in Texas. Opp. 35-37. Nor could it. These data show that the death penalty was nearly **eight times** more likely to be authorized in cases with a Black defendant than a non-Black defendant. Ex. 5 to Pet. ¶ 7, Dkt. 1-7. And a death verdict was nearly **sixteen times** more likely to be rendered in a case with a Black defendant than a non-Black defendant. *Id.*

This striking statistical evidence, when coupled with the case-specific evidence of racial animus in Mr. Hall's case, *see supra*; *see also* Dkt. 1 at 19-37; Dkt. 3-1 at 11-13, presents a compelling claim that Mr. Hall's trial was impermissibly influenced by race at every stage—from the charging decision, to the decision on where to conduct the trial, to jury selection, to conviction, to sentencing.[15]

The government's only substantive rebuttal to the data is to suggest that factors other than race may have influenced the jury's decision to hand down the death penalty. Opp. at 37. But had Mr. Hall not been tried by an all-White jury seated through a deliberate effort by the prosecution— including serial *Batson* violator Paul Macaluso—to eliminate Black jurors, there is a reasonable probability that the case might have ended differently. *See Buck*, 137 S. Ct. at 776 (noting that a crime may call for a sentence of death, but race-based testimony improperly influenced jury's determination). This is precisely the type of arbitrariness and discrimination that the Fifth and Eighth Amendments and the Federal Death Penalty Act forbid. *See Furman v. Georgia*, 408 U.S. 238, 310 (1972) (Stewart, J., concurring in the judgment); *see also Pena-Rodriguez v. Colorado*,

---

[15] This combination makes this case unlike *McCleskey v. Kemp*, 481 U.S. 279 (1987), where the death-sentenced prisoner's claim relied exclusively on statistical evidence and other generalized evidence about racial bias in the administration of the death penalty.

18

137 S. Ct. 855, 867–68 (2017) (discussing the Supreme Court's continuing commitment to eliminating racism in legal proceedings); 18 U.S.C. § 3593; 18 U.S.C. § 3595

Because Mr. Hall is likely to succeed on the merits of this claim the Court should stay his execution to allow him to litigate it.

## III.     THE EQUITIES TIP IN FAVOR OF A STAY.

Lastly, the equities tip in favor of an injunction.  Mr. Hall's interest in having the merits of his substantial claims adjudicated, "particularly when so much is at stake," means that, at a minimum "'the Government should turn square corners.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)). When a death-sentenced citizen alleges violations of his constitutional rights—"[t]his is not the case for cutting corners[.]" *See id.* at 1909-10. Here, where the harm to Mr. Hall would be ultimate and irreparable, the equities favor injunctive relief.

## CONCLUSION

For the foregoing reasons and those set forth in Mr. Hall's petition for writ of habeas corpus and motion for stay of execution, the Court should grant a stay of execution.

Dated:  November 17, 2020

Respectfully submitted,

By:     */s/  Kaitlyn A. Golden*
Kathryn M. Ali (admitted *pro hac vice*)
Kaitlyn A. Golden (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
kathryn.ali@hoganlovells.com
kaitlyn.golden@hoganlovells.com

19

Pieter Van Tol (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

*Counsel for Plaintiff Orlando Hall*