

# UNITED STATES DISTRICT COURT
## Southern District of Indiana

**Roger A. G. Sharpe, Clerk of Court**

| | | | |
|---|---|---|---|
| Birch Bayh Federal Building & U.S. Courthouse, Room 105 46 East Ohio Street Indianapolis, IN 46204 (317) 229-3700 | U.S. Courthouse, Room 104 921 Ohio Street Terre Haute, IN 47807 (812) 231-1840 | Winfield K. Denton Federal Building & U. S. Courthouse, Room 304 101 NW Martin Luther King Blvd. Evansville, IN 47708 (812) 434-6410 | Lee H. Hamilton Federal Building & U.S. Courthouse, Room 210 121 West Spring Street New Albany, IN 47150 (812) 542-4510 |

November 17, 2020

Kaitlyn A. Golden
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004

Jonathan Glen Bradshaw
DEPARTMENT OF JUSTICE
1100 Commerce Street
Suite 300
Dallas, TX 75242

RE:  ORLANDO CORDIA HALL v. T.J. WATSON

CAUSE NO:  2:20-cv-00599-JPH-DLP

Dear Appellant and Appellee:

Please be advised that the Notice of Appeal filed in 2:20-cv-00599-JPH-DLP has been forwarded to the United States Court of Appeals for the Seventh Circuit. The Clerk of the Seventh Circuit will assign an appellate case number, docket the appeal, and notify case participants of the Seventh Circuit case number assigned to this matter.

Please review Seventh Circuit Rule 10 (enclosed) for guidance regarding record preparation.

Please contact the Clerk's office with any questions or concerns.

Sincerely,
Roger A. G. Sharpe
Clerk of Court

By Rebekah Farrington, Deputy Clerk
812-231-1841

# <u>Selected Rules for Reference</u>

**CIRCUIT RULE 10. Preparation and Accessibility of Record in District Court Appeals**

**(a) Record Preparation Duties.**

   **(1) Within 14 days of filing the notice of appeal the district court must ensure the district court docket is complete and made available electronically to the court of appeals.**

   **(2) The clerk of the district court must prepare and hold any confidential record or exhibit not available electronically on the district court docket until requested by the court of appeals.**

   **(3) Counsel must ensure, within 21 days of filing the notice of appeal, that all electronic and non electronic documents necessary for review on appeal are on the district court docket.**

   (b) *Correction or Modification of Record.* A motion to correct or modify the record pursuant to Rule 10(e), Fed. R. App. P., or a motion to strike matter from the record on the ground that it is not properly a part thereof must be presented first to the district court. That court's order ruling on the motion must be included as part of the record and a notice of the order must be sent to the court of appeals.

   (c) *Order or Certification with Regard to Transcript.* Counsel and court reporters are to utilize the form prescribed by this court when ordering transcripts or certifying that none will be ordered. For specific requirements, see Rules 10(b) and 11(b), Fed. R. App. P.

   (d) *Ordering Transcripts in Criminal Cases.*

   (1) *Transcripts in Criminal Justice Act Cases.* At the time of the return of a verdict of guilty or, in the case of a bench trial, an adjudication of guilt in a criminal case in which the defendant is represented by counsel appointed under the Criminal Justice Act (C.J.A.), counsel for the defendant must request a transcript of testimony and other relevant proceedings by completing a C.J.A. Form No. 24 and giving it to the district judge. If the district judge believes an appeal is probable, the judge must order transcribed so much of the proceedings as the judge believes necessary for an appeal. The transcript must be filed with the clerk of the district court within 40 days after the return of a verdict of guilty or, in the case of a bench trial, the adjudication of guilt or within seven days after sentencing, whichever occurs later. If the district judge decides not to order the transcript at that time, the judge must retain the C.J.A. Form No. 24 without ruling. If a notice of appeal is filed later, appointed counsel or counsel for a defendant allowed after trial to proceed on appeal in forma pauperis must immediately notify the district judge of the filing of a notice of appeal and file or renew the request made on C.J.A. Form No. 24 for a free transcript.

   (2) *Transcripts in Other Criminal Cases.* Within 14 days after filing the notice of appeal in other criminal cases, the appellant or appellant's counsel must deposit with the court reporter the estimated cost of the transcript ordered pursuant to Rule 10(b), Fed. R. App. P., unless the district court orders that the transcript be paid for by the United States. A non-indigent appellant must pay a pro rata share of the cost of a transcript prepared at the request of an indigent co-defendant under the Criminal Justice Act unless the district court determines that fairness requires a different division of the cost. Failure to comply with this paragraph will be cause for dismissal of the appeal.

   (e) *Indexing of Transcript.* The transcript of proceedings to be part of the record on appeal (and any copies prepared for the use of the court or counsel in the case on appeal) must be bound by the reporter, with the pages consecutively numbered throughout. The transcript of proceedings must contain a suitable index, as well as the following information:

(1) An alphabetical list of witnesses, giving the pages on which the direct and each other examination of each witness begins.

(2) A list of exhibits by number, with a brief description of each exhibit indicating the nature of its contents, and with a reference to the pages of the transcript where each exhibit has been identified, offered, and received or rejected.

(3) A list of other significant portions of the trial such as opening statements, arguments to the jury, and instructions, with a reference to the page where each begins.

When the record includes transcripts of more than one trial or other distinct proceeding, and it would be cumbersome to apply this paragraph to all the transcripts taken together as one, the rule may be applied separately to each transcript of one trial or other distinct proceeding.

(f) *Presentence Reports.* The presentence report is part of the record on appeal in every criminal case. The district court must maintain this report under seal, unless it has already been placed in the public record in the district court. If the report is under seal, the report may not be included in the appendix to the brief or the separate appendix under Fed. R. App. P. 30 and Circuit Rule 30. Counsel of record may review the presentence report but may not review the probation officer's written comments and any other portion submitted in camera to the trial judge.

(g) *Effect of Omissions from the Record on Appeal.* When a party's argument is countered by a contention of waiver for failure to raise the point in the trial court or before an agency, the party opposing the waiver contention must give the record cite where the point was asserted and also ensure that the record before the court of appeals contains the relevant document or transcript.

NOTE:    The complete Federal Rules of Appellate Procedure & Rules of the 7th Circuit Court of Appeals are available at:  http://www.ca7.uscourts.gov/Rules/Rules/rules.pdf

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| ORLANDO CORDIA HALL, | ) | |
| | ) | |
| | ) | Civil Action No. 2:20-cv-599-JPH-DLP |
| *Petitioner,* | ) | |
| | ) | **DEATH PENALTY CASE** |
| v. | ) | |
| | ) | **EXECUTION SCHEDULED:** |
| T.J. WATSON, in his official | ) | **November 19, 2020** |
| capacity as Complex Warden of U.S.P, | ) | |
| Federal Correctional Complex (FCC) Terre | ) | |
| Haute, | ) | |
| *Respondent.* | | |

**PLAINTIFF ORLANDO HALL'S NOTICE OF APPEAL**

Notice is hereby given this 17th day of November, 2020 that Plaintiff Orlando Hall hereby appeals to the United States Court of Appeals for the Seventh Circuit from the Order of this Court entered on November 17, 2020, see ECF No. 18 (Order) (attached hereto), in which the Court denied Plaintiff's motion for a stay of execution pending resolution of his petition for a writ of habeas corpus under 28 U.S.C. § 2241.

Dated:  November 17, 2020

Respectfully submitted,

By:  */s/  Kaitlyn A. Golden*
Kathryn M. Ali (admitted pro hac vice)
Kaitlyn A. Golden (admitted pro hac vice)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
kathryn.ali@hoganlovells.com
kaitlyn.golden@hoganlovells.com

Pieter Van Tol (admitted pro hac vice)

HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com

*Counsel for Petitioner Orlando Hall*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

ORLANDO CORDIA HALL,                          )
                                              )
                    Petitioner,               )
                                              )
            v.                                )     No. 2:20-cv-00599-JPH-DLP
                                              )
T.J. Watson, in his official capacity as.     )
Complex Warded of U.S.P., Federal             )
Correctional Complex (FCC) Terre Haute        )
                    Respondent.               )

**ORDER DENYING MOTION FOR STAY OF EXECUTION**

Orlando Cordia Hall is a federal prisoner scheduled to be executed on November 19, 2020. In 1995, a federal jury in Texas convicted Mr. Hall of multiple crimes related to the kidnapping and murder of 16-year-old Lisa Rene and sentenced him to death on the charge of kidnapping resulting in death. The district judge imposed the death sentence for that conviction and imposed multiple terms of imprisonment for the other counts of conviction. The convictions and corresponding sentences imposed were upheld on appeal. Mr. Hall filed a petition for postconviction relief under 28 U.S.C. § 2255. In 2004, the district judge in Texas denied Mr. Hall relief, and that ruling was affirmed by the Fifth Circuit. In 2016 and 2020, the Fifth Circuit denied Mr. Hall's requests to file a successive § 2255 motion.

Less than a week ago, this Court denied Mr. Hall's petition for a writ of habeas corpus under 28 U.S.C. § 2241, and Mr. Hall filed a second § 2241 petition. Before the Court is Mr. Hall's motion for a stay of execution pending resolution of his second § 2241 petition. The Court considers several factors

1

when evaluating this motion, and Mr. Hall must make a "strong showing" that (1) that there is a "structural problem" with § 2255 that prevented him from raising the issues that he presents in this case and (2) he would be entitled to relief on the merits if the issues he raises were relitigated. Because Mr. Hall has not demonstrated a strong likelihood that he can make the required showing, and because Mr. Hall has not demonstrated that he diligently pursued his claims, his motion for stay of execution must be denied.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

A full recitation of the facts and procedural background is set forth in *United States v. Hall*, 152 F.3d 381, 389–90 (5th Cir. 1998) ("*Hall I*"), *United States v. Hall*, 455 F.3d 508, 510–13 (5th Cir. 2006) ("*Hall II*"), and *In re: Orlando Cordia Hall*, --- F.3d ----, ----, 2020 WL 6375718, at *1–2 (5th Cir. 2020) ("*Hall III*").

### A. Factual Background

While the details of Mr. Hall's crime are not relevant to the ultimate resolution of his legal claims, a brief summary is appropriate for context. The following facts are summarized from Mr. Hall's direct appeal. *See Hall I*, 152 F.3d at 389–90. Mr. Hall and several confederates ran a marijuana trafficking enterprise in Pine Bluff, Arkansas. On September 21, 1994, they traveled to Dallas, Texas, where they paid two local dealers $4700 to purchase marijuana. After the dealers claimed the $4700 was stolen, Mr. Hall and his confederates began surveilling an apartment where they had seen the dealers and concluded

2

the dealers scammed them. The men broke into the apartment and encountered one dealer's sister, Ms. Rene. They kidnapped Ms. Rene and dragged her to a car, where Mr. Hall raped her. The men drove from Arlington, Texas, to Pine Bluff, Arkansas. In Pine Bluff, they rented a motel room, tied Ms. Rene to a chair, and repeatedly raped her. The next day, they took her to a nearby park where they had dug a grave and beat her over the head with a shovel. One of the men covered Ms. Rene in gasoline, and they then buried her alive.

### B. Procedural Background

Unless otherwise noted, the following procedural history is summarized from the Fifth Circuit's decision denying a certificate of appealability following the denial of Mr. Hall's § 2255 motion. *Hall II*, 455 F.3d at 512–13.

### 1. Indictment, trial and sentencing

On October 26, 1994, Mr. Hall was charged in the United States District Court for the Northern District of Texas, Fort Worth Division, with kidnapping in violation of 18 U.S.C. § 1201 (a)(1). On November 4, 1994, a grand jury returned a six-count superseding indictment charging Mr. Hall with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) and five other offenses. On February 23, 1995, the government filed its notice of intent to seek the death penalty against Mr. Hall.

Mr. Hall's jury trial began on October 2, 1995. He was represented by two attorneys, Jeffrey Kearney and Michael Ware. Assistant United States Attorneys ("AUSAs") Paul Macaluso and Richard Roper represented the government.

Voir dire was conducted from October 2 to October 19. Of the one hundred prospective jurors questioned during voir dire, seven were black. Dkt. 1-9. After strikes for cause, five qualified black prospective jurors remained. The defense struck one black juror due to her strong pro-death-penalty views, and the government peremptorily struck the remaining four, leaving no black jurors. Mr. Hall raised a *Batson* challenge at trial. Dkt. 1-11 at 8−9. The district court overruled Mr. Hall's objections based on the facially neutral reasons stated by the government in support of its strikes. *Id.* at 11–16.

The jury found Mr. Hall guilty of several counts, including kidnapping resulting in death. *Hall I,* 152 F.3d at 390. After a separate penalty phase of the trial, the jury recommended that he be sentenced to death. *Id.* The district court accepted the jury's recommendation and sentenced Mr. Hall to death.

### 2. Direct appeal of conviction and sentence

Mr. Hall challenged his conviction and sentence on direct appeal, raising 11 issues. *Hall I,* 152 F.3d at 390-391. The  Fifth Circuit affirmed the conviction and sentence, *id.* at 427, and the Supreme Court declined review. *Hall v. United States*, 526 U.S. 1117 (1999).

### 3. Post-conviction challenges to conviction and sentence in the court of conviction

In May 2000, Mr. Hall filed a petition for postconviction relief under 28 U.S.C. § 2255 seeking to vacate his conviction and sentence. He later filed an amended § 2255 motion and a second amended § 2255 motion.

4

In the second amended motion, Mr. Hall raised the following issues:

(1) Mr. Hall's rights under the Fifth Amendment were violated because the indictment did not allege any aggravating factors that rendered Mr. Hall eligible for the death penalty;

(2) Mr. Hall was denied his right to the effective assistance of counsel;

(3) a juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated his Fifth, Sixth, and Eighth Amendment rights;

(4) the government failed to disclose exculpatory information concerning one of its witnesses;

(5) Mr. Hall's Fifth, Sixth, and Eighth Amendment rights were violated because of false testimony;

(6) Mr. Hall's Sixth Amendment rights were violated by using a jail inmate to elicit information from him;

(7) Mr. Hall's Fifth, Sixth, and Eighth Amendment rights were violated when the government provided a statement with false information to the defense to dissuade the defense from calling a witness;

(8) the government interfered with Mr. Hall's right to counsel by advising his first defense team about information that Mr. Hall planned to kidnap his attorneys in an escape attempt; and

(9) Mr. Hall's rights under the Fifth and Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme.

5

*Hall v. United States*, No. 4:00-cv-00422-Y, 2004 WL 1908242, at *4 (N.D. Tex. Aug. 24, 2004).

In support of the claim that the federal capital sentence scheme violates the Fifth and Eighth Amendments, Mr. Hall submitted an affidavit from Kevin McNally discussing racial disparities in the application of the death sentence in federal cases. *Hall v. United States*, No. 4:94-cr-00121-Y, dkt. 1071-2 ("McNally Affidavit May 12, 2000"). Mr. McNally noted that he had collected information, including the defendant's race, for "all potential federal death penalty cases" dating back to 1988. *Id.*, ¶¶ 2, 4.

After an evidentiary hearing limited to Ground 3, the district court denied Mr. Hall's § 2255 petition in an 89-page order that addressed each of the claims presented. The Fifth Circuit denied Mr. Hall leave to appeal, *Hall II*, 455 F.3d at 524, and the Supreme Court denied certiorari, *Hall v. United States*, 549 U.S. 1343 (2007).

In 2016 and 2019, Mr. Hall sought authorization from the Fifth Circuit to file successive § 2255 motions challenging the constitutionality of his firearm conviction under 18 U.S.C. § 924(c). In both instances, the Fifth Circuit denied leave to file. *In re Hall*, No. 16-10670 (5th Cir. June 20, 2016); *In re Hall*, --- F.3d ----, ----, 2020 WL 6375718, at *2 (5th Cir. Oct. 30, 2020).

### 4. Post-conviction challenges in this Court

Mr. Hall filed a § 2241 petition in this Court raising the same challenges to his firearms conviction that he raised in the Fifth Circuit. *Hall v. Watson*, No. 2:17-cv-00176-JPH-DLP. On November 14, 2020, the Court dismissed his

6

petition because the Fifth Circuit had ruled on the merits of his challenges to the firearms conviction. *Id.* at dkt. 48.

On November 12, 2020, seven days before the scheduled execution date, Mr. Hall filed another § 2241 petition in this Court raising two constitutional challenges. Dkt. 1. First, he alleges that "race-based peremptory strikes infected [his] trial at every stage." Second, he contends that statistical evidence shows race-based differences in application of the federal death penalty between black and non-black defendants. Along with the § 2241 petition, Mr. Hall filed a motion to stay execution. Dkt. 3. The Court entered a briefing schedule ordering Respondent to file a response by 5:00 p.m. on November 16, 2020, and for Mr. Hall to file any reply by 12:00 p.m. on November 17, 2020.

## II.

## DISCUSSION

A motion for stay of execution requires the Court to consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

### A. Likelihood of Success on the Merits

Because this is a § 2241 petition, Mr. Hall must make a "strong showing" that (1) there is a "structural problem" with § 2255 that prevented him from raising the issues that he presents in this case and (2) he would be entitled to

relief on the merits if the issues he raises were relitigated. *Lee v. Watson*, 2019 WL 6718924, at *1 (7th Cir. Dec. 6, 2019). While these are distinct issues, they are intertwined and analyzed together. The Court first sets forth the applicable Section 2255(e) framework, and then evaluates the merits of Mr. Hall's claims in the context of that framework.

### 1. Section 2255 and the Savings Clause

"As a general rule, a federal prisoner wishing to collaterally attack his conviction or sentence must do so under § 2255." *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019). Congress created within § 2255 a narrow exception to the "general rule" that requires a federal prisoner to bring a collateral attack under § 2255. Section 2255(e), aptly described by the Seventh Circuit as the "savings clause" and the "safety valve," "recognizes a narrow pathway to the general habeas corpus statute, section 2241." *Purkey v. United States*, 964 F.3d 603, 611 (7th Cir. 2020); *see Webster v. Daniels*, 784 F.3d 1123, 1135 (7th Cir. 2015) (en banc).

Under the savings clause, a prisoner can seek a writ of habeas corpus under § 2241 only if the prisoner can show "that the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). Without that showing, a district court cannot reach the merits of the arguments raised in the petition. *Id.* (petition otherwise "shall not be entertained"); *Webster*, 784 F.3d at 1124 (petition "must be dismissed at the threshold" if § 2255(e) is not satisfied).

Section 2255 is inadequate or ineffective as applied to a specific case only where there is "some kind of structural problem with section 2255." *Webster*, 784 F.3d at 1136. A structural problem requires "something more than a lack of success with a section 2255 motion." *Id.* Section 2255 is inadequate or ineffective where the court finds that the federal prisoner did not have "a reasonable opportunity [in a prior § 2255 proceeding] to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Chazen*, 938 F.3d at 856 (alteration in original) (quoting *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)).

Here, Mr. Hall relies on the path described by the Seventh Circuit in *Webster*. Dkt. 1 at 22 ("It is appropriate for this Court to hear this case under § 2241 through the path outlined in *Webster*."). In *Webster*, the Seventh Circuit held for the first and only time that the Savings Clause was met for a constitutional claim. The petitioner in *Webster* sought to challenge his death sentence as barred by *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eighth Amendment forbids the execution of a person with an intellectual disability. Although the petitioner had raised an *Atkins* claim in his § 2255 proceeding, he wished to present "newly discovered evidence" to support that claim in his § 2241 petition. *Webster*, 784 F.3d at 1125.

The Seventh Circuit found that "there is no categorical bar against resort to section 2241 in cases where new evidence would reveal that the Constitution categorically prohibits a certain penalty." *Id.* at 1139. The structural problem identified by the Seventh Circuit was based on at least two concerns. First,

9

§ 2255(h)(1) only allows a second or successive § 2255 motion if newly discovered evidence meets a certain threshold to demonstrate that the petitioner is not guilty of the *offense. Id.* at 1134–35, 1138. It does not allow for such motions if the petitioner presents newly discovered evidence that the petitioner is ineligible to receive his *sentence. Id.* Second, Congress could not have contemplated whether claims of categorical ineligibility for the death penalty should be permitted in second or successive § 2255 motions because the relevant cases— *Atkins* and *Roper v. Simmons*, 543 U.S. 551 (2005)[1]—had not been decided when § 2255 was enacted. *Webster*, 784 F.3d at 1138 ("[T]he fact that the Supreme Court had not yet decided *Atkins* and *Roper* at the time AEDPA was passed supports the conclusion that the narrow set of cases presenting issues of constitutional ineligibility for execution is another lacuna in the statute."); *id.* at 1139 ("In Webster's case, the problem is that the Supreme Court has now established that the Constitution itself forbids the execution of certain people: those who satisfy the criteria for intellectual disability that the Court has established, and those who were below the age of 18 when they committed the crime.").

*Webster* is the first and only time the Seventh Circuit permitted a constitutional claim to proceed through the Savings Clause. Indeed, the court "took great care to assure that its holding was narrow in scope." *Poe v. LaRiva*, 834 F.3d 770, 774 (7th Cir. 2016). It limited its holding to the narrow legal and

---

[1] In *Roper*, the Supreme Court held that "imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed" violates the Eighth and Fourteenth Amendments. 543 U.S. at 578.

factual circumstances presented in the case, stating explicitly that the case "will have a limited effect on future habeas corpus proceedings." *Webster*, 784 F.3d at 1140 n.9; *see Poe*, 834 F.3d at 774 ("[T]here is nothing in *Webster* to suggest that its holding applies outside the context of new evidence.").

Evidence must meet three conditions to be considered "new" within the meaning of *Webster*:

> First, the evidence sought to be presented must have existed at the time of the original proceedings. . . . Second, the evidence must have been unavailable at the time of trial despite diligent efforts to obtain it. Third, and most importantly, the evidence must show that the petitioner is constitutionally ineligible for the penalty he received. Because the Supreme Court has declared only two types of persons (minors and the intellectually disabled) categorically ineligible for a particular type of punishment, our ruling is as a matter of law limited to that set of people—those who assert that they fell into one of these categories at the time of the offense. These three limitations are more than adequate to prevent the dissent's feared flood of section 2241 petitions[.]

*Webster*, 784 F.3d at 1140 n.9.

The Court now evaluates the evidence that Mr. Hall characterizes as "new evidence" in this context.

### 2. Likelihood of Meeting *Webster*'s Test

Mr. Hall has not made a strong showing that either of his claims relies on (1) evidence that existed at the time of his original proceedings but (2) was unavailable to him at those proceedings.

### a.  *Batson* Claim

In support of his *Batson* claim, Mr. Hall points first to *Miller-El v. Dretke*, 545 U.S. 231 (2005) (*"Miller-El II"*), where the Supreme Court discussed a manual

entitled "Jury Selection in a Criminal Case," ("the Sparling Manual"), which was circulated in the Dallas County District Attorney's Office from 1968 to 1976, and explicitly urged prosecutors to exclude minorities from jury service. *Id.* at 264; s*ee also* dkt. 1-6 (Sparling Manual Excerpt). Mr. Hall argues this is material to his *Batson* claim because AUSA Macaluso worked in that office while the Sparling Manual was in use. Mr. Hall claims that at the time of his trial, this "critical evidence was unavailable, secreted away in the Dallas County District Attorney's Office," dkt. 1 at 10, insinuating that the manual's existence only came to light with the issuance of the Supreme Court's decision in *Miller-El II* in 2005. But the Sparling Manual was referenced by the Supreme Court in a February 2003 opinion involving the same litigants involved in *Miller-El II, see Miller-El v. Cockrell,* 537 U.S. 332, 334–35 (2003) ("*Miller-El I*"), and Mr. Hall's § 2255 petition was not ruled on until August 2004.[2] In fact, the Supreme Court cited the Sparling Manual excerpt referenced in *Miller-El II* while Mr. Hall's § 2255 petition was pending.

Mr. Hall also alleges that the judicial findings that AUSA Macaluso violated *Batson* in *Miller-El II* and *Reed v. Quarterman,* 555 F. 3d 364 (5th Cir. 2009), constitute new evidence because *Miller-El II* tied AUSA Macaluso to the Sparling Manual by name and both decisions demonstrated a pattern of his racist jury-selection practices. Dkt. 1 at 35 (citing *Flowers,* 139 S. Ct. at 2245). While the

---

[2] Indeed, the Sparling Manual and the controversy surrounding it has been a matter of public record since 1986, when it was discussed in a *Dallas Morning News* story about the Dallas County Office's practice of excluding black jurors. *See* Associated Press, *Racial Bias Pervades Jury Selection* (Mar. 9, 1986), *available at* https://apnews.com/article/15a4d9c91869b22db37feb26ba874718.

12

2005 *Miller-El II* opinion was the first Supreme Court opinion to reference AUSA Macaluso by name, AUSA Macaluso's employment history as a prosecutor in the Dallas County District Attorney's Office was a matter of public record easily discoverable by defense counsel well before 2005. And more specific to the precise claim presented by Mr. Hall, a 2002 article cited by Mr. Hall shows that AUSA Macaluso's ties to the Sparling Manual were also known while Mr. Hall's § 2255 petition was pending before the district judge in Texas. *See* Associated Press*, Race Is Key in Death Penalty Appeal* (Feb. 15, 2002), *available at* https://www.mrt.com/news/article/Race-Is-Key-in-Death-Penalty-Appeal-7756301.php; Sara Rimer, *In Dallas, Dismissal of Black Jurors Leads to Appeal by Death Row Inmate*, N.Y. Times, Feb. 13, 2002, *available at* https://www.nytimes.com/2002/02/13/us/in-dallas-dismissal-of-black-jurors-leads-to-appeal-by-death-row-inmate.html (discussing Macaluso's role in Miller-El's case).

News articles, court opinions, and underlying briefs are all matters of public record, discoverable through searches on the Internet and legal databases. Thus, Mr. Hall's situation is not comparable to Mr. Webster's, where defense counsel sought the relevant Social Security records but was told they did not exist when in fact they did. Nor is it comparable to that of the petitioner in *Foster v. Chatman*, where an open records request resulted in the accidental release of incriminating prosecution notes that revealed the prosecutor's discriminatory intent in striking black jurors. 136 S. Ct. 1737, 1744 (2016).

The other evidence in support of Mr. Hall's *Batson* claim also was available before he filed his § 2255 motion. This includes:

- The 1990 census data that shows only 10.41% of the population in the Fort Worth Division where Mr. Hall was tried was black, compared with 35.85% of the population in the Pine Bluff Division in the Eastern District of Arkansas, where Mr. Hall also could have been tried, dkt. 1-8 at 2;

- AUSA Roper's representation to the trial court that the government had challenged all four of the black jurors it peremptorily struck for cause, when, in fact, only two had been challenged for cause, dkt. 1-12;

- AUSA Roper's stated reasons for dismissing Juror Amy Evans, which were inconsistent with Ms. Evans's answers during voir dire and in her questionnaire, dkts. 1-11, 1-13, 1-14; and

- Side-by-side comparisons of the questioning of dismissed black jurors with seated white jurors, dkts. 1-11, 1-14, 1-20–1-33.

In short, the facts underlying Mr. Hall's *Batson* claims were available through diligent search during Mr. Hall's § 2255 proceedings. *Webster*, 784 F.3d at 1146 (To determine whether relevant evidence was previously unavailable, "the district court must also evaluate [prior] counsel's diligence."). Mr. Hall's current *Batson* claim does not involve evidence that is "newly discovered" but new lawyers looking at the same evidence that has been available to Mr. Hall for many years. And "nothing formally prevented him" from raising the claims

14

earlier. Mr. Hall raised a multitude of issues on direct appeal and in his § 2255 petition, but the denial of his *Batson* challenge at trial was not among them. Mr. Hall therefore has not demonstrated a strong likelihood that he can show § 2255 was "structurally unavailable." *Purkey*, 964 F.3d at 615.

### b. Discriminatory Application of the Death Penalty

Mr. Hall argues that, as administered by the government, the federal death penalty is racially discriminatory and that this violates the Constitution. Dkt. 1 at 45, 50, 52. He asserts that data shows that federal capital cases are impermissibly influenced by race. *Id.* In support of this claim, Mr. Hall points to statistics maintained by the Kevin McNally of the Federal Death Penalty Resource Counsel Project, which he alleges demonstrate that "the authorization process by which the DOJ selects which defendants will face the death penalty . . . [is] impermissibly influenced by race." *Id.*

These statistics cited by Mr. Hall show that the death penalty is authorized by the DOJ 1.8 times as often against black defendants as compared to white defendants. Dkt. 1 at 46. With these statistics as the backdrop, Mr. Hall asserts that he was sentenced to death in federal court in Texas, "a state with a long and shameful history of racially discriminatory use of the death penalty." *Id.*

Mr. Hall points to a 2011 study by sociologist Scott Phillips, Ph.D., who was hired by another death row inmate to "conduct a statistical analysis regarding the possible effect of race on the federal death penalty in Texas." Dkt. 1 at 48; *see* dkt. 1-7 (Phillips Declaration Mar. 29, 2011). This study examined "all potential death penalty cases filed in the four federal judicial districts in Texas"

15

from 1988 to 2010. *Id.* The study revealed that during the relevant period, a death verdict was about sixteen times more likely to be returned for a black defendant. Dkt. 1 at 49. In the Northern District of Texas (where Mr. Hall was prosecuted), the disparities were "technically speaking, slightly greater" than those in other federal districts in Texas. Dkt. 1 at 49-50. According to Mr. Hall, this study was not available to him until it was discussed in an August 2020 report by the Inter-American Commission on Human Rights. *Id.* at 48.

Recognizing that "a racially disproportionate pattern of criminal charging, standing alone, is insufficient to demonstrate purposeful racial discrimination," dkt. 1 at 56, Mr. Hall asserts that his statistical evidence is buttressed here by "case-specific evidence of personal racial animus on the part of the prosecution team." *Id.*

The evidence in support of Mr. Hall's discriminatory application claim runs afoul of *Webster*'s first requirement: "the evidence sought to be presented must have existed at the time of the original proceedings." 784 F.3d at 1140 n.9. Without this requirement, "there would never be any finality" where a petitioner raises a claim, such as discriminatory application of the death sentence, for which new evidence is regularly created. *Id.* at 1140; *cf. Purkey*, 964 F.3d at 615 (holding that petitioner could not satisfy savings clause, in part, because his argument would open the door to "a never-ending series of reviews and re-reviews"). Mr. Hall therefore cannot rely on the study to satisfy § 2255(e) under *Webster*.

16

To the extent Mr. Hall relies on the underlying data Dr. Phillips used, particularly data that existed before Mr. Hall's § 2255 proceedings concluded, he fails to satisfy *Webster*'s second requirement: "the evidence must have been unavailable at the time of [the original proceedings] despite diligent efforts to obtain it." 784 F.3d at 1140 n.9. Dr. Phillips relied on data compiled and maintained by Kevin McNally "on the cases of all criminal defendants in Texas who were eligible for a federal death sentence from the reinstatement of the federal death penalty in 1988 through 2010." Dkt. 1-7 at 3 (Phillips Affidavit Mar. 29, 2011). Mr. Hall had access to Mr. McNally's data at the time of his § 2255 proceedings.[3] Indeed, he relied on it in support of the discriminatory application claim he raised in those proceedings. *See United States v. Hall*, No. 4:94-cr-00121-Y, dkt. 1071-2 at 124–32 (McNally Affidavit May 12, 2000). Because Mr. Hall had this data and relied upon it in his § 2255 proceedings, it was not previously unavailable as required by *Webster*.

Mr. Hall has not made a strong showing that his discriminatory application claim relies upon any evidence that existed but was unavailable at the time of trial or his initial § 2255 proceedings. Therefore, he has not made a strong showing that he can satisfy § 2255(e) as to this claim.

Last, Mr. Hall cannot satisfy the third *Webster* factor because he is not categorically ineligible for the death penalty. The Supreme Court has declared

---

[3] To be sure, some of Mr. McNally's 2010 data did not yet exist at the time of Mr. Hall's § 2255 proceedings. Mr. Hall cannot rely on this data for the same reason he cannot rely on the Phillips study: because "the evidence sought to be presented must have existed at the time of the original proceedings." *Webster*, 784 F.3d at 1140 n.9.

only two types of persons (minors and the intellectually disabled) categorically ineligible to be executed. *Webster*, 784 F.3d at 1140 n.9. Persons in those categories cannot be executed—ever. Here, even if Mr. Hall were to prevail on the merits of his claims, he would still be eligible for the death penalty.

### 3. Additional § 2255(e) arguments

Mr. Hall further argues that § 2255 was ineffective or inadequate due to lack of funding in his initial § 2255 litigation and the slim hopes for bringing a successful *Batson* challenge in the Fifth Circuit before *Miller-El II, see* dkt. 15 at 5–6, but he has not made a strong showing that he is likely to succeed on the merits of these arguments.

The bounds of the savings clause are not "rigidly defined" by *Webster* and the other cases where the Seventh Circuit has found that the savings clause is satisfied. *Purkey*, 964 F.3d at 611. But to move beyond those cases, a petitioner must make "a compelling showing that, as a practical matter, it would [have been] impossible to use section 2255 to cure a fundamental problem." *Id.* at 615.

Mr. Hall identifies and explains many of the limitations that his counsel faced at trial, on appeal, and in litigating his initial § 2255 motion. These limitations, while real, did not make it practically impossible for Mr. Hall to litigate his *Batson* and discriminatory application claims. Instead, they forced counsel to make difficult strategic decisions about how to litigate in an uncertain legal environment with limited resources, including choosing which claims to bring and which claims to forego.

Allowing Mr. Hall's claims to be brought now in this § 2241 proceeding would be contrary to the framework Congress created for federal prisoners seeking postconviction relief. Congress amended § 2255 in 1996 as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA") to limit federal prisoners to one § 2255 motion unless they receive authorization from the Court of Appeals to file a second or successive § 2255 motion. 28 U.S.C. § 2255(h). This limitation was designed to curtail the problem of "repetitive filings" from federal prisoners challenging their convictions. *Garza v. Lappin*, 253 F.3d 918, 922 (7th Cir. 2001).

Congress chose to "steer[] almost all [federal] prisoner challenges to their convictions and sentences toward § 2255." *Shepherd v. Krueger*, 911 F.3d 861, 862 (7th Cir. 2018). It did so by requiring § 2255 motions to be filed in the district of conviction, *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014), and limiting federal prisoners' access to § 2241 by way of the Savings Clause. *See Davenport*, 147 F.3d at 609 ("The purpose behind the enactment of section 2255 was to change the venue of postconviction proceedings brought by federal prisoners from the district of incarceration to the district in which the prisoner had been sentenced." (citing *United States v. Hayman*, 342 U.S. 205, 212–19 (1952)). Section 2255 "not only relieved the district courts where the major federal prisons were located from a heavy load of petitions for collateral relief; it also enhanced the efficiency of the system by assigning these cases to the judges who were familiar with the records." *Webster*, 784 F.3d at 1145.

The savings clause "must be applied in light of [§ 2255's] history." *Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002); *see Unthank v. Jett*, 549 F.3d 534, 535

19

(7th Cir. 2008) (same). It cannot be interpreted so expansively that it undermines "the careful structure Congress has created." *Garza*, 253 F.3d at 921; *see Chazen*, 938 F.3d at 865 (Barrett, J., concurring) (expressing "skeptic[ism]" of an argument that, if accepted, "risks recreating some of the problems that § 2255 was designed to fix"). To allow Mr. Hall to now raise these claims in a § 2241 petition would undermine the structure of § 2255. "If error in the resolution of a collateral attack were enough to show that § 2255 is inadequate or ineffective, many of the amendments made in 1996 would be set at naught." *Taylor*, 314 F.3d at 836.

### B. Other *Nken* factors

Mr. Hall argues that the other factors also weigh in favor of a stay. First, he will be irreparably harmed without a stay because he faces death. Dkt. 3-1 at 21. Second, he argues that a brief delay to allow him to litigate him claims will not result in substantial harm to the government. Dkt. 3-1 at 22. Finally, Mr. Hall argues that the public interest is served by a stay because when racial discrimination impacts criminal sanctions it "poisons public confidence in the judicial process." Dkt. 3-1 at 7. (quoting *Buck v. Davis*, 137 S. Ct. 759, 778 (2017)).

The government argues that the harm to Mr. Hall is outweighed by the interest of the government and the public in timely enforcement of criminal judgments, including the death sentence. Dkt. 12 at 44. Moreover, the government accuses Mr. Hall of "sitting on his claims until the eve of his

scheduled execution" and argues that Mr. Hall should not benefit from this practice. *Id.*

There is no doubt that Mr. Hall faces irreparable harm if a stay is denied, and that the issues he raises are extremely serious. Mr. Hall's delay in bringing his claims, though, weighs heavily against granting a stay. *See Lee v. Watson,* 2019 WL 6718924, at *2 (7th Cir. Dec. 6, 2019) ("The grant of a stay entails equitable as well as legal considerations. . . . [S]omeone who waits years before seeking a writ of habeas corpus cannot, by the very act of delay, justify postponement of the execution."). The balance of interests weighs against staying Mr. Hall's execution.

## III.

## CONCLUSION

Mr. Hall's motion for stay of execution, dkt. [3], is **DENIED**. The motion for oral argument, dkt. [4], is **DENIED** as moot.

**SO ORDERED.**

Date: 11/17/2020

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

21

Distribution:

Kaitlyn A. Golden
HOGAN LOVELLS US LLP
kaitlyn.golden@hoganlovells.com

Jonathan Glen Bradshaw
DEPARTMENT OF JUSTICE
jonathan.bradshaw@usdoj.gov

Timothy Wayne Funnell
UNITED STATES ATTORNEY'S OFFICE
tim.funnell@usdoj.gov

James Robert Wood
UNITED STATES ATTORNEY'S OFFICE
bob.wood@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

|  |  |
|---|---|
| ORLANDO CORDIA HALL,<br><br>*Petitioner*,<br><br>v.<br><br>T.J. WATSON, in his official<br>capacity as Complex Warden of U.S.P,<br>Federal Correctional Complex (FCC) Terre<br>Haute,<br>*Respondent*. | Civil Action No. 2:20-cv-599-JPH-DLP<br><br>**DEATH PENALTY CASE**<br><br>**EXECUTION SCHEDULED:**<br>**November 19, 2020** |

## DOCKETING STATEMENT

Pursuant to Rules 3(c)(1) and 28(a) of the Circuit Rules for the United States Court of Appeals for the Seventh Circuit, Petitioner-Appellant Orlando Cordia hereby submits his Docketing Statement:

**I.    Jurisdictional Statement**

The United States District Court for the Southern District of Indiana had jurisdiction over this matter under 28 U.S.C. § 2241. This Court has jurisdiction under 28 U.S.C. § 1291. The date of entry of the judgment sought to be reviewed is November 17, 2020. The notice of appeal was filed November 17, 2020.

**II.    Prior or Related Appeals**

The following prior or related appellate proceedings are listed as follows: 1) *United States v. Orlando Cordia Hall*, 152 F.3d 381 (5th Cir. 1998), *cert. denied* 526 U.S. 1117 (1999) (direct appeal); 2) *United States v. Hall*, 455 F.3d 508 (5th Cir. 2006), *cert. denied* 549 U.S. 1343 (2007) (denying appeal from denial of § 2255 motion); 3) *In re Orlando*

*Hall*, No. 16-10670, Doc. 00513555153 (5th Cir. June 21, 2016); 4) *In re: Hall*, ---F.3d--, No. 19-10345, 2020 WL 6375718 (5th Cir. Oct. 30, 2020).(denial of second successor habeas petition); 5) *In Re: Federal Bureau of Prisons' Execution Protocol Cases, Roane, et al., v. Barr, et al.*, No. 20-5329 (D.C. Cir., pending) (challenging vacatur of injunction relating to federal lethal injection protocol; 6) *Hall v. Watson*, No. 20-3216 (7th Cir.. pending) (appeal of § 2241 petition); 7) *Hall v. Barr,* No. 20-5340 (D.C. Cir., pending) (challenging notice and access to clemency proceedings).

## III.    Custodial Information

Mr. Hall is currently confined at the United States Penitentiary, Terre Haute. The current warden at USP-Terre Haute is T. J. Watson.

Dated:  November 17, 2020

Respectfully submitted,

By:    */s/  Kaitlyn A. Golden*
       Kathryn M. Ali (admitted pro hac vice)
       Kaitlyn A. Golden (admitted pro hac vice)
       HOGAN LOVELLS US LLP
       555 Thirteenth Street, N.W.
       Washington, D.C. 20004
       Telephone: (202) 637-5600
       Facsimile: (202) 637-5910
       kathryn.ali@hoganlovells.com
       kaitlyn.golden@hoganlovells.com

       Pieter Van Tol (admitted pro hac vice)
       HOGAN LOVELLS US LLP
       390 Madison Avenue
       New York, NY 10017
       (212) 918-3000
       (212) 918-3100 (fax)
       pieter.vantol@hoganlovells.com

       *Counsel for Petitioner Orlando Hall*

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

ORLANDO CORDIA HALL,                        )
                                            )
                  Petitioner,               )
                                            )
         v.                                 )      No. 2:20-cv-00599-JPH-DLP
                                            )
T.J. Watson, in his official capacity as.   )
Complex Warded of U.S.P., Federal           )
Correctional Complex (FCC) Terre Haute      )
                  Respondent.               )

**ORDER DENYING MOTION FOR STAY OF EXECUTION**

Orlando Cordia Hall is a federal prisoner scheduled to be executed on November 19, 2020. In 1995, a federal jury in Texas convicted Mr. Hall of multiple crimes related to the kidnapping and murder of 16-year-old Lisa Rene and sentenced him to death on the charge of kidnapping resulting in death. The district judge imposed the death sentence for that conviction and imposed multiple terms of imprisonment for the other counts of conviction. The convictions and corresponding sentences imposed were upheld on appeal. Mr. Hall filed a petition for postconviction relief under 28 U.S.C. § 2255. In 2004, the district judge in Texas denied Mr. Hall relief, and that ruling was affirmed by the Fifth Circuit. In 2016 and 2020, the Fifth Circuit denied Mr. Hall's requests to file a successive § 2255 motion.

Less than a week ago, this Court denied Mr. Hall's petition for a writ of habeas corpus under 28 U.S.C. § 2241, and Mr. Hall filed a second § 2241 petition. Before the Court is Mr. Hall's motion for a stay of execution pending resolution of his second § 2241 petition. The Court considers several factors

1

when evaluating this motion, and Mr. Hall must make a "strong showing" that (1) that there is a "structural problem" with § 2255 that prevented him from raising the issues that he presents in this case and (2) he would be entitled to relief on the merits if the issues he raises were relitigated. Because Mr. Hall has not demonstrated a strong likelihood that he can make the required showing, and because Mr. Hall has not demonstrated that he diligently pursued his claims, his motion for stay of execution must be denied.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

A full recitation of the facts and procedural background is set forth in *United States v. Hall*, 152 F.3d 381, 389–90 (5th Cir. 1998) ("*Hall I*"), *United States v. Hall*, 455 F.3d 508, 510–13 (5th Cir. 2006) ("*Hall II*"), and *In re: Orlando Cordia Hall*, --- F.3d ----, ----, 2020 WL 6375718, at *1–2 (5th Cir. 2020) ("*Hall III*").

### A. Factual Background

While the details of Mr. Hall's crime are not relevant to the ultimate resolution of his legal claims, a brief summary is appropriate for context. The following facts are summarized from Mr. Hall's direct appeal. *See Hall I*, 152 F.3d at 389–90. Mr. Hall and several confederates ran a marijuana trafficking enterprise in Pine Bluff, Arkansas. On September 21, 1994, they traveled to Dallas, Texas, where they paid two local dealers $4700 to purchase marijuana. After the dealers claimed the $4700 was stolen, Mr. Hall and his confederates began surveilling an apartment where they had seen the dealers and concluded

the dealers scammed them. The men broke into the apartment and encountered one dealer's sister, Ms. Rene. They kidnapped Ms. Rene and dragged her to a car, where Mr. Hall raped her. The men drove from Arlington, Texas, to Pine Bluff, Arkansas. In Pine Bluff, they rented a motel room, tied Ms. Rene to a chair, and repeatedly raped her. The next day, they took her to a nearby park where they had dug a grave and beat her over the head with a shovel. One of the men covered Ms. Rene in gasoline, and they then buried her alive.

### B. Procedural Background

Unless otherwise noted, the following procedural history is summarized from the Fifth Circuit's decision denying a certificate of appealability following the denial of Mr. Hall's § 2255 motion. *Hall II*, 455 F.3d at 512–13.

### 1. Indictment, trial and sentencing

On October 26, 1994, Mr. Hall was charged in the United States District Court for the Northern District of Texas, Fort Worth Division, with kidnapping in violation of 18 U.S.C. § 1201 (a)(1). On November 4, 1994, a grand jury returned a six-count superseding indictment charging Mr. Hall with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) and five other offenses. On February 23, 1995, the government filed its notice of intent to seek the death penalty against Mr. Hall.

Mr. Hall's jury trial began on October 2, 1995. He was represented by two attorneys, Jeffrey Kearney and Michael Ware. Assistant United States Attorneys ("AUSAs") Paul Macaluso and Richard Roper represented the government.

3

Voir dire was conducted from October 2 to October 19. Of the one hundred prospective jurors questioned during voir dire, seven were black. Dkt. 1-9. After strikes for cause, five qualified black prospective jurors remained. The defense struck one black juror due to her strong pro-death-penalty views, and the government peremptorily struck the remaining four, leaving no black jurors. Mr. Hall raised a *Batson* challenge at trial. Dkt. 1-11 at 8–9. The district court overruled Mr. Hall's objections based on the facially neutral reasons stated by the government in support of its strikes. *Id.* at 11–16.

The jury found Mr. Hall guilty of several counts, including kidnapping resulting in death. *Hall I,* 152 F.3d at 390. After a separate penalty phase of the trial, the jury recommended that he be sentenced to death. *Id.* The district court accepted the jury's recommendation and sentenced Mr. Hall to death.

### 2. Direct appeal of conviction and sentence

Mr. Hall challenged his conviction and sentence on direct appeal, raising 11 issues. *Hall I,* 152 F.3d at 390-391. The  Fifth Circuit affirmed the conviction and sentence, *id.* at 427, and the Supreme Court declined review. *Hall v. United States,* 526 U.S. 1117 (1999).

### 3. Post-conviction challenges to conviction and sentence in the court of conviction

In May 2000, Mr. Hall filed a petition for postconviction relief under 28 U.S.C. § 2255 seeking to vacate his conviction and sentence. He later filed an amended § 2255 motion and a second amended § 2255 motion.

In the second amended motion, Mr. Hall raised the following issues:

(1) Mr. Hall's rights under the Fifth Amendment were violated because the indictment did not allege any aggravating factors that rendered Mr. Hall eligible for the death penalty;

(2) Mr. Hall was denied his right to the effective assistance of counsel;

(3) a juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated his Fifth, Sixth, and Eighth Amendment rights;

(4) the government failed to disclose exculpatory information concerning one of its witnesses;

(5) Mr. Hall's Fifth, Sixth, and Eighth Amendment rights were violated because of false testimony;

(6) Mr. Hall's Sixth Amendment rights were violated by using a jail inmate to elicit information from him;

(7) Mr. Hall's Fifth, Sixth, and Eighth Amendment rights were violated when the government provided a statement with false information to the defense to dissuade the defense from calling a witness;

(8) the government interfered with Mr. Hall's right to counsel by advising his first defense team about information that Mr. Hall planned to kidnap his attorneys in an escape attempt; and

(9) Mr. Hall's rights under the Fifth and Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme.

*Hall v. United States*, No. 4:00-cv-00422-Y, 2004 WL 1908242, at *4 (N.D. Tex. Aug. 24, 2004).

In support of the claim that the federal capital sentence scheme violates the Fifth and Eighth Amendments, Mr. Hall submitted an affidavit from Kevin McNally discussing racial disparities in the application of the death sentence in federal cases. *Hall v. United States*, No. 4:94-cr-00121-Y, dkt. 1071-2 ("McNally Affidavit May 12, 2000"). Mr. McNally noted that he had collected information, including the defendant's race, for "all potential federal death penalty cases" dating back to 1988. *Id.*, ¶¶ 2, 4.

After an evidentiary hearing limited to Ground 3, the district court denied Mr. Hall's § 2255 petition in an 89-page order that addressed each of the claims presented. The Fifth Circuit denied Mr. Hall leave to appeal, *Hall II*, 455 F.3d at 524, and the Supreme Court denied certiorari, *Hall v. United States*, 549 U.S. 1343 (2007).

In 2016 and 2019, Mr. Hall sought authorization from the Fifth Circuit to file successive § 2255 motions challenging the constitutionality of his firearm conviction under 18 U.S.C. § 924(c). In both instances, the Fifth Circuit denied leave to file. *In re Hall*, No. 16-10670 (5th Cir. June 20, 2016); *In re Hall*, --- F.3d ----, ----, 2020 WL 6375718, at *2 (5th Cir. Oct. 30, 2020).

**4. Post-conviction challenges in this Court**

Mr. Hall filed a § 2241 petition in this Court raising the same challenges to his firearms conviction that he raised in the Fifth Circuit. *Hall v. Watson*, No. 2:17-cv-00176-JPH-DLP. On November 14, 2020, the Court dismissed his

6

petition because the Fifth Circuit had ruled on the merits of his challenges to the firearms conviction. *Id.* at dkt. 48.

On November 12, 2020, seven days before the scheduled execution date, Mr. Hall filed another § 2241 petition in this Court raising two constitutional challenges. Dkt. 1. First, he alleges that "race-based peremptory strikes infected [his] trial at every stage." Second, he contends that statistical evidence shows race-based differences in application of the federal death penalty between black and non-black defendants. Along with the § 2241 petition, Mr. Hall filed a motion to stay execution. Dkt. 3. The Court entered a briefing schedule ordering Respondent to file a response by 5:00 p.m. on November 16, 2020, and for Mr. Hall to file any reply by 12:00 p.m. on November 17, 2020.

## II.

## DISCUSSION

A motion for stay of execution requires the Court to consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

### A. Likelihood of Success on the Merits

Because this is a § 2241 petition, Mr. Hall must make a "strong showing" that (1) there is a "structural problem" with § 2255 that prevented him from raising the issues that he presents in this case and (2) he would be entitled to

7

relief on the merits if the issues he raises were relitigated. *Lee v. Watson*, 2019 WL 6718924, at *1 (7th Cir. Dec. 6, 2019). While these are distinct issues, they are intertwined and analyzed together. The Court first sets forth the applicable Section 2255(e) framework, and then evaluates the merits of Mr. Hall's claims in the context of that framework.

### 1. Section 2255 and the Savings Clause

"As a general rule, a federal prisoner wishing to collaterally attack his conviction or sentence must do so under § 2255." *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019). Congress created within § 2255 a narrow exception to the "general rule" that requires a federal prisoner to bring a collateral attack under § 2255. Section 2255(e), aptly described by the Seventh Circuit as the "savings clause" and the "safety valve," "recognizes a narrow pathway to the general habeas corpus statute, section 2241." *Purkey v. United States*, 964 F.3d 603, 611 (7th Cir. 2020); *see Webster v. Daniels*, 784 F.3d 1123, 1135 (7th Cir. 2015) (en banc).

Under the savings clause, a prisoner can seek a writ of habeas corpus under § 2241 only if the prisoner can show "that the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). Without that showing, a district court cannot reach the merits of the arguments raised in the petition. *Id.* (petition otherwise "shall not be entertained"); *Webster*, 784 F.3d at 1124 (petition "must be dismissed at the threshold" if § 2255(e) is not satisfied).

8

Section 2255 is inadequate or ineffective as applied to a specific case only where there is "some kind of structural problem with section 2255." *Webster*, 784 F.3d at 1136. A structural problem requires "something more than a lack of success with a section 2255 motion." *Id.* Section 2255 is inadequate or ineffective where the court finds that the federal prisoner did not have "a reasonable opportunity [in a prior § 2255 proceeding] to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Chazen*, 938 F.3d at 856 (alteration in original) (quoting *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)).

Here, Mr. Hall relies on the path described by the Seventh Circuit in *Webster*. Dkt. 1 at 22 ("It is appropriate for this Court to hear this case under § 2241 through the path outlined in *Webster*."). In *Webster*, the Seventh Circuit held for the first and only time that the Savings Clause was met for a constitutional claim. The petitioner in *Webster* sought to challenge his death sentence as barred by *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eighth Amendment forbids the execution of a person with an intellectual disability. Although the petitioner had raised an *Atkins* claim in his § 2255 proceeding, he wished to present "newly discovered evidence" to support that claim in his § 2241 petition. *Webster*, 784 F.3d at 1125.

The Seventh Circuit found that "there is no categorical bar against resort to section 2241 in cases where new evidence would reveal that the Constitution categorically prohibits a certain penalty." *Id.* at 1139. The structural problem identified by the Seventh Circuit was based on at least two concerns. First,

9

§ 2255(h)(1) only allows a second or successive § 2255 motion if newly discovered evidence meets a certain threshold to demonstrate that the petitioner is not guilty of the *offense. Id.* at 1134–35, 1138. It does not allow for such motions if the petitioner presents newly discovered evidence that the petitioner is ineligible to receive his *sentence. Id.* Second, Congress could not have contemplated whether claims of categorical ineligibility for the death penalty should be permitted in second or successive § 2255 motions because the relevant cases— *Atkins* and *Roper v. Simmons*, 543 U.S. 551 (2005)[1]—had not been decided when § 2255 was enacted. *Webster*, 784 F.3d at 1138 ("[T]he fact that the Supreme Court had not yet decided *Atkins* and *Roper* at the time AEDPA was passed supports the conclusion that the narrow set of cases presenting issues of constitutional ineligibility for execution is another lacuna in the statute."); *id.* at 1139 ("In Webster's case, the problem is that the Supreme Court has now established that the Constitution itself forbids the execution of certain people: those who satisfy the criteria for intellectual disability that the Court has established, and those who were below the age of 18 when they committed the crime.").

*Webster* is the first and only time the Seventh Circuit permitted a constitutional claim to proceed through the Savings Clause. Indeed, the court "took great care to assure that its holding was narrow in scope." *Poe v. LaRiva*, 834 F.3d 770, 774 (7th Cir. 2016). It limited its holding to the narrow legal and

---

[1] In *Roper*, the Supreme Court held that "imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed" violates the Eighth and Fourteenth Amendments. 543 U.S. at 578.

factual circumstances presented in the case, stating explicitly that the case "will have a limited effect on future habeas corpus proceedings." *Webster*, 784 F.3d at 1140 n.9; *see Poe*, 834 F.3d at 774 ("[T]here is nothing in *Webster* to suggest that its holding applies outside the context of new evidence.").

Evidence must meet three conditions to be considered "new" within the meaning of *Webster*:

> First, the evidence sought to be presented must have existed at the time of the original proceedings. . . . Second, the evidence must have been unavailable at the time of trial despite diligent efforts to obtain it. Third, and most importantly, the evidence must show that the petitioner is constitutionally ineligible for the penalty he received. Because the Supreme Court has declared only two types of persons (minors and the intellectually disabled) categorically ineligible for a particular type of punishment, our ruling is as a matter of law limited to that set of people—those who assert that they fell into one of these categories at the time of the offense. These three limitations are more than adequate to prevent the dissent's feared flood of section 2241 petitions[.]

*Webster*, 784 F.3d at 1140 n.9.

The Court now evaluates the evidence that Mr. Hall characterizes as "new evidence" in this context.

### 2. Likelihood of Meeting *Webster*'s Test

Mr. Hall has not made a strong showing that either of his claims relies on (1) evidence that existed at the time of his original proceedings but (2) was unavailable to him at those proceedings.

### a. *Batson* Claim

In support of his *Batson* claim, Mr. Hall points first to *Miller-El v. Dretke*, 545 U.S. 231 (2005) (*"Miller-El II"*), where the Supreme Court discussed a manual

11

entitled "Jury Selection in a Criminal Case," ("the Sparling Manual"), which was circulated in the Dallas County District Attorney's Office from 1968 to 1976, and explicitly urged prosecutors to exclude minorities from jury service. *Id.* at 264; s*ee also* dkt. 1-6 (Sparling Manual Excerpt). Mr. Hall argues this is material to his *Batson* claim because AUSA Macaluso worked in that office while the Sparling Manual was in use. Mr. Hall claims that at the time of his trial, this "critical evidence was unavailable, secreted away in the Dallas County District Attorney's Office," dkt. 1 at 10, insinuating that the manual's existence only came to light with the issuance of the Supreme Court's decision in *Miller-El II* in 2005. But the Sparling Manual was referenced by the Supreme Court in a February 2003 opinion involving the same litigants involved in *Miller-El II*, *see Miller-El v. Cockrell*, 537 U.S. 332, 334–35 (2003) ("*Miller-El I*"), and Mr. Hall's § 2255 petition was not ruled on until August 2004.[2] In fact, the Supreme Court cited the Sparling Manual excerpt referenced in *Miller-El II* while Mr. Hall's § 2255 petition was pending.

Mr. Hall also alleges that the judicial findings that AUSA Macaluso violated *Batson* in *Miller-El II* and *Reed v. Quarterman*, 555 F. 3d 364 (5th Cir. 2009), constitute new evidence because *Miller-El II* tied AUSA Macaluso to the Sparling Manual by name and both decisions demonstrated a pattern of his racist jury-selection practices. Dkt. 1 at 35 (citing *Flowers*, 139 S. Ct. at 2245). While the

---

[2] Indeed, the Sparling Manual and the controversy surrounding it has been a matter of public record since 1986, when it was discussed in a *Dallas Morning News* story about the Dallas County Office's practice of excluding black jurors. *See* Associated Press, *Racial Bias Pervades Jury Selection* (Mar. 9, 1986), *available at* https://apnews.com/article/15a4d9c91869b22db37feb26ba874718.

2005 *Miller-El II* opinion was the first Supreme Court opinion to reference AUSA Macaluso by name, AUSA Macaluso's employment history as a prosecutor in the Dallas County District Attorney's Office was a matter of public record easily discoverable by defense counsel well before 2005. And more specific to the precise claim presented by Mr. Hall, a 2002 article cited by Mr. Hall shows that AUSA Macaluso's ties to the Sparling Manual were also known while Mr. Hall's § 2255 petition was pending before the district judge in Texas. *See* Associated Press, *Race Is Key in Death Penalty Appeal* (Feb. 15, 2002), *available at* https://www.mrt.com/news/article/Race-Is-Key-in-Death-Penalty-Appeal-7756301.php; Sara Rimer, *In Dallas, Dismissal of Black Jurors Leads to Appeal by Death Row Inmate*, N.Y. Times, Feb. 13, 2002, *available at* https://www.nytimes.com/2002/02/13/us/in-dallas-dismissal-of-black-jurors-leads-to-appeal-by-death-row-inmate.html (discussing Macaluso's role in Miller-El's case).

News articles, court opinions, and underlying briefs are all matters of public record, discoverable through searches on the Internet and legal databases. Thus, Mr. Hall's situation is not comparable to Mr. Webster's, where defense counsel sought the relevant Social Security records but was told they did not exist when in fact they did. Nor is it comparable to that of the petitioner in *Foster v. Chatman*, where an open records request resulted in the accidental release of incriminating prosecution notes that revealed the prosecutor's discriminatory intent in striking black jurors. 136 S. Ct. 1737, 1744 (2016).

13

The other evidence in support of Mr. Hall's *Batson* claim also was available before he filed his § 2255 motion. This includes:

- The 1990 census data that shows only 10.41% of the population in the Fort Worth Division where Mr. Hall was tried was black, compared with 35.85% of the population in the Pine Bluff Division in the Eastern District of Arkansas, where Mr. Hall also could have been tried, dkt. 1-8 at 2;

- AUSA Roper's representation to the trial court that the government had challenged all four of the black jurors it peremptorily struck for cause, when, in fact, only two had been challenged for cause, dkt. 1-12;

- AUSA Roper's stated reasons for dismissing Juror Amy Evans, which were inconsistent with Ms. Evans's answers during voir dire and in her questionnaire, dkts. 1-11, 1-13, 1-14; and

- Side-by-side comparisons of the questioning of dismissed black jurors with seated white jurors, dkts. 1-11, 1-14, 1-20–1-33.

In short, the facts underlying Mr. Hall's *Batson* claims were available through diligent search during Mr. Hall's § 2255 proceedings. *Webster*, 784 F.3d at 1146 (To determine whether relevant evidence was previously unavailable, "the district court must also evaluate [prior] counsel's diligence."). Mr. Hall's current *Batson* claim does not involve evidence that is "newly discovered" but new lawyers looking at the same evidence that has been available to Mr. Hall for many years. And "nothing formally prevented him" from raising the claims

14

earlier. Mr. Hall raised a multitude of issues on direct appeal and in his § 2255 petition, but the denial of his *Batson* challenge at trial was not among them. Mr. Hall therefore has not demonstrated a strong likelihood that he can show § 2255 was "structurally unavailable." *Purkey*, 964 F.3d at 615.

### b. Discriminatory Application of the Death Penalty

Mr. Hall argues that, as administered by the government, the federal death penalty is racially discriminatory and that this violates the Constitution. Dkt. 1 at 45, 50, 52. He asserts that data shows that federal capital cases are impermissibly influenced by race. *Id.* In support of this claim, Mr. Hall points to statistics maintained by the Kevin McNally of the Federal Death Penalty Resource Counsel Project, which he alleges demonstrate that "the authorization process by which the DOJ selects which defendants will face the death penalty . . . [is] impermissibly influenced by race." *Id.*

These statistics cited by Mr. Hall show that the death penalty is authorized by the DOJ 1.8 times as often against black defendants as compared to white defendants. Dkt. 1 at 46. With these statistics as the backdrop, Mr. Hall asserts that he was sentenced to death in federal court in Texas, "a state with a long and shameful history of racially discriminatory use of the death penalty." *Id.*

Mr. Hall points to a 2011 study by sociologist Scott Phillips, Ph.D., who was hired by another death row inmate to "conduct a statistical analysis regarding the possible effect of race on the federal death penalty in Texas." Dkt. 1 at 48; *see* dkt. 1-7 (Phillips Declaration Mar. 29, 2011). This study examined "all potential death penalty cases filed in the four federal judicial districts in Texas"

15

from 1988 to 2010. *Id.* The study revealed that during the relevant period, a death verdict was about sixteen times more likely to be returned for a black defendant. Dkt. 1 at 49. In the Northern District of Texas (where Mr. Hall was prosecuted), the disparities were "technically speaking, slightly greater" than those in other federal districts in Texas. Dkt. 1 at 49-50. According to Mr. Hall, this study was not available to him until it was discussed in an August 2020 report by the Inter-American Commission on Human Rights. *Id.* at 48.

Recognizing that "a racially disproportionate pattern of criminal charging, standing alone, is insufficient to demonstrate purposeful racial discrimination," dkt. 1 at 56, Mr. Hall asserts that his statistical evidence is buttressed here by "case-specific evidence of personal racial animus on the part of the prosecution team." *Id.*

The evidence in support of Mr. Hall's discriminatory application claim runs afoul of *Webster*'s first requirement: "the evidence sought to be presented must have existed at the time of the original proceedings." 784 F.3d at 1140 n.9. Without this requirement, "there would never be any finality" where a petitioner raises a claim, such as discriminatory application of the death sentence, for which new evidence is regularly created. *Id.* at 1140; *cf. Purkey*, 964 F.3d at 615 (holding that petitioner could not satisfy savings clause, in part, because his argument would open the door to "a never-ending series of reviews and re-reviews"). Mr. Hall therefore cannot rely on the study to satisfy § 2255(e) under *Webster*.

16

To the extent Mr. Hall relies on the underlying data Dr. Phillips used, particularly data that existed before Mr. Hall's § 2255 proceedings concluded, he fails to satisfy *Webster*'s second requirement: "the evidence must have been unavailable at the time of [the original proceedings] despite diligent efforts to obtain it." 784 F.3d at 1140 n.9. Dr. Phillips relied on data compiled and maintained by Kevin McNally "on the cases of all criminal defendants in Texas who were eligible for a federal death sentence from the reinstatement of the federal death penalty in 1988 through 2010." Dkt. 1-7 at 3 (Phillips Affidavit Mar. 29, 2011). Mr. Hall had access to Mr. McNally's data at the time of his § 2255 proceedings.[3] Indeed, he relied on it in support of the discriminatory application claim he raised in those proceedings. *See United States v. Hall*, No. 4:94-cr-00121-Y, dkt. 1071-2 at 124–32 (McNally Affidavit May 12, 2000). Because Mr. Hall had this data and relied upon it in his § 2255 proceedings, it was not previously unavailable as required by *Webster*.

Mr. Hall has not made a strong showing that his discriminatory application claim relies upon any evidence that existed but was unavailable at the time of trial or his initial § 2255 proceedings. Therefore, he has not made a strong showing that he can satisfy § 2255(e) as to this claim.

Last, Mr. Hall cannot satisfy the third *Webster* factor because he is not categorically ineligible for the death penalty. The Supreme Court has declared

---

[3] To be sure, some of Mr. McNally's 2010 data did not yet exist at the time of Mr. Hall's § 2255 proceedings. Mr. Hall cannot rely on this data for the same reason he cannot rely on the Phillips study: because "the evidence sought to be presented must have existed at the time of the original proceedings." *Webster*, 784 F.3d at 1140 n.9.

only two types of persons (minors and the intellectually disabled) categorically ineligible to be executed. *Webster*, 784 F.3d at 1140 n.9. Persons in those categories cannot be executed—ever. Here, even if Mr. Hall were to prevail on the merits of his claims, he would still be eligible for the death penalty.

### 3. Additional § 2255(e) arguments

Mr. Hall further argues that § 2255 was ineffective or inadequate due to lack of funding in his initial § 2255 litigation and the slim hopes for bringing a successful *Batson* challenge in the Fifth Circuit before *Miller-El II, see* dkt. 15 at 5–6, but he has not made a strong showing that he is likely to succeed on the merits of these arguments.

The bounds of the savings clause are not "rigidly defined" by *Webster* and the other cases where the Seventh Circuit has found that the savings clause is satisfied. *Purkey*, 964 F.3d at 611. But to move beyond those cases, a petitioner must make "a compelling showing that, as a practical matter, it would [have been] impossible to use section 2255 to cure a fundamental problem." *Id.* at 615.

Mr. Hall identifies and explains many of the limitations that his counsel faced at trial, on appeal, and in litigating his initial § 2255 motion. These limitations, while real, did not make it practically impossible for Mr. Hall to litigate his *Batson* and discriminatory application claims. Instead, they forced counsel to make difficult strategic decisions about how to litigate in an uncertain legal environment with limited resources, including choosing which claims to bring and which claims to forego.

18

Allowing Mr. Hall's claims to be brought now in this § 2241 proceeding would be contrary to the framework Congress created for federal prisoners seeking postconviction relief. Congress amended § 2255 in 1996 as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA") to limit federal prisoners to one § 2255 motion unless they receive authorization from the Court of Appeals to file a second or successive § 2255 motion. 28 U.S.C. § 2255(h). This limitation was designed to curtail the problem of "repetitive filings" from federal prisoners challenging their convictions. *Garza v. Lappin*, 253 F.3d 918, 922 (7th Cir. 2001).

Congress chose to "steer[] almost all [federal] prisoner challenges to their convictions and sentences toward § 2255." *Shepherd v. Krueger*, 911 F.3d 861, 862 (7th Cir. 2018). It did so by requiring § 2255 motions to be filed in the district of conviction, *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014), and limiting federal prisoners' access to § 2241 by way of the Savings Clause. *See Davenport*, 147 F.3d at 609 ("The purpose behind the enactment of section 2255 was to change the venue of postconviction proceedings brought by federal prisoners from the district of incarceration to the district in which the prisoner had been sentenced." (citing *United States v. Hayman*, 342 U.S. 205, 212–19 (1952)). Section 2255 "not only relieved the district courts where the major federal prisons were located from a heavy load of petitions for collateral relief; it also enhanced the efficiency of the system by assigning these cases to the judges who were familiar with the records." *Webster*, 784 F.3d at 1145.

The savings clause "must be applied in light of [§ 2255's] history." *Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002); *see Unthank v. Jett*, 549 F.3d 534, 535

19

(7th Cir. 2008) (same). It cannot be interpreted so expansively that it undermines "the careful structure Congress has created." *Garza*, 253 F.3d at 921; *see Chazen*, 938 F.3d at 865 (Barrett, J., concurring) (expressing "skeptic[ism]" of an argument that, if accepted, "risks recreating some of the problems that § 2255 was designed to fix"). To allow Mr. Hall to now raise these claims in a § 2241 petition would undermine the structure of § 2255. "If error in the resolution of a collateral attack were enough to show that § 2255 is inadequate or ineffective, many of the amendments made in 1996 would be set at naught." *Taylor*, 314 F.3d at 836.

### B. Other *Nken* factors

Mr. Hall argues that the other factors also weigh in favor of a stay. First, he will be irreparably harmed without a stay because he faces death. Dkt. 3-1 at 21. Second, he argues that a brief delay to allow him to litigate him claims will not result in substantial harm to the government. Dkt. 3-1 at 22. Finally, Mr. Hall argues that the public interest is served by a stay because when racial discrimination impacts criminal sanctions it "poisons public confidence in the judicial process." Dkt. 3-1 at 7. (quoting *Buck v. Davis*, 137 S. Ct. 759, 778 (2017)).

The government argues that the harm to Mr. Hall is outweighed by the interest of the government and the public in timely enforcement of criminal judgments, including the death sentence. Dkt. 12 at 44. Moreover, the government accuses Mr. Hall of "sitting on his claims until the eve of his

20

scheduled execution" and argues that Mr. Hall should not benefit from this practice. *Id.*

There is no doubt that Mr. Hall faces irreparable harm if a stay is denied, and that the issues he raises are extremely serious. Mr. Hall's delay in bringing his claims, though, weighs heavily against granting a stay. *See Lee v. Watson*, 2019 WL 6718924, at *2 (7th Cir. Dec. 6, 2019) ("The grant of a stay entails equitable as well as legal considerations. . . . [S]omeone who waits years before seeking a writ of habeas corpus cannot, by the very act of delay, justify postponement of the execution."). The balance of interests weighs against staying Mr. Hall's execution.

### III.

### CONCLUSION

Mr. Hall's motion for stay of execution, dkt. [3], is **DENIED**. The motion for oral argument, dkt. [4], is **DENIED** as moot.

**SO ORDERED.**

Date: 11/17/2020

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

21

Distribution:

Kaitlyn A. Golden
HOGAN LOVELLS US LLP
kaitlyn.golden@hoganlovells.com

Jonathan Glen Bradshaw
DEPARTMENT OF JUSTICE
jonathan.bradshaw@usdoj.gov

Timothy Wayne Funnell
UNITED STATES ATTORNEY'S OFFICE
tim.funnell@usdoj.gov

James Robert Wood
UNITED STATES ATTORNEY'S OFFICE
bob.wood@usdoj.gov

# *** PUBLIC DOCKET ***

APPEAL,HABEAS

## U.S. District Court
## Southern District of Indiana (Terre Haute)
## CIVIL DOCKET FOR CASE #: 2:20-cv-00599-JPH-DLP

HALL v. WATSON

Assigned to: Judge James Patrick Hanlon

Referred to: Magistrate Judge Doris L. Pryor

Cause: 28:2241 Petition for Writ of Habeas Corpus (federal)

Date Filed: 11/12/2020

Jury Demand: None

Nature of Suit: 535 Death Penalty - Habeas Corpus

Jurisdiction: U.S. Government Defendant

**Petitioner**

**ORLANDO CORDIA HALL**                represented by     **Kaitlyn A. Golden**
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5864
Fax: (202) 637-5910
Email:
kaitlyn.golden@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn M. Ali**
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600
Fax: 202-637-5910
Email: kathryn.ali@hoganlovells.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pieter Van Tol**
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
212-918-3000
Fax: 212-918-3100
Email: pieter.vantol@hoganlovells.com

*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**T.J. WATSON**                     represented by    **Brian W. McKay**
*In his official capacity as Complex*               UNITED STATES ATTORNEY'S
*Warden of U.S.P, Federal Correctional*             OFFICE
*Complex (FCC) Terre Haute*                         1100 Commerce Street, Third Floor
                                                    Dallas, TX 75242
                                                    214-659-8756
                                                    Fax: 214-659-8761
                                                    Email: brian.mckay@usdoj.gov
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Jonathan Glen Bradshaw**
                                                    DEPARTMENT OF JUSTICE
                                                    1100 Commerce Street
                                                    Suite 300
                                                    Dallas, TX 75242
                                                    214-659-8835
                                                    Email: jonathan.bradshaw@usdoj.gov
                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/12/2020 | 1 | PETITION for Writ of Habeas Corpus *Pursuant to 28 U.S.C. § 2241*, filed by ORLANDO CORDIA HALL. (Filing fee $5, receipt number 0756-6273346) (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit Index of Exhibits, # 3 Exhibit 1 - Indictment, # 4 Exhibit 2 - Verdict, Guilt, # 5 Exhibit 3 - Verdict, Penalty, # 6 Exhibit 4 - Sparling Manual Excerpt, # 7 Exhibit 5 - Declaration of Scott Phillips, # 8 Exhibit 6 - Census Statistic for Additional Observations on the Merits, # 9 Exhibit 7 - Prospective Juror Questionnaire Cover Pages, # 10 Exhibit 8 - Trial Tr. Vol. 13, # 11 Exhibit 9 - Trial Tr. Vol. 12 (Batson Hearing Transcript), # 12 Exhibit 10 - Trial Tr. Vol. 9, # 13 Exhibit 11 - Trial Tr. Vol. 10, # 14 Exhibit 12 - Juror Questionnaire of Evans, # 15 Exhibit 13 - Government's Strike List for Preemptory Challenges, # 16 Exhibit 14 - Trial Tr. Vol. 2, # 17 Exhibit 15 - Trial Tr. Vol. 3, # 18 Exhibit 16 - Trial Tr. Vol. 4, # 19 Exhibit 17 - Trial Tr. Vol. 5, # 20 Exhibit 18 - Trial Tr. Vol. 7, # 21 Exhibit 19 - Trial Tr. Vol. 11, # 22 Exhibit 20 - Trial Tr. Vol. 6, # 23 Exhibit 21 - Juror Questionnaire of Herring, # 24 Exhibit 22 - Juror Questionnaire of Harrell, # 25 Exhibit 23 - Trial Tr. Vol. 8, # 26 Exhibit 24 - Juror Questionnaire of Donaldson, # 27 Exhibit 25 - Juror Questionnaire of Davis, # 28 Exhibit 26 - Juror Questionnaire of Cox, # 29 Exhibit 27 - Juror Questionnaire of Lee, # 30 Exhibit 28 - Juror Questionnaire of Boggess, # 31 Exhibit 29 - Juror Questionnaire of Perry, # 32 Exhibit 30 - Juror Questionnaire of Crittendon, # 33 Exhibit 31 - Trial Tr. Vol. 1, # 34 Exhibit 32 - Declaration of Kevin |

| | | |
|---|---|---|
| | | McNally, # 35 Exhibit 33 - Hall's Motion to Dismiss, in Case No. 4:94-121-Y, # 36 Exhibit 34 - Gov't's Resp. to Hall's Motion to Dismiss, in Case No. 4:94-121-Y, # 37 Exhibit 35 - Order Denying Motion to Dismiss, in Case No. 4:94-121-Y)(Golden, Kaitlyn) (Entered: 11/12/2020) |
| 11/12/2020 | 2 | MOTION for Attorney(s) Kaitlyn A. Golden to Appear pro hac vice (Filing fee $100, receipt number 0756-6273354), filed by Petitioner ORLANDO CORDIA HALL. (Attachments: # 1 Text of Proposed Order)(Golden, Kaitlyn) (Entered: 11/12/2020) |
| 11/12/2020 | 3 | MOTION to Stay *Execution*, filed by Petitioner ORLANDO CORDIA HALL. (Attachments: # 1 Petitioner Orlando Hall's Memorandum of Law in Support of his Motion for a Stay of Execution)(Golden, Kaitlyn) (Entered: 11/12/2020) |
| 11/12/2020 | 4 | MOTION *Petitioner Orlando Hall's Motion for Oral Argument*, filed by Petitioner ORLANDO CORDIA HALL. (Golden, Kaitlyn) (Entered: 11/12/2020) |
| 11/13/2020 | 5 | NOTICE of Reassignment of Case to Magistrate Judge Doris L. Pryor. Magistrate Judge Mark J. Dinsmore is no longer assigned to this case. Please include the new case number, **2:20-cv-00599-JPH-DLP**, on all future filings in this matter. (RSF) (Entered: 11/13/2020) |
| 11/13/2020 | 6 | ORDER SETTING BRIEFING SCHEDULE ON MOTION FOR STAY OF EXECUTION - Orlando Cordia Hall, a federal inmate, is scheduled for execution on November 19, 2020. On November 12, 2020, he filed a petition for a writ of habeas corpus and a motion for stay of execution. The respondent shall have until 5:00 p.m. on Monday, November 16, 2020, to file a response, and Mr. Hall shall have until noon Tuesday, November 17, 2020, to file a reply. Email to counsel per distribution list. Signed by Judge James Patrick Hanlon on 11/13/2020.(RSF) (Entered: 11/13/2020) |
| 11/13/2020 | 7 | MOTION for Attorney(s) Kathryn M. Ali to Appear pro hac vice (Filing fee $100, receipt number 0756-6274824), filed by Petitioner ORLANDO CORDIA HALL. (Attachments: # 1 Exhibit A - Certification of Kathryn M. Ali in Support of Motion to Appear Pro Hac Vice, # 2 Text of Proposed Order) (Golden, Kaitlyn) (Entered: 11/13/2020) |
| 11/13/2020 | 8 | MOTION for Attorney(s) Pieter Van Tol to Appear pro hac vice (Filing fee $100, receipt number 0756-6274838), filed by Petitioner ORLANDO CORDIA HALL. (Attachments: # 1 Exhibit A - Certification of Pieter Van Tol in Support of Motion to Appear Pro Hac Vice, # 2 Text of Proposed Order)(Golden, Kaitlyn) (Entered: 11/13/2020) |
| 11/13/2020 | 9 | ORDER - This matter has come before the Court on motion of Kaitlyn A. Golden seeking an order granting leave to appear pro hac vice for the purpose of appearing as counsel on behalf of the Plaintiff, Orlando Cordia Hall, in the above-styled cause only, Dkt. 2 . Being fully advised, the Motion is hereby GRANTED. Signed by Magistrate Judge Doris L. Pryor on 11/13/2020. (KAA) (Entered: 11/13/2020) |
| | | |

| | | |
|---|---|---|
| 11/13/2020 | 10 | ORDER granting 7 Motion to Appear pro hac vice. Attorney Kathryn M. Ali for ORLANDO CORDIA HALL added. Applicant shall register for electronic filing, as required by Local Rule 5-3, within ten (10) days of the entry of this Order. Copy to Ms. Ali via US Mail. Signed by Magistrate Judge Doris L. Pryor on 11/13/2020. (KAA) (Entered: 11/13/2020) |
| 11/13/2020 | 11 | ORDER granting 8 Motion to Appear pro hac vice. Attorney Pieter Van Tol for ORLANDO CORDIA HALL added. Applicant shall register for electronic filing, as required by Local Rule 5-3, within ten (10) days of the entry of this Order. Copy to Mr. Van Tol via US Mail. Signed by Magistrate Judge Doris L. Pryor on 11/13/2020. (KAA) (Entered: 11/13/2020) |
| 11/16/2020 | 12 | RESPONSE in Opposition re 3 MOTION to Stay *Execution* , filed by Respondent T.J. WATSON. (Bradshaw, Jonathan) (Entered: 11/16/2020) |
| 11/16/2020 | 13 | Appendix of Exhibits in Support of Response in Opposition to Motion re 3 MOTION to Stay *Execution* , filed by Respondent T.J. WATSON. (Bradshaw, Jonathan) (Entered: 11/16/2020) |
| 11/16/2020 | 14 | NOTICE of Appearance by Jonathan Glen Bradshaw on behalf of Respondent T.J. WATSON. (Bradshaw, Jonathan) (Entered: 11/16/2020) |
| 11/17/2020 | 15 | REPLY in Support of Motion re 3 MOTION to Stay *Execution* , filed by Petitioner ORLANDO CORDIA HALL. (Attachments: # 1 Exhibit 1 - Declaration of Robert C. Owen, # 2 Exhibit 2 - Declaration of Marcy Widder) (Golden, Kaitlyn) (Entered: 11/17/2020) |
| 11/17/2020 | 16 | NOTICE *of Corrected Filing*, filed by Petitioner ORLANDO CORDIA HALL, re 15 Reply in Support of Motion. (Attachments: # 1 Petitioner Orlando Hall's Corrected Reply Memorandum in Support of Petition and Motion for a Stay of Execution) (Golden, Kaitlyn) (Entered: 11/17/2020) |
| 11/17/2020 | 17 | NOTICE of Appearance by Brian W. McKay on behalf of Respondent T.J. WATSON. (McKay, Brian) (Entered: 11/17/2020) |
| 11/17/2020 | 18 | ORDER DENYING MOTION FOR STAY OF EXECUTION - Less than a week ago, this Court denied Mr. Hall's petition for a writ of habeas corpus under 28 U.S.C. § 2241, and Mr. Hall filed a second § 2241 petition. Before the Court is Mr. Hall's motion for a stay of execution pending resolution of his second § 2241 petition. Mr. Hall's motion for stay of execution, dkt. 3 , is DENIED. The motion for oral argument, dkt. 4 , is DENIED as moot. (See Order.) Signed by Judge James Patrick Hanlon on 11/17/2020. (RSF) (Entered: 11/17/2020) |
| 11/17/2020 | 19 | NOTICE OF APPEAL as to 18 Order on Motion to Stay, filed by Petitioner ORLANDO CORDIA HALL. (Filing fee $505, receipt number 0756-6280380) (Attachments: # 1 November 17, 2020 Order Denying Motion for Stay of Execution)(Golden, Kaitlyn) (Entered: 11/17/2020) |
| 11/17/2020 | 20 | DOCKETING STATEMENT by ORLANDO CORDIA HALL re 19 Notice of Appeal (Golden, Kaitlyn) (Entered: 11/17/2020) |

**Case #: 2:20-cv-00599-JPH-DLP**